**2014-1611, 2016-1065, -2150, -2212**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

---

IN RE UNIFIED MESSAGING SOLUTIONS LLC and
ADVANCED MESSAGING TECHNOLOGIES, INC. PATENT LITIGATION

---

UNIFIED MESSAGING SOLUTIONS LLC,
ADVANCED MESSAGING TECHNOLOGIES, INC.,

*Plaintiffs-Appellants,*

*v.*

GOOGLE, INC., SHAWGUIDES INC., U.S. BANCORP, U.S. BANK NATIONAL
ASSOCIATION, SCOTTRADE, INC., ORBITZ, INC., MULTIPLY, INC.,

*Defendants,*

CAPTION CONTINUED INSIDE

---

*Appeals from the United States District Court for the Northern District of
Illinois in Nos. 1:12-cv-01488, 1:12-cv-01490, 1:12-cv-01492, 1:12-cv-03875,
1:12-cv-04413, 1:12-cv-06286, 1:12-cv-06291, 1:12-cv-06292, 1:12-cv-06293,
1:12-cv-06636, 1:12-cv-06637, 1:13-cv-00267, 1:13-cv-00269, 1:13-cv-00270,
1:13-cv-00271, 1:13-cv-00272, 1:13-cv-00273, 1:13-cv-00274, 1:13-cv-00276,
1:13-cv-00277, 1:13-cv-00278, 1:13-cv-00324, 1:13-cv-00327, 1:13-cv-00333,
1:13-cv00337, 1:13-cv-00338, 1:13-cv-00339, 1:13-cv-00340, 1:13-cv-00343,
1:13-cv0344, 1:13-cv-02999, 1:13-cv-03001, 1:13-cv-03002, 1:13-cv-03007,
1:13-cv-03008, 1:13-cv-05595, 4:12-cv-00371, 6:12-cv-00290, and MDL No.
2371, Judge Joan H. Lefkow.*

---

**BRIEF OF PLAINTIFFS-APPELLANTS
UNIFIED MESSAGING SOLUTIONS LLC AND ADVANCED
MESSAGING TECHNOLOGIES, INC.**

---

Ed Nelson III
Thomas Cecil
NELSON BUMGARDNER PC
3131 West 7th Street, Suite 300
Fort Worth, Texas 76107
P. 817-377-9111

*Attorneys for Plaintiffs-Appellants
Unified Messaging Solutions LLC and Advanced Messaging Technologies, Inc.*

COUNSEL CONTINUED INSIDE

(CAPTION CONTINUED)

AMERICAN AIRLINES, INC., BMO HARRIS BANK N.A.,
FIFTH THIRD BANCORP, SANTANDER HOLDINGS USA, INC.,
BANCORPSOUTH, INC., CUPID, PLC,

*Defendants-Appellees,*

SOUTHWEST AIRLINES CO., GROUPON, INC., UNITED AIR LINES, INC.,
EARTHLINK, LLC, GENERAL ELECTRIC CAPITAL SERVICES, INC., THE
NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, STATE STREET
CORPORATION, GOVERNMENT EMPLOYEES INSURANCE COMPANY,
GEICO ADVANTAGE INSURANCE COMPANY, BB&T CORPORATION,
BRANCH BANKING AND TRUST COMPANY, COXCOM, LLC, FIDELITY
NATIONAL INFORMATION SERVICES, INC., METAVANTE CORPORATION,
FISERV, INC., FRIENDFINDER NETWORKS INC., VARIOUS, INC.,
SUNTRUST BANKS, INC., SUNTRUST BANK, JUNO ONLINE SERVICES,
INC., NETZERO, INC., CLASSMATES, BOKF, N.A., BANCO POPULAR NORTH
AMERICA, HUMANA, INC., CONN'S INC., CONN APPLIANCES, INC.,
EVERBANK, COMPASS BANK, UNITED SERVICE AUTOMOBILE
ASSOCIATION, PEOPLE'S UNITED BANK, NATIONAL ASSOCIATION,
SPORTSVITE, LLC, HSBC NORTH AMERICA HOLDINGS, INC., HSBC USA,
INC., HSBC BANK USA, N.A., SPRINT NEXTEL CORPORATION, TWITTER,
INC., YAHOO! INC., SANTANDER BANK, N.A.,

*Defendants-Cross-Appellants.*

---

(COUNSEL CONTINUED)

Timothy E. Grochocinski
Joseph P. Oldaker
NELSON BUMGARDNER PC
15020 S. Ravinia Avenue, Suite 29
Orland Park, Illinois 60462
P. 708-675-1975

Robert P. Greenspoon
Flaschbart & Greenspoon, LLC
333 N. Michigan Avenue
27th Floor
Chicago, Illinois 60601
P. 312-551-9500

*Attorneys for Plaintiffs-Appellants*
*Unified Messaging Solutions LLC and Advanced Messaging Technologies, Inc.*

September 22, 2016

## CERTIFICATE OF INTEREST

Counsel for Plaintiffs-Appellants Unified Messaging Solutions LLC and Advanced Messaging Technologies, Inc. certifies the following:

1.     The full name of every party represented by me is: Unified Messaging Solutions LLC and Advanced Messaging Technologies, Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: N/A.

3.     All parent corporations and any publicly-held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: Unified Messaging Solutions LLC is a Texas limited liability company whose sole member is Acacia Research Group LLC, which is a wholly owned subsidiary of Acacia Research Corporation.  Acacia Research Corporation is a publicly-held corporation.

Advanced Messaging Technologies, Inc. is a wholly owned subsidiary of j2 Global, Inc.  j2 Global, Inc. is a publicly-held corporation.  Prior to August 2016, Advanced Messaging Technologies, Inc. was a wholly owned subsidiary of j2 Cloud Services, LLC, which was, and remains, a wholly owned subsidiary of j2 Global, Inc.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the district court or agency or are expected to appear in this Court are:

**Nelson Bumgardner PC:** Timothy E. Grochocinski, Ed Nelson III, Thomas Cecil, and Joseph P. Oldaker.

**Flaschbart & Greenspoon, LLC:** Robert P. Greenspoon.

**The Simon Law Firm, P.C.:** Anthony G. Simon, Michael P. Kella, and Stephanie H. To.

**DiNovo Price Ellwanger & Hardy LLP:** Jay D. Ellwanger.

**Berend & Lindsey PLLC:** Christie Lindsey.

**Ward & Smith Law Firm:** Thomas John Ward, Jr. and Jack Wesley Hill.

**Albritton Law Firm:** Eric M. Albritton.

Aaron W. Purser (formerly with **InnovaLaw, P.C.**)

DATED: September 22, 2016        By: /s/ Timothy E. Grochocinski
Timothy E. Grochocinski
Joseph P. Oldaker
NELSON BUMGARDNER PC
15020 S. Ravinia Ave., Suite 20
Orland Park, Illinois 60462
P. 708-675-1974
F. 708-675-1786

Ed Nelson III
Thomas Cecil
NELSON BUMGARDNER PC
3131 West 7th Street, Suite 300
Fort Worth, Texas 76107
P. 817-377-9111

Robert P. Greenspoon
FLASCHBART & GREENSPOON, LLC
333 N. Michigan Ave., 27th Floor
Chicago, Illinois 60601
P. 312-551-9500

*Attorneys for Plaintiffs-Appellants*
*Unified Messaging Solutions LLC and*
*Advanced Messaging Technologies, Inc.*

# **TABLE OF CONTENTS**

CERTIFICATE OF INTEREST ………...……………………………… i

TABLE OF AUTHORITIES ……………………………………………… vii

INTRODUCTORY STATEMENT ………………………………………... 1

STATEMENT OF RELATED CASES ……………………………………… 2

APPELLATE JURISDICTIONAL STATEMENT ………………………... 2

STATEMENT OF THE ISSUES ………………………………………... 3

STATEMENT OF THE CASE …………………………...………………... 4

I.      THE `074, `141, `306, `313, and `148 PATENTS …………………... 5

SUMMARY OF ARGUMENT …………………………...………………. 6

ARGUMENT …………………………………………………………… 9

I.      STANDARD OF REVIEW ………………………………………… 9

II.     THE DISTRICT COURT ERRED IN ITS CONSTRUCTION OF
        THE TERM "MESSAGE(S)" …………………………………… 10

        A.      The District Court's Construction of "message(s)"
                Improperly Limits the Scope of "message(s)" to those
                "received over a telephone line" …………………………….. 12

                i.      This Court's Recent Decision in *Unwired Planet, LLC
                        v. Apple, Inc.* is Directly on Point ……………………… 12

                ii.     The District Court's Construction Violates the Claim
                        Construction Canon of Claim Differentiation …………. 14

                iii.    Defendants' Present Invention Argument Is Unavailing  16

                iv.     The District Court's Construction Is Inconsistent With

the Plain Language of the Claims ……………………… 19

    v.    The District Court's Construction Is Inconsistent With the Prior Claim Construction Issued by the United States District Court for the Central District of California …………………………………………… 20

B.    The District Court's Construction of "message(s)" Improperly Excludes Email Messages from the Scope of the Term …………………………………………………. 21

    i.    The District Court's Email Exclusion Is Directly Contradicted by the Intrinsic Evidence ……………….. 22

        a.    The District Court's Email Exclusion Is Inconsistent With the Specification, Including the Plain Language of the Claims …………………………… 22

        b.    The District Court's Email Exclusion Is Inconsistent With the Prosecution History ……………………… 25

    ii.    The District Court's Email Exclusion Is Inconsistent With the Plain and Ordinary Meaning of the Term "data message" ……………………………………………….. 27

    iii.    The District Court's Construction Is a Negative Construction, Which is Disfavored ……………………. 29

C.    The District Court's Construction of "message(s)" Improperly Limits the Scope of the Term to Only Those in an "audio, facsimile, or data file format" ……………………….. 29

D.    The Term "message(s)" Should be Accorded its Plain and Ordinary Meaning ……………………………………… 31

III.    THE DISTRICT COURT ERRED IN ITS CONSTRUCTION OF THE TERM "DATA MEDIA TYPE" ……………………………… 33

IV.    THE DISTRICT COURT ERRED IN ITS CONSTRUCTION OF THE TERM "USER-SPECIFIC MESSAGE STORAGE AREA" … 35

V.     THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT
       AWARDED PREVAILING PARTY FEES TO PARTIES WHO
       ACTUALLY LOST MOTIONS FOR DISMISSAL AND
       SANCTIONS FOUNDED ON ALLEGED PATENT OWNERSHIP
       DEFECTS …………………………………………………...     40

       A.     Procedural History Relevant to the Exceptional Case Finding,
              Including Denial of Exceptional Case Findings Based on
              Claim Construction Merits …………………………………..     41

       B.     The Exceptional Case Finding ……………………………….     45

       C.     The District Court Abused its Discretion to Award Fees …….     47

CONCLUSION AND RELIEF SOUGHT …….…………………………...     56

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Abbott Laboratories v. Andrx Pharma., Inc.,*
    473 F.3d 1196 (Fed. Cir. 2007) ………………………………..    30-31

*Absolute Software, Inc. v. Stealth Signal, Inc.,*
    659 F.3d 1121 (Fed. Cir. 2011) ………………………………..    16-17

*Accent Packaging, Inc. v. Leggett & Platt, Inc.,*
    707 F.3d 1318 (Fed. Cir. 2013) ………………………………..    24

*Altiris, Inc. v. Symantec Corp.,*
    318 F.3d 1363 (Fed. Cir. 2003) ………………………………..    9

*Embrex, Inc. v. Serv. Eng'g Corp.,*
    216 F.3d 1343 (Fed. Cir. 2000) ………………………………..    34-35

*Hendler v. U.S.,*
    952 F.2d 1364 (Fed. Cir. 1991) ………………………………..    35

*Highmark, Inc. v. Allcare Health Mgt. System, Inc.,*
    134 S.Ct. 1744 (2014) ………………………………………    10

*Hill-Rom Services, Inc. v. Stryker Corp.,*
    755 F.3d 1367 (Fed. Cir. 2014) ………………………………..    32

*Honeywell Int'l, Inc. v. ITT Indus., Inc.,*
    452 F.3d 1312 (Fed. Cir. 2006) ………………………………..    17

*Innogenetics, N.V. v. Abbott Labs.,*
    512 F.3d 1363 (Fed. Cir. 2008) ………………………………..    49

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
    358 F.3d 898 (Fed. Cir. 2004) …………………………………    13

*Mattson v. Dept. of Treasury,*
    86 F.3d 211 (Fed. Cir. 1996) ………………………………..    49, 52

*Nazomi Communications, Inc. v. Arm Holdings, PLC*,
      403 F.3d 1364 (Fed. Cir. 2005) ………………………………..  14

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
      134 S. Ct. 1749 (2014) ………………………………………...  50

*Omega Engineering, Inc. v. Raytek Corp.*,
      334 F.3d 1314 (Fed. Cir. 2003) ……………………………..  13, 29

*Phillips v. AWH Corp.*,
      415 F.3d 1303 (Fed. Cir. 2005) (en banc) ……………………..  7, 19, 29

*Praxair, Inc. v. ATMI, Inc.*,
      543 F.3d 1306 (Fed. Cir. 2008) ………………………………..  17

*Rambus Inc. v. Rea*,
      731 F.3d 1248 (Fed. Cir. 2013) ………………………………..  24

*SFA Systems, LLC v. Newegg Inc.*,
      793 F.3d 1344 (Fed. Cir. 2015) ………………………………..  50

*SimpleAir, Inc. v. Sony Ericsson Mobile Communs.*,
      820 F.3d 419 (Fed. Cir. 2016) …………………………………  9-10, 27

*Thorner v. Sony Computer Entm't Am. LLC*,
      669 F.3d 1362 (Fed. Cir. 2012) ……………………………..  *passim*

*Unwired Planet v. Apple*,
      2016 WL 3947839 (July 22, 2016) …………………………….  12-13,
                                                                     34, 38

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
      503 F.3d 1295 (Fed. Cir. 2007) ………………………………..  17

*Voda v. Cordis Corp.*,
      536 F.3d 1311 (Fed. Cir. 2008) ………………………………..  16-17

## **<u>Statutes</u>**

28 U.S.C. § 1259(a)(1) …………………………………………..  3

28 U.S.C. § 1331 …………………………………………………..  2

28 U.S.C. § 1338(a) ………………………………………………..  2

28 U.S.C. § 2107(a) ………………………………………………..  3

35 U.S.C. § 285 …………………………………………………  1, 40

## **<u>Rules</u>**

Fed. R. App. P. 4(a)(1)(A) ……………………………………………  3

# INTRODUCTORY STATEMENT

This appeal has two parts. The first part challenges certain claim construction rulings that led to a stipulated noninfringement judgment. The second part challenges a partial award of attorneys' fees under 35 U.S.C. § 285.

The main claim term on appeal ("message(s)") encompasses email messages under its plain meaning. Despite this, the district court applied an improper claim construction framework and adopted an exceedingly narrow construction. The construction — prepackaged with its own negative limitation to expressly exclude email messages — ignores controlling canons of claim construction and is inconsistent with the intrinsic and extrinsic evidence. The district court's constructions for the terms "data media type" and "user-specific message storage area" suffer from the same methodological flaws.

Reversal of the district court's claim constructions will deprive Defendants of prevailing party status and should automatically lead this Court to vacate the fee award. To the extent this Court reviews the fee award on the merits, it should be reversed. The district court awarded fees to Defendants solely to compensate them for having filed a pair of motions that they lost. Awarding fees on motions that a party lost conflicts with all policy considerations guiding the proper exercise of discretion under Section 285 and Supreme Court precedents. The district court abused its discretion. This Court should reverse.

## STATEMENT OF RELATED CASES

Appeal Nos. 16-2150, 16-2150, and 16-2212, were previously consolidated by this Court with Appeal No. 14-1611 (lead case). Aside from these, no other appeal in or from the same civil action was previously before this or any other appellate court. Counsel is not aware of any other case, other than those presently before this Court, that may be directly affected by this Court's decision.

## APPELLATE JURISDICTIONAL STATEMENT

The United States District Court for the Northern District of Illinois had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a). On December 20, 2013, the district court issued its Rulings on Claim Construction. (hereinafter "Claim Construction Order"). Appx1-30. On February 25, 2014, the district court denied Unified Messaging Solutions LLC's and Advanced Messaging Technologies, Inc.'s motion for reconsideration of the district court's Claim Construction Order. Appx31-32. On June 13, 2014, the district court entered final judgment in these matters pursuant to the parties' stipulation of non-infringement under the Claim Construction Order. Appx33-37.

On September 26, 2014, this Court stayed the appellate proceedings pursuant to an agreed motion to allow the district court to rule on the exceptional case issue. Dkt. 229. On September 29, 2015, the district court entered its Opinion and Order on Defendants' request that the case be found exceptional.

2

Appx1782-1794. On October 1, 2015, the district court entered its Amended Opinion and Order on Defendants' request that the case be found exceptional. Appx1795-1807. On October 19, 2015, the district court entered its Second Amended Opinion and Order on Defendants' request that the case be found exceptional. Appx38-50. On May 20, 2016, the district court entered monetary fee judgments in favor of certain Defendants. Appx51-53

On June 27, 2014, October 6, 2015, and May 27, 2016, notices of appeal regarding these rulings were timely filed. 28 U.S.C. § 2107(a); Fed. R. App. P. 4(a)(1)(A). Appx224, Appx231, Appx236. The orders appealed from are final. This Court has appellate jurisdiction under 28 U.S.C. § 1259(a)(1).

## STATEMENT OF THE ISSUES

1.    Did the district court err in its construction of the term "message(s)"?

2.    Did the district court err in its construction of the term "data media type"?

3.    Did the district court err in its construction of the term "user-specific message storage area"?

4.    Did the district court err in its ruling that the case was exceptional and subsequent award of attorneys' fees?

## STATEMENT OF THE CASE

This appeal relates to several actions for patent infringement brought by Unified Messaging Solutions LLC ("UMS") and Advanced Messaging Technologies, Inc. ("AMT") (collectively "Plaintiffs") against several defendants that were consolidated pursuant to the August 3, 2012 Transfer Order from the Multi-District Litigation Panel establishing MDL No. 2371.   Appx239-242. Pursuant to the Transfer Order, the consolidated matters were transferred to the United States District Court for the Northern District of Illinois.  *Id*.  The five patents-in-suit are U.S. Patent Nos. 6,857,074 ("the '074 patent"), 7,836,141 ("the '141 patent"), 7,895,306 ("the '306 patent"), 7,895,313 ("the '313 patent"), and 7,934,148 ("the '148 patent") (collectively "the patents-in-suit").  *Id*.  *See also* Appx284-321 ('074 patent), Appx322-364 ('141 patent), Appx365-410 ('306 patent), Appx411-455 ('313 patent), Appx456-504 ('148 patent).

On December 20, 2013, the district court issued its Claim Construction Order, in which it construed the terms "message(s)," "data media type," and "user-specific message storage area," among others.  Appx1-30.  On February 25, 2014, the district court entered an order denying Plaintiff's motion for reconsideration of the Claim Construction Order.  Appx31-32.  On June 5, 2014, in light of the district court's Claim Construction Order, and Order on Plaintiffs' motion for reconsideration, the parties filed a stipulation of non-infringement.  Appx243-283.

4

On June 13, 2014, the district court entered final judgment in these matters pursuant to the parties' stipulation.  Appx33-37.

On July 18, 2014, Defendants filed a motion to declare this case exceptional pursuant to 35 U.S.C. § 285.  Appx1744-1781.  On September 29, 2015, the district court entered its Opinion and Order on Defendants' request that the case be found exceptional.  Appx1782-1794.  On October 1, 2015, the district court entered its Amended Opinion and Order on Defendants' request that the case be found exceptional.  Appx1795-1807.  On October 19, 2015, the district court entered its Second Amended Opinion and Order on Defendants' request that the case be found exceptional.  Appx38-50.

Appellants respectfully request that this Court (1) reverse the district court's construction of the term "message(s)"; (2) reverse the district court's construction of the term "data media type"; (3) reverse the district court's construction of the term "user-specific message storage area"; (4) reverse the district court's finding that the case was exceptional and subsequent award of attorneys' fees; and (5) remand these cases to the district court for further proceedings.

## I.    THE '074, '141, '306, '313, AND '148 PATENTS.

The patents-in-suit all share a common specification.  Appx284, Appx322, Appx365, Appx411, Appx456.[1]  The claimed inventions are related to receiving

---

[1] The patents-in-suit are all continuations of one another.  *Id.*

and storing messages on a server system and allowing users to access those messages, from anywhere, through a browser or other application program, such as via the Internet. *See e.g.,* Appx307 (1:15-23); Appx289 (Fig. 1).[2]  The messages referred to in the claimed inventions are not limited in scope, but rather include different types of messages, such as facsimile, voice, and data messages, such as text or e-mail. Appx318 (23:2-5); Appx1188.  In the patent specification, as well as during prosecution, the patentee made it clear that "messages" included e-mail messages. *Id.*

In addition, the claimed inventions relate to sending a notification message to the user to notify the user when a message is received by the server system and ready for viewing. *See e.g.,* Appx500-501 (claims 90, 96, 135, and 138).  One of the potential benefits of this approach is enhanced security over the message center in which a user's messages are stored. *Id.*

## SUMMARY OF THE ARGUMENT

In construing the terms "message(s)," "data media type," and "user-specific message storage area," the district court improperly narrowed the scope of the claims absent (1) lexicography, or (2) clear and unequivocal disavowal of claim scope.  This Court has repeatedly emphasized that claim terms are generally given

---

[2] The claims asserted at the district court include the following: '074 patent, claims 1, 2, and 4; '141 patent, claims 1, 21, 24, and 29; '306 patent, claims 1, 5, 24, 25, 37, and 40; '313 patent, claims 10 and 11; and '148 patent, claims 1, 7, 39, 90, 135, 138, 140, 146, and 147 (collectively "the Asserted Claims").

6

their plain and ordinary meanings to one of skill in the art when read in the context of the specification and prosecution history. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). In reaching its construction, the district court ignored this fundamental tenet.

By way of example, in its construction of "message(s)" the district court concluded that the "message" must be "received over a telephone line," despite the absence of lexicography or disclaimer and despite the fact that the plain language of the Asserted Claims is agnostic as to the transmission medium used to receive a message.

As another example, the district court limited the types of messages covered to those in an "audio, facsimile, or data file format," despite the absence of lexicography or disclaimer and despite the fact that such a construction is inconsistent with the claim language itself, which specifically states that "notification messages" (*i.e.,* a type of message) are e-mail messages.[3] The district

---

[3] *See e.g.,* Appx320 ('074 patent, claim 4); Appx363 ('141 patent, claim 31); Appx408 ('306 patent, claim 38); Appx455 ('313 patent, claim 41); Appx498, Appx500 ('148 patent, claims 7 and 96).

court's rationale for this narrow construction was that "[t]he specification also describes that the type of message received over a call includes facsimile messages, voice messages, and data messages." Appx10. This is a demonstrable example of a district court improperly limiting the scope of the claims to the preferred embodiment absent lexicography or disclaimer. *Thorner*, 669 F.3d at 1365.

Relying on the same improper claim construction framework, the district court made similar errors in its construction of the terms "data media type" and "user-specific message storage area." As such, the district court's constructions for each of these terms should be reversed.

Reversal of the district court's claim constructions will deprive Defendants of prevailing party status and should automatically lead this Court to vacate the fee award. To the extent this Court reviews the fee award on the merits, it should be reversed. The district court awarded fees to Defendants solely to compensate them for having filed a pair of motions that they lost. In the process, the district court believed that Plaintiff could somehow have dissuaded Defendants from bringing their nonmeritorious motions if UMS had joined AMT as a co-plaintiff at the beginning of the case. But the procedural facts belie this perception. AMT's presence or absence as a party-plaintiff was irrelevant to Defendants' various requests for relief. The district court also placed blame on UMS for not suggesting

8

adding AMT. If this were even a proper factor for consideration, the district court simply had its facts wrong. This is exactly the suggestion that UMS *did* make. Awarding fees on motions that a party lost conflicts with all policy considerations guiding the proper exercise of discretion under Section 285 and Supreme Court precedents. The district court abused its discretion. This Court should reverse.

## ARGUMENT

## I.    STANDARD OF REVIEW

When parties stipulate to a non-infringement judgment after a claim construction ruling, this Court need only address the correctness of the claim construction. *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1368 (Fed. Cir. 2003). In *SimpleAir, Inc. v. Sony Ericsson Mobile Communs. AB,* this Court set forth the standard of review for a district court's claim construction ruling as follows:

> The ultimate construction of claim language is a question of law reviewed *de novo*, based upon underlying factual determinations reviewed for clear error. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837-39, 190 L. Ed. 2d 719 (2015). "[W]hen the district court reviews only evidence intrinsic to the patent (the patent claims and specifications, along with the patent's prosecution history), the judge's determination [as to claim construction] will amount solely to a determination of law, and the Court of Appeals will review that construction *de novo*." *Id*. at 841. "If, on the other hand, a district court resolves factual disputes over evidence extrinsic to the patent, we 'review for clear error those factual findings that underlie a district court's claim construction.'" *Cardsoft, LLC v. VeriFone, Inc.*, 807 F.3d 1346, 1350 (Fed. Cir. 2015) (quoting *Teva*, 135 S. Ct. at 842). "[I]t is not enough that the district court may have heard

9

extrinsic evidence during a claim construction proceeding—rather, the district court must have actually made a factual finding in order to trigger *Teva*'s deferential review." *Id.*

820 F.3d 419, 425 (Fed. Cir. 2016). In the present case, the district court did not rely on extrinsic evidence, or otherwise make a factual finding based on extrinsic evidence, in support of its construction of the terms at issue in this appeal. As such, the standard of review is *de novo*. [4] *Id.*

With respect to the district court's exceptional case finding, the standard of review is abuse of discretion. *Highmark, Inc. v. Allcare Health Mgt. System, Inc.*, 134 S.Ct. 1744, 1748 (2014).

## II.    THE DISTRICT COURT ERRED IN ITS CONSTRUCTION OF THE TERM "MESSAGE(S)"[5]

The district court construed the term "message(s)" to mean: "communication received over a telephone line in audio, facsimile, or data file format." Appx1. In

---

[4] The only potential exception to this is the district court's construction of the term "user-specific message storage area," in which the district court discussed a prior claim construction ruling issued by the United States District Court for the Central District of California on this term. Appx5. At best, it is unclear whether the district court made any factual finding with respect to this prior claim construction ruling. *Id.* With that said, to the extent this Court determines that the district court made an underlying factual finding that should be reviewed for clear error, the district court's dismissal of the Central District of California's reasoning and construction constitutes clear error that should be reversed. *See* Section II.A.v. below.

[5] The term "message(s)" appears in all Asserted Claims.

addition, the Claim Construction Order specifically indicated that the term "message(s)" does not include e-mail messages.  Appx6, 10.[6]

The district court's construction is incorrect for at least three reasons: (1) it improperly limits the scope of "message(s)" to those "received over a telephone line;" (2) it improperly excludes e-mail messages; and (3) it improperly limits the scope of the term "message(s)" to only those messages in an "audio, facsimile, or data file format."  In support of its construction, the district court did not find lexicography or disclaimer, and otherwise provided no analysis to support a finding that either was present.  Appx6-11.[7]  As such, the district court should have construed the term "message(s)" consistent with its plain and ordinary meaning (*i.e.,* "communication(s) between a sender and a recipient") as suggested by Plaintiffs.

---

[6] The district court's construction of the term "message(s)" formed the basis of Plaintiffs' Stipulation of Non-Infringement (Appx243-283). The term "message(s)" appears in all Asserted Claims.

[7] Defendants also did not argue, at least explicitly, that the claims should be narrowed based on lexicography or disclaimer, or that the test for either had been met.

A.    **The District Court's Construction of "message(s)" Improperly Limits the Scope of "message(s)" to those "received over a telephone line.**

i.    **This Court's Recent Decision in *Unwired Planet, LLC v. Apple, Inc.* is Directly on Point.**

This Court's recent decision in *Unwired Planet v. Apple* is particularly instructive in evaluating the Claim Construction Order.  In that case, one of the terms at issue was "voice input."  2016 WL 3947839 *3 (July 22, 2016).  The district court construed "voice input" to mean "speech provided over a voice channel."  *Id.* at *2.  This Court began its analysis by noting that the term at issue was "voice input," not "voice channel," and that by "its plain language, the term 'voice input' does not dictate the manner in which voice is transmitted from a mobile device to a server."  *Id.* at *3.  This Court further noted that Apple did not argue that the patentee acted as his own lexicographer.  *Id.*  Thus, the district court's construction could only be justified if there existed "clear and unmistakable disclaimer in the specification or the prosecution history."  *Id.* (citing *Thorner*, 669 F.3d at 1367).

In analyzing the disclaimer arguments, this Court noted that Apple's reliance on the patentee's characterization of certain excerpts as constituting the "present invention" did not rise to the level of disclaimer.  *Id.*  In addition, this Court noted that the patent contained other claims that specifically recited "establishing a voice communication channel."  *Id.* at *4.  This Court concluded that "[i]f the patentee

12

intended to restrict the claims-at-issue to require voice input to travel over a particular type of channel, it could have included the same limitation." *Id.*

Based on the foregoing, this Court reversed the district court's construction and held that the term "voice input" should be construed to have its plain and ordinary meaning, which does not require the use of any particular type of channel for its transmission. *Id.*

In the present case, the term "message(s)," by its plain language, does not dictate the manner in which a message is to be transmitted. Moreover, Defendants did not argue, and the district court did not find, that the patentee acted as his own lexicographer with respect to the term "message(s)." Appx6-11; Appx521-526; Appx624-626. As such, the district court's construction can only be justified if disclaimer is found. In the present case, no disclaimer exists with respect to the term "message(s)."

As discussed in Section II.A.iii. below, Defendants' argument that the patentee's "present invention" statements rise to the level of disclaimer is incorrect.[8] Further, as in *Unwired Planet*, the patentee specifically dictated the

---

[8] Notably, Defendants never formally argued at the district court that any statements by the patentee met the legal standard for disclaimer (*i.e.,* clear and unambiguous disavowal of claim scope). *See e.g., Omega Engineering, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) ("claims of a patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the

transmission medium in other claims.    For example, the patentee stated in dependent claims 22 and 23 of the '074 patent: "at least one of the messages is of the [audio media / image media] type, is received ... from a telephone line...." Appx321.  *See also id.* (claims 26 and 27); Appx453 (claim 2).  In other words, when the patentee wanted to limit the transmission medium to a particular channel (*e.g.,* a telephone line), he specifically did so.

### ii.    The District Court's Construction Violates the Claim Construction Canon of Claim Differentiation.

Claim differentiation "normally means that limitations stated in dependent claims are not to be read into the independent claim from which they depend." *Nazomi Communications, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1370 (Fed. Cir. 2005).    The district court's construction of "message(s)," requiring that a message be "received over a telephone line," violates this canon.

Claim 1 of the '074 patent contains the limitation "messages," but is silent as to the transmission medium for such messages.  Appx320 (claim 1).  In contrast, dependent claim 22 of the '074 patent, which depends from claim 1, states that "at least one of the messages is of the audio media type, is received from a telephone line, ...."  Appx321.  Similarly, dependent claim 23 of the '074 patent, which depends from claim 1, states that "at least one of the messages is of the image

---

scope of the claims using 'words or expressions of manifest exclusion or restriction'").

14

media type, is received as a facsimile transmission from a telephone line, ….” *Id*.

*See also* '074 patent, claims 24 and 25 (containing “over a telephone line”

limitation) *as compared to* '074 patent, claim 26 (silent as to transmission

medium). *Id*.

The same is true in the '313 patent. Appx453. Claim 1 of the '313 patent

contains the term “message,” but is silent as to the transmission medium. *Id*.

Dependent claim 2 of the '313 patent, which depends from claim 1, states:

> … wherein the message is a member of the group consisting of
> a voice mail message received via an interface to a public
> switched telephone network, a facsimile message received via
> an interface to the public switched telephone network, and a
> data message.

*Id*. The district court’s construction imports the telephone line / telephone network

limitation from the dependent claims into the independent claims from which they

depend. This is improper.

In addition, the fact that in claim 2 of the '313 patent the patentee did not

limit the transmission medium for data messages, but did limit the transmission

medium for voice mail and facsimile messages, further indicates that the term

“message(s)” should not be limited to only messages “received over a telephone

line.” *Id*.

### iii.     Defendants' Present Invention Argument Is Unavailing.

At the district court, Defendants contended that limiting the scope of "message(s)" to those "received over a telephone line" was appropriate in light of statements made by the patentee characterizing the "present invention." Appx522. In particular, Defendants focused on the following excerpt from the "Summary of Invention" section:

> To achieve the foregoing and other objects, in accordance with the present invention, as embodied and broadly described herein, a system and method for storing and delivering messages involves receiving an incoming call and detecting an address signal associated with the incoming call, the address signal being associated with a user of the message storage and delivery system.

*Id.* Appx309 (5:44-49). However, this Court has previously held that use of the phrase "present invention" is not limiting where references to a certain limitation as being applied to the "invention" are not uniform, or where other portions of the intrinsic evidence do not support applying the limitation to the entire patent. *See Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1136-37 (Fed. Cir. 2011) (finding that because specification contained statements that contradicted "present invention" statement, claims should not be so limited); *Voda v. Cordis*

16

*Corp.*, 536 F.3d 1311, 1320-22 (Fed. Cir. 2008) (same); *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1326 (Fed. Cir. 2008) (same).[9]

Many portions of the intrinsic evidence are inconsistent with Defendants' position that messages must be received over a telephone line, including the claims themselves and other portions of the specification. For example, claim 2 of the '313 patent specifically indicates that a voice mail message or facsimile message must be received over a public switched telephone network, but does not include this restriction on data messages. Appx453 (claim 2).

In addition, as discussed above in the preceding section, the patentee specifically indicated that the message must be "received from a telephone line" in dependent claims indicating that the independent claims are not so limited. *See e.g.,* Appx320-321 (claims 1, 22, and 23). In addition, with respect to claims 24 and 25 in the '074 patent, the patentee limited the transmission medium to a telephone line. Appx321. With respect to claim 26 in the '074 patent, the patentee did not include such a limitation. *Id*.

---

[9] The cases relied on by Defendants at the district court (*i.e., Verizon Servs. Corp. v. Vonage Holdings Corp.,* 503 F.3d 1295 (Fed. Cir. 2007) and *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312 (Fed. Cir. 2006)) were decided prior to the cases cited by Appellants and do not contradict this Court's more recent holdings that when other portions of the intrinsic evidence are inconsistent with a patentee's "present invention" statements, such statements are not limiting. Further, in both *Verizon* and *Honeywell* there were no portions of the intrinsic evidence that were inconsistent with the patentees' "present invention" statements. *Id*.

Further, the specification specifically states that the "Message Storage and Delivery System (MSDS) can receive a translated message via the Internet. *See e.g.,* Appx319 (26:66-27:5). Finally, the intrinsic evidence explicitly states that notification messages, a type of, and subset of the genus, "message(s)," are both sent and received via the Internet, not a telephone line. *See e.g.,* Appx309 (6:4-9); Appx315 (18:7-13); Appx320 (27:5-7, claim 4); Appx298 (Fig. 13).

In addition, the patentee specifically indicated that the scope of the invention is not limited to the excerpt from the Summary of Invention relied on by Defendants. For example, the specification states:

> Additional objects, advantages and novel features of the invention will be set forth in the description which follows, and will become apparent to those skilled in the art upon reading this description or practicing the invention. The objects and advantages of the invention may be realized and attained by the appended claims.

Appx309 (5:36-43). The specification further states:

> The foregoing description of the preferred embodiments of the invention have been presented only for the purposes of illustration and description. It is not intended to be exhaustive or to limit the invention to the precise form disclosed. Many modifications and variations are possible in light of the above teaching.

> The embodiments were chosen and described in order to explain the principles of the invention and their practical application so as to enable others skilled in the art to utilize the invention and various embodiments and with various modifications as are suited to the particular use contemplated. It

18

is intended that the scope of the invention only be limited by
the claims appended hereto.

Appx320 (27:11-23).  In sum, other portions of the intrinsic record are inconsistent

with the "present invention" statement relied on by Defendants.  As such, the

patentee's "present invention" statements relied on by Defendants do not constitute

clear and unmistakable disavowal of claim scope.

### iv.    The District Court's Construction Is Inconsistent With the Plain Language of the Claims.

This Court has instructed that the first place to look in the claim construction

analysis is the plain language of the claims themselves.  *Phillips*, 415 F.3d at 1315-

17.  The district court's requirement that a message be "received over a telephone

line" is inconsistent with the plain language of the claims.

Numerous claims require a "notification message."  *See e.g.,* Appx320

(claims 1 and 4); Appx363 (claims 29 and 30); Appx408-409 (claims 37, 38, 42,

and 43); Appx455 (claims 40 and 41); Appx497-498 (claims 1 and 7); Appx500

(claims 90 and 96).  In many instances, the claims themselves specifically require

that the notification message (*i.e.,* a type of message) is transmitted via the

Internet, not via a telephone line.  *See e.g.,* Appx320 (claim 4); Appx363 (claim

30); Appx408-409 (claims 38, 42, 43); Appx455 (claims 40, 41); Appx498,

Appx500 (claims 7, 96).    The district court's construction of the term

"message(s)," which requires receipt "over a telephone line," is inconsistent with

19

the language of the claims, which specifically indicates that certain types of messages (*i.e.,* notification messages) are transmitted via the Internet.

In addition, the district court's requirement that the "message" must be received is inconsistent with the plain language of the claims. Multiple claims do not require the receipt of a message, but instead address only the storage and delivery of a message. *See e.g.,* Appx453-454 (claims 10 and 11). In other words, when the patentee intended to claim a receiving element, he did. In other instances, he did not. *Compare id. with* Appx320 (claim 1), Appx362-363 (claims 1 and 32), Appx407-409 (claims 1, 41, 53), Appx452-453 (claims 1, 4, 6).

### v.    The District Court's Construction Is Inconsistent With the Prior Claim Construction Issued by the United States District Court for the Central District of California.

In 2011, the United States District Court for the Central District of California construed the term "message signal" as used in U.S. Patent No. 6,350,066 ("the '066 patent"), which is a parent to the patents-in-suit with the same specification.[10]   Appx784-786. In that case, the defendant argued that the term "message signal" should be limited to a "signal that is transmitted over a telephone network." *Id*. The district court disagreed, finding that this restriction was not consistent with the intrinsic evidence and "would exclude the preferred

---

[10] All of the patents-in-suit are continuations of the '066 patent. Appx284, Appx322, Appx365, Appx411, Appx456.

embodiment and is at odds with the plain language of the patent." *Id*. While non-binding, the district court's reasoning is instructive and correct.

As shown by the foregoing, no justification exists for the district court's requirement that "message(s)" be received over a telephone line. In fact, the claims, specification, prosecution history, and holdings of other courts instruct otherwise. The district court's construction should be reversed and the term "message(s)" should be construed in accordance with its plain and ordinary meaning (*i.e.,* communication(s) between a sender and a recipient).

## B. The District Court's Construction of "message(s)" Improperly Excludes E-Mail Messages from the Scope of the Term.[11]

The specific text of the district court's construction of the term "message(s)" did not exclude e-mail messages. Appx1. However, in the body of the Claim Construction Order the district court stated that "the message does not include email and must be a received message." Appx6, Appx10-11. This conclusion is incorrect. The district court did not find lexicography or disclaimer in support of its conclusion. Appx6-11. Defendants did not even argue that the claims should be limited based on lexicography or disclaimer. Appx521-526, Appx624-626. Rather, the district court merely stated that the exclusion of e-mail from the scope of the term "message(s)" is "supported by the description of the invention and the

---

[11] The district court's exclusion of email messages from the scope of the term "message(s)" formed the basis for Plaintiffs' stipulation of non-infringement with respect to all Asserted Claims. Appx243-283.

21

specification." Appx10. The district court then went on to cite a single excerpt from the patent specification, discussed below. *Id.*

The district court's selective use of the specification is an improper means for limiting the scope of the term "message(s)" to exclude e-mail. *Thorner,* 669 F.3d at 1367. Absent lexicography, or clear and unequivocal disclaimer, the plain and ordinary meaning of a term shall apply. *Id.* Neither is present in this instance. The plain and ordinary meaning of the term "message(s)" should apply.

### i.   The District Court's Email Exclusion Is Directly Contradicted by the Intrinsic Evidence.

#### a.   The District Court's Email Exclusion Is Inconsistent with the Specification, Including the Plain Language of the Claims.

The patent specification specifically states that "[t]hrough the MSDS 10, a user can therefore maintain an accurate record of all received email messages, facsimile messages, and data transfers." Appx318 (23:2-5). In calling out that the MSDS will display received email messages, it is clear that the specification contemplates that the full scope of the term "message(s)" **includes** email messages. *Id.* The district court's exclusion of email messages completely ignores this disclosure.

Instead, to justify its exclusion of email messages, the district court relied on a passage from the specification that actually supports Plaintiffs' position. In

support of its conclusion that email messages should be excluded, the district court

relied solely on the following passage from the specification:

> Because the MSDS 10 can receive messages of various types,
> such as a facsimile message, voice message or data message,
> the MSDS 10 must be able to determine the type of message
> that is being sent over the DID trunk 15. With reference to FIG.
> 10, when an incoming call is received, the MSDS 10 goes off
> hook at step 200 and starts to generate a ringing sound. If, at
> step 202, a facsimile calling tone is detected, then the ringing
> sound is stopped at step 204 and the message is received as a
> facsimile message at step 206. Similarly, when a data modem
> calling tone is detected at step 208, the ringing sound is stopped
> at step 210 and the message is identified as a data message at
> step 212.

Appx10; Appx313 (14:36-47). Rather than support the district court's position, the

above passage makes clear that "the MSDS 10 can receive messages of various

types" and then provides an exemplar list including facsimile, voice, and data

messages. *Id.* In addition, the above passage indicates that the "message(s)" are

transmitted via a data modem, which is clearly capable of transmitting email

messages. *Id.* Nothing about the cited passage indicates that the patentee intended

to exclude email messages from the scope of the term "message(s)." Rather, the

passage demonstrates that the patentee intended to use the term broadly.[12]

---

[12] The district court's email exclusion is also inconsistent with the "Background of
the Invention" section in which the patentee specifically identified prior art that
provided control of e-mail messages. Appx307 (2:67-3:5) (discussing U.S. Patent
No. 5,317,628 to Misholi and U.S. Patent No. 5,333,266 to Boaz, both of which
dealt with email messaging systems). To the extent e-mail messages were not

In addition, the claims specifically indicate that certain types of messages (*e.g.,* notification messages, which are indisputably a subset of the genus "message(s)") are e-mail messages. *See e.g.,* Appx320 (claims 1 and 4); Appx363 (claims 29 and 30); Appx408-409 (claims 37, 38, 42, and 43); Appx455 (claims 40 and 41); Appx497-498 (claims 1 and 7); Appx500 (claims 90 and 96). In other words, the district court's exclusion of e-mail messages from the genus, "message(s)," is directly at odds with the language of the claims.

This Court has repeatedly held that a claim construction that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct. *See Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013); *Rambus Inc. v. Rea*, 731 F.3d 1248, 1253 (Fed. Cir. 2013) (holding same). The district court's exclusion of e-mail messages does just that. By excluding e-mail as a type of message, the district court excludes the preferred embodiment in which notification messages (*i.e.,* a type of message) are transmitted via email. Neither the district court nor Defendants provided any justification for creating a special case in which notification messages should be excluded from the definition of "message(s)." This unwarranted distinction is improper and contrary to one of the most basic tenets of claim construction.

---

within the purview of the claimed inventions, there would be no need for the patentee to be describing the prior state of e-mail messaging systems.

### b.    The District Court's Email Exclusion Is Inconsistent with the Prosecution History.

The district court's exclusion of e-mail messages is also inconsistent with the prosecution history.  During prosecution of the '141 patent the examiner erroneously argued that the stored (presumably "inbound") messages could only be facsimile messages.    Appx1164; Appx1188.    In response, the patentee unequivocally disagreed, stating:

> [t]he Examiner's position that … "the teaching of an 'email' is only stated as a means of notification" … is just wrong.

*Id*.  The patentee further stated that "a 'message' contemplated by USP 5,675,507 and the pending claims" included "[o]ther types of messages, including audio (*e.g.,* RA) and voice as well as data (*e.g.,* text or e-mail)." *Id*.[13]  If anything, this is clear and unequivocal evidence that e-mail messages are within the scope of "message(s)."

Following this, the examiner then issued claim rejections based on e-mail prior art.  *See e.g.,* Rejection based on U.S. Patent No. 5,530,852 to Meske, Jr. (Appx1198-1212); Rejection based on U.S. Patent No. 5,724,567 to Rose, in view of Kaashoek (an adaptive email browser) (Appx1235-1250, Appx1288-1309); and Rejection based on U.S. Patent No. 5,737,395 to Irribarren, in view of U.S. Patent No. 5,742,905 to Pepe (Appx2355-2374).    To the extent the claims did not

[13] The '507 patent is a parent to the patents-in-suit to which the patents-in-suit claim priority.  *See e.g.,* Appx456.

encompass email messages, the patentee could have made quick work of these rejections, highlighting that the cited prior art references focused on email messages whereas the claims did not. However, the patentee never made this argument, instead distinguishing the references based on other grounds. *See e.g.,* Appx1188.

In addition, other portions of the intrinsic record directly contradict the district court's exclusion of email messages from the scope of "message(s)." During re-examination of the '066 patent (*i.e.,* one of the parents to the patents-in-suit), the inventor, Charles R. Bobo II, submitted a declaration with exhibits. Appx1580-87.[14] One of the exhibits to the declaration (Exhibit H) was a Search Request Letter dated January 10, 1995 from Mr. Bobo's counsel, Geoff Sutcliffe. Appx1584-1585. In the letter, Mr. Sutcliffe, characterized the claimed inventions by stating:

> The system is not limited to the storage of facsimiles but may also receive voice messages which can be converted into HTML and sent over the Internet and can also store E-mail messages for the customer. The system provides a unique service to its customers in that the customers can receive their facsimile transmissions, voice messages, or E-mail messages anywhere in the world.

*Id.* In other words, it was well understood by Mr. Bobo and his counsel that the claimed inventions did not exclude email messages. *Id.*

---

[14] The declaration was dated February 15, 2007, which is pre-issuance of the '141, '306, '313, and '148 patents. *Id.*

### ii.   The District Court's Email Exclusion Is Inconsistent with the Plain and Ordinary Meaning of the Term "data message."

In drafting the claims at issue, the patentee chose to use the broader term "data message" rather than the narrower term "email message."  This is evidenced by the numerous excerpts from the intrinsic record discussed above.  It is hard to fathom how an "email message" would not fall within the scope of the broader term "data message."  Despite this, the district court found as much – absent lexicography or disclaimer – and concluded that the term "data message" is somehow confined to exclude email messages.

This conclusion is directly contradicted by the plain and ordinary meaning of the term "data message."  For example, the United Nations UNCITRAL Model Law on Electronic Commerce, which was adopted on June 12, 1996, defines "data message" to mean "information generated, sent, received or stored by electronic, optical or similar means including, but not limited to, electronic data interchange (EDI), **electronic mail**, telegram, telex, or telecopy.   Appx670.[15]   This understanding of the term "data message" (*i.e.,* that it encompasses email messages) is consistent with the intrinsic record for the reasons already discussed.

---

[15] The district court did not rely on this extrinsic evidence in concluding that email messages should be excluded from the scope of "message(s)."  As such, the *de novo* review standard still applies to this Court's review of the district court's construction of the term "message(s)."  *See SimpleAir, Inc.,* 820 F.3d at 425.

In support of its conclusion that the term "message(s)" did not encompass email messages, the district court referred to its discussion of, and the meaning it ascribed to, the term "data." Appx10. The district court contended that the patent specification refers to "data message as data files in a context that would not include email." Appx11 (citing Appx308 (4:15-22, 30-32)).

As a threshold matter, the fact that limited excerpts in the patent specification may discuss data messages as data files does not mean that the term "data messages" is limited to only data files. *Thorner*, 669 F.3d at 1367. However, the excerpts relied on by the district court do not even support the conclusion reached. Two of the three excerpts relied on by the district court ('074 patent, 4:15-22, 4:30-32, 4:66-5:7 (Appx308)) are from the Background of the Invention section in which the patentee is describing some of the shortcomings of the prior art.[16] In other words, the excerpts relied on are not describing the claimed inventions.

Setting this aside, email messages can be, and usually are, embedded as data files having a data file format, such as .eml files, which are defined via the Internet Message/Mail Format protocol for electronic mail messages. Appx670. As such,

---

[16] By way of example, at 4:15-22 the patentee discusses that one of the shortcomings of the prior art was the requirement of "some coordination between the sender and the recipient" in order to send a message. Appx308 (4:15-22). This shortcoming is overcome by the claimed inventions. *See e.g.,* Appx316 (19:38-45).

28

even if the term "data message" were somehow limited to a "data file," which it is not, this would not justify the exclusion of email.

### iii. The District Court's Construction Is a Negative Construction, Which is Disfavored.

This Court has repeatedly cautioned against construing terms in the negative absent express disclaimer or independent lexicography in the written description that justifies a negative construction. *See e.g., Omega Engineering,* 334 F.3d at 1322. As discussed above, there is no express disclaimer or independent lexicography in the written description that would justify the exclusion of e-mail messages from the scope of the term "message(s)." Thus, the district court's negative exclusion of e-mail messages should be reversed.

### C. The District Court's Construction of "message(s)" Improperly Limits the Scope of the Term "message(s)" to Only Those in an "audio, facsimile, or data file format."

The district court's construction of the term "message(s)" also limits the scope of "message(s)" to those in an "audio, facsimile, or data file format." Appx1, Appx10. This narrow construction is inconsistent with the plain language of the claims themselves. *See Phillips*, 415 F.3d at 1315-17 (first place to look in the claim construction analysis is the plain language of the claims themselves). With respect to certain claims, the patentee specifically stated the types of messages that are received. For example, claim 1 of the '074 patent states:

29

> a messaging function configured to receive messages … the messages being of any one or media types selected from the group consisting of an audio media type, an image media type, and a data media type.

Appx320 (claim 1). In addition, claims 22, 23, 24, and 25 of the '074 patent limit the type of message to a specific type (*i.e.,* audio media type (claim 22), image media type (claim 23), voice message (claim 24), and facsimile message (claim 25)). Appx321 (claims 22-25).

In contrast, other claims are agnostic as to the type of message and further specify the message type in dependent claims. *Compare* Appx362-363 (claim 1) *with* Appx363 (claims 15-17, 30); *compare* Appx362-363 (claim 1) *with* Appx364 (claims 34-36, 38); *compare* Appx452-453 (claim 1) *with* Appx453 (claim 2); Appx454 (claim 12) *with* Appx454-455 (claims 26-28, 41); *compare* Appx497-498 (claim 1) *with* Appx498 (claims 4-7). In other words, when the patentee wanted to limit the scope of "message(s)" to particular types of messages, he explicitly stated it in the claims.

This Court's prior decision in *Abbott Labs. V. Andrx Pharmaceuticals* is instructive. 473 F.3d 1196, 1209-11 (Fed. Cir. 2007). In *Abbott*, the term at issue was "pharmaceutically acceptable polymer" ("PAP"). *Id*. at 1209. The district court limited the scope of this term because the only disclosure of a PAP in the written description of the patent was a Markush group. *Id*. at 1210-11. This Court reversed, noting that "the term 'Markush group' does not have any meaning within

the context of the written description of a patent." *Id*. In addition, this Court noted that dependent claim 2 required that the PAP is a hydrophilic water-soluble polymer and dependent claim 3 introduced a Markush group listed type of hydrophilic water-soluble polymers. *Id*. at 1209. This Court held that: "the language of the claims and claim differentiation imply that the 'pharmaceutically acceptable polymer' term in claim 1 is likely broader than the 'hydrophilic water-soluble polymer' described in claim 2 and encompasses more compounds than those listed in claim 3." *Id*. at 1209.

In the present case, the written descriptions of the patents-in-suit do not utilize Markush group language. Despite this, the district court has essentially injected a Markush group into the claims via its construction of the term "message(s)" by dictating what can, and cannot, constitute a "message." Appx1. In addition, as in *Abbott*, the dependent claims further refine the scope of the term "message(s)" by dictating specific types of messages. As such, the district court's construction improperly limits the scope of the claims, absent lexicography or clear and unequivocal disavowal, and the same should be rejected. *Thorner*, 669 F.3d at 1367.

**D.    The Term "message(s)" Should be Accorded its Plain and Ordinary Meaning.**

This Court has repeatedly held that it will "depart from the plain and ordinary meaning of claim terms based on the specification in only two instances:

lexicography and disavowal." *Hill-Rom Services, Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014). As discussed *supra*, neither of these two exceptions is present with respect to the term "message(s)." The district court did not rely on either of these two exceptions. Defendants did not argue that either of these two exceptions were met. As such, the plain and ordinary meaning of the term "message(s)" should apply.

The term "message(s)" is not defined in the intrinsic record. Rather, the patentee repeatedly made it clear that the term "message(s)" should be read broadly to encompass messages of all types. *See e.g.,* Appx318 (23:2-5); Appx1188. A contemporaneous dictionary defines "message" as "a usually short communication transmitted by words, signals, or other means from one person, station, or group to another." Appx1588-1590. This is consistent with Plaintiffs' proposal as to the plain and ordinary meaning of the term: "communication(s) between a sender and recipient." This construction is also consistent with the intrinsic evidence. As such, Plaintiffs respectfully request that the term "message(s)" be accorded its plain and ordinary meaning (*i.e.,* "communication(s) between a sender and a recipient").

## III.   THE DISTRICT COURT ERRED IN ITS CONSTRUCTION OF THE TERM "DATA MEDIA TYPE"

The term "data media type" only appears in claim 1 of the '074 patent. Appx320 (claim 1).[17]  The district court construed the term "data media type" to mean "data media file type."   Appx11-12.   The district court's construction improperly limited the scope of the term to a "file type" absent lexicography or disclaimer.   Claim terms are "given their ordinary and customary meaning, absent a clear indication otherwise from the specification or prosecution history, as where the patentee acts as his own lexicographer or clearly disavows claim scope." *Unwired Planet*, 2016 WL 3947839 *3 (citing *Thorner*, 669 F.3d at 1365).

There is no clear indication in the intrinsic record that the patentee intended to depart from the plain and ordinary meaning of the term "data media type" (*i.e.,* a message containing data media).   The district court did not identify any evidence of this, nor did Defendants.   As discussed above in Section II.B.ii., the excerpts relied on by the district court in support of its construction relate to the characterizations by the patentee of deficiencies in prior art systems, not characterizations of the claimed inventions.   *Id.*  Appx308 (4:15-22, 4:30-32, 4:66-5:7).   Further, even if these limited excerpts could somehow be cast as

---

[17] The district court's construction of "data media type," and more particularly its exclusion of email as being within the scope of the term "data media type," formed the basis for Plaintiffs' stipulation of non-infringement with respect to claim 1 of the '074 patent.  Appx243-283.

characterizations of the claimed inventions, they do not constitute a clear indication by the patentee to limit the scope of the term "data media type" to "data media file types." *Id*. "A disclaimer of disavowal of claim scope must be clear and unmistakable, requiring 'words or expressions of manifest exclusion or restriction' in the intrinsic record." *Unwired Planet*, 2016 WL 3947839 *3.

Rather, the plain language of the claims themselves indicate that the scope of the term "data media type" is not limited to "files." For example, dependent claims 5, 6, 7, 8, and 10 of the '074 patent, which all depend from claim 1, specifically reference the storage and management of files. Appx320 (claims 5-8, 10). In other words, when the patentee wanted to limit the scope of one of the claimed media types to a file, he specifically stated such. *Id*.[18] In claim 1 of the '074 patent, the patentee did not limit the scope of "data media type" to files. *Id*. (claim 1).

Finally, the district court's construction is flawed because it obfuscates rather than clarifies the meaning of the term "data media type." The purpose of claim construction is to "elaborate[e] the normally terse claim language in order to understand and explain, but not change, the scope of the claims. *Embrex, Inc. v.*

---

[18] The same is true throughout the specification. In the specification, when the patentee wanted to he specifically indicated that a "data message," or other type of message (*i.e.,* voice or facsimile) included a data file he did so. *See e.g.,* Appx313 (14:24-35); Appx315 (17:26-37); Appx317 (22:35-45); Appx318 (24:59-61); Appx294 (Fig. 9).

*Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000). Injecting the word "file" into the term "data media type" does nothing to elucidate the meaning of the term. Accordingly, the district court's construction of "data media type," which violates the fundamental tenets of this Court's claim construction jurisprudence, should be rejected and this Court should accord the term its plain and ordinary meaning.

## IV.  THE DISTRICT COURT ERRED IN ITS CONSTRUCTION OF THE TERM "USER-SPECIFIC MESSAGE STORAGE AREA"

The term "user-specific message storage area" appears in the following Asserted Claims: claim 1 of the '141 patent and claims 1, 39, and 90 of the '148 patent.[19]  Appx362-363 (claim 1); Appx497-98 (claim 1); Appx499 (claim 39); Appx500 (claim 90). The district court construed the term "user-specific message storage area" to mean "storage area specific to a user separate from storage areas of other users." Appx1-5. The district court's construction is flawed for at least two reasons: (1) it negates the plain language of the claims requiring that the storage area is a "message storage area;" and (2) it arguably imposes a requirement that a user's messages must be stored in a physically separate, as opposed to logically separate, storage area from the messages of other users.

---

[19] The district court's construction of the term "user-specific message storage area" did not form the basis for Plaintiffs' stipulation of non-infringement. Appx243-283. However, review of the district court's construction is still appropriate under the principle that when a trial court enters final judgment, all interlocutory rulings merge with the final judgment, making the final judgment and all interlocutory orders reviewable on appeal. *See Hendler v. U.S.,* 952 F.2d 1364, 1368 (Fed. Cir. 1991).

With respect to the first flaw, the claim term at issue is "user-specific message storage area." *See e.g.,* Appx362-363 (claim 1); Appx497-498 (claim 1); Appx499 (claim 39); Appx500 (claim 90). The district court's construction ignores the fact that the storage area is for "user-specific messages," instead construing the term to be a storage area, presumably for any content. This position is directly contradicted by the plain language of the claim term at issue.

With respect to the second flaw in the district court's construction, the requirement that the "storage area" must be "specific to a user" and "separate from storage areas of other users" arguably imposes a requirement that a user's message must be stored in a physically separate, as opposed to logically separate, storage area from the messages of other users. This view is inconsistent with the intrinsic evidence.

For example, the patent specification states:

> In the preferred embodiment, the files for each user are stored in a separate directory assigned to just that one user because an entire directory for a given user generally can be protected easier than the individual files. <u>The memory, however, may be organized in other ways with the files for a single user being stored in different directories</u>.

Appx312 (12:34-40). In other words, there is explicit disclosure in the specification for messages for multiple users being arranged in the same area physically (*e.g.,* the same directory), but being stored logically separate from one another in memory (*e.g.,* users can only access their messages). *Id.*

36

Based on this disclosure, the United States District Court for the Central District of California, in construing this term, and rejecting the notion that a "user-specific message storage area" had to be physically separate from such storage areas for other users, held:

> The storage of data, however, is generally understood to be organized into logical and not physical areas. Furthermore, a logical area may extend over multiple "portions" of the storage medium, while still remaining "user-specific." Intrinsic evidence supports such an understanding of the invention's method of storing messages. Specifically, the specification explains that "[i]n the preferred embodiment, the files for each user are stored in a separate directory for a given user …." (`066 Patent, 12:32-39.) However, "[t]he memory … <u>may be organized in other ways</u> with the files for a single user being stored in different directories." (<u>Id</u>.).

Appx793 (emphasis in original). In light of this, the Central District of California construed the term to mean: "an area within a storage medium that stores messages for a recipient in a manner that identifies the message uniquely to the recipient." *Id.*

In the present case, the district court contended that the California court's reasoning "did not discuss whether the storage area for each user was separate from that of other users." Appx5. This is incorrect. As noted in the above passage, the California court explicitly acknowledged that "a logical area may extend over multiple 'portions' of the storage medium, while still remaining 'user-specific.'" Appx793.

37

Nothing in the intrinsic record warrants the district court's narrow interpretation of the term "user-specific message storage area." Defendants did not argue, and the district court did not find, that the patentee acted as his own lexicographer with respect to this term. In addition, there is no clear and unambiguous disavowal of claim scope with respect to this term that would warrant a finding that a "user-specific message storage area" must be physically separate, as opposed to logically separate, from the storage areas for other users.

In support of its construction, the district court noted that "nothing in the specification indicates that different users' messages would be commingled within directories." Appx3. This is incorrect. *See* Appx312 (12:34-40). Setting this aside, even if the district court were correct, and the specification was silent on this point, such silence is insufficient to limit the scope of the claims as suggested by the district court. In sum, all of the excerpts from the specification relied on by the district court are merely descriptions of a preferred embodiment. *Unwired Planet*, 2016 WL 3947839 *3 (citing *Thorner*, 669 F.3d at 1365).

In addition, the prosecution histories do not warrant limiting the scope of the term "user-specific message storage area" to require physical separation – as opposed to logical – between user storage areas. In support of its construction, the district court relied on the following statement by the patentee during prosecution of the '141 patent:

38

> [T]he items of information [stored in the prior art] are not stored in user-specific storage areas – they are stored in an unstructured global database and are unambiguously accessible to all users.

Appx4; Appx1267.  The district court held that the above statement constituted argument by the patentee that "a user-specific message storage area could not include databases in which multiple users' messages were commingled."  Appx4. This is a blatant misreading of the excerpt.  At best, the patentee was arguing that messages could not be stored in "an unstructured global database" and "unambiguously accessible to all users."  Appx1267.  At no point did the patentee state that messages could not be stored in a database or commingled.[20]

The proper construction for the term "user-specific message storage area" is "a logical or physical storage area within a storage medium for storing a specific user's messages."  This is consistent with the prior construction by the Central

---

[20] The other portions of the prosecution history relied on by the district court also do not support the district court's construction and are, frankly, irrelevant to the issue.  *See* Appx4-5.  For example, the district court noted that in prosecuting the '066 patent, the patentee amended the claims to replace the phrase "storing the message signal in a storage medium" with "user-specific storage area of the storage medium."  *Id.*  This amendment to a non-asserted claim in a parent application does not warrant construing the term "user-specific message storage area" to require physical separation between user message storage areas, as opposed to logical separation.  The district court also noted that during prosecution of the '141 patent the patentee stated: "these claims further require storing the message in a user-specific message storage area associated with the network server, wherein access to the *user-specific, message storage area* is restricted to the user."  Appx1228.  Once again, the issue addressed by the patentee in this statement is accessibility, not physical versus logical separation.

District of California and the intrinsic evidence.  Appx793.  In the alternative, the construction previously adopted by the Central District of California should be adopted for the reasons stated in that claim construction order.

## V.  THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT AWARDED PREVAILING PARTY FEES TO PARTIES WHO ACTUALLY LOST MOTIONS FOR DISMISSAL AND SANCTIONS FOUNDED ON ALLEGED PATENT OWNERSHIP DEFECTS

For the reasons mentioned before, the Court should vacate the judgment and remand for further proceedings under the corrected claim construction.  Doing so would make Defendants no longer prevailing parties.  The Court should accordingly vacate the exceptional case award based on its unwinding of Defendants' "prevailing party" status.  *See* 35 U.S.C. § 285.

Even if the Court affirms the claim construction, though, the exceptional case finding should still be reversed.  A fee award should not punish UMS for having won motions brought against it.  That is the reverse of how sound policy dictates courts should resolve fee motions, but is what the district court did.  The district court thus based its exceptionality finding on clear errors of judgment in weighing the relevant factors, while making erroneous findings on key facts.  Since the district court abused its discretion in making its exceptional case finding, its award of fees should be reversed regardless of this Court's disposition of the claim construction and infringement merits.

**A.    Procedural History Relevant to the Exceptional Case Finding, Including Denial of Exceptional Case Findings Based on Claim Construction Merits.**

The district court based its exceptional case finding on perceptions about Plaintiff UMS's conduct in relation to two motions filed against it early in the case – both eventually denied.  First, three related Defendants filed a motion for Rule 11 sanctions against UMS on June 5, 2013.  Appx1594-1615.  Second, a different set of Defendants filed a misnamed motion for judgment on the pleadings against UMS on July 3, 2013 (eventually converted under Rule 56 to a motion for summary judgment).  Appx1637-1658.  Each motion asserted the same theory – unenforceability of the asserted patents because of ownership-splitting in violation of prosecution terminal disclaimers.  Appx1599; Appx1638-1639.

Importantly, neither motion raised lack of standing (either jurisdictional or prudential) on the ground that not enough parties had joined as co-plaintiffs.[21]  Nor did either motion assert entitlement to relief for failure to join a necessary or indispensable party under Federal Rule of Civil Procedure 19.  Instead, both motions alleged (wrongly, as the district court determined, Appx1737-1738) that pre-suit transfers of ownership rights for four of the five patents-in-suit made the whole portfolio "unenforceable."  *See generally* Appx1594-1615; Appx1637-1658.

---

[21] The Rule 12(c) motion did, however, advance an undeveloped argument in a footnote that there was an incurable lack of Article III standing based on no injury in fact.  Appx1646, n. 8.  The district court did not thereafter address this wholly distinct theory.

41

These two motions pressed Defendants' legal theory[22] that the district court should disregard AMT's sole ownership of **legal** title for all of the relevant patent properties, because AMT gave UMS an **exclusive license**.  Appx1601-1605; Appx1647-1649.  According to the argument, delivery of exclusive license rights somehow ran afoul of the prosecution undertakings within the terminal disclaimers that required the four affected patents to be commonly owned with the ultimate parent patent (a patent that was not in-suit).  *Id.*

In its successful oppositions to these motions, UMS pointed out that the unenforceability argument lacked merit.  *See e.g.,* Appx1616-1636; Appx1681-1698.  In the process, UMS correctly observed that the relevant legal status of the portfolio under the pertinent terminal disclaimers could only fall within one of two hypothetical categories: (1) either UMS (exclusive licensee) and AMT (title owner) collectively shared all of the incidents of legal ownership, with UMS bearing "all substantial rights" sufficient to allow it to stand alone in the caption as sole plaintiff; or (2) AMT solely possessed all legal ownership with UMS being considered a licensee without "all substantial rights."  Appx1622; Appx1687.

---

[22] As UMS explained to the district court, the movants changed their theory of sanctionable conduct between initially threatening and actually filing the Rule 11 motion.  Appx1621-1622.  At first, these defendants mistakenly believed that AMT did not own legal title to several of the relevant patents.  UMS then showed them documentation that corrected this initial misunderstanding in an attempt to explain why no terminal disclaimer unenforceability issue existed, and thus no sanctionable conduct in bringing suit.  *See id.*  Rather than drop the matter, these movants changed theories and filed for Rule 11 sanctions anyway.

Whichever the case, UMS argued, no splitting of ownership violated the terminal disclaimers.  *See generally* Appx1616-1636; Appx1681-1698.

The nature of the motions to which UMS responded did not require UMS to take a position about which of these two hypothetical scenarios held true.  UMS did, though, state that it considered the facts to fall into the first category (*i.e.*, with UMS possessing "all substantial rights").  Appx1622; Appx1687.  Even so, UMS at the time candidly and transparently suggested that if there were any concern, the district court should simply join AMT as a party co-plaintiff.  Appx1629.[23]

The district court correctly rejected the requests for both sanctions and dismissal, denying both motions.  Appx1740.  The district court noted that AMT's sole legal title ownership satisfied the terminal disclaimer undertaking, vitiating the unenforceability argument.  Appx1737-1739.  The district court also noted that the movants had presented no showing of bad faith behind any pre-suit patent assignment.  Appx1740.  But within its decision that went unambiguously UMS's way, the district court *sua sponte* took up the question of standing and party-joinder.  It reasoned that UMS's exclusive license was not the type of license that qualifies as a "territorial" one, and thus UMS would have to join AMT as co-

---

[23] Adding AMT would have been (and turned out to be) trivial. AMT had a contractual obligation to join on UMS's request.  Appx1720-1721.  This is likely the reason why no defendant ever moved for dismissal based on alleged lack of standing.  Every defendant would have known how easily curable standing problems would have been, even if they existed.

43

plaintiff within a certain time to continue the suit. Appx1726-1735. The district court helpfully suggested that if AMT refused, UMS could seek to join AMT involuntarily. Appx1735, n.13. A short time later, AMT accordingly joined the suit as co-plaintiff. Appx1741-1743.

To summarize, as things stood by that point, the district court had rejected all requests for dismissal for unenforceability, had rejected all requests for sanctions, had rejected requests for findings that pre-suit ownership transfers reflected bad faith, and had effectively adopted UMS's pragmatic suggestion of how to proceed. Though the district court did not adopt UMS's understanding that it possessed "all substantial rights" under its exclusive license, UMS completely won this early motion practice in all other particulars.

Meanwhile, as claim construction proceeded, certain Defendants advanced yet a ***third*** theory of sanctionable conduct. (*See* note 22, above). This became known later as the "assignment shell game" / estoppel avoidance theory. These Defendants suggested that UMS and AMT shared a nefarious motive in creating an environment where UMS would assert the patents-in-suit as sole plaintiff. Supposedly, this was to avoid the estoppel effect of positions that AMT's parent company had taken on claim construction in earlier litigation. In particular, these Defendants suggested that AMT's parent had agreed to a construction of "message signal" that would not read on any of the products accused in the present litigation.

44

After prevailing on claim construction in a manner that led Plaintiffs to offer a stipulated judgment of noninfringement, Defendants filed their Section 285 motion. In it, they primarily asserted the "assignment shell game" / estoppel avoidance theory for why the district court should find this to have been an exceptional case. *See generally* Appx1744-1781. The district court correctly rejected this ground. It pointed out that the "message" claim terminology in the present case was different from "message signal" terminology, and thus the canons of claim construction did not forbid the respective terms from receiving distinct constructions. Appx46. More importantly, no cognizable estoppel theory applies to bind any party whatsoever with respect to prior claim construction contentions, much less that might bind a different party. *Id.* In short, just as it had found no bad faith in connection with the prior Rule 11 motion, the district court found no possibility that any "assignment shell game" to avoid estoppel motivated any conduct of Plaintiffs, since no such estoppels were legally possible in the first place.

## B. The Exceptional Case Finding.

Though it denied the request to find the whole case exceptional based on a flawed claim construction, the district court did not end its analysis there. In the last three pages of its 13-page order, the district court considered UMS's conduct in responding to the earlier interlocutory motions. Appx48-50. The district court

held that such conduct and the motives behind it made this case "stand out from other cases."  Appx49.

In particular, the district court apparently forgot that it was UMS who suggested, during briefing on one of the motions, that AMT should be joined if any doubts arose about UMS's sole party standing.  The district court instead found that UMS failed to make such a suggestion, and this failure reflected lack of candor and transparency.  *Compare* Appx49 ("But UMS did not even offer that option in response to the motions, requiring the court to discern this for itself,") *with* Appx1629 ("If, however, the Court determines that Unified Messaging does not have an exclusive, territorial license; then, as a bare licensee, there exists a curable prudential standing issue (whereby AMT is simply added as a party plaintiff.)").  And though it had just pages earlier found no basis for Defendants' "assignment shell game" theory, the district court inconsistently found that this very motive was behind a failure of UMS to suggest adding AMT to cure any standing defects.  Appx49 ("The court can only infer that the litigation strategy set out above motivated UMS's lack of candor and transparency.").

Finally, the district court deemed the earlier Rule 11 and dismissal motions to have caused an unnecessary expenditure of judicial effort.  Appx49.  But rather than appreciating that the movants were responsible for their own filings, the district court blamed UMS for not having joined AMT earlier to obviate these

46

motions before they were filed.  *Id.*  In this final aspect, the district court lost sight of the fact that the district court itself raised absent-coparty standing defects *sua sponte* as its own issue.   And the district court failed to understand that the presence or absence of AMT in the caption bore no relationship to the terminal disclaimer unenforceability theories advanced in those motions.  In other words, UMS took blame for not joining AMT before any party or the court raised a question about standing, even though Defendants would have drawn on the district court's time with those motions regardless of whether AMT was already a co-plaintiff.

Underscoring that it blamed UMS for its conduct in not joining AMT earlier, the district court restricted its award of fees just to those amounts linked to the interlocutory motions that Defendants lost.  Appx49 ("the time defendants spent presenting and briefing the motion for judgment on the pleadings and the motion for sanctions.").

### C.    The District Court Abused its Discretion to Award Fees.

Palpable abuses of discretion surround the district court's decision to find this case exceptional and award fees.  The district court's reasoning deviated from the policies and purposes behind Section 285 fee shifting.   It reasoned that Plaintiffs should compensate for Defendants having brought two motions that Defendants *lost*.  This must be unprecedented in patent law – a court forcing a

47

*prevailing* party on two interlocutory motions to compensate the opponents for bringing losing motions, after having rejected the position that the case-merits as a whole required fee shifting. Such an incongruous award serves none of the purposes behind Section 285, or the Supreme Court's *Octane* decision. It does, however, disrupt the development of sound precedent to allow such a confounding result to stand.

Independently, clear factual errors improperly led to the fee award. First, the district court believed that Plaintiff UMS was not candid and transparent on matters relevant to the motions on which it prevailed, on the ground that UMS supposedly failed to suggest adding AMT as a party-plaintiff to obviate any standing issues. Appx49. Even if this reasoning were sound, it misapprehends what really happened. UMS *did* suggest within briefing on the interlocutory motions that adding AMT would obviate any perceived standing issues. Appx1629. The district court disposed of the motions exactly how UMS suggested it should.

Second, the district court found a "motive" for this lack of candor and transparency that was in conflict with findings of no bad faith made earlier in the case, and findings that rendered impossible the alleged "motive" just pages earlier. No sound discretion can rest on district court reasoning in conflict with its own fact finding.

48

And finally, the district court erroneously believed that UMS having joined AMT from the outset would have eliminated the interlocutory motions that led to the standing and joinder ruling. But this conclusion does not follow from the procedural facts. The meritless interlocutory motions did not rely on AMT's presence or absence from the caption. UMS would never have had any control over Defendants' motion tactics even if it had perfect foresight about the district court's later *sua sponte* rulings on standing and joinder.

A district court commits an abuse of discretion when it makes a clear error of judgment in weighing relevant factors, or exercises its discretion based upon an error of law or clearly erroneous factual findings. *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1379 (Fed. Cir. 2008) (district court abused its discretion in issuing permanent injunction because it made a clear error in its "irreparable harm" finding); *see also Mattson v. Dept. of Treasury*, 86 F.3d 211, 215 (Fed. Cir. 1996) (MSPB abused its discretion where its ruling contradicted its own prior factual finding). Pertinent here, the Supreme Court's *Octane* decision lays out the "relevant factors" against which this Court tests the exercise of judgment under Section 285.

*Octane* holds that an "exceptional case" is "simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable

manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756-57 (2014). While district courts may determine exceptionality in the case-by-case exercise of their discretion considering the totality of the circumstances, and while there is "no precise rule or formula for making these determinations," the Supreme Court has identified a nonexclusive list of considerations. *Id.* These include frivolousness, motivation, objective unreasonableness (both factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence. *Id.* at 1756 n.6. It is a "rare case" where a district court will properly award fees when a party's unreasonable conduct was not necessarily independently sanctionable, but is exceptional enough to justify the award. *Id.* at 1756-57. Further, a case involving either subjective bad faith or exceptionally meritless claims may sufficiently set itself apart to warrant a fee award. Balanced against this, fee awards are not to be used "as a penalty for failure to win a patent infringement suit." *Id.* at 1753. In short, courts should use fee awards to address instances of, among other things, egregious behavior, frivolousness, or a high degree of misconduct. *SFA Systems, LLC v. Newegg Inc.*, 793 F.3d 1344, 1348 (Fed. Cir. 2015).

No proper *Octane* factors supported an award of fees here. At the outset, three district court mistakes, considered independently or together, establish an

abuse of discretion.  First and foremost, the district court seemed to ground its rationale for fee shifting on its perception that UMS never suggested to the district court to add AMT to address any questions about party-standing.  Appx49.  This is untrue.  Appx1629.  Even Defendants' reply briefing recognized that UMS had made the suggestion.  Appx1672 ("Plaintiff [] suggests that the problem can easily be fixed by allowing Plaintiff to amend its complaint to add AMT as a co-plaintiff."); Appx1706 n.5 ("UMS misrepresents to the Court that the standing issue for a bare license could be solved by joining AMT to the case.").

Thus the sole fact finding behind the fee shifting is clearly erroneous.  Defendants' admissions in their district court reply briefing (just quoted) foreclose any possibility of a nonfrivolous argument sustaining these findings.  UMS made its suggestion to add AMT during briefing opposing the Rule 11 motion.  Appx1629.  When the district court ruled as it eventually did to require AMT's joinder (Appx1735-1736), by all appearances it seemed as if it had simply adopted UMS's suggestion of adding AMT to address this eventuality.

Second, the next ground for the district court's rationale for fee shifting was the district court's finding that UMS had an improper motive behind not suggesting to the district court to add AMT.  As just mentioned, the district court was wrong on the facts.  UMS did suggest adding AMT.  But even if that were not so, the "motive" finding was itself erroneous.  Here, the district court revived the

"assignment shell game" / estoppel avoidance strategy attributed by Defendants to Plaintiffs as the supposed motive. Appx49. But the district court had just rejected that estoppel was possible at all only pages earlier. Appx45-46. In fact, the district court's fee opinion itself notes that it rejected a bad faith finding during proceedings on the earlier Rule 11 motion. Appx43. No exercise of discretion is proper if it relies on contradicting a prior factual finding. *See Mattson*, 86 F.3d at 215.

Finally, the district court expressed dissatisfaction with UMS (the winning nonmovant) for having to deal at all with Defendants' various unsuccessful motions. Appx49. This rationale, if anything, stands as the most perplexing of all. The unsuccessful motions advanced a theory of total unenforceability based on ownership splitting in violation of the terms of prosecution terminal disclaimers. Appx1594-1615; Appx1637-1658. The district court failed to apprehend that this theory was agnostic about which party or parties occupied the plaintiff-side of the caption. Had UMS and AMT sued together at the outset, this would not have deterred Defendants from filing. Put another way, Defendants did not complain in those motions that UMS elbowed out the legal title owner from being a co-plaintiff. Since joinder was so straightforward, that would have gained Defendants nothing. Instead, Defendants complained (wrongly) that the patents were

unenforceable based on pre-litigation division of patent rights, in the shadow of prosecution terminal disclaimers.

These clearly erroneous factual findings and errors of judgment merit reversal of the exceptional case finding and fee award. This becomes even more evident when considering the district court's misweighing (or failure to weigh) the *Octane* factors within its exercise of judgment. Comparing those factors against the facts at bar reveals that the record was devoid of any proper basis for finding the case exceptional and awarding fees.

For example, UMS's conduct in the case (and more particularly in winning the Rule 11 and dismissal motions) cannot reasonably be viewed as "frivolous." UMS won the interlocutory motions. The district court rejected the meritless terminal disclaimer unenforceability defense behind them. The district court also rejected the Rule 11 assault, which explicitly and directly sought a finding that UMS's conduct in bringing suit was frivolous. Appx1740 (finding no evidence of bad faith involving pre-suit assignments). And then later, the district court also rejected a request to find Plaintiffs' claim construction positions frivolous. Appx46-48.

Nor does anything in the record support an improper "motivation" for this action, or more to the point, for UMS's successful opposition to the meritless Rule 11 and dismissal motions. UMS was "motivated" to make the winning arguments

that it did, including to suggest adding AMT to cure any standing-doubts, because it had a "motivation" to reach the merits as efficiently as possible. In fact, when Plaintiffs lost a key claim construction, they conceded noninfringement in order to perfect this appeal with minimum cost and disruption to either side or the district court. Appx243-283. Thus, nothing "exceptional" exists in the record about UMS's motivation in bringing or arguing this case.

Nor does the record support any objective unreasonableness or subjective bad faith on Plaintiffs' part. As discussed before, UMS won the interlocutory motions, and then acted compliantly by joining AMT when the district court adopted UMS's suggestion of that solution. And again, in ruling on the Rule 11 motion, the district court held that the record did not support any finding of bad faith with regard to pre-suit assignments. Appx1740.

Finally, the last factor, "considerations of compensation and deterrence," weighs in Plaintiffs' favor and against any fee award. The district court's fee order suggests that, somehow, it was UMS who caused two sets of opposing parties to file meritless motions advancing the terminal disclaimer unenforceability issue, which UMS supposedly could have staved off by joining AMT as a co-plaintiff from the outset. Appx48-49. This belief makes no sense. First, it is as preposterous as it sounds to suggest that a winning party should compensate losing parties for fees expended in filing meritless motions. And as for deterrence, those

interlocutory motions had nothing to do with AMT's co-plaintiff status (or temporary lack of such status).  It is difficult to grasp how UMS (or parties similarly situated) could be "deterred" from doing anything improper where all it did was to react to events out of its control.  Namely, it was Defendants who solely controlled whether they would bring their losing motions.  A fee award should not punish UMS for having won motions brought against it.  That is the reverse of how sound policy dictates courts should resolve fee motions.

Perhaps the district court just believed that UMS should have joined AMT so as to obviate the district court's eventual *sua sponte* ruling on standing.  But parties do not have crystal balls to know in advance what minute procedural matters might fascinate a district court, especially ones that draw no attention for years from well-funded and motivated opponents who are armed with the full machinery of the adversarial system.  No court has ever held that fee shifting statutes should serve the purpose of eliminating litigatable issues that parties ignore, but district courts take up *sua sponte*.

For the foregoing reasons, including errors in reasoning, judgment and factfinding, and including the district court's failure to weigh relevant factors correctly in its exercise of judgment, the district court abused its discretion to find the case exceptional and award fees.  Appellants respectfully request that the exceptional case finding and fee award be reversed.

## CONCLUSION AND RELIEF SOUGHT

For the foregoing reasons, Appellants respectfully requests that this Court:

1. Vacate the district court's final judgment;

2. Reverse the district court's construction of the term "message(s)";

3. Reverse the district court's construction of the term "data media type";

4. Reverse the district court's construction of the term "user-specific message storage area";

5. Reverse the district court's finding that this case is exceptional and subsequent award of attorney fees;

6. Remand this case back to the United States District Court for the Northern District of Illinois for further proceedings consistent with this Court's mandate.

DATED: September 22, 2016      Respectfully submitted,

By: /s/ Timothy E. Grochocinski
Timothy E. Grochocinski
Joseph P. Oldaker
NELSON BUMGARDNER PC
15020 S. Ravinia Ave., Suite 20
Orland Park, Illinois 60462
P. 708-675-1974
F. 708-675-1786

Ed Nelson III
Thomas Cecil
NELSON BUMGARDNER PC
3131 West 7th Street, Suite 300
Fort Worth, Texas 76107
P. 817-377-9111

Robert P. Greenspoon
FLASCHBART & GREENSPOON, LLC
333 N. Michigan Ave., 27th Floor
Chicago, Illinois 60601
P. 312-551-9500

*Attorneys for Plaintiffs-Appellants*
*Unified Messaging Solutions LLC and*
*Advanced Messaging Technologies, Inc.*

# ADDENDUM

**Addendum Table of Contents**

| Document | Appendix Range |
|---|---|
| Order entering judgment (Dkt. 712) | Appx33 |
| Final Judgment of Non-Infringement (Dkt. 713) | Appx34-35 |
| Judgment (Dkt. 715) | Appx36-37 |
| Claim Construction Order (Dkt. 639) | Appx1-30 |
| Order Regarding Plaintiffs' Motion for Reconsideration (Dkt. 676) | Appx31-32 |
| Second Amended Opinion and Order (Dkt. 805) | Appx38-50 |
| Order Regarding Attorney Fees (Dkt. 838) | Appx51-53 |
| U.S. Patent No. 6,857,074 | Appx284-321 |
| U.S. Patent No. 7,836,141 | Appx322-364 |
| U.S. Patent No. 7,895,306 | Appx365-410 |
| U.S. Patent No. 7,895,313 | Appx411-455 |
| U.S. Patent No. 7,934,148 | Appx456-504 |

# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS

|  |  |  |  |
|---|---|---|---|
| | | ) | |
| | | ) | |
| IN RE: | UNIFIED MESSAGING | ) | Case No: 12 C 6286 |
| | SOLUTIONS LLC | ) | |
| | PATENT LITIGATION | ) | |
| | | ) | Judge Joan H. Lefkow |
| | | ) | |
| | | ) | |

## ORDER

Judgment is entered in favor of defendants on all of plaintiffs' claims of infringement of the patents-in-suit and on defendants' counterclaims for declaratory judgment of non-infringement. Plaintiff's claims of infringement are hereby dismissed with prejudice. Defendants' counterclaims regarding invalidity and unenforceability of the patents-in-suit are dismissed without prejudice. See Final Order of Infringement for more detail. All pending motions are denied as moot. Civil case terminated.

Date:   June 13, 2014

_____
U.S. District Judge Joan H. Lefkow

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE:   **UNIFIED MESSAGING SOLUTIONS LLC AND ADVANCED MESSAGING TECHNOLOGIES, INC. PATENT LITIGATION** | **MDL No. 2371**<br><br>**Master Docket No. 12 C 6286**<br><br>**JURY TRIAL DEMANDED** |

## FINAL JUDGMENT OF NON-INFRINGEMENT

Based on the parties' Stipulation Reserving Right to Appeal and For Entry of Final Judgment of Non-Infringement Under the Court's Claim Construction, the Court finds, and it is HEREBY ORDERED, that:

1.     Defendants do not directly or indirectly infringe, and have not directly or indirectly infringed, either literally or under the doctrine of equivalents, any claim of U.S. Patents Nos. 6,857,074, 7,836,141, 7,895,306, 7,895,313, and 7,934,148 (collectively, the "Patents-in-Suit") given the Court's constructions of the terms "*message(s) [not including notification messages]*".

2.     Defendants CoxCom, LLC, Earthlink, Inc., Juno Online Services, Inc., NetZero, Inc., Northwestern Mutual Life Insurance Co., and Yahoo! Inc. do not directly or indirectly infringe, and have not directly or indirectly infringed, either literally or under the doctrine of equivalents, claims 1, 2, and 4 of U.S. Patent No. 6,857,074 given the Court's construction of the term *"data media type"*.

3.     Judgment is, therefore, entered in favor of Defendants, both with respect to Plaintiffs' claims of infringement and Defendants' counterclaims for declaratory judgment of non-infringement as to the Patents-in-Suit.

1

4. Plaintiffs' claims of infringement under the Patents-in-Suit are hereby dismissed WITH PREJUDICE, and Plaintiffs shall take nothing from Defendants with respect to their allegations of infringement.

5. Defendants' counterclaims concerning the invalidity and unenforceability of the Patents-in-Suit are dismissed WITHOUT PREJUDICE to Defendants' rights to assert any defenses and counterclaims in the future.

6. This Final Judgment resolves the issue of non-infringement based on the Court's construction of the terms "*message(s) [not including notification messages]*" and "*data media type*" (wher e applicable). Other issues, including construction of other claim terms of the Patents-in-Suit, do not form a basis of this Judgment.

Dated: June *13,* 2014

JOAN HUMPHREY LEFKOW
United States District Judge

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

IN RE: UNIFIED MESSAGING SOLUTIONS
LLC AND ADVANCED MESSAGING
TECHNOLOGIES, INC. PATENT LITIGATION,

Plaintiff(s),

v.

,

Defendant(s).

Case No. 12 C 6286
Judge Joan Humphrey Lefkow

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐      in favor of plaintiff(s)
and against defendant(s)
in the amount of $ ,

which ☐ includes     pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☐      in favor of defendant(s)
and against plaintiff(s)

.

Defendant(s) shall recover costs from plaintiff(s).

---

☒      other: Judgment is entered in favor of defendants on all of plaintiffs' claims of infringement of the patents-in-suit and on defendants' counterclaims for declaratory judgment of non-infringement. Plaintiff's claims of infringement are hereby dismissed with prejudice. Defendants' counterclaims regarding invalidity and unenforceability of the patents-in-suit are dismissed without prejudice. (Agreed Final Judgment of Infringement is incorporated herein).

---

This action was *(check one)*:

☐ tried by a jury with Judge    presiding, and the jury has rendered a verdict.
☐ tried by Judge Joan Humphrey Lefkow without a jury and the above decision was reached.
☒ decided by Judge Joan Humphrey Lefkow on a motion for judgment by stipulation.

Date:  6/13/2014                    Thomas G. Bruton, Clerk of Court

                                    /s/Michael Dooley , Deputy Clerk

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE UNIFIED MESSAGING | ) |  |
| SOLUTIONS, LLC PATENT LITIGATION | ) | **MDL No. 2371** |
|  | ) |  |
|  | ) | **Master Docket No. 12 C 6286** |
|  | ) |  |
|  | ) | **Hon. Joan H. Lefkow** |

## RULINGS ON CLAIM CONSTRUCTION

Based on the evidence received, the arguments of counsel, the court's review of the
record, and the undisputed rules of law applicable to claim construction as set out in the parties'
respective briefs, the court enters the following constructions of disputed claims in United States
Patent Nos. 6,857,074 ("the '074 patent"); 7,836,141 ("the '141 patent"); 7,895,306 ("the '306
patent"); 7,895,313 ("the '313 patent"); and 7,934,148 ("the '148 patent"):

| Disputed Claim Terms and Constructions |
|---|
| **user-specific message storage area ('141: 1, '148: 1, 39, 90)**: storage area specific to a user separate from storage areas of other users |
| **link to a message stored in a user-specific message storage area ('148: 1, 90)**: no construction needed |
| **message(s) [not including notification message(s)] ('074: 1, 2, 4, '141: 1, 24, 29, '306: 1, 24, 37, '313: 10, 11, '148: 1, 7, 90)**: communication received over a telephone line in audio, facsimile, or data file format |
| **data media type ('074: 1):** data media file type |
| **Ordering of steps.  See Part 5, below.** |
| **mark-up language file ('141: 1, '306: 1, '313: 10, 11, '148: 1, 90)**: a file generated on the server that contains a series of instructions used to generate the user interface |

| |
|---|
| **HTTP/hyper-text transfer protocol ('141: 1, '306: 1, '148: 1)**:  data access protocol used to access information on the internet |
| **provides information personal to the user ('148: 1, 90)**: provides information personal to the user other than the link(s) to a message and the message. |
| **storing the mark-up language file in a storage area accessible by the network server ('148: 1, 90)**: no construction necessary |
| **notification(s)/notification message(s) ('074: 1, 26, '141: 29, '306: 37, '148: 1, 90)**: no construction necessary |
| **customized according to one or more user-selected preferences received by the network server from the user's client device ('148: 91)**:  altering the content of the mark-up language file that is responsible for generating the user's interface's layout and slash or content in accordance with preferences selected by the user (**agreed**) |
| **Means-plus-function does not apply.** |
| **user interface ('141: 1, '306: 1, '313: 10, 11, '148: 1, 90)**: visual display that enables the user to interact with the network |
| **browser interface ('074: 1, 26)**: visual display that enables the user to interact with the network |

## EXPLANATIONS

**1.**     **"user-specific message storage area"**

Defendants contend that "user specific message storage area" means a "storage area of a user (such as a directory) separate from the storage area of other users, for storing messages only to that user."  In support, they rely on (1) the plain and ordinary meaning of the claims at issue, (2) the specification, and (3) the prosecution history.  UMS contends the term comprises a database in which messages to specific users may be commingled.  UMS relies on the specification.

2

**Specification**

The language of the claims supports defendants' position that the storage area is user-specific and that messages are not commingled therein. For example, dependent claim 44 recites a "user-specific message storage area compris[ing] a user-specific message mailbox within a searchable messaging database comprising a plurality of message mailboxes for a respective plurality of users." '148 patent, 29:13–17. Dependent claims 46 and 49 detail a process by which the user sends a request to access the storage area and provides authentication information that enables the user to access the user-specific message storage area. As detailed in claims 64 and 68, the user can also run a search for messages in the user-specific message storage area. The process recited, by which individual users check their own messages, indicates that the storage area for each user is separate from that of other users.

UMS also points to the specification's description of a directory, which provides,

In the preferred embodiment, the files for each user are stored in a separate directory assigned to just that one user because an entire directory for a given user generally can be protected easier than the individual files. The memory, however, may be organized in other ways with the files for a single user being stored in different directories.

'148 patent, 12:17–23. UMS argues that "the files for a single user being stored in different directories" contemplates storing messages in a database, within which message files for multiple users may be commingled.

While not the preferred embodiment, *see* '074 patent, 16:49–54, the specification discloses that messages could be stored in separate directories; however, nothing in the specification indicates that different users' messages would be commingled within directories. Moreover, the means by which the user accesses messages reveals that the storage area is specific

3

to the user.  *See* '148 patent, 16:29-34 ("The central processor **3** receives the calls on the DID trunks **15** and stores the messages in storage **11** in accordance with software **7**.  Preferably, a separate directory in storage **11** is established for each user having an account on the MSDS **10** so that all of the messages for a single user will be stored in the same directory.").

**Prosecution History**

The prosecution history supports defendants' interpretation, as well.  During reexamination of the '066 patent (a parent to the patents in suit), after rejection of the original claims that required "storing the message signal in a storage medium," the applicant amended the claims to require that a message be stored in a "user-specific storage area of the storage medium."  During reexamination of the related '321 patent, the applicant first sought claims requiring that messages be stored either in a "database" or in "computer storage."  The examiner rejected the argument that these claims were similar in scope to those allowed in the '066 patent, as those claims were narrower than a non-specific message storage area.  The applicant ultimately acceded to the rejection.  These events suggest that a broader "database" storage medium was not acceptable to the examiner.

Furthermore, to distinguish prior art during prosecution of the '141 patent, the applicant argued that a user-specific message storage area could not include databases in which multiple users' messages were commingled:  "[T]he items of information [stored in the prior art] are not stored in user-specific storage areas–they are stored in an unstructured global database and are unambiguously accessible to all users."  JA 795 (emphasis omitted).  The applicant further asserted that "these claims further require storing the message in a user-specific message storage area associated with the network server, wherein access to the *user-specific, message storage*

4

*area is* restricted to the user." JA 752 (internal quotations omitted; emphasis in original partially omitted). Thus, the applicant recognized that the message storage area was user-specific.

In *j2 Global Communications Inc.* v. *Captaris, Inc.*, No. 2:09-cv-4150, 2011 WL 837923, at *7 (C.D. Cal. Mar. 4, 2011), the court construed "user-specific message storage area" to mean "an area within a storage medium that stores messages for a recipient in a manner that identifies the message uniquely to the recipient." This construction, argues UMS, shows that the storage area can consist of user-specific directories that permit storing messages in a structure where they commingle with messages of other users. In reaching its conclusion, however, the court did not discuss whether the storage area for each user was separate from that of other users. Rather, the court's analysis focused on whether the storage area referred to a physical or logical portion of a storage medium. Therefore, that court's construction gives little guidance here.

## 2. **"link to a message stored in a user-specific message storage area"**

Defendants contend that this phrase should be construed as "selectable elements of a user interface which point to a message file stored in the user-specific message storage area and which, when selected, cause the contents of that particular message file to be retrieved." UMS argues that no construction is needed. The court agrees with UMS that "link" need not be defined as it has a readily apparent meaning to a person skilled in the art as well as a typical juror.

Defendants argue that UMS should be judicially estopped from taking this position because UMS "took a contrary position" in different litigation regarding this same patent family. "The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding[.] [A]bsent any

5

good explanation, a party should not be allowed to gain an advantage by litigation on one theory,
and then seek an inconsistent advantage by pursuing an incompatible theory." *New Hampshire v.
Maine,* 532 U.S. 742, 749, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001) (internal citations and
quotation marks omitted). First, it is not clear that UMS's position in arguing that no
construction is necessary here is either inconsistent with the *j2 Global Communications* litigation
or advantageous to UMS in any substantial way. In any event, where the party that stipulated is
another assignee of a patent in the same patent family, not UMS, the court is not inclined to
impose this equitable bar. Accordingly, judicial estoppel does not apply.

3.      **"message(s) [not including notification message(s)]"**

        Defendants argue that the term "message" is an inbound message that should be
construed as meaning "communication(s) from a third-party sender, received in an audio,
facsimile, or data file format over a call." UMS contends that the term is not limited to incoming
messages and should be construed to mean  "communication(s) between a sender and a
recipient." Defendants are correct that the message does not include email and must be a
received message. UMS is correct that a third party sender is not required.

        **Received Over a Call**

        The specification details a process by which messages are received and stored in the
message storage and delivery system (MSDS), reflecting that the claimed messages are inbound:

> [The system] involves receiving an incoming call and detecting an address signal
> associated with the incoming call, the address signal being associated with a user
> of the message storage and delivery system. A message accompanied with the
> address signal is then received and converted from a first file format to a second
> file format. The message is stored in the second file format within a storage area
> and is retrieved after a request has been received from the user.

6

'074 patent, 5:47–54. The types of messages received include facsimile messages, voice messages, and data messages. *See*, *e.g.*, *id.* at 6:4–6. After receipt of a new message, the MSDS notifies the user via email or through a paging system. *Id.* at 6:6–8.

> The incoming communication comes over a call to a number associated with the user:

> With reference to Fig. **2** depicting an overall operation of the invention, a telephone call directed to a number serviced by the MSDS **10** is initiated at step **40** by a third party, for instance, through the facsimile message **24**, telephone set **26**, or computer **28**. The incoming telephone call may therefore carry a facsimile message, a voice message, or a data message. At step **42**, the address signal associated with the initiated call is routed through the central office **20**, over the DID trunk **15**, and to the MSDS **10**.

'074 patent, 7:59–67. Figures 1 and 2 explaining how the message is received are detailed below.



FIG 1        FIG 2

Appx0007

Figure 13 (also below on page 9) demonstrates that the message is received via DID

Trunk over a call and then placed in storage.  The specification details,

> In another aspect, a network message storage and delivery system comprises a central processor for receiving an incoming call, for detecting an address signal on the incoming call, for detecting a message on the incoming call, and for placing the message in a storage area.  The address signal on the incoming call is associated with a user of the network message storage and delivery system.  A network server receives the message from the storage area, converts the message into a mixed media page layout language, and places the message in the storage area.  When the network server receives a request from the user over the network, the network server transmits at least a portion of the message over the network to the user.

> * * *

> A more detailed diagram of the MSDS **10** is shown in FIG. **13**. As shown in the figure, a plurality of DID trunks **15** are received by an input/output device **17** and are then sent to a central processor **3**. The number of DID trunks **15** may be changed to any suitable number that would be necessary to accommodate the anticipated number of telephone calls that may be made to the MSDS **10**. The input/output device **17** routes a call on one of the DID trunks **15** to an open port of the central processor **3** and is preferably a DID Interface Box manufactured by Exacom.

> The central processor **3** receives the calls on the DID trunks **15** and stores the messages in storage **11** in accordance with software **7**.  Preferably, a separate directory in storage **11** is established for each user having an account on the MSDS **10** so that all of the messages for a single user will be stored in the same directory. It should be understood that the number of processors within the central processor **3** is dependent upon the number of DID trunks **15**. With a greater number of DID trunks **15** capable of handling a larger number of telephone calls, the central processor **3** may actually comprise a number of computers. The input/output device **17** would then function to route incoming calls to an available computer within the central processor **3**.

'074 patent, 5:58–6:3; 16:37–59.

The specification also describes the process by which the user is notified of the message

and ultimately accesses the MSDS to retrieve the message:

> [**Notification**:]  The Internet Server **5** may be connected to a paging system **13**. Upon the arrival of a new message, in addition to sending an E-mail message to the

8

user's mailbox, the Internet Server **13** may also activate the paging system **13** so that a pager **15** would be activated. In this manner, the user could receive almost instantaneous notification that a message has arrived.

'074 patent, 18:7–13.

> [**Access**:]  The Internet Server **5** is connected to the central processor **3**, such as through a local area network, and also has access to the storage **11**. The Internet Server **5** performs a number of functions according to software **9**. For instance, the Internet Server **5** retrieves the data files stored in storage **11** by the central computer **3** and converts the files into the appropriate HTML files. The converted HTML files are then stored in storage **11** and may be downloaded to the computer **32** through the Internet **30**. The Internet Server **5** also handles the requests from the computer **32**, which might require the retrieval of files from the storage **11** and possibly the generation of additional HTML files.

('074 patent, 17:26–37.)

Figure 13 details the process in which the message is received over the DID trunk, placed in storage, and retrieved by the user.



**FIG 13**

9

### Type of Message

The specification also describes that the type of message received over a call includes facsimile messages, voice messages, and data messages. The parties dispute whether this message can include an email message. The defendants' position that a message does not include email is supported by the description of the invention and the specification. (*See* Section 4 below on the discussion regarding the meaning of "data.")

The specification further details that the MSDS detects the type of message over the call based on the calling tone:

> Because the MSDS **10** can receive messages of various types, such as a facsimile message, voice message or data message, the MSDS **10** must be able to determine the type of message that is being sent over the DID trunk **15**. With reference to FIG. 10, when an incoming call is received, the MSDS **10** goes off hook at step **200** and starts to generate a ringing sound. If, at step **202**, a facsimile calling tone is detected, then the ringing sound is stopped at step **204** and the message is received as a facsimile message at step **206**. Similarly, when a data modem calling tone is detected at step **208**, the ringing sound is stopped at step **210** and the message is identified as a data message at step **212**.

'074 patent, 14:36–47.

### Origination

The incoming communication need not originate from a third party sender. The specification provides,

> The messages or files received by the MSDS **10** need not arrive from a third party. In other words, the MSDS **10** may be used as a file repository or as a file manager for documents generated by the user itself. The user may call the designated telephone number for receiving messages and transmit voice messages, data messages, or facsimile messages and have the MSDS **10** document the receipt and content of these messages.

10

'074 patent, 26:41–48.  Defendants argue that the original patent application giving rise to the '507 patent did not include that the user could access the MSDS, but this is a question regarding priority dates that may be decided at a later time.  *See*, *e.g.*, *PowerOasis, Inc.* v. *T-Mobile USA, Inc.*, 522 F.3d 1299, 1311 (Fed. Cir. 2008) ("Since the Original Application does not support a 'customer interface' on a customer laptop, the asserted claims are not entitled to the effective filing date of the Original Application."); *Liebel-Flarsheim Co.* v. *Medrad, Inc.*, 358 F.3d 898, 903 (Fed. Cir. 2004) ("[A]ny question regarding the support or lack of support for the claims in the original disclosure bears on the issues of priority and validity, not on the issue of claim construction.").

### 4.  "data media type"

Defendants argue that this phrase should be construed as "data file format."  UMS contends that the phrase needs no construction or that it should be construed as "data," which would comprehend email.  Claim 1 of the '074 patent recites that "the messages being of any one or [more] media types selected from the group consisting of an audio media type, an image media type, and a data media type."  The specification does not describe data media type; it does, however, refer to data messages as data files in a context that would not include email:

> With regard to data messages, the transmission of the message often requires some coordination between the sender and the recipient.  For instance, the recipient's computer must be turned on to receive the message, which usually occurs only when someone is present during normal office hours.  Consequently, the recipient's computer is usually only able to receive a data message during normal office hours. . . . It is therefore frequently difficult to transmit and receive data messages and is also difficult to later relay the messages to another location.

'074 patent, 4:15–22; 30–32.  The specification further discusses problems with tracking and recording data messages, indicating the presence of a data "file":

> In addition to facsimile and voice mail messages, data messages are also difficult to track and record. A download or upload of a file may only be evident by the existence of a file itself. A file transfer procedure normally does not lend itself to any permanent record of what file was transferred, the dialed telephone number, the telephone number of the computer receiving the file, the time, or the date of the transfer. It is therefore difficult to maintain accurate records of all data transfers between itself and another entity.

'074 patent, 4:66–5:7. The specification also discusses the data message as being a file:

> FIG. 9 illustrates a process for converting a data message into HTML. At step **180**, the data file is retrieved from a database and at step **182** the HTML file containing the list of data messages is updated to include a listing of the newly received message along with identifying information. For instance, the HTML file for the listing 'datalist.html' would be updated to include an anchor to a data file 'file 1.1' and would have information such as the time and date that the data was transmitted, the size of the data file, as well as additional identifying information.

'074 patent, 14:26–35. See Figure 9 below (figures 7 and 8 are irrelevant to this analysis although in figure 8 the patent refers to a voicemail as a "voice file"):



12

Thus, it is clear from the specification that a "data media type" is one of several data file types. For this reason the word "file" is inserted.

## 5. Ordering of Steps

"Unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one. . . . However, such a result can ensue when the method steps implicitly require that they be performed in the order written." *Interactive Gift Express, Inc.* v. *Compuserve Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001) (internal quotation marks and citations omitted). Courts perform a two-part test when determining whether a method claim requires an order. "First, we look to the claim language to determine if, as a matter of logic or grammar, they must be performed in the order written. . . . If not, we next look to the rest of the specification to determine whether it directly or implicitly requires such a narrow construction. . . . If not, the sequence in which such steps are written is not a requirement." *Altiris, Inc.* v. *Symantec Corp.*, 318 F.3d 1363, 1369–70 (Fed. Cir. 2003) (internal quotation marks and citations omitted).

### A. Claims 1 and 90 of the '148 Patent

With regard to claims 1 and 90 of the '148 patent, defendants argue that the "mark-up language file" must be "generated" and "stored" before the system can send a "notification" to the user regarding the availability of the "mark-up language file."

Claim 1 of the '148 patent recites:

A method for storing a mark-up language file and delivering the mark-up language file from a network server to a user's computer via a packet switched data network using a hyper-text transfer protocol (HTTP), comprising:

> [1] generating the mark-up language file to include a sequence of mark-up language instructions that cause an application program executing on the user's computer to generate a user interface that provides a link to a message stored in a user-specific message

13

storage area accessible by the network server, and that further provides information personal to the user;

[2] storing the mark-up language file in a storage area accessible by the network server;

[3] transmitting a notification to the user's computer, wherein the notifications serves to notify the user of the availability of the mark-up language file; and

[4] in response to a user request made in response to the notification, transmitting the mark-up language file from the network server to the user's computer, via the packet switched data network, using the hyper-text transfer protocol.

Claim 90 of the '148 patent states:

A method for storing and delivering a mark-up language file from a network server to a user's client device via a packet switched data network using an Internet protocol, comprising:

[1] generating the mark-up language file to include a sequence of mark-up language instructions that cause an application program executing on the user's client device to generate a user interface that provides a link to a message stored in a user-specific message storage area accessible by the network server, and that further provides information personal to the user;

[2] storing the mark-up language file in a storage area accessible by the network server;

[3] transmitting a notification to the user's client device, the notification serving to notify the user of the availability of the mark-up language file; and

[4] in response to a request received from the user's client device via the packet switched data network, transmitting the mark-up language file from the network server to the user's client device, via the packet switched data network, using the Internet protocol;

wherein the request is generated in the user's client device in response to a user action performed after the notification is received at the user's client device.

14

While claims 1 and 90 place "generating the mark-up language file" before "transmitting a notification to the user's computer," the claims do not require this sequence of events. Indeed, the specification provides that a notification can be sent before the mark-up language file is generated.

> For instance, when a facsimile message is received, the MSDS **10**, at step **54**, will update the total listing of all messages to indicate the newly received message and may additionally generate the HTML files for the newly received facsimile message according to the user's preferences. When the user later requests information on the message at step **76**, the HTML information has already been generated and the MSDS **10** may directly send the requested information to the user at step **80**. If, on the other hand, the user desires to view the message according to one of the other options, the MSDS **10** will generate the HTML files at step **82** according to that other option at the time of the request. A first option available to the user for viewing a facsimile message is a textual only listing of the messages. . . . The second through fifth options allow the user to preview an image of the facsimile message before having the message downloaded from the MSDS **10** through the Internet **30** and to the computer **32**. . . . As discussed above, after the database is updated at step **54**, the MSDS **10** will generate additional information based upon the option selected for displaying the facsimile messages.

'313 patent, 9:29–42; 9:54–57; 10:24–28.

> The term synchronous has been used to refer to a mode of operation for the MSDS **10** in which the all possible HTML files for a message are generated at the time the message is received. The HTML files may be generated by the central processor **3** or by the application programs **31**. When a request for information is then later received by the HTTPD **37**, the information has already been generated and the HTTPD **37** only needs to retrieve the information from storage **11** and transmit the information to the user's computer **32**. With a synchronous mode of operation, the CGI **35** would be unnecessary.

> The MSDS **10** preferably operates according to an asynchronous mode of operation. In an asynchronous mode of operation, information requested by the user may not be available and may have to be generated after the request. The asynchronous mode of operation is preferred since fewer files are generated, thereby reducing the required amount of storage **11**.

15

'313 patent, 18:49–19:2.  Moreover, Figure 2 details a process where the message is converted to HTML based on user preferences after the message is received.  *See* specifically steps 50 and 58 in Figure 2 above on page 7.

**B.      Claim 1 of the '141 patent**

Defendants argue that the steps in claim 1 must be performed consecutively.  UMS contends that steps 1 and 2 do not need to precede step 3.  The court agrees with UMS: a user sending an access request in step 3 is not dependent on the MSDS's receiving a message beforehand.  Although the MSDS notifies the user of the receipt of a message, likely precipitating an access request by the user, the user can still access the mailbox without receiving this notification.

**C.      Claim 1 of the '306 patent**

The parties agreed to the order of the steps for Claim 1 of the '306 patent at the claim construction hearing.

**D.      Claim 10 of the '313 patent**

Defendants argue that the steps of claim 10 of the '313 patent must be performed consecutively while UMS argues that step [1] need not be performed before step [2].  UMS's construction is correct because establishing the application layer session of step [2] (communication between the user and server) can occur before the message is received in step [1] or stored in step [2].

**E.      Claim 11 of the '313 patent**

Defendants argue that the steps of claim 11 of the '313 patent must be performed consecutively while UMS argues that step [1] does not have to be performed first. UMS's construction is correct because a user can "request access" before a message is stored.

16

6.     "mark-up language file"

Defendants contend that this term means "the file generated by the network server that consists of all mark-up language instructions and content used to generate the user/browser interface and which excludes both scripts and the ability to deliver dynamic content.'" UMS contends that the phrase should be construed in accord with its plain and ordinary meaning, "a file containing mark-up language such as SGML, HTML, XML or the like."

The first dispute is whether the mark-up language file must be generated on the server side. Claim 1 of the '141 patent explicitly describes "transmitting a mark-up language file from the network server to the hyper-text browser, via the network[.]" '141 patent, 27:11–12. Thus, the claim requires that the mark-up language file be generated at the server side.[1]

The next part of defendants' construction, *i.e.*, that the mark-up language file consists of all mark-up language instructions and content used to generate the user/browser interface and which excludes both scripts and the ability to deliver dynamic content, is not necessary. First, inserting that the mark-up language file is "used to generate the user/browser interface" is included in other parts of the claim and would be redundant. *See* '141 patent, cl. 1. In addition,

---

[1]  As defendants contend, moreover, the patentee disavowed any claim that the mark-up language could be generated on the client side. During the prosecution of the '141 patent, in order to overcome Kaashoek, which disclosed a program running on the client-side user's computer that executed TCL scripts and "other interpretation techniques" to generate the user interface, JA 797–98, the patentee stated,  "It is clear from the language of claim 1 and the specification that the mark-up language file is generated at the server-side, is transmitted to the client side, and enables the client side to generate a user interface via a browser." JA 715. A statement made by the patentee during prosecution of a patent in the same family can operate as a disclaimer. *See Verizon Servs. Corp.* v. *Vonage Holdings Corp.*, 503 F.3d 1295, 1306 (Fed. Cir. 2007). To operate as a disclaimer, the statement in the prosecution history must be clear and unambiguous, and constitute a clear disavowal of scope. *Id.*; *see also Augustine Med., Inc.* v. *Gaymar Indus., Inc.*, 181 F.3d 1291, 1300 (Fed. Cir. 1999) ("[T]he prosecution history of a parent application may limit the scope of a later application using the same claim term.").

another claim specifies that an application program located on the client's device or a browser program executing on the intended recipient's computer produces the mailbox user interface in response to the mark-up language file. *See* '306 patent, cl. 1; '313 patent, cls. 10, 11; '148 patent, cl. 1.

Last, defendants seek to exclude scripts and the ability to deliver dynamic content. They argue that this material was new matter added in the 1997 continuation-in-part application. This issue, however, deals with priority dates. *See, e.g., PowerOasis,* 522 F.3d at 1310; *Liebel-Flarsheim*, 358 F.3d at 903 ("[A]ny question regarding the support or lack of support for the claims in the original disclosure bears on the issues of priority and validity, not on the issue of claim construction.").

The DICTIONARY OF COMPUTING (which the Federal Circuit has relied upon) defines mark-up language as follows:

> A notation for defining the structure and formatting of a document by using ordinary characters embedded in the text. This system of tags identifies the logical components of the document and relates them to a syntactic definition of the document structure. *See also* SGML, hypertext mark-up language.

DICTIONARY OF COMPUTING, 295 (4th ed. 1997). Moreover, hypertext mark-up language is defined as "[a] strictly defined method of presenting textual material intended for the *World Wide Web." DICTIONARY OF COMPUTING, 231 (4th ed. 1997). These definitions seem to capture what mark-up language is: a series of instructions used to generate the user interface.

18

7.    **"HTTP / hyper-text transfer protocol"**

Defendants contend that this term means "any version of hyper-text transfer protocol (HTTP) in common use as of April 28, 1995" while UMS argues that the proper construction is "data access protocol used to access information on the Internet."

The specification defines HTTP, stating

> [t]he MSDS **10** is also not limited to any particular version or standard of HTTP and thus not to any particular hyper-text transfer protocol deamon **37**. In general, HTTP is a data access protocol run over TCP and is the basis of the World Wide Web. HTTP began as a generic request-response protocol, designed to accommodate a variety of applications ranging from document exchange and management to searching and forms processing.

'148 patent, 21:16–23. This description is in accord with UMS's proposed construction.

Defendants argue that the definition of HTTP must be limited to what was known in 1995 when the original patent application was filed. This argument, as noted above, deals with the applicable priority date for the patents-in-suit. *See*, *e.g.*, *PowerOasis,* 522 F.3d at 1310; *Liebel-Flarsheim*, 358 F.3d at 903.

Defendants also argue that HTTP is limited to accessing information over the World Wide Web, which is a subset of the Internet. The specification, however, indicates that the user can interface with the MSDS over the Internet. The Field of the Invention portion of the specification provides, "This invention relates to system(s) and method(s) for storing and delivering messages and, more particularly, to system(s) and method(s) for storing messages and for delivery [of] the messages through a network, such as the Internet, or a telephone line to an intended recipient."

19

Other parts of the specification also indicate that the user communicates with the MSDS over the Internet. *E.g.,* '148 patent, 8:4–15 ("After the MSDS **10** receives a message for one of its users, the user can then communicate with the MSDS **10** at any time and at any location by connecting to the Internet World Wide Web **30** and retrieving the message stored within the MSDS **10**. With reference to FIG. 3, at step **60** the user first connects to the Internet **30**, such as through a personal computer **32** which may be connected to the Internet **30** in any suitable manner, such as through its own portal or node or through some intermediate access provider. The personal computer **32** is not limited to a single computer but may instead comprise a network of computers, such as a local area network within an office."); '148 patent, 9:48–51, 54–57 ("When the user selects one of the facsimile messages on the list, a request is sent to the HTTPD within the MSDS **10** causing the message to be downloaded via the Internet **30** to the user's computer **32**. . . . The second through fifth options allow the user to preview an image of the facsimile message before having the message downloaded from the MSDS **10** through the Internet **30** and to the computer **32**."); '148 patent, 19:21–25 ("The Internet World Wide Web **30** is a constantly expanding network that permits the user to retrieve the messages at virtually any location in the world. Since the user only needs to incur a local charge for connecting to the Internet **30**, the user can retrieve or review messages at a relatively low cost."); '148 patent, 20:35–37 ("The invention has been described as converting the messages into HTML and transmitting the HTML files over the Internet **30** to the computer **32**.").

## 8. **"provides information personal to the user"**

Defendants contend that this term should be construed as "displays information private to the user, other than the link(s) to the message(s)." UMS argues that no construction is necessary.

20

As set out in the Abstract, "[t]he mark-up language file is stored in a storage area accessible by the network server, wherein the file contains information personal to the user."[2] Digested, claim 1 describes generating a mark-up language file that causes an application program to generate an interface on the user's computer that provides (1) "a link to a [stored] message" and (2) "information personal to the user." This claim language suggests information personal to the user is something other than the link to the message and the message. Dependent claim 3 of the '148 patent also contains this phrase, stating that "the information personal to the user contained in the mark-up language file comprises information pertaining to one or more messages directed to the user as an intended recipient." Based on these references, the court infers that information personal to the user refers to the user's identifying information and preferences contained in the mark-up language file. User-specific information may be a broader term. The term, therefore, is construed as "provides information personal to the user other than the link(s) to a message and the message."[3]

---

[2] The abstract states,

. . . The mark-up language file is stored in a storage area accessible by the network server, wherein the file contains information personal to the user. A notification is transmitted to the user's computer, wherein the notification serves to notify the user of the availability of the file. In response to a user request made in response to the notification, the mark-up language file is transmitted from the network server to the user's computer, via the packet switched data network, using the HTTP. . . .

[3] Defendants also argue that "information personal to the user" is different from "user-specific information," since claims 36 and 37 of the abandoned '011 application (filed the same day as the application that led to the '148 patent), differentiated between "information personal to the user" and "user-specific information." But little can be inferred from this use of distinguishing terminology without support in the '011 file history.

21

**9.    "storing the mark-up language file in a storage area accessible by the network server"**

Defendants contend that the term should be construed to mean "storing the mark-up language file in a *user specific* storage area which the network server can access" (emphasis added).  UMS argues that further construction is unnecessary.

The element of claim 1 beginning "generating the mark-up language file" recites that "a *message* [is] stored in a user specific storage area."  '148 patent, 27:4–5 (emphasis added). Defendants point to the specification, which states, "the files for each user are stored in a separate directory assigned to just that one user because an entire directory for a given user generally can be protected easier than the individual files."  *Id.* at 12:18–21.  The files being described, however, are the files resulting from converting a facsimile message into an HTML file.  *See id.* at 11:51–12:64.  This is consistent with the claim language that the message is stored in a user-specific storage area.

Defendants also argue that during prosecution of the '148 patent, the patentee's expert attempted to distinguish prior art by arguing that "[the prior art] does not disclose the storing of a mark-up language file in a user specific message storage area accessible by the network server." JA 5184.  UMS responds that this statement is taken out of context, as the Richter declaration referred to is making the point that Kashooek's dynamic documents are not mark-up language files at all.  Richter states,

> Further, the independent claims (1 and 44) require that such a stored mark-up language file contains [*sic*] information personal to the user.  Since Kaashoek does not disclose the storing of a mark-up language file in a user specific message storage area accessible by the network server, it also does not disclose the mark-up language file storing information personal to the user. . . .  **Therefore it is my**

22

> **opinion that the dynamic document files of Kasshoek [*sic*] do not contain information personal to the user.**

*Id.* (emphasis in original). Plainly, Kaashoek is not addressing a rejection based on where the mark-up language files are stored. Defendants do not argue that this reference amounts to a disclaimer, and it is weak support for defendants' construction. *See Ecolab, Inc.* v. *FMC Corp.*, 569 F.3d 1335, 1342 (Fed. Cir. 2009) ("Even if an isolated statement appears to disclaim subject matter, the prosecution history as a whole may demonstrate that the patentee committed no clear and unmistakable disclaimer.").

**10.** **"notification/notification messages"**

Defendants contend that the term should be construed as "'notice receivable only outside of the application in which the message [mark-up language file] was presented to the user,' in which the bracketed language is the proposed '148 patent construction." UMS argues that no construction is necessary.

As previously stated, a message is the communication received by the MSDS via facsimile, voicemail, or a data transfer file. Once this message is received, the MSDS generates a notification to alert the user of a new message. The difference between a message and the notification is that "message" refers to the incoming communication while the notification is an alert sent by the MSDS to the user that a message is waiting.

Defendants argue that it is proper to construe message this way (*i.e.*, differentiating between messages that are incoming and outgoing). The term "notification message" only appears in one of the disputed claims (claim 1 of the '074 patent), which claims "a notification function configured to send notification messages to respective ones of the intended recipients

23

after receipt of the messages, the notification messages alerting the respective ones of the intended recipients of the receipt and availability of the messages at their respective mailboxes. . . ." In this context, notification modifies the term message, distinguishing it from the other type of message in the asserted claims (*i.e.*, an incoming message). Thus, "notification message" is the alert sent to inform the user of a message. It does not need further construction.

In the other asserted claims, however, notification is a stand-alone term. *See* '141 patent, cl. 29 ("further comprising sending a notification to the user to notify the user that the message has been received"); '306 patent, cl. 37 ("The method as set forth in claim 1, further comprising sending a notification to the user to notify the user that the particular message has been received."); '148 patent, cl. 1 ("transmitting a notification to the user's computer, wherein the notifications serves to notify the user of the availability of the mark-up language file"); '148 patent, cl. 90 ("transmitting a notification to the user's client device, the notification serving to notify the user of the availability of the mark-up language file"). Again, the term "notification" in these claims is clear and does not need further construction.

## 11. Means-plus-function terms

The parties dispute whether "a computerized server system programmed to implement" a messaging function and a notification function constitutes definite structure or whether it is subject to means-plus-function construction. Means-plus-function construction applies to "purely functional limitations that do not provide the structure that performs the recited function." *Phillips* v. *AWH Corp.*, 415 F.3d 1303, 1311 (Fed. Cir. 2005) (en banc). Means-plus-function claims "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112(f).

24

Use of the word "means" creates a rebuttable presumption that the drafter intended to invoke § 112(f), whereas failure to use the word "means" creates a rebuttable presumption that the drafter did not intend for § 112(f) to apply. *See Flo Healthcare Solutions, LLC* v. *Kappos*, 697 F.3d 1367, 1373 (Fed. Cir. 2012); *see also Lighting World, Inc.* v. *Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004) ("Our cases make clear ... that the presumption flowing from the absence of the term 'means' is a strong one that is not readily overcome.") (citations omitted). "[A] limitation lacking the term 'means' may overcome the presumption against means-plus-function treatment if it is shown that 'the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Flo Healthcare Solutions*, 697 F.3d at 1373 (quoting *Mass. Inst. of Tech.* v. *Abacus Software*, 462 F.3d 1344, 1353 (Fed. Cir. 2006)); *see also Encyclopedia Britannica, Inc.* v. *Alpine Elecs., Inc.*, 355 F. App'x 389, 392–93 (Fed. Cir. 2009) ("For computer-implemented inventions with means-plus-function claiming, the particular structure disclosed in the specification must be more than the general purpose computer or microprocessor.") (citing *Aristocrat Techs. Austl. Pty Ltd.* v. *Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008)). "When the claim drafter has not signaled his intent to invoke [§ 112(f)] by using the term 'means,' we are unwilling to apply that provision without a showing that the limitation essentially is devoid of anything that can be construed as structure." *Flo Healthcare Solutions*, 697 F.3d at 1374. Section 112(f) is inapplicable "if the limitation contains a term that is used in common parlance or by persons of skill in the pertinent art to designate structure." *Id.* (internal quotation marks and citation omitted).

25

The burden of overcoming the presumption is on the party alleging that § 112(f) applies. *Linear Tech. Corp.* v. *Impala Linear Corp.*, 379 F.3d 1311, 1319 (Fed. Cir. 2004). "In cases where the claims do not recite the term 'means,' considering intrinsic and extrinsic evidence is usually helpful, as the litigated issue often reduces to whether skilled artisans, after reading the patent, would conclude that a claim limitation is so devoid of structure that the drafter constructively engaged in means-plus-function claiming." *Inventio AG* v. *Thyssenkrupp Elevator Ams. Corp.*, 649 F.3d 1350, 1357 (Fed. Cir. 2011). "Ultimately, whether claim language invokes [§ 112(f)] depends on how those skilled in the art would understand the structural significance of that claim language, assessed against the presumptions that flow from a drafter's choice to employ or not employ the term 'means.'" *Id*. at 1360.

Claims 1 and 26 of the '074 patent recite as structure a "computerized server system programmed to implement" a messaging function and a notification function. The structure is a computerized server system, *i.e.*, a server. As defined in MICROSOFT COMPUTER DICTIONARY at 430 (PA 000682), "On the Internet or other network," a server is "a computer or program that responds to commands from a client. For example, a file server may contain an archive of data or program files; when a client submits a request for a file, the server transfers a copy of the file to the client." "Function" in patent parlance is the purpose of the "means." In computer parlance, similarly, it is "[t]he purpose of, or the action carried out by, a program or routine," as well as "[a] general term for a subroutine." MICROSOFT COMPUTER DICTIONARY at 237 (PA 679). Although defendants argue that the claims fail to recite sufficient structure, they have not offered any evidence demonstrating that one skilled in the art would conclude that a server programmed to perform the claimed functions lacks definite structure. Thus, the court has no

26

evidence on which to rest a determination that the claim fails to define structure. *See Linear Tech.*, 379 F.3d at 1320 ("To help determine whether a claim term recites sufficient structure, we examine whether it has an understood meaning in the art.") (quoted citation omitted). As stated in the specification, "The Internet Server **5** performs a number of functions according to software **9**. . . . Based on the above-referenced flowcharts and their respective description the production of the software **9** is within the capability of one of ordinary skill in the art and need not be described in any further detail." '074 patent, 17:11-30.

Furthermore, the cases suggest that a term such as "server programmed to implement" "a messaging function" and "a notification function," each function setting out the programming configuration needed to accomplish the function, would likely be understood by one skilled in the art. *See Linear Tech.*, 379 F.3d at 1320 (relying on expert declaration and technical dictionary, holding that "circuit" connotes structure to persons of skill in the art); *Lighting World*, 382 F. 3d at 1360 ("We have rejected arguments that broad terms such as 'digital detector' . . . trigger section 112 ¶ 6."); *id.* ("What is important is whether the term is one that is understood to describe structure, as opposed to a term that is simply a nonce word or a verbal construct that is not recognized as the name of structure and is simply a substitute for the term 'means for.'"); *Affymetrix, Inc.* v. *Hyseq, Inc.*, 132 F. Supp. 2d 1212, 1232 (N.D. Cal. 2001) (relying on expert's declaration, concluding "that 'computer code' is not a generic term, but rather recites structure that is understood by those of skill in the art to be a type of device for accomplishing the stated functions."); *see also* IPLAC PATENT CLAIM CONSTRUCTION IN THE FEDERAL CIRCUIT § 2:80 (2010 ed.) ("Of course, in method claims functional expressions are to be expected.").

27

The situation here is unlike *Aristocrat Technologies Australia Pty Limited* v. *International Game Technology*, 521 F.3d 1328, 1331 (2008), which defendants cite, where the inventor had invoked means-plus-function claiming, namely "control means," and the district court found the structure lacking in description and not found in the specification. Affirming, the Federal Circuit stated that for means-plus-function claiming it "has consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor. The point of the requirement . . . is to avoid pure functional claiming." *Id.* at 1333. In *Aspex Eyewear, Inc.* v. *Altair Eyewear, Inc.*, 288 F. App'x 697, 699 (2008), the invention was a device for attaching auxiliary eyeglass lenses (such as sunglasses) to a pair of eyeglasses. The court ruled that the term "retaining mechanism" was a means-plus-function limitation where there was no evidence that the term "connote[d] definite structure to a person of ordinary skill in the [eyeglass-making] art." *Id.* at 704. Thus, it called on the specification to define structure as "rims." By contrast here, the term "server programmed" to perform specific functions is likely to be familiar to a person of skill in computer programming as definite structure. At least, defendants have failed to overcome the presumption that § 112(f) does not apply.

**12.    "user interface"/"browser interface"**

Defendants contend that "user interface" and "browser interface" should be construed as a "visual display generated from mark-up language instructions that enable the user to interface with a network server with a hypertext browser." UMS argues that "user interface" means "a visual display that is enabled for user interaction" and "browser interface" means "a visual display that is enabled for user interaction within a browser window."

28

Defendants argue that the prior owners of the '066 patent (containing the same specification of the patents-in-suit) stipulated to this construction. As noted above, that stipulation is not binding on this court.

Not all of the asserted claims have the limitation that the interface is generated from mark-up language instructions. *See, e.g.*, '313 patent, cl. 10 ("wherein the browser program produces a mailbox user interface *in response to the mark-up language file*, the mailbox user interface comprising a link to the message in the restricted access storage area thereby enabling the intended recipient to request delivery of the message") (emphasis added). The limitation that the user interface or browser interface is generated from mark-up language instructions does not appear accurate. In addition, other claims such as claims 1 and 90 of the '148 patent already detail that the mark-up language file includes a sequence of instructions that cause an application program to generate a user interface making defendants' construction redundant.

With regard to defendants' construction that the user interfaces with a network server with a hypertext browser, this construction finds support in the specification, which provides that "[o]nce connected with the Internet **30**, at step **62**, the user accesses with a hyper-text browser the Universal Resource Locator (URL) associated with his or her MSDS **10** mailbox. The computer **32** may use any suitable hypertext browser, such as Netscape, to access the mailbox." '148 patent, 8:16–18. However, the asserted claims in the '148 patent and the '306 patent state that the application programs (not the hyper-text browser) generate the user interface. Moreover, dependent claims 8 and 9 of the '306 patent define application programs as consisting of hyper-text browsers and web browsers. Based on claim differentiation, it would be improper to limit application programs to a hyper-text browser when its definition seems to be broader.

29

Therefore, the proper construction is that an interface is a "visual display that enables the user to interact with the network server."

**<u>ORDER</u>**

Claim construction rulings are hereby entered as set forth on pages 1 and 2 of this document.

ENTER:

Dated: December 20, 2013

_____

JOAN HUMPHREY LEFKOW

United States District Judge

30

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

|  |  |  |  |
|---|---|---|---|
|  |  | ) |  |
|  |  | ) |  |
| IN RE: | UNIFIED MESSAGING | ) | Case No: 12 C 6286 |
|  | SOLUTIONS LLC | ) |  |
|  | PATENT LITIGATION | ) |  |
|  |  | ) | Judge Joan H. Lefkow |
|  |  | ) |  |
|  |  | ) |  |

## ORDER

 Plaintiffs' motion for reconsideration [665] is denied.  The declaration of Daniel Menascé is stricken because it was filed in violation of Local Patent Rule 4.2(c).  See Statement for more detail.

## STATEMENT

 The court has reviewed with care plaintiff's entire submission, including the declaration of Daniel Manascé, which could have been presented in support of plaintiffs' proposed claim construction.  In addition to its Rulings On Claim Construction, the court states as follows:

1.      The "message" of the referenced claims is a  "communication" (*i.e.*, "information generated . . . by electronic, optical or similar means," as plaintiff's reference defines it) that originates outside the claimed "computerized service system" ('074 patent, claims 1, 3, 4 ) and is received by that system, wherein it is stored and can be ultimately retrieved by the intended recipient via email.

2.      In 1995, the problems the claimed methods and systems were designed to solve did not apply to email transmitted over a telephone line via dial up connection.  Such email would have been, for example, discoverable immediately in the recipient's inbox, retrievable at a computer away from the user's office, private to and sent directly to the intended recipient, and readily tracked and recorded (See, *e.g.*, '074 patent, cols. 2-4).

3.      The claimed inventions made messages previously received via traditional telephone lines, such as faxes, voice mail and data messages, available over a network such as the Internet.  Although these three forms of communications are not exclusive, the intrinsic evidence contains no indication that messages might be conveyed by means other than telephone lines, such as computer to computer over the Internet. As stated, such means of transmission would not have had deficiencies that would have invoked a need for the systems and methods claimed.

Date:   February 25, 2014

_____
U.S. District Judge Joan H. Lefkow

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| ) | |
| ) | MDL No. 2371 |
| IN RE UNIFIED MESSAGING ) | |
| SOLUTIONS, LLC ) | Master Docket No. 12 C 6286 |
| PATENT LITIGATION ) | |
| ) | Judge Joan H. Lefkow |
| ) | |

### SECOND AMENDED OPINION AND ORDER

Plaintiff Unified Messaging Solutions, LLC brought suits against numerous defendants

alleging infringement of five related patents. (*See* dkt. 1.) These suits were consolidated into the

present multidistrict litigation. (*See id.*) Plaintiff Advanced Messaging Technologies, Inc. later

joined the suit as a necessary party. (Dkts. 608, 618.)

Before the court is defendants'[1] motion to find this case exceptional under 35 U.S.C.

§ 285. (Dkts. 745, 750.) Defendants General Electric Capital Services, Inc. and BMO Harris

Bank join the motion (dkts. 752, 753), and defendants Scottrade, Inc. and Orbitz LLC support it

---

[1] The following defendants joined the motion to find this case exceptional under 35 U.S.C. § 285:
Yahoo! Inc.; Twitter, Inc.; HSBC Bank USA, Inc.; HSBC Bank USA, National Association; HSBC North
America Holdings, Inc.; Conn's, Inc.; Conn's Appliances, Inc.; Sportsvite, LLC; Huntington Bancshares
Inc.; Cupid PLC; FriendFinder Networks, Inc.; Various, Inc.; Compass Bank; United Services
Automobile Association; Northwestern Mutual Life Insurance Co.; Groupon, Inc.; United Air Lines, Inc.;
Multiply, Inc.; Fidelity National Information Service, Inc.; Metavante Corporation; Banco Popular North
America; EverBank; People's United Bank; Fifth Third Bancorp; Scottrade, Inc.; Sprint Nextel
Corporation; Southwest Airlines Co.; The Vanguard Group, Inc.; Vanguard Marketing Corporation; U.S.
Bancorp; U.S. Bank National Association; State Street Corporation; SunTrust Banks, Inc.; SunTrust
Bank; Government Employees Insurance Company; GEICO Advantage Insurance Company; Fiserv, Inc.;
Sovereign Bank, N.A.; Juno Online Services, Inc.; NetZero, Inc.; Classmates, Inc.; Humana Inc.;
EarthLink, Inc.; CoxCom, LLC; American Airlines, Inc.; BancorpSouth, Inc.; BOKF, NA; Orbitz LLC;
and Branch Banking and Trust Company.

with supplemental memoranda.  (Dkts. 741, 746.)  For the reasons stated below, defendants'

motion is granted in part and denied in part.[2]

## BACKGROUND

The court assumes familiarity with the facts set forth in its opinion denying summary

judgment and declining to impose sanctions.  (Dkt. 608.)  It repeats only those facts necessary

for the disposition of the present motion.

## I.      Patents at Issue

Plaintiff United Messaging Solutions, LLC ("UMS") filed multiple lawsuits against

defendants alleging infringement of United States Patent Numbers 6,857,074 ("the '074 patent"),

7,836,141 ("the '141 patent"), 7,895,306 ("the '306 patent), 7,895,313 ("the '313 patent"), and

7,934,148 ("the '148 patent")—collectively the "patents in suit."

Each of the patents in suit is the result of a "continuation application," which allows a

patent applicant to pursue additional claims to an invention disclosed in an earlier application.

Thus, each of the five patents is based on the same invention—they simply build on that

invention through additional claims.  Here, the invention is a method and system for storing and

managing messages, disclosed in United States Patent 6,350,066 ("the '066 Patent").  In patent

vernacular, the '066 patent is the "parent patent" and the patents in suit are the "child patents."[3]

The '066 patent claims a system for receiving and storing a message signal directed to an

intended recipient and for relaying that message signal to a computer.  '066 Patent col.27 l.32–

34.  As the patent's abstract explains, a message storage and delivery system is connected to a

_____

[2] The court has jurisdiction under 28 U.S.C. § 1331.

[3] Four out of the five patents in suit are also subject to a terminal disclaimer—an
acknowledgement by the patent applicant that a later patent application discloses substantially the same
invention as an earlier application.  A terminal disclaimer obviates the need for a finding of double
patenting (and subsequent rejection of a later patent application).

public switched telephone network.  *Id.* at [57].  The network receives incoming "calls" in the form of facsimile, voice, or data transmissions and the system detects the type of call and stores it in a database.  *Id.*  The system, which is also connected to the Internet, then uses a "hyper-text transfer protocol deamon" to transmit the stored message to the recipient.  *Id.*

## II.    Patent Assignments

In the mid-2000s, j2 Global, Inc. ("j2") acquired the '066 patent, the '074 patent, and four patent applications, which ultimately issued as the remaining patents in suit.  (*See* dkt. 536-7.)

j2 assigned the '074 patent and the '306 patent to Acacia Patent Acquisition LLC, a wholly-owned subsidiary of Acacia Research Corporation, which acquires, licenses, and enforces patents.  (*See id.*)  j2 assigned the '066 patent and the three remaining patents to Advanced Messaging Technologies, Inc. ("AMT"), j2's wholly-owned subsidiary.  Shortly after j2 assigned the '074 patent and the '306 patent to Acacia Patent Acquisition, Acacia Patent Acquisition assigned both patents to UMS, another wholly-owned subsidiary of Acacia Research Corporation.  (*See id.*)

UMS then entered into an agreement with AMT.  (*See* dkt. 750-5.) The agreement transferred UMS's ownership interest in the '074 patent and the '306 patent to AMT.  (*Id.* § 2.1.) At the same time, it granted UMS an exclusive, non-transferrable, worldwide right and license to sue for infringement of the '066 patent and all five patents in suit.  (*Id.* § 2.2.)  The agreement limited that right, however, to "covered entities."[4]  AMT retained the right to bring infringement actions against non-covered entities.  The agreement further directed UMS to pay AMT

---

[4] Although the agreement includes a list of covered entities, that list is redacted.  (*See* dkt. 750-5 § 2.5, Ex. D.)  Plaintiffs have not produced an unredacted version.  Although the court does not know who the covered entities are, it assumes they are the types of entities sued in the present multidistrict litigation.

3

$2 million for the right and license to sue for infringement.  (*Id.* § 4.1.)  It also stated that if UMS obtained a recovery in connection with those suits, UMS would pay AMT royalties.  (*Id.* § 4.2.)

To summarize, j2 acquired the rights to the '066 patent and the patents in suit.  j2 assigned the '074 patent and the '306 patent to Acacia Patent Acquisition and assigned the '066 patent and the three remaining patents to its wholly-owned subsidiary, AMT.  Acacia Patent Acquisition (a wholly-owned subsidiary of Acacia Research Corporation) then transferred the '074 patent and the '306 patent to UMS (another wholly-owned subsidiary of Acacia Research Corporation), which then entered into an agreement with AMT that transferred the right, title, and interest of the two patents to AMT (and thus, effectively back to j2) but gave UMS the right to sue for infringement of the '066 patent and the patents in suit against covered entities.

## III.    Procedural History

Beginning in 2004, j2 brought several lawsuits in California alleging infringement of the '066 patent.  j2 brought a second round of lawsuits in 2009, this time joining AMT.  A few years later, UMS filed separate actions alleging infringement of the five patents in suit.  UMS did not join j2 or AMT to any of these actions.

In their suits for infringement, j2 and AMT claimed ownership of the '066 patent.  Because UMS never sued for infringement of the '066 patent (even though the agreement gave it the right to, at least against covered entities), it never explicitly claimed ownership of the patent.  It did, however, claim to be "the exclusive licensee" of the patents in suit "with ownership of all substantial rights" in the patents, "including the right [to] exclude others and to enforce, sue and recover damages for past and future infringement."  *See, e.g.*, Complaint at 6–10, *Unified Messaging Solutions LLC* v. *Google Inc., et al.*, No. 11-00464 (E.D. Tex. Sept. 7, 2011), ECF No. 1.

UMS's suits were consolidated into the present multidistrict litigation. From the start, there was confusion as to who owned the '066 patent and the patents in suit. During claim construction, defendants argued that UMS should be bound by a construction advocated by j2 in an earlier suit. UMS, however, maintained not only that it was a separate entity but that there was no privity between it and AMT, and that therefore estoppel was improper. UMS also argued that even if there were privity, it had sued to enforce different patents.

Before the court issued its claim construction ruling, defendants Juno Online Services, Inc., NetZero, Inc., and Memory Lane, Inc. moved for sanctions.[5] (Dkt. 536.) Shortly after, both the first and second wave defendants[6] filed a motion for judgment on the pleadings. (Dkt. 561.) In the motion for sanctions, defendants argued that the patents in suit were unenforceable, as patents on variants of the same invention must be commonly owned and the agreement between UMS and AMT split ownership. (Dkt. 536.) The first and second wave defendants argued for judgment on the pleadings for the same reason. (Dkt. 561.)

The court addressed the motion for judgment on the pleadings first, which it construed as a motion for summary judgment because it forced the court to look beyond the pleadings to the agreement between UMS and AMT. (Dkt. 608 at 10–11.) The court observed that a litigant must have legal title to a patent in order to sue for infringement. (*Id.* at 12.) Thus, it reasoned, the parties' dispute of ownership of the patents in suit was really a question of standing. (*Id.*) The court then concluded that because a conveyance of legal title "can be made only of the entire patent, an undivided part or share of the entire patent, or all rights under the patent in a specified

---

[5] Defendants also moved for dismissal under Federal Rule of Civil Procedure 11, which the court explained was improper. (Dkt. 608 at 9–10.)

[6] The first wave defendants are defendants whose cases were pending before the Judicial Panel on Multidistrict Litigation consolidated pretrial proceedings. The second wave defendants are those against whom UMS filed suit after the consolidation.

geographical region of the United States," *Rite-Hill Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1551 (Fed. Cir. 1995) (en banc), and the agreement between UMS and AMT did not involve the transfer of any one of these three interests, UMS did not have standing. The court declined to dismiss the case, and instead joined AMT as a necessary party under Federal Rule of Civil Procedure 19. (Dkts. 608 at 20–21, 618.)

The court then turned to the motion for sanctions. The court observed that the plaintiffs' litigation strategy allowed them to take different positions on what is effectively the same invention through the guise of different patents. Although the court found plaintiffs' conduct troubling, it declined to impose sanctions, concluding that there was no evidence that UMS and AMT entered into the agreement in bad faith. (Dkt. 608 at 25.)

The court ruled on claim construction a few months later without addressing defendants' argument for the application of judicial estoppel. (Dkt. 639.) Plaintiffs stipulated to dismissal and appealed. (Dkts. 713, 721, 730.) Defendants brought the present motion claiming the litigation was a deliberate attempt to exact licensing fees by exploiting the judicial system. (Dkts. 745, 750.)

## LEGAL STANDARD

Section 285 of the Patent Act authorizes a district court to "award reasonable attorney fees to the prevailing party" in "exceptional cases." 35 U.S.C. § 285. Until 2005, exceptional cases were limited to those that met the Federal Circuit's strict two-part test for objective baselessness and subjective bad faith. *Brooks Furniture Mfg., Inc.* v. *Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005). The Supreme Court abrogated that standard in *Octane Fitness*, expanding the definition of an exceptional case to "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing

law and the facts of the case) or the unreasonable manner in which the case was litigated."

*Octane Fitness, LLC* v. *ICON Health & Fitness, Inc.*, ---U.S.---, 134 S. Ct. 1749, 1756, 188 L. Ed. 2d 816 (2014).

The Supreme Court added that "[d]istrict courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.* The Court also rejected the *Brooks Furniture* requirement that the party seeking fees prove its entitlement by clear and convincing evidence. *Id.* at 1758. Under *Octane Fitness*, a preponderance of the evidence is sufficient. *Id.*

## ANALYSIS

Defendants argue that this case is exceptional because both UMS's proposed claim construction and its failure to join AMT in the first place were unreasonable.

## I.    Proposed Claim Construction

Defendants give considerably more color to the facts outlined above but offer little evidence in support of their allegations. According to defendants, after its first wave of lawsuits, j2 decided to target a broader range of defendants. (Dkt. 750 at 2.) j2 (at this point joined by AMT), however, was restricted by its earlier arguments that the disclosures in the '066 patent were limited to products and services using fax-to-web technology—products that converted incoming faxes to a format suitable for retrieval on the Internet. (*Id.* at 2–3.) Their solution, according to defendants, was to assign the right to sue to Acacia Research Corporation, which defendants call "one . . . of the largest and most litigious patent assertion entities in the United States." (*Id.* at 3.) According to defendants, Acacia Research Corporation formed UMS shortly after, with the express purpose of transferring the right to bring infringement actions to the subsidiary. (*Id.*) j2 then entered into a series of agreements with Acacia Research Corporation,

7

the final version of which was between AMT and UMS and was finalized in the fall of 2010. (*Id.* at 3–4.)  As noted above, this agreement gave UMS a right and license to sue for infringement of the '066 patent and all five of the patents in suit.  (*See* dkt. 750-5 § 2.2.)  It also directed UMS to pay AMT $2 million as well as 50% to 60% of any proceeds UMS generated through licensing or litigation.  (*Id.* §§  4.1–4.2.)  Defendants contend that this "shell game of assignments" was a win–win for plaintiffs:  j2 and AMT could bring actions against defendants in the fax-to-web industry and UMS could bring actions against a broader range of defendants and neither would be restricted by the other's litigation positions.  Specifically, defendants argue that this arrangement allowed plaintiffs to advocate for different constructions of the term "messages," avoiding estoppel.  (Dkt. 750 at 5.)

One of the disputed terms at claim construction was "message(s) [not including notification message(s)]."  (*See* dkt. 639.)  In earlier infringement actions, j2 had argued that inbound "message signals," as recited in the '066 patent, were limited to voice, fax, and data transfers.  (*See, e.g.*, dkt. 745-5 at 10 ("A 'message signal' should be defined as 'a signal that can include a fax, voice, or data message.'"))  At claim construction, defendants pushed for a similar interpretation, arguing that "message(s) [not including notification message(s)]" referred to an incoming message from a third-party sender received in a facsimile, audio, or data format.  (*Id.* at 6.)  UMS argued for a far broader construction, insisting that the term "messages" is not limited to incoming messages from third-party senders and simply refers to "communication(s) between a sender and a recipient."  (*Id.*)  Indeed, during the claim construction hearing UMS argued that "messages" is not even restricted to facsimile, voice, or data transmissions.  (*See, e.g.*, dkt. 553 at 7:9–15 ("[T]he claims at issue in this case are directed to a groundbreaking method and system for storing and delivering messages that enable messages *of any type* to be stored in mailboxes

8

associated with a network server." (emphasis added)).)  When AMT joined the case, it adopted

UMS's position.  The court ruled against plaintiffs and held that although a third-party sender

was not required, the message must be an incoming message and must be a facsimile, voice, or

data message.  (Dkt. 639 at 6–11.)

Defendants argue that plaintiffs' claim construction is substantively unreasonable for two

reasons—because it is "squarely at odds" with j2's prior position and because it is "baseless."

(Dkt. 750 at 1.)  The court is not persuaded by either argument.  First, it is unclear whether the

two positions *are* squarely at odds.  j2 argued for a construction of the disputed term "message

signal"; UMS argued for a construction of the disputed term "message(s) [not including

notification message(s)]."  Although the terms are similar, they are not the same—and neither are

the patents to which they belong.  Defendants do not adequately explain why the court should

expect plaintiffs' proposed construction of these disputed terms to be the same—putting more

weight in the terms' similarities than their differences.  But even if the court accepted

defendants' argument, it is unclear what it proves.  The application of judicial estoppel requires

more than a determination that positions are inconsistent.  *See New Hampshire* v. *Maine*,

532 U.S. 742, 750–51, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001) (detailing the "several factors"

that inform a court's decision to apply judicial estoppel).  Inconsistent positions, by themselves,

do not require an application of judicial estoppel.  Finally, defendants do not explain the

connection between judicial estoppel—an equitable doctrine—and a substantively unreasonable

litigation position.  Even if the court had estopped UMS from arguing for such a broad claim

construction, it is unclear how the court's decision would speak to the *substantive

unreasonableness* of that claim construction.

9

Defendants also argue that plaintiffs' position was "meritless." (Dkt. 750 at 7.) Defendants explain that plaintiffs' proposed construction, which defendants contend "was adapted from a common English language dictionary without regard for the intrinsic evidence," exemplifies a claim construction methodology "conclusively rejected by the Federal Circuit in *Phillips v. AWH Corp.*, 415 F.3d 1303, 1320–21 (Fed. Cir. 2005)." (Dkt. 750 at 12 n.6.) *Phillips* teaches that when construing claims courts must consider a patent's specification over extrinsic sources such as encyclopedias and dictionaries. 415 F.3d at 1320–21. The Federal Circuit explained,

> The main problem with elevating the dictionary to such prominence is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent. Properly viewed, the "ordinary meaning" of a claim term is its meaning to the ordinary artisan after reading the entire patent. Yet heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification.

*Id.* at 1321. As this court noted in its claim construction, the specification describes the type of messages received as "facsimile messages, voice messages, and data messages." (Dkt. 639 at 10.) For example, in the '074 patent, the specification refers to "facsimile, voice, and data" messages three times: it states that the storage and delivery system "encompasses the translation of facsimile, voice, and data messages"; that when using the search query form, which allows the user to search for a specific type of message, the user can indicate whether the message is a "facsimile, voice message or data file"; and that the storage and delivery system provides users with a link to recent files and clicking the link returns a "listing of all facsimile, voice, and data messages received." '074 Patent col.21 l.24, col.24 l.61, col.26 l.33. Defendants argue, therefore, that plaintiffs' claim construction was substantively unreasonable. But the *Phillips*

court acknowledged that there is a fine line between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim. 415 F.3d at 1323. This is far too fine a line to draw in awarding fees under § 285. Defendants must show, by a preponderance of the evidence, that plaintiffs' claim construction was substantively unreasonable. Characterizing it as in conflict with a Federal Circuit case warning against overreliance on dictionaries is insufficient. Furthermore, the mere fact that plaintiffs were unsuccessful does not establish that their position was substantively unreasonable. *See Raylon, LLC* v. *Complus Data Innovations, Inc.*, 700 F.3d 1361, 1368 (Fed. Cir. 2012) ("Reasonable minds can differ as to claim construction positions and losing constructions can nevertheless be nonfrivolous.").

## II. Failure to Join AMT

Defendants also argue that this case is exceptional because UMS failed to join AMT to any of its infringement actions. Indeed, it was only after the cases were consolidated and the parties briefed and argued both a motion for sanctions and a motion for judgment on the pleadings that UMS's lack of standing and AMT's status as a necessary party were revealed. (*See* dkts. 608 at 20–21, 618.) In ruling on those motions, this court wrote,

> "This litigation strategy ultimately may result in AMT's subsequently bringing lawsuits against the same defendants or their customers for infringement of the same invention through the guise of a different patent. Equally troubling is the fact that the '066 patent and the terminally disclaimed patents must be owned by the same entity, but AMT chooses to enforce the former while UMS sues for infringement of the latter.

*Id.* at 25. UMS knew it had not been transferred ownership of the patents as would be necessary to have standing, as it asserted joint ownership in response to defendants' motion for judgment on the pleadings. (Dkt. 589 at 2.) Moreover, UMS and AMT anticipated that AMT might be required to join a case as a plaintiff if a court rules that AMT is a "necessary party." (Dkt. 750-5

11

§ 2.6.)  As the court stated in its Opinion, "There would be no need for this provision if AMT had transferred all rights in the patent portfolio to UMS." (Dkt. 608 at 18.)

Even if excused from not joining AMT in the first instance, UMS should have been aware that Federal Rule of Civil Procedure 19(a) would require AMT to be joined. (See Dkt 608 at 20-21.) Had AMT been joined from the start, litigation of the motion for judgment on the pleadings and for sanctions could have been avoided.  But UMS did not even offer that option in response to the motions, requiring the court to discern this for itself.  The court can only infer that the litigation strategy set out above motivated UMS's lack of candor and transparency.

For these reasons, the court is persuaded that UMS's conduct stands out from other cases it qualifies as exceptional under 35 U.S.C § 285—in this respect. The court will award defendants a reasonable attorney's fee for the time defendants spent presenting and briefing the motion for judgment on the pleadings and the motion for sanctions.

Defendants also contend that UMS knew it was in privity with AMT when it argued during claim construction that the parties were not in privity. (*See* dkt. 553 at 74:13–75:18.) Defendants insist that, because UMS and AMT had an agreement under which UMS would pay AMT $2 million and royalties on any proceeds from the present suit, there was a "mutuality of interest."  (Dkt. 750 at 12 n.7.)  The court declines to hang an award of fees on these provisions alone.  As stated in the September 2013 Opinion and Order, a determination of privity could later bind AMT (dkt 608 at 21, n.14), but since AMT has been joined it is clear that AMT is bound by the judgment in any event.

## CONCLUSION

For the foregoing reasons, defendants' motion to declare this case exceptional under 35 U.S.C. § 285 (dkt. 745, 750), joined by defendants General Electric Capital Services, Inc. and BMO Harris Bank (dkts. 752, 753), and supported by defendants Scottrade, Inc. and Orbitz LLC (dkts. 741, 746), is granted in part and denied in part. Defendants are awarded a reasonable attorney's fee under § 285 for the portion of the litigation identified above. The parties are to proceed under LR 54.3(d).

Date: October 19, 2015

_____
U.S. District Judge

Appx0050

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | UNIFIED MESSAGING SOLUTIONS LLC AND ADVANCED MESSAGING TECHNOLOGIES, INC. PATENT LITIGATION | **MDL NO. 2371**<br><br>Master Docket No. 12-cv-6286<br><br>ALL CASES |

**ORDER REGARDING ATTORNEY FEES**
**FOR EXCEPTIONAL CASE PURSUANT TO 35 U.S.C. § 285**

Before the Court are various stipulations between Plaintiffs Unified Messaging Solutions

LLC and Advanced Messaging Technologies, Inc. ("Plaintiffs") and certain Defendants

regarding attorneys' fees in the above-captioned consolidated cases pursuant to the Court's

October 19, 2015 Second Amended Opinion and Order ("Order"), Dkt. No. 805.[1] Dkt Nos. 808,

809, 810, 811, 812, 813, 814, 815, 816, 817, 818, 819, 821, 822, 823, 824, 825, 826, 827, 828,

and 835. In the Order, the Court awarded certain Defendants "a reasonable attorney's fee for the

time Defendants spent presenting and briefing the motion for judgment on the pleadings and the

motion for sanctions," and instructed the parties to proceed under Local Rule 54.3(d). Dkt. 805

at 12-13.

Having considered the parties' stipulations and the facts in the record, the Court hereby

awards the following Defendants the following amounts of fees:

---

[1] All citations to the record refer to Master Docket No. 12-cv-6286 unless otherwise indicated.

| Dkt. No. | Defendant | Amount |
|---|---|---|
| 808 | Southwest Airlines Co. | $ 5,232.50 |
| 809 | Earthlink, Inc. | $ 7,500.00 |
| 810 | CoxCom, LLC | $ 7,500.00 |
| 811 | Government Employees Insurance Company and GEICO Advantage Insurance Company | $ 7,500.00 |
| 812 | Conn's Inc. and Conn Appliances, Inc. | $ 4,500.00 |
| 813 | State Street Corporation | $ 7,500.00 |
| 814 | Humana Inc. | $ 7,500.00 |
| 815 | Compass Bank | $ 4,050.00 |
| 816 | SunTrust Banks, Inc. and SunTrust Bank | $ 4,050.00 |
| 817 | United Services Automobile Association | $ 3,585.00 |
| 818 | Juno Online Services, Inc., NetZero, Inc., and Classmates, Inc. | $ 125,000.00 |
| 819 | United Air Lines, Inc. | $ 7,500.00 |
| 821 | Sprint Nextel Corporation | $ 7,500.00 |
| 822 | Yahoo! Inc. | $ 42,169.99 |
| 823 | Twitter Inc. | $ 49,612.20 |
| 824 | HSBC North America Holdings, Inc., HSBC USA Inc., and HSBC Bank USA, National Association | $ 7,500 |
| 825 | FriendFinder Networks, Inc. and Various, Inc. | $ 10,000.00 |
| 826 | Fiserv, Inc. and Santander Bank, N.A. | $ 24,000.00 |
| 827 | General Electric Capital Services, Inc. | $ 35,000.00 |

**Appx0052**

| 828 | Branch Banking and Trust Company | $ 6,518.25 |
| 835 | Groupon, Inc. | $ 10,000.00 |

Within 14 days of this Order, Plaintiffs shall pay the above amounts to the Defendants identified herein, or, alternatively, obtain from the Court a stay of such amounts pending appeal by posting, for each fee stipulation, a supersedeas bond approved by the Clerk in the amount defined by LR62.1 and in conformance with LR65.1, or otherwise by depositing the stipulated amounts with the Clerk of the Court pursuant to Fed. R. Civ. P. 67.

IT IS SO ORDERED.

Dated: May 20, 2016

By: _____

JOAN HUMPHREY LEFKOW
United States District Judge

Appx0053

US006857074B2

(12) **United States Patent**        (10) **Patent No.:**    **US 6,857,074 B2**

Bobo, II        (45) **Date of Patent:**        **Feb. 15, 2005**

(54) **SYSTEMS AND METHODS FOR STORING, DELIVERING, AND MANAGING MESSAGES**

(75) Inventor: **Charles R. Bobo, II**, Atlanta, GA (US)

(73) Assignee: **j2 Global Communication, Inc.,** Los Angeles, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 24 days.

(21) Appl. No.: **10/436,798**

(22) Filed: **May 12, 2003**

(65) **Prior Publication Data**

US 2003/0208688 A1 Nov. 6, 2003

**Related U.S. Application Data**

(63) Continuation of application No. 09/840,759, filed on Apr. 23, 2001, now Pat. No. 6,564,321, which is a continuation of application No. 09/186,595, filed on Nov. 5, 1998, now Pat. No. 6,350,066, which is a continuation of application No. 08/944,741, filed on Oct. 6, 1997, now Pat. No. 5,870, 549, which is a continuation-in-part of application No. 08/431,716, filed on Apr. 28, 1995, now Pat. No. 5,675,507.

(51) Int. Cl.[7] ................................................. **G06F 3/00**

(52) U.S. Cl. ...................... **713/168**; 713/165; 713/200; 713/201

(58) **Field of Search** ................................ 713/168, 165, 713/200, 201

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,106,060 | A | 8/1978 | Chapman, Jr. |
| 4,289,930 | A | 9/1981 | Connolly et al. |
| 4,405,829 | A | 9/1983 | Rivest et al. |
| 4,532,588 | A | 7/1985 | Foster |
| 4,713,780 | A | 12/1987 | Schultz et al. |
| 4,754,428 | A | 6/1988 | Schultz et al. |
| 4,816,653 | A | 3/1989 | Anderl et al. |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 755321 | 4/2003 |
| EP | 0 615 368 A2 | 2/1994 |
| WO | WO 1994006230 | 9/1992 |
| WO | WO 1995001040 | 6/1993 |
| WO | WO 1995006386 | 8/1993 |
| WO | WO 1995020288 | 1/1994 |
| WO | WO 96/34341 | 10/1996 |

OTHER PUBLICATIONS

B. S. Kaliski Jr., "An Overview of the PKCS Standards," RSA Laboratories Technical Note, RSA Security, Inc. Pub-lic-Key Cryptography Standards (PKCS), Revised Nov. 1, 1993.

"Keys and Certificates," downloaded from the Internet at www.elock.com.

(List continued on next page.)

*Primary Examiner*—Thomas R. Peeso

(74) *Attorney, Agent, or Firm*—Kenyon & Kenyon

(57) **ABSTRACT**

A Message Storage and Deliver System (MSDS) is con-nected to the public switched telephone network (PSTN) and receives incoming calls with these calls being facsimile, voice, or data transmissions. The MSDS detects the type of call and stores the message signal in a database. The MSDS is also connected to the Internet and has a hyper-text transfer protocol deamon (HTTPD) for receiving requests from users. The HTTPD forwards requests for certain files or messages to a network server which transmits at least part of the message to the HTTPD and then to the user. In addition to requests for certain documents, the HTTPD may also receive a request in the form of a search query. The search query is forwarded from the HTTPD to an application program for conducting the search of the database. The results of the search are forwarded through the HTTPD to the user. The user may then select one or more files or messages from the search results and may save the search for later reference.

**28 Claims, 18 Drawing Sheets**



**US 6,857,074 B2**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,837,798 | A | 6/1989 | Cohen et al. |
| 4,853,961 | A | 8/1989 | Pastor |
| 4,918,722 | A | 4/1990 | Duehren et al. |
| 5,008,814 | A | 4/1991 | Mathur |
| 5,033,079 | A | 7/1991 | Catron et al. |
| 5,065,427 | A | 11/1991 | Godbole |
| 5,068,888 | A | 11/1991 | Scherk et al. |
| 5,091,790 | A | 2/1992 | Silverberg |
| 5,105,184 | A | 4/1992 | Pirani et al. |
| 5,115,326 | A | 5/1992 | Burgess et al. |
| 5,517,556 | A | 9/1992 | Pounds |
| 5,167,011 | A | 11/1992 | Priest |
| 5,175,762 | A | 12/1992 | Kochis et al. |
| 5,241,594 | A | 8/1993 | Kung |
| 5,247,591 | A | 9/1993 | Baran |
| 5,247,661 | A | 9/1993 | Hager et al. |
| 5,255,312 | A | 10/1993 | Koshiishi |
| 5,257,112 | A | 10/1993 | Okada |
| 5,448,626 | A | 11/1993 | Kajiya |
| 5,276,869 | A | 1/1994 | Forrest et al. |
| 5,283,887 | A | 2/1994 | Zachery |
| 5,488,651 | A | 2/1994 | Giler |
| 5,291,302 | A | 3/1994 | Gordon et al. |
| 5,291,546 | A | 3/1994 | Giler et al. |
| 5,293,250 | A | 3/1994 | Okumura et al. |
| 5,297,208 | A | 3/1994 | Schlafly et al. |
| 5,317,628 | A | 5/1994 | Misholi et al. |
| 5,333,266 | A | 7/1994 | Boaz et al. |
| 5,349,636 | A | 9/1994 | Irribarren |
| 5,742,905 | A | 9/1994 | Pepe |
| 5,355,472 | A | 10/1994 | Lewis |
| 5,367,621 | A | 11/1994 | Cohen et al. |
| 5,379,374 | A | 1/1995 | Ishizaki et al. |
| 5,404,231 | A | 4/1995 | Bloomfield |
| 5,406,557 | A | 4/1995 | Baudoin |
| 5,608,874 | A | 4/1995 | Ogawa |
| 5,418,908 | A | 5/1995 | Keller et al. |
| 5,424,724 | A | 6/1995 | Williams et al. |
| 5,459,584 | A | 10/1995 | Gordon et al. |
| 5,471,617 | A | 11/1995 | Farrand et al. |
| 5,479,411 | A | 12/1995 | Klein |
| 5,483,466 | A | 1/1996 | Kawahara et al. |
| 5,483,580 | A | 1/1996 | Brandman et al. |
| 5,495,610 | A | 2/1996 | Shing et al. |
| 5,497,373 | A | 3/1996 | Hulen et al. |
| 5,509,123 | A | 4/1996 | Dobbins et al. |
| 5,513,323 | A | 4/1996 | Williams et al. |
| 5,526,353 | A | 6/1996 | Henley et al. |
| 5,530,852 | A | 6/1996 | Meske, Jr. et al. |
| 5,544,320 | A | 8/1996 | Konrad |
| 5,555,100 | A | 9/1996 | Bloomfield et al. |
| 5,559,611 | A | 9/1996 | Bloomfield et al. |
| 5,572,643 | A | 11/1996 | Judson |
| 5,608,786 | A | 3/1997 | Gordon |
| 5,673,316 | A | 9/1997 | Auerbach et al. |
| 5,675,507 | A | 10/1997 | Bobo, II |
| 5,677,955 | A | 10/1997 | Doggett et al. |
| 6,282,270 | B1 | 11/1997 | Porter |
| 5,710,883 | A | 1/1998 | Hong et al. |
| 5,727,156 | A | 3/1998 | Herr-Hoyman et al. |
| 5,737,396 | A | 4/1998 | Garcia |
| 5,751,814 | A | 5/1998 | Kafri |
| 5,751,956 | A | 5/1998 | Kirsch |
| 5,768,528 | A | 6/1998 | Stumm |
| 5,781,901 | A | 7/1998 | Kuzma |
| 5,787,175 | A | 7/1998 | Carter |
| 5,790,790 | A | 8/1998 | Smith et al. |
| 5,790,793 | A | 8/1998 | Higley |
| 5,793,972 | A | 8/1998 | Shane |
| 5,819,295 | A | 10/1998 | Nakagawa et al. |
| 5,870,549 | A | 2/1999 | Bobo, II |
| 5,893,908 | A | 4/1999 | Cullen et al. |
| 5,903,723 | A | 5/1999 | Beck et al. |
| 5,960,085 | A | 9/1999 | de la Huerga |
| 6,009,173 | A | 12/1999 | Sumner |
| 6,035,332 | A | 3/2000 | Ingrassia, Jr. et al. |
| 6,055,530 | A | 4/2000 | Sato |
| 6,061,448 | A | 5/2000 | Smith et al. |
| 6,643,034 | B1 | 10/2000 | Gordon |
| 6,192,407 | B1 | 2/2001 | Smith et al. |
| 6,314,425 | B1 | 11/2001 | Serbinis et al. |
| 6,350,066 | B1 | 2/2002 | Bobo, II |
| 6,564,321 | B2 | 5/2003 | Bobo, II |
| 2001/0014910 | A1 | 8/2001 | Bobo, II |

### OTHER PUBLICATIONS

"Cryptography Systems," downloaded from the Internet at www.elock.com.

"How does the S/MIME encryption and digital signature process work?" downloaded from the Internet at www-.worldtalk.com, on Jul. 25, 1999.

"PKCS #7: Cryptographic Message Syntax Standard," RSA Laboratories Technical Note, Version 1.5, RSA Security, Inc. Public–Key Cryptography Standards (PKCS), Revised Nov. 1, 1993, downloaded from the Internet at www.ftp.rsa.com, on Oct. 1, 1998.

C. Ellison, et al., "Default Protecting Secret Keys with Personal Entropy," Mar. 3, 1999.

"Chaffing and Winnowing: Confidentiality without Encryption," downloaded from the Internet at www.theory.Ics.mit-.edu, on Jul. 13, 1999.

"S/MIME or OpenPGP? How Will You Secure Your E–mail?" downloaded from the Internet at www.worldtalk.com.

"S/MIME Frequently Asked Questions," downloaded from the Internet at www.rsa.com, on Jul. 23, 1999.

"S/MIME Frequently Asked Questions," downloaded from the Internet at www.rsa.com, on Nov. 16, 1999.

"SDML–Signed Document Markup Language," W3C Note Jun. 19, 1998, downloaded from the Internet at www.23.org, on Oct. 28, 1998.

C. R. Baudoin, "The Sematech Electronic Mail System," Proceedings of the Digital Equipment Computer Users Society, pp. 221–231, US.A., Spring 1989.

N. Borenstein, et al., "A Multi–media Message System for Andrew," USENIX Winter Conference, Dallas, TX, pp. 37–42, Feb. 9–12, 1988.

J. Donahue, et al., "Walnut: Storing Electronic Mail in a Database," XEROX PARK, CSL–85–9, Nov. 1985.

K. Hofrichter, et al., "The BERKOM Multimedia–Mail Teleservice," Proceedings of the Fourth Workshop on Future Trends of Distributed Computing Systems, Lisbon, Portugal, pp. 23–30, Sep. 22–24, 1993.

J. K. Reichard, "Leveraging E–Mail," PC Magazine: 241, 244 and 245 (May 1995), et al., "Browsing Electronic Mail: Experiences Interfacing a Mail System to a DBMS," Proceedings of the Fourteenth International Conference on Very Large Data Bases, Los Angeles, CA, pp. 112–123, 1988.

E. Moeller, et al., "The BERKOM multimedia–mail teleservice," Computer Communications, vol. 18:2, pp. 89–102, Feb. 1995.

J. Pan, "Internet Security & Firewall Issues for NIIIP Virtual Enterprise," NIIIP OMB Meeting, Boca Raton, FL, Jan. 23–25, 1996.

US 6,857,074 B2

Page 3

A. Poggio, et al., "CCWS: A Computer–Based, Multimedia Information Systemm," Multimedia Communications, pp. 92–103, Oct. 1985.

A. Reinhardt, "Smarter E–Mail Is Coming," BYTE Magazine, pp. 90–108, Mar. 1993.

J. Rosenberg, et al., "An Overview of the Andrew Message System," Computer Communications Review, vol. 17:5, pp. 99–108, Apr. 1988.

S. Sakata, et al., "A Distributed Interoffice Mail System," Multimedia Communications, pp. 106–116, Oct. 1985.

S. J. Vaughan–Nichols, "Internet Publishing Tools Proliferate," BYTE Magazine, Mar. 1995.

"Microsoft Messaging Application Pro Interface (MAPI)," downloaded from the Internet at www.mmicrosoft.com/win32dev/apiext/mapiwp.html.

"Novell Announces *Softsolutions* 4.1", PR Newswire, New Orleans, LA, May 9, 1995.

"How Posta Works," downloaded from the Internet at www-.tumbleweed.com/posta/posta_overview.html.

"Overview of the Trans–Virtual Empriser Server," Product Overview.

V. Gay, et al, "Conception of a Multimedia Electronic Mail Based on Standards," Proceedings of the Fourth Workshop on Future Trends of Distributed Computing Systems, Sep. 22–24, 1993.

J. Postel, et al. "An Experimental Multimedia Mail System," ACM Transactions on Office Information Systems, vol. 6, No. 1, Jan. 1988.

"Web Mail", InformationWeek, pp. 120, Dec. 16, 1996.

"Ipswitch Delivers the First Internet–Ready Messaging Server for Windows NT That Allows Access to E–mail via the Web", PR Newswire, pp. 1209NEM007, Dec. 9, 1996.

"Hotmail Introduces Hotmail WebCourier Direct Content Delivery Service", Business Wire, pp. 02030123, Mar. 1997.

J. B. Postel, RFC0821, Simple Mail Transfer Protocol, HTTP://rfc–koeln.de/html, 80 pages, Aug. 1982.

M. Sherman, et al., "Allocation of User–Interface Resources in the Andrew Toolkit," International Conference on Multimedia Information Systems, pp. 261–272, 1991.

M. Sherman, et al., "Building Hypertext on a Multimedia Toolkit: An Overview of Andrew Toolkit Hypermedia Facilities," Proceedings of the First European Conference on Hypertext, pp. 13–24, France, Nov. 1990.

V. S. Wheatman, "Sorting Through the Secure Messaging Maze," Messaging Magazine, downloaded from the Internet at www.ema.org/html/pubs/mmv4n2/msgmaze.htm, Mar.–Apr. 1998.

"The Andrew Messages System," downloaded from the Internet at www.cs.cmu.edu/afs/cs.cmu.edu/project/atk–ftp/web/ams.html.

"Facts on File re: Andrew," downloaded from the Internet at www.cs.cmu.edu:80/afs/cs.cmu.edu/project/atk–ftp/web/faxonfile.html.

"Welcome to the Andrew Consortium," www.cs.cmu.edu:80/afs/cs.cmu.edu/project/atk–ftp/web/andrew–home-.html.

"The Andrew Publication Archive," ftp.andrew.cmu.edu/pub/AUIS/PAPERS/REDME.

"Bibliography of Publications on the Andrew User Interface System," ftp.andrew.cmu.edu/pub/AUIS/PAPERS/BIBLIOGRAPHY.

J. Peek, et al., "MH & xmh, Email for Users & Programmers," O'Reilly & Associates, Inc., Sebastopol, CA, 1995.

B. Costales, et al., "sendmail," O'Reilly & Associates, Inc., Sebastopol, CA, 1993.

K. S. Morris, "A Technical Overview of MIME," Web Developer's Journal Archives, Mar. 1995.

"Comp.mail.mime FAQ (frequently asked questions list)," downloaded from the Internet at www.cis.ohio–state.edu/text/faq/usenet/mail/mime–faq/part1/faq.html, Jun. 11, 1997.

"Composing and Sending MIME Message," downloaded from the Internet at www.gieldasgarage.com/mh/cosemine.htm.

"Reading MIME Messages," downloaded from the Internet at www.gieldasgarage.com/mh/cosemime.htm.

"Comp.mail.mime frequently asked questions list (FAQ) (1/3)," downloaded from the Internet at www.tu–chem-nitz.de/–fri/mime/FAQ–1.htmk, Sep. 4, 1994.

M. Grand, "MIME Overview," downloaded from the Internet at www.mindspring.com/–mgrand/mime.html, revised Oct. 26, 1993.

D. W. Connolly, "A Formalism for Internet Information References," downloaded from the Internet at www.w3.org/People/Connolly/drafts/formalism.txt.

G. Vaudreuil, "The Multipart/Report Content Type for the Reporting of Mail System Administrative Messages," Network Working Group, Internet Draft, Sep. 1995.

G. Vaudreil, "Enhanced Mail System Status Codes," Network Working Group, Internet Draft, Jun. 1995.

K. Moore, et al., "An Extensible Message Format for Delivery Status Notifications," Network Working Group, Internet Draft, Sep. 1995.

"Information Technology—Text and office systems—Distributed–office–applications model—Part 1: General model," International Standard ISO / IEC 10031–1:1–73, 1991 (E).

"Information Technology—Text and Office Systems—Distributed Office Applications Model: Part 2; Distinguished–object–reference and Associated Procedures," International Standard ISO/IEC 10031–2:1–13, 1991.

D. H. Crocker, "Standard for the Format of ARPA Interent Text Message," RFC 822, 1982.

J. Klensin, "Simple Mail Transfer Protocol," Internet Draft, draft–ietf–drums–02.txt, May 21, 1996.

N. Borenstein et al., "MIME: Mechanisms for Specifying and Describing the Format of Internet Message Bodies," Network Working Group, RFC 1341, Jun. 1992.

N. Borenstein, "MIME (Multipurpose Internet Mail Extensions) Part One: Mechanism for Specifying and Describing the Format of Internet Message Bodies," Network Working Group, RFC 1521, Sep. 1993.

K. Moore, "MIME (Multipurpose Internet Mail Extensions) Part Two: Message Header Extensions for Non–ASCII Text," Network Working Group, RFC 1522, Sep. 1993.

N. Freed, et al., "Definition of the URL MIME External–Body Access–Type," Network Working Group, Internet Draft of RFC 2017 (Apr. 11, 1995) see also N. Freed et al., "Definition of the URL MIME External–Body Access–Type," Network Working Group, RFC 2017, Oct. 1996.

C. Manros, "New Internet Mail Functionality for Delivery Status Notifications," Messaging Magazine, Jul./Aug. 1995.

K. Moore, "SMTP Service Extension for Delivery Status Notifications," Network Working Group, Internet–Draft of RFC 1891, Sep. 21, 1995.

**US 6,857,074 B2**

Page 4

Internet Engineering Task Force, R. Braden (ed.), "Requirements for Internet Hosts—Application and Support," Network Working Group, RFC 1123, Oct. 1989.

J. Myers, et al., "Post Office Protocol—Version 3," Network Working Group, RFC 1725, Nov. 1994.

K. Sollins et al., "Functional Requirements for Uniform Resource Names," Network Working Group, RFC 1737 Dec. 1994.

T. Berners–Lee, "Universal Resource Identifier in WWW, A Unifying Syntax for the Expression and Address of Objects on the Network as used in the World–Wide Web," Network Working Group, RFC 1630, Jun. 1994.

T. Berners–Lee, et al., "Uniform Resource Locators (URL)," Network Working Group, RFC 1738, Dec. 1994.

T. Berners–Lee, et al., "Hypertext Markup Language–2.0," Network Working Group, RFC 1866, Nov. 1995.

S. Bradner, "The Internet Standards Process—Revision 3," Network Working Group, RFC 2026, 1996.

J. K. Reynolds, et al., "The DARPA Experimental Multimedia Mail System," Computer: 82–89, 1985.

S. Baker, "Hypertext Browsing on the Internet," UNIX Review : 21–27, 1994.

D.P. Dern, "Applying the Internet," BYTE Magazine, Feb. 1992.

K.M. Savetz, "Magazines Without Paper," BYTE Magazine, Sep. 1993.

S.J. Vaughan–Nichols, "The Web Means Business," BYTE Magazine, Nov. 1994.

A. Singleton, "The Virtual Storefront," BYTE Magazine, Jan. 1995.

J.R. Vacca, "Mosaic: Beyond Net Surfing," BYTE Magazine, Jan. 1995.

B. Smith, "Internet with Style," BYTE Magazine, Jan. 1995.

B. Smith, "Making the Internet Connection," BYTE Magazine, Jan. 1995.

B. Friesenhahn, "Build Your Own WWW Server," BYTE Magazine, Apr. 1995.

S.B. Jones, "Caught in the World Wide Web: MIT Moves Computer Documentation Online," Meet the Shadow Future:187–189, 1994.

S. Baker, "Mosaic–Surfing at Home and Abroad," Meet the Shadow Future: 159–163, 1994.

R. J. Vetter et al., "Mosaic, HTML, and the World Wide Web," IEEE Computer, 27, 1994.

University of Cambridge Statistical Laboratory, "Using Mosaic for Xwindows," Internet Publication, Jul. 1994, downloaded from http://www.statslab.cam.ac.uk.

"New Features in Mosaic 2.0," Internet Publication, downloaded from http://www.issi.com, Dec. 1994.

"World Wide Web Frequently Asked Questions," from URL http://sunsite.unc.edu/boutell/faq/www_faq.html, Dec. 9, 1994.

MHonArc Home Page updated Nov. 17, 1994 and MHonArc software manual published by Earl Hood <ehood@convex.com> Convex Computer Corporation, Richardson Texas.

C. Liu, et al., "Managing Internet Information Services," World Wide Web, Gopher, FTP, and more : 357–359, Dec. 1994.

J. December, et al., "The World Wide Web; Everything You Need to Master the Web!": 180–189–part I and 277–280 (part II), 1994.

T. Berners–Lee, et al., "Hypertext Markup Language (HTML); A Representation of Textual Information and Metainformation for Retrieval and Interchange," Internet Draft, IIIR Working Group, 1993.

K. Reichard, "Leveraging E–Mail," PC Magazine: 241, 244 and 245, May 1995.

"Lan–Aces, Inc. Announces Expanded Capabilities to Office–Logic Clerk Application," PR Newswire, May–Jun. 1994.

"Working with AT&T Easylink, An Effective Communication Solution for Business," PC Today 62, May 1995.

J. Davis, et al., "Drop–in Publishing With the World Wide Web," Computer Networks and IDSN Systems, 28, pp. 247–255, 1995.

K. Goldberg, "Beyond the Web: Manipulating the Real World," Computer Networks and ISDN Systems, 28, pp. 209–219, 1995.

A. N. Boston, et al., "Interactive species distribution reporting, mapping, and modelling using the World Wide Web," Computer Networks and ISDN Systems, 28, pp. 231–238, 1995.

T. W. Yan, et al., "From user access patterns to dynamic hypertext linking," Computer Networks and ISDN Systems, 28, pp. 1007–1014, 1996.

H. Pusch, "Design and implementation of a global reference mechanism for data objects," Computer Standards & Interfaces, 17, pp. 181–192, 1995.

B. Wiegel, "Secure External References in Multimedia Email Messages," 3rd ACM Conference on Computer and Communications Security, New Delhi, Mar. 14–16, 1996.

E. Levinson, "Exchanging SGML Documents Using Internet Mail and MIME," Computer Standards & Interfaces, 18, pp. 93–102, 1996.

E. Meyer, et al., "Borealis Image Server," Computer Networks and ISDN Systems, 28, pp. 1123–1137, 1996.

M. Rio, et al., "A framework for broadcasting and management of URIs," Computer Networks and ISDN Systems, 28, pp. 535–542, 1996.

Delrina Advertisement, 1994.

Cope, "Working with . . . Fax Mailbox," *PCToday*, vol. 8, Issue 9, Sep. 1994.

Warren, "Voice/fax Combos," *Computer Telephony*, Sep./Oct. 1994, p. 88.

Swartz, Barry K. and Stephen B. Weinstein, Dual–Media Messaging Using Screen Telephones on the Telephone Network, IEEE International Conference on Communications '93, May 23–26, 1993, pp. 1183–1188, Technical Program, Conference Record, vol. 2/3.

Borenstein, Nathaniel S., "Internet Multimedia Mail with MIME: Emerging Standards for Interoperability," Upper Layer Protocols, Architectures and Applications, 1992, pp. 183–192, Elsevier Science Publishers B.V. (North–Hollard).

Supplementary European Search Report in European Patent Application No. EP 96 91 3855, search results mailed Nov. 22, 2001.

*Critical Path Data Sheet—Critical Path Notification Server, 2 pages, Dec. 2002.

*Critical Path Data Sheet—Critical Path Messaging Server, 2 pages, Dec. 2002.

*Critical Path Data Sheet—Critical Path Internet File Server, 2 pages, Dec. 2002.

*Critical Path Data Sheet—Critical Path Presentation Server, 2 pages, Dec. 2002.

*Critical Path Data Sheet—Critical Path SMS Access Server, 2 pages, 2002.

*Critical Path Data Sheet—Critical Path Calendar Server, 2 pages, Dec. 2002.

*Critical Path Data Sheet—Critical Path Personal Address Book Server, 2 pages, Dec. 2002.

*CP™ Meta–Directory Server, 4 pages, Jun. 2002.

*Critical Path Meta–Directory Server, 1 page, May 8, 2003 http://www.cp.net/solutions/metaDirectoryServer.html.

*Tumbleweed Communications, 3 pages, May 8, 2003, http://www.tumbleweed.com/en/products/ime_overview.html.

*Tumbleweed Communications, 1 page, May 8, 2003 http://www.tumbleweed.com/en/products/ime_product_architecture.html.

*Tumbleweed Communications, 1 page, May 8, 2003 http://www.tumbleweed.com/en/products/ime_for_automated_deliveries.html.

*Tumbleweed Communications, 3 pages, May 8, 2003 http://www.tumbleweed.com/dy/print/.

*Tumbleweed Communications, 1 page, May 8, 2003 http://www.tumbleweed.com/en/products/ime_portal_integration.html.

*Tumbleweed Communications, 1 page, May 8, 2003 http://www.tumbleweed.com/en/products/ime_message_tracking.html.

*Tumbleweed Communications, 2 pages, May 8, 2003 http://www.tumbleweed.com/dy/print/.

*Tumbleweed Communications, 2 pages, May 8, 2003 http://www.tumbleweed.com/dy/print/.

Fax Mailbox, PC Today, Sep. 1994.

The Multimedia Fax–MIME Gateway, Patel, Henderson and Georganas, IEEE Multimedia, Winter 1994.

Multimedia Fax–MIME Interworking, Patel, Henderson and Georganas, IEEE, 1994.

MIME (Multipurpose Internet Mail Extension) Part One: Mechanisms for Specifying and Describing the Format of Internet Message Bodies, Internet 1521 (obsoletes 1342), Sep. 1993.

MIME (Multipurpose Internet Mail Extension) Part Two: Message Header Extensions for Non–ASCII Text, Internet RFC 1522 (obsoletes 1342), Sep. 1993.

Lotus Turns Up the Heat on Microsoft Exchange Rival, Network Week, Jan. 27, 1994.

Novell Inc. to Demonstrate Alex, a Universal In–box That Will Accept and Store Email, Voice mail and Faxes, Computer Reseller News, Feb. 6, 1995.

IBM Softward Allows Phone Messages to be Retrieved Via Internet World Wide Web, press release, Nov. 28, 1995 (announcing product release).

MSN Hotmail Continues to Grow Faster than Any Company in History, press release, Feb. 8, 1999 (referencing Jul. 4, 1996 launch of Hotmail, which permitted users to access e–mail accounts through web browsers).



**FIG 1**

**FIG 2**



FIG 3



**FIG 4A**



**FIG 4B**



FIG 5

FIG 6

**Fax from (404)249-6801**

Received on May 31, 1995 at 1:58 PM
Page 1 of 3

NetOffice, Inc.

From: Charles R. Bobo, II.
Pages: 3
Date: May 31, 1995

Next Page

Return to Fax Listing
This page was automatically generated by FaxWeb(tm) On May 31, 1995 at 2:05pm.
©1995 NetOffice, inc.

*NetOffice, inc.*
PO Box 7115
Atlanta, GA 30357
info@netoffice.com

**FIG 7**



**FIG 8**



**FIG 9**



**FIG 10**



**FIG 11**



**FIG 12**



**FIG 13**



**FIG 14**



FIG 15

| INDIVIDUAL APPLICATION PROGRAMS |
| COMMON GATEWAY INTERFACE (CGI) |
| HTTPD |
| INTERNET DEAMON (INETD) |
| OPERATING SYSTEM (OS) |
| TCP/IP |

**FIG 16A**

| PREFORMATTED HTML FILE |
| HTTPD |
| INETD |
| OS |
| TCP/IP |

**FIG 16B**



FIG. 17



320

321
USER SENDS REQUEST
FOR SEARCH

322
MSDS SENDS USER A
SEARCH QUERY FORM

323
USER ENTERS SEARCH
PARAMETERS IN
SEARCH QUERY FORM

324
MSDS PERFORMS
REQUESTED SEARCH
FOR FILES/MESSAGES

325
MSDS SENDS USER
RESULTS OF SEARCH

326
USER SELECTS DESIRED
FILES/MESSAGES

FIG. 18

FIG. 19

## SEARCH QUERY

RECIPIENT'S NAME:

DOCUMENT TYPE:    FACSIMILE

DATE:

TIME:

CALLING NO.:    (404) 249-6801

FILE SIZE:

NO. PAGES:

DOCUMENT NO.:

OTHER FIELD:

SEARCH                    RECENT FILES

STORED SEARCHES            HELP

FIG. 20

SEARCH
RESULTS

1.   Document No. 11:  Facsimile from (404) 249-6801 to Jane Doe on May 31, 1995, 3 Pages

2.   Document No. 243:  Facsimile from (404) 249-6801 to Jane Doe on July 16, 1995, 21 Pages

3.   Document No. 1002:  Facsimile from (404) 249-6801 to Jane Doe on January 1, 1996, 10 Pages

SAVE SEARCH AS:   | CHARLES R. BOBO FACSIMILES |

HELP

FIG. 21

STORED
SEARCHES

1.   CHARLES R. BOBO FACSIMILES

2.   CHARLES R. BOBO VOICE MESSAGES

3.   DATA TRANSFERS FROM 01-01-96 TO 6-01-96 TO
JANE DOE

HELP

FIG. 22

US 6,857,074 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# SYSTEMS AND METHODS FOR STORING, DELIVERING, AND MANAGING MESSAGES

This application is a continuation of patent application Ser. No. 09/840,759, filed Apr. 23, 2001, U.S. Pat. No. 6,564,321, which is a continuation of patent application Ser. No. 09/186,595, filed Nov. 5, 1998, now U.S. Pat. No. 6,350,066, which is a continuation of patent application Ser. No. 08/944,741, filed Oct. 6, 1997, now U.S. Pat. No. 5,870,549, which is a continuation-in-part of patent application Ser. No. 08/431,716, filed Apr. 28, 1995, now U.S. Pat. No. 5,675,507.

## FIELD OF THE INVENTION

This invention relates to system(s) and method(s) for storing and delivering messages and, more particularly, to system(s) and method(s) for storing messages and for delivery the messages through a network, such as the Internet, or a telephone line to an intended recipient. In another aspect, the invention relates to system(s) and method(s) for storing, delivering, and managing messages or other files, such as for archival purposes or for document tracking.

## BACKGROUND OF THE INVENTION

Even though the facsimile machine is heavily relied upon by businesses of all sizes and is quickly becoming a standard piece of office equipment, many businesses or households cannot receive the benefits of the facsimile machine. Unfortunately, for a small business or for a private household, a facsimile machine is a rather expensive piece of equipment. In addition to the cost of purchasing the facsimile machine, the facsimile machine also requires toner, paper, maintenance, as well as possible repairs. These expenses may be large enough to prevent many of the small businesses and certainly many households from benefiting from the service that the facsimile machine can provide. For others who are constantly traveling and who do not have an office, it may be impractical to own a facsimile machine. In fact, the Atlanta Business Chronicle estimates that 30% of the small businesses do not have any facsimile machines. Therefore, many businesses and households are at a disadvantage since they do not have access to a facsimile machine.

Because a facsimile machine can be such an asset to a company and is heavily relied upon to quickly transmit and receive documents, a problem exists in that the machines are not always available to receive a facsimile message. At times, a facsimile machine may be busy receiving another message or the machine may be transmitting a message of its own. During these times, a person must periodically attempt to send the message until communication is established with the desired facsimile machine. This inability to connect with a facsimile machine can be frustrating, can consume quite a bit of the person's time, and prevent the person from performing more productive tasks. While some more advanced facsimile machines will retry to establish communication a number of times, a person will still have to check on the facsimile machine to ensure that the message was transmitted or to re-initiate the transmission of the message.

In addition to labor costs and a reduction in office efficiency, a facsimile machine may present costs to businesses that are not readily calculated. These costs include the loss of business or the loss of goodwill that occurs when the facsimile machine is not accessible by another facsimile machine. These costs can occur for various reasons, such as when the facsimile machine is out of paper, when the

machine needs repairing, or when the facsimile machine is busy with another message. These costs occur more frequently with some of the smaller businesses, who are also less able to incur these expenses, since many of them have a single phone line for a telephone handset and the facsimile machine and thereby stand to lose both telephone calls and facsimile messages when the single line is busy. In fact, the Atlanta Business Chronicle estimated that fewer than 5% of the small businesses have 2 or more facsimile machines. Many of the larger companies can reduce these losses by having more than one facsimile machine and by having calls switched to another machine when one of the machines is busy. These losses, however, cannot be completely eliminated since the machines can still experience a demand which exceeds their capabilities.

A main benefit of the facsimile machine, namely the quick transfer of documents, does not necessarily mean that the documents will quickly be routed to the intended recipient. The facsimile machines may be unattended and a received facsimile message may not be noticed until a relatively long period of time has elapsed. Further, even for those machines which are under constant supervision, the routing procedures established in an office may delay the delivery of the documents. It is therefore a problem in many offices to quickly route the facsimile message to the intended recipient.

The nature of the facsimile message also renders it difficult for the intended recipient to receive a sensitive message without having the message exposed to others in the office who can intercept and read the message. If the intended recipient is unaware that the message is being sent, other people may see the message while it is being delivered or while the message remains next to the machine. When the intended recipient is given notice that a sensitive message is being transmitted, the intended recipient must wait near the facsimile machine until the message is received. It was therefore difficult to maintain the contents of a facsimile message confidential.

In an office with a large number of employees, it may also be difficult to simply determine where the facsimile message should be routed. In light of this difficulty, some systems have been developed to automatically route facsimile messages to their intended recipient. One type of system, such as the one disclosed in U.S. Pat. No. 5,257,112 to Okada, can route an incoming call to a particular facsimile machine based upon codes entered with telephone push-buttons by the sender of the message. Another type of system, such as the one disclosed in U.S. Pat. No. 5,115,326 to Burgess et al. or in U.S. Pat. No. 5,247,591 to Baran, requires the sender to use a specially formatted cover page which is read by the system. This type of system, however, burdens the sender, who may very well be a client or customer, by requiring the sender to take special steps or additional steps to transmit a facsimile message. These systems are therefore not very effective or desirable.

Another type of routing system links a facsimile machine to a Local Area Network (LAN) in an office. For instance, in the systems disclosed in the patents to Baran and Burgess et al., after the system reads the cover sheet to determine the intended recipient of the facsimile message, the systems send an E-mail message to the recipient through the local network connecting the facsimile machine to the recipient's computer. Other office systems, such as those in U.S. Pat. No. 5,091,790 to Silverberg and U.S. Pat. No. 5,291,546 to Giler et al., are linked to the office's voice mail system and may leave a message with the intended recipient that a facsimile message has been received. Some systems which

3

are even more advanced, such as those in U.S. Pat. No. 5,317,628 to Misholi et al. and U.S. Pat. No. 5,333,266 to Boaz et al., are connected to an office's local network and provide integrated control of voice messages, E-mail messages, and facsimile messages.

The various systems for routing facsimile messages, and possibly messages of other types received in the office, are very sophisticated and expensive systems. While these office systems are desirable in that they can effectively route the messages at the office to their intended recipients, the systems are extremely expensive and only those companies with a great number of employees can offset the costs of the system with the benefits that the system will provide to their company. Thus, for most businesses, it still remains a problem to effectively and quickly route messages to the intended recipients. It also remains a problem for most businesses to route the messages in a manner which can preserve the confidential nature of the messages.

Even for the businesses that have a message routing system and especially for those that do not have any type of system, it is usually difficult for a person to retrieve facsimile messages while away from the office. Typically, a person away on business must call into the office and be informed by someone in the office as to the facsimile messages that have been received. Consequently, the person must call into the office during normal business hours while someone is in the office and is therefore limited in the time that the information in a facsimile message can be relayed.

If the person away on business wants to look at the facsimile message, someone at the office must resend the message to a facsimile machine accessible to that person. Since this accessible machine is often a facsimile machine at another business or at a hotel where the person is lodging, it is difficult for the person to receive the facsimile message without risking disclosure of its contents. Further, since someone at the person's office must remember to send the message and since someone at the accessible facsimile machine must route the message to the person away from the office, the person may not receive all of the facsimile messages or may have to wait to receive the messages.

The retrieval of facsimile messages, as well as voice mail messages, while away from the office is not without certain costs. For one, the person often must incur long distance telephone charges when the person calls the office to check on the messages and to have someone in the office send the messages to another facsimile. The person will then incur the expenses of transmitting the message to a fax bureau or hotel desk as well as the receiving location's own charges for use of their equipment. While these charges are certainly not substantial, the charges are nonetheless expenses incurred while the person is away from the office.

Overall, while the facsimile machine is an indispensable piece of equipment for many businesses, the facsimile machine presents a number of problems or costs. Many businesses or households are disadvantaged since they are unable to reap the benefits of the facsimile machine. For the businesses that do have facsimile machines, the businesses must incur the normal costs of operating the facsimile machine in addition to the costs that may be incurred when the facsimile machine or machines are unable to receive a message. Further, the facsimile messages may not be efficiently or reliably routed to the intended recipient and may have its contents revealed during the routing process. The costs and problems in routing a facsimile message are compounded when the intended recipient is away from the office.

4

Many of the problems associated with facsimile messages are not unique to just facsimile messages but are also associated with voice mail messages and data messages. With regard to voice messages, many businesses do not have voice mail systems and must write the message down. Thus, the person away from the office must call in during normal office hours to discover who has called. The information in these messages are usually limited to just the person who called, their number, and perhaps some indication as to the nature of the call. For those businesses that have voice mail, the person away from the office must call in and frequently incur long distance charges. Thus, there is a need for a system for storing and delivery voice messages which can be easily and inexpensively accessed at any time.

With regard to data messages, the transmission of the message often requires some coordination between the sender and the recipient. For instance, the recipient's computer must be turned on to receive the message, which usually occurs only when someone is present during normal office hours. Consequently, the recipient's computer is usually only able to receive a data message during normal office hours. Many households and also businesses may not have a dedicated data line and must switch the line between the phone, computer, and facsimile. In such a situation, the sender must call and inform the recipient to switch the line over to the computer and might have to wait until the sender can receive the message. The retransmission of the data message to another location, such as when someone is away from the office, only further complicates the delivery. It is therefore frequently difficult to transmit and receive data messages and is also difficult to later relay the messages to another location.

A standard business practice of many companies is to maintain records of all correspondence between itself and other entities. Traditionally, the correspondence that has been tracked and recorded includes letters or other such printed materials that is mailed to or from a company to the other entity. Although tracking correspondence of printed materials is relatively easy, non-traditional correspondence, such as facsimile messages, e-mail messages, voice messages, or data messages, are more difficult to track and record.

For example, facsimile messages may be difficult to track and record since the messages may be received on thermal paper, which suffers from a disadvantage that the printing fades over time. Also, accurate tracking of facsimile messages is difficult since the facsimile messages may only be partially printed at the facsimile machine or the messages may be lost or only partially delivered to their intended recipients. Facsimile messages also present difficulties since they are often delivered within an organization through different channels than ordinary mail and thus easily fall outside the normal record keeping procedures of the company.

Voice mail messages are also difficult to track and record. Although voice messages can be saved, many voice mail servers automatically delete the messages after a certain period of time. To maintain a permanent record of a voice message, the voice message may be transcribed and a printed copy of the message may be kept in the records. This transcribed copy of the voice message, however, is less credible and thus less desirable than the original voice message since the transcribed copy may have altered material or may omit certain portions of the message.

In addition to facsimile and voice mail messages, data messages are also difficult to track and record. A download

US 6,857,074 B2

5

or upload of a file may only be evident by the existence of a file itself. A file transfer procedure normally does not lend itself to any permanent record of what file was transferred, the dialed telephone number, the telephone number of the computer receiving the file, the time, or the date of the transfer. It is therefore difficult to maintain accurate records of all data transfers between itself and another entity.

## SUMMARY OF THE INVENTION

It is an object of the invention to reliably and efficiently route messages to an intended recipient.

It is another object of the invention to route messages to the intended recipient while maintaining the contents of the message confidential.

It is another object of the invention to enable the intended recipient to access the messages easily and with minimal costs.

It is a further object of the invention to permit the simultaneous receipt of more than one message on behalf of the intended recipient.

It is a further object of the invention to enable the intended recipient of a message to access the message at any time and at virtually any location world-wide.

It is yet a further object of the invention to enable the intended recipient of a message to browse through the received messages.

It is yet a further object of the invention to quickly notify an intended recipient that a message has been received.

It is still another object of the invention to receive messages of various types.

It is still another object of the invention to deliver messages according to the preferences of the intended recipient.

It is still a further object of the invention to record and track correspondence, such as facsimile messages, voice mail messages, and data transfers.

Additional objects, advantages and novel features of the invention will be set forth in the description which follows, and will become apparent to those skilled in the art upon reading this description or practicing the invention. The objects and advantages of the invention may be realized and attained by the appended claims.

To achieve the foregoing and other objects, in accordance with the present invention, as embodied and broadly described herein, a system and method for storing and delivering messages involves receiving an incoming call and detecting an address signal associated with the incoming call, the address signal being associated with a user of the message storage and delivery system. A message accompanied with the address signal is then received and converted from a first file format to a second file format. The message is stored in the second file format within a storage area and is retrieved after a request has been received from the user. At least a portion of the message is then transmitted to the user over a network with the second file format being a mixed media page layout language.

In another aspect, a network message storage and delivery system comprises a central processor for receiving an incoming call, for detecting an address signal on the incoming call, for detecting a message on the incoming call, and for placing the message in a storage area. The address signal on the incoming call is associated with a user of the network message storage and delivery system. A network server receives the message from the storage area, converts the message into a mixed media page layout language, and places the message in the storage area. When the network

6

server receives a request from the user over the network, the network server transmits at least a portion of the message over the network to the user.

Preferably, the network storage and delivery system can receive facsimile messages, data messages, or voice messages and the network is the Internet. The messages are converted into a standard generalized mark-up language and the user is notified that a message has arrived through E-mail or through a paging system. A listing of the facsimile messages may be sent to the user in one of several formats. These formats include a textual only listing or a listing along with a full or reduced size image of the first page of each message. A full or reduced size image of each page of a message in the listing may alternatively be presented to the user.

According to a further aspect, the invention relates to a system and method for managing files or messages and involves storing message signals in storage and receiving requests from a user for a search. The search preferably comprises a search query that is completed by a user and supplied to a hyper-text transfer protocol daemon (HTTPD) in the system. The HTTPD transfers the request through a common gateway interface (CGI) to an application program which conducts the search. The results of the search are preferably returned through the HTTPD to the computer in the form of a listing of all messages or files satisfying the search parameters. The user may then select one or more of the listed messages or files and may save the search for later references.

## BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated in, and form a part of, the specification, illustrate an embodiment of the present invention and, together with the description, serve to explain the principles of the invention. In the drawings:

FIG. **1** is a block diagram illustrating the connections of a message storage and delivery system MSDS;

FIG. **2** is an overall flow chart of operations for transmitting a message to the MSDS of FIG. **1**;

FIG. **3** is an overall flow chart of operations for receiving a message stored at the MSDS of FIG. **1**;

FIGS. **4**(A) and (B) are flowcharts of operations for generating HTML files according to user preferences;

FIG. **5** is a flowchart of operations for generating requested information;

FIG. **6** is a flowchart of operations for converting a facsimile message into HTML files;

FIG. **7** is an exemplary display of a first page of a facsimile message according to a fourth display option;

FIG. **8** is a flowchart of operations for converting a voice message into an HTML file;

FIG. **9** is a flowchart of operations for converting a data message into an HTML file;

FIG. **10** is a flowchart of operations for detecting a type of call received at the MSDS **10**;

FIG. **11** is a flowchart of operations for receiving voice messages;

FIG. **12** is a flowchart of operations for interacting with an owner's call;

FIG. **13** is a more detailed block diagram of the MSDS **10**;

FIG. **14** is a block diagram of the central processor in FIG. **13**;

FIG. **15** is a block diagram of the Internet Server of FIG. **13**;

7

FIGS. **16**(A) and **16**(B) depict possible software layers for the Internet Server of FIG. **13**;

FIG. **17** is a diagram of a data entry for a message signal;

FIG. **18** is a flowchart of a process for sending a search query, for conducting a search, and for returning results of the search to a computer through the Internet;

FIG. **19** is an example of a search query form for defining a desired search;

FIG. **20** is an example of a completed search query;

FIG. **21** is an example of a set of search results returned to the computer in response to the search query of FIG. **20**; and

FIG. **22** is an example of a listing of stored searches.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Reference will now be made in detail to the preferred embodiments of the invention, examples of which are illustrated in the accompanying drawings.

With reference to FIG. **1**, a message storage and delivery system (MSDS) **10** is connected to a central office **20** of the telephone company through at least one direct inward dialing (DID) trunk **15**. With each call on the DID trunk **15**, an address signal indicating the telephone number being called is provided to the MSDS **10**. The DID trunk **15** can carry a large number of telephone numbers or addresses. Preferably, the DID trunk **15** comprises a number of DID trunks **15** connected in parallel between the central office **20** and the MSDS **10** so that the MSDS **10** can simultaneously receive more than one call and, moreover, can simultaneously receive more than one call for a single telephone number or address.

The central office **20** is connected to a number of third parties. For instance, the central office **20** may be connected to a facsimile machine **24**, a telephone set **26**, and to a computer **28** with each connection being made through a separate telephone line. While a single computer **28** is shown in the figure, the single computer **28** may actually represent a local area network which is connected through the central office **20** to the MSDS **10**. Although the facsimile machine **24**, telephone set **26**, and computer **28** have been shown on separate lines, it should be understood that one or more of these devices could share a single line.

The MSDS **10** is also connected to a network, preferably the Internet World Wide Web **30**. Although the Internet **30** has been shown as a single entity, it should be understood that the Internet **30** is actually a conglomeration of computer networks and is a constantly evolving and changing structure. The MSDS **10** therefore is not limited to the current structure or form of the Internet **30** but encompasses any future changes or additions to the Internet **30**. Further, the MSDS **10** is shown as being directly connected to the Internet **30**, such as through its own node or portal. The MSDS **10**, however, may be practiced with any suitable connection to the Internet **30**, such as through an intermediate Internet access provider.

With reference to FIG. **2** depicting an overall operation of the invention, a telephone call directed to a number serviced by the MSDS **10** is initiated at step **40** by a third party, for instance, through the facsimile machine **24**, telephone set **26**, or computer **28**. The incoming telephone call may therefore carry a facsimile message, a voice message, or a data message. At step **42**, the address signal associated with the initiated call is routed through the central office **20**, over the DID trunk **15**, and to the MSDS **10**.

8

When the call reaches the MSDS **10**, the call is routed within the MSDS **10** in a manner that will be described in more detail below with reference to FIG. **13**. At step **46**, the MSDS **10** answers the telephone call and receives the address signal from the DID trunk **15**. Next, at step **48**, the call is established between the MSDS **10** and the third party and, at step **50**, the MSDS **10** receives the message transmitted over the telephone line. The message is stored at step **52**, a database within the MSDS **10** is updated at step **54**, and the intended recipient of the message is notified at step **56**. The intended recipient of the message uses the services provided by the MSDS **10** and will hereinafter be referred to as a user. At step **58**, the message is converted into hyper-text mark-up language (HTML).

After the MSDS **10** receives a message for one of its users, the user can then communicate with the MSDS **10** at any time and at any location by connecting to the Internet World Wide Web **30** and retrieving the message stored within the MSDS **10**. With reference to FIG. **3**, at step **60** the user first connects to the Internet **30**, such as through a personal computer **32** which may be connected to the Internet **30** in any suitable manner, such as through its own portal or node or through some intermediate access provider. The personal computer **32** is not limited to a single computer but may instead comprise a network of computers, such as a local area network within an office.

Once connected with the Internet **30**, at step **62**, the user accesses with a hyper-text browser the Universal Resource Locator (URL) associated with his or her MSDS **10** mailbox. The computer **32** may use any suitable hypertext browser, such as Netscape, to access the mailbox. A Hypertext Transfer Protocol Deamon (HTTPD) within the MSDS **10** receives the URL request at step **64** and, at step **66**, requests user authentication. The user then supplies his or her ID and password at step **68** and, if found valid at step **70**, the MSDS **10** provides the computer **32** with access to the mailbox at step **72**. If the ID and password are invalid, as determined at step **70**, then the HTTPD sends the computer **32** an authentication failure message at step **74**.

After the user gains access to the mailbox at step **72**, the user can request information stored within the MSDS **10**. The MSDS **10** receives the request at step **76** and, at step **78**, determines whether the information exists. As is common practice, the MSDS **10** also determines the validity of the request at step **78**. The request from the user will include the mailbox number for the user, the message identifier, display preferences, and, if the message is a facsimile message, a page identifier. If for any reason the request is invalid, such as when a hacker is attempting to gain access to privileged information, the request for the information will be terminated.

If the requested information is available, then at step **80** the information is transmitted through the Internet **30** to the user's computer **32**. If, on the other hand, the information does not exist, then at step **82** the MSDS **10** will generate the requested information and then send the information to the user's computer through the Internet **30** at step **80**.

Prior to gaining access to the mailbox at step **72**, the user is preferably sent a greeting page or other such type of information which permits the user to learn about the services provided by the MSDS **10**, open an account with the MSDS **10**, or gain access to an account. Once access is provided at step **72**, the user is provided with information indicating the total number of messages stored in his or her mailbox within the MSDS **10**. Preferably, the information sent by the MSDS **10** indicates the total number of messages

US 6,857,074 B2

9                                                        10

for each type of message and also the total number of saved messages versus the total number of new messages.

The user is also preferably given the option at this step to change account information. The account information might include the E-mail address for the user, the manner in which messages are to be reviewed, the user's pager information, as well as other user preferences. The display options and other user preferences will be discussed in further detail below.

The general information HTML file which indicates the total number of different messages is provided with a number of anchors, which are also termed links or references. In general, an anchor permits a user on the computer **32** to retrieve information located on another file. For instance, an anchor to a listing of facsimile messages is preferably provided on the display of the total number of messages. When the user selects the anchor for the facsimile list, the MSDS **10** pulls up and displays the file containing the list of facsimiles, such as a file "faxlist.html." The other types of messages, such as voice messages and data messages, would have similar anchors on the general information page directed to their respective HTML listing files.

When a new message is received at step **54** in FIG. **2**, the user's mailbox is updated to display the total number and types of messages. The MSDS **10** might also update other files in addition to the total listing of messages. Additionally, at this time, the MSDS **10** sends an E-mail message to the user's computer **32** to inform the user of the newly arrived message. The MSDS **10** could also send notice to the user through a paging system so that the user receives almost instantaneous notice that a message is received.

The MSDS **10** also generates additional information according to the user's preferences. These preferences on how the MSDS **10** is configured for the user include options on how the messages are reviewed. With facsimile messages, for instance, the user can vary the amount or the type of information that will be supplied with the listing of the facsimile messages by selecting an appropriate option. Other options are also available so that the user can custom fit the MSDS **10** to the users own computer **32** or own personal preferences.

For instance, when a facsimile message is received, the MSDS **10**, at step **54**, will update the total listing of all messages to indicate the newly received message and may additionally generate the HTML files for the newly received facsimile message according to the user's preferences. When the user later requests information on the message at step **76**, the HTML information has already been generated and the MSDS **10** may directly send the requested information to the user at step **80**. If, on the other hand, the user desires to view the message according to one of the other options, the MSDS **10** will generate the HTML files at step **82** according to that other option at the time of the request.

A first option available to the user for viewing a facsimile message is a textual only listing of the messages. The information on the textual listing preferably includes the date and time that the message was received at the MSDS **10**, the telephone number from where the message was transmitted, the number of pages, the page size, and the size of the message in bytes. The messages, of course, could be listed with other types of information. When the user selects one of the facsimile messages on the list, a request is sent to the HTTPD within the MSDS **10** causing the message to be downloaded via the Internet **30** to the user's computer **32**. Once the message is received by the computer **32**, the message can be displayed, printed, or saved for further review.

The second through fifth options allow the user to preview an image of the facsimile message before having the message downloaded from the MSDS **10** through the Internet **30** and to the computer **32**. The second option permits the user to view the list of messages with a reduced size image of the cover page next to each entry on the list. When the user selects one of the messages on the list, the selected facsimile message is transmitted through the Internet **30** to the computer **32**. The user may also scroll through the listings if all of the message cannot be displayed at one time on the computer **32**.

The third option provides the user with a full size view of the cover page of each facsimile message. The user can quickly scroll through the cover pages of each message without downloading the entire message to the computer **32**. The full size view of the cover page permit the user to clearly discern any comments that may be placed on the cover page, which may not be possible from just a reduced image of the cover page available through the second option.

The fourth option provides the user with a reduced size image of each page and permits the user to scroll through the entire message. The user can therefore read the entire facsimile message on screen before the message is downloaded onto the computer **32**. With this option, the user can go through the pages of the facsimile message and can also skip to the next message or previous message. Additionally, the user has the option of enlarging a page to a full size view of the page. When one of the messages is selected, as with the other options, the HTTPD within the MSDS **10** causes the facsimile message to be transmitted through the Internet **30** to the user's computer **32**.

With a fifth option, a full size image of each page is transmitted to the user's computer **32**. The user can scroll through the pages of the facsimile message and easily read the contents of each page. If the user wants the message downloaded to the computer **32**, the user selects the message and the HTTPD within the MSDS **10** transmits the message to the user's computer **32** through the Internet **30**.

As discussed above, after the database is updated at step **54**, the MSDS **10** will generate additional information based upon the option selected for displaying the facsimile messages. More specifically, as shown in FIG. **4**(A), if the first option has been selected, as determined at step **100**, then at step **102** the MSDS **10** will generate the textual listing of the facsimile messages with anchors or references to the respective facsimile files. The HTML files are then moved to an Internet Server at step **104**.

If the first option is not selected, the MSDS **10** next determines whether the second option has been selected at step **106**. With the second option, the facsimile messages are listed along with a reduced size image of the cover page. To generate this information, the cover page is extracted from the facsimile file at step **108** and a reduced size HTML image of the cover page is created at step **110**. At step **112**, a listing of the facsimile messages is generated with a thumbnail view of each cover page linked to its respective facsimile file. The generated HTML files are then sent to the Internet Server at step **104**.

When the third option is selected, as determined at step **114**, a full size image of the cover page is sent to the computer **32**. The full size image of the cover page is generated by first extracting the cover page from the facsimile file at step **116**. Next, the cover page is converted into a full size HTML image at step **118** and, at step **120**, the listing is generated with the embedded cover page linked to the facsimile file.

US 6,857,074 B2

11

If, at step **122**, the fourth option is determined to be selected, then a reduced size image of each page is provided to the user with the option of enlarging the page to view the contents of the page more clearly. With reference to FIG. **4**(B), the information necessary for the third option is produced by first extracting the first page of the facsimile message at step **124**. A reduced size HTML image is created at step **126** and then a full size HTML image is created at step **128**. At step **130**, the listing is generated with embedded thumbnail images of the pages with links to the full size images. If the page is not the last page, as determined at step **140**, then the next page is extracted at step **142** and steps **126** to **130** are repeated to generate the HTML files for the other pages of the facsimile message. After the last page has been converted into an HTML file according to the third option, the files are moved onto the Internet Server at step **104**.

At step **144**, the MSDS **10** determines whether the fifth option has been selected. The fifth option provides the user with a full size image of each page of the facsimile message.

While only five options have been discussed, the invention may be practiced with additional options. Consequently, with additional options and with the fourth option not being selected, the MSDS **10** would next determine whether one of the additional options have been selected. With the preferred embodiment of the invention having only five options, however, the MSDS **10** will assume that the fifth option has been selected if none of the first four options were found to be selected.

The information necessary to display the pages of the facsimile message according to the fifth option is generated by first extracting the first page of the facsimile message at step **146**. At step **148**, a full size HTML image of the page is created and, at step **150**, a listing is generated with an embedded image and links to previous and next pages. When the page is not the last page, as determined at step **152**, the MSDS **10** extracts the next page and generates the HTML file for that page. After all pages have been converted into HTML files according to the fourth option, the files are sent to the Internet Server at step **104**.

While FIGS. **4**(A) and (B) describe the operations of the MSDS **10** at the time a message is received, FIG. **5** depicts an overall flowchart of operations for the MSDS **10** when the user requests a page of information in a display format other than the user's preferred option of displaying the message. FIG. **5** is therefore a more detailed explanation of how the MSDS **10** generates the necessary information at step **82** of FIG. **3**.

In general, as shown in FIG. **5**, the MSDS **10** first determines the type of image that is **20** needed at step **82***a*. For example, at this step, the MSDS **10** will determine whether images are unnecessary, whether an image of just the cover page is necessary, whether an image is needed for every page, and whether the image needs to be a full size, a reduced size, or both full and reduced sized images. At step **82***b*, the MSDS **10** determines whether the image has already been created. If the image has not been created, then at step **82***c* the MSDS **10** will extract the page from the base facsimile file and, at step **82***d*, generate the required HTML image. As discussed above, the required image may be for just the cover page, for all the pages, and may be a full size and/or a reduced size image of the page. At step **82***e*, the image is embedded with links or anchors to other HTML files. These links or anchors might be references to the next and previous pages and also to the next and previous facsimile messages. Finally, the HTML file having the embedded image and links is sent to the user at step **80** in FIG. **3**.

12

The process for converting a facsimile message into HTML files according to the fifth option will be described with reference to FIG. **6**. This process will occur at step **54** when the message is received and when the fifth option is the user's preferred option of displaying the messages. It should be understood that a similar type of process will also occur when the user requests a page of information according to the fifth option when the user is retrieving a facsimile message and the fifth option is not the user's preferred option. The conversion processes according to the other options will become apparent to those skilled in the art and will therefore not be discussed in further detail.

With reference to FIG. **6**, when the facsimile message is received, the message is in a Tagged Image File Format/Facsimile (TIFF/F) and each page of the facsimile message is split into a separate file. Each page of the facsimile message is then converted from the TIFF/F format into a Portable Pixel Map (PPM) format. The PPM files are next converted into separate Graphic Interchange Format (GIF) files and then into separate HTML files. Thus, each page of the facsimile message is converted into a separate HTML file. The TIFF/F files may be converted into PPM with an available software package entitled "LIBTIFF" and the PPM files may be converted into GIF files with an available software package found in "Portable Pixel Map Tools."

The invention is not limited to this exact conversion process or to the particular software packages used in the conversion process. For instance, the TIFF/F files may be converted into another portable file format, through any other type of intermediate format, or may be converted directly into the GIF format. Further, instead of GIF, the facsimile messages may be converted into JPEG, BMP, PCX, PIF, PNG, or any other suitable type of file format.

The files may be identified with any suitable filename. In the preferred embodiment, the files for each user are stored in a separate directory assigned to just that one user because an entire directory for a given user generally can be protected easier than the individual files. The memory, however, may be organized in other ways with the files for a single user being stored in different directories. The first part of the filename is a number preferably sequentially determined according to the order in which messages arrive for that user. The preferred naming convention for ending the filenames is depicted in FIG. **6**. Each page of the facsimile message is saved as a separate file with an extension defined by the format of the file. Thus, the files will end with an extension of ".TIFF," ".PPM," ".GIF," or ".HTML" according to the format of the particular file. In the example shown, the separate pages have filenames which end with the respective page number, for instance, the first page ends with a "1." The files, however, are preferably terminated with a letter or multiples letters to indicate the order of the pages. For instance, page **1** might have an ending of "aa," page **2** might have an ending of "ab," etc. The invention, however, is not limited to the disclosed naming convention but encompasses other conventions that will be apparent to those skilled in the art.

As shown in FIG. **6**, in addition to the GIF files representing the pages of the facsimile message, the HTML files include a number of anchors or references. In the example shown, the first HTML file has an anchor a for the "Next Page." Anchor a is defined as a=<A HREF="2.html">Next Page</a> and will therefore reference the second HTML file when a user selects the "Next Page." The second HTML file has an anchor b for the "Previous Page" and an anchor c for the "Next Page" and the third HTML file has an anchor d for the "Previous Page." With these particular HTML files, the

US 6,857,074 B2

13

user can scroll through each page of the facsimile message and view a full size image of the page.

Each HTML file preferably contains anchors in addition to those relating to "Next Page" and "Previous Page." For instance, each HTML file may contain an anchor to the next facsimile message, an anchor to the previous facsimile message, and an anchor to return to the facsimile list. The HTML files preferably contain anchors relating to "Save" and "Delete." When the "Save" anchor is selected, the user would be able to save the message under a more descriptive name for the message. The "Delete" anchor is preferably followed by a inquiry as to whether the user is certain that he or she wants to delete the message. Other anchors, such as an anchor to the general listing, will be apparent to those skilled in the art and may also be provided.

FIG. 7 provides an example of a display according to the fifth option for the first page of the facsimile message shown in FIG. 6. The headings of the display provide information on the telephone number from where the message was sent, the date and time the message was received at the MSDS **10**, and an indication of the page of the message being displayed. The main portion of the display is the full size image of the page. At the bottom of the display, an anchor or link is provided to the "Next Page" and another anchor is provided to the "Return to Fax Listing." Additional information may also be provided on the display, such as a link to a company operating the MSDS **10**.

An example of the "1.html" file for generating the display shown in FIG. 7 is shown below in Table 1.

TABLE 1

```
<HTML>
<HEAD>
<TITLE>Fax Received on May 31, 1995 at 1:58 PM from (404) 249
6801;
Page 1 of 3</TITLE>
</HEAD>
<BODY>
<H1>Fax from (404) 249–6801</H1>
<H2>Received on May 31, 1995 at 1:58 PM</H2>
<H2>Page 1 of 3</H2>
<IMG SRC="1.gif">
<P>
<A HREF="2.html">Next Page</a>
<HR>
<A HREF="faxlist.html">Return to Fax Listing</A>
<P>
This page was automatically generated by FaxWeb(tm) on
May 31, 1995 at 2:05 PM.
<P>
&copy; 1995 NetOffice, Inc.
<HR>
<Address>
<A HREF="http://www.netoffice.com/">NetOffice, Inc.</A><BR>
PO Box 7115<BR>
Atlanta, GA 30357<BR>
<A HREF="mailto:info@netoffice.com">info@netoffice.com</A>
</Address>
</BODY>
</HTML>
```

As is apparent from the listing in Table 1, the image file "1.gif" for the first page is embedded into the HTML file "1.html." Also apparent from the listing is that the anchor for "Next Page" directs the MSDS **10** to the second page of the facsimile message having the filename "2.html" and the anchor for "Return to Fax Listing" directs the MSDS **10** to the filename "faxlist.html" containing the list of facsimile messages.

A process for converting a voice message into an HTML file is illustrated in FIG. 8. The voice message is originally stored in a VOX format or an AD/PCM format and is

14

retrieved at step **170**. The voice message is then converted either into an AU format or WAV format in accordance with the user's preference, which is stored in memory. Preferably, the message is preferably in the AD/PCM format originally and is converted in WAV, but the voice files may alternatively be stored and converted in file formats other than the ones disclosed, such as RealAudio (RA).

At step **174**, the listing of all of the voice messages is then updated to include a listing of the newly received voice message and an anchor to the voice message. For instance, the original voice message may be stored with filename "1.vox" and is converted into WAV and stored with a filename "1.wav." The HTML file "voicelist.html" which contains a list of all voice messages would then have an anchor to the filename "1.wav" along with identifying information for the voice message, such as when the message was received.

The listing of the voice messages may have additional anchors or references. For instance, each voice message may have an anchor directing the MSDS **10** to a file which contains a short sampling of the message. Thus, when the user selects this anchor, the user could receive the first 5 seconds of the message or some other predefined number of seconds. As with the listing of facsimile messages, the listing of the voice messages also preferably has anchors to "Save" and "Delete."

FIG. 9 illustrates a process for converting a data message into HTML. At step **180**, the data file is retrieved from a database and at step **182** the HTML file containing the list of data messages is updated to include a listing of the newly received message along with identifying information. For instance, the HTML file for the listing "datalist.html" would be updated to include an anchor to a data file "file 1.1" and would have information such as the time and date that the data was transmitted, the size of the data file, as well as additional identifying information.

Because the MSDS **10** can receive messages of various types, such as a facsimile message, voice message or data message, the MSDS **10** must be able to determine the type of message that is being sent over the DID trunk **15**. With reference to FIG. **10**, when an incoming call is received, the MSDS **10** goes off hook at step **200** and starts to generate a ringing sound. If, at step **202**, a facsimile calling tone is detected, then the ringing sound is stopped at step **204** and the message is received as a facsimile message at step **206**. Similarly, when a data modem calling tone is detected at step **208**, the ringing sound is stopped at step **210** and the message is identified as a data message at step **212**.

If the MSDS **10** detects a DTMF digit at step **214**, the ringing sound is stopped at step **216** and the MSDS **10** then determines which digit was pressed. When the digit is a "1," as determined at step **218**, the message is identified as a facsimile message. The MSDS **10** will thereafter receive and store the facsimile message in the manner described above with reference to FIG. **2**. If the digit is identified as a "0" at step **220**, the call is identified as an owner's call and will be processed in a manner that will be described below with reference to FIG. **12**. As will be apparent, other digits may cause the MSDS **10** to take additional steps. If any other DTMF digit is pressed, at step **224** the MSDS **10** activates a voice call system, which will be described in more detail below with reference to FIG. **11**.

With step **226**, the MSDS **10** will enter a loop continuously checking for a facsimile calling tone, a data modem calling tone, or a DTMF digit. If after n rings none of these tones or digits has been detected, the ringing sound is stopped at step **228** and the voice call system is activated at step **224**.

US 6,857,074 B2

15

With reference to FIG. 11, when a fax calling tone or modem calling tone is not detected, the voice call system begins at step 230 by playing a voice greeting. If the greeting was not interrupted by a DTMF digit as determined at step 232, then the caller is prompted for the voice message at step 234 and, at step 236, the voice message is recorded and stored in memory. At step 238, the caller is prompted with a number of options, such as listening to the message, saving the message, or re-recording the message. Since the selection of these options with DTMF digits will be apparent to those skilled in the art, the details of this subroutine or subroutines will not be described in further detail. When the caller wishes to re-record the message, as determined at step 240, the caller is again prompted for a message at step 234. If the caller does not wish to re-record the message, the call is terminated at step 242.

If the voice greeting is interrupted by a DTMF digit, as determined at step 232, then the MSDS 10 ascertains which digit has been pressed. At step 244, if the digit is a "0," the MSDS 10 detects that the call is an owner's call. When the digit is a "1," the MSDS 10 is informed at step 206 that the call carries a facsimile message. As discussed above with reference to FIG. 10, other DTMF digits may cause the MSDS 10 to take additional steps. If an invalid digit is pressed, by default at step 248 the routine returns to step 234 of prompting the caller for a message.

It should be understood that the invention is not limited to the specific interactive voice response system described with reference to FIG. 11. As discussed above, the invention may be responsive to DTMF digits other than just a "0" and a "1." Further variations or alterations will be apparent to those skilled in the art.

With reference to FIG. 12, when the call is considered an owner's call, the caller is first prompted for the password at step 250. The password is received at step 252 and, if found correct at step 254, a set of announcements are played to the owner. These announcements would preferably inform the owner of the number of new messages that have been received, the number of saved messages, the number of facsimile message, the number of data messages, and the number of voice messages. Other announcements, of course, could also be made at this time.

At step 258, the owner then receives a recording of the owner's menu with the appropriate DTMF digit for each option. For instance, the DTMF digit "1" may be associated with playing a message, the DTMF digit "2" may be associated with an options menu, and the DTMF digit "*" may be associated with returning to a previous menu or terminating the call if no previous menu exists.

A DTMF digit is detected at step 260 and the appropriate action is taken based upon the digit received. Thus, if the digit is determined to be a "1" at step 264, the owner can play a message at step 266. At step 266, the owner is preferably greeted with a menu giving the owner the options of playing or downloading new messages, saved messages, facsimile messages, data messages, or voice messages. As should be apparent to those skilled in the art, the owner may receive one or more menus at step 266 and the owner may enter one or more DTMF digits in order to play or download a particular message.

If, instead, the digit is determined to be a "2" at step 268, then the owner receives an options menu at step 270. With the options menu, the owner can enter or change certain parameters of the MSDS 10. For instance, the owner can change his or her password, the owner can change the manner in which facsimile messages are displayed on the computer 32, the owner can change the image file format

16

from GIF to another format, the owner can select the file formats for the voice messages, as well as other options.

If the "*" DTMF digit is received, as determined at step 272, then the owner is returned to a previous menu. The "*" digit is also used to terminate the call when the owner has returned to the initial menu. The "*" digit is therefore universally recognized by the MSDS 10 throughout the various menus as a command for returning to a previous menu.

If the owner enters a DTMF digit that is not being used by the MSDS 10, the owner receives an indication at step 276 that the key is invalid and the owner is then again provided with the owner's menu at step 258. When the owner does not enter a DTMF digit while the owner's menu is being played, as determined at step 260, the menu will be replayed n times. Once the menu has been replayed n times, as determined at step 262, then the call will be terminated at step 278.

If the password is incorrect, as determined at step 254, then the MSDS 10 checks whether the user has made more than "n" attempts at step 280. If "n" attempts have not been made, then a password incorrect message will be displayed to the user at step 282 and the user will once again be prompted for the password at step 250. When the user has made "n" attempts to enter the correct password, the MSDS 10 will play a failure message to the user at step 284 and then terminate the call at step 286. The specific number "n" may be three so that the call is terminated after three failed attempts.

The owner's menu may be responsive to an additional number of DTMF digits and may be structured in other ways. For instance, separate DTMF digits may direct the owner to the respective types of messages, such as a facsimile message, data message, or voice message. Also, separate DTMF digits may direct the owner to a recording of new messages or to a recording of saved messages. Other variations will be apparent to those skilled in the art.

A more detailed diagram of the MSDS 10 is shown in FIG. 13. As shown in the figure, a plurality of DID trunks 15 are received by an input/output device 17 and are then sent to a central processor 3. The number of DID trunks 15 may be changed to any suitable number that would be necessary to accommodate the anticipated number of telephone calls that may be made to the MSDS 10. The input/output device 17 routes a call on one of the DID trunks 15 to an open port of the central processor 3 and is preferably a DID Interface Box manufactured by Exacom.

The central processor 3 receives the calls on the DID trunks 15 and stores the messages in storage 11 in accordance with software 7. Preferably, a separate directory in storage 11 is established for each user having an account on the MSDS 10 so that all of the messages for a single user will be stored in the same directory. It should be understood that the number of processors within the central processor 3 is dependent upon the number of DID trunks 15. With a greater number of DID trunks 15 capable of handling a larger number of telephone calls, the central processor 3 may actually comprise a number of computers. The input/output device 17 would then function to route incoming calls to an available computer within the central processor 3.

A more detailed diagram of the central processor 3 is shown in FIG. 14. The central processor 3 comprises a telephone line interface 21 for each DID trunk 15. The telephone interface 21 provides the ringing sounds and other communication interfacing with the telephone lines. The signals from the telephone interface 21 are routed to a pulse/tone decoder 23 and to a digital signal processor (DSP) 25. The pulse/tone decoder 23 detects the address

US 6,857,074 B2

17

signal off of an incoming call and sends the address signal onto a bus 29 to a microprocessor 27. The DSP performs the necessary signal processing on the incoming calls and routes the processed signals to the microprocessor 27.

The microprocessor 27 will then read the address signal from the pulse/tone decoder 23 and store the message from the DSP 25 in an appropriate directory in storage 11. As discussed above, the central processor 3 may comprise a number of computers or, more precisely, a number of microprocessors 27 with each microprocessor 27 handling the calls from a certain number, such as four, DID trunks 15. The microprocessor 27 may comprise any suitable microprocessor, but is preferably at least a 486 PC.

In addition to handling incoming calls and storing the messages in storage 11, the central processor 3 also coordinates the interactive voice response system of the MSDS 10. The software 7 would incorporate the flowcharts of operations for receiving a message shown in FIG. 3, for detecting the type of message on an incoming call shown in FIG. 10, for receiving voice messages shown in FIG. 11, and for receiving an owner's call shown in FIG. 12. Based upon the above-referenced flowcharts and the respective descriptions, the production of the software 7 is within the capability of one of ordinary skill in the art and will not be described in any further detail.

The Internet Server 5 is connected to the central processor 3, such as through a local area network, and also has access to the storage 11. The Internet Server 5 performs a number of functions according to software 9. For instance, the Internet Server 5 retrieves the data files stored in storage 11 by the central computer 3 and converts the files into the appropriate HTML files. The converted HTML files are then stored in storage 11 and may be downloaded to the computer 32 through the Internet 30. The Internet Server 5 also handles the requests from the computer 32, which might require the retrieval of files from the storage 11 and possibly the generation of additional HTML files.

The software 9 for the Internet Server 5 would therefore incorporate the flowchart of operations for generating HTML files according to user preferences shown in FIG. 4, for generating requested information from a user shown in FIG. 5, for converting facsimile messages into HTML shown in FIG. 6, for converting voice messages into HTML shown in FIG. 8, and for converting data messages into HTML shown in FIG. 9. Based upon the above-referenced flowcharts and their respective description the production of the software 9 is within the capability of one of ordinary skill in the art and need not be described in any further detail.

Nonetheless, a more detailed block diagram of the Internet Server 5 is shown in FIG. 15. The Internet Server 5 runs on a suitable operating system (OS) 39, which is preferably Windows NT. The Internet Server 5 has a number of application programs 31, such as the ones depicted in the flowcharts discussed above, for communicating with the central processor 3 and for accessing data from storage 11 and also from memory 33.

The memory 33, inter alia, would contain the data indicating the preferences of each user. Thus, for example, when a facsimile message in the TIFF/F format is retrieved by the Internet Server 5, the Internet Server 5 would ascertain from the data in memory 33 the preferred option of displaying the facsimile message and would generate the appropriate HTML files.

All interfacing with the Internet 30 is handled by the HTTPD 37, which, in the preferred embodiment, is "Enterprise Server" from NetScape Communications Corp. Any requests from users, such as a request for a file, would be

18

handled by the HTTPD 37, transferred through the CGI 35, and then received by the application programs 31. The application programs 31 would then take appropriate actions according to the request, such as transferring the requested file through the CGI 35 to the HTTPD 37 and then through the Internet 30 to the user's computer 32.

The Internet Server 5 may be connected to a paging system 13. Upon the arrival of a new message, in addition to sending an E-mail message to the user's mailbox, the Internet Server 13 may also activate the paging system 13 so that a pager 15 would be activated. In this manner, the user could receive almost instantaneous notification that a message has arrived.

The paging system 13 is preferably one that transmits alphanumeric characters so that a message may be relayed to the user's pager 15. The Internet Server 5 therefore comprises a signal processor 41 for generating signals recognized by the paging system 13 and a telephone interface 43. The signal processor 41 preferably receives information from the application programs 31 and generates a paging message in a paging file format, such as XIO/TAP. The telephone interface 43 would include a modem, an automatic dialer, and other suitable components for communicating with the paging system 13.

The information from the application programs 31 may simply notify the user of a message or may provide more detailed information. For instance, with a facsimile message, the information from the application programs 31 may comprise CSI information identifying the sender's telephone number. The user would therefore receive a message on the pager 15 informing the user that a facsimile message was received from a specified telephone number. The amount and type of information that may be sent to the user on the pager 15 may vary according to the capabilities of the paging system 13 and may provide a greater or lesser amount of information than the examples provided.

The Internet Server 5 is not limited to the structure shown in FIG. 15 but may comprise additional components. For instance, the HTTPD 37 would be linked to the Internet 30 through some type of interface, such as a modem or router. The Internet Server 5 may be connected to the Internet 30 through typical phone lines, ISDN lines, a T1 circuit, a T3 circuit, or in other ways with other technologies as will be apparent to those skilled in the art.

Furthermore, the Internet Server 5 need not be connected to the Internet 30 but may be connected to other types of networks. For instance, the Internet Server 5, or more generally the network Server 5, could be connected to a large private network, such as one established for a large corporation. The network Server 5 would operate in the same manner by converting messages into HTML files, receiving requests for information from users on the network, and by transmitting the information to the users.

Also, at least one interface circuit would be located between the Internet Server 5 and the central processor 3 in order to provide communication capabilities between the Internet Server 5 and the central processor 3. This network interface may be provided within both the Internet Server 5 and the central processor 3 or within only one of the Internet Server 5 or central processor 3.

Examples of the Internet Server 5 software layers are shown in FIGS. 16(A) and 16(B), with FIG. 16(A) representing the Internet Server 5 in an asynchronous mode of communication and FIG. 16(B) representing the Internet 5 in a synchronous mode of communication. As shown in the figures, the software 9 for the Internet Server 5 may additional comprise an Internet Deamon for running the HTTPD

19

20

37. The software **9** for the Internet Server **5** would also include TCP/IP or other transport layers. Moreover, while the authentication is provided through the HTTPD **37**, the authentication of the user's password and ID may be supplemented or replaced with other ways of authentication.

The term synchronous has been used to refer to a mode of operation for the MSDS **10** in which the all possible HTML files for a message are generated at the time the message is received. The HTML files may be generated by the central processor **3** or by the application programs **31**. When a request for information is then later received by the HTTPD **37**, the information has already been generated and the HTTPD **37** only needs to retrieve the information from storage **11** and transmit the information to the user's computer **32**. With a synchronous mode of operation, the CGI **35** would be unnecessary.

The MSDS **10** preferably operates according to an asynchronous mode of operation. In an asynchronous mode of operation, information requested by the user may not be available and may have to be generated after the request. The asynchronous mode of operation is preferred since fewer files are generated, thereby reducing the required amount of storage **11**. Because the information requested by a user may not be available, some anchors cannot specify the filename, such as "2.html," but will instead contain a command for the file. For instance, an anchor may be defined as <AHREF= "/faxweb/users/2496801/viewpage.cgi?FAX_NUM= 1&PAGE=1&VIEW_MODE=FULL">for causing the CGI **35** to run a viewpage program so that page 1 of facsimile message **1** will be displayed in a full size image. The CGI **35** will generate the requested information when the information has not been generated, otherwise the CGI **35** will retrieve the information and relay the information to the HTTPD **37** for transmission to the user.

With the invention, the MSDS **10** can reliably receive voice, facsimile, and data messages for a plurality of users and can receive more than one message for a user at a single time. The messages are stored by the MSDS **10** and can be retrieved at the user's convenience at any time by connecting to the Internet **30**. The Internet World Wide Web **30** is a constantly expanding network that permits the user to retrieve the messages at virtually any location in the world. Since the user only needs to incur a local charge for connecting to the Internet **30**, the user can retrieve or review messages at a relatively low cost.

Even for the user's at the office or at home, the MSDS **10** provides a great number of benefits. The user would not need a facsimile machine, voice mail system, or a machine dedicated for receiving data messages. The user also need not worry about losing part of the message or violating the confidential nature of the messages. The user, of course, can still have a facsimile machine and dedicated computer for data messages. The MSDS **10**, however, will permit the user to use the telephone company's "call forwarding" feature so that messages may be transferred to the MSDS **10** at the user's convenience, such as when the user is away from the office.

The software **7** and software **9** are not limited to the exact forms of the flowcharts shown but may be varied to suit the particular hardware embodied by the invention. The software may comprise additional processes not shown or may combine one or more of the processes shown into a single process. Further, the software **7** and **9** may be executed by a single computer, such as a Silicon Graphics Workstation, or may be executed by a larger number of computers.

The facsimile messages preferably undergo signal processing so that the images of the facsimile messages are converted from a two tone black or white image into an image with a varying gray scale. As is known in the art, a gray scale image of a facsimile message provides a better image than simply a black or white image of the message. The signal processing may comprise any suitable standard contrast curve method of processing, such as anti-aliasing or a smoothing filter. The signal processing may occur concurrently with the conversion from TIFF/F to GIF and is preferably performed for both full and reduced size images of the facsimile messages.

Furthermore, the user may be provided with a greater or fewer number of options in displaying or retrieving messages. The options are not limited to the exact forms provided but may permit the user to review or retrieve the messages in other formats. The options may also permit a user to join two or messages into a single message, to delete portions of a message, or to otherwise the contents of the messages. Also, the various menus provided to the user over the telephone may have a greater number of options and the MSDS **10** may accept responses that involve more than just a single DTMF digit.

The specific DTMF digits disclosed in the various menus are only examples and, as will be apparent to those skilled in the art, other digits may be used in their place. For instance, a "9" may be used in the place of a "*" in order to exit the menu or to return to a previous menu. Also, the DTMF digits may be changed in accordance with the user's personal convention. If the user had a previous voice mail system, the user could customize the commands to correspond with the commands used in the previous system in order to provide a smooth transition to the MSDS **10**.

The MSDS **10** may restrict a user to only certain types of messages. For instance, a user may want the MSDS **10** to store only facsimile messages in order to reduce costs of using the MSDS **10**. In such a situation, the MSDS **10** would perform an additional step of checking that the type of message received for a user is a type of message that the MSDS **10** is authorized to receive on the user's behalf. When the message is an unauthorized type of message, the MSDS **10** may ignore the message entirely or the MSDS **10** may inform the user that someone attempted to send a message to the MSDS **10**. Moreover, the MSDS **10** has been described as having the central processor **3** for handling incoming calls and the Internet Server **10** for interfacing with the Internet **30**. The invention may be practiced in various ways other than with two separate processors. For instance, the central processor **3** and the Internet Server **5** may comprise a single computer or workstation for handling the incoming calls and for interfacing with the Internet **30**. The MSDS **10** may convert the messages into HTML files prior to storing the messages. Also, the central processor **3** may communicate with the paging system **13** instead of the Internet Server **5**. Additionally, as discussed above, the central processor **3** may comprise a number of microprocessors **27** for handling a large number of DID trunks.

The invention has been described as converting the messages into HTML and transmitting the HTML files over the Internet **30** to the computer **32**. The HTML format, however, is only the currently preferred format for exchanging information on the Internet **30** and is actually only one type of a Standard Generalized Mark-Up Language. The invention is therefore not limited to the HTML format but may be practiced with any type of mixed media page layout language that can be used to exchange information on the Internet **30**.

SGML is not limited to any specific standard but encompasses numerous dialects and variations in languages. One

US 6,857,074 B2

21                                                                         22

example of an SGML dialect is virtual reality mark-up language (VRML) which is used to deliver three dimensional images through the Internet. As another example, the computer 32 for accessing the MSDS 10 through the Internet 30 may comprise a handheld device. A handheld device is generally characterized by a small display size, limited input capabilities, limited bandwidth, and limited resources, such as limited amount of memory, processing power, or permanent storage. In view of these limited capabilities, a handheld device markup language (HDML) has been proposed to provide easy access to the Internet 30 for handheld devices. The SGML information transmitted by the MSDS 10 to the computer 32 may therefore comprise HDML information suitable for a handheld device or may comprise VRML.

As another example, Extensible Mark-Up Language (XML) is an abbreviated version of SGML, which makes it easier to define document types and makes it easier for programmers to write programs to handle them. XML omits some more complex and some less-used parts of the standard SGML in return for the benefits of being easier to write applications for, easier to understand, and more suited to delivery and inter-operability over the Web. Because XML is nonetheless a dialect of SGML, the MSDS 10 therefore encompasses the translation of facsimile, voice, and data messages into XML, including all of its dialects and variations, and the delivery of these messages to computers 32 through the Internet 30.

As a further example, the MSDS 10 encompasses the use of "dynamic HTML." "Dynamic HTML" is a term that has been used to describe the combination of HTML, style sheets, and scripts that allows documents to be animated. The Document Object Model (DOM) is a platform-neutral and language neutral interface allowing dynamic access and updating of content, structure, and style of documents. The MSDS 10 may therefore include the use of the DOM and dynamic HTML to deliver dynamic content to the computer 32 through the Internet 30.

The MSDS 10 is also not limited to any particular version or standard of HTTP and thus not to any particular hypertext transfer protocol deamon 37. In general, HTTP is a data access protocol run over TCP and is the basis of the World Wide Web. HTTP began as a generic request-response protocol, designed to accommodate a variety of applications ranging from document exchange and management to searching and forms processing. Through the development of HTTP, the request for extensions and new features to HTTP has exploded; such extensions range from caching, distributed authoring and content negotiation to various remote procedure call mechanisms. By not having a modularized architecture, the price of new features has been an overly complex and incomprehensible protocol. For instance, a Protocol Extension Protocol (PEP) is an extension mechanism for HTTP designed to address the tension between private agreement and public specification and to accommodate extension of HTTP clients and servers by software components. Multiplexing Protocol (MUX) is another extension that introduces asynchronous messaging support at a layer below HTTP. As a result of these drawbacks of HTTP, a new version of HTTP, namely HTTP-NG, has been proposed and its purpose is to provide a new architecture for the HTTP protocol based on a simple, extensible distributed object-oriented model. HTTP-NG, for instance, provides support for commercial transactions including enhanced security and support for on-line payments. Another version of HTTP, namely S-HTTP, provides secure messaging. The MSDS 10 and the HTTPD 37 may incorporate these versions or other versions of HTTP.

In addition to different versions of HTTP, the HTTPD 37 of the MSDS 10 may operate with other implementations of HTTP. For instance, the W3C's has an implementation of HTTP called "Jigsaw." Jigsaw is an HTTP server entirely written in Java and provides benefits in terms of portability, extensibility, and efficiency. The MSDS 10 may employ Jigsaw or other implementations of HTTP.

With regard to the transmission of messages to the user's computer 32, the MSDS 10 permits the user to sample the voice message or to preview the facsimile message without requiring the MSDS 10 to transmit the entire message to the computer 32. This sampling ability is a significant benefit since the transmission of the entire message would frequently tie up the computer 32 for a rather long period of time. Thus, with the preview or sample feature, the user can determine whether the user needs the message transmitted to the computer 32.

If the user does decide that the entire message needs to be transmitted, as stated above, the user's computer 32 might be receiving the message for a relatively long period of time. After the entire message has been received, the user then has the options of viewing, listening, retrieving, or saving the message. As an alternative, the user's computer may instead indicate the contents of the message to the user as the message is being received.

For instance, with a voice message, the user's computer 32 could send the message to an audio speaker as the message is being received. In this manner, the message would be played in real time and the user would not need to wait until the entire message is received before listening to the message. In order to play the messages in real time, the messages are preferably in the RealAudio (RA) format, which the user can select as the preferred file format for voice messages.

In operation, the MSDS 10 would transmit an HTML file containing an RA file. If the user selects the RA file with the browser on the computer 32, the browser will activate a program for use with RA files. The operations and functioning of this program will be apparent to those skilled in the art and will be available as a separate software package or will be incorporated within a browser program. The RA program will request the RA data file containing the message from the MSDS 10 and, as the RA file is being received at the computer 32, this program will play the message in real time.

The MSDS 10 and the user's computer 32 could also be arranged so that each page or even line of a facsimile message could be displayed as the computer 32 receives the facsimile message. Further, although the transmission of a data message is relatively fast in comparison to a voice or facsimile message, the computer 32 could also be programmed to permit access to the data message as the message is being received.

The invention has been described as storing and transmitting voice messages. It should be understood that the voice message would probably be the most often type of audio message stored at the MSDS 10. The invention, however, may be used with any type of audio message and is in no way limited to just voice messages.

According to another aspect of the invention, the MSDS 10 may be used as a file repository serving as an archive for a particular user or group of users. As described above, the MSDS 10 may maintain a list of all messages for a particular user which is displayed to the user when the user access his or her mailbox. The MSDS 10 may store all messages, whether they are voice, facsimile, or data, for a user in the database indefinitely. The MSDS 10 may therefore be relied

US 6,857,074 B2

23

24

upon by a user to establish the authenticity of a message and the existence or absence of a particular message. Through the MSDS 10, a user can therefore maintain an accurate record of all received email messages, facsimile messages, and data transfers.

In addition to serving as a file depository, the MSDS 10 may also function as a document management tool. As described above with reference to FIG. 2, when the MSDS 10 receives a message, the MSDS 10 updates a database with information on the message. This information includes the type of message, whether it is a facsimile message, voice message, or data message, the time and date at which the message was received, the size of the file, such as in bytes, the telephone number of the caller leaving the message, as well as other information, such as the number of pages of a facsimile message. Because the telephone number called is unique for each user, the information also includes the intended recipient of the message.

An example of a data entry 300 in storage 11 for a message is shown in FIG. 17. The data entry 300 represents the entry for just a single message with each message having a separate data entry 300. Preferably, the data entries 300 are stored in a relational database and may be searched through a structured query language (SQL).

As shown in FIG. 17, the data field 300 for a message may comprise numerous data fields for describing the message. One of these data fields may comprise a field 301 for indicating the name of the person receiving the message. As will be appreciated by those skilled in the art, the person may be identified in numerous ways, such as by a portion of the person's name or by a unique number. Another field 302 in the data entry 300 indicates the type of the document, such as whether the document is a facsimile message, voice message, or data transfer, and fields 303 and 304 respectively indicate the date and time that the message was received by the MSDS 10. The telephone number of the caller is indicated in field 305 while the size of the message, which may be measured in bytes, is indicated in field 306 and the number of pages of the message is indicated in field 307. A document number for uniquely identifying the message is indicated in field 308. As discussed above, the files or messages received for a particular user may be numbered sequentially in the order that they are received by the MSDS 10. The files and messages, however, may be numbered or identified in other ways, such as by a combination of numbers with an identifier for the date when the message was received. Also, the documents number or identifier may be unique for each file or message directed to a user or, alternatively, may be unique for each file or message directed to a plurality of users, which is advantageous when the MSDS 10 tracks documents for an entire company or other group of users.

In addition to fields 301 to 308, the data entry 300 for a message or file may have other fields 309 for describing or documenting the message or file. The other fields 309, for instance, may be used to identify the type of storage that a message should receive. The messages or files may have different lengths of time that the message is stored before being automatically deleted. The type of storage, such as whether the full text of the message is stored, may also be indicated by field 309. Another example of a trait that may be contained within the other field 309 is security. At times, a user may desire and may be granted access to another person's mailbox, such when the MSDS 10 tracks documents for an entire company. By designating a message or file as secure in field 309, a user may restrict or deny access to that message or file by other users. The other fields 309

may also be used by a user to customize the MSDS 10 according to his or her own desires. For instance, if the user is a company, the company may want to classify messages according to the division at which the message is directed, such as one code for marketing, one for sales, one for engineering, and one for legal.

As another example of a use of one of the other fields 309, a user can input notes in the other field 309. When a user initially receives a data entry 300, the entry 300, for instance, may include data in all fields 301 to 308 except field 309, which has been left blank. The user can then input his or her notes in the other field. An initial data entry 300 may include the field 305 for the caller's telephone number which contains the digits for the calling number. The user, however, may not readily recognize the caller from just reading the telephone number listed in field 305. To more clearly indicate the caller, the user may input notes in field 309 to identify the caller's name. Alternatively, the notes in field 309 may reflect part or all of the contents of the message. The user may receive a large document or message and may input a brief description of the document or message in the field 309. As another example, the recipient of the message may read the message or document and discover that the caller is requesting some service or goods from the recipient, such as a request for certain documents or delivery of a certain quantity of goods. The recipient may read the document or message and place some notes in the field 309 to indicate the type of follow-up service or action that needs to be taken. An assistant to the recipient can then view the notes in field 309 and take appropriate steps to ensure that the requested service or goods are delivered. If the data entry is security protected, one of the other fields 309, as discussed above, may grant the assistant limited access to just the field 309 or may grant more expansive access whereby the assistant can view fields 301 to 309 as well as the actual document or message. The fields 309 may serve various other purposes, as will be apparent to those skilled in the art.

FIG. 18 illustrates a process 320 for using the MSDS 10 for document management purposes. With reference to FIG. 18, a user sends a search request to the MSDS 10 for a particular document or set of documents at step 321. The user may issue this request with the computer 32 by clicking on a link, such as a link to "Search Documents," which may be presented to the user by the MSDS 10 after the user has been granted accesses to his or her mailbox at step 72 shown in FIG. 3. The MSDS 10 may present the user with the option to search the document archives at other times, such as when the user first attempts to access the mailbox at step 62, or when the URL received by the HTTPD 37 from computer 32 points toward the document archives.

In response to this request, the HTTPD 37 sends the user a search query form at step 322 to allow the user to define a desired search. An example of a search query form is shown in FIG. 19. The search query form may include an entry for each of the data fields 301 to 309 in the data entry 300. For instance, the user may input one or more names for a recipient and have the MSDS 10 search for all messages or files directed to just those recipients. The user may also indicate the type of document, such as whether it is a facsimile, voice message or data file. The search query form also has entries for the date or time, which preferably accept ranges of times and dates, and an entry for the telephone number of the caller to the MSDS 10. The search query form may also include an entry for the size of the file or for the number of pages, which is relevant if the message is a facsimile message. The search query form may also include

US 6,857,074 B2

25 26

an entry for the document number, which may accept a range of document numbers, and also an entry for another field.

At step **323**, the user enters the search parameters in the search query form with computer **32** and returns the information to the MSDS **10** through the Internet **30**. The user may define the search about any one data field or may define the search about a combination of two or more data fields. For instance, as reflected in the completed search query form shown in FIG. **20**, a user may define a search by designating the document type as a facsimile and the calling number as (404) 249-6801. Once the user has finished defining the search, the user then selects the "SEARCH" link shown at the bottom of the screen whereby the user's computer **32** would send the completed search query form through the Internet **30** to the HTTPD **37** of the MSDS **10**.

At step **324**, the HTTPD **37** receives the completed search query form and, through CGI **35**, invokes one or more of the application programs **31** for performing the desired search for any files or messages falling within the parameters of the search. The results of the search are passed from the application programs **31** through the CGI **35** to the HTTPD **37** and, at step **325**, are returned to the user through the Internet **37**. Preferably, the MSDS **10** returns the search results in the form of a listing of all files or messages contained within the search parameters, although the MSDS **10** may return the results in other ways.

An example of the search results of the query shown in FIG. **20** is shown in FIG. **21**. As discussed above, the parameters of the search were all facsimile messages from telephone number (404) 249-6081. With reference to FIG. **21**, this query resulted in three messages being discovered. The first document has a document number **11** and is described as being a facsimile from the designated telephone number to Jane Doe on May 31, 1995, and consists of three pages. This first-listed document is an example of the facsimile shown in FIG. **7**. The other two documents respectively correspond to document numbers **243** and **1,002** and are also from the designated telephone number.

At step **326**, the user selects the desired file or message from the listing of messages and files. For instance, by clicking on the first listed document, namely document number **11**, the computer **32** sends a request to the MSDS **10** for a viewing of that document and, in response, the MSDS **10** provides a viewing of the document according to the user defined preferences. As described above, the user may receive a reduced size image of the first page, a full size image of the first page, reduced size images of all pages, or full size images of all pages of the facsimile message. Thus, if the user selected the fourth display option as the user defined preference, the MSDS **10** would return an image of the first page of the facsimile, such as the one depicted in FIG. **7**.

At step **326**, the user may also have the MSDS **10** save the search results. For instance, as shown in FIG. **21**, the user may input the name of "CHARLES R. BOBO FACSIMI-LES" as the name for the search. By clicking on the "SAVE SEARCH AS" link, the name of the search is provided from the computer **32** to the MSDS **10**. At the MSDS **10**, the HTTPD **37** transfers the information from the computer **32** to the CGI **35** and the CGI **35** invokes an application program **31** to store the results of the search in storage **11** under the designated name. The invoked application program **31** preferably does not store the contents of all messages but rather stores a listing of the search results in the storage **11**.

The results of a search may be stored in storage **11** as either a closed search or an open search. If the MSDS **10** saves the results of a search as an open search, then the files or messages in that named search may be updated with recent files or messages falling within the particular search parameters for the search. On the other hand, a closed search is one in which the files or messages in the named search are limited to those existing at the time of the search. For example, if the MSDS **10** saved the search results shown in FIG. **21** as a closed search, then any retrieval of the "CHARLES R BOBO FACSIMILES" would result in only the three listed documents. If, on the other hand, the search named as the "CHARLES R BOBO FACSIMILES" was saved by the MSDS **10** as an open search, then the MSDS **10** would reactivate the search query shown in FIG. **20** in response to a request by the computer **32** for that search in order to obtain all facsimile messages from that particular telephone number, including those received after the initial saving of the search results.

With reference to FIG. **19**, rather than defining a new search, the user may click on the "STORED SEARCHES" link in order to receive the results of a previously performed search. For example, by clicking on this link, the MSDS **10** may return a listing of searches stored for that particular user, such as the searches shown in FIG. **22**. As shown in this figure, the "CHARLES R. BOBO FACSIMILES" is included within the list of stored searches. If the user then selected the "CHARLES R. BOBO FACSIMILES" search, the user may then be presented with the listing of facsimiles shown in FIG. **21**, possibly including recent additions to the search group.

With reference to FIG. **19**, the MSDS **10** may also provide a user with a link to "RECENT FILES" at step **322**. By selecting this link, the MSDS **10** may return a listing of all facsimile, voice, and data messages received with a particular period of time, such as the last month. By placing the "RECENT FILES" link on the search query form rather than in the listing of "STORED SEARCHES," the user can quickly turn to the most recent files and messages. The search query form may contain other such easy-access links, such as a link to the last search performed by the MSDS **10** on behalf of the user.

The messages or files received by the MSDS **10** need not arrive from a third party. In other words, the MSDS **10** may be used as a file repository or as a file manager for documents generated by the user itself. The user may call the designated telephone number for receiving messages and transmit voice messages, data messages, or facsimile messages and have the MSDS **10** document the receipt and content of these messages. A user may easily use a facsimile machine as a scanner for entering documents into the storage **11** of the MSDS **10**.

The MSDS **10** may have applications in addition to those discussed-above with regard to serving as a message deliverer, file repository, and file manager. For instance, the MSDS **10** may perform some additional processing on the incoming calls prior to forwarding them to the user. For voice messages, this processing may involve transcribing the message and then returning the transcribed messages to the user. The MSDS **10** may therefore be viewed as offering secretarial assistance which may be invaluable to small companies or individuals who cannot afford a secretary or even to larger businesses who may need some over-flow assistance. The transcription may be provided by individuals located in any part of the world or may be performed automatically by a speech-to-text recognition software, such as

Another type of processing that the MSDS **10** may provide is translation services. The incoming call, whether it

US 6,857,074 B2

27

is a voice, facsimile, or data message, can be converted into SGML and then forwarded first to a translator. Given the reach of the Internet, the translator may be located virtually anywhere in the world and can return the translated document via the Internet to the MSDS **10**. The MSDS **10** can notify the user that the translation has been completed through email, voice mail, pager, facsimile, or in other ways. The user would then connect to the Internet and retrieve the translated document. The translation services of the MSDS **10** may also provide transcription of the message, such as with speech-to-text recognition software.

The foregoing description of the preferred embodiments of the invention have been presented only for the purposes of illustration and description. It is not intended to be exhaustive or to limit the invention to the precise form disclosed. Many modifications and variations are possible in light of the above teaching.

The embodiments were chosen and described in order to explain the principles of the invention and their practical application so as to enable others skilled in the art to utilize the invention and various embodiments and with various modifications as are suited to the particular use contemplated. It is intended that the scope of the invention only be limited by the claims appended hereto.

I claim:

1. A communications messaging platform, comprising:

at least one computerized server system programmed to implement:

a messaging function configured to receive messages and configured to place the messages in storage areas associated with respective mailboxes associated with respective intended recipients of the messages, the messages being of any one or media types selected from the group consisting of an audio media type, an image media type, and a data media type; and

a notification function configured to send notification messages to respective ones of the intended recipients after receipt of the messages, the notification messages alerting the respective ones of the intended recipients of the receipt and availability of the messages at their respective mailboxes, wherein:

the messaging function is configured to interface with the intended recipients through a browser interface;

the intended recipients are capable of accessing their respective mailboxes and the messages associated therewith through the browser interface; and

the messaging function couples information associated with the messages to the respective intended recipients via the Internet.

2. The communications messaging platform as set forth in claim 1, wherein the notification function provides a Uniform Resource Locator in the notification message.

3. The communications messaging platform as set forth in claim 1, wherein the notification messages comprise wireless messages.

4. The communications messaging platform as set forth in claim 1, wherein the notification messages comprise email messages.

5. The communications messaging platform as set forth in claim 1, wherein the computerized server system further comprises an Internet file storage management function configured to store files associated with Internet users, wherein the Internet file storage and management function is configured to interface with the Internet users through a browser interface, and is configured to enable the Internet users to manage the files through the browser interface.

6. The communications messaging platform as set forth in claim 5, wherein the Internet file storage and management function supports files of a plurality of different formats.

28

7. The communications messaging platform as set forth in claim 5, wherein the Internet file storage and management function enables the Internet users to control access privileges to the files.

8. The communications messaging platform as set forth in claim 5, wherein the Internet file storage and management function provides a thumbnail view of the files.

9. The communications messaging platform as set forth in claim 1, wherein the computerized server system is further programmed to implement a meta-directory function configured to store user preferences associated with the Internet users.

10. The communications messaging platform as set forth in claim 9, wherein the meta-directory function is configured to store meta-data associated with the files.

11. An integrated messaging platform, comprising:

at least one computerized server system programmed to implement:

a messaging function configured to receive an electronic document intended for an Internet user, to provide a secure mailbox for the Internet user, to store the electronic document in a storage area associated with the Internet user's mailbox, and to receive electronic documents of a plurality of different formats; and

a notification function configured to provide the Internet user with notification of the availability of the electronic document, the notification including a reference provided to assist the Internet user to gain access to the electronic document, wherein:

the messaging function is configured to interface with the Internet user through a browser interface;

Internet user's mailbox and the electronic document associated therewith are capable of being accessed by the Internet user through the browser interface; and

the messaging function is configured to forward the electronic document via the Internet for delivery to the user.

12. The integrated messaging platform as set forth in claim 11, wherein the reference included with the notification comprises a Uniform Resource Locator.

13. The integrated messaging platform as set forth in claim 11, wherein the reference included with the notification comprises a set of alphanumeric characters.

14. The integrated messaging platform as set forth in claim 11, wherein the messaging function determines the authenticity of the electronic document.

15. The integrated messaging platform as set forth in claim 11, wherein the messaging function tracks the delivery of the electronic document.

16. The integrated messaging platform as set forth in claim 11, wherein the messaging function translates the electronic document from a first format to a second format.

17. The integrated messaging platform as set forth in claim 11, further comprising a document management tool.

18. The integrated messaging platform as set forth in claim 17, wherein the document management tool controls privileges associated with the electronic document.

19. The integrated messaging platform as set forth in claim 17, wherein the document management tool stores meta-data associated with the electronic document.

20. The integrated messaging platform as set forth in claim 11, wherein the messaging function receives the electronic document in hyper-text transfer protocol.

21. The integrated messaging platform as set forth in claim 11, wherein the messaging function forwards the electronic document to a plurality of Internet users.

**22**. The communications messaging platform as set forth in claim **1**, wherein:

at least one of the messages is of the audio media type, is received from a telephone line, and is converted to an audio formatted file which is stored in a messaging database associated with the communications messaging platform, and

the information associated with the at least one of the messages comprises the audio formatted file.

**23**. The communications messaging platform as set forth in claim **1**, wherein:

at least one of the messages is of the image media type, is received as a facsimile transmission from a telephone line, and is converted to an image formatted file which is stored in a messaging database associated with the communications messaging platform, and

the information associated with the at least one of the messages comprises the image formatted file.

**24**. A communications messaging platform, comprising:

at least one computerized server system programmed to implement:

a messaging function configured to receive a voice message over a telephone line, convert the voice message into an audio formatted file, and place the audio formatted file into a storage area associated with a mailbox associated with an intended recipient of the voice message; and

a notification function configured to send a notification message to the intended recipient after receipt of the voice message, the notification message alerting the intended recipient of the voice message of the availability of the audio formatted file via the mailbox, wherein

the messaging function is configured to interface with the intended recipient through a browser interface;

the mailbox and the audio formatted file associated therewith are capable of being accessed by the intended recipient through the browser interface; and

the messaging function is operative to forward the audio formatted file from the communications messaging platform via the Internet for download to the intended recipient in response to a client request packet received via the browser interface.

**25**. A communications messaging platform, comprising:

at least one computerized server system programmed to implement:

a messaging function configured to receive a facsimile message over a telephone line, convert the facsimile message into an image formatted file, and place the image formatted file into a storage area associated with a mailbox associated with an intended recipient of the facsimile message; and

a notification function configured to send a notification message to the intended recipient after receipt of the facsimile message, the notification message alerting the intended recipient of the facsimile message of the availability the image formatted file via the mailbox, wherein:

the messaging function is configured to interface with the intended recipient through a browser interface;

the mailbox and the image formatted file associated therewith are capable of being accessed by the intended recipient through the browser interface; and the messaging function is operative to couple the image formatted file from the communications messaging platform via the Internet for download to the internet recipient in response to a client request packet received via the browser interface.

**26**. An integrated messaging platform, comprising:

at least one computerized server system programmed to implement:

a messaging function configured to receive a media file intended for a user of a packet switched data network, to provide a secure mailbox for the user, to store the media file into a storage area associated with the user's mailbox, and to receive media files of a plurality of different formats; and

a notification function configured to provide the user with notification via a wireless transmission path of the availability of the media file in the storage area, the notification including a reference provided to assist the user to gain access to the media file, wherein:

the messaging function is configured to interface with the user through a browser interface;

the mailbox and the media file stored in the storage area associated therewith are capable of being accessed through the browser interface; and the messaging function is configured to forward the media file via the packet switched data network for delivery to the user.

**27**. The integrated messaging platform as set forth in claim **26**, wherein the packet switched data network is the Internet and the user uses a web browser to interface with the browser interface.

**28**. The integrated messaging platform as set forth in claim **26**, wherein the packet switched data network is a restricted access network coupled to the Internet, the user uses an application program that interprets markup language to render information on a user interface to interface with the browser interface, and at least oen of the plurality of different formats is an image file format.

* * * * *

US007836141B2

(12) **United States Patent**    (10) **Patent No.:**    **US 7,836,141 B2**

Bobo, II    (45) **Date of Patent:**    **Nov. 16, 2010**

(54) **SYSTEMS AND METHOD FOR STORING, DELIVERING, AND MANAGING MESSAGES**

(75) Inventor: **Charles R. Bobo, II**, Atlanta, GA (US)

(73) Assignee: **Advanced Messaging Technologies, Inc.**, Los Angeles, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 318 days.

(21) Appl. No.: **11/608,986**

(22) Filed: **Dec. 11, 2006**

(65) **Prior Publication Data**

US 2007/0081457 A1    Apr. 12, 2007

**Related U.S. Application Data**

(63) Continuation of application No. 10/963,586, filed on Oct. 14, 2004, which is a continuation of application No. 10/436,798, filed on May 12, 2003, now Pat. No. 6,857,074, which is a continuation of application No. 09/840,759, filed on Apr. 23, 2001, now Pat. No. 6,564,321, which is a continuation of application No. 09/186,595, filed on Nov. 5, 1998, now Pat. No. 6,350,066, which is a continuation of application No. 08/944,741, filed on Oct. 6, 1997, now Pat. No. 5,870,549, which is a continuation-in-part of application No. 08/431,716, filed on Apr. 28, 1995, now Pat. No. 5,675,507.

(51) **Int. Cl.**
   *G06F 15/16*    (2006.01)

(52) **U.S. Cl.** ........................ **709/207**; 709/205; 709/206

(58) **Field of Classification Search** ................ 709/206, 709/207, 204, 205
   See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,106,060 A    8/1978    Chapman, Jr.

4,130,885 A    12/1978    Dennis
4,289,930 A    9/1981    Connolly et al.

(Continued)

FOREIGN PATENT DOCUMENTS

AU    755321    4/2003

(Continued)

OTHER PUBLICATIONS

Casson, Andrew: "Plinth, Html and the World Wide Web", Jul. 1994, Artificial Intellignece Applications Institute, pp. 1-9.*

(Continued)

*Primary Examiner*—Michael Won
(74) *Attorney, Agent, or Firm*—Kenyon & Kenyon LLP

(57)    **ABSTRACT**

Systems and methods of storing a message directed to a user and delivering the message from a network server to a user's client device provide for receiving the message and storing the message to an access-restricted user-specific message storage area. When an access request from an application program executing on the user's client device is received via a packet switched network in accordance with an Internet protocol, a determination is made whether to grant or deny the access request. If the request is granted, a link is provided to the user, wherein selection of the link causes the message to be transmitted to the application program via the packet switched network in accordance with the Internet protocol.

**67 Claims, 18 Drawing Sheets**



US 7,836,141 B2

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,405,829 A | 9/1983 | Rivest et al. |
| 4,532,588 A | 7/1985 | Foster |
| 4,571,699 A | 2/1986 | Herzog |
| 4,713,780 A | 12/1987 | Schultz et al. |
| 4,754,428 A | 6/1988 | Schultz et al. |
| 4,816,653 A | 3/1989 | Anderl et al. |
| 4,837,798 A | 6/1989 | Cohen et al. |
| 4,853,961 A | 8/1989 | Pastor |
| 4,917,722 A | 4/1990 | Duehren et al. |
| 4,941,170 A | 7/1990 | Herbst |
| 5,008,814 A | 4/1991 | Mathur |
| 5,033,079 A | 7/1991 | Catron et al. |
| 5,047,918 A | 9/1991 | Schwartz et al. |
| 5,054,096 A | 10/1991 | Beizer |
| 5,065,427 A | 11/1991 | Godbole |
| 5,068,797 A | 11/1991 | Sanone et al. |
| 5,068,888 A | 11/1991 | Scherk et al. |
| 5,091,790 A | 2/1992 | Silverberg |
| 5,105,184 A | 4/1992 | Pirani et al. |
| 5,113,420 A | 5/1992 | Richardson, Jr. et al. |
| 5,113,496 A | 5/1992 | McCalley et al. |
| 5,115,326 A | 5/1992 | Burgess et al. |
| 5,127,003 A | 6/1992 | Doll, Jr. et al. |
| 5,167,011 A | 11/1992 | Priest |
| 5,175,762 A | 12/1992 | Kochis et al. |
| 5,193,110 A | 3/1993 | Jones et al. |
| 5,195,085 A | 3/1993 | Bertsch et al. |
| 5,224,156 A | 6/1993 | Fuller et al. |
| 5,227,893 A | 7/1993 | Ett |
| 5,241,594 A | 8/1993 | Kung |
| 5,247,591 A | 9/1993 | Baran |
| 5,247,661 A | 9/1993 | Hager et al. |
| 5,255,312 A | 10/1993 | Koshiishi |
| 5,257,112 A | 10/1993 | Okada |
| 5,267,047 A | 11/1993 | Argenta et al. |
| 5,267,301 A | 11/1993 | Nishii |
| 5,274,635 A | 12/1993 | Rahman et al. |
| 5,276,869 A | 1/1994 | Forrest et al. |
| 5,283,887 A | 2/1994 | Zachery |
| 5,289,371 A | 2/1994 | Abel et al. |
| 5,289,472 A | 2/1994 | Cho |
| 5,291,302 A | 3/1994 | Gordon et al. |
| 5,291,546 A | 3/1994 | Giler et al. |
| 5,293,250 A | 3/1994 | Okumura et al. |
| 5,296,934 A | 3/1994 | Ohtsuki |
| 5,297,208 A | 3/1994 | Schlafly et al. |
| 5,299,255 A | 3/1994 | Iwaki et al. |
| 5,307,456 A | 4/1994 | MacKay |
| 5,317,628 A | 5/1994 | Misholi et al. |
| 5,333,266 A | 7/1994 | Boaz et al. |
| 5,339,156 A | 8/1994 | Ishii |
| 5,349,636 A | 9/1994 | Irribarren |
| 5,351,276 A | 9/1994 | Doll, Jr. et al. |
| 5,355,472 A | 10/1994 | Lewis |
| 5,367,621 A | 11/1994 | Cohen et al. |
| 5,371,885 A | 12/1994 | Letwin |
| 5,379,374 A | 1/1995 | Ishizaki et al. |
| 5,394,460 A | 2/1995 | Olson et al. |
| 5,394,522 A | 2/1995 | Sanchez-Frank et al. |
| 5,404,231 A | 4/1995 | Bloomfield |
| 5,406,557 A | 4/1995 | Baudoin |
| 5,418,908 A | 5/1995 | Keller et al. |
| 5,424,724 A | 6/1995 | Williams et al. |
| 5,438,433 A | 8/1995 | Reifman et al. |
| 5,448,626 A | 9/1995 | Kajiya et al. |
| 5,452,289 A | 9/1995 | Sharma et al. |
| 5,459,584 A | 10/1995 | Gordon et al. |
| 5,471,617 A | 11/1995 | Farrand et al. |
| 5,475,738 A | 12/1995 | Penzias |
| 5,479,411 A | 12/1995 | Klein |
| 5,479,491 A | 12/1995 | Garcia et al. |
| 5,483,466 A | 1/1996 | Kawahara et al. |
| 5,483,524 A | 1/1996 | Lev et al. |
| 5,483,580 A | 1/1996 | Brandman et al. |
| 5,487,100 A | 1/1996 | Kane |
| 5,488,651 A | 1/1996 | Giler et al. |
| 5,495,610 A | 2/1996 | Shing et al. |
| 5,497,373 A | 3/1996 | Hullen et al. |
| 5,502,637 A | 3/1996 | Beaulieu et al. |
| 5,509,123 A | 4/1996 | Dobbins et al. |
| 5,513,126 A | 4/1996 | Harkins et al. |
| 5,513,323 A | 4/1996 | Williams et al. |
| 5,517,556 A | 5/1996 | Pounds |
| 5,524,137 A | 6/1996 | Rhee |
| 5,526,353 A | 6/1996 | Henley et al. |
| 5,530,740 A | 6/1996 | Irribarren et al. |
| 5,530,852 A * | 6/1996 | Meske et al. ................ 709/206 |
| 5,544,320 A | 8/1996 | Konrad |
| 5,546,388 A | 8/1996 | Lin |
| 5,548,789 A | 8/1996 | Nakanura |
| 5,552,901 A | 9/1996 | Kikuchi |
| 5,555,100 A | 9/1996 | Bloomfield et al. |
| 5,557,659 A | 9/1996 | Hyde-Thomson |
| 5,559,611 A | 9/1996 | Bloomfield et al. |
| 5,559,721 A | 9/1996 | Ishii |
| 5,561,703 A | 10/1996 | Arledge et al. |
| 5,568,536 A | 10/1996 | Tiller et al. |
| 5,568,540 A | 10/1996 | Greco et al. |
| 5,572,643 A | 11/1996 | Judson |
| 5,579,472 A | 11/1996 | Keyworth, II et al. |
| 5,590,178 A | 12/1996 | Murakami et al. |
| 5,604,737 A | 2/1997 | Iwami et al. |
| 5,604,788 A | 2/1997 | Tett |
| 5,608,446 A | 3/1997 | Carr et al. |
| 5,608,786 A | 3/1997 | Gordon et al. |
| 5,608,874 A | 3/1997 | Ogawa et al. |
| 5,621,727 A | 4/1997 | Vaudreuil |
| 5,625,675 A | 4/1997 | Katsumaru et al. |
| 5,630,060 A | 5/1997 | Tang et al. |
| 5,630,061 A | 5/1997 | Richter et al. |
| 5,633,916 A | 5/1997 | Goldhagen et al. |
| 5,634,005 A | 5/1997 | Matsuo |
| 5,647,002 A | 7/1997 | Brunson |
| 5,654,957 A | 8/1997 | Koyama |
| 5,657,461 A | 8/1997 | Harkins et al. |
| 5,664,102 A | 9/1997 | Faynberg |
| 5,673,316 A | 9/1997 | Auerbach et al. |
| 5,675,507 A | 10/1997 | Bobo, II |
| 5,677,955 A | 10/1997 | Doggett et al. |
| 5,687,220 A | 11/1997 | Finnigan |
| 5,689,550 A | 11/1997 | Garson et al. |
| 5,692,039 A | 11/1997 | Brankley et al. |
| 5,694,458 A | 12/1997 | Okada et al. |
| 5,710,883 A | 1/1998 | Hong et al. |
| 5,712,901 A | 1/1998 | Meermans |
| 5,712,903 A | 1/1998 | Bartholomew et al. |
| 5,712,907 A | 1/1998 | Wegner et al. |
| 5,715,453 A | 2/1998 | Stewart |
| 5,717,742 A | 2/1998 | Hyde-thomson |
| 5,724,410 A | 3/1998 | Parvulescu et al. |
| 5,727,156 A | 3/1998 | Herr-Hoyman et al. |
| 5,732,219 A | 3/1998 | Blumer et al. |
| 5,737,395 A * | 4/1998 | Irribarren ................ 379/88.13 |
| 5,737,396 A | 4/1998 | Garcia |
| 5,737,533 A | 4/1998 | de Hond |
| 5,740,231 A | 4/1998 | Cohn et al. |
| 5,742,596 A | 4/1998 | Baratz et al. |
| 5,742,668 A | 4/1998 | Pepe et al. |
| 5,742,905 A | 4/1998 | Pepe et al. |
| 5,751,791 A | 5/1998 | Chen et al. |
| 5,751,814 A | 5/1998 | Kafri |
| 5,751,956 A | 5/1998 | Kirsch |
| 5,758,088 A | 5/1998 | Bezaire et al. |
| 5,761,201 A | 6/1998 | Vaudreuil |

US 7,836,141 B2

Page 3

| | | | |
|---|---|---|---|
| 5,761,396 A | 6/1998 | Austin et al. |
| 5,765,033 A | 6/1998 | Miloslavsky |
| 5,768,528 A | 6/1998 | Stumm |
| 5,771,354 A | 6/1998 | Crawford |
| 5,774,668 A | 6/1998 | Choquier et al. |
| 5,781,614 A | 7/1998 | Brunson |
| 5,781,901 A | 7/1998 | Kuzma |
| 5,787,175 A | 7/1998 | Carter |
| 5,790,790 A * | 8/1998 | Smith et al. ................. 709/206 |
| 5,790,793 A * | 8/1998 | Higley ........................ 709/218 |
| 5,793,972 A | 8/1998 | Shane |
| 5,805,298 A | 9/1998 | Ho et al. |
| 5,812,278 A | 9/1998 | Toyoda et al. |
| 5,812,639 A | 9/1998 | Bartholomew et al. |
| 5,812,786 A | 9/1998 | Seazholtz et al. |
| 5,819,092 A | 10/1998 | Ferguson et al. |
| 5,819,295 A | 10/1998 | Nakagawa et al. |
| 5,825,865 A | 10/1998 | Oberlander et al. |
| 5,838,906 A | 11/1998 | Doyle et al. |
| 5,848,413 A | 12/1998 | Wolff |
| 5,854,893 A | 12/1998 | Ludwig et al. |
| 5,859,967 A | 1/1999 | Kaufeld |
| 5,870,454 A | 2/1999 | Dahlen |
| 5,870,549 A | 2/1999 | Bobo, II |
| 5,872,845 A | 2/1999 | Feder |
| 5,872,926 A | 2/1999 | Levac et al. |
| 5,881,233 A | 3/1999 | Toyoda et al. |
| 5,892,591 A | 4/1999 | Anglin, Jr. et al. |
| 5,892,909 A | 4/1999 | Grasso et al. |
| 5,893,908 A | 4/1999 | Cullen et al. |
| 5,903,723 A | 5/1999 | Beck et al. |
| 5,907,598 A | 5/1999 | Mandalia et al. |
| 5,911,776 A | 6/1999 | Guck |
| 5,917,615 A | 6/1999 | Reifman et al. |
| 5,930,493 A | 7/1999 | Ottesen et al. |
| 5,933,412 A | 8/1999 | Choudhury et al. |
| 5,933,490 A | 8/1999 | White et al. |
| 5,937,041 A | 8/1999 | Cardillo, IV et al. |
| 5,937,161 A | 8/1999 | Mulligan |
| 5,937,162 A | 8/1999 | Funk |
| 5,940,476 A | 8/1999 | Morganstein et al. |
| 5,940,598 A | 8/1999 | Strauss et al. |
| 5,944,786 A | 8/1999 | Quinn |
| 5,946,386 A | 8/1999 | Rogers et al. |
| 5,958,016 A | 9/1999 | Chang et al. |
| 5,960,085 A | 9/1999 | de la Huerga |
| 5,963,618 A | 10/1999 | Porter |
| 5,963,892 A | 10/1999 | Tanaka et al. |
| 5,970,490 A | 10/1999 | Morgenstern |
| 5,978,813 A | 11/1999 | Foltz et al. |
| 5,987,504 A | 11/1999 | Toga |
| 5,987,508 A | 11/1999 | Agraharam et al. |
| 5,991,292 A | 11/1999 | Focsaneanu et al. |
| 5,996,006 A | 11/1999 | Speicher |
| 5,999,525 A | 12/1999 | Krishnaswamy et al. |
| 5,999,965 A | 12/1999 | Kelly |
| 6,009,173 A | 12/1999 | Sumner |
| 6,009,469 A | 12/1999 | Mattaway et al. |
| 6,014,668 A | 1/2000 | Tabata et al. |
| 6,020,980 A | 2/2000 | Freeman |
| 6,023,345 A | 2/2000 | Bloomfield |
| 6,023,700 A | 2/2000 | Owens et al. |
| 6,025,931 A | 2/2000 | Bloomfield |
| 6,028,679 A | 2/2000 | Murphy |
| 6,032,192 A | 2/2000 | Wegner et al. |
| 6,035,332 A | 3/2000 | Ingrassia, Jr. et al. |
| 6,052,367 A | 4/2000 | Bowater et al. |
| 6,052,442 A | 4/2000 | Cooper et al. |
| 6,055,530 A | 4/2000 | Sato |
| 6,061,448 A | 5/2000 | Smith et al. |
| 6,064,653 A | 5/2000 | Farris |
| 6,064,723 A | 5/2000 | Cohn et al. |
| 6,069,890 A | 5/2000 | White et al. |

| | | | |
|---|---|---|---|
| 6,072,862 A | 6/2000 | Srinivasan |
| 6,073,165 A | 6/2000 | Narasimhan et al. |
| 6,084,892 A | 7/2000 | Benash et al. |
| 6,084,952 A | 7/2000 | Beerman, Jr. et al. |
| 6,085,101 A | 7/2000 | Jain et al. |
| 6,097,797 A | 8/2000 | Oseto |
| 6,108,329 A | 8/2000 | Oyama et al. |
| 6,157,706 A | 12/2000 | Rachelson |
| 6,181,781 B1 | 1/2001 | Porter |
| 6,185,603 B1 | 2/2001 | Henderson et al. |
| 6,192,407 B1 | 2/2001 | Smith et al. |
| 6,208,638 B1 | 3/2001 | Rieley et al. |
| 6,211,972 B1 | 4/2001 | Okutomi et al. |
| 6,212,550 B1 | 4/2001 | Segur |
| 6,215,858 B1 | 4/2001 | Bartholomew et al. |
| 6,216,173 B1 | 4/2001 | Jones et al. |
| 6,229,844 B1 | 5/2001 | Kong |
| 6,233,318 B1 | 5/2001 | Picard et al. |
| 6,240,445 B1 * | 5/2001 | Kumar et al. ............... 709/206 |
| 6,240,454 B1 | 5/2001 | Nepustil |
| 6,246,983 B1 | 6/2001 | Zou et al. |
| 6,256,115 B1 | 7/2001 | Adler et al. |
| 6,259,533 B1 | 7/2001 | Toyoda et al. |
| 6,263,064 B1 | 7/2001 | O'Neal et al. |
| 6,266,160 B1 | 7/2001 | Saito et al. |
| 6,278,532 B1 | 8/2001 | Heimendinger et al. |
| 6,282,270 B1 | 8/2001 | Porter |
| 6,285,777 B2 | 9/2001 | Kanevsky et al. |
| 6,295,350 B1 | 9/2001 | Schreyer et al. |
| 6,295,552 B1 | 9/2001 | Shibata |
| 6,301,339 B1 | 10/2001 | Staples et al. |
| 6,304,636 B1 | 10/2001 | Goldberg et al. |
| 6,314,425 B1 | 11/2001 | Serbinis et al. |
| 6,330,070 B1 | 12/2001 | Toyoda et al. |
| 6,330,079 B1 | 12/2001 | Dugan et al. |
| 6,330,323 B1 | 12/2001 | Gottlieb et al. |
| 6,334,142 B1 * | 12/2001 | Newton et al. ............... 709/206 |
| 6,339,591 B1 | 1/2002 | Migimatsu |
| 6,341,160 B2 | 1/2002 | Tverskoy et al. |
| 6,350,066 B1 | 2/2002 | Bobo, II |
| 6,356,356 B1 | 3/2002 | Miller, Jr. et al. |
| 6,359,881 B1 | 3/2002 | Gerszberg et al. |
| 6,360,256 B1 | 3/2002 | Lim |
| 6,404,513 B1 | 6/2002 | Denker |
| 6,411,696 B1 | 6/2002 | Iverson et al. |
| 6,417,930 B2 | 7/2002 | Mori |
| 6,430,272 B1 | 8/2002 | Maruyama et al. |
| 6,486,895 B1 | 11/2002 | Robertson et al. |
| 6,498,835 B1 | 12/2002 | Skladman et al. |
| 6,510,438 B2 | 1/2003 | Hasegawa |
| 6,564,321 B2 | 5/2003 | Bobo, II |
| 6,597,688 B2 | 7/2003 | Narasimhan et al. |
| 6,643,034 B1 | 11/2003 | Gordon |
| 6,690,480 B2 | 2/2004 | Maeda |
| 6,742,022 B1 | 5/2004 | King et al. |
| 6,795,108 B2 | 9/2004 | Jarboe et al. |
| 6,825,955 B1 | 11/2004 | Shibata |
| 6,948,070 B1 | 9/2005 | Ginter et al. |
| 2001/0014910 A1 | 8/2001 | Bobo, II |
| 2003/0208688 A1 | 11/2003 | Bobo, II |
| 2005/0050349 A1 | 3/2005 | Bobo, II |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 4309072 A1 | 9/1994 |
| EP | 0615368 A2 | 2/1992 |
| EP | 0835021 A1 | 4/1998 |
| EP | 0554456 A1 | 8/1998 |
| GB | 2024561 A | 1/1980 |
| GB | 2157117 A | 10/1985 |
| JP | 2237338 A | 9/1990 |
| JP | 04018844 A | 1/1992 |
| JP | 04111557 A | 4/1992 |

US 7,836,141 B2

Page 4

| JP | 04150351 | A | 5/1992 |
| JP | 04256273 | A | 9/1992 |
| JP | 4265040 | A | 9/1992 |
| JP | 04290033 | A | 10/1992 |
| JP | 04291858 | A | 10/1992 |
| JP | 05233488 | A | 9/1993 |
| JP | 05235997 | A | 9/1993 |
| JP | 05244292 | A | 9/1993 |
| JP | 05284326 | A | 10/1993 |
| JP | 05316309 | A | 11/1993 |
| JP | 06069956 | A | 3/1994 |
| JP | 06164645 | A | 6/1994 |
| JP | 06217069 | A | 9/1994 |
| JP | 07023057 | A | 1/1995 |
| JP | 07038689 | A | 2/1995 |
| JP | 07058845 | A | 3/1995 |
| JP | 07212393 | A | 8/1995 |
| JP | 07250094 | A | 9/1995 |
| JP | 07288543 | A | 10/1995 |
| JP | 07288668 | A | 10/1995 |
| JP | 08009092 | A | 1/1996 |
| JP | 08111692 | A | 4/1996 |
| JP | 08130601 | A | 5/1996 |
| JP | 08237294 | A | 9/1996 |
| JP | 08237297 | A | 9/1996 |
| JP | 08256235 | A | 10/1996 |
| JP | 08286091 | A | 11/1996 |
| JP | 08336053 | A | 12/1996 |
| JP | 09023273 | A | 1/1997 |
| JP | 07170288 | A | 2/1997 |
| JP | 09046369 | A | 2/1997 |
| JP | 09102798 | A | 4/1997 |
| JP | 09135266 | A | 5/1997 |
| JP | 09163064 | A | 6/1997 |
| JP | 09200251 | A | 7/1997 |
| JP | 09-223004 | A | 8/1997 |
| JP | 09214559 | A | 8/1997 |
| JP | 09214560 | A | 8/1997 |
| WO | 94/06230 | | 3/1994 |
| WO | 95/01040 | | 1/1995 |
| WO | 95/06386 | | 3/1995 |
| WO | 95/20288 | | 7/1995 |
| WO | 9531060 | A1 | 11/1995 |
| WO | 9627160 | A1 | 9/1996 |
| WO | 9627967 | A1 | 9/1996 |
| WO | 9629663 | A1 | 9/1996 |
| WO | 9629664 | A1 | 9/1996 |
| WO | 96/34341 | A1 | 10/1996 |
| WO | 9638987 | A1 | 12/1996 |
| WO | 97/09682 | | 3/1997 |
| WO | 9718635 | A2 | 5/1997 |
| WO | 9723082 | A1 | 6/1997 |
| WO | 9723988 | A1 | 7/1997 |
| WO | 9817041 | A2 | 4/1998 |
| WO | 9823058 | A2 | 5/1998 |

OTHER PUBLICATIONS

El-Hadidi et al., "Design of an E-Mail System for Personal Computers", 1991, Engineering Journal of Qatar University, vol. 4, pp. 51-69.*

"WebMail, a www interface to e-mail—1st public release", Mar. 1995, http://scout.wisc.edu/Projects/PastProjects/NH/95-03/95-03-30/0009.html.*

NPL Search Results: http://www.dialongclassic.com/tiny_mce/blank.htm, Jun. 29, 2010.*

EAST: "Search History", C:\Documents and Settings\bprieto\My Documents\EAST\Workspaces\xxxxx.wsp, Jul. 15, 2010.*

*Critical Path Data Sheet—Critical Path Messaging Server, 2 pages, Dec. 2002r.

*Critical Path Data Sheet—Critical Path Internet File Server, 2 pages, Dec. 2002r.

*Critical Path Data Sheet—Critical Path Presentation Server, 2 pages, Dec. 2002r.

*Critical Path Data Sheet—Critical Path SMS Access Server, 2 pages, 2002r.

*Critical Path Data Sheet—Critical Path Calendar Server, 2 pages, Dec. 2002r.

*Critical Path Data Sheet—Critical Path Personal Address Book Server, 2 pages, Dec. 2002r.

*CPT™ Meta-Directory Server, 4 pages, Jun. 2002r.

*Critical Path Meta-Directory Server, 1 page, May 8, 2003http://www.cp.net/solutions/metaDirectoryServer.html.

*Tumbleweed Communications, 3 pages, May 8, 2003http://www.tumbleweed.com/en/products/ime_overview.html.

*Tumbleweed Communications, 1 pages, May 8, 2003http://www.tumbleweed.com/en/products/ime_product_architecture.html.

*Tumbleweed Communications, 1 page, May 8, 2003http://www.tumbleweed.com/en/products/ime_for automated_deliveries.html.

*Tumbleweed Communications, 3 pages, May 8, 2003_http://www.tumbleweed.com/dy/print/.

Tumbleweed Communications, 1 page, May 8, 2003http://www.tumbleweed.com/en/products/ime_portal_integration.html.

*Tumbleweed Communications, 1 page, May 8, 2003http://www.tumbleweed.com/en/products/ime_message_tracking.html.

*Tumbleweed Communications, 2 pages, May 8, 2003http://www.tumbleweed.com/dy/print/.

*Tumbleweed Communications, 2 pages, May 8, 2003http://www.tumbleweed.com/dy/print/.

Nakagawa, et al., Development of a Network Model for the Total Health Care Management of Multi-Vendor Environment, in Multimedia Communications, 1994, Multimedia '94, 5th IEEE COMSOC Int'l Workshop, pp. 5/2/1-5/2/4 (workshop occurred May 16-19, 1994).

Larry M. Edwards, E-Mail: Industry is Posting Impressive Gains, in San Diego Business Journal, pp. 1 and 17-18 (Mar. 7, 1994).

Aurthor unknown, Lotus Executive Details Notes' Work Flow Strategy; Pinches Notes as a platform for Third-Party Products, in Network World, p. 27 (Sep. 6, 1993).

Paul Kinnucan, What's New in the Fax World, in Systems Integration, vol. 23, No. 2 at 50 (Feb. 1990).

Author unknown, Delrina WinFax Pro 4.0 Focuses on Ease of Use, Newsbytes, Post-Newsweek Business Information, Inc., (Mar. 15, 1994).

David Morgenstern, DynaWeb Server Holds SGML Books: Web Server Queries, Converts to HTML, in MacWeek, vol. 8, No. 28 at 12 (Jul. 11, 1994).

Gord Nickerson, WorldWideWeb: hypertext from CERN, Computers in Libraries, vol. 12, No. 11, p. 75 (1992).

Mario J. Silva and Randy H. Katz, The case for Design Using the World Wide Web, in 32nd ACM/EEE Design Automation Conference (1995).

Barry Fenn and Hermann Maurer, Harmony on an Expanding Net, ACM Interactions, pp. 27-38 (Oct. 1994).

Plaintiff's Opposition Claim Construction Brief in j2 Global Communications, Inc. v Venali, Inc., cv 04-1172 DDP AJWx.

Brief in Opposition to Plaintiff j2's Opening Claim Construction Brief in j2 Global Communications, Inc. v Venali, Inc., cv 04-1172 DDP AJWx.

Plaintiffs Opening Claim Construction Brief in j2 Global Communications, Inc. v Venali, Inc., cv 04-1172 DDP AJWx.

Opening Claim Construction Brief in j2 Global Communications, Inc. v Venali, Inc., cv 04-1172 DDP AJWx.

Docket Report from cv 04-1172 DDP AJWx.

"JFax Personal Telecom—Plug a Phone Into Your E-Mail," downloaded from the Internet at www.jfax.com on Oct. 31, 1996.

J. Peck, et al., "MH & xmh, Email for USOIS & Programers," O'Reilly & Associates, Inc., Sebastopol, Ca, 1995.

"ScanFX-Scanning Hardware for Internet E-Mail", Aug. 1990.

"Plaintiff's Opening Markman Brief" in j2 Global Communications, Inc. v. CallWave, Inc., CA 04-7068 DDP AJWx.

"Plaintiff's Opposition Markman Brief" in j2 Global Communications, Inc. v. CallWave, Inc., CA 04-7068 DDP AJWx.

US 7,836,141 B2

Page 5

"Defendant CallWave, Inc.'s Opening Claim Construction Brief" in *j2 Global Communications, Inc.* v. *CallWave, Inc.*, CA 04-7068 DDP AJWx.

"Defendant CallWave, Inc.'s Opposition to Plaintiff j2's Opening Markman Brief" in *j2 Global Communications, Inc.* v. *CallWave, Inc.*, CA 04-7068 DDP AJWx.

"Defendant CallWave's Supplemental Disclosures Pursuant FRCP 26(A)(1)" in *j2 Global Communications, Inc.* v. *CallWave, Inc.*, CA 04-7068 DDP AJWx.

Delrina Advertisement, 1994.

"Working with . . . Fax Mailbox" PCToday by Jim Cope (Sep. 1994, vol. 8, Issue 9).

Voice/Fax Combos by Stuart Warren, Computer Telephony, Sep./Oct. 1994, p. 88.

B.S. Kaliski Jr., "An Overview of the PKCS Standards," RSA Laboratories Technical Note, RSA Security, Inc., Public-Key Cryptography Standards (PKCS), Revised Nov. 1, 1993.

"Keys and Certificates" downloaded from the Internet at www.elock. com.

"Cryptography Systems," downloaded from the internet at www.elock.com.

How does the S/MIME encryption and digital signature process work? downloaded from the Internet at www.worldtalk.com, on Jul. 25, 1999.

PKCS #7: Cryptographic Message Syntax Standard, RSA Laboratories Technical Note, Version 1.5, RSA Security, Inc. Public-Key Cryptography Standards (PKCS), Revised Nov. 1, 1993, downloaded from the Internet at www.ftp.rsa.com, on Oct. 1, 1998.

C. Ellison, et al., "Default Protecting Secret Keys with Personal Entropy," Mar. 3, 1999.

Chaffing and Winnowing: Confidentiality without Encryption, downloaded from the Internet at www.theory.lcs.mit.edu, on Jul. 13,1999.

"S/MIME or OpenPGP? How Will You Secure Your E-mail?" downloaded from the Internet atwww.worldtalk.com.

"S/MIME Frequently Asked Questions," downloaded from the Internet at www.rsa.com, on Jul. 23, 1999.

"S/MIME Frequently Asked Questions," downloaded from the Internet at www.rsa.com, on Nov. 16, 1999.

"SCML-Signed Document Markup Language," W3C Note Jun. 19, 1998, downloaded from the Internet at www.23.org, on Oct. 28, 1998.

"C. R. Baudoin, —the Sematech Electronic Mail System," Proceedings of the Digital Equipment Computer Users Society, pp. 221-231, US.A., Spring 1989.

N. Borenstein, et al., "A Multi-media Message System for Andrew," USENIX Winter Conference, Dallas, TX, pp. 37-42, Feb. 9-12, 1988.

J. Donahue, et al., "Walnut: Storing Electronic Mail in a Database," Xerox Park, CSL-85-9, Nov. 1985.

K. Hofrichter, et al., "The BERKOM Multimedia-Mail Teleservice," Proceedings of the Fourth Workshop on Future Trends of Distributed Computing Systems, Lisbon, Portugal, pp. 23-30, Sep. 22-24, 1993.

J. K. Reichard, "Leveraging E-Mail," PC Magazine: 241, 244 and 245 (May 1995), et al., "Browsing Electronic Mail: Experiences Interfacing a Mail System to a DBMS," Proceedings of the Fourteenth International Conference on Very Large Data Bases, Los Angeles, CA, pp. 112-123, 1988.

E. Moeller, et al., "The BERKOM multimedia-mail teleservice," Computer Communications, vol. 18:2, pp. 89-102, Feb. 1995.

J. Pan, "Internet Security & Firewall Issues for NIIIP Virtual Enterprise," NIIIP OMB Meeting, Boca Raton, FL., Jan. 23-25, 1996.

A. Poggio, et al., "CCWS: A Computer-Based, Multimedia Information System," Multimedia Communications, pp. 92-103, Oct. 1985.

A. Reinhardt, "Smarter E-Mail Is Coming," BYTE Magazine, pp. 90-108, Mar. 1993.

J. Rosenberg, et al., "An Overview of the Andrew Message System," Computer Communications Review, vol. 17:5, pp. 99-108, Apr. 1988.

S. Sakata, et at ., "A Distributed Interoffice Mail System," Multimedia Communications, pp. 106-116, Oct. 1985.

S. J. Vaughan-Nichols, "Internet Publishing Tools Proliferate," BYTE Magazine, Mar. 1995.

"Microsoft Messaging Application Pro Interface (MAPI)," downloaded from the Internet at www.microsoft.com/win32dev/apiext/mapiwp.html.

Novell Announces *Softsolutions* 4.1, PR Newswire, New Orleans, LA, May 9, 1995.

"How Posta Works", downloaded from the Internet at www.tumbleweed.com/posta/posta_overview.html.

"Overview of the Trans-Virtual Enterprise Server," Product Overview.

V. Gay, et al, "Conception of a Multimedia Electronic Mail Based on Standards," Proceedings of the Fourth Workshop on Future Trends of Distributed Computing Systems, Sep. 22-24, 1993.

J. Postel, et al. "An Experimental Multimedia Mail System," ACM Transactions on Office Information Systems, vol. 6, No. 1, Jan. 1988.

"Web Mail", Information Week, p. 120, Dec. 16, 1996.

"Ipswitch Delivers the First Internet-Ready Messaging Server for Windows NT That Allows Access to E-mailvia the Web", PR Newswire, pp. 1209NEM007, Dec. 9, 1996.

"Hotmail Introduces Hotmail WebCourier Direct Content Delivery Service", Business Wire, pp. 02030123, Mar.1997.

J. B. Postel, RFC0821, Simple Mail Transfer Protocol, HTTP://rfc-koeln.de/html, 80 pages, Aug. 1982.

M. Sherman, et al., "Allocation of User-Interface Resources in the Andrew Toolkit," International Conference on Multimedia Information stems, pp. 261-272, 1991.

M. Sherman, et al., "Building Hypertext on a Multimedia Toolkit: An Overview of Andrew Toolkit Hypermedia Facilities," Proceedings of the First European Conference on Hypertext, pp. 13-24, France, Nov. 1990.

V. S.,Wheatman, "Sorting Through the Secure Messaging Maze," Messaging Magazine, downloaded from theInternet at www.ema.org/html/pubs/mmv4n2/msgmaze.htm, Mar.-Apr. 1998.

The Andrew Messages System, downloaded from the Internet at www.cs.cmu.edu/afs/cs.cmu.edu/project/atk-ftp/web/ams.html.

"Facts on File re: Andrew," downloaded from the internet at www.cs.cmu.edu:80/afs/cs.cmu.edu/project/atk-ftp/web/faxonfile.html.

Welcome to the Andrew Consortium, www.cs.cmu.edu:80/afs/cs.cmu.edu/project/atk-ftp/web/andrew-home.html.

"The Andrew Publication Archive," ftp.andrew.cmu.edupub/AUIS/PAPERS/REDME.

"Bibliography of Publications on the Andrew User Interface System," ftp.andrew.cmu.edu/pub/AUIS/PAPERS/BIBLIOGRAPHY on May 13, 2002.

J. Peek, et al., "MH & xmh, Email for Users & Programmers," Reilly & Associates, Inc., Sebastopol, CA, 1995.

B. Costales, et al., "sendmail," 0' Reilly & Associates, Inc., Sebastopol, CA, 1993.

K. S. Morris, "A Technical Overview of MIME," Web Developer's Journal Archives, Mar. 1995.

"comp.mail.unime FAQ (frequently asked questions list)," downloaded from the Internet at www.cis.ohio-state.edu/text/faq/usenet/mail/mime-faq/part/faq.html Jun. 11,1997.

"Composing and Sending MIME Message," downloaded from the Internet at www.gieldasgarage.com/mh/cosemine.htm.

"Reading MIME Messages," downloaded from the Internet at www.gieldasgarage.com/mh/cosemime.htm.

"comp.mail.mime frequently asked questions list (FAQ) (1/3)," downloaded from the Internet at www.tu-chemnitz.del-fri/mime/FAO-1.htmk, Sep. 4, 1994.

M. Grand, "MIME Overview," downloaded from the Internet at www.mindspring.com/-mgrand/mime.html, revised Oct. 26, 1993.

D. W. Connolly, "A Formalism for Internet Information References," downloaded from the Internet atwww.w3.org/people//Connolly/drafts/formalism.txt.

G. Vaudreuil, "The Multipart/Report Content Type for the Reporting of Mail System Administrative Messages," Network Working Group, Internet Draft, Sep. 1995.

G. Vaudreuil, "Enhanced Mail System Status Codes," Network Working Group, Internet Draft, Jun. 1995.

K. Moore, et al., "An Extensible Message Format for Delivery Status Notifications," Network Working Group,Internet Draft, Sep. 1995.

"Information Technology—Text and Office systems—Distributed-office-applications Model -Part 1: General model," International Standard ISO / IEC 10031-1:1-73, 1991 (E).

US 7,836,141 B2

Page 6

"Information Technology—Text and Office Systems—Distributed Office Applications Model: Part 2;Distinguished-object-reference and Associated Procedures," International Standard ISO/IEC 10031-2:1-13, 1991.

D. H. Crocker, "Standard for the Format of ARPA Interent Text Message," RFC 822, 1982.

J. Klensin, "Simple Mail Transfer Protocol," Internet Draft, draft-ietf-drums-02.txt, May 21, 1996.

N. Borenstein et al., "MIME: Mechanisms for Specifying and Describing the Format of Internet Message Bodies," Network Working Group, RFC 1341, Jun. 1992.

N. Borenstein, "MIME (Multipurpose Internet Mail Extensions) Part One: Mechanism for Specifying and Describing the Format of Internet Message Bodies," Network Working Group, RFC 1521, Sep. 1993.

K. Moore, "MIME (Multipurpose Internet Mail Extensions) Part Two: Message Header Extensions for Non-ASCII Text," Network Working Group, RFC 1522, Sep. 1993.

N. Freed, et al., "Definition of the URL MIME External-Body Access-Type," Network Working Group, InternetDraft of RFC 2017 (Apr. 11, 1995) see also N. Freed et al., "Definition of the URL MIME External-Body Access-Type," Network Working Group, RFC 2017, Oct. 1996.

C. Manros, "New Internet Mail Functionality for Delivery Status Notifications," Messaging Magazine,Jul./Aug. 1995.

K. Moore, "SMTP Service Extension for Delivery Status Notifications," Network Working Group, Internet-Draftof RFC 1891, Sep. 21, 1995.

Internet Engineering Task Force, R. Braden (ed.), "Requirements for Internet Hosts—Application and Support," Network Working Group, RFC 1123, Oct. 1989.

J. Myers, et al., "Post Office Protocol-Version 3," Network Working Group, RFC 1725, Nov. 1994.

K. Sollins et al., "Functional Requirements for Uniform Resource Names," Network Working Group, RFC 1737Dec. 1994.

T. Berners-Lee, "Universal Resource Identifier in WWW, A Unifying Syntax for the Expression and Address ofObjects on the Network as used in the World-Wide Web," Network Working Group, RFC 1630, Jun. 1994.

T. Berners-Lee, et al., "Uniform Resource Locators (URL)," Network Working Group, RFC 1738, Dec. 1994.

T. Berners-Lee, et al., "Hypertext Markup Language-2.0," Network Working Group, RFC 1866, Nov. 1995.

S. Bradner, "The Internet Standards Process—Revision 3," Network Working Group, RFC 2026, 1996.

J. K. Reynolds, et al., "The DARPA Experimental Multimedia Mail System," Computer: 82-89, 1985.

S. Baker, "Hypertext Browsing on the Internet," UNIX Review : 21-27, 1994.

D.P. Dern, "Applying the Internet," BYTE Magazine, Feb. 1992.

K.M. Savetz, "Magazines Without Paper," BYTE Magazine, Sep. 1993.

S.J. Vaughan-Nichols, "The Web Means Business," BYTE Magazine, Nov. 1994.

A. Singleton, "The Virtual Storefront," BYTE Magazine, Jan. 1995.

J.R. Vacca, "Mosaic: Beyond Net Surfing," BYTE Magazine, Jan. 1995.

B. Smith, "Internet with Style," BYTE Magazine, Jan. 1995.

B. Smith, "Making the Internet Connection," BYTE Magazine, Jan. 1995.

B. Friesenhahn, "Build Your Own WWW Server," BYTE Magazine, Apr. 1995.

S.B. Jones, "Caught in the World Wide Web: MIT Moves Computer Documentation Online," Meet the ShadowFuture: 187-189, 1994.

S. Baker, "Mosaic-Surfing at Home and Abroad," Meet the Shadow Future: 159-163, 1994.

R. J. Vetter et al., Mosaic, HTML, and the World Wide Web, IEEE Computer, 27, 1994.

University of Cambridge Statistical Laboratory, "Using Mosaic for Xwindows," Internet Publication, Jul. 1994, downloaded from http:// www.statslab.cam.ac.uk.

"New Features in Mosaic 2.0," Internet Publication, downloaded from http://www.issi.com, Dec. 1994.

"World Wide Web Frequently Asked Questions," from URL http:// sunsite.unc.edu/boutell/faq/www_faq.html, Dec. 9, 1994.

"MHonArc Home Page updated Nov. 17, 1994 and MHonArc software manual published by Earl Hood<ehood©convex.com> Convex Computer Corporation, Richardson Texas".

C. Liu, et al., "Managing The Internet Information Services," World Wide Web, Gopher, FTP, and more : 357-359,Dec. 1994.

J. December, et al., "The World Wide Web; Everything You Need to Master the Web!": 180-189-part I and 277-280 (part II), 1994.

T. Berners-Lee, et al., "Hypertext Markup Language (HTML); A Representation of Textual Information and Metainformation for Retrieval and Interchange," Internet Draft, IIIR Working Group, 1993.

K. Reichard, "Leveraging E-Mail", PC Magazine: 241, 244 and 245, May 1995.

"Lan-Aces, Inc. Announces Expanded Capabilities to Office-Logic Clerk Application," PR Newswire, May-Jun. 1994.

"Working with AT&T Easylink, An Effective Communication Solution for Business," PC Today 62, May 1995.

J. Davis, et al., "Drop-in Publishing With the World Wide Web," Computer Networks and IDSN Systems, 28, pp. 247-255, 1995.

K. Goldberg, "Beyond the Web: Manipulating the Real World," Computer Networks and ISDN Systems, 28, pp. 209-219, 1995.

A. N. Boston, et al., "Interactive species distribution reporting, mapping, and modelling using the World Wide Web," Computer Networks and ISDN Systems, 28, pp. 231-238, 1995.

T. W. Yan, et al., "From user access patterns to dynamic hypertext linking," Computer Networks and ISDN Systems, 28, pp. 1007-1014, 1996.

H. Pusch, "Design and implementation of a global reference mechanism for data objects," Computer Standards & Interfaces, 17, pp. 181-192, 1995.

B. Wiegel, "Secure External References in Multimedia Email Messages," 3rd ACM Conference on Computer and Communications Security, New Delhi, India, Mar. 14-16, 1996.

E. Levinson, "Exchanging SGML Documents Using Internet Mail and MIME," Computer Standards &Interfaces, 18, pp. 93-102, 1996.

E. Meyer, et al., "Borealis Image Server," Computer Networks and ISDN Systems, 28, pp. 1123-1137, 1996.

M. Rio, et al, "A framework for broadcasting and management of URIs," Computer Networks and ISDNSystems, 28, pp. 535-542, 1996.

Swartz, Barry K. and Stephen B. Weinstein, "Dual-Media Messaging Using Screen Telephones on the Telephone Network," IEEE International Conference on Communications '93, May 23-26, 1993, pp. 1183-1188, Technical Program, Conference Record, vol. 2/3.

Borenstein, Nathaniel S., "Internet Multimedia Mail with MIME: Emerging Standards for Interoperability," Upper Layer Protocols, Architectures and Applications, 1992, pp. 183-192. Elsevier Science Publishers B.V. (North Holland).

Supplementary European Search Report in European Patent Application No. EP 96 91 3855, search results mailed Nov. 22, 2001.

Patel, Sanjiv P, et al., "The Multimedia Fax-MIME Gateway," IEEE Multimedia Journal, Winter 1994, at 64-70.

Internet Engineering Task Force, R. Braden (ed.), "Requirements for Internet Hosts—Application and Support," Network Working Group, RFC 1123, Oct. 1989

D. Nakamura, "AT&T Introduces Most Comprehensive Fax-to_Data Service" dated Feb. 22, 1996, downloaded from Internet at http://www.att.com/press/0296/960222.ela.html on May 16, 1997.

Biscom, "Biscom Introduces the E-fax Machine: the E-mail/Facsimile Solution 'For the Rest of Us,'" FAXCOM, Sep. 19, 1996.

C3 Launches its Advanced Itmail Multi-medial Messaging System for Desk Top PC's Computer and Communications Company Ltd., Jun. 1993.

"Digital Note Fax2Net R5S 1-A Beginners Guide to Digital Mail Fax," Digital Mail Limited, Oct. 31, 1996.

J. Duffy, "IBM's SAA Gets Voice: Company to Expland Enterprise Networking Horizons," Computer Systems News, p. 1, May 14, 1990.

"Frequently Asked Questions", Jfax Personal Telecom, downloaded from Internet at www.jfax.net/faq.htm on Oct. 31, 1996.

N. Ballard, "@ the Paperless Office", Jfax Personal Telecom, downloaded from the Internet at www.jfax.net/ballard1.htm on Oct. 31, 1996.

J. Lyle, "Internet Fax Software: Internet Fax Utility Offers Simplified Faxing to E-Mail Addresses", Lumina News, Sep. 3, 1996, downloaded from Internet at http://lumina2000.com/lumina/press93.html printed on Jun. 11, 1997.

"Delivering Unified Messaging Solutions on the Internet", Media Mail, Nov. 2, 1996, downloaded from Internet at www.web.archive.org/web/1996121905113/http://mediamail.com on Mar. 2, 2005.

"Metholoby for Mail Delivery in a Multi-Media Environment," IBM Technical Disclosure Bulletin, Apr. 1993, pp. 507-508.

"ScanFX-Scanning Hardware for Internet E-Mail," Our Business Machines, Inc., OBM's Editorial Resource Chest, Aug. 1996, Irwindale, CA.

J. Kravitz, "SDML-Signed Document Markup Language," Financial Services Technology Consortium, W3C Note Jun. 19, 1998, downloaded from the Internet at www.23.org, on Jun. 19, 1998.

"Three Pronged Strategy for Octel, as it Integrates VMX and Moves from Core Market to New Territories," Computergram International, Aug. 1995, n.2719, ComputerWire, Inc.

D. Rush, "Announce: Voice Mail, Email & Fax Integration Over the Web," Google Groups: biz.nextnewprod. Mar. 19, 1996, http://groups-beta.google.com/group/biznextnewprod/msg/db3c129fdo394667?dmode+source, Mar. 2, 2005.

D. Rush, "Announce: Voice Mail, Email & Fax Integration Over the Web," Google Groups: biz.nextnewprod. Mar. 25, 1996, http://groups-beta.google.com/group/biznextnewprod/msg/b85b59d49e923318b?dmode+source, Mar. 2, 2005.

E Spire, "Fax->E-mail" Google Groups, http://groups-beta.google.com/group/comp/acom.telecom, Dec. 20, 1995.

R. Schockey, "Fax->E-Mail Plus Voice Mail Also?" Google Groups, http://groups-beta.google.com/group/comp/dcom. telecom, Dec. 28, 1995.

R. Schockey, "Fax->E-Mail Plus Voice Mail Also?" Google Groups, http://groups-beta.google.com/group/comp/dcom. telecom/msgf7db6ab0035e113c2?dmode=source, Dec. 28, 1995.

R. Schockey, "Fax->E-Mail Plus Voice Continued" Google Groups, http://groups-beta.google.com/group/comp/dcom. telecom/msg11a2c73a37bc90e6b2dmode=source, Dec. 28, 1995.

S. Sreenivasan "Cybertimes German Pop Singer Sets Sights on Virtual Office," Sep. 23, 1996, downloaded from the New York Times CyberTime website.

Fax Mailbox, PC Today, Sep. 1994.

Multimedia Fax-MIME Interworking, Patel, Henderson and Georganas, IEEE, 1994.

"IBM Software Allows Phone Messages to be Retrieved Via Internet World Wide Web,press release, Nov. 28, 1995 (announcing product release)".

MSN Hotmail Continues to Grow Faster than Any Media Company in History, pressrelease, Feb. 8, 1999 (referencing Jul. 4, 1996 launch of Hotmail, which permitteds users to access e-mail accounts through web browsers).

MIME (Multipurpose Internet Mail Extension) Part One: "Mechanisms for Specifying and Describing the Format of Internet Message Bodies", Internet RFC 1341 and 1521, Sep. 1993.

MIME (Multipurpose Internet Mail Extension) Part Two: "Message Header Extensions got Non-ASCII Text", Internet RFC 1342, Sep. 1993.

"Lotus Turns up the Heat on Microsoft Exchange Rival," Network Week, Jan. 27, 1995.

"Novell Inc. To Demonstrate Alex, a Universal In-box That Will Accept and Store Email,Voice mail and Faxes," Computer Reseller News, Feb. 6, 1995.

"Wide Area Networking Puts Remote Offices On-Line," Managing Office Technology,Sep. 1994, pp. 49-50, 52, vol. 39, USA.

M. Pop, "Comparative Study of Electronic Mail Systems," May 30, 1994.

H. Chan et al., "Integrated Telephone/Fax/Paging/Email Services over ATM/MAN-based Personal Communication Networks," Department of Electrical and ComputerEngineering, The University of British Columbia, Vancouver, B. C., Canada.

Supplementary European Search Report in European Patent Application No. EP 9895 0859, Jun. 3, 2005.

International Search Report in International Application No. PCT/US98/20732, Jan. 25, 1999.

International Search Report in International Application No. PCT/US96/05910, Jul. 18, 1996.

*Critical Path Data Sheet—Critical Path Notification Server, 2 pages, Dec. 2002r.

"Defendant Comodo Communications, Inc.'s Local Patent Rule 3-3 Invalidity Contentions" in j2 Global Communications, Inc. v. Comodo Communications, Inc., Case No. 6:08-cv-275.

Coresoft Technologies, CenterPoint Fax Server Administration Guide, 1997-98.

Russell Kahan, "Fax over IP" Gale Group, Inc., 1997.

Shung-Foo Yu et al., "A multimedia gateway for phone/fax and MIME mail" 20 Computer Communications, pp. 615-627, Aug. 1997.

Ahmed Patel, et al., "A technique for multi-network access to multimedia messages" 20 Computer Communications 324-337, Jul. 1997.

Daniel J. Rosenbaum, "The E-Mail Route to Fax" 7 PC World, pp. 168-170, Jun. 1989.

Hertzoff, Ira; AT&T Global Messaging , The AT&T EasyLink Services Sourcebook; Ch. 7, pp. 149-176.

Hertzoff, Ira; AT&T Global Messaging , The AT&T EasyLink Services Sourcebook; Ch. 10, pp. 219-249.

Hertzoff, Ira; AT&T Global Messaging , The AT&T EasyLink Services Sourcebook; Ch. 11, pp. 251-283.

Hertzoff, Ira; AT&T Global Messaging , The AT&T EasyLink Services Sourcebook; Ch. 12, pp. 285-319.

RightFax Installation & Administration Guide, 1996.

RightFax E-mail Gateway Guide, 1994, v.3.51.

RightFax Users Guide, 1996.

"Invalidity Contentions of Defendant Protus IP Solutions, Inc." in j2 Global Communications, Inc. v. Protus IP Solutions, Inc.,Case No. 6:08-cv-211-LED-JDL.

"Defendant Captaris, Inc.'s, Local Patent Rule 3-3 Invalidity Contentions" in j2 Global Communications, Inc. v. Captaris, Inc., Case No. 6:08-cv-262 (LED).

"Defendant Easylink Service International Corporation's Invalidity Contentions under P.R. 3-3 " in j2 Global Communications, Inc. v. Easylink Service International Copration, Case No. 6:08-cv-263.

Deixler, Lyle; Fax Forges Ahead; Teleconnect; v. 14 N 11, p. 25(12).

Fax Solutions; Lan Times, v.13 N 21, p. 123(5).

Guide to Intelligent Least Cost Routing, Right Fax, Inc.

Guide to Internet Faxing, Right Fax, Inc.

Hertzoff, Ira; AT&T Global Messaging , The AT&T EasyLink Services Sourcebook; Ch. 6, pp. 107-147.

Mendel, Brett; Net Faxing Awaits Its Day; Lan Times, Dec. 9, 1996, v13 N 27 p. 25(2).

Beware the Fax Beast, Network World Reprint; vol. 12, # 48.

Rightfax Introduces New Fax Server Designed for the Enterprise; Rightfax News Release.

Rightfax Poised for Internet Faxing; Rightfax News Release.

Rightfax Ships Internet Connectivity Module for Lan Fax Software; Rightfax News Release.

Guo Zhen Sheng, et al., "Internet-Based Mail Fax Gateway Technology", 1997 IEEE International Conference on Intelligent Processing Systems, Oct. 28-31, Beijing, China 97TH8335 vol. 2 of 2 pp. 1607-1161.

Savetz, Kevin; Faxing From the Internet; Tricks of the Internet Gurus, CH. 6. pp. 165-174.

RightFAX E-mail Gateway Guide, 1996.

Castelle FaxPress Internet Faxing White Paper, Dec. 9, 1997.

Castelle FaxPress End User Features, Dec. 9, 1997.

Castelle FaxPress The Integrated Network Fax Server, Dec. 9, 1997.

Castelle FaxPress Network Diagram, Dec. 16, 1997.

Castelle FaxPress Lotus cc-Mail Gateway, Dec. 9, 1997.

Castelle FaxPress Lotus Notes Gateway, Dec. 9, 1997.

Castelle FaxPress Exchange Direct, Dec. 9, 1997.

Castelle Infopress Press Release: New Castelle System Merges Web, Fax, E-Mail and Phone for Universal Document Access/Delivery, Oct. 28, 1996.

FAXSAV, Rebiller/Reseller Manual, 1997.

FAXSAV Launches Serverlink 1997.
Simeonov, P.L., A Distributed Intelligent Network Approach to Bridge Switching . . . , Computer Comms. & Networks, 1997.
Hoffmann, P., Integrating Telephony and Internet, IEEE Conference on Protocols for Multimedia Systems . . . 1997.
Tanenbum, A.S., Computer Networks, 3rd Edition, 1996.
Boran.com, IT Security Cookbook-Firewalls.
Cormen, T.H., Introduction to Algorithms, 8th Printing, 1992.
Patterson, D.A., Computer Organization & Design: The Hardware/Software Interface, 2nd, 1998.
Malamud, C, RFC 1528 Priciples of Operation for the TPC.INT Subdomain: Remote Printing—Technical Procedures, Oct. 1993 ("Malamud 1").
Malamud, C, RFC 1530 Priciples of Operation for the TPC.INT Subdomain: Remote Printing—Technical Procedures, Oct. 1993 ("Malamud 2").
Rose, M.T., The Internet Message: Closing the Book with Electronic Mail, 1993.
Toyoda, K., RFC 2305 A Simple Mode of Facsimile Using Internet Mail, Mar. 1998.
Berners-Lee, T., Hypertext Transfer Protocols—HTTP/1.0 Network Working Group Internet Draft, Dec. 1994.
Luotonen, A., CERN httpd Reference Manual: A Guide to a World-Wide Web Hyper Text Daemon, May 1994.
Dec., J., The World Wide Web Unleashed, 1994.
Microsoft Corporation, Microsoft Internet Information Server Technical Articles Web Services Frequently Asked Questions, 1997.
RightFax Installation & Administration Guide, Version 3.5 1994.
RightFax Installation & Administration Guide, Version 3.51 1994.
RightFax Installation & Administration Guide, Version 3.0 1993.
RightFax User's Guide, V. 3.5 1994.
RightFax E-mail Gateway Guide 1996.
RightFax Web Client Installation and Administration Guide, Version 1.1 1997.
An Introduction to Database Systems vol. II, Chapters 7 & 8.
The DCA/Intel Communicating Applications Specification.
InstantCom/ESL..
Delrina WinFax Pro 4.0 User's Guide.
Delrina WinFax Pro 4.1 Set-Up Guide.
Delrina WinFax Pro 4.1 for Networks User's Guide.
FaxBack InForms Reference Guide.
CallXpress3 Unified Messaging To Be Fully Compatible with Windows 95 and Microsoft Mail Server.
Applied Voice Technology Announces New Version of its Award-Winning Voice and Call Processing System CallXpress3.
Applied Voice Technology Announces CallXpress3 Release 4.0.
Low Cost Messaging the LAN Fax Way (McCusker).
Surprise! Fax Servers Smarten Up (Levine).
Pursuing One Peripheral (Blankenhorn).
What's Ahead for PC/Fax (Cook).
Meet the Intranet.
Now Your PC Can "Read" Your Fax (Stevens).
Intel NET SatisFaxtion Software User's Guide.
Intel FAXability Plus Software for Windows User's Guide.
Intel Net SatisFaxtion Software Installation Guide for Net Ware networks.
FaxPress Supervisor's Guide.
Commerce Path Messaging Connector.
WinFax Pro's User Guide v. 3.0.
RightFax E-mail Gateway Guide 3.51ightFax E-mail Gateway Guide 3.51.
Commerce Path Net Link User Guide.
WinFax Pro for Networks 4.1 Marketing Brochure.
European Search Report in European Patent Application No. EP 09165919, Sep. 1, 2009 (59 pgs).
Notice of Reason for Rejection, Dispatch Date: Jan. 17, 2008, Patent Application No. JP 2000-515377 (5 pgs).
Invalidity Contentions of Defendant Packetel, Inc. In *j2 Global Communications, Inc.* v. *Packetel, Inc.*, Case No. 09cv3240 DDP (AJWx) (20 pgs).
Invalidity Contentions of Defendant Protus IP Solutions, Inc. in *j2 Global Communications, Inc.* v. *Protus IP Solutions, Inc.*, Case No. 05cv5610 DDP (AJWx) (109 pgs).

Invalidity Contentions of Defendant Venali, Inc. in *j2 Global Communications, Inc.* v. *Venali, Inc.*, Case No. 04v1172 DDP (AJWx) (52 pgs).
Defendant Captaris, Inc.'s Invalidity Contentions in *j2 Global Communications, Inc.* v. *Captaris, Inc.*, Case No. 09cv4150 DDP (AJWx) (217 pgs) (2 Parts).
Defendant Easylink Service International Corporation's Invalidity Contentions as to '638 in *j2 Global Communications, Inc.* v. *Easylink Service International Copration*, Case No. 09cv4189 DDP (AJWx) (17 pgs).
Defendant Easylink Service International Corporation's Invalidity Contentions as to '688 & '132 in *j2 Global Communications, Inc.* v. *Easylink Service International Copration*, Case No. 09cv4189 DDP (AJWx) (92 pgs).
Defendant EasyLink's Opening Claim Construction Brief in *j2 Global Communications* v *Easylink Services Intl. Corp.*, 09cv4189 (55 pgs).
Defendant Venali's Opening Claim Construction Brief in *j2 Global Communications, Inc.* v *Venali, Inc.*, cv 04-1172 DDP AJWx.pdf (filed Jun. 11, 2010) (42 pgs).
Plaintiff j2 Global Communications, Inc.'s Opening Markman Brief filed on Jun. 11, 2010, *j2 Global Comm., Inc.* v. *Venali, Inc.*, Case No. 04-1172 DDP (AJWx) (DI 160) (65 pgs).
Consolidated Opening Claim Construction Brief of Defendants Captaris, Inc., Packetel, Inc. and Protus IP Solutions filed in *j2 Global Communications, Inc.* v *Protus, et al.*, filed Jun. 11, 2010, *j2 Global Communications* v *Protus* 05cv5610 (61 pgs).
Reply Claim Construction Brief of Defendants Captaris, Inc., Packetel, Inc. and Protus IP Solutions filed Jul. 1, 2010 *j2 Global Comm* v *Protus* 05cv5610 (52 pgs).
Defendant Venali's Reply Claim Construction Brief, filed Jul. 1, 2010 *j2 Global* v *Venali* 04cv1172 (43 pgs).
Plaintiffs Reply Markman Brief filed on Jul. 1, 2010, *j2 Global Comm., Inc.* v. *Protus IP Solutions, Inc.*, Case No. 05-5610 DDP (AJWx) (67 pgs).
Easylink's Reply to Plaintiff's Claim Construction Brief filed Jul. 1, 2010 09cv4189 (46 pgs).
*j2 Global Communications, Inc.* v *Callwave, Inc.* CV04-7068 DDP AJWx Callwave Inc.'s Responses to Plaintiffs First Set of Interrogatories Dec. 22, 2004 (12 pgs).
*j2 Global Communications, Inc.* v *Callwave, Inc.* CV04-7068 DDP AJWx Callwave Inc.'s Second Set of Supplemental Responses to Plaintiff's First Set of Interrogatories Mar. 30, 2005 (11 pgs).
*j2 Global Communications, Inc.* v *Venali, Inc.*, cv 04-1172 DDP AJWx, Defendant Venali, Inc.'s Objections and Responses to Plaintiff j2 Global Communications, Inc.'s First Set of Interrogatories (Nos. 1-7) (19 pgs).
*j2 Global Communications, Inc.* v *Venali, Inc.*, cv 04-1172 DDP AJWx, litigation cover page (1 pg).
Notice of Dismissal filed on Sep. 22, 2005, *j2 Global Comm., Inc.* v. *Mijanda, Inc.*, Case No. 05-5300 DDP (AJWx) (DI 15) (1 pg).
Venali's Answer to First Amended Complaint for Patent Infringement and Counterclaim for Declaration of NonInfringement and Invalidity filed on Nov. 1, 2004, *j2 Global Comm., Inc.* v. *Venali, Inc.*, Case No. 04-1172 DDP (AJWx) (14 pgs).
Declaration of Professor Walter Scacchi Regarding Defendant CallWave, Inc.'s Opening Claim Construction Brief in *j2 Global Communications, Inc.* v. *Call Wave, Inc.*, CV 04-7068 VBKx (20 pgs).
Defendant Protus' Answer and Counterclaim in *j2 Global Comm.* v *Protus* 05cv5610 filed Nov. 12, 2005 (12 pgs).
Administrator's Guide Lotus Notes Release 3, Lotus Development Co., 1993, p. 5-54 (1 pg).
Alta Vista Search, SHAREWARE.COM: Search results, Dec. 5, 1996 (2 pgs).
Andrew Eberle, The Path Taken: Inbound Routing, Network World, May 2, 1994, p. 101.
(Author Unknown) Call and Voice Processing PC Board Roundup (Buyers Guide), in Teleconnect Library, Inc., Dec. 1995, v13, n12, pp. 1-6.
B. Kantor, et al., Network News Transfer Protocol, A Proposed Standard for the Stream-Based Transmission of News, RFC 977, Feb. 1986 (29 pgs).

B. Mathers, et al., Lotus Notes Internet Cookbook, last modified Apr. 21, 1995, (25 pgs).

C. Hunt, TCP IP Network Administration, Jan. 1994 (268 pgs).

Carlos A. Varela, et al., Providing Data on the Web: From Examples to Programs, Second International WWW Conference, Oct. 17-21, 1994, pp. 1-12, http://fiaker.ncsa.uiuc.edu:8080/WWW94-2/paper.html.

Chane Fullmer, et al., A TCP/IP Network Facsimile System Built from Publicly Available Software, in Association for Computing Machinery (ACM),1992, ref. No. 089791-472-4/92/0002/525, pp. 525-529.

Dale Doughtery, et al., The Mosaic Handbook for Microsoft Windows, Oct. 1994, O'Reilly & Associates (239 pgs).

Duval & Main, Exploring the Internet with Mosaic, Library Software Review, vol. 13, No. 4, Winter 1994, Sage Periodicals Press, pp. 269-279.

Ed Liebowitz, The Dialogic VAR Parade: Open Voice Processing for Art Dealers, the Blind, the Dallas Cowboys and the RBOCs, in Teleconnect, Apr. 1993, v11, N4, p. 40(3) (2 pgs).

e-mail-fax-120.hqx, E-Mail Fax Search Results, Shareware.com, Nov. 24, 1996, <http://www.search.shareware.com/code/ . . . mail+fax+&category=All- Categories> (2 pgs).

F. Sung and M. Johnson, Faxing Docs in HP MPower, Apr. 1994 Hewlett-Packard Journal, pp. 53-61.

Facsimile and Voice System Links Offices, Electronics, Jan. 18, 1979 (379-100), S9054 0063, pp. 69-70.

FaxMail Networks for Windows v5.13: Fax over a network, ZD NET Software Library, Nov. 14, 1996, http://search2zdnet.com/cgi-bin/texis/swlib/hotfiles/search.html. (3 pgs).

FAXSAV, faxMAILER—How FaxMailer Works, (1996) (2 pgs).

FAXSAV, The FaxSav Technology Edge: A White Paper, (1997) (5 pgs).

French, Fox, Maly & Selman, Wide Area Technical Report Service—Technical Reports Online, Communications on the ACM, Apr. 1995, ACM 002-0782/95/0400 pp. 124-127.

Graphics, Visualization and Usability Center GSQL-ORACLE Backend, Date Unknown (2 pgs).

GSQL in detail, Dec. 1993 (4 pgs).

Halama, James R., et al., An Interactive Electronic Bulletin Board Implementation For Mosaic and HTTP Server, EBBSMos.htm, Date Unknown (4 pgs).

Helen Plotkin, The Forum Newsreader Plans, Apr. 5, 1994, http://mathforum.org/kb/plaintext.jspa?messageID=1072645 (2 pgs).

Hong, J., et al.; Personal Electronic Notebook with Sharing, Center for Design Research, Stanford University, 1080-1383/95, 1995 IEEE, pp. 88-94.

Jay C. Weber, the Webmaster's Starter Kit, WWW Fall '94 paper, Enterprise Integration Technologies Corporation (4 pgs).

Jennifer Myers, Announcing Version 0.11 of 'readcomics', a Common Gateway Interface World Wide Web Gateway to clari.feature.dilbert, Jan. 17, 1994, v. 0.11, Article 9857, comp.lang.perl. (6 pgs).

Jennifer Myers, readcomics, Jan. 18, 1994, v. 0.12 (4 pgs).

JFAX Personal Telecom, Free Downloads JFAX Communicator Software!, Dec. 4, 1996 <http://www.jfax.net/software.htm/> (2 pgs).

JFAX Personal Telecom, Get All Your Voice-Mail and Faxes in your E-Mail, Dec. 4, 1996, <http://www.jfax.net/> (4 pgs).

JFAX Personal Telecom, What the Media Says About JFAX Personal Telecom, Oct. 31, 1996, <http://www.jfax.net/> (2 pgs).

K. Tomaru, Electronic Mail Systems, Japan Annual Review in Electronics, Computers & Telecommunications, 1983, vol. 9, Telecommunication Technology, pp. 283-290.

Kennie Jones, NASA Langley Research Center, Tops On-Line—Automating the Construction and Maintenance of HTML Pages, 1994 (7 pgs).

Kevin Bachus, Touring Lotus Notes: The New World of Group ware, Windows Magazine, Mar. 1, 1994 Issue 503, CMP Publications, Inc., Factiva, Inc. (7 pgs).

Kevin Brown, et al., Mastering Lotus Notes, Sybex, Inc., 1995, p. 939.

L. Orozco-Barbosa, et al., Design and Performance Evaluation of Intelligent Multimedia Services, rec'd Jun. 28, 1996, pp. 219-232, v. 20 (1997), Computer Communications.

Lotus Fax Server Gives cc:Mail, Notes Users better fax gateway services, Jan. 30, 1995, v. 17, n. 5, 1995 WLNR 5462216, InfoWord Media Group, Inc. (2 pgs).

Lotus Notes for Dummies, IDG Books Worldwide, Inc., 1994, p. 295, (3 pgs).

M. Horton, Standard for Interchange of USENET Messages, RFC 850 (June 1983) (19 pgs).

M. Kauffman, Computer Based Fax Processing The Kauffman Group, Cherry Hill, N.J. First edition 1994, pp. 19-20, 61. 75. 77—79 (ISBN 0-936648-62-7) (10 pgs).

Mail2HTML.c, Convert Mail/News Files to HTML (Prototype), Jan. 21, 1993, Rev. 0.3 (17 pgs).

Marc Andreessen, NCSA Mosaic for X 2.0 available, www.talk newsgroup message, Nov. 10, 1993 (8 pgs).

Mark Miller, Defusing TCPIP-based internet problems in layers, Network World, Oct. 17, 1994 (6 pgs).

MHonArc: Index Page Customization, v1.0.0, http://ftp.sunet.se/pub/text-processing/sgml/DTD2HTML/ file MHonArc 1.0.0.tar.gz. (5 pgs).

Michael L. Nelson, et al., Electronic Document Distribution Design of the Anonymous FTP Langley Technical Report Server, NASA Technical Memorandum 4567, Mar. 1994, National Aeronautics and Space Administration, Langley Research Center, Hampton, Virginia (20 pgs).

Michael L. Nelson, et al., The Widest Practicable Dissemination: The NASA Technical Report Server, Computers in Aerospace 10 (Mar. 28-30, 1995, San Antonio, TX), 1995, American Institute of Aueronautics and Astronautics, Inc. (14 pgs).

Michael L. Nelson, et al., The World Wide Web and Technology Transfer at NASA Langley Research Center, Proceedings of the Second International World Wide Web Conference: Mosaic and the Web (Oct. 19-21, 1994, Chicago, IL, pp. 701-710), NASA Langley Research Center (12 pgs).

Michael L. Nelson, et al., World Wide Web Implementation of the Langley Technical Report Server, Sep. 5, 1994, NASA Technical Memorandum 109162, National Aeronautics and Space Administration, Langley Research Center, Hampton, Virginia (31 pgs).

NCSA http—Unified Directory Structure (1 pg).

NCSA httpd—Compatibility (1 pg).

NCSA httpd—Document Root Directive.html (1 pg).

NCSA httpd—Security (1 pg).

NetScan Kofax: The Easy Way to Share a Scanner, 1996, KOFAX, http://www.netscan.kofax.com. (10 pgs).

On the Road: The Telephone User Interface, Computer Telephony Expo in Dallas, TX, Mar. 7, 1995, Applied Voice Technology, Inc. (4 pgs).

Pacific Bell Information Services, 1994 Annual Report, p. 6 (1994) (10 pgs).

Putting Paper Documents in the World-wide Web, Myka, 1994 Article (10 pgs).

QNet Business Plan, Apr. 1987 (104 pgs).

R. Thomas, Hands-On Wizard's Grabbag Getting A Bang Out Of Unix, UnixWorld's Open Computing, vol. 11, No. 1 (Jan. 1, 1994) (5 pgs).

Reg Quinton, Sendmail—Care and Feeding, Mar. 24, 1992, pp. 1-44, Computing and Communications Services, The University of Western, Ontario, Canada (23 pgs).

RightFAX Web Client. (RightFAX's RightFAX Web Client) (Product Announcement) Software Magazine, Apr. 1, 1997 (1 pg).

Ronald J. Vetter, et al., Mosaic and the World-Wide Web, pp. 49-57, Computer Practives, Oct. 1994 (9 pgs).

S. Broadhead, Getting Your Fax Straight: Getting Ahead of the Game with Fax Server Technology Network Computing, Feb. 1997 (Abstract) (2 pgs).

S. Leffler, FlexFAX—A Network-based Facsimile Service, Silicon Graphics, Inc., Nov. 27, 1990 (9 pgs).

S.C. Hui, et al., A Distributed Fax Messaging System, Proc. Of IEEE Singapore Intl. Conf. on Networks/Intl Conf on Information Engineering 1995, pp. 393-397, IEEE Cat. No. 95TH8061 (6 pgs).

S.D. Reilly, et al., Increasing the Computational Potential of the World Wide Web, Feb. 9, 1996, pp. 1-28, Dept. of Computer Science School of Engineering and Applied Science University of Virginia, Charlottesville, VA (30 pgs).

US 7,836,141 B2

Page 10

Steve Putz, Design and Implementation of the System 33 Document Service, ISTL-NLTT-93-07-01, 1993, Xerox Corporation (116 pgs).

Steve Putz, Interactive Information Services Using World-Wide Web Hypertext, First International Conference on World-Wide Web, (May 25-27, 1994), Apr. 20, 1994, pp. 1-10, ISTL-QCA-1994-03-01, Xerox Corporation (10 pgs).

Steve Putz, System 33 Gateway Code, Gateway Software, http://www.w3.org/Gateways/System33/gateway (14 pgs).

T. Kasper, Untangling the Web—The role of text retrieval in a hypertext environment (6 pgs).

The Geometry Forum News Gateway—A Newsreader for the World Wide Web, Forum Outposts: The Geometry Forum Newsletter (Dec. 30, 1994) (2 pgs).

V. Kumar, et al., A SHARed Web to Support Design Teams, Enterprise Integration Technologies Corp., 1994 IEEE, 0-8186-5705-7/94, pp. 178-182.

Wayne Rash, The Fax of the Matter, Information Week, May 20, 1996 (4 pgs).

XDOC Data Format, Technical Specification, Mar. 1995, pp. 1:1 - 2:10, vol. 3.0, The Document Company Xerox (15 pgs).

Yahoo, Inc., NetScan Kofax, Yahoo! Internet Life, Jan. 1997, p. 73, vol. 3, No. 1, <http://www.yil.com/>.

Yvonee L. Lee, Vendors to Showcase Integrated Telephony Solutions, InfoWorld, Mar. 4, 1996, p. 18(1), vol. 18, No. 10, Gale Group (1 pg).

* cited by examiner



**FIG 1**

**FIG 2**



FIG 3



FIG 4A



**FIG 4B**



**FIG 5**

**FIG 6**

# Fax from (404)249-6801

Received on May 31, 1995 at 1:58 PM
Page 1 of 3

---

NetOffice, Inc.

From: Charles R. Bobo, II.
Pages: 3
Date: May 31, 1995

---



RETRIEVE VOICE FILE

170

CONVERT AD/PCM TO WAV

172

UPDATE HTML LISTING

174

**FIG 8**



RETRIEVE DATA FILE

180

UPDATE HTML LISTING

182

**FIG 9**

Next Page

Return to Fax Listing
This page was automatically generated by FaxWeb(tm) On May 31, 1995 at 2:05pm.
©1995 NetOffice, inc.

---

NetOffice, inc.
PO Box 7115
Atlanta, GA 30357
info@netoffice.com

**FIG 7**



**FIG 10**



**FIG 11**



**FIG 12**



**FIG 13**



**FIG 14**



FIG 15

FIG 16A

| INDIVIDUAL APPLICATION PROGRAMS |
| COMMON GATEWAY INTERFACE (CGI) |
| HTTPD |
| INTERNET DEAMON (INETD) |
| OPERATING SYSTEM (OS) |
| TCP/IP |

FIG 16B

| PREFORMATTED HTML FILE |
| HTTPD |
| INETD |
| OS |
| TCP/IP |



300

| RECIPIENT'S NAME | DOCUMENT TYPE | DATE | TIME | CALLER'S TELEPHONE NUMBER | FILE SIZE | NO. PAGES | DOCUMENT NUMBER | OTHER FIELDS |
|---|---|---|---|---|---|---|---|---|
| 301 | 302 | 303 | 304 | 305 | 306 | 307 | 308 | 309 |

FIG. 17



320

321
USER SENDS REQUEST FOR SEARCH

322
MSDS SENDS USER A SEARCH QUERY FORM

323
USER ENTERS SEARCH PARAMETERS IN SEARCH QUERY FORM

324
MSDS PERFORMS REQUESTED SEARCH FOR FILES/MESSAGES

325
MSDS SENDS USER RESULTS OF SEARCH

326
USER SELECTS DESIRED FILES/MESSAGES

FIG. 18

FIG. 19

# SEARCH QUERY

RECIPIENT'S NAME:

DOCUMENT TYPE: FACSIMILE

DATE:

TIME:

CALLING NO.: (404) 249-6801

FILE SIZE:

NO. PAGES:

DOCUMENT NO.:

OTHER FIELD:

SEARCH          RECENT FILES

STORED SEARCHES          HELP

# FIG. 20

# SEARCH RESULTS

1.   Document No. 11:  Facsimile from (404) 249-6801 to Jane Doe on May 31, 1995. 3 Pages

2.   Document No. 243:  Facsimile from (404) 249-6801 to Jane Doe on July 16, 1995. 21 Pages

3.   Document No. 1002:  Facsimile from (404) 249-6801 to Jane Doe on January 1, 1996. 10 Pages

SAVE SEARCH AS:   CHARLES R. BOBO FACSIMILES

HELP

## FIG. 21

STORED
SEARCHES

1.  CHARLES R. BOBO FACSIMILES

2.  CHARLES R. BOBO VOICE MESSAGES

3.  DATA TRANSFERS FROM 01-01-96 TO 6-01-96 TO
JANE DOE

HELP

FIG. 22

US 7,836,141 B2

<div style="text-align:center">1</div>

## SYSTEMS AND METHOD FOR STORING, DELIVERING, AND MANAGING MESSAGES

The present application is a continuation of U.S. application Ser. No. 10/963,586 filed Oct. 14, 2004, which is a continuation of U.S. application Ser. No. 10/436,798 filed May 12, 2003, now U.S. Pat. No. 6,857,074, which is a continuation of U.S. application Ser. No. 09/840,759 filed Apr. 23, 2001, now U.S. Pat. No. 6,564,321, which is a continuation of U.S. application Ser. No. 09/186,595 filed Nov. 5, 1998, now U.S. Pat. No. 6,350,066, which is a continuation of U.S. application Ser. No. 08/944,741 filed Oct. 6, 1997, now U.S. Pat. No. 5,870,549, which is a continuation-in-part of U.S. application Ser. No. 08/431,716 filed Apr. 28, 1995, now U.S. Pat. No. 5,675,507.

### FIELD OF THE INVENTION

This invention relates to system(s) and method(s) for storing and delivering messages and, more particularly, to system (s) and method(s) for storing messages and for delivery the messages through a network, such as the Internet, or a telephone line to an intended recipient. In another aspect, the invention relates to system(s) and method(s) for storing, delivering, and managing messages or other files, such as for archival purposes or for document tracking.

### BACKGROUND OF THE INVENTION

Even though the facsimile machine is heavily relied upon by businesses of all sizes and is quickly becoming a standard piece of office equipment, many businesses or households cannot receive the benefits of the facsimile machine. Unfortunately, for a small business or for a private household, a facsimile machine is a rather expensive piece of equipment. In addition to the cost of purchasing the facsimile machine, the facsimile machine also requires toner, paper, maintenance, as well as possible repairs. These expenses may be large enough to prevent many of the small businesses and certainly many households from benefiting from the service that the facsimile machine can provide. For others who are constantly traveling and who do not have an office, it may be impractical to own a facsimile machine. In fact, the Atlanta Business Chronicle estimates that 30% of the small businesses do not have any facsimile machines. Therefore, many businesses and households are at a disadvantage since they do not have access to a facsimile machine.

Because a facsimile machine can be such an asset to a company and is heavily relied upon to quickly transmit and receive documents, a problem exists in that the machines are not always available to receive a facsimile message. At times, a facsimile machine may be busy receiving another message or the machine may be transmitting a message of its own. During these times, a person must periodically attempt to send the message until communication is established with the desired facsimile machine. This inability to connect with a facsimile machine can be frustrating, can consume quite a bit of the person's time, and prevent the person from performing more productive tasks. While some more advanced facsimile machines will retry to establish communication a number of times, a person will still have to check on the facsimile machine to ensure that the message was transmitted or to re-initiate the transmission of the message.

In addition to labor costs and a reduction in office efficiency, a facsimile machine may present costs to businesses that are not readily calculated. These costs include the loss of business or the loss of goodwill that occurs when the fac-

<div style="text-align:center">2</div>

simile machine is not accessible by another facsimile machine. These costs can occur for various reasons, such as when the facsimile machine is out of paper, when the machine needs repairing, or when the facsimile machine is busy with another message. These costs occur more frequently with some of the smaller businesses, who are also less able to incur these expenses, since many of them have a single phone line for a telephone handset and the facsimile machine and thereby stand to lose both telephone calls and facsimile messages when the single line is busy. In fact, the Atlanta Business Chronicle estimated that fewer than 5% of the small businesses have 2 or more facsimile machines. Many of the larger companies can reduce these losses by having more than one facsimile machine and by having calls switched to another machine when one of the machines is busy. These losses, however, cannot be completely eliminated since the machines can still experience a demand which exceeds their capabilities.

A main benefit of the facsimile machine, namely the quick transfer of documents, does not necessarily mean that the documents will quickly be routed to the intended recipient. The facsimile machines may be unattended and a received facsimile message may not be noticed until a relatively long period of time has elapsed. Further, even for those machines which are under constant supervision, the routing procedures established in an office may delay the delivery of the documents. It is therefore a problem in many offices to quickly route the facsimile message to the intended recipient.

The nature of the facsimile message also renders it difficult for the intended recipient to receive a sensitive message without having the message exposed to others in the office who can intercept and read the message. If the intended recipient is unaware that the message is being sent, other people may see the message while it is being delivered or while the message remains next to the machine. When the intended recipient is given notice that a sensitive message is being transmitted, the intended recipient must wait near the facsimile machine until the message is received. It was therefore difficult to maintain the contents of a facsimile message confidential.

In an office with a large number of employees, it may also be difficult to simply determine where the facsimile message should be routed. In light of this difficulty, some systems have been developed to automatically route facsimile messages to their intended recipient. One type of system, such as the one disclosed in U.S. Pat. No. 5,257,112 to Okada, can route an incoming call to a particular facsimile machine based upon codes entered with telephone push-buttons by the sender of the message. Another type of system, such as the one disclosed in U.S. Pat. No. 5,115,326 to Burgess et al., or in U.S. Pat. No. 5,247,591 to Baran, requires the sender to use a specially formatted cover page which is read by the system. This type of system, however, burdens the sender, who may very well be a client or customer, by requiring the sender to take special steps or additional steps to transmit a facsimile message. These systems are therefore not very effective or desirable.

Another type of routing system links a facsimile machine to a Local Area Network (LAN) in an office. For instance, in the systems disclosed in the patents to Baran and Burgess et al., after the system reads the cover sheet to determine the intended recipient of the facsimile message, the systems send an E-mail message to the recipient through the local network connecting the facsimile machine to the recipient's computer. Other office systems, such as those in U.S. Pat. No. 5,091,790 to Silverberg and U.S. Pat. No. 5,291,546 to Giler et al., are linked to the office's voice mail system and may leave a message with the intended recipient that a facsimile message

US 7,836,141 B2

3

has been received. Some systems which are even more advanced, such as those in U.S. Pat. No. 5,317,628 to Misholi et al. and U.S. Pat. No. 5,333,266 to Boaz et al., are connected to an office's local network and provide integrated control of voice messages, E-mail messages, and facsimile messages.

The various systems for routing facsimile messages, and possibly messages of other types received in the office, are very sophisticated and expensive systems. While these office systems are desirable in that they can effectively route the messages at the office to their intended recipients, the Systems are extremely expensive and only those companies with a great number of employees can offset the costs of the system with the benefits that the system will provide to their company. Thus, for most businesses, it still remains a problem to effectively and quickly route messages to the intended recipients. It also remains a problem for most businesses to route the messages in a manner which can preserve the confidential nature of the messages.

Even for the businesses that have a message routing system and especially for those that do not have any type of system, it is usually difficult for a person to retrieve facsimile messages while away from the office. Typically, a person away on business must call into the office and be informed by someone in the office as to the facsimile messages that have been received. Consequently, the person must call into the office during normal business hours while someone is in the office and is therefore limited in the time that the information in a facsimile message can be relayed.

If the person away on business wants to look at the facsimile message, someone at the office must resend the message to a facsimile machine accessible to that person. Since this accessible machine is often a facsimile machine at another business or at a hotel where the person is lodging, it is difficult for the person to receive the facsimile message without risking disclosure of its contents. Further, since someone at the person's office must remember to send the message and since someone at the accessible facsimile machine must route the message to the person away from the office, the person may not receive all of the facsimile messages or may have to wait to receive the messages.

The retrieval of facsimile messages, as well as voice mail messages, while away from the office is not without certain costs. For one, the person often must incur long distance telephone charges when the person calls the office to check on the messages and to have someone in the office send the messages to another facsimile. The person will then incur the expenses of transmitting the message to a fax bureau or hotel desk as well as the receiving location's own charges for use of their equipment. While these charges are certainly not substantial, the charges are nonetheless expenses incurred while the person is away from the office.

Overall, while the facsimile machine is an indispensable piece of equipment for many businesses, the facsimile machine presents a number of problems or costs. Many businesses or households are disadvantaged since they are unable to reap the benefits of the facsimile machine. For the businesses that do have facsimile machines, the businesses must incur the normal costs of operating the facsimile machine in addition to the costs that may be incurred when the facsimile machine or machines are unable to receive a message. Further, the facsimile messages may not be efficiently or reliably routed to the intended recipient and may have its contents revealed during the routing process. The costs and problems in routing a facsimile message are compounded when the intended recipient is away from the office.

Many of the problems associated with facsimile messages are not unique to just facsimile messages but are also associ-

4

ated with voice mail messages and data messages. With regard to voice messages, many businesses do not have voice mail systems and must write the message down. Thus, the person away from the office must call in during normal office hours to discover who has called. The information in these messages are usually limited to just the person who called, their number, and perhaps some indication as to the nature of the call. For those businesses that have voice mail, the person away from the office must call in and frequently incur long distance charges. Thus, there is a need for a system for storing and delivery voice messages which can be easily and inexpensively accessed at any time.

With regard to data messages, the transmission of the message often requires some coordination between the sender and the recipient. For instance, the recipient's computer must be turned on to receive the message, which usually occurs only when someone is present during normal office hours. Consequently, the recipients computer is usually only able to receive a data message during normal office hours. Many households and also businesses may not have a dedicated data line and must switch the line between the phone, computer, and facsimile. In such a situation, the sender must call and inform the recipient to switch the line over to the computer and might have to wait until the sender can receive the message. The retransmission of the data message to another location, such as when someone is away from the office, only further complicates the delivery. It is therefore frequently difficult to transmit and receive data messages and is also difficult to later relay the messages to another location.

A standard business practice of many companies is to maintain records of all correspondence between itself and other entities. Traditionally, the correspondence that has been tracked and recorded includes letters or other such printed materials that is mailed to or from a company to the other entity. Although tracking correspondence of printed materials is relatively easy, non-traditional correspondence, such as facsimile messages, e-mail messages, voice messages, or data messages, are more difficult to track and record.

For example, facsimile messages may be difficult to track and record since the messages may be received on thermal paper, which suffers from a disadvantage that the printing fades over time. Also, accurate tracking of facsimile messages is difficult since the facsimile messages may only be partially printed at the facsimile machine or the messages may be lost or only partially delivered to their intended recipients. Facsimile messages also present difficulties since they are often delivered within an organization through different channels than ordinary mail and thus easily fall outside the normal record keeping procedures of the company.

Voice mail messages are also difficult to track and record. Although voice messages can be saved, many voice mil servers automatically delete the messages after a certain period of time. To maintain a permanent record of a voice message, the voice message may be transcribed and a printed copy of the message may be kept in the records. This transcribed copy of the voice message, however, is less credible and thus less desirable than the original voice message since the transcribed copy may have altered material or may omit certain portions of the message.

In addition to facsimile and voice mail messages, data messages are also difficult to track and record. A download or upload of a file may only be evident by the existence of a file itself. A file transfer procedure normally does not lend itself to any permanent record of what file was transferred, the dialed telephone number, the telephone number of the computer receiving the file, the time, or the date of the transfer. It is

US 7,836,141 B2

5

therefore difficult to maintain accurate records of all data transfers between itself and another entity.

### SUMMARY OF THE INVENTION

It is an object of the invention to reliably and efficiently route messages to an intended recipient.

It is another object of the invention to route messages to the intended recipient while maintaining the contents of the message confidential.

It is another object of the invention to enable the intended recipient to access the messages easily and with minimal costs.

It is a further object of the invention to permit the simultaneous receipt of more than one message on behalf of the intended recipient.

It is a further object of the invention to enable the intended recipient of a message to access the message at any time and at virtually any location world-wide.

It is yet a further object of the invention to enable the intended recipient of a message to browse through the received messages.

It is yet a further object of the invention to quickly notify an intended recipient that a message has been received.

It is still another object of the invention to receive messages of various types.

It is still another object of the invention to deliver messages according to the preferences of the intended recipient.

It is still a further object of the invention to record and track correspondence, such as facsimile messages, voice mail messages, and data transfers.

Additional objects, advantages and novel features of the invention will be set forth in the description which follows, and will become apparent to those skilled in the art upon reading this description or practicing the invention. The objects and advantages of the invention may be realized and attained by the appended claims.

To achieve the foregoing and other objects, in accordance with the present invention, as embodied and broadly described herein, a system and method for storing and delivering messages involves receiving an incoming call and detecting an address signal associated with the incoming call, the address signal being associated with a user of the message storage and delivery system. A message accompanied with the address signal is then received and converted from a first file format to a second file format. The message is stored in the second file format within a storage area and is retrieved after a request has been received from the user. At least a portion of the message is then transmitted to the user over a network with the second file format being a mixed media page layout language.

In another aspect, a network message storage and delivery system comprises a central processor for receiving an incoming call, for detecting an address signal on the incoming call, for detecting a message on the incoming call, and for placing the message in a storage area. The address signal on the incoming call is associated with a user of the network message storage and delivery system. A network server receives the message from the storage area, converts the message into a mixed media page layout language, and places the message in the storage area. When the network server receives a request from the user over the network, the network server transmits at least a portion of the message over the network to the user.

Preferably, the network message storage and delivery system can receive facsimile messages, data messages, or voice messages and the network is the Internet. The messages are con-

6

verted into a standard generalized mark-up language and the user is notified that a message has arrived through E-mail or through a paging system. A listing of the facsimile messages may be sent to the user in one of several formats. These formats include a textual only listing or a listing along with a full or reduced size image of the first page of each message. A full or reduced size image of each page of a message in the listing may alternatively be presented to the user.

According to a further aspect, the invention relates to a system and method for managing files or messages and involves storing message signals in storage and receiving requests from a user for a search. The search preferably comprises a search query that is completed by a user and supplied to a hyper-text transfer protocol deamon (HTTPD) in the system. The HTTPD transfers the request through a common gateway interface (CGI) to an application program which conducts the search. The results of the search are preferably returned through the HTTPD to the computer in the form of a listing of all messages or files satisfying the search parameters. The user may then select one or more of the listed messages or files and may save the search for later references.

### BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated in, and form a part of, the specification, illustrate an embodiment of the present invention and, together with the description, serve to explain the principles of the invention. In the drawings:

FIG. 1 is a block diagram illustrating the connections of a message storage and delivery system MSDS;

FIG. 2 is an overall flow chart of operations for transmitting a message to the MSDS of FIG. 1;

FIG. 3 is an overall flow chart of operations for receiving a message stored at the MSDS of FIG. 1;

FIGS. 4(A) and (B) are flowcharts of operations for generating HTML files according to user preferences;

FIG. 5 is a flowchart of operations for generating requested information;

FIG. 6 is a flowchart of operations for converting a facsimile message into HTML files;

FIG. 7 is an exemplary display of a first page of a facsimile message according to a fourth display option;

FIG. 8 is a flowchart of operations for converting a voice message into an HTML file;

FIG. 9 is a flowchart of operations for converting a data message into an HTML file;

FIG. 10 is a flowchart of operations for detecting a type of call received at the MSDS 10;

FIG. 11 is a flowchart of operations for receiving voice messages;

FIG. 12 is a flowchart of operations for interacting with an Owner's call;

FIG. 13 is a more detailed block diagram of the MSDS 10;

FIG. 14 is a block diagram of the central processor in FIG. 13;

FIG. 15 is a block diagram of the Internet Server of FIG. 13;

FIGS. 16(A) and 16(B) depict possible software layers for the Internet Server of FIG. 13;

FIG. 17 is a diagram of a data entry for a message signal;

FIG. 18 is a flowchart of a process for sending a search query, for conducting a search, and for returning results of the search to a computer through the Internet;

FIG. 19 is an example of a search query form for defining a desired search;

FIG. 20 is an example of a completed search query;

7

FIG. **21** is an example of a set of search results returned to the computer in response to the search query of FIG. **20**; and

FIG. **22** is an example of a listing of stored searches.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Reference will now be made in detail to the preferred embodiments of the invention, examples of which are illustrated in the accompanying drawings.

With reference to FIG. **1**, a message storage and delivery system (MSDS) **10** is connected to a central office **20** of the telephone company through at least one direct inward dialing (DID) trunk **15**. With each call on the DID **15**, an address signal indicating the telephone number being called is provided to the MSDS **10**. The DID trunk **15** can carry a large number of telephone numbers or addresses. Preferably, the DID trunk **15** comprises a number of DID trunks **15** connected in parallel between the central office **20** and the MSDS **10** so that the MSDS **10** can simultaneously receive more than one call and, moreover, can simultaneously receive more than one call for a single telephone number or address.

The central office **20** is connected to a number of third parties. For instance, the central office **20** may be connected to a facsimile machine **24**, a telephone set **26**, and to a computer **28** with each connection being made through a separate telephone line. While a single computer **28** is shown in the figure, the single computer **28** may actually represent a local area network which is connected through the central office **20** to the MSDS **10**. Although the facsimile machine **24**, telephone set **26**, and computer **28** have been shown on separate lines, it should be understood that one or more of these devices could share a single line.

The MSDS **10** is also connected to a network, preferably the Internet World Wide Web **30**. Although the Internet **30** has been shown as a single entity, it should be understood that the Internet **30** is actually a conglomeration of computer networks and is a constantly evolving and changing structure. The MSDS **10** therefore is not limited to the current structure or form of the Internet **30** but encompasses any future changes or additions to the Internet **30**. Further, the MSDS **10** is shown as being directly connected to the Internet **30**, such as through its own node or portal. The MSDS **10**, however, may be practiced with any suitable connection to the Internet **30**, such as through an intermediate Internet access provider.

With reference to FIG. **2** depicting an overall operation of the invention, a telephone call directed to a number serviced by the MSDS **10** is initiated at step **40** by a third party, for instance, through the facsimile machine **24**, telephone set **26**, or computer **28**. The incoming telephone call may therefore carry a facsimile message, a voice message, or a data message. At step **42**, the address signal associated with the initiated call is routed through the central office **20**, over the DID trunk **15**, and to the MSDS **10**.

When the call reaches the MSDS **10**, the call is routed within the MSDS **10** in a manner that will be described in more detail below with reference to FIG. **13**. At step **46**, the MSDS **10** answers the telephone call and receives the address signal from the DID trunk **15**. Next, at step **48**, the call is established between the MSDS **10** and the third party and, at step **50**, the MSDS **10** receives the message transmitted over the telephone line. The message is stored at step **52**, a database within the MSDS **10** is updated at step **54**, and the intended recipient of the message is notified at step **56**. The intended recipient of the message uses the services provided

8

by the MSDS **10** and will hereinafter be referred to as a user. At step **58**, the message is converted into hyper-text mark-up language (HTML).

After the MSDS **10** receives a message for one of its users, the user can then communicate with the MSDS **10** at any time and at any location by connecting to the Internet World Wide Web **30** and retrieving the message stored within the MSDS **10**. With reference to FIG. **3**, at step **60** the user first connects to the Internet **30**, such as through a personal computer **32** which may be connected to the Internet **30** in any suitable manner, such as through its own portal or node or through some intermediate access provider. The personal computer **32** is not limited to a single computer but may instead comprise a network of computers, such as a local area network within an office.

Once connected with the Internet **30**, at step **62**, the user accesses with a hyper-text browser the Universal Resource Locator (URL) associated with his or her MSDS **10** mailbox. The computer **32** may use any suitable hypertext browser, such as Netscape, to access the mailbox. A Hypertext Transfer Protocol Deamon (HTTPD) within the MSDS **10** receives the URL request at step **64** and, at step **66**, requests user authentication. The user then supplies his or her ID and password at step **68** and, if found valid at step **70**, the MSDS **10** provides the computer **32** with access to the mailbox at step **72**. If the ID and password are invalid, as determined at step **70**, then the HTTPD sends the computer **32** an authentication failure message at step **74**.

After the user gains access to the mailbox at step **72**, the user can request information stored within the MSDS **10**. The MSDS **10** receives the request at step **76** and, at step **78**, determines whether the information exists. As is common practice, the MSDS **10** also determines the validity of the request at step **78**. The request from the user will include the mailbox number for the user, the message identifier, display preferences, and, if the message is a facsimile message, a page identifier. If for any reason the request is invalid, such as when a hacker is attempting to gain access to privileged information, the request for the information will be terminated.

If the requested information is available, then at step **80** the information is transmitted through the Internet **30** to the user's computer **32**. If, on the other hand, the information does not exist, then at step **82** the MSDS **10** will generate the requested information and then send the information to the user's computer through the Internet **30** at step **80**.

Prior to gaining access to the mailbox at step **72**, the user is preferably sent a greeting page or other such type of information which permits the user to team about the services provided by the MSDS **10**, open an account with the MSDS **10**, or gain access to an account. Once access is provided at step **72**, the user is provided with information indicating the total number of messages stored in his or her mailbox within the MSDS **10**. Preferably, the information sent by the MSDS **10** indicates the total number of messages for each type of message and also the total number of saved messages versus the total number of new messages.

The user is also preferably given the option at this step to change account information. The account information might include the E-mail address for the user, the manner in which messages are to be reviewed, the user's pager information, as well as other user preferences. The display options and other user preferences wilt be discussed in further detail below.

The general information HTML file which indicates the total number of different messages is provided with a number of anchors, which are also termed links or references. In general, an anchor permits a user on the computer **32** to

9            10

retrieve information located on another file. For instance, an anchor to a listing of facsimile messages is preferably provided on the display of the total number of messages. When the user selects the anchor for the facsimile list, the MSDS 10 pulls up and displays the file containing the list of facsimiles, such as a file "faxlist.html." The other types of messages, such as voice messages and data messages, would have similar anchors on the general information page directed to their respective HTML listing files.

When a new message is received at step 54 in FIG. 2, the user's mailbox is updated to display the total number and types of messages. The MSDS 10 might also update other files in addition to the total listing of messages. Additionally, at this time, the MSDS 10 sends an E-mail message to the user's computer 32 to inform the user of the newly arrived message. The MSDS 10 could also send notice to the user though a paging system so that the user receives almost instantaneous notice that a message is received.

The MSDS 10 also generates additional information according to the user's preferences. These preferences on how the MSDS 10 is configured for the user include options on how the messages are reviewed. With facsimile messages, for instance, the user can vary the amount or the type of information that will be supplied with the listing of the facsimile messages by selecting an appropriate option. Other options are also available so that the user can custom fit the MSDS 10 to the user's own computer 32 or own personal preferences.

For instance, when a facsimile message is received, the MSDS 10, at step 54, will update the total listing of all messages to indicate the newly received message and may additionally generate the HTML files for the newly received facsimile message according to the user's preferences. When the user later requests information on the message at step 76, the HTML information has already been generated and the MSDS 10 may directly send the requested information to the user at step 80. If, on the other hand, the user desires to view the message according to one of the other options, the MSDS 10 will generate the HTML files at step 82 according to that other option at the time of the request.

A first option available to the user for viewing a facsimile message is a textual only listing of the messages. The information on the textual listing preferably includes the date and time that the message was received at the MSDS 10, the telephone number from where the message was transmitted, the number of pages, the page size, and the size of the message in bytes. The messages, of course, could be listed with other types of information. When the user selects one of the facsimile messages on the list, a request is sent to the HTTPD within the MSDS 10 causing the message to be downloaded via the Internet 30 to the user's computer 32. Once the message is received by the computer 32, the message can be displayed, printed, or saved for further review.

The second through fifth options allow the user to preview an image of the facsimile message before having the message downloaded from the MSDS 10 through the Internet 30 and to the computer 32. The second option permits the user to view the list of messages with a reduced size image of the cover page next to each entry on the list. When the user selects one of the messages on the list, the selected facsimile message is transmitted through the Internet 30 to the computer 32. The user may also scroll through the listings if all of the message cannot be displayed at one time on the computer 32.

The third option provides the user with a full size view of the cover page of each facsimile message. The user cm quickly scroll through the cover pages of each message without downloading the entire message to the computer 32. The full size view of the cover pages permit the user to clearly discern any comments that may be placed on the cover page, which may not be possible from just a reduced image of the cover page available through the second option.

The fourth option provides the user with a reduced size image of each page and permits the user to scroll through the entire message. The user can therefore read the entire facsimile message on screen before the message is downloaded onto the computer 32. With this option, the user can go through the pages of the facsimile message and can also skip to the next message or previous message. Additionally, the user has the option of enlarging a page to a full size view of the page. When one of the messages is selected, as with the other options, the HTTPD within the MSDS 10 causes the facsimile message to be transmitted through the Internet 30 to the user's computer 32.

With a fifth option, a full size image of each page is transmitted to the user's computer 32. The user can scroll through the pages of the facsimile message and easily read the contents of each page. If the user wants the message downloaded to the computer 32, the user selects the message and the HTTPD within the MSDS 10 transmits the message to the user's computer 32 through the Internet 30.

As discussed above, after the database is updated at step 54, the MSDS 10 will generate additional information based upon the option selected for displaying the facsimile messages. More specifically, as shown in FIG. 4(A), if the first option has been selected, as determined at step 100, then at step 102 the MSDS 10 will generate the textual listing of the facsimile messages with anchors or references to the respective facsimile files. The HTML files are then moved to an Internet Server at step 104.

If the first option is not selected, the MSDS 10 next determines whether the second option has been selected at step 106. With the second option, the facsimile messages are listed along with a reduced size image of the cover page. To generate this information, the cover page is extracted from the facsimile file at step 108 and a reduced size HTML image of the cover page is created at step 110. At step 112, a listing of the facsimile messages is generated with a thumbnail view of each cover page linked to its respective facsimile file. The generated HTML files are then sent to the Internet Server at step 104.

When the third option is selected, as determined at step 114, a full size image of the cover page is sent to the computer 32. The full size image of the cover page is generated by first extracting the cover page from the facsimile file at step 116. Next, the cover page is converted into a full size HTML image at step 118 and, at step 120, the listing is generated with the embedded cover page linked to the facsimile file.

If, at step 122, the fourth option is determined to be selected then a reduced size image of each page is provided to the user with the option of enlarging the page to view the contents of the page more clearly. With reference to FIG. 4(B), the information necessary for the third option is produced by first extracting the first page of the facsimile message at step 124. A reduced size HTML image is created at step 126 and then a full size HTML image is created at step 128. At step 130, the listing is generated with embedded thumbnail images of the pages with links to the full size images. If the page is not the last page, as determined at step 140, then the next page is extracted at step 142 and steps 126 to 130 are repeated to generate the HTML files for the other pages of the facsimile message. After the last page has been converted into an HTML file according to the third option, the files are moved onto the Internet Server at step 104.

11

At step **144**, the MSDS **10** determines whether the fifth option has been selected. The fifth option provides the user with a full size image of each page of the facsimile message. While only five options have been discussed, the invention may be practiced with additional options. Consequently, with additional options and with the fourth option not being selected, the MSDS **10** would next determine whether one of the additional options have been selected. With the preferred embodiment of the invention having only five options, however, the MSDS **10** will assume that the fifth option has been selected if none of the first four options were found to be detected.

The information necessary to display the pages of the facsimile message according to the fifth option is generated by first extracting the first page of the facsimile message at step **146**. At step **148**, a full size HTML image of the page is created and, at step **150**, a listing is generated with an embedded image and links to previous and next pages. When the page is not the last page, as determined at step **152**, the MSDS **10** extracts the next page and generates the HTML file for that page After all pages have been converted into HTML files according to the fourth option, the files are sent to the Internet Server at step **104**.

While FIGS. **4**(A) and (B) describe the operations of the MSDS **10** at the time a message is received, FIG. **5** depicts an overall flowchart of operations for the MSDS **10** when the user requests a page of information in a display format other than the user's preferred option of displaying the message. FIG. **5** is therefore a more detailed explanation of how the MSDS **10** generates the necessary information at step **82** of FIG. **3**.

In general, as shown in FIG. **5**, the MSDS **10** first determines the type of image that is needed at step **82***a*. For example, at this step, the MSDS **10** will determine whether images are unnecessary, whether an image of just the cover page is necessary, whether an image is needed for every page, and whether the image needs to be a full size, a reduced size, or both full and reduced sized images. At step **82***b*, the MSDS **10** determines whether the image has already been created. If the image has not been created, then at step **82***c* the MSDS **10** will extract the page from the base facsimile file and, at step **82***d* generate the required HTML image. As discussed above, the required image may be for just the cover page, for all the pages, and may be a full size and/or a reduced size image of the page. At step **82***e*, the image is embedded with links or anchors to other HTML files. The links or anchors might be references to the next and previous pages and also to the next and previous facsimile messages. Finally, the HTML file having the embedded image and links is sent to the user at step **80** in FIG. **3**.

The process for converting a facsimile message into HTML files according to the fifth option will be described with reference to FIG. **6**. This process will occur at step **54** when the message is received and when the fifth option is the user's preferred option of displaying the messages. It should be understood that a similar type of process will also occur when the user requests a page of information according to the fifth option when the user is retrieving a facsimile message and the fifth option is not the user's preferred option. The conversion processes according to the other options will become apparent to those skilled in the art and will therefore not be discussed in further detail.

With reference to FIG. **6**, when the facsimile message is received, the message is in a Tagged Image File Format/ Facsimile (TIFF/F) and each page of the facsimile message is split into a separate file. Each page of the facsimile message is then converted from the TIFF/F format into a Portable Pixel

12

Map (PPM) format. The PPM files are next converted into separate Graphic Interchange Format (GIF) files and then into separate HTML files. Thus, each page of the facsimile message is converted into a separate HTML file. The TIFF/F files may be converted into PPM with an available software package entitled "LIBTIFF" and the PPM files may be converted into GIF files with an available software package found in "Portable Pixel Map Tools."

The invention is not limited to this exact conversion process or to the particular software packages used in the conversion process. For instance, the TIFF/F files may be converted into another portable file format, through any other type of intermediate format, or may be converted directly into the GIF format. Further, instead of GIF, the facsimile messages may be converted into JPEG, BMP, PCX, PIF, PNG, or any other suitable type of file format.

The files may be identified with any suitable filename. In the preferred embodiment, the files for each user are stored in a separate directory assigned to just that one user because an entire directory for a given user generally can be protected easier than the individual files. The memory, however, may be organized in other ways with the files for a single user being stored in different directories. The first part of the filename is a number preferably sequentially determined according to the order in which messages arrive for that user. The preferred naming convention for ending the filenames is depicted in FIG. **6**. Each page of the facsimile message is saved as a separate file with an extension defined by the format of the file. Thus, the files will end with an extension of ".TIFF," ".PPM," "GIF" or ".HTML" according to the format of the particular file. In the example shown, the separate pages have filenames which end with the respective page number, for instance, the first page ends with a "1." The files, however, are preferably terminated with a letter or multiples letters to indicate the order of the pages. For instance, page 1 might have an ending of "aa," page 2 might have an ending of "ab," etc. The invention, however, is not limited to the disclosed naming convention but encompasses other conventions that will be apparent to those skilled in the art.

As shown in FIG. **6**, in addition to the GIF files representing the pages of the facsimile message, the HTML files include a number of anchors or references. In the example shown, the first HTML file has an anchor a for the "Next Page." Anchor a is defined as a=<AHREF="2.html"> Next Page </a> and will therefore reference the second HTML file when a user selects the "Next Page." The second HTML file has an anchor b for the "Previous Page" and an anchor c for the "Next Page" and the third HTML file has an anchor d for the "Previous Page." With these particular HTML files, the user can scroll through each page of the facsimile message and view a full size image of the page.

Each HTML file preferably contains anchors in addition to those relating to "Next Page" and "Previous Page." For instance, each HTML file may contain an anchor to the next facsimile message, an anchor to the previous facsimile message, and an anchor to return to the facsimile list. The HTML files preferably contain anchors relating to "Save" and "Delete." When the "Save" anchor is selected, the user would be able to save the message under a more descriptive name for the message. The "Delete" anchor is preferably followed by a inquiry as to whether the user is certain that he or she wants to delete the message. Other anchors, such as an anchor to the general listing, will be apparent to those skilled in the art and may also be provided.

FIG. **7** provides an example of a display according to the fifth option for the first page of the facsimile message shown in FIG. **6**. The headings of the display provide information on

US 7,836,141 B2

13 14

the telephone number from where the message was sent, the date and time the message was received at the MSDS **10**, and an indication of the page of the message being displayed. The main portion of the display is the full site image of the page. At the bottom of the display, an anchor or link is provided to the "Next Page" and another anchor is provided to the "Return to Fax Listing." Additional information may also be provided on the display, such as a link to a company operating the MSDS **10**.

An example of the "1.html" file for generating the display shown in FIG. **7** is shown below in Table 1.

TABLE 1

```
<HTML>
<HEAD>
<TITLE>Fax Received on May 31, 1995 at 1:58 PM from (404) 249 6801;
Page 1 of 3</TITLE>
</HEAD>
<BODY>
<H1>Fax from (404) 249-6801</H1>
<H2>Received on May 31, 1995 at 1:58 PM</H2>
<H2>Page 1 of 3</H2>
<IMG SRC="1.gif">
<P>
<A HREF="2.html">Next Page</a>
<HR>
<A HREF="faxlist.html">Return to Fax Listing</A>
<P>
This page was automatically generated by FaxWeb(tm) on May 31,
1995 at 2:05 PM.
<P>
&copy; 1995 NetOffice, Inc.
<HR>
<Address>
<A HREF="http://www.netoffice.com/">NetOffice, Inc.</A><BR>
PO Box 7115<BR>
Atlanta, GA 30357<BR>
<A HREF="mailto:info@netoffice.com">info@netoffice.com</A>
</Address>
</BODY>
</HTML>
```

As is apparent from the listing in Table 1, the image file "1.gif" for the first page is embedded into the HTML file "1.html." Also apparent from the listing is that the anchor for "Next Page" directs the MSDS **10** to the second page of the facsimile message having the filename "2.html" and the anchor for "Return to Fax Listing" directs the MSDS **10** to the filename "faxlist.html" containing the list of facsimile messages.

A process for converting a voice message into an HTML file is illustrated in FIG. **8**. The voice message is originally stored in a VOX format or an AD/PCM format and is retrieved at step **170**. The voice message is then converted either into an AU format or WAV format in accordance with the user's preference, which is stored in memory. Preferably, the message is preferably in the AD/PCM format originally and is converted in WAV, but the voice files may alternatively be stored and converted in file formats other than the ones disclosed, such as RealAudio (RA).

At step **174**, the listing of all of the voice messages is then updated to include a listing of the newly received voice message and an anchor to the voice message. For instance, the original voice message may be stored with filename "1.vox" and is converted into WAV and stored with a filename "1.wav."0 The HTML file "voicelist.html" which contains a list of all voice messages would then have an anchor to the filename "1.wav" along with identifying information for the voice message, such as when the message was received.

The listing of the voice messages may have additional anchors or references. For instance, each voice message may

have an anchor directing the MSDS **10** to a file which contains a short sampling of the message. Thus, when the user selects this anchor, the user could receive the first 5 seconds of the message or some other predefined number of seconds. As with the listing of facsimile messages, the listing of the voice messages also preferably has anchors to "Save" and "Delete."

FIG. **9** illustrates a process for converting a data message into HTML. At step **180**, the data file is retrieved from a database and at step **182** the HTML file containing the list of data messages is updated to include a listing of the newly received message along with identifying information. For instance, the HTML file for the listing "datalist.html" would be updated to include an anchor to a data "file1.1" and would have information such as the time and date that the data was transmitted, the size of the data file, as well as additional identifying information.

Because the MSDS **10** can receive messages of various types, such as a facsimile message, voice message or data messages the MSDS **10** must be able to determine the type of message that is being sent over the DID trunk **15**. With reference to FIG. **10**, when an incoming call is received, the MSDS **10** goes off hook at step **200** and starts to generate a ringing sound. If, at step **202**, a facsimile calling tone is detected, then the ringing sound is stopped at step **204** and the message is received as a facsimile message at step **206**. Similarly, when a data modem calling tone is detected at step **208**, the ringing sound is stopped at step **210** and the message is identified as a data message at step **212**.

If the MSDS **10** detects a DTMF digit at step **214**, the ringing sound is stopped at step **216** and the MSDS **10** then determines which digit was pressed. When the digit is a "1," as determined at step **218**, the message is identified as a facsimile message. The MSDS **10** will thereafter receive and store the facsimile message in the manner described above with reference to FIG. **2**. If the digit is identified as a "0" at step **220**, the call is identified as an owner's call and will be processed in a manner that will be described below with reference to FIG. **12**. As will be apparent, other digits may cause the MSDS **10** to take additional steps. If any other DTMF digit is pressed, at step **224** the MSDS **10** activates a voice call system, which will be described in more detail below with reference to FIG. **11**.

With step **226**, the MSDS **10** will enter a loop continuously checking for a facsimile calling tone, a data modem calling tone, or for a DTMF digit. If after n rings none of these tones or digits has been detected, the ringing sound is stopped at step **228** and the voice call system is activated at step **224**.

With reference to FIG. **11**, when a fax calling tone or modem calling tone is not detected, the voice call system begins at step **230** by playing a voice greeting. If the greeting was not interrupted by a DTMF digit as determined at step **232**, then the caller is prompted for the voice message at step **234** and, at step **236**, the voice message is recorded and stored in memory. At step **238**, the caller is prompted with a number of options, such as listening to the message, saving the message, or re-recording the message. Since the selection of these options with DTMF digits will be apparent to those skilled in the art, the details of this subroutine or subroutines will not be described in further detail. When the caller wishes to re-record the message, as determined at step **240**, the caller is again prompted for a message at step **234**. If the caller does not wish to re-record the message, the call is terminated at step **242**.

If the voice greeting is interrupted by a DTMF digit, as determined at step **232**, then the MSDS **10** ascertains which digit has been pressed. At step **244**, if the digit is a "0," the MSDS **10** detects that the call is an owner's call. When the

15

16

digit is a "1," the MSDS 10 is informed at step 206 that the call carries a facsimile message. As discussed above with reference to FIG. 10, other DTMF digits may cause the MSDS 10 to take additional steps. If an invalid digit is pressed, by default at step 248 the routine returns to step 234 of prompting the caller for a message.

It should be understood that the invention is not limited to the specific interactive voice response system described with reference to FIG. 11. As discussed above, the invention may be responsive to DTMF digits other than just a "0" and a "1." Further variations or alterations will be apparent to those skilled in the art.

With reference to FIG. 12, when the call is considered an owner—call, the caller is first prompted for the password at step 250. The password is received at step 252 and, if found correct at step 254, a set of announcements are played to the owner. These announcements would preferably inform the owner of the number of new messages that have been received, the number of saved messages, the number of facsimile messages, the number of data messages, and the number of voice messages. Other announcements, of course, could also be made at this time.

At step 258, the owner then receives a recording of the owner's menu with the appropriate DTMF digit for each option. For instance, the DTMF digit "1" may be associated with placing a message, the DTMF digit "2" may be associated with an options menu, and the DTMF digit "*" may be associated with returning to a previous menu or terminating the call if no previous menu exists.

A DTMF digit is detected at step 260 and the appropriate action is taken based upon the digit received. Thus, if the digit is determined to be a "1" at step 264, the owner can play a message at step 266. At step 266, the owner is preferably greeted with a menu giving the owner the options of playing or downloading new messages, saved messages, facsimile messages, data messages, or voice messages. As should be apparent to those skilled in the art, the owner may receive one or more menus at step 266 and the owner may enter one or more DTMF digits in order to play or download a particular message.

If, instead, the digit is determined to be a "2" at step 268, then the owner receives an options menu at step 270. With the options menu, the owner can enter or change certain parameters of the MSDS 10. For instance, the owner can change his or her password, the owner can change the manner in which facsimile messages are displayed on the computer 32, the owner can change the image file format from GIF to another format, the owner can select the file formats for the voice messages, as well as other options.

If the "*" DTMF digit is received, as determined at step 272, then the owner is returned to a previous menu. The "*" digit is also used to terminate the call when the owner has returned to the initial menu. The "*" digit is therefore universally recognized by the MSDS 10 throughout the various menus as a command for returning to a previous menu.

If the owner enters a DTMF digit that is not being used by the MSDS 10, the owner receives an indication at step 276 that the key is invalid and the owner is then again provided with the owner's menu at step 258. When the owner does not enter a DTMF digit while the owner's menu is being played, as determined at step 260, the menu will be replayed n times. Once the menu has been replayed n times, as determined at step 262, then the call will be terminated at step 278.

If the password is incorrect, as determined at step 254, then the MSDS 10 checks whether the user has made more than "n" attempts at step 280. If "n" attempts have not been made, then a password incorrect message will be displayed to the user at step 282 and the user will once again be prompted for the password at step 250. When the user has made "n" attempts to enter the correct password, the MSDS 10 will play a failure message to the user at step 284 and then terminate the call at step 286. The specific number "n" may be three so that the call is terminated after three failed attempts.

The owner's menu may be responsive to an additional number of DTMF digits and may be structured in other ways. For instance, separate DTMF digits may direct the owner to the respective types of messages, such as a facsimile message, data message, or voice message. Also, separate DTMF digits may direct the owner to a recording of new messages or to a recording of saved messages. Other variations will be apparent to those skilled in the art.

A more detailed diagram of the MSDS 10 is shown in FIG. 13. As shown in the figure, a plurality of DID trunks 15 are received by an input/output device 17 and are then sent to a central processor 3. The number of DID trunks 15 may be changed to any suitable number that would be necessary to accommodate the anticipated number of telephone calls that may be made to the MSDS 10. The input/output device 17 routes a call on one of the DID trunks 15 to an open port of the central processor 3 and is preferably a DID Interface Box manufactured by Exacom.

The central processor 3 receives the calls on the DID trunks 15 and stores the messages in storage 11 in accordance with software 7. Preferably, a separate directory in storage 11 is established for each user having an account on the MSDS 10 so that all of the messages for a single user will be stored in the same directory. It should be understood that the number of processors within the central processor 3 is dependent upon the number of DID trunks 15. With a greater number of DID trunks 15 capable of handling a larger number of telephone calls, the central processor 3 may actually comprise a number of computers. The input/output device 17 would then function to route incoming calls to an available computer within the central processor 3.

A more detailed diagram of the central processor 3 is shown in FIG. 14. The central processor 3 comprises a telephone line interface 21 for each DID trunk 15. The telephone interface 21 provides the ringing sounds and other communication interfacing with the telephone lines. The signals from the telephone interface 21 are routed to a pulse/tone decoder 23 and to a digital signal processor (DSP) 25. The pulse/tone decoder 23 detects the address signal off of an incoming call and sends the address signal onto a bus 29 to a microprocessor 27. The DSP performs the necessary signal processing on the incoming calls and routes the processed signals to the microprocessor 27.

The microprocessor 27 will then read the address signal from the pulse/tone decoder 23 and store the message from the DSP 25 in an appropriate directory in storage 11. As discussed above, the central processor 3 may comprise a number of computers or, more precisely, a number of microprocessors 27 with each microprocessor 27 handling the calls from a certain number, such as four, DID trunks 15. The microprocessor 27 may comprise any suitable microprocessor, but is preferably at least a 486 PC.

In addition to handling incoming calls and storing the messages in storage 11, the central processor 3 also coordinates the interactive voice response system of the MSDS 10. The software 7 would incorporate the flowcharts of operations for receiving a message shown in FIG. 3, for detecting the type of message on an incoming call shown in FIG. 10, for receiving voice messages shown in FIG. 11, and for receiving an owner's call shown in FIG. 12. Based upon the above-referenced flowcharts and the respective descriptions, the

17

production of the software 7 is within the capability of one of ordinary skill in the art and will not be described in any further detail.

The Internet Server 5 is connected to the central processor 3, such as through a local area network, and also has access to the storage 11. The Internet Server 5 performs a number of functions according to software 9. For instance, the Internet Server 5 retrieves the data files stored in storage 11 by the central computer 3 and converts the files into the appropriate HTML files. The converted HTML files are then stored in storage 11 and may be downloaded to the computer 32 through the Internet 30. The Internet Server 5 also handles the requests from the computer 32, which might require the retrieval of files from the storage 11 and possibly the generation of additional HTML files.

The software 9 for the Internet Server 5 would therefore incorporate the flowchart of operations for generating HTML files according to user preferences shown in FIG. 4, for generating requested information from a user shown in FIG. 5, for converting facsimile messages into HTML shown in FIG. 6, for converting voice messages into HTML shown in FIG. 8, and for converting data messages into HTML shown in FIG. 9. Based upon the above-referenced flowcharts and their respective descriptions, the production of the software 9 is with the capability of one of ordinary skill in the art and need not be described in any further detail.

Nonetheless, a more detailed block diagram of the Internet Server 5 is shown in FIG. 15. The Internet Server 5 runs on a suitable operating system (OS) 39, which is preferably Windows NT. The Internet Server 5 has a number of application programs 31, such as the ones depicted in the flowcharts discussed above, for communicating with the central processor 3 and for accessing data from storage 11 and also from memory 33.

The memory 33, inter alia, would contain the data indicating the preferences of each user. Thus, for example, when a facsimile message in the TIFF/F format is retrieved by the Internet Server 5, the Internet Server 5 would ascertain from the data in memory 33 the preferred option of displaying the facsimile message and would generate the appropriate HTML files.

All interfacing with the Internet 30 is handled by the HTTPD 37, which, in the preferred embodiment, is "Enterprise Server" from NetScape Communications Corp. Any requests from users, such as a request for a file, would be handled by the HTTPD 37, transferred through the CGI 35, and then received by the application programs 31. The application programs 31 would then take appropriate actions according to the request, such as transferring the requested file through the CGI 35 to the HTTPD 37 and then through the Internet 30 to the user's computer 32.

The Internet Server 5 may be connected to a paging system 13. Upon the arrival of a new message, in addition to sending an E-mail message to the user's mailbox, the Internet Server 13 may also activate the paging system 13 so that a pager 15 would be activated. In this manner, the user could receive almost instantaneous notification that a message has arrived.

The paging system 13 is preferably one that transmits alphanumeric characters so that a message may be relayed to the user's pager 15. The Internet Server 5 therefore comprises a signal processor 41 for generating signals recognized by the paging system 13 and a telephone interface 43. The signal processor 4 preferably receives information from the application programs 31 and generates a paging message in a paging file format, such as XIO/TAP. The telephone interface

18

43 would include a modem, an automatic dialer, and other suitable components for communicating with the paging system 13.

The information from the application programs 31 may simply notify the user of a message or may provide more detailed information. For instance, with a facsimile message, the information from the application programs 31 may comprise CSI information identifying the sender's telephone number. The user would therefore receive a message on the pager 15 informing the user that a facsimile message was received from a specified telephone number. The amount and type of information that may be sent to the user on the pager 15 may vary according to the capabilities of the paging system 13 and may provide a greater or lesser amount of information than the examples provided.

The Internet Server 5 is not limited to the structure shown FIG. 15 but may comprise additional components. For instance, the HTTPD 37 would be linked to the Internet 30 through some type of interface, such as a modem or router. The Internet Server 5 may be connected to the Internet 30 through typical phone lines, ISDN lines, a T1 circuit, a T3 circuit, or in other ways with other technologies as will be apparent to those skilled in the art.

Furthermore, the Internet Server 5 need not be connected to the Internet 30 but may be connected to other types of networks. For instance, the Internet Server 5, or more generally the network Server 5, could be connected to a large private network, such as one established for a large corporation. The network Server 5 would operate in the same manner by converting messages into HTML files, receiving requests for information from users on the network, and by transmitting the information to the users.

Also, at least one interface circuit would be located between the Internet Server 5 and the central processor 3 in order to provide communication capabilities between the Internet Server 5 and the central processor 3. This network interface may be provided within both the Internet Server 5 and the central processor 3 or within only one of the Internet Server 5 or central processor 3.

Examples of the Internet Server 5 software layers are shown in FIGS. 16(A) and 16(B), with FIG. 16(A) representing the Internet Server 5 in an asynchronous mode of communication and FIG. 16(B) representing the Internet 5 in a synchronous mode of communication. As shown in the figures, the software 9 for the Internet Server 5 may additional comprise an Internet Deamon for running the HTTPD 37. The software 9 for the Internet Server 5 would also include TCP/IP or other transport layers. Moreover, while the authentication is provided through the HTTPD 37, the authentication of the user's password and ID may be supplemented or replaced with other ways of authentication.

The term synchronous has been used to refer to a mode of operation for the MSDS 10 in which the all possible HTML files for a message are generated at the time the message is received. The HTML files may be generated by the central processor 3 or by the application programs 31. When a request for information is then later received by the HTTPD 37, the information has already been generated and the HTTPD 37 only needs to retrieve the information from storage 11 and transmit the information to the user's computer 32. With a synchronous mode of operation, the CGI 35 would be unnecessary.

The MSDS 10 preferably operates according to an asynchronous mode of operation. In an asynchronous mode of operation, information requested by the user may not be available and may have to be generated after the request. The asynchronous mode of operation is preferred since fewer files

US 7,836,141 B2

19            20

are generated, thereby reducing the required amount of storage **11**. Because the information requested by a user may not be available, some anchors cannot specify the filename, such as "2.html," but will instead contain a command for the file. For instance, an anchor may be defined as <AHREF="/fax-web/users/2496801/ viewpage.cgi?FAX_NUM=1&PAGE=1&VIEW_MODE=FULL">" for causing the CGI **35** to run a viewpage program so that page 1 of facsimile message **1** will be displayed in a full size image. The CGI **35** will generate the requested information when the information has not been generated, otherwise the CGI **35** will retrieve the information and relay the information to the HTTPD **37** for transmission to the user.

With the invention, the MSDS **10** can reliably receive voice, facsimile, and data messages for a plurality of users and can receive more than one message for a user at a single time. The messages are stored by the MSDS **10** and can be retrieved at the user's convenience at any time by connecting to the Internet **30**. The Internet World Wide Web **30** is a constantly expanding network that permits the user to retrieve the messages at virtually any location in the world. Since the user only needs to incur a local charge for connecting to the Internet **30**, the user can retrieve or review messages at a relatively low cost.

Even for the user's at the office or at home, the MSDS **10** provides a great number of benefits. The user would not need a facsimile machine, voice mail system, or a machine dedicated for receiving data messages. The user also need not worry about losing part of the message or violating the confidential nature of the messages. The user, of course, can still have a facsimile machine and dedicated computer for data messages The MSDS **10**, however, will permit the user to use the telephone company's "call forwarding" feature so that messages may be transferred to the MSDS **10** at the user's convenience, such as when the user is away from the office.

The software **7** and software **9** are not limited to the exact forms of the flowcharts shown but may be varied to suit the particular hardware embodied by the invention. The software may comprise additional processes not shown or may combine one or more of the processes shown into a single process. Further, the software **7** and **9** may be executed by a single computer, such as a Silicon Graphics Workstation, or may be executed by a larger number of computers.

The facsimile messages preferably undergo signal processing so that the images of the facsimile messages are converted from a two tone black or white image into an image with a varying gray scale. As is known in the art, a gray scale image of a facsimile message provides a better image than simply a black or white image of the message. The signal processing may comprise any suitable standard contrast curve method of processing, such as anti-aliasing or a smoothing filter. The signal processing may occur concurrently with the conversion from TIFF/F to GIF and is preferably performed for both full and reduced size images of the facsimile messages.

Furthermore, the user may be provided with a greater or fewer number of options in displaying or retrieving messages. The options are not limited to the exact forms provided but may permit the user to review or retrieve the messages in other formats. The options may also permit a user to join two or messages into a single message, to delete portions of a message, or to otherwise the contents of the messages. Also, the various menus provided to the user over the telephone may have a greater number of options and the MSDS **10** may accept responses that involve more than just a single DTMF digit.

The specific DTMF digits disclosed in the various menus are only examples and, as will be apparent to those skilled in the art, other digits may be used in their place. For instance, a "9" may be used in the place of a "*" in order to exit the menu or to return to a previous menu. Also, the DTMF digits may be changed in accordance with the user's personal convention. If the user had a previous voice mail system, the user could customize the commands to correspond with the commands used in the previous system in order to provide a smooth transition to the MSDS **10**.

The MSDS **10** may restrict a user to only certain types of messages. For instance, a user may want the MSDS **10** to store only facsimile messages in order to reduce costs of using the MSDS **10**. In such a situation, the MSDS **10** would perform an additional step of checking that the type of message received for a user is a type of message that the MSDS **10** is authorized to receive on the user's behalf. When the message is an unauthorized type of message, the MSDS **10** may ignore the message entirely or the MSDS **10** may inform the user that someone attempted to send a message to the MSDS **10**.

Moreover, the MSDS **10** has been described as having the central processor **3** for handling incoming calls and the Internet Server **10** for interfacing with the Internet **30**. The invention may be practiced in various ways other than with two separate processors. For instance, the central processor **3** and the Internet Server **5** may comprise a single computer or workstation for handling the incoming calls and for Interfacing with the Internet **30**. The MSDS **10** may convert the messages into HTML files prior to storing the messages. Also, the central processor **3** may communicate with the paging system **13** instead of the Internet Server **5**. Additionally, as discussed above, the central processor **3** may comprise a number of microprocessors **27** for handling a large number of DID trunks.

The invention has been described as converting the messages into HTML and transmitting the HTML files over the Internet **30** to the computer **32**. The HTML format, however, is only the currently preferred format for exchanging information on the Internet **30** and is actually only one type of a Standard Generalized Mark-Up Language. The invention is therefore not limited to the HTML format but may be practiced with any type of mixed media page layout language that can be used to exchange information on the Internet **30**.

SGML is not limited to any specific standard but encompasses numerous dialects and variations in languages. One example of an SGML dialect is virtual reality mark-up language (VRML) switch is used to deliver three dimensional images trough the Internet. As another example, the computer **32** for accessing the MSDS **10** through the Internet **30** may comprise a hand held device. A hand held device is generally characterized by a small display size, limited input capabilities, limited bandwidth, and limited resources, such as limited amount of memory, processing power, or permanent storage. In view of these limited capabilities, a hand held device markup language (HDML) has been proposed to provide easy access to the Internet **30** for hand held devices. The SGML information transmitted by the MSDS **10** to the computer **32** may therefore comprise HDML information suitable for a handheld device or may comprise HDML.

As another example, Extensible Mark-Up Language (XML) is an abbreviated version of SGML, which makes it easier to define document types and makes it easier for programmers to write programs to handle them. XML omits some more complex and some less-used parts of the standard SGML in return for the benefits of being easier to write applications for, easier to understand, and more suited to delivery and inter-operability over the Web. Because XML is nonetheless a dialect of SGML, the MSDS **10** therefore encompasses the translation of facsimile, voice, and data

Appx0359

US 7,836,141 B2

21

messages into XML, including all of its dialects and variations, and the delivery of these messages to computers **32** through the Internet **30**.

As a further example, the MSDS **10** encompasses the use of "dynamic HTML." "Dynamic HTML" is a term that has been used to describe the combination of HTML, style sheets, and scripts that allows documents to be animated. The Document Object Model (DOM) is a platform-neutral and language neutral interface allowing dynamic access and updating of content, structure, and style of documents. The MSDS **10** may therefore include the use of the DOM and dynamic HTML to deliver dynamic content to the computer **32** through the Internet **30**.

The MSDS **10** is also not limited to any particular version or standard of HTTP and thus not to any particular hyper-text transfer protocol deamon **37**. In general, HTTP is a data access protocol run over TCP and is the basis of the World Wide Web. HTTP began as a generic request-response protocol, designed to accommodate a variety of applications ranging from document exchange and management to searching and forms processing. Through the development of HTTP, the request for extensions and new features to HTTP has exploded; such extensions range from caching, distributed authoring and content negotiation to various remote procedure call mechanisms. By not having a modularized architecture, the price of new features has been an overly complex and incomprehensible protocol. For instance, a Protocol Extension Protocol (PEP) is an extension mechanism for HTTP designed to address the tension between private agreement and public specification and to accommodate extension of HTTP clients and servers by software components. Multiplexing Protocol (MUX) is another extension that introduces asynchronous messaging support at a layer below HTTP. As a result of these drawbacks of HTTP, a new version of HTTP, namely HTTP-NG, has been proposed and its purpose is to provide a new architecture for the HTTP protocol based on a simple, extensible distributed object-oriented model. HTTP-NG, for instance, provides support for commercial transactions including enhanced security and support for on-line payments. Another version of HTTP, namely S-HTTP, provides secure messaging. The MSDS **10** and the HTTPD **37** may incorporate these versions or other versions of HTTP.

In addition to different versions of HTTP, the HTTPD **37** of the MSDS **10** may operate with other implementations of HTTP. For instance, the W3C's has an implementation of HTTP called "Jigsaw." Jigsaw is an HTTP server entirely written in Java and provides benefits in terms of portability, extensibility, and efficiency. The MSDS **10** may employ Jigsaw or other implementations of HTTP.

With regard to the transmission of messages to the user's computer **32**, the MSDS **10** permits the user to sample the voice message or to preview the facsimile message without requiring the MSDS **10** to transmit the entire message to the computer **32**. This sampling ability is a significant benefit since the transmission of the entire message would frequently tie up the computer **32** for a rather long period of time. Thus, with the preview or sample feature, the user can determine whether the user needs the message transmitted to the computer **32**.

If the user does decide that the entire message needs to be transmitted, as stated above, the user's computer **32** might be receiving the message for a relatively long period of time. After the entire message has been received, the user then has the options of viewing, listening, retrieving, or saving the message. As an alternative, the user's computer may instead indicate the contents of the message to the user as the message is being received.

22

For instance, with a voice message, the user's computer **32** could send the message to an audio speaker as the message is being received. In this manner, the message would be played in real time and the user would not need to wait until the entire message is received before listening to the message. In order to play the messages in real time, the messages are preferably in the RealAudio (RA) format, which the user can select as a preferred file format for voice messages.

In operation, the MSDS **10** would transmit an HTML file containing an RA file. If the user selects the RA file with the browser on the computer **32**, the browser will activate a program for use with RA files. The operations and functioning of this program will be apparent to those skilled in the art and will be available as a separate softwarepackage or will be incorporated within a browser program. The RA program will request the RA data file containing the message from the MSDS **10** and, as the RA file is being received at the computer **32**, this program will play the message in real time.

The MSDS **10** and the user's computer **32** could also be arranged so that each page or even line of a facsimile message could be displayed as the computer **32** receives the facsimile message. Further, although the transmission of a data message is relatively fast in comparison to a voice or facsimile message, the computer **32** could also be programmed to permit access to the data message as the message is being received.

The invention has been described as storing and transmitting voice messages. It should be understood that the voice message would probably be the most often type of audio message stored at the MSDS **10**. The invention, however, may be used with any type of audio message and is in no way limited to just voice messages.

According to another aspect of the invention, the MSDS **10** may be used as a file repository serving as an archive for a particular user or group of users. As described above, the MSDS **10** may maintain a list of all messages for a particular user which is displayed to the user when the user access his or her mailbox. The MSDS **10** may store all messages, whether they are voice, facsimile, or data, for a user in the database indefinitely. The MSDS **10** may therefore be relied upon by a user to establish the authenticity of a message and the existence or absence of a particular message. Through the MSDS **10**, a user can therefore maintain an accurate record of all received email messages, facsimile messages, and data transfers.

In addition to serving as a file depository, the MSDS **10** may also function as a document management tool. As described above with reference to FIG. **2**, when the MSDS **10** receives a message, the MSDS **10** updates a database with information on the message. This information includes the type of message, whether it is a facsimile message, voice message, or data message, the time and date at which the message was received, the size of the file, such as in bytes, the telephone number of the caller leaving the message, as well as other information, such as the number of pages of a facsimile message. Because the telephone number called is unique for each user, the information also includes the intended recipient of the message.

An example of a data entry **300** in storage **11** for a message is shown in FIG. **17**. The data entry **300** represents the entry for just a single message with each message having a separate data entry **300**. Preferably, the data entries **300** are stored in a relational database and may be searched through a structured query language (SQL).

As shown in FIG. **17**, the data field **300** for a message may comprise numerous data fields for describing the message. One of these data fields may comprise a field **301** for indicat-

US 7,836,141 B2

23

ing the name of the person receiving the message. As will be appreciated by those skilled in the art, the person may be identified in numerous ways, such as by a portion of the person's name or by a unique number. Another field **302** in the data entry **300** indicates the type of the document, such as whether the document is a facsimile message, voice message, or data transfer, and fields **303** and **304** respectively indicate the date and time that the message was received by the MSDS **10**. The telephone number of the caller is indicated in field **305** while the size of the message, which may be measured in bytes, is indicated in field **306** and the number of pages of the message is indicated in field **307**. A document number for uniquely identifying the message is indicated in field **308**. As discussed above, the files or messages received for a particular user may be numbered sequentially in the order that they are received by the MSDS **10**. The files and messages, however, may be numbered or identified in other ways, such as by a combination of numbers with an identifier for the date when the message was received. Also, the documents number or identifier may be unique for each file or message directed to a user or, alternatively, may be unique for each file or message directed to a plurality of users, which is advantageous when the MSDS **10** tracks documents for an entire company or other group of users.

In addition to fields **301** to **308**, the data entry **300** for a message or file may have other fields **309** for describing or documenting the message or file. The other fields **309**, for instance, may be used to identify the type of storage that a message should receive. The messages or files may have different lengths of time that the message is stored before being automatically deleted. The type of storage, such as whether the fill text of the message is stored, may also be indicated by field **309**. Another example of a tracks that may be contained within the other field **309** is security. At times, a user may desire and may be granted access to another person's mailbox, such when the MSDS **10** trucks documents for an entire company. By designating a message or file as secure in field **309**, a user may restrict or deny access to that message or file by other users. The other fields **309** may also be used by a user to customize the MSDS **10** according to his or her own desires. For instance, if the user is a company, the company may want to classify messages according to the division at which the message is directed, such as one code for marketing, one for sales, one for engineering, and one for legal.

As another example of a use of one of the other fields **309**, a user can input notes in the other field **309**. When a user initially receives a data entry **300**, the entry **300**, for instance, may include data in all fields **301** to **308** except field **309**, which has been left blank. The user can then input his or her notes in the other field. An initial data entry **300** may include the field **305** for the caller's telephone number which contains the digits for the calling number. The user, however, may not readily recognize the caller from just reading the telephone number listed in field **305**. To more clearly indicate the caller, the user may input notes in field **309** to identify the caller's name. Alternatively, the notes in field **309** may reflect part or all of the contents of the message. The user may receive a large document or message and may input a brief description of the document or message in the field **309**. As another example, the recipient of the message may read the message or document and discover that the caller is requesting some service or go from the recipient, such as a request for certain documents or delivery of a certain quantity of goods. The recipient may read the document or message and place some notes in the field **309** to indicate the type of follow-up service or action that needs to be taken. An assistant to the recipient can then view the notes in field **309** and take appropriate steps

24

to ensure that the requested service or goods are delivered. If the data entry is security protected, one of the other fields **309**, as discussed above, may grant the assistant limited access to just the field **309** or may grant more expansive access whereby the assistant can View fields **301** to **309** as well as the actual document or message. The fields **309** may serve various other purposes, as will be apparent to those skilled in the art.

FIG. **18** illustrates a process **320** for using the MSDS **10** for document management purposes. With reference to FIG. **18**, a user sends a search request to the MSDS **10** for a particular document or set of documents at step **321**. The user may issue this request with the computer **32** by clicking on a link, such as a link to "Search Documents," which may be presented to the user by the MSDS **10** after the user has been granted accesses to his or her mailbox at step **72** shown in FIG. **3**. The MSDS **10** may present the user with the option to search the document archives at other times, such as when the user first attempts to access the mailbox at step **62**, or when the URL received by the HTTPD **37** from computer **32** points toward the document archives.

In response to this request the HTTPD **37** sends the user a search query form at step **322** to allow the user to define a desired search. An example of a search query form is shown in FIG. **19**. The search query form may include any entry for each of the data fields **301** to **309** in the data entry **300**. For instance, the user may input one or more names for a recipient and have the MSDS **10** search for all messages or files directed to just those recipients. The user may also indicate the type of document, such as whether it is a facsimile, voice message or data file. The search query form also has entries for the date or time, which preferably accept ranges of times and dates, and an entry for the telephone number of the caller to the MSDS **10**. The search query form may also include an entry for the size of the file or for the number of pages, which is relevant if the message is a facsimile message. The search query form may also include an entry for the document number, which may accept a range of document numbers, and also an entry for another field.

At step **323**, the user enters the search parameters in the search query form with computer **32** and returns the information to the MSDS **10** through the Internet **30**. The user may define the search about any one data field or may define the search about a combination of two or more data fields. For instance, as reflected in the completed search query form shown in FIG. **20**, a user may define a search by designating the document type as a facsimile and the calling number as (404) 249-6801. Once the user has finished defining the search, the user then selects the "SEARCH" link shown at the bottom of the screen whereby the user's computer **32** would send the completed search query form through the Internet **30** to the HTTPD **37** of the MSDS **10**.

At step **324**, the HTTPD **37** receives the completed search query form and, through CGI **35**, invokes one or more of the application program **31** for performing the desired search for any files or messages falling within the parameters of the search. The results of the search are passed from the application programs **31** through the CGI **35** to the HTTPD **37** and, at step **325**, are returned to the user through the Internet **30**. Preferably, the MSDS **10** returns the search results in the form of a listing of all files or messages contained within the search parameters, although the MSDS **10** may return the results in other ways.

An example of the search results of the query shown in FIG. **20** is shown in FIG. **21**. As discussed above, the parameters of the search were all facsimile messages from telephone number (404) 249-6081. With reference to FIG. **21**,

US 7,836,141 B2

25 | 26

this query resulted in three messages being discovered. The first document has a document number 11 and is described as being a facsimile from the designated telephone number to Jane Doe on May 31, 1995, and consists of three pages. This first-listed document is an example of the facsimile shown in FIG. 7. The other two documents respectively correspond to document numbers 243 and 1,002 and are also from the designated telephone number.

At step **326**, the user selects the desired file or message from the listing of messages and files. For instance, by clicking on the first listed document, namely document number 11, the computer **32** sends a request to the MSDS **10** for a viewing of that document and, in response, the MSDS **10** provides a viewing of the document according to the user defined preferences. As described above, the user may receive a reduced size image of the first page, a full size image of the first page, reduced size images of all pages, or full size images of all pages of the facsimile message. Thus, if the user selected the fourth display option as the user defined preference, the MSDS **10** would return an image of the first page of the facsimile, such as the one depicted in FIG. 7.

At step **326**, the user may also have the MSDS **10** save the search result. For instance, as shown in FIG. **21**, the user may input the name of "CHARLES R. BOBO FACSIMILES" as the name for the search. By clicking on the "SAVE SEARCH AS" link, the name of the search is provided from the computer **32** to the MSDS **10**. At the MSDS **10**, the HTTPD **37** transfers the information from the computer **32** to the CGI **35** and the CGI **35** invokes an application program **31** to store the results of the search in storage **11** under the designated name. The invoked application program **31** preferably does not store the contents of all messages but rather stores a listing of the search results in the storage **11**.

The results of a search may be stored in storage **11** as either a closed search or an open search. If the MSDS **10** saves the results of a search as an open search, then the files or messages in that named search may be updated with recent files or messages falling within the particular search parameters for the search. On the other hand, a closed search is one in which the files or messages in the named search are limited to those existing at the time of the search. For example, if the MSDS **10** saved the search results shown in FIG. **21** as a closed search, then any retrieval of the "CHARLES R. BOBO FACSIMILES" would result in only the three listed documents. If, on the other hand, the search named as the "CHARLES R. BOBO FACSIMILES," was saved by the MSDS **10** as an open search, then the MSDS **10** would reactivate the search query shown in FIG. **20** in response to a request by the computer **32** for that search in order to obtain all facsimile messages from that particular telephone number, including those received after the initial saving of the search results.

With reference to FIG. **19**, rather than defining a new search, the user may click on the "STORED SEARCHES" link in order to receive the results of a previously performed search. For example, by clicking on this link, the MSDS **10** may return a listing of searches stored for that particular user, such as the searches shown in FIG. **22**. As shown in this figure, the "CHARLES R. BOBO FACSIMILES" is included within the list of stored searches. If the user then selected the "CHARLES R. BOBO FACSIMILES" search, the user may then be presented with the listing of facsimiles shown in FIG. **21**, possibly including recent additions to the search group.

With reference to FIG. **19**, the MSDS **10** may also provide a user with a link to "RECENT FILES" at step **322**. By selecting this link, the MSDS **10** may return a listing of all facsimile, voice, and data messages received with a particular period of time, such as the last month. By placing the

"RECENT FILES" link on the search query form rather than in the listing of "STORED SEARCHES," the user can quickly turn to the most recent files and messages. The search query form may contain other such easy-access links, such as a link to the last search performed by the MSDS **10** on behalf of the user.

The messages or files received by the MSDS **10** need not arrive from a third party. In other words, the MSDS **10** may be used as a file repository or as a file manager for documents generated by the user itself. The user may call the designated telephone number for receiving messages and transmit voice messages, data messages, or facsimile messages and have the MSDS **10** document the receipt and content of these messages. A user may easily use a facsimile machine as a scanner for entering documents into the storage **11** of the MSDS **10**.

The MSDS **10** may have applications in addition to those discussed-above with regard to serving as a message deliverer, file repository, and file manager. For instance, the MSDS **10** may perform some additional processing on the incoming calls prior to forwarding them to the user. For voice messages, this processing may involve transcribing the message and then returning the transcribed messages to the user. The MSDS **10** may therefore be viewed as offering secretarial assistance which may be invaluable to small companies or individuals who cannot afford a secretary or even to larger businesses who may need some over-flow assistance. The transcription may be provided by individuals located in any part of the world or may be performed automatically by a speech-to-text recognition software, such as VoiceType from IBM.

Another type of processing that the MSDS **10** may provide is translation services. The incoming call, whether it is a voice, facsimile, or data message, cm be converted into SGML and then forwarded first to a translator. Given the reach of the Internet, the translator may be located virtually anywhere in the world and can return the translated document via the Internet to the MSDS **10**. The MSDS **10** can notify the user that the translation has been completed through email, voice mail, pager, facsimile, or in other ways. The user would then connect to the Internet and retrieve the translated document. The translation services of the MSDS **10** may also provide transcription of the message, such as with speech-to-text recognition software.

The foregoing description of the preferred embodiments of the invention have been presented only for the purposes of illustration and description. It is not intended to be exhaustive or to limit the invention to the precise form disclosed. Many modifications and variations are possible in light of the above teaching.

The embodiments were chosen and described in order to explain the principles of the invention and their practical application so as to enable others skilled in the art to utilize the invention and various embodiments and with various modifications as are suited to the particular use contemplated. It is intended that the scope of the invention only be limited by the claims appended hereto.

What is claimed is:

1. A method for storing a message and delivering the message from a network server to a user's computer via a network using a hyper-text transfer protocol (HTTP), comprising:

receiving the message, wherein the message is addressed to the user;

storing the message in a user-specific message storage area associated with the network server, wherein access to the user-specific message storage area is restricted to the user or others authorized by the user;

receiving an access request from a hyper-text browser executing on the user's computer, via the network, in accordance with the hyper-text transfer protocol, wherein the access request contains an application layer address associated with the network server on the network and the access request is indicative of a request by the user to gain access to the user-specific message storage area;

making a determination to grant or deny the access request;

in response to a determination to grant the access request, transmitting a mark-up language file from the network server to the hyper-text browser, via the network, using the hyper-text transfer protocol, wherein the mark-up language file enables the hyper-text browser to generate a user interface through which a link to the message stored in the user-specific message storage area can be selected by the user;

receiving, via the network, in accordance with the hyper-text transfer protocol, an indication that the user has selected the link corresponding to the message stored in the user-specific message storage area; and

transmitting the message to the hyper-text browser, via the network, in accordance with the hyper-text transfer protocol, in response to the indication.

**2**. The method as set forth in claim **1**, wherein the computer comprises a personal computer comprising a display device and a user input device.

**3**. The method as set forth in claim **1**, wherein the application layer address comprises a URL.

**4**. The method as set forth in claim **1**, wherein the packet switched data network comprises the Internet.

**5**. The method as set forth in claim **1**, wherein the packet switched data network comprises a private network.

**6**. The method as set forth in claim **1**, wherein the user-specific message storage area comprises a user-specific message mailbox within a messaging database comprising a plurality of message mailboxes for a plurality of user's.

**7**. The method as set forth in claim **1**, wherein the message comprises an HTML file.

**8**. The method as set forth in claim **1**, wherein the mark-up language file comprises an HTML file.

**9**. The method as set forth in claim **1**, wherein the network server executes a hyper-text transfer protocol deamon (HT-TPD) to execute the hyper-text transfer protocol interactions between the network server and the hyper-text browser.

**10**. The method as set forth in claim **9**, wherein the network server comprises an HTTP server and the user's computer comprises an HTTP client.

**11**. The method as set forth in claim **10**, wherein the packet switched data network comprises the Internet.

**12**. The method as set forth in claim **1**, wherein the message comprises a mark-up language file that conforms with a dialect of a standardized generalized mark-up language (SGML).

**13**. The method as set forth in claim **1**, wherein the message comprises a standardized generalized mark-up language (SGML) file.

**14**. The method as set forth in claim **1**, wherein the message is received in a first file format other than a mark-up language file format, and, further comprising converting a file format of the received message from the first file format to the mark-up language file format.

**15**. The method as set forth in claim **1**, wherein the message comprises a voice mail message.

**16**. The method as set forth in claim **1**, wherein the message comprises a facsimile message.

**17**. The method as set forth in claim **1**, wherein the message comprises a data message.

**18**. The method as set forth in claim **1**, wherein the making a determination is performed in response to authentication information received from the hyper-text browser via the packet switched data network in accordance with the hyper-text transfer protocol.

**19**. The method as set forth in claim **18**, wherein the authentication information includes a user-specific password.

**20**. The method as set forth in claim **18**, wherein the authentication information includes a user name.

**21**. The method as set forth in claim **1**, wherein the hyper-text browser comprises a web browser.

**22**. The method as set forth in claim **21**, wherein the packet switched data network comprises the Internet.

**23**. The method as set forth in claim **22**, wherein the computer comprises a personal computer that includes a keyboard and a display.

**24**. The method as set forth in claim **1**, wherein the user interface provides additional links to other messages stored in the user-specific message storage area.

**25**. The method as set forth in claim **24**, wherein the user interface further provides an indication of the total number of messages stored in the user-specific message storage area.

**26**. The method as set in claim **25**, wherein the user interface further provides an indication of the total number of new messages stored in the user-specific message storage area, and an indication of the total number of saved messages stored in the user-specific message storage area.

**27**. The method as set forth in claim **1**, wherein the message is a confidential message intended to be viewed by only the user.

**28**. The method as set forth in claim **1**, wherein the user interface enables the user to browse through all messages stored in the user-specific message storage area.

**29**. The method as set forth in claim **1**, further comprising sending a notification to the user to notify the user that the message has been received.

**30**. The method as set forth in claim **29**, wherein the notification comprises an e-mail message.

**31**. The method as set forth in claim **29**, wherein the notification comprises a wireless notification.

**32**. A method for storing a message and delivering the message from a network server to a user's client device via a network using an Internet protocol, comprising:

receiving the message, wherein the message is addressed to the user;

storing the message in a user-specific message storage area associated with the network server, wherein access to the user-specific message storage area is restricted to the user or others authorized by the user;

receiving an access request from an application program executing on the user's computer, via the network, in accordance with the Internet protocol, wherein the access request contains an application layer address associated with the network server on the network and is indicative of a request by the user to gain access to the user-specific message storage area;

making a determination to grant or deny the access request;

in response to a determination to grant the access request, transmitting a mark-up language file from the network server to the application program, via the network, using the Internet protocol, wherein the mark-up language file enables the application program to generate a user interface through which a link to the message stored in the user-specific message storage area can be selected by the user;

US 7,836,141 B2

29

receiving, via the network, in accordance with the Internet protocol, an indication that the user has selected the link corresponding to the message stored in the user-specific message storage area; and

transmitting the message to the application program, via the network, in accordance with the Internet protocol, in response to the indication.

**33.** The method as set forth in claim **32**, wherein the user's client device comprises a handheld device.

**34.** The method as set forth in claim **32**, wherein the application layer address comprises a URL.

**35.** The method as set forth in claim **32**, wherein the packet switched data network comprises the Internet.

**36.** The method as set forth in claim **32**, wherein the packet switched data network comprises a private network.

**37.** The method as set forth in claim **32** wherein the user-specific message storage area comprises a user-specific message mailbox within a messaging database comprising a plurality of message mailboxes for a plurality of user's.

**38.** The method as set forth in claim **32**, wherein the message comprises an HTML file.

**39.** The method as set forth in claim **32**, wherein the mark-up language file comprises an HTML file.

**40.** The method as set forth in claim **32**, wherein the Internet protocol comprises a hyper-text transfer protocol (HTTP), and wherein the network server executes a hyper-text transfer protocol deamon (HTTPD) to execute the hyper-text transfer protocol interactions between the network server and the application program.

**41.** The method as set forth in claim **32**, wherein thee application program comprises a hyper-text browser.

**42.** The method as set forth in claim **41**, wherein the packet switched data network comprises the Internet.

**43.** The method as set forth in claim **32**, wherein the message comprises a mark-up language file that conforms with a dialect of a standardized generalized mark-up language (SGML).

**44.** The method as set forth in claim **32**, wherein the message comprises a standardized generalized mark-up language (SGML) file.

**45.** The method as set forth in claim **32**, wherein the message is received in a first file format other than a mark-up language file format, and further comprising converting a file format of the received message from the first file format to a mark-up language file format.

**46.** The method as set forth in claim **32**, wherein the message comprises a voice mail message.

**47.** The method as set forth in claim **32**, wherein the message comprises a facsimile message.

**48.** The method as set forth in claim **32**, wherein the message comprises a data message.

**49.** The method as set forth in claim **32**, wherein the making a determination is performed in response to authentica-

30

tion information received from the application program via the packet switched data network, in accordance with the Internet protocol.

**50.** The method as set forth in claim **49**, wherein the authentication information includes a user-specific password.

**51.** The method as set forth in claim **49**, wherein the authentication information includes a user name.

**52.** The method as set forth in claim **32** wherein the application program comprises a web browser.

**53.** The method as set forth in claim **52**, wherein the packet switched data network comprises the Internet.

**54.** The method as set forth in claim **52**, wherein the user's client device comprises a personal computer that includes a keyboard and a display.

**55.** The method as set forth in claim **32**, wherein the user interface provides additional links to other messages stored in the user-specific message storage area.

**56.** The method as set forth in claim **55**, wherein the user interface further provides an indication of the total number of new messages stored in the user-specific message storage area.

**57.** The method as set forth in claim **56**, wherein the user interface further provides an indication of the total number of new messages stored in the user-specific message storage area, and an indication of the total number of saved messages stored in the user-specific message storage area.

**58.** The method as set forth in claim **32**, wherein the message is a confidential message intended to be viewed by only the user.

**59.** The method as set forth in claim **32**, wherein the user interface enables the user to browse through all messages stored in the user-specific message storage area.

**60.** The method as set forth in claim **32**, further comprising sending a notification to the user to notify the user that the message has been received.

**61.** The method as set forth in claim **60**, wherein the notification comprises an e-mail message.

**62.** The method as set forth in claim **60**, wherein the notification comprises a wireless notification.

**63.** The method as set forth in claim **40**, wherein the application program comprises a hyper-text browser.

**64.** The method as set forth in claim **63**, wherein the hyper-text browser comprises a web browser.

**65.** The method as set forth in claim **63**, wherein the packet switched data network comprises the Internet.

**66.** The method as set forth in claim **32**, wherein the network server comprises an HTTP server and the user's client device comprises an HTTP client.

**67.** The method as set forth in claim **65**, wherein the Internet protocol comprises a hyper-text transfer protocol (HTTP).

\* \* \* \* \*

US007895306B2

(12) **United States Patent**
Bobo, II

(10) **Patent No.:**     **US 7,895,306 B2**
(45) **Date of Patent:**     \*Feb. 22, 2011

---

(54) **SYSTEMS AND METHODS FOR STORING, DELIVERING, AND MANAGING MESSAGES**

(75) Inventor: **Charles R. Bobo, II**, Atlanta, GA (US)

(73) Assignee: **Advanced Messaging Technologies, Inc.**, Los Angeles, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1632 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/963,586**

(22) Filed: **Oct. 14, 2004**

(65) **Prior Publication Data**

US 2005/0050349 A1     Mar. 3, 2005

**Related U.S. Application Data**

(63) Continuation of application No. 10/436,798, filed on May 12, 2003, now Pat. No. 6,857,074, which is a continuation of application No. 09/840,759, filed on Apr. 23, 2001, now Pat. No. 6,564,321, which is a continuation of application No. 09/186,595, filed on Nov. 5, 1998, now Pat. No. 6,350,066, which is a continuation of application No. 08/944,741, filed on Oct. 6, 1997, now Pat. No. 5,870,549, which is a continuation-in-part of application No. 08/431,716, filed on Apr. 28, 1995, now Pat. No. 5,675,507.

(51) Int. Cl.
*G06F 15/173*     (2006.01)

(52) **U.S. Cl.** ........................ **709/223**; 713/200; 713/193; 713/168; 379/88; 379/89; 455/461; 455/412; 455/435; 726/4; 726/26

(58) **Field of Classification Search** ................ 709/217, 709/223; 713/200, 193, 168; 379/88, 89; 455/461, 412, 435; 348/6, 4, 26
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,106,060 A     8/1978 Chapman, Jr.

| | | |
|---|---|---|
| 4,130,885 A | 12/1978 | Dennis |
| 4,289,930 A | 9/1981 | Connolly et al. |
| 4,405,829 A | 9/1983 | Rivest et al. |
| 4,532,588 A | 7/1985 | Foster |

(Continued)

FOREIGN PATENT DOCUMENTS

| AU | 755321 | 4/2003 |
|---|---|---|
| CA | 2109899 C | 9/1997 |
| CA | 2305459 A1 | 10/1998 |
| CA | 2232397 C | 8/2004 |
| DE | 4309072 A1 | 9/1994 |

(Continued)

OTHER PUBLICATIONS

M.Frans Kaashoek, Dynamic Documents: Extensibility and Adaptability in the WWW, Sep. 15, 1994, MIT.EDU.*

(Continued)

*Primary Examiner*—Saleh Najjar
*Assistant Examiner*—Thuong T Nguyen
(74) *Attorney, Agent, or Firm*—Kenyon & Kenyon LLP

(57)     **ABSTRACT**

A Message Storage and Deliver System (MSDS) is connected to the public switched telephone network (PSTN) and receives incoming calls with these calls being facsimile, voice, or data transmissions. The MSDS detects the type of call and stores the message signal in a database. The MSDS is also connected to the Internet and has a hyper-text transfer protocol deamon (HTTPD) for receiving requests from users. The HTTPD forwards requests for certain files or messages to a network server which transmits at least part of the message to the HTTPD and then to the user. In addition to requests for certain documents, the HTTPD may also receive a request in the form of a search query. The search query is forwarded from the HTTPD to an application program for conducting the search of the database. The results of the search are forwarded through the HTTPD to the user. The user may then select one or more files or messages from the search results and may save the search for later reference.

**55 Claims, 18 Drawing Sheets**



## US 7,895,306 B2
Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,571,699 | A | 2/1986 | Herzog |
| 4,713,780 | A | 12/1987 | Schultz et al. |
| 4,754,428 | A | 6/1988 | Schultz et al. |
| 4,816,653 | A | 3/1989 | Anderl et al. |
| 4,837,798 | A | 6/1989 | Cohen et al. |
| 4,853,961 | A | 8/1989 | Pastor |
| 4,918,722 | A | 4/1990 | Duehren et al. |
| 4,941,170 | A | 7/1990 | Herbst |
| 5,008,814 | A | 4/1991 | Mathur |
| 5,018,191 | A | 5/1991 | Catron et al. |
| 5,029,199 | A | 7/1991 | Jones |
| 5,033,079 | A | 7/1991 | Catron et al. |
| 5,047,918 | A | 9/1991 | Schwartz et al. |
| 5,054,096 | A | 10/1991 | Beizer |
| 5,065,427 | A | 11/1991 | Godbole |
| 5,068,797 | A | 11/1991 | Sansone et al. |
| 5,068,888 | A | 11/1991 | Scherk et al. |
| 5,091,790 | A | 2/1992 | Silverberg |
| 5,105,184 | A | 4/1992 | Pirani et al. |
| 5,113,430 | A | 5/1992 | Richardson, Jr. et al. |
| 5,113,496 | A | 5/1992 | McCalley et al. |
| 5,115,326 | A | 5/1992 | Burgess et al. |
| 5,127,003 | A | 6/1992 | Doll, Jr. et al. |
| 5,129,080 | A | 7/1992 | Smith |
| 5,167,011 | A | 11/1992 | Priest |
| 5,175,762 | A | 12/1992 | Kochis et al. |
| 5,193,110 | A | 3/1993 | Jones et al. |
| 5,195,085 | A | 3/1993 | Bertsch et al. |
| 5,210,824 | A | 5/1993 | Putz |
| 5,224,156 | A | 6/1993 | Fuller et al. |
| 5,227,893 | A | 7/1993 | Ett |
| 5,241,594 | A | 8/1993 | Kung |
| 5,247,591 | A | 9/1993 | Baran |
| 5,247,661 | A | 9/1993 | Hager et al. |
| 5,255,312 | A | 10/1993 | Koshiishi |
| 5,257,112 | A | 10/1993 | Okada |
| 5,267,047 | A | 11/1993 | Argenta et al. |
| 5,267,301 | A | 11/1993 | Nishii |
| 5,274,635 | A | 12/1993 | Rahman et al. |
| 5,276,869 | A | 1/1994 | Forrest et al. |
| 5,283,887 | A | 2/1994 | Zachery |
| 5,289,371 | A | 2/1994 | Abel et al. |
| 5,289,472 | A | 2/1994 | Cho |
| 5,291,302 | A | 3/1994 | Gordon et al. |
| 5,291,546 | A | 3/1994 | Giler et al. |
| 5,293,250 | A | 3/1994 | Okumura et al. |
| 5,296,934 | A | 3/1994 | Ohtsuki |
| 5,297,208 | A | 3/1994 | Schlafly et al. |
| 5,299,255 | A | 3/1994 | Iwaki et al. |
| 5,301,226 | A | 4/1994 | Olson et al. |
| 5,307,456 | A | 4/1994 | MacKay |
| 5,317,628 | A | 5/1994 | Misholi et al. |
| 5,333,266 | A | 7/1994 | Boaz et al. |
| 5,339,156 | A | 8/1994 | Ishii |
| 5,349,636 | A | 9/1994 | Irribarren |
| 5,351,276 | A | 9/1994 | Doll, Jr. et al. |
| 5,355,472 | A | 10/1994 | Lewis |
| 5,367,621 | A | 11/1994 | Cohen et al. |
| 5,371,885 | A | 12/1994 | Letwin |
| 5,379,374 | A | 1/1995 | Ishizaki et al. |
| 5,384,835 | A | 1/1995 | Wheeler et al. |
| 5,394,460 | A | 2/1995 | Olson et al. |
| 5,394,522 | A | 2/1995 | Sanchez-Frank et al. |
| 5,404,231 | A | 4/1995 | Bloomfield |
| 5,406,557 | A | 4/1995 | Baudoin |
| 5,418,908 | A | 5/1995 | Keller et al. |
| 5,424,724 | A | 6/1995 | Williams et al. |
| 5,432,841 | A | 7/1995 | Rimer |
| 5,438,433 | A | 8/1995 | Reifman et al. |
| 5,448,626 | A | 9/1995 | Kajiya et al. |
| 5,452,289 | A | 9/1995 | Sharma et al. |
| 5,459,584 | A | 10/1995 | Gordon et al. |
| 5,471,617 | A | 11/1995 | Ferrand et al. |
| 5,475,738 | A | 12/1995 | Penzias |
| 5,479,408 | A | 12/1995 | Will |
| 5,479,411 | A | 12/1995 | Klein |
| 5,479,491 | A | 12/1995 | Herrero Garcia et al. |
| 5,483,466 | A | 1/1996 | Kawahara et al. |
| 5,483,524 | A | 1/1996 | Lev et al. |
| 5,483,580 | A | 1/1996 | Brandman et al. |
| 5,487,100 | A | 1/1996 | Kane |
| 5,488,651 | A | 1/1996 | Giler et al. |
| 5,495,610 | A | 2/1996 | Shing et al. |
| 5,497,373 | A | 3/1996 | Hulen et al. |
| 5,502,637 | A | 3/1996 | Beaulieu et al. |
| 5,509,123 | A | 4/1996 | Dobbins et al. |
| 5,513,126 | A | 4/1996 | Harkins et al. |
| 5,513,323 | A | 4/1996 | Williams et al. |
| 5,517,556 | A | 5/1996 | Pounds et al. |
| 5,524,137 | A | 6/1996 | Rhee |
| 5,526,353 | A | 6/1996 | Henley et al. |
| 5,530,740 | A | 6/1996 | Irribarren et al. |
| 5,530,852 | A | * | 6/1996 | Meske et al. ................ 709/206 |
| 5,534,913 | A | 7/1996 | Majeti et al. |
| 5,537,415 | A | 7/1996 | Miller et al. |
| 5,542,289 | A | 8/1996 | Sharma et al. |
| 5,544,320 | A | 8/1996 | Konrad |
| 5,546,388 | A | 8/1996 | Lin |
| 5,548,789 | A | 8/1996 | Nakanura |
| 5,552,901 | A | 9/1996 | Kikuchi |
| 5,555,100 | A | 9/1996 | Bloomfield et al. |
| 5,557,659 | A | 9/1996 | Hyde-Thompson |
| 5,559,611 | A | 9/1996 | Bloomfield et al. |
| 5,559,721 | A | 9/1996 | Ishii |
| 5,561,703 | A | 10/1996 | Arledge et al. |
| 5,568,536 | A | 10/1996 | Tiller et al. |
| 5,568,540 | A | 10/1996 | Greco et al. |
| 5,572,643 | A | 11/1996 | Judson |
| 5,579,472 | A | 11/1996 | Keyworth, II et al. |
| 5,590,178 | A | 12/1996 | Murakami et al. |
| 5,604,737 | A | 2/1997 | Iwami et al. |
| 5,604,788 | A | 2/1997 | Tett |
| 5,608,446 | A | * | 3/1997 | Carr et al. ................... 725/114 |
| 5,608,786 | A | 3/1997 | Gordon |
| 5,608,874 | A | 3/1997 | Ogawa et al. |
| 5,619,648 | A | 4/1997 | Canale et al. |
| 5,621,727 | A | 4/1997 | Vaudreuil |
| 5,625,675 | A | 4/1997 | Katsumaru et al. |
| 5,630,060 | A | 5/1997 | Tang et al. |
| 5,630,061 | A | 5/1997 | Richter et al. |
| 5,633,916 | A | 5/1997 | Goldhagen et al. |
| 5,634,005 | A | 5/1997 | Matsuo |
| 5,647,002 | A | 7/1997 | Brunson |
| 5,654,886 | A | 8/1997 | Zereski et al. |
| 5,654,957 | A | 8/1997 | Koyama |
| 5,657,461 | A | 8/1997 | Harkins et al. |
| 5,664,102 | A | 9/1997 | Faynberg |
| 5,673,316 | A | 9/1997 | Auerbach et al. |
| 5,675,507 | A | 10/1997 | Bobo, II |
| 5,677,955 | A | 10/1997 | Doggett et al. |
| 5,687,220 | A | 11/1997 | Finnigan |
| 5,689,550 | A | * | 11/1997 | Garson et al. ............ 379/88.18 |
| 5,692,039 | A | 11/1997 | Brankley et al. |
| 5,694,458 | A | 12/1997 | Okada |
| 5,694,546 | A | 12/1997 | Reisman |
| 5,710,883 | A | * | 1/1998 | Hong et al. ................. 709/246 |
| 5,712,901 | A | 1/1998 | Meermans |
| 5,712,903 | A | 1/1998 | Bartholomew et al. |
| 5,712,907 | A | 1/1998 | Wegner et al. |
| 5,715,314 | A | 2/1998 | Payne |
| 5,715,444 | A | * | 2/1998 | Danish et al. .................. 707/4 |
| 5,715,453 | A | 2/1998 | Stewart |
| 5,717,742 | A | * | 2/1998 | Hyde-Thomson ...... 379/88.17 |
| 5,724,406 | A | 3/1998 | Juster |

**US 7,895,306 B2**

Page 3

| | | | |
|---|---|---|---|
| 5,724,410 A | 3/1998 | Parvulescu et al. | |
| 5,724,424 A | 3/1998 | Gifford | |
| 5,724,425 A | 3/1998 | Chang et al. | |
| 5,724,514 A | 3/1998 | Arias | |
| 5,724,567 A * | 3/1998 | Rose et al. ........................ | 1/1 |
| 5,727,156 A | 3/1998 | Herr-Hoyman et al. | |
| 5,732,219 A * | 3/1998 | Blumer et al. ............. | 709/227 |
| 5,737,395 A * | 4/1998 | Irribarren ................ | 379/88.13 |
| 5,737,396 A | 4/1998 | Garcia | |
| 5,737,533 A | 4/1998 | de Hond | |
| 5,740,231 A | 4/1998 | Cohn et al. | |
| 5,742,596 A | 4/1998 | Baratz et al. | |
| 5,742,668 A | 4/1998 | Pepe et al. | |
| 5,742,905 A * | 4/1998 | Pepe et al. ................. | 455/461 |
| 5,751,791 A | 5/1998 | Chen et al. | |
| 5,751,814 A | 5/1998 | Kafri | |
| 5,751,956 A | 5/1998 | Kirsch | |
| 5,754,939 A | 5/1998 | Herz et al. | |
| 5,758,088 A | 5/1998 | Bezaire et al. | |
| 5,761,201 A | 6/1998 | Vaudreuil | |
| 5,761,396 A | 6/1998 | Austin et al. | |
| 5,761,662 A | 6/1998 | Dasan | |
| 5,765,033 A | 6/1998 | Miloslavsky | |
| 5,768,528 A | 6/1998 | Stumm | |
| 5,771,354 A | 6/1998 | Crawford | |
| 5,774,668 A | 6/1998 | Choquier et al. | |
| 5,781,614 A | 7/1998 | Brunson | |
| 5,781,901 A | 7/1998 | Kuzma | |
| 5,787,175 A | 7/1998 | Carter | |
| 5,790,790 A | 8/1998 | Smith et al. | |
| 5,790,793 A | 8/1998 | Higley | |
| 5,793,972 A | 8/1998 | Shane | |
| 5,801,702 A * | 9/1998 | Dolan et al. ................ | 715/854 |
| 5,805,298 A | 9/1998 | Ho et al. | |
| 5,812,278 A | 9/1998 | Toyoda et al. | |
| 5,812,639 A | 9/1998 | Bartholomew et al. | |
| 5,812,786 A | 9/1998 | Seazholtz et al. | |
| 5,819,092 A | 10/1998 | Ferguson | |
| 5,819,295 A | 10/1998 | Nakagawa et al. | |
| 5,825,865 A | 10/1998 | Oberlander et al. | |
| 5,838,906 A | 11/1998 | Doyle et al. | |
| 5,845,303 A | 12/1998 | Templeman | |
| 5,848,413 A | 12/1998 | Wolff | |
| 5,854,893 A | 12/1998 | Ludwig et al. | |
| 5,855,015 A | 12/1998 | Shoham | |
| 5,859,967 A | 1/1999 | Kaufeld | |
| 5,870,454 A | 2/1999 | Dahlen | |
| 5,870,549 A | 2/1999 | Bobo, II | |
| 5,870,552 A | 2/1999 | Dozier et al. | |
| 5,872,845 A | 2/1999 | Feder | |
| 5,872,926 A | 2/1999 | Levac et al. | |
| 5,881,233 A | 3/1999 | Toyoda et al. | |
| 5,892,591 A | 4/1999 | Anglin, Jr. et al. | |
| 5,892,909 A | 4/1999 | Grasso | |
| 5,893,908 A | 4/1999 | Cullen et al. | |
| 5,903,723 A | 5/1999 | Beck et al. | |
| 5,907,598 A | 5/1999 | Mandalia et al. | |
| 5,911,776 A | 6/1999 | Guck | |
| 5,917,615 A | 6/1999 | Reifman et al. | |
| 5,930,493 A | 7/1999 | Ottessen et al. | |
| 5,933,412 A | 8/1999 | Choudhury et al. | |
| 5,933,490 A | 8/1999 | White et al. | |
| 5,937,041 A | 8/1999 | Cardillo, IV et al. | |
| 5,937,161 A | 8/1999 | Mulligan | |
| 5,937,162 A | 8/1999 | Funk | |
| 5,940,476 A | 8/1999 | Morganstein et al. | |
| 5,940,598 A | 8/1999 | Strauss et al. | |
| 5,944,786 A | 8/1999 | Quinn | |
| 5,945,989 A | 8/1999 | Freishtat et al. | |
| 5,946,386 A | 8/1999 | Rogers et al. | |
| 5,958,016 A | 9/1999 | Chang et al. | |
| 5,960,085 A | 9/1999 | de la Huerga | |
| 5,961,582 A | 10/1999 | Gaines | |
| 5,963,618 A | 10/1999 | Porter | |
| 5,963,892 A | 10/1999 | Tanaka et al. | |
| 5,970,490 A | 10/1999 | Morgenstern | |
| 5,978,813 A | 11/1999 | Foltz et al. | |
| 5,987,504 A | 11/1999 | Toga | |
| 5,987,508 A | 11/1999 | Agraharam et al. | |
| 5,991,292 A | 11/1999 | Focsaneanu et al. | |
| 5,996,006 A | 11/1999 | Speicher | |
| 5,999,525 A | 12/1999 | Krishnaswamy et al. | |
| 5,999,594 A | 12/1999 | Mizoguchi et al. | |
| 5,999,965 A | 12/1999 | Kelly | |
| 6,009,173 A | 12/1999 | Sumner | |
| 6,009,469 A | 12/1999 | Mattaway et al. | |
| 6,014,668 A | 1/2000 | Tabata et al. | |
| 6,020,980 A | 2/2000 | Freeman | |
| 6,023,345 A | 2/2000 | Bloomfield | |
| 6,023,700 A | 2/2000 | Owens et al. | |
| 6,025,931 A | 2/2000 | Bloomfield | |
| 6,028,679 A | 2/2000 | Murphy | |
| 6,032,192 A | 2/2000 | Wegner et al. | |
| 6,035,332 A | 3/2000 | Ingrassia, Jr. et al. | |
| 6,052,367 A | 4/2000 | Bowater et al. | |
| 6,052,442 A | 4/2000 | Cooper et al. | |
| 6,052,637 A | 4/2000 | Bowater et al. | |
| 6,055,530 A | 4/2000 | Sato | |
| 6,061,448 A | 5/2000 | Smith et al. | |
| 6,064,653 A | 5/2000 | Farris | |
| 6,064,723 A | 5/2000 | Cohn et al. | |
| 6,069,890 A | 5/2000 | White et al. | |
| 6,072,862 A | 6/2000 | Srinivasan | |
| 6,073,165 A | 6/2000 | Narasimhan et al. | |
| 6,084,892 A | 7/2000 | Benash et al. | |
| 6,084,952 A | 7/2000 | Beerman, Jr. et al. | |
| 6,085,101 A | 7/2000 | Jain et al. | |
| 6,097,797 A | 8/2000 | Oseto | |
| 6,108,329 A | 8/2000 | Oyama et al. | |
| 6,157,706 A | 12/2000 | Rachelson | |
| 6,167,253 A | 12/2000 | Farris et al. | |
| 6,181,781 B1 | 1/2001 | Porter | |
| 6,185,603 B1 | 2/2001 | Henderson et al. | |
| 6,192,407 B1 | 2/2001 | Smith et al. | |
| 6,208,638 B1 | 3/2001 | Rieley et al. | |
| 6,211,972 B1 | 4/2001 | Okutomi et al. | |
| 6,212,550 B1 | 4/2001 | Segur | |
| 6,215,858 B1 | 4/2001 | Bartholomew et al. | |
| 6,216,173 B1 | 4/2001 | Jones et al. | |
| 6,229,844 B1 | 5/2001 | Kong | |
| 6,233,318 B1 | 5/2001 | Picard et al. | |
| 6,240,445 B1 | 5/2001 | Kumar et al. | |
| 6,240,454 B1 | 5/2001 | Nepustil | |
| 6,246,983 B1 | 6/2001 | Zou et al. | |
| 6,256,115 B1 | 7/2001 | Adler et al. | |
| 6,259,533 B1 | 7/2001 | Toyoda et al. | |
| 6,263,064 B1 | 7/2001 | O'Neal et al. | |
| 6,266,160 B1 | 7/2001 | Saito et al. | |
| 6,278,532 B1 | 8/2001 | Heimendinger et al. | |
| 6,282,270 B1 | 8/2001 | Porter et al. | |
| 6,285,777 B2 | 9/2001 | Kanevsky et al. | |
| 6,288,799 B1 | 9/2001 | Sekiguchi | |
| 6,295,350 B1 | 9/2001 | Schreyer et al. | |
| 6,295,552 B1 | 9/2001 | Shibata | |
| 6,301,245 B1 * | 10/2001 | Luzeski et al. .............. | 370/352 |
| 6,301,339 B1 | 10/2001 | Staples et al. | |
| 6,304,636 B1 | 10/2001 | Goldberg et al. | |
| 6,314,425 B1 | 11/2001 | Serbinis et al. | |
| 6,330,070 B1 | 12/2001 | Toyoda et al. | |
| 6,330,079 B1 | 12/2001 | Dugan et al. | |
| 6,330,323 B1 | 12/2001 | Gottlieb et al. | |
| 6,334,142 B1 | 12/2001 | Newton et al. | |
| 6,339,591 B1 | 1/2002 | Migimatsu | |
| 6,339,780 B1 | 1/2002 | Shell et al. | |
| 6,341,160 B2 | 1/2002 | Tverskoy et al. | |
| 6,350,066 B1 | 2/2002 | Bobo, II | |

## US 7,895,306 B2

Page 4

| | | | |
|---|---|---|---|
| 6,356,356 B1 | 3/2002 | Miller, Jr. et al. | |
| 6,359,881 B1 | 3/2002 | Gerszberg et al. | |
| 6,360,256 B1 | 3/2002 | Lim | |
| 6,404,513 B1 | 6/2002 | Denker | |
| 6,411,696 B1 | 6/2002 | Iverson et al. | |
| 6,417,930 B2 | 7/2002 | Mori | |
| 6,430,272 B1 | 8/2002 | Maruyama et al. | |
| 6,486,895 B1 | 11/2002 | Robertson et al. | |
| 6,498,835 B1 | 12/2002 | Skladman et al. | |
| 6,510,438 B2 | 1/2003 | Hasegawa | |
| 6,564,321 B2 | 5/2003 | Bobo, II | |
| 6,597,688 B2 | 7/2003 | Narasimhan et al. | |
| 6,643,034 B1 | 11/2003 | Gordon et al. | |
| 6,690,480 B2 | 2/2004 | Maeda | |
| 6,742,022 B1 | 5/2004 | King et al. | |
| 6,775,264 B1 | 8/2004 | Kurganov | |
| 6,795,108 B2 | 9/2004 | Jarboe et al. | |
| 6,825,955 B1 | 11/2004 | Shibata | |
| 6,857,074 B2 | 2/2005 | Bobo, II | |
| 6,948,070 B1* | 9/2005 | Ginter et al. ................ | 713/193 |
| 2001/0014910 A1 | 8/2001 | Bobo, II | |
| 2003/0208688 A1 | 11/2003 | Bobo, II | |
| 2005/0050349 A1 | 3/2005 | Bobo, II | |
| 2008/0229182 A1 | 9/2008 | Hendricks et al. | |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 615 368 A2 | 2/1994 |
| EP | 0631419 A1 | 12/1994 |
| EP | 0835021 A1 | 4/1998 |
| EP | 0554456 A1 | 8/1998 |
| EP | 0760503 B1 | 8/2001 |
| EP | 1034651 B1 | 12/2006 |
| GB | 2024561 A | 1/1980 |
| GB | 2157117 A | 10/1985 |
| JP | 2237338 A | 9/1990 |
| JP | 04018844 A | 1/1992 |
| JP | 04111557 A | 4/1992 |
| JP | 04150351 A | 5/1992 |
| JP | 04256273 A | 9/1992 |
| JP | 4265040 A | 9/1992 |
| JP | 04290033 A | 10/1992 |
| JP | 04291858 A | 10/1992 |
| JP | 05233488 A | 9/1993 |
| JP | 05235997 A | 9/1993 |
| JP | 05244292 A | 9/1993 |
| JP | 05284326 A | 10/1993 |
| JP | 05316309 A | 11/1993 |
| JP | 06069956 A | 3/1994 |
| JP | 06164645 A | 6/1994 |
| JP | 06217069 A | 8/1994 |
| JP | 07023057 A | 1/1995 |
| JP | 07038689 A | 2/1995 |
| JP | 07058845 A | 3/1995 |
| JP | 07212393 A | 8/1995 |
| JP | 07250094 A | 9/1995 |
| JP | 07288543 A | 10/1995 |
| JP | 07288668 A | 10/1995 |
| JP | 08009092 A | 1/1996 |
| JP | 08111692 A | 4/1996 |
| JP | 08130601 A | 5/1996 |
| JP | 08237294 A | 9/1996 |
| JP | 08237297 A | 9/1996 |
| JP | 08256235 A | 10/1996 |
| JP | 08286091 A | 11/1996 |
| JP | 08336053 A | 12/1996 |
| JP | 09023273 A | 1/1997 |
| JP | 07170288 A | 2/1997 |
| JP | 09046369 A | 2/1997 |
| JP | 09102798 A | 4/1997 |
| JP | 09135266 A | 5/1997 |
| JP | 09163064 A | 6/1997 |
| JP | 09200251 A | 7/1997 |

| | | |
|---|---|---|
| JP | 09-223004 A | 8/1997 |
| JP | 09214559 A | 8/1997 |
| JP | 09214560 A | 8/1997 |
| JP | 4230661 B2 | 2/2009 |
| WO | WO 94006230 | 3/1994 |
| WO | WO 95001040 | 1/1995 |
| WO | WO 95006386 | 3/1995 |
| WO | WO 95020288 | 7/1995 |
| WO | 9531060 A1 | 11/1995 |
| WO | 9627160 A1 | 9/1996 |
| WO | 9627967 A1 | 9/1996 |
| WO | 9629663 A1 | 9/1996 |
| WO | 9629664 A1 | 9/1996 |
| WO | WO 96/34341 | 10/1996 |
| WO | 9638987 A1 | 12/1996 |
| WO | 9641463 A1 | 12/1996 |
| WO | 9710668 A1 | 3/1997 |
| WO | WO 97/09682 | 3/1997 |
| WO | 9718563 A2 | 5/1997 |
| WO | 9723082 A1 | 6/1997 |
| WO | 9723988 A1 | 7/1997 |
| WO | 9817041 A2 | 4/1998 |
| WO | 9823058 A2 | 5/1998 |
| WO | 9918716 A1 | 4/1999 |

### OTHER PUBLICATIONS

M. Frans Kaashoek, Dynamic Documents: Extensibilty and Adaptability in the www, Sep. 15, 1994, MIT Laboratory for Computer Science.*

Edwards, Nigel, ANSA Phase III, The working of client servers in WWW, Sep. 28 1994.*

Casson, Andrew, PLINTH, HTML and the World Wide Web, Aritficial Intelligence Applications Institute AIS-PR-56, Jul. 1994.*

Design of an Email System for Personal Computers, El-Hadidi, M.T., et.al., Eng. Journal of Qatar Univ, vol. 4, 1991, p. 51-69.*

MIME (Multipurpose Internet Mail Extension) Part One: Mechanism for Specifying and Describing the Format of Internet Messages Bodies. Borenstein, N. et. al., Bellcore, Internet Draft: MIME, Apr. 1993.*

"Plaintiff's Opening Markman Brief" in *j2 Global Communications, Inc.* v. *CallWave, Inc.*, CA 04-7068 DDP AJWx.

"Plaintiff's Opposition Markman Brief" in *j2 Global Communications, Inc.* v. *CallWave, Inc.*, CA 04-7068 DDP AJWx.

"Defendant CallWave, Inc.'s Opening Claim Construction Brief" in *j2 Global Communications, Inc.* v. *CallWave, Inc.*, CA 04-7068 DDP AJWx.

"Defendant CallWave's Opposition to Plaintiff j2's Opening Markman Brief" in *j2 Global Communications, Inc.* v. *CallWave, Inc.*, CA 04-7068 DDP AJWx.

J. Duffy, "IBM's SAA Gets Voice: Company to Expland Enterprise Networking Horizons," Computer Systems News, p. 1, May 14, 1990.

E Spire, "Fax->E-mail" Google Groups, http://groups-beta.google.com/group/comp/acom.telecom, Dec. 20, 1995.

Plaintiff's Opposition Claim Construction Brief in *j2 Global Communications, Inc.* v *Venali, Inc.*, cv 04-1172 DDP AJWx.

Brief in Opposition to Plaintiff j2's Opening Claim Construction Brief in *j2 Global Communications, Inc.* v *Venali, Inc.*, cv 04-1172 DDP AJWx.

Plaintiff's Opening Claim Construction Brief in *j2 Global Communications, Inc.* v *Venali, Inc.*, cv 04-1172 DDP AJWx.

Opening Claim Construction Brief in *j2 Global Communications, Inc.* v *Venali, Inc.*, cv 04-1172 DDP AJWx.

Docket Report from cv 04-1172 DDP AJWx.

"Invalidity Contentions of Defendant Protus IP Solutions, Inc." in *j2 Global Communications, Inc.* v. *Protus IP Solutions, Inc.*, Case No. 6:08-cv-211-LED-JDL.

"Defendant Captaris, Inc.'s, Local Patent Rule 3-3 Invalidity Contentions" in *j2 Global Communications, Inc.* v. *Captaris, Inc.*, Case No. 6:08-cv-262 (LED).

"Defendant Easylink Service International Corporation's Invalidity Contentions under P.R. 3-3" in *j2 Global Communications, Inc.* v. *Easylink Service International Copration*, Case No. 6:08-cv-263.

Deixler, Lyle; Fax Forges Ahead; Teleconnect; v. 14 n 11, p. 25(12).

Fax Solutions; Lan Times, v.13 n 21, p. 123(5).

Guide to Intelligent Least Cost Routing, Right Fax, Inc.

Guide to Internet Faxing, Right Fax, Inc.

Hertzoff, Ira; AT&T Global Messaging , The At&T EasyLink Services Sourcebook; Ch. 6, p. 107-47.

Mendel, Brett; Net Faxing Awaits Its Day; Lan Times, Dec. 9, 1996, v13 n 27 p. 25(2).

Beware the Fax Beast, Network World Reprint; vol. 12, # 48.

Rightfax Introduces New Fax Server Designed for the Enterprise; Rightfax News Release.

Rightfax Poised for Internet Faxing; Rightfax News Release.

Rightfax Ships Internet Connectivity Module for Lan Fax Software; Rightfax News Release.

Guo Zhen Sheng, et al., "Internet-Based Mail Fax Gateway Technology", 1997 IEEE International Conference on Intelligent Processing Systems, Oct. 28-31, Beijing, China 97TH8335 vol. 2 of 2 pp. 1607-161.

Savetz, Kevin; Faxing From the Internet; Tricks of the Internet Gurus, CH. 6. pp. 165-174.

RightFAX E-mail Gateway Guide, 1996.

Castelle FaxPress Internet Faxing White Paper, Dec. 9, 1997.

Castelle FaxPress End User Features, Dec. 9, 1997.

Castelle FaxPress The Integrated Network Fax Server, Dec. 9, 1997.

Castelle FaxPress Network Diagram, Dec. 16, 1997.

Castelle FaxPress Lotus cc-Mail Gateway, Dec. 9, 1997.

Castelle FaxPress Lotus Notes Gateway, Dec. 9, 1997.

Castelle FaxPress Exchange Direct, Dec. 9, 1997.

Castelle Infopress Press Release: New Castelle System Merges Web, Fax, E-Mail and Phone for Universal Document Access/Delivery, Oct. 28, 1996.

FAXSAV, Rebiller/Reseller Manual, 1997.

FAXSAV Launches Serverlink 1997.

Simeonov, P.L., A Distributed Intelligent Network Approach to Bridge Switching . . . , Computer Comms. & Networks, 1997.

Hoffmann, P., Integrating Telephony and Internet, IEEE Conference on Protocols for Multimedia Systems . . . 1997.

Tanenbum, A.S., Computer Networks, 3rd Edition, 1996.

Boran.com, IT Security Cookbook-Firewalls.

Cormen, T.H., Introduction to Algorithms, 8th Printing, 1992.

Patterson, D.A., Computer Organization & Design: The Hardware/Software Interface, 2nd, 1998.

Malamud, C, RFC 1528 Priciples of Operation for the TPC. INT Subdomain: Remote Printing- Technical Procedures, Oct. 1993 ("Malamud 1").

Malamud, C, RFC 1530 Priciples of Operation for the TPC. INT Subdomain: Remote Printing- Technical Procedures, Oct. 1993 ("Malamud 2").

Rose, M.T., The Internet Message: Closing the Book with Electronic Mail, 1993.

Toyoda, K., RFC 2305 A Simple Mode of Facsimile Using Internet Mail, Mar. 1998.

Berners-Lee, T., Hypertext Transfer Protocols—HTTP/1.0 Network Working Group Internet Draft, Dec. 1994.

Luotonen, A., CERN httpd Reference Manual: A Guide to a World-Wide Web Hyper Text Daemon, May 1994.

December, J., The World Wide Web Unleashed, 1994.

Microsoft Corporation, Microsoft Internet Information Server Technical Articles Web Services Frequently Asked Questions, 1997.

RightFax Installation & Administration Guide, Version 3.5 1994.

RightFax Installation & Administration Guide, Version 3.51 1994.

RightFax Installation & Administration Guide, Version 3.0 1993.

RightFax User's Guide, V. 3.5 1994.

RightFax E-mail Gateway Guide 1996.

RightFax Web Client Installation and Administration Guide, Version 1.1 1997.

An Introduction to Database Systems vol. II, Chapters 7 & 8.

The DCA/Intel Communicating Applications Specification. InstantCom/ESL.

Delrina WinFax Pro 4.0 User's Guide.

Delrina WinFax Pro 4.1 Set-Up Guide.

Delrina WinFax Pro 4.1 for Networks User's Guide.

FaxBack InForms Reference Guide.

CallXpress3 Unified Messaging To Be Fully Compatible with Windows 95 and Microsoft Mail Server.

Applied Voice Technology Announces New Version of its Award-Winning Voice and Call Processing System CallXpress3.

Applied Voice Technology Announces CallXpress3 Release 4.0.

Low Cost Messaging the LAN Fax Way (McCusker).

Surprise! Fax Servers Smarten Up (Levine).

Pursuing One Peripheral (Blankenhorn).

What's Ahead for PC/Fax (Cook).

Meet the Intranet.

Now Your PC Can "Read" Your Fax (Stevens).

Intel NET SatisFaxtion Software User's Guide.

Intel FAXability Plus Software for Windows User's Guide.

Intel Net SatisFaxtion Software Installation Guide for Net Ware networks.

FaxPress Supervisor's Guide.

Commerce Path Messaging Connector.

WinFax Pro's User Guide v. 3.0.

RightFax E-mail Gateway Guide 3.51ightFax E-mail Gateway Guide 3.51.

Commerce Path Net Link User Guide.

WinFax Pro for Networks 4.1 Marketing Brochure.

"Defendant Comodo Communications, Inc.'s Local Patent Rule 3-3 Invalidity Contentions" in *j2 Global Communications, Inc.* v. *Comodo Communications, Inc.*, Case No. 6:08-cv-275.

Coresoft Technologies, CenterPoint Fax Server Administration Guide, 1997-98.

Russell Kahan, "Fax over IP" Gale Group, Inc., 1997.

Shung-Foo Yu et al., "A multimedia gateway for phone/fax and MIME mail" 20 Computer Communications, pp. 615-627, Aug. 1997.

Ahmed Patel, et al., "A technique for multi-network access to multimedia messages" 20 Computer Communications 324-337, Jul. 1997.

Daniel J. Rosenbaum, "The E-Mail Route to Fax" 7 PC World, pp. 168-170, Jun. 1989.

Hertzoff, Ira; AT&T Global Messaging, The AT&T EasyLink Services Sourcebook; Ch. 7, p. 149-176.

Hertzoff, Ira; AT&T Global Messaging, The AT&T EasyLink Services Sourcebook; Ch. 10, p. 219-249.

Hertzoff, Ira; AT&T Global Messaging, The AT&T EasyLink Services Sourcebook; Ch. 11, p. 251-283.

Hertzoff, Ira; AT&T Global Messaging, The AT&T EasyLink Services Sourcebook; Ch. 12, p. 285-319.

RightFax Installation & Administration Guide, 1996.

RightFax E-mail Gateway Guide, 1994, v.3.51.

RightFax Users Guide, 1996.

M. Sirbu, "RFC1049—Content-type header field for Internet messages", [Online], Mar. 1988, XP-002542400 retrieved from the Internet: URL: http://www.faqs.org/rfcs/rfc1049.html>.

Luca Manunza, "SOFT>WebMail, a www interface to e-mail" [Online], Mar. 10, 1995, XP-002542401 retrieved from the Internet: URL: http://scout.wisc.edu/Projects/PastProjects/NH/95-03/95-03-20/0010.html>.

Luca Manunza, "SOFT>WebMail, a www interface to e-mail -1st public release" [Online], Mar. 30, 1995, XP-002542402 retrieved from the Internet: URL: http://scout.wisc.edu/Projects/PastProjects/NH/95-03/95-03-30/0009.html>, [retrieved on Aug. 20, 2009].

Craig McFetridge, "Server Side Includes" [Online], Feb. 19, 1995, XP-002542447 retrieved from the Internet: URL: http://http-server.carleton.ca/~dmcfet/html/ssi.html>.

Daniel W. Conolly, "Towards closure on HTML" [Online], Apr. 7, 1994, XP-002542403 retrieved from the Internet: URL: http://www.w3.org/MarkUp/html-spec/html-direction.html>.

Jason Levitt, "A Push-Button Solution" [Online], Apr. 3, 1995, XP-002542404 retrieved from the Internet: URL: http://www.informationweek.com/521/21oljl.htm:jsession-id=LN00SMQTD0F01QE1GHPSKH4ATMY32JVN>.

ScanFX-Scanning Hardware for Internet E-Mail; Aug. 1990.

European Search Report, Application No. EP 09165919; Sep. 1, 2009.

Final Office Action, U.S. Appl. No. 11/608,986; Nov. 6, 2009.

Non-Final Office Action, U.S. Appl. No. 11/608,986; Jul. 23, 2009.

Final Office Action, U.S. Appl. No. 11/608,999; Sep. 18, 2009.

Non-Final Office Action, U.S. Appl. No. 11/608,999; Mar. 17, 2009.

Duval & Main, Exploring the Internet with Mosaic, Library Software Review, vol. 13, No. 4, Winter 1994, Sage Periodicals Press, pp. 269-279.

Ed Liebowitz, The Dialogic VAR Parade: Open Voice Processing for Art Dealers, the Blind, the Dallas Cowboys and the RBOCs, in Teleconnect, Apr. 1993, v11, n4, p. 40(3) (2 pgs).

e-mail-fax-120.hqx, E-Mail Fax Search Results, Shareware.com, Nov. 24, 1996, <http://www.search.shareware.com/code/...mail+fax+&category=All- Categories> (2 pgs).

F. Sung and M. Johnson, Faxing Docs in HP MPower, Apr. 1994 Hewlett-Packard Journal, pp. 53-61.

Facsimile and Voice System Links Offices, Electronics, Jan. 18, 1979 (379-100), S9054 0063, pp. 69-70.

FaxMail Networks for Windows v5.13: Fax over a network, ZD NET Software Library, Nov. 14, 1996, http://search2zdnet.com/cgi-bin/texis/swlib/hotfiles/search.html. (3 pgs).

FAXSAV, faxMAILER—How FaxMailer Works, (1996) (2 pgs).

FAXSAV, The FaxSav Technology Edge: A White Paper, (1997) (5 pgs).

French, Fox, Maly & Selman, Wide Area Technical Report Service—Technical Reports Online, Communications on the ACM, Apr. 1995, ACM 002-0782/95/0400 pp. 124-127.

G. Vaudreuil, Enhanced Mail System Status Codes, Network Working Group, Internet Draft, Jan. 1996 (13 pgs).

Graphics, Visualization and Usability Center GSQL-ORACLE Backend, Date Unknown (2 pgs).

GSQL in detail, Dec. 1993 (4 pgs).

Halama, James R., et al., An Interactive Electronic Bulletin Board Implementation for Mosaic and HTTP Server, EBBSMos.htm, Date Unknown (4 pgs).

Helen Plotkin, The Forum Newsreader Plans, Apr. 5, 1994, http://mathforum.org/kb/plaintext.jspa?          messageID=1072645 (2 pgs).

Hong, J., et al.; Personal Electronic Notebook with Sharing, Center for Design Research, Stanford University, 1080-1383/95, 1995 IEEE, pp. 88-94.

Intel NET SatisFAXtion Software Fax Administration Guide, Sep. 1993 (150 pgs).

J. Kent, Browsing Electronic Mail: Experiences interfacing a Mail System to a DBMS. Proceedings of the Fourteenth International Conference on Very Large Data Base. Los Angeles, CA. pp. 112-123, 1988.

James C. French, John C. Knight and Allison L. Powell, Applying Hypertext Structures to Software Documentation, Department of Computer Science, University of Virginia, Charlottesville, VA 22903, U.S.A., Information Processing & Management, vol. 33, No. 2, 1997, pp. 216-231.

James C. French, John C. Knight and Allison L. Powell, Hypertext Structures and Software Documentation, Technical Report CS-96-04, Department of Computer Science, University of Virginia, Feb. 1996, pp. 1-16.

James R. Davis and Carl Lagoze, Dienst, A Protocol for a Distributed Digital Document Library, Xerox, Cornell, Jul. 1994, pp. 1-14.

James R. Davis, A server for a distributed digital technical report library, Xerox Corporation, Design Research Institute, 502 Theory Center, Cornell University, Ithaca, NY 14853, Jan. 15, 1994, pp. 1-8.

James R. Davis, Creating a Networked Computer Science Technical Report Library, Design Research Institute, Xerox Corporation, 502, Rhodes Hall, Cornell University, Ithaca, NY 14853, davis@dri.cornell.edu, D-Lib Magazine, Sep. 1995 (5 pgs).

Jay C. Weber, The Webmaster's Starter Kit, WWW Fall '94 paper, Enterprise Integration Technologies Corporation (4 pgs).

Jay Scott, The Perly Gateway, version 0.1, Subject, README, Sep. 2, 1994 (7 pgs).

Jeff Symoens, Lotus' InterNotes Web Publisher speeds migration to the Web, Internet utility, Version 1.0, Lotus Development Corp., Cambridge, Mass, INFOWORLD Apr. 24, 1995, p. 122.

Jennifer Myers, Announcing Version 0.11 of 'readcomics', a Common Gateway Interface World Wide Web Gateway to clari.feature.dilbert, Jan. 17, 1994, v. 0.11, Article 9857, comp.lang.perl. (6 pgs).

Jennifer Myers, readcomics, Jan. 18, 1994, v. 0.12 (4 pgs).

JFAX Personal Telecom, Free Downloads JFAX Communicator Software!, Dec. 4, 1996 <http://www.jfax.net/software.htm/> (2 pgs).

JFAX Personal Telecom, Get All Your Voice-Mail and Faxes in your E-Mail, Dec. 4, 1996, <http://www.jfax.net/> (4 pgs).

US 7,895,306 B2

Page 7

JFAX Personal Telecom, What the Media Says About JFAX Personal Telecom, Oct. 31, 1996, <http://www.fax.net/> (2 pgs).

John Taylor, Building FAX into Computer Telephony Applications, Computer Telephony Expo 95, Computer Fax 1995—Making Technology Work, GammaLink, A Dialogic Company and Attachments (233 pages).

K. Moore, Representation of Non-ASCII Text in Internet Message Headers, Internet RFC 1342, Sep. 1993 (7 pgs).

K. Tomaru, Electronic Mail Systems, Japan Annual Review in Electronics, Computers & Telecommunications, 1983, vol. 9, Telecommunication Technology, pp. 283-290.

Kennie Jones, NASA Langley Research Center, Tops On-Line—Automating the Construction and Maintenance of HTML Pages, 1994 (7 pgs).

Kevin Bachus, Touring Lotus Notes: The New World of Group ware, Windows Magazine, Mar. 1, 1994 Issue 503, CMP Publications, Inc., Factiva, Inc. (7 pgs).

Kevin Brown, et al., Mastering Lotus Notes, Sybex, Inc., 1995, p. 939.

L. Orozco-Barbosa, et al., Design and Performance Evaluation of Intelligent Multimedia Services, pp. 219-232, v. 20 (1997), Computer Communications.

Larry Masinter, Document Management, Digital Libraries and the Web, Jun. 9, 1995, pp. 1-22, http://larry.masinter.net/docweblib.html.

Lotus Fax Server Gives cc:Mail, Notes Users better fax gateway services, Jan. 30, 1995, v. 17, n. 5, 1995 WLNR 5462216, InfoWord Media Group, Inc. (2 pgs).

Lotus Notes for Dummies, IDG Books Worldwide, Inc., 1994, p. 295, (3 pgs).

Lotus Ships Notes: Document Imaging Release 2; Office Imaging Made Easy and Affordable, 1,189 words, Nov. 22, 1993, Business Wire (4 pgs).

M. Horton, Standard for Interchange of USENET Messages, RFC 850 (Jun. 1983) (19 pgs).

M. Kaashoek, et al, Dynamic Documents Mobile Wireless Access to the WWW, MIT Laboratory for Computer Science (6 pgs).

M. Kauffman, Computer Based Fax Processing The Kauffman Group, Cherry Hill, N.J. First edition 1994, pp. 19-20, 61, 75, 77-79 (ISBN 0-936648-62-7) (10 pgs).

Mail2HTML.c, Convert Mail/News Files to HTML (Prototype), Jan. 21, 1993, Rev. 0.3 (17 pgs).

Marc Andreessen, NSCA Mosaic for X 2.0 available, www.talk newsgroup message, Nov. 10, 1993 (8 pgs).

Marc Vanheyningen, New service: The Unified CS TR Index, Computer Science Dept., Indiana University, May 20, 1993 (2 pgs).

Marc Vanheyningen, The Unified Computer Science Technical Report Index: Lessons in Indexing Diverse Resources, http://www.CS.indiana.edu/paper/paper.html, UCSTRI Paper for WWW94 Chicago (8 pgs).

Mark Miller, Defusing TCPIP-based internet problems in layers, Network World, Oct. 17, 1994 (6 pgs).

MHonArc: Index Page Customization, v1.0.0, http://ftp.sunet.se/pub/text-processing/sgml/DTD2HTML/ file MHonArc 1.0.0.tar.gz. (5 pgs).

Michael L. Nelson, et al., Electronic Document Distribution Design of the Anonymous FTP Langley Technical Report Server, NASA Technical Memorandum 4567, Mar. 1994, National Aeronautics and Space Administration, Langley Research Center, Hampton, Virginia (20 pgs).

Michael L. Nelson, et al., The Widest Practicable Dissemination: The NASA Technical Report Server, Computers in Aerospace 10 (Mar. 28-30, 1995, San Antonio, TX), 1995, American Institute of Aueronautics and Astronautics, Inc. (14 pgs).

Michael L. Nelson, et al., The World Wide Web and Technology Transfer at NASA Langley Research Center, Proceedings of The Second International World Wide Web Conference: Mosaic and the Web (Oct. 19-21, 1994, Chicago, IL, pp. 701-710), NASA Langley Research Center (12 pgs).

Michael L. Nelson, et al., World Wide Web Implementation of the Langley Technical Report Server, Sep. 5, 1994, NASA Technical Memorandum 109162, National Aeronautics and Space Administration, Langley Research Center, Hampton, Virginia (31 pgs).

NCSA http—Unified Directory Structure (1 pg).

NCSA httpd—Compatibility (1 pg).

NCSA httpd—Document Root Directive.html (1 pg).

NCSA httpd—Security (1 pg).

NetScan Kofax: The Easy Way to Share a Scanner, 1996, KOFAX, http://www.netscan.kofax.com. (10 pgs).

On the Road: The Telephone User Interface, Computer Telephony Expo in Dallas, TX, Mar. 7, 1995, Applied Voice Technology, Inc. (4 pgs).

Pacific Bell Information Services, 1994 Annual Report, p. 6 (1994) (10 pgs).

Pascal R. Chesnais, et al., The Fishwrap Personalized News System, MIT Media Laboratory, Cambridge, Massachusetts. (8 pgs).

Putting Paper Documents in the World-wide Web, Myka, 1994 Article (10 pgs).

QNet Business Plan, Apr. 1987 (104 pgs).

R. Thomas, Hands-On Wizard's Grabbag Getting A Bang Out Of Unix, UnixWorld's Open Computing, vol. 11, No. 1 (Jan. 1, 1994) (5 pgs).

Reg Quinton, Sendmail—Care and Feeding, Mar. 24, 1992, pp. 1-44, Computing and Communications Services, The University of Westerr, Ontario, Canada (23 pgs).

Rightfax Administration Guide, 1997 (168 pgs).

RightFAX Brings Award-Winning LAN Fax Software to Multi-Platform Environments With Web Client Module; Fax Server Software Leader Debuts New Module; Adds Remote Internet Connectivity to LAN Fax Server, Business Wire, Copyright 1996, Article dated: Oct. 11, 1996, pp. 1-2 (2 pgs).

RightFAX E-Mail Gateway Guide, 1997, RightFAX, Inc. (114 pgs).

RightFAX Web Client. (RightFAX's RightFAX Web Client) (Product Announcement) Software Magazine, Apr. 1, 1997 (1 pg).

Ronald J. Vetter, et al., Mosaic and the World-Wide Web, pp. 49-57, Computer Practives, Oct. 1994 (9 pgs).

S. Broadhead, Getting Your Fax Straight: Getting Ahead of the Game with Fax Server Technology Network Computing, Feb. 1997 (Abstract) (2 pgs).

S. Leffler, FlexFAX—A Network-based Facsimile Service, Silicon Graphics, Inc., Nov. 27, 1990 (9 pgs).

S.C. Hui, et al., A Distributed Fax Messaging System, Proc. Of IEEE Singapore Intl. Conf. on Networks/Intl Conf on Information Engineering 1995, pp. 393-397, IEEE Cat. No. 95TH8061 (6 pgs.).

S.D. Reilly, et al., Increasing the Computational Potential of the World Wide Web, Feb. 9, 1996, pp. 1-28, Dept. of Computer Science School of Engineering and Applied Science University of Virginia, Charlottesville, VA (30 pgs).

Stephen Laudermilk, Trio Set to Roll Out Fax Gear for LANs, PC Week, Aug. 17, 1992, pp. 39, 47.

Steve Putz, Design and Implementation of the System 33 Document Service, ISTL-NLTT-93-07-01, 1993, Xerox Corporation (116 pgs).

Steve Putz, Interactive Information Services Using World-Wide Web Hypertext, First International Conference on World-Wide Web, (May 25-27, 1994), Apr. 20, 1994, pp. 1-10, ISTL-QCA-1994-03-01, Xerox Corporation (10 pgs).

Steve Putz, System 33 Gateway Code, Gateway Software, http://www.w3.org/Gateways/System33/gateway (14 pgs).

Stuart Melnitsky, Fax Server Face Off, Network World, Apr. 15, 1996, pp. 43-45.

T. Kasper, Untangling the Web—The role of text retrieval in a hypertext environment (6 pgs).

The Geometry Forum News Gateway—A Newsreader for the World Wide Web, Forum Outposts: The Geometry Forum Newsletter (Dec. 30, 1994) (2 pgs).

V. Kumar, et al., A SHARed Web to Support Design Teams, Enterprise Integration Technologies Corp., 1994 IEEE, 0-8186-5705-7/94, pp. 178-182.

Wayne Rash, The Fax of the Matter, Information Week, May 20, 1996 (4 pgs).

XDOC Data Format, Technical Specification, Mar. 1995, pp. 1:1-2:10, vol. 3.0, The Document Company Xerox (15 pgs).

Yahoo, Inc., NetScan Kofax, Yahoo! Internet Life, Jan. 1997, p. 73, vol. 3, No. 1I, <http://www.yil.com/>.

Yvonee L. Lee, Vendors to Showcase Integrated Telephony Solutions, InfoWorld, Mar. 4, 1996, p. 18(1), vol. 18, No. 10, Gale Group (1 pg).

500 Tips—Communications, Windows Magazine, CPM Publications, Dec. 1, 1993 (7 pgs).

European Search Report in European Patent Application No. EP 09165919, Sep. 1, 2009 (59 pgs).

Notice of Reason for Rejection, Dispatch Date: Jan. 17, 2008, Patent Application No. JP 2000-515377 (5 pgs).

Invalidity Contentions of Defendant Packetel, Inc. In *j2 Global Communications, Inc.* v. *Packetel, Inc.*, Case No. 09cv3240 DDP (AJWx) (20 pgs).

Invalidity Contentions of Defendant Protus IP Solutions, Inc. In *j2 Global Communications, Inc.* v. *Protus IP Solutions, Inc.*, Case No. 05cv5610 DDP (AJWx) (109 pgs).

Invalidity Contentions of Defendant Venali, Inc. In *j2 Global Communications, Inc.* v. *Venali, Inc.*, Case No. 04cv1172 DDP (AJWx) (52 pgs).

Defendant Captaris, Inc.'s Invalidity Contentions in *j2 Global Communications, Inc.* v. *Captaris, Inc.*, Case No. 09cv4150 DDP (AJWx) (217 pgs) (2 Parts).

Defendant Easylink Service International Corporation's Invalidity Contentions as to '638 in *j2 Global Communications, Inc.* v. *Easylink Service International Copration*, Case No. 09cv4189 DDP (AJWx) (17 pgs).

Defendant Easylink Service International Corporation's Invalidity Contentions as to '688 & '132 in *j2 Global Communications, Inc.* v. *Easylink Service International Copration*, Case No. 09cv4189 DDP (AJWx) (92 pgs).

Defendant EasyLink's Opening Claim Construction Brief in *j2 Global Communications* v *Easylink Services Intl. Corp.*, 09cv4189 (55 pgs).

Defendant Venali's Opening Claim Construction Brief in *j2 Global Communications, Inc.* v *Venali, Inc.*, cv 04-1172 DDP AJWx.pdf (filed Jun. 11, 2010) (42 pgs).

Plaintiff j2 Global Communications, Inc.'s Opening Markman Brief filed on Jun. 11, 2010, *j2 Global Comm., Inc.* v. *Venali, Inc.*, Case No. 04-1172 DDP (AJWx) (DI 160) (65 pgs).

Consolidated Opening Claim Construction Brief of Defendants Captaris, Inc., Packetel, Inc. and Protus IP Solutions filed in *j2 Global Communications, Inc.* v *Protus*, et al., filed Jun. 11, 2010, *j2 Global Communications* v *Protus* 05cv5610 (61 pgs).

Reply Claim Construction Brief of Defendants Captaris, Inc., Packetel, Inc. and Protus IP Solutions filed Jul. 1, 2010 *j2 Global Comm* v *Protus* 05cv5610 (52 pgs).

Defendant Venali's Reply Claim Construction Brief, filed Jul. 1, 2010 *j2 Global* v *Venali* 04cv1172 (43 pgs).

Plaintiff's Reply Markman Brief filed on Jul. 1, 2010, *j2 Global Comm., Inc.* v. *Protus IP Solutions, Inc.*, Case No. 05-5610 DDP (AJWx) (67 pgs).

Easylink's Reply to Plaintiff's Claim Construction Brief filed Jul. 1, 2010 09cv4189 (46 pgs).

*j2 Global Communications, Inc.* v *Callwave, Inc.* CV04-7068 DDP AJWx Callwave Inc.'s Responses to Plaintiff's First Set of Interrogatories Dec. 22, 2004 (12 pgs).

*j2 Global Communications, Inc.* v *Callwave, Inc.* CV04-7068 DDP AJWx Callwave Inc.'s Second Set of Supplemental Responses to Plaintiff's First Set of Interrogatories Mar. 30, 2005 (11 pgs).

*j2 Global Communications, Inc.* v *Venali, Inc.*, cv 04-1172 DDP AJWx, Defendant Venali, Inc.'s Objections and Responses to Plaintiff j2 Global Communications, Inc.'s First Set of Interrogatories (Nos. 1-7) (19 pgs).

*j2 Global Communications, Inc.* v *Venali, Inc.*, cv 04-1172 DDP AJWx, litigation cover page (1 pg).

Notice of Dismissal filed on Sep. 22, 2005, *j2 Global Comm., Inc.* v. *Mijanda, Inc.*, Case No. 05-5300 DDP (AJWx) (DI 15) (1 pg).

Venali's Answer to First Amended Complaint for Patent Infringement and Counterclaim for Declaration of NonInfringement and Invalidity filed on Nov. 1, 2004, *j2 Global Comm., Inc.* v. *Venali, Inc.*, Case No. 04-1172 DDP (AJWx) (14 pgs).

Declaration of Professor Walter Scacchi Regarding Defendant CallWave, Inc.'s Opening Claim Construction Brief in *j2 Global Communications, inc.* v. *Call Wave, Inc.*, CV 04-7068 VBKx (20 pgs).

Defendant Protus' Answer and Counterclaim in *j2 Global Comm.* v *Protus* 05cv5610 filed Nov. 12, 2005 (12 pgs).

Administrator's Guide Lotus Notes Release 3, Lotus Development Co., 1993, p. 5-54 (1 pg).

AltaVista Search, SHAREWARE.COM: Search results, Dec. 5, 1996 (2 pgs).

Andrew Eberle, The Path Taken: Inbound Routing, Network World, May 2, 1994, p. 101.

AT & T EasyLink Services and Visioneer offer easy integration of paper and electronic documents, 863 words, Nov. 28, 1994, Business Wire (2 pgs).

(Author Unknown) Call and Voice Processing PC Board Roundup (Buyers Guide), in Teleconnect Library, Inc., Dec. 1995, v13, n12, pp. 1-6.

B. Kantor, et al., Network News Transfer Protocol, A Proposed Standard for the Stream-Based Transmission of News, RFC 977, Feb. 1986 (29 pgs).

B. Mathers, et al., Lotus Notes Internet Cookbook, last modified Apr. 21, 1995, (25 pgs).

Brian Gaines, Supporting Collaboration through Multimedia Digital Document Archives, Knowledge Science Institute, University of Calgary, Version 1.0, Nov. 1994, pp. 1-53.

C. Hunt, TCP IP Network Administration, Jan. 1994 (268 pgs).

Carl Lagoze and James R. Davis, Dienst: An Architecture for Distributed Document Libraries, Communications of the ACM, Apr. 1995, vol. 38, No. 4, p. 47.

Carl Lagoze, Erin Shaw, James R. Davis, Dean B. Krafft, Dienst: Implementation Reference Manual, May 5, 1995, Computer Science Department, Cornell University, Ithaca, NY 14853, lagoze@cs.cornell.edu, shaw@cs.cornell.edu, dean@cs.cornell.edu, Xerox Corporation, Design Research Institute, Cornell University, Ithaca, NY 14853, davis@dri.cornell.edu., pp. 1-69.

Carlos A. Varela, et al., Providing Data on the Web: From Examples to Programs, Second International WWW Conference, Oct. 17-21, 1994, pp. 1-12, http://fiaker.ncsa.uiuc.edu:8080/WWW94-2/paper.html.

Chane Fullmer, et al., A TCP/IP Network Facsimile System Built from Publicly Available Software, in Association for Computing Machinery (ACM),1992, ref. No. 089791-472-4/ 92/0002/525, pp. 525-529.

Comp.mail.mime meta-FAQ: Help for MIME problems, downloaded from the Internet at www.cis.ohio-state.edu/text/ faq/usenet/mail/mimefaq/partl/faq.html. Aug. 8, 1997 (8 pgs).

D. Nakamura, AT&T Introduces Most Comprehensive Fax-to_Data Service dated Feb. 22, 1996, downloaded from Internet at http://www.att.com/press/0296/960222.ela.html on May 16, 1997 (2 pgs).

Dale Doughtery, et al., The Mosaic Handbook for Microsoft Windows, Oct. 1994, O'Reilly & Associates (239 pgs).

Definity Communications System Generic 3 Feature Description, AT & T, 555-230-204, Issue 3, Mar. 1996 (1254 pages) (8 Parts).

"JFAX Personal Telecom—Plug a Phone Into Your E-Mail", downloaded from the Internet at www.jfax.com, on Oct. 31, 1996.

Public-Key Cryptography Standards (PKCS) , Revised Nov. 1, 1993, downloaded from the Internet at www.ftp.rsa.com on Oct. 1, 1998.

*j2 Global Communications, Inc.* v. *Venali, Inc.* CV04-1172 DDP AJWx Venali, Inc.'s Answer to First Amended Complaint for Patent Infringement and Counterclaim for Declaration of Noninfringement and Invalidity Nov. 1, 2004.

*j2 Global Communications, Inc* v. *CallWave, Inc.*, CV04-7068 DDP AJWx Callwave Inc.'s Second Set of Supplemental Responses to Plaintiff's First Set of Interrogatories Mar. 30, 2005.

Request for Ex Parte Reexamination Transmittal Form Control No. 90007539.

Request for Reexamination Control No. 90007539 Detailed Statement in Support of Request for Reexamination of United States Patent No. 6,350,066.

Fax Mailbox, PC Today, Sep. 1994.

The Multimedia Fax-MIME Gateway, Patel, Henderson and Georganas, IEEE Multimedia, Winter 1994.

Multimedia Fax-MIME Interworking, Patel, Henderson and Georganas, IEEE, 1994.

MIME (Multipurpose Internet Mail Extension) Part One: Mechanisms for Specifying and Describing the Format of Internet Message Bodies, Internet 1521 (obsoletes 1342), Sep. 1993.

MIME (Multipurpose Internet Mail Extension) Part Two: Message Header Extensions for Non-ASCII Text, Internet RFC 1522 (obsoletes 1342), Sep. 1993.

Lotus Turns Up the Heat on Microsoft Exchange Rival, Network Week, Jan. 27, 1994.

Novell Inc. to Demonstrate Alex, a Universal In-box That Will Accept and Store Email, Voice mail and Faxes, Computer Reseller News, Feb. 6, 1995.

IBM Softward Allows Phone Messages to be Retrieved Via Internet World Wide Web, press release, Nov. 28, 1995 (announcing product release).

MSN Hotmail Continues to Grow Faster than Any Media Company in History, press release, Feb. 8, 1999 (referencing Jul. 4, 1996 launch of Hotmail, which permitted users to access e-mail accounts through web browsers).

Nakagawa et al., *Development of a Network Model for the Total Health Care Management on Multi-vendor Environment*, in Multimedia Communications, 1994, Multimedia '94, 5th IEEE COMSOC Int'l Workshop, pp. 5/2/1-5/2/4 (workshop occurred May 16-19, 1994).

Sanjiv P. Patel, *The Multimedia Fax-MIME Gateway*, in IEEE Multimedia 1(4), pp. 64-70 (Winter 1994).

Larry M. Edwards, *E-Mail: Industry is Posting Impressive Gains*, in San Diego Business Journal, pp. 1 and 17-18 (Mar. 7, 1994).

Author Unknown, *Lotus Executive Details Notes' Work Flow Strategy; Pinches Notes as a platform for Third-Party Products*, in Network World, p. 27 (Sep. 6, 1993).

Paul Kinnucan, *What's New in the Fax World*, in Systems Integration, vol. 23, No. 2 at 50 (Feb. 1990).

Author Unknown, *Delrina WinFax Pro 4.0 Focuses on Ease of Use*, Newsbytes, Post-Newsweek Business Information, Inc., (Mar. 15, 1994).

David Morgenstern, *DynaWeb Server Holds SGML Books: Web Server Queries, Converts to HTML*, in MacWeek, vol. 8, No. 28 at 12 (Jul. 11, 1994).

Gord Nickerson, *WorldWideWeb: hypertext from CERN*, Computers in Libraries, vol. 12, No. 11, p. 75 (1992).

Mario J. Silva and Randy H. Katz, *The case for Design Using the World Wide Web*, in 32nd ACM/IEEE Design Automation Conference, (1995).

Barry Fenn and Hermann Maurer, *Harmony on an Expanding Net*, ACM Interactions, pp. 27-38 (Oct. 1994).

B. S. Kaliski Jr., "An Overview of the PKCS Standards," RSA Laboratories Technical Note, RSA Security, Inc. Public-Key Cryptography Standards (PKCS), Revised Nov. 1, 1993.

"Keys and Certificates," downloaded from the Internet at www.elock.com.

"Cryptography Systems," downloaded from the Internet at www.elock.com.

"How does the S/MIME encryption and digital signature process work?" downloaded from the Internet at www.worldtalk.com, on Jul. 25, 1999.

"PKCS #7: Cryptographic Message Syntax Standard," RSA Laboratories Technical Note, Version 1.5, RSA Security, Inc. Public-Key Cryptography Standards (PKCS), Revised Nov. 1, 1993, downloaded from the Internet at www.ftp.rsa.com, on Oct. 1, 1998.

C. Ellison, et al., "Default Protecting Secret Keys with Personal Entropy," Mar. 3, 1999.

"Chaffing and Winnowing: Confidentiality without Encryption," downloaded from the Internet at www.theory.lcs.mit.edu, on Jul. 13, 1999.

"S/MIME Or OpenPGP? How Will You Secure Your E-mail?" downloaded from the Internet at www.worldtalk.com.

"S/MIME Frequently Asked Questions," downloaded from the Internet at www.rsa.com, on Jul. 23, 1999.

"S/MIME Frequently Asked Questions," downloaded from the Internet at www.rsa.com, on Nov. 16, 1999.

"SDML-Signed Document Markup Language," W3C Note Jun. 19, 1998, downloaded from the Internet at www.23.org, on Oct. 28, 1998.

C. R. Baudoin, "The Sematech Electronic Mail System," Proceedings of the Digital Equipment Computer Users Society, pp. 221-231, US.A., Spring 1989.

N. Borenstein, et al., "A Multi-media Message System for Andrew," USENIX Winter Conference, Dallas, TX, pp. 37-42, Feb. 9-12, 1988.

J. Donahue, et al., "Walnut: Storing Electronic Mail in a Database," XEROX PARK, CSL-85-9, Nov. 1985.

K. Hofrichter, et al., "The BERKOM Multimedia-Mail Teleservice," Proceedings of the Fourth Workshop on Future Trends of Distributed Computing Systems, Lisbon, Portugal, pp. 23-30, Sep. 22-24, 1993.

J. K. Reichard, "Leveraging E-Mail," PC Magazine: 241, 244 and 245 (May 1995), et al., "Browsing Electronic Mail: Experiences Interfacing a Mail System to a DBMS," Proceedings of the Fourteenth International Conference on Very Large Data Bases, Los Angeles, CA, pp. 112-123, 1988.

E. Moeller, et al., "The BERKOM multimedia-mail teleservice," Computer Communications, vol. 18:2, pp. 89-102, Feb. 1995.

J. Pan, "Internet Security & Firewall Issues for NIIIP Virtual Enterprise," NIIIP OMB Meeting, Boca Raton, FL, Jan. 23-25, 1996.

A. Poggio, et al., "CCWS: A Computer-Based, Multimedia Information System," Multimedia Communications, pp. 92-103, Oct. 1985.

A. Reinhardt, "Smarter E-Mail Is Coming," BYTE Magazine, pp. 90-108, Mar. 1993.

J. Rosenberg, et al., "An Overview of the Andrew Message System," Computer Communications Review, vol. 17:5, pp. 99-108, Apr. 1988.

S. Sakata, et al., "A Distributed Interoffice Mail System," Multimedia Communications, pp. 106-116, Oct. 1985.

S. J. Vaughan-Nichols, "Internet Publishing Tools Proliferate," BYTE Magazine, Mar. 1995.

"Microsoft Messaging Application Pro Interface (MAPI)," downloaded from the Internet at www.mmicrosoft.com/win32dev/apiext/mapiwp.html.

"Novell Announces *SoftSolutions* 4.1", PR Newswire, New Orleans, LA, May 9, 1995.

"How Posta Works", downloaded from the Internet at www.tumbleweed.com/posta/posta_overview.html.

"Overview of the Trans-Virtual Enterpriser Server," Product Overview.

V. Gay, et al, "Conception of a Multimedia Electronic Mail Based on Standards," Proceedings of the Fourth Workshop on Future Trends of Distributed Computing Systems, Sep. 22-24, 1993.

J. Postel, et al. "An Experimental Multimedia Mail System," ACM Transactions on Office Information Systems, vol. 6, No. 1, Jan. 1988.

"Web Mail", InformationWeek, pp. 120, Dec. 16, 1996.

"Ipswitch Delivers the First Internet-Ready Messaging Server for Windows NT That Allows Access to E-mail via the Web", PR Newswire, pp. 1209NEM007, Dec. 9, 1996.

"Hotmail Introduces Hotmail WebCourier Direct Content Delivery Service", Business Wire, pp. 02030123, Mar. 1997.

J. B. Postel, RFC0821, Simple Mail Transfer Protocol, HTTP://rfc-koeln.de/html, 80 pages, Aug. 1982.

M. Sherman, et al., "Allocation of User-Interface Resources in the Andrew Toolkit," International Conference on Multimedia Information Systems, pp. 261-272, 1991.

M. Sherman, et al., "Building Hypertext on a Multimedia Toolkit: An Overview of Andrew Toolkit Hypermedia Facilities," Proceedings of the First European Conference on Hypertext, pp. 13-24, France, Nov. 1990.

V. S. Wheatman, "Sorting Through the Secure Messaging Maze," Messaging Magazine, downloaded from the Internet at www.ema.org/html/pubs/mmv4n2/msgmaze.htm, Mar.-Apr. 1998.

"The Andrew Messages System," downloaded from the Internet at www.cs.cmu.edu/afs/cs.cmu.edu/project/atk-ftp/web/ams.html.

"Facts on File re: Andrew," downloaded from the Internet at www.cs.cmu.edu:80/afs/cs.cmu.edu/project/atk-ftp/web/faxonfile.html.

"Welcome to the Andrew Consortium," www.cs.cmu.edu:80/afs/cs.cmu.edu/project/atk-ftp/web/andrew-home.html.

"The Andrew Publication Archive," ftp.andrew.cmu.edu/pub/AUIS/PAPERS/REDME.

"Bibliography of Publications on the Andrew User Interface System," ftp.andrew.cmu.edu/pub/AUIS/PAPERS/BIBLIOGRAPHY.

J. Peek, et al., "MH & xmh, Email for Users & Programmers," O' Reilly & Associates, Inc., Sebastopol, CA, 1995.

B. Costales, et al., "sendmail," O' Reilly & Associates, Inc., Sebastopol, CA, 1993.

K. S. Morris, "A Technical Overview of MIME," Web Developer's Journal Archives, Mar. 1995.

"Comp.mail.mime FAQ (frequently asked questions list)," downloaded from the Internet at www.cis.ohio-state.edu/text/faq/usenet/mail/mime-faq/part1/faq.html, Jun. 11, 1997.

"Composing and Sending MIME Message," downloaded from the Internet at www.gieldasgarage.com/mlh/cosemine.htm.

"Reading MIME Messages," downloaded from the Internet at www.gieldasgarage.com/mlh/cosemime.htm.

"Comp.mail.mime frequently asked questions list (FAQ) (1/3)," downloaded from the Internet at www.tu-chemnitz.de/-fri/mime/FAQ-1.htmk, Sep. 4, 1994.

M. Grand, "MIME Overview," downloaded from the Internet at www.mindspring.com/-mgrand/mime.html, revised Oct. 26, 1993.

D. W. Connolly, "A Formalism for Internet Information References," downloaded from the Internet at www.w3.org/People/Connolly/drafts/formalism.txt.

G. Vaudreuil, "The Multipart/Report Content Type for the Reporting of Mail System Administrative Messages," Network Working Group, Internet Draft, Sep. 1995.

G. Vaudreil, "Enhanced Mail System Status Codes," Network Working Group, Internet Draft, Jun. 1995.

K. Moore, et al., "An Extensible Message Format for Delivery Status Notifications," Network Working Group, Internet Draft, Sep. 1995.

"Information Technology—Text and office systems—Distributed-office-applications model—Part 1: General model," International Standard ISO / IEC 10031-1:1-73, 1991 (E).

"Information Technology—Text and Office Systems—Distributed Office Applications Model: Part 2; Distinguished-object-reference and Associated Procedures," International Standard ISO/IEC 10031-2:1-13, 1991.

D. H. Crocker, "Standard for the Format of ARPA Interent Text Message," RFC 822, 1982.

J. Klensin, "Simple Mail Transfer Protocol," Internet Draft, draft-ietf-drums-02.txt, May 21, 1996.

US 7,895,306 B2

Page 11

N. Borenstein et al., "MIME: Mechanisms for Specifying and Describing the Format of Internet Message Bodies," Network Working Group, RFC 1341, Jun. 1992.

N. Borenstein, "MIME (Multipurpose Internet Mail Extensions) Part One: Mechanism for Specifying and Describing the Format of Internet Message Bodies," Network Working Group, RFC 1521, Sep. 1993.

K. Moore, "MIME (Multipurpose Internet Mail Extensions) Part Two: Message Header Extensions for Non-ASCII Text," Network Working Group, RFC 1522, Sep. 1993.

N. Freed, et al., "Definition of the URL MIME External-Body Access-Type," Network Working Group, Internet Draft of RFC 2017 (Apr. 11, 1995) [see also N. Freed et al., "Definition of the URL MIME External-Body Access-Type," Network Working Group, RFC 2017, Oct. 1996.

C. Manros, "New Internet Mail Functionality for Delivery Status Notifications," Messaging Magazine, Jul./Aug. 1995.

K. Moore, "SMTP Service Extension for Delivery Status Notifications," Network Working Group, Internet-Draft of RFC 1891, Sep. 21, 1995.

Internet Engineering Task Force, R. Braden (ed.), "Requirements for Internet Hosts—Application and Support," Network Working Group, RFC 1123, Oct. 1989.

J. Myers, et al., "Post Office Protocol—Version 3," Network Working Group, RFC 1725, Nov. 1994.

K. Sollins et al., "Functional Requirements for Uniform Resource Names," Network Working Group, RFC 1737 Dec. 1994.

T. Berners-Lee, "Universal Resource Identifier in WWW, A Unifying Syntax for the Expression and Address of Objects on the Network as used in the World-Wide Web," Network Working Group, RFC 1630, Jun. 1994.

T. Berners-Lee, et al., "Uniform Resource Locators (URL)," Network Working Group, RFC 1738, Dec. 1994.

T. Berners-Lee, et al., "Hypertext Markup Language-2.0," Network Working Group, RFC 1866, Nov. 1995.

S. Bradner, "The Internet Standards Process—Revision 3," Network Working Group, RFC 2026, Oct. 1996.

J. K. Reynolds, et al., "The DARPA Experimental Multimedia Mail System," Computer: 82-89, 1985.

S. Baker, "Hypertext Browsing on the Internet," UNIX Review : 21-27, 1994.

D.P. Dern, "Applying the Internet," BYTE Magazine, Feb. 1992.

K.M. Savetz, "Magazines Without Paper," BYTE Magazine, Sep. 1993.

S.J. Vaughan-Nichols, "The Web Means Business," BYTE Magazine, Nov. 1994.

A. Singleton, "The Virtual Storefront," BYTE Magazine, Jan. 1995.

J.R. Vacca, "Mosaic: Beyond Net Surfing," BYTE Magazine, Jan. 1995.

B. Smith, "Internet with Style," BYTE Magazine, Jan. 1995.

B. Smith, "Making the Internet Connection," BYTE Magazine, Jan. 1995.

B. Friesenhahn, "Build Your Own WWW Server," BYTE Magazine , Apr. 1995.

S.B. Jones, "Caught in the World Wide Web: MIT Moves Computer Documentation Online," Meet the Shadow Future: 187-189, 1994.

S. Baker, "Mosaic-Surfing at Home and Abroad," Meet the Shadow Future: 159-163, 1994.

R. J. Vetter et al., "Mosaic, HTML, and the World Wide Web," IEEE Computer, 27, 1994.

University of Cambridge Statistical Laboratory, "Using Mosaic for Xwindows," Internet Publication, Jul. 1994, downloaded from http://www.statslab.com.ac.uk.

"New Features in Mosaic 2.0," Internet Publication, downloaded from http://www.issi.com, Dec. 1994.

"World Wide Web Frequently Asked Questions," from URL http://sunsite.unc.edu/boutell/faq/www__faq.html, Dec. 9, 1994.

MHonArc Home Page updated Nov. 17, 1994 and MHonArc software manual published by Earl Hood <ehood@convex. com> Convex Computer Corporation, Richardson Texas.

C. Liu, et al., "Managing Internet Information Services," World Wide Web, Gopher, FTP, and more : 357-359, Dec. 1994.

J. December, et al., "The World Wide Web; Everything You Need to Master the Web!": 180-189-part I and 277-280 (part II), 1994.

T. Berners-Lee, et al., "Hypertext Markup Language (HTML); A Representation of Textual Information and Metainformation for Retrieval and Interchange," Internet Draft, IIIR Working Group, 1993.

K. Reichard, "Leveraging E-Mail," PC Magazine: 241, 244 and 245, May 1995.

"Lan-Aces, Inc. Announces Expanded Capabilities to Office-Logic Clerk Application," PR Newswire, May-Jun. 1994.

"Working with AT&T Easylink, An Effective Communication Solution for Business," PC Today 62, May 1995.

J. Davis, et al., "Drop-in Publishing With the World Wide Web," Computer Networks and IDSN Systems, 28, pp. 247-255, 1995.

K. Goldberg, "Beyond the Web: Manipulating the Real World," Computer Networks and ISDN Systems, 28, pp. 209-219, 1995.

A. N. Boston, et al., "Interactive species distribution reporting, mapping, and modelling using the World Wide Web," Computer Networks and ISDN Systems, 28, pp. 231-238, 1995.

T. W. Yan, et al., "From user access patterns to dynamic hypertext linking," Computer Networks and ISDN Systems, 28, pp. 1007-1014, 1996.

H. Pusch, "Design and implementation of a global reference mechanism for data objects," Computer Standards & Interfaces, 17, pp. 181-192, 1995.

B. Wiegel, "Secure External References in Multimedia Email Messages," 3rd ACM Conference on Computer and Communications Security, New Delhi, India, Mar. 14-16, 1996.

E. Levinson, "Exchanging SGML Documents Using Internet Mail and MIME," Computer Standards & Interfaces, 18, pp. 93-102, 1996.

E. Meyer, et al., "Borealis Image Server," Computer Networks and ISDN Systems, 28, pp. 1123-1137, 1996.

M. Rio, et al., "A framework for broadcasting and management of URIs," Computer Networks and ISDN Systems, 28, pp. 535-542, 1996.

Delrina Advertisement, 1994.

Cope, "Working with . . . Fax Mailbox," PCToday, vol. 8, Issue 9, Sep. 1994.

Warren, "Voice/fax Combos," Computer Telephony, Sep./Oct. 1994, p. 88.

Swartz, Barry K. and Stephen B. Weinstein, Dual-Media Messaging Using Screen Telephones on the Telephone Network, IEEE International Conference on Communications '93, May 23-26, 1993, pp. 1183-1188, Technical Program, Conference Record, vol. 2/3.

US 7,895,306 B2

Page 12

Borenstein, Nathaniel S., "Internet Multimedia Mail with MIME: Emerging Standards for Interoperability," Upper Layer Protocols, Architectures and Applications, 1992, pp. 183-192, Elsevier Science Publishers B.V. (North-Hollard).

Supplementary European Search Report in European Patent Application No. EP 96 91 3855, search results mailed Nov. 22, 2001.

Critical Path Data Sheet—Critical Path Notification Server, 2 pages, Dec. 2002r.

Critical Path Data Sheet—Critical Path Messaging Server, 2 pages, Dec. 2002r.

Critical Path Data Sheet—Critical Path Internet File Server, 2 pages, Dec. 2002r.

Critical Path Data Sheet—Critical Path Presentation Server, 2 pages, Dec. 2002r.

Critical Path Data Sheet—Critical Path SMS Access Server, 2 pages, 2002r.

Critical Path Data Sheet—Critical Path Calendar Server, 2 pages, Dec. 2002r.

Critical Path Data Sheet—Critical Path Personal Address Book Server, 2 pages, Dec. 2002r.

CP™ Meta-Directory Server, 4 pages, Jun. 2002r.

Critical Path Meta-Directory Server, 1 page, May 8, 2003 http://www.cp.net/solutions/metaDirectoryServer.html.

Tumbleweed Communications, 3 pages, May 8, 2003 http://www.tumbleweed.com/en/products/ime_overview.html.

Tumbleweed Communications, 1 page, May 8, 2003 http://www/tumbleweed.com/en/products/ime_product_architecture.html.

Tumbleweed Communications, 2 pages, May 8, 2003 http://www.tumbleweed.com/en/products/ime_for_automated_deliveries.html.

Tumbleweed Communications, 3 pages, May 8, 2003 http://www.tumbleweed.com/dy/print/.

Tumbleweed Communications, 1 page, May 8, 2003 http://www.tumbleweed.com/en/products/ime_portal_integration.html.

Tumbleweed Communications, 1 page, May 8, 2003 http://www.tumbleweed.com/en/products/ime_message_tracking.html.

Tumbleweed Communications, 2 pages, May 8, 2003 http://www.tumbleweed.com/dy/print/.

"Defendant CallWave's Supplemental Disclosures Pursuant FRCP 26(A)(1)" in *j2 Global Communications, Inc.* v. *CallWave, Inc.*, CV04-7068 DDP AJWx.

"Wide Area Networking Puts Remote Offices On-Line," Managing Office Technology, Sep. 1994, pp. 49-50, 52, vol. 39, USA.

M. Pop, "Comparative Study of Electronic Mail Systems," May 30, 1994.

H. Chan et al., "Integrated Telephone/Fax/Paging/Email Services over ATM/MAN-based Personal Communication Networks," Department of Electrical and Computer Engineering, The University of British Columbia, Vancouver, B. C., Canada.

Supplementary European Search Report in European Patent Application No. EP 98 95 0859, Jun. 3, 2005.

International Search Report in International Application No. PCT/US98/20732, Jan. 25, 1999.

International Search Report in International Application No. PCT/US96/05910, Jul. 18, 1996.

Office Action in U.S. Appl. No. 11/608,986, inventor Charles R. Bobo II, issued on Jan. 4, 2010.

* cited by examiner



**FIG 1**

**FIG 2**



FIG 3



**FIG 4A**



**FIG 4B**



FIG 5

FIG 6

Fax from (404)249-6801



NetOffice, Inc.

From: Charles R. Bobo, II.
Pages: 3
Date: May 31, 1995

## RETRIEVE VOICE FILE
*170*

## CONVERT AD/PCM TO WAV
*172*

## UPDATE HTML LISTING
*174*

### FIG 8

## RETRIEVE DATA FILE
*180*

## UPDATE HTML LISTING
*182*

### FIG 9

### FIG 7



**FIG 10**



**FIG 11**



FIG 12



**FIG 13**



**FIG 14**



FIG 15

FIG 16A

FIG 16B



FIG. 17



320

321

USER SENDS REQUEST
FOR SEARCH

322

MSDS SENDS USER A
SEARCH QUERY FORM

323

USER ENTERS SEARCH
PARAMETERS IN
SEARCH QUERY FORM

324

MSDS PERFORMS
REQUESTED SEARCH
FOR FILES/MESSAGES

325

MSDS SENDS USER
RESULTS OF SEARCH

326

USER SELECTS DESIRED
FILES/MESSAGES

FIG. 18

# SEARCH QUERY

RECIPIENT'S NAME:

DOCUMENT TYPE:

DATE:

TIME:

CALLING NO.:

FILE SIZE:

NO. PAGES:

DOCUMENT NO.:

OTHER FIELD:

SEARCH        RECENT FILES

STORED        HELP
SEARCH GROUP

# FIG. 19

Appx0391

# SEARCH QUERY

RECIPIENT'S NAME: [                    ] ⬇

DOCUMENT TYPE: [ FACSIMILE ] ⬇

DATE: [                    ]

TIME: [                    ]

CALLING NO.: [ (404) 249-6801 ]

FILE SIZE: [                    ]

NO. PAGES: [                    ]

DOCUMENT NO.: [                    ]

OTHER FIELD: [                    ] ⬇

SEARCH                RECENT FILES

STORED SEARCHES        HELP

# FIG. 20

# SEARCH RESULTS

1.   Document No. 11:  Facsimile from (404) 249-6801 to Jane Doe on May 31, 1995, 3 Pages

2.   Document No. 243:  Facsimile from (404) 249-6801 to Jane Doe on July 16, 1995, 21 Pages

3.   Document No. 1002:  Facsimile from (404) 249-6801 to Jane Doe on January 1, 1996, 10 Pages

SAVE SEARCH AS:   | CHARLES R. BOBO FACSIMILES |

HELP

FIG. 21

# STORED
# SEARCHES

1.  CHARLES R. BOBO FACSIMILES

2.  CHARLES R. BOBO VOICE MESSAGES

3.  DATA TRANSFERS FROM 01-01-96 TO 6-01-96 TO JANE DOE

HELP

# FIG. 22

US 7,895,306 B2

1

## SYSTEMS AND METHODS FOR STORING, DELIVERING, AND MANAGING MESSAGES

This is a continuation of application Ser. No. 10/436,798 filed 12 May 2003 now U.S. Pat. No. 6,857,074, which is a continuation of application Ser. No. 09/840,759 filed 23 Apr. 2001, U.S. Pat. No. 6,564,321, which is a continuation of application Ser. No. 09/186,595 filed 5 Nov. 1998, U.S. Pat. No. 6,350,066, which is a continuation of application Ser. No. 08/944,741 filed 6 Oct. 1997, U.S. Pat. No. 5,870,549, which is a continuation-in-part of application Ser. No. 08/431,716 filed 28 Apr. 1995, U.S. Pat. No. 5,675,507.

### FIELD OF THE INVENTION

This invention relates to system(s) and method(s) for storing and delivering messages and, more particularly, to system(s) and method(s) for storing messages and for delivery the messages through a network, such as the Internet, or a telephone line to an intended recipient. In another aspect, the invention relates to system(s) and method(s) for storing, delivering, and managing messages or other files, such as for archival purposes or for document tracking.

### BACKGROUND OF THE INVENTION

Even though the facsimile machine is heavily relied upon by businesses of all sizes and is quickly becoming a standard piece of office equipment, many businesses or households cannot receive the benefits of the facsimile machine. Unfortunately, for a small business or for a private household, a facsimile machine is a rather expensive piece of equipment. In addition to the cost of purchasing the facsimile machine, the facsimile machine also requires toner, paper, maintenance, as well as possible repairs. These expenses may be large enough to prevent many of the small businesses and certainly many households from benefiting from the service that the facsimile machine can provide. For others who are constantly traveling and who do not have an office, it may be impractical to own a facsimile machine. In fact, the Atlanta Business Chronicle estimates that 30% of the small businesses do not have any facsimile machines. Therefore, many businesses and households are at a disadvantage since they do not have access to a facsimile machine.

Because a facsimile machine can be such an asset to a company and is heavily relied upon to quickly transmit and receive documents, a problem exists in that the machines are not always available to receive a facsimile message. At times, a facsimile machine may be busy receiving another message or the machine may be transmitting a message of its own. During these times, a person must periodically attempt to send the message until communication is established with the desired facsimile machine. This inability to connect with a facsimile machine can be frustrating, can consume quite a bit of the person's time, and prevent the person from performing more productive tasks. While some more advanced facsimile machines will retry to establish communication a number of times, a person will still have to check on the facsimile machine to ensure that the message was transmitted or to re-initiate the transmission of the message.

In addition to labor costs and a reduction in office efficiency, a facsimile machine may present costs to businesses that are not readily calculated. These costs include the loss of business or the loss of goodwill that occurs when the facsimile machine is not accessible by another facsimile machine. These costs can occur for various reasons, such as when the facsimile machine is out of paper, when the machine

2

needs repairing, or when the facsimile machine is busy with another message. These costs occur more frequently with some of the smaller businesses, who are also less able to incur these expenses, since many of them have a single phone line for a telephone handset and the facsimile machine and thereby stand to lose both telephone calls and facsimile messages when the single line is busy. In fact, the Atlanta Business Chronicle estimated that fewer than 5% of the small businesses have 2 or more facsimile machines. Many of the larger companies can reduce these losses by having more than one facsimile machine and by having calls switched to another machine when one of the machines is busy. These losses, however, cannot be completely eliminated since the machines can still experience a demand which exceeds their capabilities.

A main benefit of the facsimile machine, namely the quick transfer of documents, does not necessarily mean that the documents will quickly be routed to the intended recipient. The facsimile machines may be unattended and a received facsimile message may not be noticed until a relatively long period of time has elapsed. Further, even for those machines which are under constant supervision, the routing procedures established in an office may delay the delivery of the documents. It is therefore a problem in many offices to quickly route the facsimile message to the intended recipient.

The nature of the facsimile message also renders it difficult for the intended recipient to receive a sensitive message without having the message exposed to others in the office who can intercept and read the message. If the intended recipient is unaware that the message is being sent, other people may see the message while it is being delivered or while the message remains next to the machine. When the intended recipient is given notice that a sensitive message is being transmitted, the intended recipient must wait near the facsimile machine until the message is received. It was therefore difficult to maintain the contents of a facsimile message confidential.

In an office with a large number of employees, it may also be difficult to simply determine where the facsimile message should be routed. In light of this difficulty, some systems have been developed to automatically route facsimile messages to their intended recipient. One type of system, such as the one disclosed in U.S. Pat. No. 5,257,112 to Okada, can route an incoming call to a particular facsimile machine based upon codes entered with telephone push-buttons by the sender of the message. Another type of system, such as the one disclosed in U.S. Pat. No. 5,115,326 to Burgess et al. or in U.S. Pat. No. 5,247,591 to Baran, requires the sender to use a specially formatted cover page which is read by the system. This type of system, however, burdens the sender, who may very well be a client or customer, by requiring the sender to take special steps or additional steps to transmit a facsimile message. These systems are therefore not very effective or desirable.

Another type of routing system links a facsimile machine to a Local Area Network (LAN) in an office. For instance, in the systems disclosed in the patents to Baran and Burgess et al., after the system reads the cover sheet to determine the intended recipient of the facsimile message, the systems send an E-mail message to the recipient through the local network connecting the facsimile machine to the recipient's computer. Other office systems, such as those in U.S. Pat. No. 5,091,790 to Silverberg and U.S. Pat. No. 5,291,546 to Giler et al., are linked to the office's voice mail system and may leave a message with the intended recipient that a facsimile message has been received. Some systems which are even more advanced, such as those in U.S. Pat. No. 5,317,628 to Misholi et al. and U.S. Pat. No. 5,333,266 to Boaz et al., are connected

US 7,895,306 B2

3

4

to an office's local network and provide integrated control of voice messages, E-mail messages, and facsimile messages.

The various systems for routing facsimile messages, and possibly messages of other types received in the office, are very sophisticated and expensive systems. While these office systems are desirable in that they can effectively route the messages at the office to their intended recipients, the systems are extremely expensive and only those companies with a great number of employees can offset the costs of the system with the benefits that the system will provide to their company. Thus, for most businesses, it still remains a problem to effectively and quickly route messages to the intended recipients. It also remains a problem for most businesses to route the messages in a manner which can preserve the confidential nature of the messages.

Even for the businesses that have a message routing system and especially for those that do not have any type of system, it is usually difficult for a person to retrieve facsimile messages while away from the office. Typically, a person away on business must call into the office and be informed by someone in the office as to the facsimile messages that have been received. Consequently, the person must call into the office during normal business hours while someone is in the office and is therefore limited in the time that the information in a facsimile message can be relayed.

If the person away on business wants to look at the facsimile message, someone at the office must resend the message to a facsimile machine accessible to that person. Since this accessible machine is often a facsimile machine at another business or at a hotel where the person is lodging, it is difficult for the person to receive the facsimile message without risking disclosure of its contents. Further, since someone at the person's office must remember to send the message and since someone at the accessible facsimile machine must route the message to the person away from the office, the person may not receive all of the facsimile messages or may have to wait to receive the messages.

The retrieval of facsimile messages, as well as voice mail messages, while away from the office is not without certain costs. For one, the person often must incur long distance telephone charges when the person calls the office to check on the messages and to have someone in the office send the messages to another facsimile. The person will then incur the expenses of transmitting the message to a fax bureau or hotel desk as well as the receiving location's own charges for use of their equipment. While these charges are certainly not substantial, the charges are nonetheless expenses incurred while the person is away from the office.

Overall, while the facsimile machine is an indispensable piece of equipment for many businesses, the facsimile machine presents a number of problems or costs. Many businesses or households are disadvantaged since they are unable to reap the benefits of the facsimile machine. For the businesses that do have facsimile machines, the businesses must incur the normal costs of operating the facsimile machine in addition to the costs that may be incurred when the facsimile machine or machines are unable to receive a message. Further, the facsimile messages may not be efficiently or reliably routed to the intended recipient and may have its contents revealed during the routing process. The costs and problems in routing a facsimile message are compounded when the intended recipient is away from the office.

Many of the problems associated with facsimile messages are not unique to just facsimile messages but are also associated with voice mail messages and data messages. With regard to voice messages, many businesses do not have voice mail systems and must write the message down. Thus, the person away from the office must call in during normal office hours to discover who has called. The information in these messages are usually limited to just the person who called, their number, and perhaps some indication as to the nature of the call. For those businesses that have voice mail, the person away from the office must call in and frequently incur long distance charges. Thus, there is a need for a system for storing and delivery voice messages which can be easily and inexpensively accessed at any time.

With regard to data messages, the transmission of the message often requires some coordination between the sender and the recipient. For instance, the recipient's computer must be turned on to receive the message, which usually occurs only when someone is present during normal office hours. Consequently, the recipient's computer is usually only able to receive a data message during normal office hours. Many households and also businesses may not have a dedicated data line and must switch the line between the phone, computer, and facsimile. In such a situation, the sender must call and inform the recipient to switch the line over to the computer and might have to wait until the sender can receive the message. The retransmission of the data message to another location, such as when someone is away from the office, only further complicates the delivery. It is therefore frequently difficult to transmit and receive data messages and is also difficult to later relay the messages to another location.

A standard business practice of many companies is to maintain records of all correspondence between itself and other entities. Traditionally, the correspondence that has been tracked and recorded includes letters or other such printed materials that is mailed to or is from a company to the other entity. Although tracking correspondence of printed materials is relatively easy, non-traditional correspondence, such as facsimile messages, e-mail messages, voice messages, or data messages, are more difficult to track and record.

For example, facsimile messages may be difficult to track and record since the messages may be received on thermal paper, which suffers from a disadvantage that the printing fades over time. Also, accurate tracking of facsimile messages is difficult since the facsimile messages may only be partially printed at the facsimile machine or the messages may be lost or only partially delivered to their intended recipients. Facsimile messages also present difficulties since they are often delivered within an organization through different channels than ordinary mail and thus easily fall outside the normal record keeping procedures of the company.

Voice mail messages are also difficult to track and record. Although voice messages can be saved, many voice mail servers automatically delete the messages after a certain period of time. To maintain a permanent record of a voice message, the voice message may be transcribed and a printed copy of the message may be kept in the records. This transcribed copy of the voice message, however, is less credible and thus less desirable than the original voice message since the transcribed copy may have altered material or may omit certain portions of the message.

In addition to facsimile and voice mail messages, data messages are also difficult to track and record. A download or upload of a file may only be evident by the existence of a file itself. A file transfer procedure normally does not lend itself to any permanent record of what file was transferred, the dialed telephone number, the telephone number of the computer receiving the file, the time, or the date of the transfer. It is

US 7,895,306 B2

**5**

therefore difficult to maintain accurate records of all data transfers between itself and another entity.

## SUMMARY OF THE INVENTION

It is an object of the invention to reliably and efficiently route messages to an intended recipient.

It is another object of the invention to route messages to the intended recipient while maintaining the contents of the message confidential.

It is another object of the invention to enable the intended recipient to access the messages easily and with minimal costs.

It is a further object of the invention to permit the simultaneous receipt of more than one message on behalf of the intended recipient.

It is a further object of the invention to enable the intended recipient of a message to access the message at any time and at virtually any location world-wide.

It is yet a further object of the invention to enable the intended recipient of a message to browse through the received messages.

It is yet a further object of the invention to quickly notify an intended recipient that a message has been received.

It is still another object of the invention to receive messages of various types.

It is still another object of the invention to deliver messages according to the preferences of the intended recipient.

It is still a further object of the invention to record and track correspondence, such as facsimile messages, voice mail messages, and data transfers.

Additional objects, advantages and novel features of the invention will be set forth in the description which follows, and will become apparent to those skilled in the art upon reading this description or practicing the invention. The objects and advantages of the invention may be realized and attained by the appended claims.

To achieve the foregoing and other objects, in accordance with the present invention, as embodied and broadly described herein, a system and method for storing and delivering messages involves receiving an incoming call and detecting an address signal associated with the incoming call, the address signal being associated with a user of the message storage and delivery system. A message accompanied with the address signal is then received and converted from a first file format to a second file format. The message is stored in the second file format within a storage area and is retrieved after a request has been received from the user. At least a portion of the message is then transmitted to the user over a network with the second file format being a mixed media page layout language.

In another aspect, a network message storage and delivery system comprises a central processor for receiving an incoming call, for detecting an address signal on the incoming call, for detecting a message on the incoming call, and for placing the message in a storage area. The address signal on the incoming call is associated with a user of the network message storage and delivery system. A network server receives the message from the storage area, converts the message into a mixed media page layout language, and places the message in the storage area. When the network server receives a request from the user over the network, the network server transmits at least a portion of the message over the network to the user.

Preferably, the network storage and delivery system can receive facsimile messages, data messages, or voice messages and the network is the Internet. The messages are con-

**6**

verted into a standard generalized mark-up language and the user is notified that a message has arrived through E-mail or through a paging system. A listing of the facsimile messages may be sent to the user in one of several formats. These formats include a textual only listing or a listing along with a full or reduced size image of the first page of each message. A full or reduced size image of each page of a message in the listing may alternatively be presented to the user.

According to a further aspect, the invention relates to a system and method for managing files or messages and involves storing message signals in storage and receiving requests from a user for a search. The search preferably comprises a search query that is completed by a user and supplied to a hyper-text transfer protocol deamon (HTTPD) in the system. The HTTPD transfers the request through a common gateway interface (CGI) to an application program which conducts the search. The results of the search are preferably returned through the HTTPD to the computer in the form of a listing of all messages or files satisfying the search parameters. The user may then select one or more of the listed messages or files and may save the search for later references.

## BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated in, and form a part of, the specification, illustrate an embodiment of the present invention and, together with the description, serve to explain the principles of the invention. In the drawings:

FIG. 1 is a block diagram illustrating the connections of a message storage and delivery system MSDS;

FIG. 2 is an overall flow chart of operations for transmitting a message to the MSDS of FIG. 1;

FIG. 3 is an overall flow chart of operations for receiving a message stored at the MSDS of FIG. 1;

FIGS. 4(A) and (B) are flowcharts of operations for generating HTML files according to user preferences;

FIG. 5 is a flowchart of operations for generating requested information;

FIG. 6 is a flowchart of operations for converting a facsimile message into HTML files;

FIG. 7 is an exemplary display of a first page of a facsimile message according to a fourth display option;

FIG. 8 is a flowchart of operations for converting a voice message into an HTML file;

FIG. 9 is a flowchart of operations for converting a data message into an HTML file;

FIG. 10 is a flowchart of operations for detecting a type of call received at the MSDS 10;

FIG. 11 is a flowchart of operations for receiving voice messages;

FIG. 12 is a flowchart of operations for interacting with an owner's call;

FIG. 13 is a more detailed block diagram of the MSDS 10;

FIG. 14 is a block diagram of the central processor in FIG. 13;

FIG. 15 is a block diagram of the Internet Server of FIG. 13;

FIGS. 16(A) and 16(B) depict possible software layers for the Internet Server of FIG. 13;

FIG. 17 is a diagram of a data entry for a message signal;

FIG. 18 is a flowchart of a process for sending a search query, for conducting a search, and for returning results of the search to a computer through the Internet;

FIG. 19 is an example of a search query form for defining a desired search;

FIG. 20 is an example of a completed search query;

US 7,895,306 B2

7

8

FIG. **21** is an example of a set of search results returned to the computer in response to the search query of FIG. **20**; and

FIG. **22** is an example of a listing of stored searches.

DETAILED DESCRIPTION OF THE PREFERRED
EMBODIMENTS

Reference will now be made in detail to the preferred embodiments of the invention, examples of which are illustrated in the accompanying drawings.

With reference to FIG. **1**, a message storage and delivery system (MSDS) **10** is connected to a central office **20** of the telephone company through at least one direct inward dialing (DID) trunk **15**. With each call on the DID trunk **15**, an address signal indicating the telephone number being called is provided to the MSDS **10**. The DID trunk **15** can carry a large number of telephone numbers or addresses. Preferably, the DID trunk **15** comprises a number of DID trunks **15** connected in parallel between the central office **20** and the MSDS so that the MSDS **10** can simultaneously receive more than one call and, moreover, can simultaneously receive more than one call for a single telephone number or address.

The central office **20** is connected to a number of third parties. For instance, the central office **20** may be connected to a facsimile machine **24**, a telephone set **26**, and to a computer **28** with each connection being made through a separate telephone line. While a single computer **28** is shown in the figure, the single computer **28** may actually represent a local area network which is connected through the central office **20** to the MSDS **10**. Although the facsimile machine **24**, telephone set **26**, and computer **28** have been shown on separate lines, it should be understood that one or more of these devices could share a single line.

The MSDS **10** is also connected to a network, preferably the Internet World Wide Web **30**. Although the Internet **30** has been shown as a single entity, it should be understood that the Internet **30** is actually a conglomeration of computer networks and is a constantly evolving and changing structure. The MSDS **10** therefore is not limited to the current structure or form of the Internet **30** but encompasses any future changes or additions to the Internet **30**. Further, the MSDS **10** is shown as being directly connected to the Internet **30**, such as through its own node or portal. The MSDS **10**, however, may be practiced with any suitable connection to the Internet **30**, such as through an intermediate Internet access provider.

With reference to FIG. **2** depicting an overall operation of the invention, a telephone call directed to a number serviced by the MSDS **10** is initiated at step **40** by a third party, for instance, through the facsimile machine **24**, telephone set **26**, or computer **28**. The incoming telephone call may therefore carry a facsimile message, a voice message, or a data message. At step **42**, the address signal associated with the initiated call is routed through the central office **20**, over the DID trunk **15**, and to the MSDS **10**.

When the call reaches the MSDS **10**, the call is routed within the MSDS **10** in a manner that will be described in more detail below with reference to FIG. **13**. At step **46**, the MSDS **10** answers the telephone call and receives the address signal from the DID trunk **15**. Next, at step **48**, the call is established between the MSDS **10** and the third party and, at step **50**, the MSDS **10** receives the message transmitted over the telephone line. The message is stored at step **52**, a database within the MSDS **10** is updated at step **54**, and the intended recipient of the message is notified at step **56**. The intended recipient of the message uses the services provided

by the MSDS **10** and will hereinafter be referred to as a user. At step **58**, the message is converted into hyper-text mark-up language (HTML).

After the MSDS **10** receives a message for one of its users, the user can then communicate with the MSDS **10** at any time and at any location by connecting to the Internet World Wide Web **30** and retrieving the message stored within the MSDS **10**. With reference to FIG. **3**, at step **60** the user first connects to the Internet **30**, such as through a personal computer **32** which may be connected to the Internet **30** in any suitable manner, such as through its own portal or node or through some intermediate access provider. The personal computer **32** is not limited to a single computer but may instead comprise a network of computers, such as a local area network within an office.

Once connected with the Internet **30**, at step **62**, the user accesses with a hyper-text browser the Universal Resource Locator (URL) associated with his or her MSDS **10** mailbox. The computer **32** may use any suitable hypertext browser, such as Netscape, to access the mailbox. A Hypertext Transfer Protocol Deamon (HTTPD) within the MSDS **10** receives the URL request at step **64** and, at step **66**, requests user authentication. The user then supplies his or her ID and password at step **68** and, if found valid at step **70**, the MSDS **10** provides the computer **32** with access to the mailbox at step **72**. If the ID and password are invalid, as determined at step **70**, then the HTTPD sends the computer **32** an authentication failure message at step **74**.

After the user gains access to the mailbox at step **72**, the user can request information stored within the MSDS **10**. The MSDS **10** receives the request at step **76** and, at step **78**, determines whether the information exists. As is common practice, the MSDS **10** also determines the validity of the request at step **78**. The request from the user will include the mailbox number for the user, the message identifier, display preferences, and, if the message is a facsimile message, a page identifier. If for any reason the request is invalid, such as when a hacker is attempting to gain access to privileged information, the request for the information will be terminated.

If the requested information is available, then at step **80** the information is transmitted through the Internet **30** to the user's computer **32**. If, on the other hand, the information does not exist, then at step **82** the MSDS **10** will generate the requested information and then send the information to the user's computer through the Internet **30** at step **80**.

Prior to gaining access to the mailbox at step **72**, the user is preferably sent a greeting page or other such type of information which permits the user to learn about the services provided by the MSDS **10**, open an account with the MSDS **10**, or gain access to an account. Once access is provided at step **72**, the user is provided with information indicating the total number of messages stored in his or her mailbox within the MSDS **10**. Preferably, the information sent by the MSDS **10** indicates the total number of messages for each type of message and also the total number of saved messages versus the total number of new messages.

The user is also preferably given the option at this step to change account information. The account information might include the E-mail address for the user, the manner in which messages are to be reviewed, the user's pager information, as well as other user preferences. The display options and other user preferences will be discussed in further detail below.

The general information HTML file which indicates the total number of different messages is provided with a number of anchors, which are also termed links or references. In general, an anchor permits a user on the computer **32** to

US 7,895,306 B2

9 10

retrieve information located on another file. For instance, an anchor to a listing of facsimile messages is preferably provided on the display of the total number of messages. When the user selects the anchor for the facsimile list, the MSDS 10 pulls up and displays the file containing the list of facsimiles, such as a file "faxlist.html." The other types of messages, such as voice messages and data messages, would have similar anchors on the general information page directed to their respective HTML listing files.

When a new message is received at step 54 in FIG. 2, the user's mailbox is updated to display the total number and types of messages. The MSDS 10 might also update other files in addition to the total listing of messages. Additionally, at this time, the MSDS 10 sends an E-mail message to the user's computer 32 to inform the user of the newly arrived message. The MSDS 10 could also send notice to the user through a paging system so that the user receives almost instantaneous notice that a message is received.

The MSDS 10 also generates additional information according to the user's preferences. These preferences on how the MSDS 10 is configured for the user include options on how the messages are reviewed. With facsimile messages, for instance, the user can vary the amount or the type of information that will be supplied with the listing of the facsimile messages by selecting an appropriate option. Other options are also available so that the user can custom fit the MSDS 10 to the user's own computer 32 or own personal preferences.

For instance, when a facsimile message is received, the MSDS 10, at step 54, will update the total listing of all messages to indicate the newly received message and may additionally generate the HTML files for the newly received facsimile message according to the user's preferences. When the user later requests information on the message at step 76, the HTML information has already been generated and the MSDS 10 may directly send the requested information to the user at step 80. If, on the other hand, the user desires to view the message according to one of the other options, the MSDS 10 wilt generate the HTML files at step 82 according to that other option at the time of the request.

A first option available to the user for viewing a facsimile message is a textual only listing of the messages. The information on the textual listing preferably includes the date and time that the message was received at the MSDS 10, the telephone number from where the message was transmitted, the number of pages, the page size, and the size of the message in bytes. The messages, of course, could be listed with other types of information. When the user selects one of the facsimile messages on the list, a request is sent to the HTTPD within the MSDS 10 causing the message to be downloaded via the Internet 30 to the user's computer 32. Once the message is received by the computer 32, the message can be displayed, printed, or saved for further review.

The second through fifth options allow the user to preview an image of the facsimile message before having the message downloaded from the MSDS 10 through the Internet 30 and to the computer 32. The second option permits the user to view the list of messages with a reduced size image of the cover page next to each entry on the list. When the user selects one of the messages on the list, the selected facsimile message is transmitted through the Internet 30 to the computer 32. The user may also scroll through the listings if all of the message cannot be displayed at one time on the computer 32.

The third option provides the user with a full size view of the cover page of each facsimile message. The user can quickly scroll through the cover pages of each message without downloading the entire message to the computer 32. The full size view of the cover pages permit the user to clearly discern any comments that may be placed on the cover page, which may not be possible from just a reduced image of the cover page available through the second option.

The fourth option provides the user with a reduced size image of each page and permits the user to scroll through the entire message. The user can therefore read the entire facsimile message on screen before the message is downloaded onto the computer 32. With this option, the user can go through the pages of the facsimile message and can also skip to the next message or previous message. Additionally, the user has the option of enlarging a page to a full size view of the page. When one of the messages is selected, as with the other options, the HTTPD within the MSDS 10 causes the facsimile message to be transmitted through the Internet 30 to the user's computer 32.

With a fifth option, a full size image of each page is transmitted to the users computer 32. The user can scroll through the pages of the facsimile message and easily read the contents of each page. If the user wants the message downloaded to the computer 32, the user selects the message and the HTTPD within the MSDS 10 transmits the message to the user's computer 32 through the Internet 30.

As discussed above, after the database is updated at step 54, the MSDS 10 will generate additional information based upon the option selected for displaying the facsimile messages. More specifically, as shown in FIG. 4(A), if the first option has been selected, as determined at step 100, then at step 102 the MSDS 10 will generate the textual listing of the facsimile messages with anchors or references to the respective facsimile files. The HTML files are then moved to an Internet Server at step 104.

If the first option is not selected, the MSDS 10 next determines whether the second option has been selected at step 106. With the second option, the facsimile messages are listed along with a reduced size image of the cover page. To generate this information, the cover page is extracted from the facsimile file at step 108 and a reduced size HTML image of the cover page is created at step 110. At step 112, a listing of the facsimile messages is generated with a thumbnail view of each cover page linked to its respective facsimile file. The generated HTML files are then sent to the Internet Server at step 104.

When the third option is selected, as determined at step 114, a full size image of the cover page is sent to the computer 32. The full size image of the cover page is generated by first extracting the cover page from the facsimile file at step 116. Next, the cover page is converted into a full size HTML image at step 118 and, at step 120, the listing is generated with the embedded cover page linked to the facsimile file.

If, at step 122, the fourth option is determined to be selected, then a reduced size image of each page is provided to the user with the option of enlarging the page to view the contents of the page more clearly. With reference to FIG. 4(B), the information necessary for the third option is produced by first extracting the first page of the facsimile message at step 124. A reduced size HTML image is created at step 126 and then a full size HTML image is created at step 128. At step 130, the listing is generated with embedded thumbnail images of the pages with links to the full size images. If the page is not the last page, as determined at step 140, then the next page is extracted at step 142 and steps 126 to 130 are repeated to generate the HTML files for the other pages of the facsimile message. After the last page has been converted into an HTML file according to the third option, the files are moved onto the Internet Server at step 104.

At step **144**, the MSDS **10** determines whether the fifth option has been selected. The fifth option provides the user with a full size image of each page of the facsimile message. While only five options have been discussed, the invention may be practiced with additional options. Consequently, with additional options and with the fourth option not being selected, the MSDS **10** would next determine whether one of the additional options have been selected. With the preferred embodiment of the invention having only five options, however, the MSDS **10** will assume that the fifth option has been selected if none of the first four options were found to be selected.

The information necessary to display the pages of the facsimile message according to the fifth option is generated by first extracting the first page of the facsimile message at step **146**. At step **148**, a full size HTML image of the page is created and, at step **150**, a listing is generated with an embedded image and links to previous and next pages. When the page is not the last page, as determined at step **152**, the MSDS **10** extracts the next page and generates the HTML file for that page. After all pages have been converted into HTML files according to the fourth option, the files are sent to the Internet Server at step **104**.

While FIGS. **4**(A) and (B) describe the operations of the MSDS **10** at the time a message is received, FIG. **5** depicts an overall flowchart of operations for the MSDS **10** when the user requests a page of information in a display format other than the user's preferred option of displaying the message. FIG. **5** is therefore a more detailed explanation of how the MSDS **10** generates the necessary information at step **82** of FIG. **3**.

In general, as shown in FIG. **5**, the MSDS **10** first determines the type of image that is needed at step **82**a. For example, at this step, the MSDS **10** will determine whether images are unnecessary, whether an image of just the cover page is necessary, whether an image is needed for every page, and whether the image needs to be a full size, a reduced size, or both full and reduced sized images. At step **82**b, the MSDS **10** determines whether the image has already been created. If the image has not been created, then at step **82**c the MSDS **10** will extract the page from the base facsimile file and, at step **82**d, generate the required HTML image. As discussed above, the required image may be for just the cover page, for all the pages, and may be a full size and/or a reduced size image of the page. At step **82**e, the image is embedded with links or anchors to other HTML files. These links or anchors might be references to the next and previous pages and also to the next and previous facsimile messages. Finally, the HTML file having the embedded image and links is sent to the user at step **80** in FIG. **3**.

The process for converting a facsimile message into HTML files according to the fifth option will be described with reference to FIG. **6**. This process will occur at step **54** when the message is received and when the fifth option is the user's preferred option of displaying the messages. It should be understood that a similar type of process will also occur when the user requests a page of information according to the fifth option when the user is retrieving a facsimile message and the fifth option is not the user's preferred option. The conversion processes according to the other options will become apparent to those skilled in the art and will therefore not be discussed in further detail.

With reference to FIG. **6**, when the facsimile message is received, the message is in a Tagged Image File Format/Facsimile (TIFF/F) and each page of the facsimile message is split into a separate file. Each page of the facsimile message is then converted from the TIFF/F format into a Portable Pixel

Map (PPM) format. The PPM files are next converted into separate Graphic Interchange Format (GIF) files and then into separate HTML files. Thus, each page of the facsimile message is converted to a separate HTML file. The TIFF/F files may be converted into PPM with an available software package entitled "LIBTIFF" and the PPM files may be converted into GIF files with an available software package found in "Portable Pixel Map Tools."

The invention is not limited to this exact conversion process or to the particular software packages used in the conversion process. For instance, the TIFF/F files may be converted into another portable file format, through any other type of intermediate format, or may be converted directly into the GIF format. Further, instead of GIF, the facsimile messages may be converted into JPEG, BMP, PCx, PIF, PNG, or any other suitable type of file format.

The files may be identified with any suitable filename. In the preferred embodiment, the files for each user are stored in a separate directory assigned to just that one user because an entire directory for a given user generally can be protected easier than the individual files. The memory, however, may be organized in other ways with the files for a single user being stored in different directories. The first part of the filename is a number preferably sequentially determined according to the order in which messages arrive for that user. The preferred naming convention for ending the filenames is depicted in FIG. **6**. Each page of the facsimile message is saved as a separate file with an extension defined by the format of the file. Thus, the files will end with an extension of ".TIFF," ".PPM," ".GIF," or ".HTML." according to the format of the particular file. In the example shown, the separate pages have filenames which end with the respective page number, for instance, the first page ends with a "1." The files, however, are preferably terminated with a letter or multiples letters to indicate the order of the pages. For instance, page 1 might have an ending of "aa," page 2 might have an ending of "ab," etc. The invention, however, is not limited to the disclosed naming convention but encompasses other conventions that will be apparent to those skilled in the art.

As shown in FIG. **6**, in addition to the GIF files representing the pages of the facsimile message, the HTML files include a number of anchors or references. In the example shown, the first HTML file has an anchor a for the "Next Page." Anchor a is defined as a=<A HREF="2.html"> Next Page </a> and will therefore reference the second HTML file when a user selects the "Next Page." The second HTML file has an anchor b for the "Previous Page" and an anchor c for the "Next Page" and the third HTML file has an anchor d for the "Previous Page." With these particular HTML files, the user can scroll through each page of the facsimile message and view a full size image of the page.

Each HTML file preferably contains anchors in addition to those relating to "Next Page" and "Previous Page." For instance, each HTML file may contain an anchor to the next facsimile message, an anchor to the previous facsimile message, and an anchor to return to the facsimile list. The HTML files preferably contain anchors relating to "Save" and "Delete." When the "Save" anchor is selected, the user would be able to save the message under a more descriptive name for the message. The "Delete" anchor is preferably followed by an inquiry as to whether the user is certain that he or she wants to delete the message. Other anchors, such as an anchor to the general listing, will be apparent to those skilled in the art and may also be provided.

FIG. **7** provides an example of a display according to the fifth option for the first page of the facsimile message shown in FIG. **6**. The headings of the display provide information on

US 7,895,306 B2

13                                                    14

the telephone number from where the message was sent, the date and time the message was received at the MSDS **10**, and an indication of the page of the message being displayed. The main portion of the display is the full size image of the page. At the bottom of the display, an anchor or link is provided to the "Next Page" and another anchor is provided to the "Return to Fax Listing." Additional information may also be provided on the display, such as a link to a company operating the MSDS **10**.

An example of the "1.html" file for generating the display shown in FIG. **7** is shown below in Table 1.

TABLE 1

```
<HTML>
<HEAD>
<TITLE>Fax Received on May 31, 1995 at 1:58 PM from (404) 249 6801;
Page 1 of 3</TITLE>
</HEAD>
<BODY>
<H1>Fax from (404) 249-6801</H1>
<H2>Received on May 31, 1995 at 1:58 PM</H2>
<H2>Page 1 of 3</H2>
<IMG SRC="1.gif">
<P>
<A HREF="2.html">Next Page</a>
<HR>
<A HREF="faxlist.html">Return to Fax Listing</A>
<P>
This page was automatically generated by FaxWeb(tm) on May 31, 1995
at 2:05 PM.
<P>
&copy; 1995 NetOffice, Inc.
<HR>
<Address>
<A HREF="http://www.netoffice.com/">NetOffice, Inc.</A><BR>
PO Box 7115<BR>
Atlanta, GA 30357<BR>
<A HREF="mailto:info@netoffice.com">info@netoffice.com</A>
</Address>
</BODY>
</HTML>
```

As is apparent from the listing in Table 1, the image file "1.gif" for the first page is embedded into the HTML file "1.html." Also apparent from the listing is that the anchor for "Next Page" directs the MSDS **10** to the second page of the facsimile message having the filename "2.html" and the anchor for "Return to Fax Listing" directs the MSDS **10** to the filename "faxlist.html" containing the list of facsimile messages.

A process for converting a voice message into an HTML file is illustrated in FIG. **8**. The voice message is originally stored in a VOX format or an AD/PCM format and is retrieved at step **170**. The voice message is then converted either into an AU format or WAV format in accordance with the user's preference, which is stored in memory. Preferably, the message is preferably in the AD/PCM format originally and is converted in WAV, but the voice files may alternatively be stored and converted in file formats other than the ones disclosed, such as RealAudio (RA).

At step **174**, the listing of all of the voice messages is then updated to include a listing of the newly received voice message and an anchor to the voice message. For instance, the original voice message may be stored with filename "1.vox" and is converted into WAV and stored with a filename "1.wav." The HTML file "voicelist.html" which contains a list of all voice messages would then have an anchor to the filename "1.wav" along with identifying information for the voice message, such as when the message was received.

The listing of the voice messages may have additional anchors or references. For instance, each voice message may

have an anchor directing the MSDS **10** to a file which contains a short sampling of the message. Thus, when the user selects this anchor, the user could receive the first 5 seconds of the message or some other predefined number of seconds. As with the listing of facsimile messages, the listing of the voice messages also preferably has anchors to "Save" and "Delete."

FIG. **9** illustrates a process for converting a data message into HTML. At step **180**, the data file is retrieved from a database and at step **182** the HTML file containing the list of data messages is updated to include a listing of the newly received message along with identifying information. For instance, the HTML file for the listing "datalist.html" would be updated to include an anchor to a data file "file1.1" and would have information such as the time and date that the data was transmitted, the size of the data file, as well as additional identifying information.

Because the MSDS **10** can receive messages of various types, such as a facsimile message, voice message or data message, the MSDS **10** must be able to determine the type of message that is being sent over the DID trunk **15**. With reference to FIG. **10**, when an incoming call is received, the MSDS **10** goes off hook at step **200** and starts to generate a ringing sound. If, at step **202**, a facsimile calling tone is detected, then the ringing sound is stopped at step **204** and the message is received as a facsimile message at step **206**. Similarly, when a data modem calling tone is detected at step **208**, the ringing sound is stopped at step **210** and the message is identified as a data message at step **212**.

If the MSDS **10** detects a DTMF digit at step **214**, the ringing sound is stopped at step **216** and the MSDS **10** then determines which digit was pressed. When the digit is a "1," as determined at step **218**, the message is identified as a facsimile message. The MSDS **10** will thereafter receive and store the facsimile message in the manner described above with reference to FIG. **2**. If the digit is identified as a "0" at step **220**, the call is identified as an owner's call and will be processed in a manner that will be described below with reference to FIG. **12**. As will be apparent, other digits may cause the MSDS **10** to take additional steps. If any other DTMF digit is pressed, at step **224** the MSDS **10** activates a voice call system, which will be described in more detail below with reference to FIG. **11**.

With step **226**, the MSDS **10** will enter a loop continuously checking for a facsimile calling tone, a data modem calling tone, or for a DTMF digit. If after n rings none of these tones or digits has been detected, the ringing sound is stopped at step **228** and the voice call system is activated at step **224**.

With reference to FIG. **11**, when a fax calling tone or modem calling tone is not detected, the voice call system begins at step **230** by playing a voice greeting. If the greeting was not interrupted by a DTMF digit as determined at step **232**, then the caller is prompted for the voice message at step **234** and, at step **236**, the voice message is recorded and stored in memory. At step **238**, the caller is prompted with a number of options, such as listening to the message, saving the message, or re-recording the message. Since the selection of these options with DTMF digits will be apparent to those skilled in the art, the details of this subroutine or subroutines will not be described in further detail. When the caller wishes to re-record the message, as determined at step **240**, the caller is again prompted for a message at step **234**. If the caller does not wish to re-record the message, the call is terminated at step **242**.

If the voice greeting is interrupted by a DTMF digit, as determined at step **232**, then the MSDS **10** ascertains which digit has been pressed. At step **244**, if the digit is a "0," the MSDS **10** detects that the call is an owner's call. When the

US 7,895,306 B2

15 16

digit is a "1," the MSDS 10 is informed at step 206 that the call carries a facsimile message. As discussed above with reference to FIG. 10, other DTMF digits may cause the MSDS 10 to take additional steps. If an invalid digit is pressed, by default at step 248 the routine returns to step 234 of prompting the caller for a message.

It should be understood that the invention is not limited to the specific interactive voice response system described with reference to FIG. 11. As discussed above, the invention may be responsive to DTMF digits other than just a "0" and a "1." Further variations or alterations will be apparent to those skilled in the art.

With reference to FIG. 12, when the call is considered an owners call, the caller is first prompted for the password at step 250. The password is received at step 252 and, if found correct at step 254, a set of announcements are played to the owner. These announcements would preferably inform the owner of the number of new messages that have been received, the number of saved messages, the number of facsimile message, the number of data messages, and the number of voice messages. Other announcements, of course, could also be made at this time.

At step 258, the owner then receives a recording of the owner's menu with the appropriate DTMF digit for each option. For instance, the DTMF digit "1" may be associated with playing a message, the DTMF digit "2" may be associated with an options menu, and the DTMF digit "*" may be associated with returning to a previous menu or terminating the call if no previous menu exists.

A DTMF digit is detected at step 260 and the appropriate action is taken based upon the digit received. Thus, if the digit is determined to be a "1" at step 264, the owner can play a message at step 266. At step 266, the owner is preferably greeted with a menu giving the owner the options of playing or downloading new messages, saved messages, facsimile messages, data messages, or voice messages. As should be apparent to those skilled in the art, the owner may receive one or more menus at step 266 and the owner may enter one or more DTMF digits in order to play or download a particular message.

If, instead, the digit is determined to be a "2" at step 268, then the owner receives an options menu at step 270. With the options menu, the owner can enter or change certain parameters of the MSDS 10. For instance, the owner can change his or her password, the owner can change the manner in which facsimile messages are displayed on the computer 32, the owner can change the image file format from GIF to another format, the owner can select the file formats for the voice messages, as well as other options.

If the "*" DTMF digit is received, as determined at step 272, then the owner is returned to a previous menu. The "*" digit is also used to terminate the call when the owner has returned to the initial menu. The "*" digit is therefore universally recognized by the MSDS 10 throughout the various menus as a command for returning to a previous menu.

If the owner enters a DTMF digit that is not being used by the MSDS 10, the owner receives an indication at step 276 that the key is invalid and the owner is then again provided with the owner's menu at step 258. When the owner does not enter a DTMF digit while the owner's menu is being played, as determined at step 260, the menu will be replayed n times. Once the menu has been replayed n times, as determined at step 262, then the call will be terminated at step 278.

If the password is incorrect, as determined at step 254, then the MSDS 10 checks whether the user has made more than "n" attempts at step 280. If "n" attempts have not been made, then a password incorrect message will be displayed to the user at step 282 and the user will once again be prompted for the password at step 250. When the user has made "n" attempts to enter the correct password, the MSDS 10 will play a failure message to the user at step 284 and then terminate the call at step 286. The specific number "n" may be three so that the call is terminated after three failed attempts.

The owner's menu may be responsive to an additional number of DTMF digits and may be structured in other ways. For instance, separate DTMF digits may direct the owner to the respective types of messages, such as a facsimile message, data message, or voice message. Also, separate DTMF digits may direct the owner to a recording of new messages or to a recording of saved messages. Other variations will be apparent to those skilled in the art.

A more detailed diagram of the MSDS 10 is shown in FIG. 13. As shown in the figure, a plurality of DID trunks 15 are received by an input/output device 17 and are then sent to a central processor 3. The number of DID trunks 15 may be changed to any suitable number that would be necessary to accommodate the anticipated number of telephone calls that may be made to the MSDS 10. The input/output device 17 routes a call on one of the DID trunks 15 to an open port of the central processor 3 and is preferably a DID Interface Box manufactured by Exacom.

The central processor 3 receives the calls on the DID trunks 15 and stores the messages in storage 11 in accordance with software 7. Preferably, a separate directory in storage 11 is established for each user having an account on the MSDS 10 so that all of the messages for a single user will be stored in the same directory. It should be understood that the number of processors within the central processor 3 is dependent upon the number of DID trunks 15. With a greater number of DID trunks 15 capable of handling a larger number of telephone calls, the central processor 3 may actually comprise a number of computers. The input/output device 17 would then function to route incoming calls to an available computer within the central processor 3.

A more detailed diagram of the central processor 3 is shown in FIG. 14. The central processor 3 comprises a telephone line interface 21 for each DID trunk 15. The telephone interface 21 provides the ringing sounds and other communication interfacing with the telephone lines. The signals from the telephone interface 21 are routed to a pulse/tone decoder 23 and to a digital signal processor (DSP) 25. The pulse/tone decoder 23 detects the address signal off of an incoming call and sends the address signal onto a bus 29 to a microprocessor 27. The DSP performs the necessary signal processing on the incoming calls and routes the processed signals to the microprocessor 27.

The microprocessor 27 will then read the address signal from the pulse/tone decoder 23 and store the message from the DSP 25 in an appropriate directory in storage 11. As discussed above, the central processor 3 may comprise a number of computers or, more precisely, a number of microprocessors 27 with each microprocessor 27 handling the calls from a certain number, such as four, DID trunks 15. The microprocessor 27 may comprise any suitable microprocessor, but is preferably at least a 486 PC.

In addition to handling incoming calls and storing the messages in storage 11, the central processor 3 also coordinates the interactive voice response system of the MSDS 10. The software 7 would incorporate the flowcharts of operations for receiving a message shown in FIG. 3, for detecting the type of message on an incoming call shown in FIG. 10, for receiving voice messages shown in FIG. 11, and for receiving an owner's call shown in FIG. 12. Based upon the above-referenced flowcharts and the respective descriptions, the

US 7,895,306 B2

17                                                                18

production of the software **7** is within the capability of one of ordinary skill in the art and will not be described in any further detail.

The Internet Server **5** is connected to the central processor **3**, such as through a local area network, and also has access to the storage **11**. The Internet Server **5** performs a number of functions according to software **9**. For instance, the Internet Server **5** retrieves the data files stored in storage **11** by the central computer **3** and converts the files into the appropriate HTML files. The converted HTML files are then stored in storage **11** and may be downloaded to the computer **32** through the Internet **30**. The Internet Server **5** also handles the requests from the computer **32**, which might require the retrieval of files from the storage **11** and possibly the generation of additional HTML files.

The software **9** for the Internet Server **5** would therefore incorporate the flowchart of operations for generating HTML files according to user preferences shown in FIG. **4**, for generating requested information from a user shown in FIG. **5**, for converting facsimile messages into HTML shown in FIG. **6**, for converting voice messages into HTML shown in FIG. **8**, and for converting data messages into HTML shown in FIG. **9**. Based upon the above-referenced flowcharts and their respective descriptions, the production of the software **9** is within the capability of one of ordinary skill in the art and need not be described in any further detail.

Nonetheless, a more detailed block diagram of the Internet Server **5** is shown in FIG. **15**. The Internet Server **5** runs on a suitable operating system (OS) **39**, which is preferably Windows NT. The Internet Server **5** has a number of application programs **31**, such as the ones depicted in the flowcharts discussed above, for communicating with the central processor **3** and for accessing data from storage **11** and also from memory **33**.

The memory **33**, inter alia, would contain the data indicating the preferences of each user. Thus, for example, when a facsimile message in the TIFF/F format is retrieved by the Internet Server **5**, the Internet Server **5** would ascertain from the data in memory **33** the preferred option of displaying the facsimile message and would generate the appropriate HTML files.

All interfacing with the Internet **30** is handled by the HTTPD **37**, which, in the preferred embodiment, is "Enterprise Server" from NetScape Communications Corp. Any requests from users, such as a request for a file, would be handled by the HTTPD **37**, transferred through the CGI **35**, and then received by the application programs **31**. The application programs **31** would then take appropriate actions according to the request, such as transferring the requested file through the CGI **35** to the HTTPD **37** and then through the Internet **30** to the user's computer **32**.

The Internet Server **5** may be connected to a paging system **13**. Upon the arrival of a new message, in addition to sending an E-mail message to the user's mailbox, the Internet Server **13** may also activate the paging system **13** so that a pager **15** would be activated. In this manner, the user could receive almost instantaneous notification that a message has arrived.

The paging system **13** is preferably one that transmits alphanumeric characters so that a message may be relayed to the user's pager **15**. The Internet Server **5** therefore comprises a signal processor **41** for generating signals recognized by the paging system **13** and a telephone interface **43**. The signal processor **41** preferably receives information from the application programs **31** and generates a paging message in a paging file format, such as XIO/TAP. The telephone interface

**43** would include a modem, an automatic dialer, and other suitable components for communicating with the paging system **13**.

The information from the application programs **31** may simply notify the user of a message or may provide more detailed information. For instance, with a facsimile message, the information from the application programs **31** may comprise CSI information identifying the sender's telephone number. The user would therefore receive a message on the pager **15** informing the user that a facsimile message was received from a specified telephone number. The amount and type of information that may be sent to the user on the pager **15** may vary according to the capabilities of the paging system **13** and may provide a greater or lesser amount of information than the examples provided.

The Internet Server **5** is not limited to the structure shown in FIG. **15** but may comprise additional components. For instance, the HTTPD **37** would be linked to the Internet **30** through some type of interface, such as a modem or router. The Internet Server **5** may be connected to the Internet **30** through typical phone lines, ISDN lines, a TI circuit, a T3 circuit, or in other ways with other technologies as will be apparent to those skilled in the art.

Furthermore, the Internet Server **5** need not be connected to the Internet **30** but may be connected to other types of networks. For instance, the Internet Server **5**, or more generally the network Server **5**, could be connected to a large private network, such as one established for a large corporation. The network Server **5** would operate in the same manner by converting messages into HTML files, receiving requests for information from users on the network, and by transmitting the information to the users.

Also, at least one interface circuit would be located between the Internet Server **5** and the central processor **3** in order to provide communication capabilities between the Internet Server **5** and the central processor **3**. This network interface may be provided within both the Internet Server **5** and the central processor **3** or within only one of the Internet Server **5** or central processor **3**.

Examples of the Internet Server **5** software layers are shown in FIGS. **16**(A) and **16**(B), with FIG. **16**(A) representing the Internet Server **5** in an asynchronous mode of communication and FIG. **16**(B) representing the Internet **5** in a synchronous mode of communication. As shown in the figures, the software **9** for the Internet Server **5** may additional comprise an Internet Deamon for running the HTTPD **37**. The software **9** for the Internet Server **5** would also include TCP/IP or other transport layers. Moreover, while the authentication is provided through the HTTPD **37**, the authentication of the user's password and ID may be supplemented or replaced with other ways of authentication.

The term synchronous has been used to refer to a mode of operation for the MSDS **10** in which the all possible HTML files for a message are generated at the time the message is received. The HTML files may be generated by the central processor **3** or by the application programs **31**. When a request for information is then later received by the HTTPD **37**, the information has already been generated and the HTTPD **37** only needs to retrieve the information from storage **11** and transmit the information to the user's computer **32**. With a synchronous mode of operation, the CGI **35** would be unnecessary.

The MSDS **10** preferably operates according to an asynchronous mode of operation. In an asynchronous mode of operation, information requested by the user may not be available and may have to be generated after the request. The asynchronous mode of operation is preferred since fewer files

US 7,895,306 B2

19

are generated, thereby reducing the required amount of storage 11. Because the information requested by a user may not be available, some anchors cannot specify the filename, such as "2.html," but will instead contain a command for the file. For instance, an anchor may be defined as <AHREF= "/faxweb/users/2496801/S viewpage.cgi?FAX_NUM=1& PAGE=1&VIEW_MODE=FULL"> for causing the CGI 35 to run a viewpage program so that page 1 of facsimile message 1 will be displayed in a full size image. The CGI 35 will generate the requested information when the information has not been generated, otherwise the CGI 35 will retrieve the information and relay the information to the HTTPD 37 for transmission to the user.

With the invention, the MSDS 10 can reliably receive voice, facsimile, and data messages for a plurality of users and can receive more than one message for a user at a single time. The messages are stored by the MSDS 10 and can be retrieved at the user's convenience at any time by connecting to the Internet 30. The Internet World Wide Web 30 is a constantly expanding network that permits the user to retrieve the messages at virtually any location in the world. Since the user only needs to incur a local charge for connecting to the Internet 30, the user can retrieve or review messages at a relatively low cost.

Even for the user's at the office or at home, the MSDS 10 provides a great number of benefits. The user would not need a facsimile machine, voice mail system, or a machine dedicated for receiving data messages. The user also need not worry about losing part of the message or violating the confidential nature of the messages. The user, of course, can still have a facsimile machine and dedicated computer for data messages. The MSDS 10, however, will permit the user to use the telephone company's "call forwarding" feature so that messages may be transferred to the MSDS 10 at the user's convenience, such as when the user is away from the office.

The software 7 and software 9 are not limited to the exact forms of the flowcharts shown but may be varied to suit the particular hardware embodied by the invention. The software may comprise additional processes not shown or may combine one or more of the processes shown into a single process. Further, the software 7 and 9 may be executed by a single computer, such as a Silicon Graphics Workstation, or may be executed by a larger number of computers.

The facsimile messages preferably undergo signal processing so that the images of the facsimile messages are converted from a two tone black or white image into an image with a varying gray scale. As is known in the art, a gray scale image of a facsimile message provides a better image than simply a black or white image of the message. The signal processing may comprise any suitable standard contrast curve method of processing, such as anti-aliasing or a smoothing filter. The signal processing may occur concurrently with the conversion from TIFF/F to GIF and is preferably performed for both full and reduced size images of the facsimile messages.

Furthermore, the user may be provided with a greater or fewer number of options in displaying or retrieving messages. The options are not limited to the exact forms provided but may permit the user to review or retrieve the messages in other formats. The options may also permit a user to join two or messages into a single message, to delete portions of a message, or to otherwise the contents of the messages. Also, the various menus provided to the user over the telephone may have a greater number of options and the MSDS 10 may accept responses that involve more than just a single DTMF digit.

The specific DTMF digits disclosed in the various menus are only examples and, as will be apparent to those skilled in

20

the art, other digits may be used in their place. For instance, a "9" may be used in the place of a "n" in order to exit the menu or to return to a previous menu. Also, the DTMF digits may be changed in accordance with the user's personal convention. If the user had a previous voice mail system, the user could customize the commands to correspond with the commands used in the previous system in order to provide a smooth transition to the MSDS 10.

The MSDS 10 may restrict a user to only certain types of messages. For instance, a user may want the MSDS 10 to store only facsimile messages in order to reduce costs of using the MSDS 10. In such a situation, the MSDS 10 would perform an additional step of checking that the type of message received for a user is a type of message that the MSDS 10 is authorized to receive on the user's behalf. When the message is an unauthorized type of message, the MSDS 10 may ignore the message entirely or the MSDS 10 may inform the user that someone attempted to send a message to the MSDS 10.

Moreover, the MSDS 10 has been described as having the central processor 3 for handling incoming calls and the Internet Server 10 for interfacing with the Internet 30. The invention may be practiced in various ways other than with two separate processors. For instance, the central processor 3 and the Internet Server 5 may comprise a single computer or workstation for handling the incoming calls and for interfacing with the Internet 30. The MSDS 10 may convert the messages into HTML files prior to storing the messages. Also, the central processor 3 may communicate with the paging system 13 instead of the Internet Server 5. Additionally, as discussed above, the central processor 3 may comprise a number of microprocessors 27 for handling a large number of DID trunks.

The invention has been described as converting the messages into HTML and transmitting the HTML files over the Internet 30 to the computer 32. The HTML format, however, is only the currently preferred format for exchanging information on the Internet 30 and is actually only one type of a Standard Generalized Mark-Up Language. The invention is therefore not limited to the HTML format but may be practiced with any type of mixed media page layout language that can be used to exchange information on the Internet 30.

SGML is not limited to any specific standard but encompasses numerous dialects and variations in languages. One example of an SGML dialect is virtual reality mark-up language (VRML) which is used to deliver three dimensional images through the Internet. As another example, the computer 32 for accessing the MSDS 10 through the Internet 30 may comprise a handheld device. A handheld device is generally characterized by a small display size, limited input capabilities, limited bandwidth, and limited resources, such as limited amount of memory, processing power, or permanent storage. In view of these limited capabilities, a handheld device markup language (HDML) has been proposed to provide easy access to the Internet 30 for handheld devices. The SGML information transmitted by the MSDS 10 to the computer 32 may therefore comprise HDML information suitable for a handheld device or may comprise VRML.

As another example, Extensible Mark-Up Language (XML) is an abbreviated version of SGML, which makes it easier to define document types and makes it easier for programmers to write programs to handle them. XML omits some more complex and some less-used parts of the standard SGML in return for the benefits of being easier to write applications for, easier to understand, and more suited to delivery and inter-operability over the Web. Because XML is nonetheless a dialect of SGML, the MSDS 10 therefore encompasses the translation of facsimile, voice, and data

US 7,895,306 B2

21

messages into XML, including all of its dialects and variations, and the delivery of these messages to computers **32** through the Internet **30**.

As a further example, the MSDS **10** encompasses the use of "dynamic HTML." "Dynamic HTML" is a term that has been used to describe the combination of HTML, style sheets, and scripts that allows documents to be animated. The Document Object Model (DOM) is a platform-neutral and language neutral interface allowing dynamic access and updating of content, structure, and style of documents. The MSDS **10** may therefore include the use of the DOM and dynamic HTML to deliver dynamic content to the computer **32** through the Internet **30**.

The MSDS **10** is also not limited to any particular version or standard of HTTP and thus not to any particular hyper-text transfer protocol deamon **37**. In general, HTTP is a data access protocol run over TCP and is the basis of the World Wide Web. HTTP began as a generic request-response protocol, designed to accommodate a variety of applications ranging from document exchange and management to searching and forms processing. Through the development of HTTP, the request for extensions and new features to HTTP has exploded; such extensions range from caching, distributed authoring and content negotiation to various remote procedure call mechanisms. By not having a modularized architecture, the price of new features has been an overly complex and incomprehensible protocol. For instance, a Protocol Extension Protocol (PEP) is an extension mechanism for HTTP designed to address the tension between private agreement and public specification and to accommodate extension of HTTP clients and servers by software components. Multiplexing Protocol (MUX) is another extension that introduces asynchronous messaging support at a layer below HTTP. As a result of these drawbacks of HTTP, a new version of HTTP, namely HTTP-NG, has been proposed and its purpose is to provide a new architecture for the HTTP protocol based on a simple, extensible distributed object-oriented model. HTTP-NG, for instance, provides support for commercial transactions including enhanced security and support for on-line payments. Another version of HTTP, namely S-HTTP, provides secure messaging. The MSDS **10** and the HTTPD **37** may incorporate these versions or other versions of HTTP.

In addition to different versions of HTTP, the HTTPD **37** of the MSDS **10** may operate with other implementations of HTTP. For instance, the W3C's has an implementation of HTTP called "Jigsaw." Jigsaw is an HTTP server entirely written in Java and provides benefits in terms of portability, extensibility, and efficiency. The MSDS **10** may employ Jigsaw or other implementations of HTTP.

With regard to the transmission of messages to the user's computer **32**, the MSDS **10** permits the user to sample the voice message or to preview the facsimile message without requiring the MSDS **10** to transmit the entire message to the computer **32**. This sampling ability is a significant benefit since the transmission of the entire message would frequently tie up the computer **32** for a rather long period of time. Thus, with the preview or sample feature, the user can determine whether the user needs the message transmitted to the computer **32**.

If the user does decide that the entire message needs to be transmitted, as stated above, the user's computer **32** might be receiving the message for a relatively long period of time. After the entire message has been received, the user then has the options of viewing, listening, retrieving, or saving the message. As an alternative, the user's computer may instead indicate the contents of the message to the user as the message is being received.

22

For instance, with a voice message, the user's computer **32** could send the message to an audio speaker as the message is being received. In this manner, the message would be played in real time and the user would not need to wait until the entire message is received before listening to the message. In order to play the messages in real time, the messages are preferably in the RealAudio (RA) format, which the user can select as the preferred file format for voice messages.

In operation, the MSDS **10** would transmit an HTML file containing an RA file. If the user selects the RA file with the browser on the computer **32**, the browser will activate a program for use with RA files. The operations and functioning of this program will be apparent to those skilled in the art and will be available as a separate software package or will be incorporated within a browser program. The RA program will request the RA data file containing the message from the MSDS **10** and, as the RA file is being received at the computer **32**, this program will play the message in real time.

The MSDS **10** and the user's computer **32** could also be arranged so that each page or even line of a facsimile message could be displayed as the computer **32** receives the facsimile message. Further, although the transmission of a data message is relatively fast in comparison to a voice or facsimile message, the computer **32** could also be programmed to permit access to the data message as the message is being received.

The invention has been described as storing and transmitting voice messages. It should be understood that the voice message would probably be the most often type of audio message stored at the MSDS **10**. The invention, however, may be used with any type of audio message and is in no way limited to just voice messages.

According to another aspect of the invention, the MSDS **10** may be used as a file repository serving as an archive for a particular user or group of users. As described above, the MSDS **10** may maintain a list of all messages for a particular user which is displayed to the user when the user access his or her mailbox. The MSDS **10** may store all messages, whether they are voice, facsimile, or data, for a user in the database indefinitely. The MSDS **10** may therefore be relied upon by a user to establish the authenticity of a message and the existence or absence of a particular message. Through the MSDS **10**, a user can therefore maintain an accurate record of all received email messages, facsimile messages, and data transfers.

In addition to serving as a file depository, the MSDS **10** may also function as a document management tool. As described above with reference to FIG. **2**, when the MSDS **10** receives a message, the MSDS **10** updates a database with information on the message. This information includes the type of message, whether it is a facsimile message, voice message, or data message, the time and date at which the message was received, the size of the file, such as in bytes, the telephone number of the caller leaving the message, as well as other information, such as the number of pages of a facsimile message. Because the telephone number called is unique for each user, the information also includes the intended recipient of the message.

An example of a data entry **300** in storage **11** for a message is shown in FIG. **17**. The data entry **300** represents the entry for just a single message with each message having a separate data entry **300**. Preferably, the data entries **300** are stored in a relational database and may be searched through a structured query language (SQL).

As shown in FIG. **17**, the data field **300** for a message may comprise numerous data fields for describing the message. One of these data fields may comprise a field **301** for indicat-

23

ing the name of the person receiving the message. As will be appreciated by those skilled in the art, the person may be identified in numerous ways, such as by a portion of the person's name or by a unique number. Another field **302** in the data entry **300** indicates the type of the document, such as whether the document is a facsimile message, voice message, or data transfer, and fields **303** and **304** respectively indicate the date and time that the message was received by the MSDS **10**. The telephone number of the caller is indicated in field **305** while the size of the message, which may be measured in bytes, is indicated in field **306** and the number of pages of the message is indicated in field **307**. A document number for uniquely identifying the message is indicated in field **308**. As discussed above, the files or messages received for a particular user may be numbered sequentially in the order that they are received by the MSDS **10**. The files and messages, however, may be numbered or identified in other ways, such as by a combination of numbers with an identifier for the date when the message was received. Also, the documents number or identifier may be unique for each file or message directed to a user or, alternatively, may be unique for each file or message directed to a plurality of users, which is advantageous when the MSDS **10** tracks documents for an entire company or other group of users.

In addition to fields **301** to **308**, the data entry **300** for a message or file may have other fields **309** for describing or documenting the message or file. The other fields **309**, for instance, may be used to identify the type of storage that a message should receive. The messages or files may have different lengths of time that the message is stored before being automatically deleted. The type of storage, such as whether the full text of the message is stored, may also be indicated by field **309**. Another example of a trait that may be contained within the other field **309** is security. At times, a user may desire and may be granted access to another person's mailbox, such when the MSDS **10** tracks documents for an entire company. By designating a message or file as secure in field **309**, a user may restrict or deny access to that message or file by other users. The other fields **309** may also be used by a user to customize the MSDS **10** according to his or her own desires. For instance, if the user is a company, the company may want to classify messages according to the division at which the message is directed, such as one code for marketing, one for sales, one for engineering, and one for legal.

As another example of a use of one of the other fields **309**, a user can input notes in the other field **309**. When a user initially receives a data entry **300**, the entry **300**, for instance, may include data in all fields **301** to **308** except field **309**, which has been left blank. The user can then input his or her notes in the other field **309**. An initial data entry **300** may include the field **305** for the caller's telephone number which contains the digits for the calling number. The user, however, may not readily recognize the caller from just reading the telephone number listed in field **305**. To more clearly indicate the caller, the user may input notes in field **309** to identify the caller's name. Alternatively, the notes in field **309** may reflect part or all of the contents of the message. The user may receive a large document or message and may input a brief description of the document or message in the field **309**. As another example, the recipient of the message may read the message or document and discover that the caller is requesting some service or goods from the recipient, such as a request for certain documents or delivery of a certain quantity of goods. The recipient may read the document or message and place some notes in the field **309** to indicate the type of follow-up service or action that needs to be taken. An assistant to the recipient can then view the notes in field **309** and take appro-

24

priate steps to ensure that the requested service or goods are delivered. If the data entry is security protected, one of the other fields **309**, as discussed above, may grant the assistant limited access to just the field **309** or may grant more expansive access whereby the assistant can view fields **301** to **309** as well as the actual document or message. The fields **309** may serve various other purposes, as will be apparent to those skilled in the art.

FIG. 18 illustrates a process **320** for using the MSDS **10** for document management purposes. With reference to FIG. 18, a user sends a search request to the MSDS **10** for a particular document or set of documents at step **321**. The user may issue this request with the computer **32** by clicking on a link, such as "Search Documents," which may be presented to the user by the MSDS **10** after the user has been granted accesses to his or her mailbox at step **72** shown in FIG. 3. The MSDS **10** may present the user with the option to search the document archives at other times, such as when the user first attempts to access the mailbox at step **62**, or when the URL received by the HTTPD **37** from computer **32** points toward the document archives.

In response to this request, the HTTPD **37** sends the user a search query form at step **322** to allow the user to define a desired search. An example of a search query form is shown in FIG. 19. The search query form may include an entry for each of the data fields **301** to **309** in the data entry **300**. For instance, the user may input one or more names for a recipient and have the MSDS **10** search for all messages or files directed to just those recipients. The user may also indicate the type of document, such as whether it is a facsimile, voice message or data file. The search query form also has entries for the date or time, which preferably accept ranges of times and dates, and an entry for the telephone number of the caller to the MSDS **10**. The search query form may also include an entry for the size of the file or for the number of pages, which is relevant if the message is a facsimile message. The search query form may also include an entry for the document number, which may accept a range of document numbers, and also an entry for another field.

At step **323**, the user enters the search parameters in the search query form with computer **32** and returns the information to the MSDS **10** through the Internet **30**. The user may define the search about any one data field or may define the search about a combination of two or more data fields. For instance, as reflected in the completed search query form shown in FIG. 20, a user may define a search by designating the document type as a facsimile and the calling number as (404) 249-6801. Once the user has finished defining the search, the user then selects the "SEARCH" link shown at the bottom of the screen whereby the user's computer **32** would send the completed search query form through the Internet **30** to the HTTPD **37** of the MSDS **10**.

At step **324**, the HTTPD **37** receives the completed search query form and, through CGI **35**, invokes one or more of the application programs **31** for performing the desired search for any files or messages falling within the parameters of the search. The results of the search are passed from the application programs **31** through the CGI **35** to the HTTPD **37** and, at step **325**, are returned to the user through the Internet **30**. Preferably, the MSDS **10** returns the search results in the form of a listing of all files or messages contained within the search parameters, although the MSDS **10** may return the results in other ways.

An example of the search results of the query shown in FIG. 20 is shown in FIG. 21. As discussed above, the parameters of the search were all facsimile messages from telephone number (404) 249-6081. With reference to FIG. 21,

US 7,895,306 B2

25
26

this query resulted in three messages being discovered. The first document has a document number 11 and is described as being a facsimile from the designated telephone number to Jane Doe on May 31, 1995, and consists of three pages. This first-listed document is an example of the facsimile shown in FIG. 7. The other two documents respectively correspond to document numbers 243 and 1,002 and are also from the designated telephone number.

At step 326, the user selects the desired file or message from the listing of messages and files. For instance, by clicking on the first listed document, namely document number 11, the computer 32 sends a request to the MSDS 10 for a viewing of that document and, in response, the MSDS 10 provides a viewing of the document according to the user defined preferences. As described above, the user may receive a reduced size image of the first page, a full size image of the first page, reduced size images of all pages, or full size images of all pages of the facsimile message. Thus, if the user selected the fourth display option as the user defined preference, the MSDS 10 would return an image of the first page of the facsimile, such as the one depicted in FIG. 7.

At step 326, the user may also have the MSDS 10 save the search results. For instance, as shown in FIG. 21, the user may input the name of "CHARLES R. BOBO FACSIMILES" as the name for the search. By clicking on the "SAVE SEARCH AS" link, the name of the search is provided from the computer 32 to the MSDS 10. At the MSDS 10, the HTTPD 37 transfers the information from the computer 32 to the CGI 35 and the CGI 35 invokes an application program 31 to store the results of the search in storage 11 under the designated name. The invoked application program 31 preferably does not store the contents of all messages but rather stores a listing of the search results in the storage 11.

The results of a search may be stored in storage 11 as either a closed search or an open search. If the MSDS 10 saves the results of a search as an open search, then the files or messages in that named search may be updated with recent files or messages falling within the particular search parameters for the search. On the other hand, a closed search is one in which the files or messages in the named search are limited to those existing at the time of the search. For example, if the MSDS 10 saved the search results shown in FIG. 21 as a closed search, then any retrieval of the "CHARLES R. BOBO FACSIMILES" would result in only the three listed documents. If, on the other hand, the search named as the "CHARLES R BOBO FACSIMILES" was saved by the MSDS 10 as an open search, then the MSDS 10 would reactivate the search query shown in FIG. 20 in response to a request by the computer 32 for that search in order to obtain all facsimile messages from that particular telephone number, including those received after the initial saving of the search results.

With reference to FIG. 19, rather than defining a new search, the user may click on the "STORED SEARCHES" link in order to receive the results of a previously performed search. For example, by clicking on this link, the MSDS 10 may return a listing of searches stored for that particular user, such as the searches shown in FIG. 22. As shown in this figure, the "CHARLES R. BOBO FACSIMILES" is included within the list of stored searches. If the user then selected the "CHARLES R. BOBO FACSIMILES" search, the user may then be presented with the listing of facsimiles shown in FIG. 21, possibly including recent additions to the search group.

With reference to FIG. 19, the MSDS 10 may also provide a user with a link to "RECENT FILES" at step 322. By selecting this link, the MSDS 10 may return a listing of all facsimile, voice, and data messages received with a particular period of time, such as the last month. By placing the

"RECENT FILES" link on the search query form rather than in the listing of "STORED SEARCHES," the user can quickly turn to the most recent files and messages. The search query form may contain other such easy-access links, such as a link to the last search performed by the MSDS 10 on behalf of the user.

The messages or files received by the MSDS 10 need not arrive from a third party. In other words, the MSDS 10 may be used as a file repository or as a file manager for documents generated by the user itself. The user may call the designated telephone number for receiving messages and transmit voice messages, data messages, or facsimile messages and have the MSDS 10 document the receipt and content of these messages. A user may easily use a facsimile machine as a scanner for entering documents into the storage 11 of the MSDS 10.

The MSDS 10 may have applications in addition to those discussed-above with regard to serving as a message deliverer, file repository, and file manager. For instance, the MSDS to may perform some additional processing on the incoming calls prior to forwarding them to the user. For voice messages, this processing may involve transcribing the message and then returning the transcribed messages to the user. The MSDS 10 may therefore be viewed as offering secretarial assistance which may be invaluable to small companies or individuals who cannot afford a secretary or even to larger businesses who may need some over-flow assistance. The transcription may be provided by individuals located in any part of the world or may be performed automatically by a speech-to-text recognition software, such as VoiceType from IBM.

Another type of processing that the MSDS 10 may provide is translation services. The incoming call, whether it is a voice, facsimile, or data message, can be converted into SGML and then forwarded first to a translator. Given the reach of the Internet, the translator may be located virtually anywhere in the world and can return the translated document via the Internet to the MSDS 10. The MSDS 10 can notify the user that the translation has been completed through email, voice mail, pager, facsimile, or in other ways. The user would then connect to the Internet and retrieve the translated document. The translation services of the MSDS 10 may also provide transcription of the message, such as with speech-to-text recognition software.

The foregoing description of the preferred embodiments of the invention have been presented only for the purposes of illustration and description. It is not intended to be exhaustive or to limit the invention to the precise form disclosed. Many modifications and variations are possible in light of the above teaching.

The embodiments were chosen and described in order to explain the principles of the invention and their practical application so as to enable others skilled in the art to utilize the invention and various embodiments and with various modifications as are suited to the particular use contemplated. It is intended that the scope of the invention only be limited by the claims appended hereto.

What is claimed is:

1. A method for delivering from a network server a particular message via a network using a hyper-text transfer protocol, comprising:

    receiving the particular message, wherein the particular message is addressed to a user;

    writing a particular link to the particular message into a mark-up language file;

    transmitting the mark-up language file from the network server to an application program located on a client device associated with the user, via the network, in

27

28

accordance with the hyper-text transfer protocol, wherein by the time of the transmitting, the mark-up language file contains links to a plurality of messages, including the particular link to the particular message, wherein further the application program generates a mailbox user interface in response to the mark-up language file to enable the user to browse the plurality of messages, and wherein further, the plurality of messages are stored in a user-associated storage area associated with the network server; and

in response to the user selecting the particular link via the mailbox user interface, transmitting the particular message to the user's client device in accordance with the hyper-text transfer protocol.

**2**. The method as set forth in claim **1**, wherein the client device associated with the user comprises a computer.

**3**. The method as set forth in claim **2**, wherein the computer includes a display and a keyboard.

**4**. The method as set forth in claim **1**, wherein the client device associated with the user comprises a handheld device.

**5**. The method as set forth in claim **1**, wherein the network comprises the Internet.

**6**. The method as set forth in claim **1**, wherein the network comprises a private network.

**7**. The method as set forth in claim **1**, wherein the particular message comprises a mark-up language file.

**8**. The method as set forth in claim **1**, wherein the application program is a hyper-text browser which displays at least part of a content of the particular message in response to user selection of the links contained in the mark-up language file.

**9**. The method as set forth in claim **8**, wherein the application program is a web browser which displays at least part of a content of the particular message in response to user selection of the links contained in the mark-up language file.

**10**. The method as set forth in claim **1**, wherein the network server executes a hyper-text transfer protocol daemon which performs the transmitting.

**11**. The method as set forth in claim **1**, wherein the network server executes a hyper-text transfer protocol daemon which handles hyper-text transfer protocol interactions between the network server and the client device associated with the user.

**12**. The method as set forth in claim **1**, wherein:

the network server executes a hyper-text transfer protocol daemon;

the application program is a browser; and

wherein the hyper-text transfer protocol daemon performs the transmitting by transmitting the mark-up language file to the browser.

**13**. The method as set forth in claim **12**, wherein the browser comprises a hyper-text browser.

**14**. The method as set forth in claim **1**, wherein the network server comprises an HTTP server and the client device associated with the user comprises an HTTP client.

**15**. The method as set forth in claim **1**, wherein the particular message is received in a first file format, and further comprising converting the particular message from the first file format to a second file format, wherein the second file format comprises a mark-up language file format.

**16**. The method as set forth in claim **15**, wherein the network server executes a second application program and an HTTP daemon (HTTPD), and wherein the second application program performs the converting, and the HTTPD performs the transmitting.

**17**. The method as set forth in claim **16**, wherein the HTTPD establishes an HTTP application layer session between the second application program executing on the network server and a hyper-text browser executing on the client device associated with the user.

**18**. The method as set forth in claim **17**, wherein the client device associated with the user comprises a computer.

**19**. The method as set forth in claim **18**, wherein the computer includes a display and a keyboard.

**20**. The method as set forth in claim **18**, wherein the client device associated with the user comprises a handheld device.

**21**. The method as set forth in claim **18**, wherein the network comprises the Internet.

**22**. The method as set forth in claim **18**, wherein the network comprises a private network.

**23**. The method as set forth in claim **18**, wherein the particular message comprises an HTML file.

**24**. The method as set forth in claim **1**, further comprising, after the receiving and before the transmitting, storing the particular message in the user-associated storage area associated with the network server.

**25**. The method as set forth in claim **24**, wherein the user-associated storage area comprises a restricted access message storage area.

**26**. The method as set forth in claim **25**, wherein the user-associated message storage area comprises a mailbox having an associated URL.

**27**. The method as set forth in claim **26**, wherein the application program is a hypertext browser that enables the user to access the mailbox using the URL.

**28**. The method as set forth in claim **27**, wherein the particular message is received in a first file format, and further comprising converting the particular message from the first file format to a second file format, wherein the second file format comprises the format of the mark-up language file.

**29**. The method as set forth in claim **28**, wherein the network server executes a second application program and an HTTP daemon (HTTPD), and wherein the second application program performs the converting, and the HTTPD performs the transmitting and processing of user URL access requests to the mailbox.

**30**. The method as set forth in claim **29**, wherein the HTTPD performs the transmitting by transmitting the mark-up language file to the hyper-text browser.

**31**. The method as set forth in claim **1**, wherein the particular message comprises a mark-up language file that conforms with a dialect of a standardized generalized mark-up language (SGML).

**32**. The method as set forth in claim **1**, wherein the particular message comprises a standardized generalized mark-up language (SGML) file.

**33**. The method as set forth in claim **1**, wherein the particular message is received in a first file format other than a mark-up language file format, and, further comprising converting a file format of the received message from the first file format to the mark-up language file format.

**34**. The method as set forth in claim **1**, wherein the particular message comprises a voice mail message.

**35**. The method as set forth in claim **1**, wherein the particular message comprises a facsimile message.

**36**. The method as set forth in claim **1**, wherein the particular message comprises a data message.

**37**. The method as set forth in claim **1**, further comprising sending a notification to the user to notify the user that the particular message has been received.

**38**. The method as set forth in claim **37**, wherein the notification comprises an e-mail message.

**39**. The method as set forth in claim **37**, wherein the notification comprises a wireless notification.

US 7,895,306 B2

29

**40**. The method as set forth in claim **1**, wherein the user-associated storage area comprises a user-specific message mailbox within a messaging database comprising a plurality of mailboxes for a plurality of users.

**41**. A method for delivering a particular message addressed to an intended recipient from a network server to the intended recipient's computer, the method comprising:

receiving the particular message, wherein the particular message is addressed to the intended recipient;

writing a particular link to the particular message into a mark-up language file;

establishing a user-authenticated hypertext transfer protocol connection, over the Internet, between the intended recipient's computer and the network server; and

transmitting the mark-up language file from the network server to a browser program executing on the intended recipient's computer over the Internet, via the hypertext transfer protocol connection, wherein by the time of the transmitting, the markup language file contains links to a plurality of messages, including the particular link to the particular message, and wherein further the browser program produces a graphical user interface in response to the mark-up language file, the graphical user interface enabling the intended recipient to request delivery of the particular message from a user-associated storage area associated with the network server; and

in response to the intended recipient selecting the particular link via the graphical user interface, transmitting the particular message to the intended recipient's computer via the user-authenticated hypertext transfer protocol connection.

**42**. The method as set forth in claim **41**, further comprising sending a notification to the user to notify the user that the particular message has been received.

**43**. The method as set forth in claim **42**, wherein the notification comprises an e-mail message.

**44**. The method as set forth in claim **42**, wherein the user-associated storage area is a restricted access storage area of the storage medium allocated to the intended recipient.

**45**. The method as set forth in claim **44**, wherein the graphical user interface provides an indication of the plurality of messages stored in the restricted access storage area allocated to the intended recipient.

**46**. The method as set forth in claim **42**, wherein the notification comprises a wireless notification.

**47**. The method as set forth in claim **41**, wherein the particular message comprises an HTML file.

**48**. The method as set forth in claim **41**, wherein the browser program comprises a hyper-text browser.

**49**. The method as set forth in claim **41**, wherein the browser program comprises a web browser.

**50**. The method as set forth in claim **41**, wherein the particular link comprises a hyper-text link which can be activated by the intended recipient to download the particular message from the network server to the intended recipient's computer.

**51**. A method for delivering a particular message addressed to an intended recipient to the intended recipient's user device, comprising:

receiving, at the intended recipient's user device, the particular message, wherein the particular message is addressed to the intended recipient;

storing, at a remote server, the particular message in a user-associated storage area allocated to the intended recipient;

writing a particular link to the particular message into a mark-up language file;

30

establishing a user-authenticated hypertext transfer protocol connection, over a network, between the intended recipient's user device and the remote server; and

transmitting the mark-up language file from the remote server to the intended recipient's user device, over the network, via the hypertext transfer protocol connection, wherein by the time of the transmitting, the markup language file contains links to a plurality of messages, including the particular link to the particular message, and wherein further an application program executing on the user device generates, in response to the mark-up language file, a mailbox user interface to enable the intended recipient to access the particular message stored in the user-associated storage area; and

in response to the intended recipient selecting the particular link via the mailbox user interface, transmitting the message to the intended recipient's user device via the user-authenticated hypertext transfer protocol connection.

**52**. A method of accessing a particular message addressed to a user via a network server and via a network using a hyper-text transfer protocol, comprising:

receiving, at a client device, in accordance with the hyper-text transfer protocol, a mark-up language file from the network server;

producing, at the client device, in response to the mark-up language file, a graphical user interface that enables the user to access the particular message from the network server, and to browse a plurality of messages stored in a user-associated area of the network server;

transmitting, in accordance with the hyper-text transfer protocol, a request from the client device to the network server, wherein the request is responsive to the user selecting a particular link in the markup language file via the graphical user interface, and the request is indicative of the user's desire to access the particular message, and wherein further the user is associated with the client device; and

responsive to the request, receiving the particular message from the network server at the client device, via the network, in accordance with the hyper-text transfer protocol,

wherein the particular link to the particular message is written into the mark-up language file, and by the time of the receiving of the mark-up language file at the client device, the markup language file contains links to the plurality of messages, including the particular link to the particular message.

**53**. A method, comprising:

receiving a particular message addressed to an intended recipient;

storing the particular message in a user-associated storage area associated with a network server and allocated to the intended recipient;

writing a particular link to the particular message into a mark-up language file;

transmitting, in accordance with the hyper-text transfer protocol, the mark-up language file from the network server to a client device, wherein by the time of the transmitting, the mark-up language file contains links to a plurality of messages, including the particular link to the particular message;

the network server receiving a request from a user application program executing on the client device, via a network, wherein the request comprises a request to retrieve the particular message and is directed to an

US 7,895,306 B2

**31**

application layer address which is used to locate the particular message using at least a portion of the particular link; and

in response to the request, transmitting the particular message from the network server to the user application program, via the network,

wherein the network server and the user application program communicate using an application layer communication protocol as application layer peer endpoints, and the user application program produces, in response to the mark-up language file, a mailbox user interface

**32**

that enables the intended recipient to select the links to the plurality of messages via the mailbox user interface, and the particular link comprises a link to the application layer address of the particular message in the user-associated storage area.

**54**. The method a set forth in claim **53**, wherein the application layer communication protocol comprises a hyper-text transfer protocol.

**55**. The method as set forth in claim **53**, wherein the packet switched data network comprises the Internet.

\*   \*   \*   \*   \*

(12) **United States Patent**          (10) **Patent No.:**          **US 7,895,313 B2**

Bobo, II                              (45) **Date of Patent:**          *Feb. 22, 2011

(54) **SYSTEMS AND METHODS FOR STORING, DELIVERING, AND MANAGING MESSAGES**

(75) Inventor:   **Charles R. Bobo, II**, Atlanta, GA (US)

(73) Assignee:   **Advanced Messaging Technologies, Inc.**, Los Angeles, CA (US)

( * ) Notice:   Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 594 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/608,999**

(22) Filed:   **Dec. 11, 2006**

(65)          **Prior Publication Data**

US 2007/0083656 A1     Apr. 12, 2007

**Related U.S. Application Data**

(63) Continuation of application No. 10/963,586, filed on Oct. 14, 2004, which is a continuation of application No. 10/436,798, filed on May 12, 2003, now Pat. No. 6,857,074, which is a continuation of application No. 09/840,759, filed on Apr. 23, 2001, now Pat. No. 6,564, 321, which is a continuation of application No. 09/186, 595, filed on Nov. 5, 1998, now Pat. No. 6,350,066, which is a continuation of application No. 08/944,741, filed on Oct. 6, 1997, now Pat. No. 5,870,549, which is a continuation-in-part of application No. 08/431,716, filed on Apr. 28, 1995, now Pat. No. 5,675,507.

(51) **Int. Cl.**
**G06F 15/173**      (2006.01)

(52) **U.S. Cl.** ...................... **709/223**; 455/435; 455/412; 379/88; 713/168; 726/4; 726/26

(58) **Field of Classification Search** ................. 709/217, 709/226, 223; 713/200, 193, 168; 379/88, 379/89; 455/461, 412, 435; 348/6; 726/4, 726/26

See application file for complete search history.

(56)          **References Cited**

U.S. PATENT DOCUMENTS

4,106,060 A     8/1978   Chapman, Jr.

(Continued)

FOREIGN PATENT DOCUMENTS

AT          755321      4/2003

(Continued)

OTHER PUBLICATIONS

M. Frans Kaashoek, Dynamic Documents: Extensibility and Adaptablility in the WWW, Sep. 15, 1994, MIT.*

(Continued)

*Primary Examiner*—Thuong T Nguyen
(74) *Attorney, Agent, or Firm*—Kenyon & Kenyon LLP

(57)          **ABSTRACT**

Systems and methods are provided for receiving and storing a message addressed to an intended recipient and for delivering the message to a client computer that has a graphical user interface. The received message is stored in a restricted-access message storage area associated with the intended recipient. A hyper-text transfer protocol daemon receives requests to access the storage area and the message, and transmits at least part of the message to the client computer.

**42 Claims, 18 Drawing Sheets**



US 7,895,313 B2

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,130,885 | A | 12/1978 | Dennis |
| 4,289,930 | A | 9/1981 | Connolly et al. |
| 4,405,829 | A | 9/1983 | Rivest et al. |
| 4,532,588 | A | 7/1985 | Foster |
| 4,571,699 | A | 2/1986 | Herzog |
| 4,713,780 | A | 12/1987 | Schultz et al. |
| 4,754,428 | A | 6/1988 | Schultz et al. |
| 4,816,653 | A | 3/1989 | Anderl et al. |
| 4,837,798 | A | 6/1989 | Cohen et al. |
| 4,853,961 | A | 8/1989 | Pastor |
| 4,918,722 | A | 4/1990 | Duehren et al. |
| 4,941,170 | A | 7/1990 | Herbst |
| 5,008,814 | A | 4/1991 | Mathur |
| 5,018,191 | A | 5/1991 | Catron et al. |
| 5,029,199 | A | 7/1991 | Jones et al. |
| 5,033,079 | A | 7/1991 | Catron et al. |
| 5,047,918 | A | 9/1991 | Schwartz et al. |
| 5,054,096 | A | 10/1991 | Beizer |
| 5,065,427 | A | 11/1991 | Godbole |
| 5,068,797 | A | 11/1991 | Sansone et al. |
| 5,068,888 | A | 11/1991 | Scherk et al. |
| 5,091,790 | A | 2/1992 | Silverberg |
| 5,105,184 | A | 4/1992 | Pirani et al. |
| 5,113,430 | A | 5/1992 | Richardson, Jr. et al. |
| 5,113,496 | A | 5/1992 | McCalley et al. |
| 5,115,326 | A | 5/1992 | Burgess et al. |
| 5,127,003 | A | 6/1992 | Doll, Jr. et al. |
| 5,129,080 | A | 7/1992 | Smith |
| 5,167,011 | A | 11/1992 | Priest |
| 5,175,762 | A | 12/1992 | Kochis et al. |
| 5,193,110 | A | 3/1993 | Jones et al. |
| 5,195,085 | A | 3/1993 | Bertsch et al. |
| 5,210,824 | A | 5/1993 | Putz et al. |
| 5,224,156 | A | 6/1993 | Fuller et al. |
| 5,227,893 | A | 7/1993 | Ett |
| 5,241,594 | A | 8/1993 | Kung |
| 5,247,591 | A | 9/1993 | Baran |
| 5,247,661 | A | 9/1993 | Hager et al. |
| 5,255,312 | A | 10/1993 | Koshiishi |
| 5,257,112 | A | 10/1993 | Okada |
| 5,267,047 | A | 11/1993 | Argenta et al. |
| 5,267,301 | A | 11/1993 | Nishii |
| 5,274,635 | A | 12/1993 | Rahman et al. |
| 5,276,869 | A | 1/1994 | Forrest et al. |
| 5,283,887 | A | 2/1994 | Zachery |
| 5,289,371 | A | 2/1994 | Abel et al. |
| 5,289,472 | A | 2/1994 | Cho |
| 5,291,302 | A | 3/1994 | Gordon et al. |
| 5,291,546 | A | 3/1994 | Giler et al. |
| 5,293,250 | A | 3/1994 | Okumura et al. |
| 5,296,934 | A | 3/1994 | Ohtsuki |
| 5,297,208 | A | 3/1994 | Schlafly et al. |
| 5,299,255 | A | 3/1994 | Iwaki et al. |
| 5,301,226 | A | 4/1994 | Olson et al. |
| 5,307,456 | A | 4/1994 | MacKay |
| 5,317,628 | A | 5/1994 | Misholi et al. |
| 5,333,266 | A | 7/1994 | Boaz |
| 5,339,156 | A | 8/1994 | Ishii |
| 5,349,636 | A | 9/1994 | Irribarren |
| 5,351,276 | A | 9/1994 | Doll, Jr. et al. |
| 5,355,472 | A | 10/1994 | Lewis |
| 5,367,621 | A | 11/1994 | Cohen et al. |
| 5,371,885 | A | 12/1994 | Letwin |
| 5,379,374 | A | 1/1995 | Ishizaki et al. |
| 5,384,835 | A | 1/1995 | Wheeler et al. |
| 5,394,460 | A | 2/1995 | Olson et al. |
| 5,394,522 | A | 2/1995 | Sanchez-Frank et al. |
| 5,404,231 | A | 4/1995 | Bloomfield |
| 5,406,557 | A | 4/1995 | Baudoin |
| 5,418,908 | A | 5/1995 | Keller et al. |
| 5,424,724 | A | 6/1995 | Williams et al. |
| 5,432,841 | A | 7/1995 | Rimer |
| 5,438,433 | A | 8/1995 | Reifman et al. |
| 5,448,626 | A | 9/1995 | Kajiya et al. |
| 5,452,289 | A | 9/1995 | Sharma et al. |
| 5,459,584 | A | 10/1995 | Gordon et al. |
| 5,471,617 | A | 11/1995 | Farrand et al. |
| 5,475,738 | A | 12/1995 | Penzias |
| 5,479,408 | A | 12/1995 | Will |
| 5,479,411 | A | 12/1995 | Klein |
| 5,479,491 | A | 12/1995 | Herrero Garcia et al. |
| 5,483,466 | A | 1/1996 | Kawahara et al. |
| 5,483,524 | A | 1/1996 | Lev et al. |
| 5,483,580 | A | 1/1996 | Brandman et al. |
| 5,487,100 | A | 1/1996 | Kane |
| 5,488,651 | A | 1/1996 | Giler et al. |
| 5,495,610 | A | 2/1996 | Shing et al. |
| 5,497,373 | A | 3/1996 | Hulen et al. |
| 5,502,637 | A | 3/1996 | Beaulieu et al. |
| 5,509,123 | A | 4/1996 | Dobbins et al. |
| 5,513,126 | A | 4/1996 | Harkins et al. |
| 5,513,323 | A | 4/1996 | Williams et al. |
| 5,517,556 | A | 5/1996 | Pounds et al. |
| 5,524,137 | A | 6/1996 | Rhee |
| 5,526,353 | A | 6/1996 | Henley et al. |
| 5,530,740 | A | 6/1996 | Irribarren et al. |
| 5,530,852 | A | 6/1996 | Meske, Jr. et al. |
| 5,534,913 | A | 7/1996 | Majeti et al. |
| 5,537,415 | A | 7/1996 | Miller et al. |
| 5,544,320 | A | 8/1996 | Konrad |
| 5,546,388 | A | 8/1996 | Lin |
| 5,548,789 | A | 8/1996 | Nakanura |
| 5,552,901 | A | 9/1996 | Kikuchi |
| 5,555,100 | A | 9/1996 | Bloomfield et al. |
| 5,557,659 | A | 9/1996 | Hyde-Thomson |
| 5,559,611 | A | 9/1996 | Bloomfield et al. |
| 5,559,721 | A | 9/1996 | Ishii |
| 5,561,703 | A | 10/1996 | Arledge et al. |
| 5,568,536 | A | 10/1996 | Tiller et al. |
| 5,568,540 | A | 10/1996 | Greco et al. |
| 5,572,643 | A | 11/1996 | Judson |
| 5,579,472 | A | 11/1996 | Keyworth, II et al. |
| 5,590,178 | A | 12/1996 | Murakami et al. |
| 5,604,737 | A | 2/1997 | Iwami et al. |
| 5,604,788 | A | 2/1997 | Tett |
| 5,608,446 | A | * | 3/1997 | Carr et al. .................... 725/114 |
| 5,608,786 | A | 3/1997 | Gordon |
| 5,608,874 | A | 3/1997 | Ogawa et al. |
| 5,619,648 | A | 4/1997 | Canale et al. |
| 5,621,727 | A | 4/1997 | Vaudreuil |
| 5,625,675 | A | 4/1997 | Katsumaru et al. |
| 5,630,060 | A | 5/1997 | Tang et al. |
| 5,630,061 | A | 5/1997 | Richter et al. |
| 5,633,916 | A | 5/1997 | Goldhagen et al. |
| 5,634,005 | A | 5/1997 | Matsuo |
| 5,647,002 | A | 7/1997 | Brunson |
| 5,654,886 | A | 8/1997 | Zereski, Jr. et al. |
| 5,654,957 | A | 8/1997 | Koyama |
| 5,657,461 | A | 8/1997 | Harkins et al. |
| 5,664,102 | A | 9/1997 | Faynberg |
| 5,673,316 | A | 9/1997 | Auerbach et al. |
| 5,675,507 | A | 10/1997 | Bobo, II |
| 5,677,955 | A | 10/1997 | Doggett et al. |
| 5,687,220 | A | 11/1997 | Finnigan |
| 5,689,550 | A | * | 11/1997 | Garson et al. ............ 379/88.18 |
| 5,692,039 | A | 11/1997 | Brankley et al. |
| 5,694,458 | A | 12/1997 | Okada et al. |
| 5,694,546 | A | 12/1997 | Reisman |
| 5,710,883 | A | 1/1998 | Hong et al. |
| 5,712,901 | A | 1/1998 | Meermans |
| 5,712,903 | A | 1/1998 | Bartholomew et al. |
| 5,712,907 | A | 1/1998 | Wegner et al. |
| 5,715,314 | A | 2/1998 | Payne et al. |
| 5,715,444 | A | 2/1998 | Danish et al. |

**US 7,895,313 B2**

Page 3

| | | | |
|---|---|---|---|
| 5,715,453 A | 2/1998 | Stewart | |
| 5,717,742 A | * 2/1998 | Hyde-Thomson ........ 379/88.17 | |
| 5,724,406 A | 3/1998 | Juster | |
| 5,724,410 A | 3/1998 | Parvulescu et al. | |
| 5,724,424 A | 3/1998 | Gifford | |
| 5,724,425 A | 3/1998 | Chang et al. | |
| 5,724,514 A | 3/1998 | Arias | |
| 5,724,567 A | 3/1998 | Rose et al. | |
| 5,727,156 A | 3/1998 | Herr-Hoyman et al. | |
| 5,732,219 A | 3/1998 | Blumer et al. | |
| 5,737,395 A | * 4/1998 | Irribarren ................ 379/88.13 | |
| 5,737,396 A | 4/1998 | Garcia | |
| 5,737,533 A | 4/1998 | de Hond | |
| 5,740,231 A | 4/1998 | Cohn et al. | |
| 5,742,596 A | 4/1998 | Baratz et al. | |
| 5,742,668 A | 4/1998 | Pepe et al. | |
| 5,742,905 A | * 4/1998 | Pepe et al. .................. 455/461 | |
| 5,751,791 A | 5/1998 | Chen et al. | |
| 5,751,814 A | 5/1998 | Kafri | |
| 5,751,956 A | 5/1998 | Kirsch | |
| 5,754,939 A | 5/1998 | Herz et al. | |
| 5,758,088 A | 5/1998 | Bezaire et al. | |
| 5,761,201 A | 6/1998 | Vaudreuil | |
| 5,761,396 A | 6/1998 | Austin et al. | |
| 5,761,662 A | 6/1998 | Dasan | |
| 5,765,033 A | 6/1998 | Miloslavsky | |
| 5,768,528 A | 6/1998 | Stumm | |
| 5,771,354 A | 6/1998 | Crawford | |
| 5,774,668 A | 6/1998 | Choquier et al. | |
| 5,781,614 A | 7/1998 | Brunson | |
| 5,781,901 A | 7/1998 | Kuzma | |
| 5,787,175 A | 7/1998 | Carter | |
| 5,790,790 A | 8/1998 | Smith et al. | |
| 5,790,793 A | * 8/1998 | Higley ........................ 709/218 | |
| 5,793,972 A | 8/1998 | Shane | |
| 5,801,702 A | 9/1998 | Dolan et al. | |
| 5,805,298 A | 9/1998 | Ho et al. | |
| 5,812,278 A | 9/1998 | Toyoda et al. | |
| 5,812,639 A | 9/1998 | Bartholomew et al. | |
| 5,812,786 A | 9/1998 | Seazholtz et al. | |
| 5,819,092 A | 10/1998 | Ferguson et al. | |
| 5,819,295 A | 10/1998 | Nakagawa et al. | |
| 5,825,865 A | 10/1998 | Oberlander et al. | |
| 5,838,906 A | 11/1998 | Doyle et al. | |
| 5,845,303 A | 12/1998 | Templeman | |
| 5,848,413 A | 12/1998 | Wolff | |
| 5,854,893 A | 12/1998 | Ludwig et al. | |
| 5,855,015 A | 12/1998 | Shoham | |
| 5,859,967 A | 1/1999 | Kaufeld | |
| 5,870,454 A | 2/1999 | Dahlen | |
| 5,870,549 A | 2/1999 | Bobo, II | |
| 5,870,552 A | 2/1999 | Dozier et al. | |
| 5,872,845 A | 2/1999 | Feder | |
| 5,872,926 A | 2/1999 | Levac et al. | |
| 5,881,233 A | 3/1999 | Toyoda et al. | |
| 5,892,591 A | 4/1999 | Anglin, Jr. et al. | |
| 5,892,909 A | 4/1999 | Grasso | |
| 5,893,908 A | 4/1999 | Cullen et al. | |
| 5,903,723 A | 5/1999 | Beck et al. | |
| 5,907,598 A | 5/1999 | Mandalia et al. | |
| 5,911,776 A | 6/1999 | Guck | |
| 5,917,615 A | 6/1999 | Reifman et al. | |
| 5,930,493 A | 7/1999 | Ottesen et al. | |
| 5,933,412 A | 8/1999 | Choudhury et al. | |
| 5,933,490 A | 8/1999 | White et al. | |
| 5,937,041 A | 8/1999 | Cardillo, IV et al. | |
| 5,937,161 A | 8/1999 | Mulligan | |
| 5,937,162 A | 8/1999 | Funk | |
| 5,940,476 A | 8/1999 | Morganstein et al. | |
| 5,940,598 A | 8/1999 | Strauss et al. | |
| 5,944,786 A | 8/1999 | Quinn | |
| 5,945,989 A | 8/1999 | Freishtat et al. | |
| 5,946,386 A | 8/1999 | Rogers et al. | |
| 5,958,016 A | 9/1999 | Chang et al. | |
| 5,960,085 A | 9/1999 | de la Huerga | |
| 5,961,582 A | 10/1999 | Gaines | |
| 5,963,618 A | 10/1999 | Porter | |
| 5,963,892 A | 10/1999 | Tanaka et al. | |
| 5,970,490 A | 10/1999 | Morgenstern | |
| 5,978,813 A | 11/1999 | Foltz et al. | |
| 5,987,504 A | 11/1999 | Toga | |
| 5,987,508 A | 11/1999 | Agraharam et al. | |
| 5,991,292 A | 11/1999 | Focsaneanu et al. | |
| 5,996,006 A | 11/1999 | Speicher | |
| 5,999,525 A | 12/1999 | Krishnaswamy et al. | |
| 5,999,594 A | 12/1999 | Mizoguchi et al. | |
| 5,999,965 A | 12/1999 | Kelly | |
| 6,009,173 A | 12/1999 | Sumner | |
| 6,009,469 A | 12/1999 | Mattaway et al. | |
| 6,014,668 A | 1/2000 | Tabata et al. | |
| 6,020,980 A | 2/2000 | Freeman | |
| 6,023,345 A | 2/2000 | Bloomfield | |
| 6,023,700 A | 2/2000 | Owens et al. | |
| 6,025,931 A | 2/2000 | Bloomfield | |
| 6,028,679 A | 2/2000 | Murphy | |
| 6,032,192 A | 2/2000 | Wegner et al. | |
| 6,035,332 A | 3/2000 | Ingrassia, Jr. et al. | |
| 6,052,367 A | 4/2000 | Bowater et al. | |
| 6,052,442 A | 4/2000 | Cooper et al. | |
| 6,055,530 A | 4/2000 | Sato | |
| 6,061,448 A | 5/2000 | Smith et al. | |
| 6,064,653 A | 5/2000 | Farris | |
| 6,064,723 A | 5/2000 | Cohn et al. | |
| 6,069,890 A | 5/2000 | White et al. | |
| 6,072,862 A | 6/2000 | Srinivasan | |
| 6,073,165 A | 6/2000 | Narasimhan et al. | |
| 6,084,892 A | 7/2000 | Benash et al. | |
| 6,084,952 A | 7/2000 | Beerman, Jr. et al. | |
| 6,085,101 A | 7/2000 | Jain et al. | |
| 6,097,797 A | 8/2000 | Oseto | |
| 6,108,329 A | 8/2000 | Oyama et al. | |
| 6,157,706 A | 12/2000 | Rachelson | |
| 6,167,253 A | * 12/2000 | Farris et al. .............. 455/412.2 | |
| 6,181,781 B1 | 1/2001 | Porter et al. | |
| 6,185,603 B1 | 2/2001 | Henderson et al. | |
| 6,192,407 B1 | 2/2001 | Smith et al. | |
| 6,208,638 B1 | 3/2001 | Rieley et al. | |
| 6,211,972 B1 | 4/2001 | Okutomi et al. | |
| 6,212,550 B1 | 4/2001 | Segur | |
| 6,215,858 B1 | 4/2001 | Bartholomew et al. | |
| 6,216,173 B1 | 4/2001 | Jones et al. | |
| 6,229,844 B1 | 5/2001 | Kong | |
| 6,233,318 B1 | 5/2001 | Picard et al. | |
| 6,240,445 B1 | 5/2001 | Kumar et al. | |
| 6,240,454 B1 | 5/2001 | Nepustil | |
| 6,246,983 B1 | 6/2001 | Zou et al. | |
| 6,256,115 B1 | 7/2001 | Adler et al. | |
| 6,259,533 B1 | 7/2001 | Toyoda et al. | |
| 6,263,064 B1 | 7/2001 | O'Neal et al. | |
| 6,266,160 B1 | 7/2001 | Saito et al. | |
| 6,278,532 B1 | 8/2001 | Heimendinger et al. | |
| 6,282,270 B1 | 8/2001 | Porter | |
| 6,285,777 B2 | 9/2001 | Kanevsky et al. | |
| 6,288,799 B1 | 9/2001 | Sekiguchi | |
| 6,295,350 B1 | 9/2001 | Schreyer et al. | |
| 6,295,552 B1 | 9/2001 | Shibata | |
| 6,301,245 B1 | 10/2001 | Luzeski et al. | |
| 6,301,339 B1 | 10/2001 | Staples et al. | |
| 6,304,636 B1 | 10/2001 | Goldberg et al. | |
| 6,314,425 B1 | 11/2001 | Serbinis et al. | |
| 6,330,070 B1 | 12/2001 | Toyoda et al. | |
| 6,330,079 B1 | 12/2001 | Dugan et al. | |
| 6,330,323 B1 | 12/2001 | Gottlieb et al. | |
| 6,334,142 B1 | 12/2001 | Newton et al. | |
| 6,339,591 B1 | 1/2002 | Migimatsu | |
| 6,339,780 B1 | 1/2002 | Shell et al. | |

## US 7,895,313 B2

Page 4

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 6,341,160 | B2 | 1/2002 | Tverskoy et al. | | JP | 09200251 | A | 7/1997 |
| 6,350,066 | B1 | 2/2002 | Bobo, II | | JP | 09-223004 | A | 8/1997 |
| 6,356,356 | B1 | 3/2002 | Miller, Jr. et al. | | JP | 09214559 | A | 8/1997 |
| 6,359,881 | B1 | 3/2002 | Gerszberg et al. | | JP | 09214560 | A | 8/1997 |
| 6,360,256 | B1 | 3/2002 | Lim | | WO | 94/06230 | | 3/1994 |
| 6,404,513 | B1 | 6/2002 | Denker | | WO | 95/01040 | | 1/1995 |
| 6,411,696 | B1 | 6/2002 | Iverson et al. | | WO | 95/06386 | | 3/1995 |
| 6,417,930 | B2 | 7/2002 | Mori | | WO | WO 95 20288 | | 7/1995 |
| 6,430,272 | B1 | 8/2002 | Maruyama et al. | | WO | 9531060 | A1 | 11/1995 |
| 6,486,895 | B1 | 11/2002 | Robertson et al. | | WO | 9627160 | A1 | 9/1996 |
| 6,498,835 | B1 | 12/2002 | Skladman et al. | | WO | 9627967 | A1 | 9/1996 |
| 6,510,438 | B2 | 1/2003 | Hasegawa | | WO | 9629663 | A1 | 9/1996 |
| 6,564,321 | B2 | 5/2003 | Bobo, II | | WO | 9629664 | A1 | 9/1996 |
| 6,597,688 | B2 | 7/2003 | Narasimhan et al. | | WO | 96/34341 | A1 | 10/1996 |
| 6,643,034 | B1 | 11/2003 | Gordon et al. | | WO | 9638987 | A1 | 12/1996 |
| 6,690,480 | B2 | 2/2004 | Maeda | | WO | 9641463 | | 12/1996 |
| 6,742,022 | B1 | 5/2004 | King et al. | | WO | 97/09682 | | 3/1997 |
| 6,775,264 | B1 | 8/2004 | Kurganov | | WO | 9710668 | | 3/1997 |
| 6,795,108 | B2 | 9/2004 | Jarboe et al. | | WO | 9718635 | A2 | 5/1997 |
| 6,825,955 | B1 | 11/2004 | Shibata | | WO | 9723082 | A1 | 6/1997 |
| 6,857,074 | B2 | 2/2005 | Bobo, II | | WO | 9723988 | A1 | 7/1997 |
| 6,948,070 | B1* | 9/2005 | Ginter et al. ............... 713/193 | | WO | 9817041 | A2 | 4/1998 |
| 2001/0014910 | A1 | 8/2001 | Bobo, II | | WO | 9823058 | A2 | 5/1998 |
| 2003/0208688 | A1 | 11/2003 | Bobo, II | | | | | |
| 2005/0050349 | A1 | 3/2005 | Bobo, II | | | | | |
| 2008/0229182 | A1* | 9/2008 | Hendricks et al. ........... 715/205 | | | | | |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 4309072 | A1 | 9/1994 |
| EP | 0615368 | A2 | 2/1992 |
| EP | 0760503 | A1 | 5/1997 |
| EP | 0835021 | A1 | 4/1998 |
| EP | 0554456 | A1 | 8/1998 |
| GB | 2024561 | A1 | 1/1980 |
| GB | 2157117 | A1 | 10/1985 |
| JP | 2237338 | A | 9/1990 |
| JP | 04018844 | A | 1/1992 |
| JP | 04111557 | A | 4/1992 |
| JP | 04150351 | A | 5/1992 |
| JP | 04256273 | A | 9/1992 |
| JP | 4265040 | A | 9/1992 |
| JP | 05233488 | A | 9/1992 |
| JP | 05235997 | A | 9/1992 |
| JP | 04290033 | A | 10/1992 |
| JP | 04291858 | A | 10/1992 |
| JP | 05244292 | A | 9/1993 |
| JP | 05284326 | A | 10/1993 |
| JP | 05316309 | A | 11/1993 |
| JP | 06069956 | A | 3/1994 |
| JP | 06164645 | A | 6/1994 |
| JP | 06217069 | A | 8/1994 |
| JP | 07023057 | A | 1/1995 |
| JP | 07038689 | A | 2/1995 |
| JP | 07058845 | A | 3/1995 |
| JP | 07212393 | A | 8/1995 |
| JP | 07250094 | A | 9/1995 |
| JP | 07288543 | A | 10/1995 |
| JP | 07288668 | A | 10/1995 |
| JP | 08009092 | A | 1/1996 |
| JP | 08111692 | A | 4/1996 |
| JP | 08130601 | A | 5/1996 |
| JP | 08237294 | A | 9/1996 |
| JP | 08237297 | A | 9/1996 |
| JP | 08256235 | A | 10/1996 |
| JP | 08286991 | A | 11/1996 |
| JP | 08336053 | A | 12/1996 |
| JP | 09023273 | A | 1/1997 |
| JP | 07170288 | A | 2/1997 |
| JP | 09046369 | A | 2/1997 |
| JP | 09102798 | A | 4/1997 |
| JP | 09135266 | A | 5/1997 |
| JP | 09163064 | A | 6/1997 |

### OTHER PUBLICATIONS

Edwards, Nigel, ANSA Phase III, The working of client servers in WWW, Sept. 28 1994.*

Casson, Andrew, PLINTH, HTML and the World Wide Web, Artificial Intelligence Applications Institute AIS-PR-56, Jul. 1994.*

Design of an Email System for Personal Computers, El-Hadidi, M.T., et.al., Eng. Journal of Qatar Univ. vol. 4, 1991, p. 51-69.*

MIME (Multipurpose Internet Mail Extension) Part One: Mechanism for Specifying and Describing the Format of Internet Messages Bodies. Borenstein, N. et. al., Bellcore, Internet Draft: MIME, Apr. 1993.*

Delrina WinFax Pro 4.1 Set-Up Guide.

Delrina WinFax Pro 4.1 for Networks User's Guide.

FaxBack InForms Reference Guide.

CallXpress3 Unified Messaging to Be Fully Compatible with Windows 95 and Microsoft Mail Server.

Applied Voice Technology Announces New Version of its Award-Winning Voice and Call Processing System CallXpress3.

Applied Voice Technology Announces CallXpress3 Release 4.0.

Low Cost Messaging the LAN Fax Way (McCusker).

Surprise! Fax Servers Smarten Up (Levine).

Pursuing One Peripheral (Blankenhorn).

What's Ahead for PC/Fax (Cook).

Meet the Intranet.

Now Your PC Can "Read" Your Fax (Stevens).

Intel NET SatisFaxtion Software User's Guide.

Intel FAXability Plus Software for Windows User's Guide.

Intel Net SatisFaxtion Software Installation Guide for Net Ware networks.

FaxPress Supervisor's Guide.

Commerce Path Messaging Connector.

WinFax Pro's User Guide v. 3.0.

RightFax E-mail Gateway Guide 3.51ightFax E-mail Gateway Guide 3.51.

Commerce Path Net Link User Guide.

WinFax Pro for Networks 4.1 Marketing Brochure.

J. Duffy, "IBM's SAA Gets Voice: Company to Expand Enterprise Networking Horizons," Computer Systems News, p. 1, May 14, 1990.

E Spire, "Fax→E-mail" Google Groups, http://groups-beta.google.com/group/comp/acom.telecom, Dec. 20, 1995.

Plaintiff's Opposition Claim Construction Brief in *j2 Global Communications, Inc.* v *Venali, Inc.*, cv 04-1172 DDP AJWx.

Brief in Opposition to Plaintiff j2's Opening Claim Construction Brief in j2 *Global Communications, Inc.* v *Venali, Inc.*, cv 04-1172 DDP AJWx .

Plaintiffs Opening Claim Construction Brief in j2 *Global Communications, Inc.* v *Venali, Inc.*, cv 04-1172 DDP AJWx.

Opening Claim Construction Brief in j2 *Global Communications, Inc.* v *Venali, Inc.*, cv 04-1172 DDP AJWx.

Docket Report from cv 04-1172 DDP AJWx.

Critical Path Data Sheet—Critical Path Messaging Server, 2 pages, Dec. 2002.

Critical Path Data Sheet—Critical Path Internet File Server, 2 pages, Dec. 2002.

Critical Path Data Sheet—Critical Path Presentation Server, 2 pages, Dec. 2002.

Critical Path Data Sheet—Critical Path SMS Access Server, 2 pages, 2002.

Critical Path Data Sheet—Critical Path Calendar Server, 2 pages, Dec. 2002.

Critical Path Data Sheet—Critical Path Personal Address Book Server, 2 pages, Dec. 2002.

CPT™ Meta-Directory Server, 4 pages, Jun. 2002.

Critical Path Meta-Directory Server, 1 page, May 8, 2003 http://www.cp.net/solutions/metaDirectoryServer.html.

Tumbleweed Communications, 3 pages, May 8, 2003 http://www.tumbleweed.com/en/products/ime_overview.html.

Tumbleweed Communications, 1 page, May 8, 2003 http://www/tumbleweed.com/en/products/ime_product_architecture.html.

Tumbleweed Communications, 1 page, May 8, 2003 http://www.tumbleweed.com/en/products/ime_for_automated_deliveries.html.

Tumbleweed Communications, 3 pages, May 8, 2003 _http://www.tumbleweed.com/dy/print/.

Tumbleweed Communications, 1 page, May 8, 2003 http://www.tumbleweed.com/en/products/ime_portal_integration.html.

Tumbleweed Communications, 1 page, May 8, 2003 http://www.tumbleweed.com/en/products/ime_message_tracking.html.

Tumbleweed Communications, 2 pages, May 8, 2003 http://www.tumbleweed.com/dy/print/.

Nakagawa, et al., Development of a Network Model for the Total Health Care Management of Multi-Vendor Environment, in Multimedia Communications, 1994, Multimedia '94, 5th IEEE COMSOC Int'l Workshop, pp. 5/2/1-5/2/4 (workshop occurred May 16-19, 1994).

Larry M. Edwards, E-Mail: Industry is Posting Impressive Gains, in San Diego Business Journal, pp. 1 and 17-18 (Mar. 7, 1994).

Aurthor unknown, Lotus Executive Details Notes' Work Flow Strategy; Pinches Notes as a platform for Third-Party Products, in Network World, p. 27 (Sep. 6, 1993).

Paul Kinnucan, What's New in the Fax World, in Systems Integration, vol. 23, No. 2 at 50 (Feb. 1990).

Author unknown, Delrina WinFax Pro 4.0 Focuses on Ease of Use, Newsbytes, Post-Newsweek Business Information, Inc., (Mar. 15, 1994).

David Morgenstern, DynaWeb Server Holds SGML Books: Web Server Queries, Converts to HTML, in MacWeek, vol. 8, No. 28 at 12 (Jul. 11, 1994).

Gord Nickerson, WorldWideWeb: hypertext from CERN, Computers in Libraries, vol. 12, No. 11, p. 75 (1992).

Mario J. Silva and Randy H. Katz, The case for Design Using the World Wide Web, in 32nd ACM/EEE Design Automation Conference (1995).

Barry Fenn and Hermann Maurer, Harmony on an Expanding Net, ACM Interactions, pp. 27-38 (Oct. 1994).

Brief in Opposition to Plaintiff j2's Opening Claim Construction Brief in j2 *Global Communications, Inc.* v *Venali, Inc.*, cv 04-1172 DDP AJWx.

"JFax Personal Telecom—Plug a Phone Into Your E-Mail," downloaded from the Internet at www.jfax.com on Oct. 31, 1996.

J. Peck, et al., "MH & xmh, Email for USOIS & Programers," O'Reilly & Associates, Inc., Sebastopol, CA, 1995.

"ScanFX-Scanning Hardware for Internet E-Mail", Aug. 1990.

"Defendant CallWave's Supplemental Disclosures Pursuant FRCP 26(A)(1)" in j2 *Global Communications, Inc.* v. *CallWave, Inc.*, CV04-7068 DDP AJWx.

MIME (Multipurpose Internet Mail Extension) Part One: "Mechanisms for Specifying and Describing the Format of Internet Message Bodies", Internet RFC 1341 and 1521, Sep. 1993.

MIME (Multipurpose Internet Mail Extension) Part Two: "Message Header Extensions got Non-ASCII Text", Internet RFC 1342, Sep. 1993.

Patel, Henderson and Georganas, The Multimedia Fax-MIME Gateway, IEEE Multimedia, 1994.

"Hypertext Markup Language (HTML), A Representation of Textual Information and Meta Information for Retrieval and Interchange," Draft version, Jun. 1993.

"Lotus Turns up the Heat on Microsoft Exchange Rival," Network Week, Jan. 27, 1995.

"Novell Inc. to Demonstrate Alex, a Universal In-box That Will Accept and Store Email, Voice mail and Faxes," Computer Reseller News, Feb. 6, 1995.

Public-Key Cryptography Standards (PKCS), Revised Nov. 1, 1993, downloaded from the Internet at www.ftp.rsa.com, on Oct. 1, 1998.

j2 *Global Communications, Inc.* v. *Venali, Inc.* CV04-1172 DDP AJWx Venali, Inc.'s Answer to First Amended Complaint for Patent Infringement and Counterclaim for Declaration of Noninfringement and Invalidity Nov. 1, 2004.

j2 *Global Communications, Inc.* v. *CallWave, Inc.*, CV04-7068 DDp AJWx Callwave Inc.'s Second Set of Supplemental Responses to Plaintaff's First Set of Interrogatories Mar. 30, 2005.

"Invalidity Contentions of Defendant Protus IP Solutions, Inc." in j2 *Global Communications, Inc.* v. *Protus IP Solutions, Inc.*,Case No. 6:08-cv-211-LED-JDL.

"Defendant Captaris, Inc.'s, Local Patent Rule 3-3 Invalidity Contentions" in j2 *Global Communications, Inc.* v. *Captaris, Inc.*, Case No. 6:08-cv-262 (LED).

"Defendant Easylink Service International Corporation's Invalidity Contentions under P.R. 3-3 " in j2 *Global Communications, Inc.* v. *Easylink Service International Copration*, Case No. 6:08-cv-263.

Deixler, Lyle; Fax Forges Ahead; Teleconnect; v. 14 n 11, p. 25(12).

Fax Solutions; Lan Times, v 13 n 21, p. 123(5).

Guide to Intelligent Least Cost Routing, Right Fax, Inc.

Guide to Internet Faxing, Right Fax, Inc.

Hertzoff, Ira; AT&T Global Messaging , The AT&T EasyLink Services Sourcebook; Ch. 6, pp. 107-47.

Mendel, Brett; Net Faxing Awaits Its Day; Lan Times, Dec. 9, 1996, v13 n 27 p. 25(2).

Beware the Fax Beast, Network World Reprint; vol. 12, # 48.

Rightfax Introduces New Fax Server Designed for the Enterprise; Rightfax News Release.

Rightfax Poised for Internet Faxing; Rightfax News Release.

Rightfax Ships Internet Connectivity Module for Lan Fax Software; Rightfax News Release.

Guo Zhen Sheng, et al., "Internet-Based Mail Fax Gateway Technology", 1997 IEEE International Conference on Intelligent Processing Systems, Oct. 28-31, Beijing, China 97TH8335 vol. 2 of 2 pp. 1607-161.

Savetz, Kevin; Faxing From the Internet; Tricks of the Internet Gurus, Ch. 6. pp. 165-174.

RightFAX E-mail Gateway Guide, 1996.

Castelle FaxPress Internet Faxing White Paper, Dec. 9, 1997.

Castelle FaxPress End User Features, Dec. 9, 1997.

Castelle FaxPress The Integrated Network Fax Server, Dec. 9, 1997.

Castelle FaxPress Network Diagram, Dec. 16, 1997.

Castelle FaxPress Lotus cc-Mail Gateway, Dec. 9, 1997.

Castelle FaxPress Lotus Notes Gateway, Dec. 9, 1997.

Castelle FaxPress Exchange Direct, Dec. 9, 1997.

Castelle Infopress Press Release: New Castelle System Merges Web, Fax, E-Mail and Phone for Universal Document Access/Delivery, Oct. 28, 1996.

FAXSAV, Rebiller/Reseller Manual, 1997.

FAXSAV Launches Serverlink 1997.

Simeonov, P.L., A Distributed Intelligent Network Approach to Bridge Switching . . . , Computer Comms. & Networks, 1997.

Hoffmann, P., Integrating Telephony and Internet, IEEE Conference on Protocols for Multimedia Systems . . . 1997.

Tanenbaum, A.S., Computer Networks, 3rd Edition, 1996.

Boran.com, IT Security Cookbook-Firewalls.

Cormen, T.H., Introduction to Algorithms, 8th Printing, 1992.

Patterson, D.A., Computer Organization & Design: The Hardware/Software Interface, 2nd, 1998.

Malamud, C, RFC 1528 Priciples of Operation for the TPC.INT Subdomain: Remote Printing—Technical Procedures, Oct. 1993 ("Malamud 1").

Malamud, C, RFC 1530 Priciples of Operation for the TPC.INT Subdomain: Remote Printing—Technical Procedures, Oct. 1993 ("Malamud 2").

Rose, M.T., The Internet Message: Closing the Book with Electronic Mail, 1993.

Toyoda, K., RFC 2305 A Simple Mode of Facsimile Using Internet Mail, Mar. 1998.

Berners-Lee, T., Hypertext Transfer Protocols—HTTP/1.0 Network Working Group Internet Draft, Dec. 1994.

Luotonen, A., CERN httpd Reference Manual: A Guide to A World-Wide Web Hyper Text Daemon, May 1994.

December, J., The World Wide Web Unleashed, 1994.

Microsoft Corporation, Microsoft Internet Information Server Technical Articles Web Services Frequently Asked Questions, 1997.

RightFax Installation & Administration Guide, Version 3.5 1994.

RightFax Installation & Administration Guide, Version 3.51 1994.

RightFax Installation & Administration Guide, Version 3.0 1993.

RightFax User's Guide, V. 3.5 1994.

RightFax E-mail Gateway Guide 1996.

RightFax Web Client Installation and Administration Guide, Version 1.1 1997.

An Introduction to Database Systems vol. II, Chapters 7 & 8.

The DCA/Intel Communicating Applications Specification. InstantCom/ESL..

Delrina WinFax Pro 4.0 User's Guide.

Request for Ex Parte Reexamination Transmittal Form Control No. 90007539.

Request for Reexamination Control No. 90007539 Detailed Statement in Support of Request for Reexamination of United States Patent No. 6,350,066.

"Defendant Comodo Communications, Inc.'s Local Patent Rule 3-3 Invalidity Contentions" in *j2 Global Communications, Inc. v. Comodo Communications, Inc.*, Case No. 6:08-cv-cv-275.

Coresoft Technologies, CenterPoint Fax Server Administration Guide, 1997-98.

Russell Kahan, "Fax over IP" Gale Group, Inc., 1997.

Shung-Foo Yu et al., "A multimedia gateway for phone/fax and MIME mail" 20 Computer Communications, pp. 615-627, Aug. 1997.

Ahmed Patel, et al., "A technique for multi-network access to multimedia messages" 20 Computer Communications 324-337, Jul. 1997.

Daniel J. Rosenbaum, "The E-Mail Route to Fax" 7 PC World, pp. 168-170, Jun. 1989.

Hertzoff, Ira; AT&T Global Messaging , The AT&T EasyLink Services Sourcebook; Ch. 7, p. 149-176.

Hertzoff, Ira; AT&T Global Messaging , The AT&T EasyLink Services Sourcebook; Ch. 10, p. 219-249.

Hertzoff, Ira; AT&T Global Messaging , The AT&T EasyLink Services Sourcebook; Ch. 11, p. 251-283.

Hertzoff, Ira; AT&T Global Messaging , The AT&T EasyLink Services Sourcebook; Ch. 12, p. 285-319.

RightFax Installation & Administration Guide, 1996.

RightFax E-mail Gateway Guide, 1994, v.3.51.

RightFax Users Guide, 1996.

M. Sirbu, "RFC1049—Content-type header field for Internet messages", [Online], Mar. 1988, XP-002542400 retrieved from the Internet: URL: http://www.fags.org/rfcs/rfc1049.html>, [retrieved on Aug. 21, 2009].

Luca Manunza, "Soft>WebMail, a www interface to e-mail" [Online], Mar. 10, 1995, XP-002542401 retrieved from the Internet: URL: http://scout.wisc.edu/Projects/PastProjects/NH/95-03/95-03-20/0010.html>, [retrieved on Aug. 20, 2009].

Luca Manunza, "Soft>WebMail, a www interface to e-mail—1st public release" [Online], Mar. 30, 1995, XP-002542402 retrieved from the Internet: URL: http://scout.wisc.edu/Projects/PastProjects/NH/95-03/95-03-30/0009. html>, [retrieved on Aug. 20, 2009].

Craig Mcfetridge, "Server Side Includes" [Online], Feb. 19, 1995, XP-002542447 retrieved from the Internet: URL: http://http-server.carleton.ca/~dmcfet/html/ssi.html>, [retrieved on Aug. 21, 2009].

Daniel W. Conolly, "Towards closure on HTML" [Online], Apr. 7, 1994, XP-002542403 retrieved from the Internet: URL: http://www.w3.org/MarkUp/html-spec/html-direction.html>, [retrieved on Aug. 20, 2009].

Jason Levitt, "A Push-Button Solution" [Online], Apr. 3, 1995, XP-002542404 retrieved from the Internet: URL: http://www.informationweek.com/521/21oljl.htm     :jsessionid=LN00SMQTI0OF01QE1G HPSKH4ATMY32JVN>, [retrieved on Aug. 21, 2009].

European Search Report in European Patent Application No. EP 09165919, Sep. 1, 2009 (59 pgs).

Notice of Reason for Rejection, Dispatch Date: Jan. 17, 2008, Patent Application No. JP 2000-515377 (5 pgs).

Invalidity Contentions of Defendant *Packetel, Inc. in j2 Global Communications, Inc. v. Packetel, Inc.*, Case No. 09cv3240 DDP (AJWx) (20 pgs).

Invalidity Contentions of Defendant *Protus IP Solutions, Inc. in j2 Global Communications, Inc. v. Protus IP Solutions, Inc.*, Case No. 05cv5610 DDP (AJWx) (109 pgs).

Invalidity Contentions of Defendant *Venali, Inc. in j2 Global Communications, Inc. v. Venali, Inc.*, Case No. 04v1172 DDP (AJWx) (52 pgs).

Defendant *Captaris, Inc.'s Invalidity Contentions in j2 Global Communications, Inc. v. Captaris, Inc.*, Case No. 09cv4150 DDP (AJWx) (217 pgs) (2 Parts).

Defendant Easylink Service International Corporation's Invalidity Contentions as to '638 in *j2 Global Communications, Inc. v. Easylink Service International Copration*, Case No. 09cv4189 DDP (AJWx) (17 pgs).

Defendant Easylink Service International Corporation's Invalidity Contentions as to '688 & '132 in j2 Global Communications, Inc. v. *Easylink Service International Copration*, Case No. 09cv4189 DDP (AJWx) (92 pgs).

Defendant *EasyLink's Opening Claim Construction Brief in j2 Global Communicationsv Easylink Services Intl.* Corp., 09cv4189 (55 pgs).

Defendant Venali's Opening Claim Construction Brief in *j2 Global Communications, Inc. v Venali, Inc.*, cv 04-1172 DDP AJWx.pdf (filed Jun. 11, 2010) (42 pgs).

Plaintiff *j2 Global Communications, Inc.'s Opening Markman Brief* filed on Jun. 11, 2010, *j2 Global Comm., Inc. v. Venali, Inc.*, Case No. 04-1172 DDP (AJWx) (DI 160) (65 pgs).

Consolidated Opening Claim Construction Brief of Defendants *Captaris, Inc., Packetel, Inc. and Protus IP Solutions* filed in *j2 Global Communications, Inc. v Protus, et al.*, filed Jun. 11, 2010, *j2 Global Communications v Protus* 05cv5610 (61 pgs).

Reply Claim Construction Brief of Defendants Captaris, Inc., Packetel, Inc. and Protus IP Solutions filed Jul. 1, 2010 *j2 Global Comm v Protus* 05cv5610 (52 pgs).

Defendant Venali's Reply Claim Construction Brief, filed Jul. 1, 2010 *j2 Global v Venali* 04cv1172 (43 pgs).

Plaintiffs Reply Markman Brief filed on Jul. 1, 2010, *j2 Global Comm., Inc. v. Protus IP Solutions, Inc.*, Case No. 05-5610 DDP (AJWx) (67 pgs).

Easylink's Reply to Plaintiff's Claim Construction Brief filed Jul. 1, 2010 09cv4189 (46 pgs).

*j2 Global Communications, Inc. v Callwave, Inc.* CV04-7068 DDP AJWx Callwave Inc.'s Responses to Plaintiffs First Set of Interrogatories Dec. 22, 2004 (12 pgs).

*j2 Global Communications, Inc. v Venali, Inc.*, cv 04-1172 DDP AJWx, Defendant *Venali, Inc.'s* Objections and Responses to Plaintiff *j2 Global Communications, Inc.'s* First Set of Interrogatories (Nos. 1-7) (19 pgs).

*j2 Global Communications, Inc. v Venali, Inc.*, cv 04-1172 DDP AJWx, litigation cover page (1 pg).

Notice of Dismissal filed on Sep. 22, 2005, *j2 Global Comm., Inc. v. Mijanda, Inc.*, Case No. 05-5300 DDP (AJWx) (DI 15) (1 pg).

Declaration of Professor Walter Scacchi Regarding Defendant CallWave, Inc.'s Opening Claim Construction Brief in *j2 Global Communications, inc. v. Call Wave, Inc.*, CV 04-7068 VBKx (20 pgs).

Defendant Protus' Answer and Counterclaim in *j2 Global Comm. v Protus* 05cv5610 filed Nov. 12, 2005 (12 pgs).

Administrator's Guide Lotus Notes Release 3, Lotus Development Co., 1993, p. 5-54 (1 pg.).

Alta Vista Search, SHAREWARE.COM: Search results, Dec. 5, 1996 (2 pgs.).

Andrew Eberle, The Path Taken: Inbound Routing, Network World, May 2, 1994, p. 101.

(Author Unknown) Call and Voice Processing PC Board Roundup (Buyers Guide), in Teleconnect Library, Inc., Dec. 1995, v13, n12, pp. 1-6.

B. Kantor, et al., Network News Transfer Protocol, A Proposed Standard for the Stream-Based Transmission of News, RFC 977, Feb. 1986 (29 pgs.).

B. Mathers, et al., Lotus Notes Internet Cookbook, last modified Apr. 21, 1995, (25 pgs.).

C. Hunt, TCP IP Network Administration, Jan. 1994 (268 pgs.).

Carlos A. Varela, et al., Providing Data on the Web: From Examples to Programs, Second International WWW Conference, Oct. 17-21, 1994, pp. 1-12, http://fiaker.ncsa.uiuc.edu:8080/WWW94-2/paper.html.

Chane Fullmer, et al., A TCP/IP Network Facsimile System Built from Publicly Available Software, in Association for Computing Machinery (ACM),1992, ref. No. 089791-472-4/92/0002/525, pp. 525-529.

comp.mail.mime meta-FAQ: Help for MIME problems, downloaded from the Internet at www.cis.ohio-state.edu/text/faq/ usenet/mail/mimefaq/partl/faq.html. Aug. 8, 1997 (8 pgs.).

D. Nakamura, AT&T Introduces Most Comprehensive Fax-to_Data Service dated Feb. 22, 1996, downloaded from Internet at http://www.att.com/press/0296/960222.ela.html on May 16, 1997 (2 pgs.)

Dale Doughtery, et al., The Mosaic Handbook for Microsoft Windows, Oct. 1994, O'Reilly & Associates (239 pgs).

Lotus Fax Server Gives cc: Mail, Notes Users better fax gateway services, Jan. 30, 1995, v. 17, n. 5, 1995 WLNR 5462216, InfoWord Media Group, Inc. (2 pgs).

Lotus Notes for Dummiew, IDG Books Worldwide, Inc., 1994, p. 295, (3 pgs).

M. Horton, Standard for Interchange of USENET Messages, RFC 850 (Jun. 1983) (19 pgs).

M. Kauffman, Computer Based Fax Processing The Kauffman Group, Cherry Hill, N.J. First edition 1994, pp. 19-20, 61, 75, 77-79 (ISBN 0-936648-62-7) (10 pgs).

Mail2HTML.c, Convert Mail/News Files to HTML (Prototype), Jan. 21, 1993, Rev. 0.3 (17 pgs).

Marc Andreessen, NCSA Mosaic for X 2.0 available, www.talk newsgroup message, Nov. 10, 1993 (8 pgs).

Marc Vanheyningen, The Unified Computer Science Technical Report Index: Lessons in Indexing Diverse Resources, http://www.CS.indiana.edu/paper/paper.html, UCSTRI Paper for WWW94 Chicago (8 pgs).

Mark Miller, Defusing TCPIP-based internet problems in layers, Network World, Oct. 17, 1994 (6 pgs).

MHonArc: Index Page Customization, v1.0.0, http://ftp.sunet.se/pub/text-processing/sgml/DTD2HTML/ file MHonArc 1.0.0.tar.gz. (5 pgs).

Michael L. Nelson, et al., Electronic Document Distribution Design of the Anonymous FTP Langley Technical Report Server, NASA Technical Memorandum 4567, Mar. 1994, National Aeronautics and Space Administration, Langley Research Center, Hampton, Virginia (20 pgs).

Michael L. Nelson, et al., The Widest Practicable Dissemination: The NASA Technical Report Server, Computers in Aerospace 10 (Mar. 28-30, 1995, San Antonio, TX), 1995, American Institute of Aueronautics and Astronautics, Inc. (14 pgs).

Michael L. Nelson, et al., The World Wide Web and Technology Transfer at NASA Langley Research Center, Proceedings of the Second International World Wide Web Conference: Mosaic and the Web (Oct. 19-21,1994, Chicago, IL., pp. 701-710), NASA Langley Research Center (12 pgs).

Michael L. Nelson, et al., World Wide Web Implementation of the Langley Technical Report Server, Sep. 5, 1994, NASA Technical Memorandum 109162, National Aeronautics and Space Administration, Langley Research Center, Hampton, Virginia (31 pgs).

NCSA http—Unified Directory Structure (1 pg).

NCSA httpd—Compatibility (1 pg).

NCSA httpd—Document Root Directive.html (1 pg).

NCSA httpd—Security (1 pg).

NetScan Kofax: The Easy Way to Share a Scanner, 1996, KOFAX, http://www.netscan.kofax.com. (10 pgs).

On the Road: The Telephone User Interface, Computer Telephony Expo in Dallas, TX, Mar. 7, 1995, Applied Voice Technology, Inc. (4 pgs).

Pacific Bell Information Services, 1994 Annual Report, p. 6 (1994) (10 pgs).

Putting Paper Documents In the World-wide Web, Myka, 1994 Article (10 pgs).

QNet Business Plan, Apr. 1987 (104 pgs).

R. Thomas, Hands-On Wizard's Grabbag Getting A Bang Out of Unix, UnixWorld's Open Computing, vol. 11, No. 1 (Jan. 1, 1994) (5 pgs).

Reg Quinton, Sendmail—Care and Feeding, Mar. 24, 1992, pp. 1-44, Computing and Communications Services, The University of Western, Ontario, Canada (23 pgs).

RightFAX Web Client. (RightFAX's RightFAX Web Client) (Product Announcement) Software Magazine, Apr. 1, 1997 (1 pg).

Ronald J. Vetter, et al., Mosaic and the World-Wide Web, pp. 49-57, Computer Practives, Oct. 1994 (9 pgs).

S. Broadhead, Getting Your Fax Straight: Getting Ahead of the Game with Fax Server Technology Network Computing, Feb. 1997 (Abstract) (2 pgs).

S. Leffler, FlexFAX—A Network-based Facsimile Service, Silicon Graphics, Inc., Nov. 27, 1990 (9 pgs).

S.C. Hui, et al., A Distributed Fax Messaging System, Proc. Of IEEE Singapore Intl. Conf. on Networks/Intl Conf on Information Engineering 1995, pp. 393-7, IEEE Cat. No. 95TH8061 (6 pgs).

S. D. Reilly, et al., Increasing the Computational Potential of the World Wide Web, Feb. 9, 1996, pp. 1-28, Dept. Of Computer Science School of Engineering and Applied Science University of Virginia, Charlottesville, VA (30 pgs).

Stephen Laudermilk, Trio Set to Roll Out Fax Gear for LANs, PC Week, Aug. 17, 1992, pp. 39, 47.

Steve Putz, Design and Implementation of the System 33 Document Service, ISTL-NLTT-93-07-01, 1993, Xerox Corporation (116 pgs).

Steve Putz, Interactive Information Services Using World-Wide Web Hypertext, First International Conference on World-Wide Web, (May 25-27, 1994), Apr. 20, 1994, pp. 1-10, ISTL-QCA-1994-03-01, Xerox Corporation (10 pgs).

Steve Putz, System 33 Gateway Code, Gateway Software, http://www.w3.org/Gateways/System33/gateway (14 pgs).

Stuart Melnitsky, Fax Server Face Off, Network World, Apr. 15, 1996, pp. 43-45.

T. Kasper, Untangling the Web—The role of text retrieval in a hypertext environment (6 pgs).

The Geometry Forum News Gateway—A Newsreader for the World Wide Web, Forum Outposts: The Geometry Forum Newsletter (Dec. 30, 1994) (2 pgs).

V. Kumar, et al., A SHARed Web to Support Design Teams, Enterprise Integration Technologies Corp., 1994 IEEE, 0-8186-5705-7/94, pp. 178-182.

Wayne Rash, The Fax of the Matter, Information Week, May 20, 1996 (4 pgs).

XDOC Data Format, Technical Specification, Mar. 1995, pp. 1:1-2:10, vol. 3.0, The Document Company Xerox (15 pgs).

Yahoo, Inc., NetScan Kofax, Yahoo! Internet Life, Jan. 1997, p. 73, vol. 3, No. 1, <http://www.yil.com/>.

Yvonee L. Lee, Vendors to Showcase Integrated Telephony Solutions, InfoWorld, Mar. 4, 1996, p. 18(1), vol. 18, No. 10, Gale Group (1 pg).

Duval & Main, Exploring the Internet with Mosaic, Library Software Review, vol. 13, No. 4, Winter 1994, Sage Periodicals Press, pp. 269-279.

Ed Liebowitz, The Dialogic VAR Parade: Open Voice Processing for Art Dealers, the Blind, the Dallas Cowboys and the RBOCs, in Teleconnect, Apr. 1993, v11, n 4, p. 40(3) (2 pgs).

e-mail-fax-120.hqx, E-Mail Fax Search Results, Shareware.com, Nov. 24, 1996, <http://www.search.shareware.com/code/ . . . mail+fax+&category=A11—Categories> (2 pgs).

F. Sung and M. Johnson, Faxing Docs in HP MPower, Apr. 1994 Hewlett-Packard Journal, pp. 53-61.

Facsimile and Voice System Links Offices, Electronics, Jan. 18, 1979 (379-100), S9054 0063, pp. 69-70.

FaxMail Networks for Windows v5.13: Fax over a network, ZD NET Software Library, Nov. 14, 1996, http://search2zdnet.com/cgi-bin/texis/swlib/hotfiles/search.html. (3 pgs).

FAXSAV, faxMAILER—How FaxMailer Works, (1996) (2 pgs).

FAXSAV, The FaxSav Technology Edge: A White Paper, (1997) (5 pgs).

French, Fox, Maly & Selman, Wide Area Technical Report Service—Technical Reports Online, Communications on the ACM, Apr. 1995, ACM 002-0782/95/0400 pp. 124-127.

G. Vaudreuil, Enhanced Mail System Status Codes, Network Working Group, Internet Draft, Jan. 1996 (13 pgs).

Graphics, Visualization and Usability Center GSQL-ORACLE Backend, Date Unknown (2 pgs).

GSQL in detail, Dec. 1993 (4 pgs).

Halama, James R., et al., An Interactive Electronic Bulletin Board Implementation for Mosaic and HTTP Server, EBBSMos.htm, Date Unknown (4 pgs).

Helen Plotkin, The Forum Newsreader Plans, Apr. 5, 1994, http://mathforum.org/kb/plaintext.jspa? messageID=1072645 (2 pgs).

Hong, J., et al.; Personal Electronic Notebook with Sharing, Center for Design Research, Stanford University, 1080-1383/95, 1995 IEEE, pp. 88-94.

Jay C. Weber, The Webmaster's Starter Kit, WWW Fall '94 paper, Enterprise Integration Technologies Corporation (4 pgs).

Jennifer Myers, Announcing Version 0.11 of 'readcomics', a Common Gateway Interface World Wide Web Gateway to clari.feature.dilbert, Jan. 17, 1994, v. 0.11, Article 9857, comp.lang.perl. (6 pgs).

Jennifer Myers, readcomics, Jan. 18, 1994, v. 0.12 (4 pgs).

JFAX Personal Telecom, Free Downloads JFAX Communicator Software!, Dec. 4, 1996 <http://www.jfax.net/software.htm/> (2 pgs).

JFAX Personal Telecom, Get All Your Voice-Mail and Faxes in your E-Mail, Dec. 4, 1996, <http://www.jfax.net/> (4 pgs).

JFAX Personal Telecom, What the Media Says About JFAX Personal Telecom, Oct. 31, 1996, <http://www.fax.netl> (2 pgs).

K. Tomaru, Electronic Mail Systems, Japan Annual Review in Electronics, Computers & Telecommunications, 1983, vol. 9, Telecommunication Technology, pp. 283-290.

Kennie Jones, NASA Langley Research Center, Tops On-Line—Automating the Construction and Maintenance of HTML pp., 1994 (7 pgs).

Kevin Bachus, Touring Lotus Notes: The New World of Group ware, Windows Magazine, Mar. 1, 1994 Issue 503, CMP Publications, Inc., Factiva, Inc. (7 pgs).

Kevin Brown, et al., Mastering Lotus Notes, Sybex, Inc., 1995, p. 939.

L. Orozco-Barbosa, et al., Design and Performance Evaluation of Intelligent Multimedia Services, rec'd Jun. 28, 1996, pp. 219-232, v. 20 (1997), Computer Communications.

"Plaintiffs Opening Markman Brief" in j2 Global Communications, Inc. v. CallWave, Inc., CA 04-7068 DDP AJWx.

"Plaintiffs Opposition Markman Brief" in j2 Global Communications, Inc. v. CallWave, Inc., CA 04-7068 DDP AJWx.

"Defendant CallWave, Inc.'s Opening Claim Construction Brief" in j2 Global Communications, Inc. v. CallWave, Inc., CA 04-7068 DDP AJWx.

Delrina Advertisement, 1994.

"Working with . . . Fax Mailbox" PCToday by Jim Cope (Sep. 1994, vol. 8, Issue 9).

Voice/Fax Combos by Stuart Warren, Computer Telephony, Sep./Oct. 1994, p. 88.

B.S. Kaliski Jr., "An Overview of the PKCS Standards," RSA Laboratories Technical Note, RSA Security, Inc., Public-Key Cryptography Standards (PKCS), Revised Nov. 1, 1993.

"Keys and Certificates" downloaded from the Internet at www.elock.com.

"Cryptography Systems," downloaded from the internet at work at www.elock.com.

How does the S/MIME encryption and digital signature process work? downloaded from the Internet at www.worldtalk.com, on Jul. 25, 1999.

PKCS #7: Cryptographic Message Syntax Standard, RSA Laboratories Technical Note, Version 1.5, RSA Security, Inc. Public-Key Cryptography Standards (PKCS), Revised Nov. 1, 1993, downloaded from the Internet at www.ftp.rsa.com, on Oct. 1, 1998.

C. Ellison, et al., "Default Protecting Secret Keys with Personal Entropy;" Mar. 3, 1999.

Chaffing and Winnowing: Confidentiality without Encryption, downloaded from the Internet at www.theory.lcs.mit.edu, on Jul. 13,1999.

"S/MIME Or OpenPGP? How Will You Secure Your E-mail?" downloaded from the Internet atwww.worldtalk.com.

"S/MIME Frequently Asked Questions," downloaded from the Internet at www.rsa.com, on Jul. 23, 1999.

"S/MIME Frequently Asked Questions," downloaded from the Internet at www.rsa.com, on Nov. 16, 1999.

"SDML-Signed Document Markup Language," W3C Note Jun. 19, 1998, downloaded from the Internet at www.23.org, on Oct. 28, 1998.

"C. R. Baudoin, ""The Sematech Electronic Mail System," "Proceedings of the Digital Equipment Computer Users Society, pp. 221-231, US.A., Spring 1989" .

N. Borenstein, et al., "A Multi-media Message System for Andrew," USENIX Winter Conference, Dallas, TX, pp. 37-42, Feb. 9-12, 1988.

J. Donahue, et al., "Walnut: Storing Electronic Mail in a Database," XEROX PARK, CSL-85-9, Nov. 1985.

K. Hofrichter, et al., "The BERKOM Multimedia-Mail Teleservice," Proceedings of the Fourth Workshop on Future Trends of Distributed Computing Systems, Lisbon, Portugal, pp. 23-30, Sep. 22-24, 1993.

J. K. Reichard, "Leveraging E-Mail," PC Magazine: 241, 244 and 245 (May 1995), et al., "Browsing Electronic Mail: Experiences Interfacing a Mail System to a DBMS," Proceedings of the Fourteenth International Conference on Very Large Data Bases, Los Angeles, CA, pp. 112-123, 1988.

E. Moeller, et al., "The BERKOM multimedia-mail teleservice," Computer Communications, vol. 18:2, pp. 89-102, Feb. 1995.

J. Pan, "Internet Security & Firewall Issues NIIIP Virtual Enterprise,"NIIIP OMB Meeting, Boca Raton, FL, Jan. 23-25, 1996.

A. Poggio, et al., "CCWS: A Computer-Based, Multimedia Information System,"Multimedia Communications, pp. 92-103, Oct. 1985.

A. Reinhardt, "Smarter E-Mail is Coming,"BYTE Magazine, pp. 90-108, Mar. 1993.

J. Rosenberg, et al., "An Overview of the Andrew Message System,"Computer Communications Review, vol. 17:5, pp. 99-108, Apr. 1988.

S. Sakata, et at., "A Distributed Interoffice Mail System,"Multimedia Communications, pp. 106-116, Oct. 1985.

S. J. Vaughan-Nichols, "Internet Publishing Tools Proliferate,"BYTE Magazine, Mar. 1995.

"Microsoft Messaging Application Pro Interface (MAPI),"downloaded from the Internet at www.microsoft.com/win32dev/apiexs/mapiwp.html.

Novell Announces Softsolutions 4.1, PR Newswire, New Orleans, LA, May 9, 1995.

"How Posta Works", downloaded from the Internet at www.tumbleweed.com/posta/posta_overview.html.

"Overview of the Trans-Virtual Enterprise Server," Product Overview.

V. Gay, et al, "Conception of a Multimedia Electronic Mail Based on Standards," Proceedings of the Fourth Workshop on Future Trends of Distributed Computing Systems, Sep. 22-24, 1993.

J. Postel, et al. "An Experimental Multimedia Mail System,""ACM Transactions on Office Information Systems, vol. 6, No. 1, Jan. 1988".

"Web Mail", Information Week, pp. 120, Dec. 16, 1996.

"Ipswitch Delivers the First Internet-Ready Messaging Server for Windows NT Tha. Allows Access to E-mailvia the Web", "PR Newswire, pp. 1209NEM007, Dec. 9, 1996".

"Hotmail Introduces Hotmail WebCourier Direct Content Delivery Service", Business Wire, pp. 02030123, Mar.1997.

J. B. Postel, RFC0821, Simple Mail Transfer Protocol, Http://rfc-koeln.de/html, 8C pages, Aug. 1982.

US 7,895,313 B2

Page 9

M. Sherman, et al., "Allocation of User-Interface Resources in the Andrew Toolkit," International Conference on Multimedia Information stems, pp. 261-272, 1991.

M. Sherman, et al., "Building Hypertext on a Multimedia Toolkit: An Overview of Andrew Toolkit Hypermedia Facilities," Proceedings of the First European Conference on Hypertext, pp. 13-24, France, Nov. 1990.

V. S.,Wheatman,"Sorting Through the Secure Messaging Maze," Messaging Magazine, downloaded from theInternet at www.ema.org/html/pubs/mmv4n2/msgmaze.htm, Mar.-Apr. 1998.

The Andrew Messages System, downloaded from the Internet at www.cs.cmu.edu/afs/cs.cmu.edu/project/atk-ftp/web/ams.html.

"Facts on File re: Andrew," downloaded from the internet at www.cs.cmu.edu:80/afs/cs.cmu.edu/project/atk-ftp/web/faxonfile.html.

Welcome to the Andrew Consortium, www.cs.cmu.edu:80/afs/cs.cmu.edu/project/atk-ftp/web/andrew-home.html.

"The Andrew Publication Archive," ftp.andrew.cmu.edu/pub/AUIS/PAPERS/REDME.

"Bibliography of Publications on the Andrew User Interface System," ftp.andrew.cmu.edu/pub/AUIS/PAPERS/BIBLIOGRAPHY on May 13, 2002.

J. Peek, et al., "MH & xmh, Email for Users & Programmers," O'Reilly & Associates, Inc., Sebastopol, CA, 1995.

B. Costales, et al., "sendmail,"O'Reilly & Associates, Inc., Sebastopol, CA, 1993.

K. S. Morris, "A Technical Overview of MIME." Web Developer's Journal Archives, Mar. 1995.

"comp.mail.mime FAQ (frequently asked questions list)," downloaded from the Internet at www.cis.ohio-state.edu/text/ faq/usenet/mail/mime-faq/partifaq.html Jun. 11,1997.

"Composing and Sending MIME Message," downloaded from the Internet at www.gieldasgarage.com/mh/cosemine.htm.

"Reading MIME Messages," downloaded from the Internet at www.gieldasgarage.com/mh/cosemime.htm.

"comp.mail.mime frequently asked questions list (FAQ) (1/3)," downloaded from the Internet at www.tu-chemnitz.del-fri/mime/FAO-1.htmk, Sep. 4, 1994.

M. Grand, "MIME Overview," downloaded from the Internet at www.mindspring.com/-mgrand/mime.html, revised Oct. 26, 1993.

D. W. Connolly, "A Formalism for Internet Information References," downloaded from the Internet atwww.w3.org/people//Connolly/drafts/formalism.txt.

G. Vaudreuil, "The Multipart/Report Content Type for the Reporting of Mail System Administrative Messages," Network Working Group, Internet Draft, Sep. 1995.

G. Vaudreuil, "Enhanced Mail System Status Codes," Network Working Group, Internet Draft, Jun. 1995.

K. Moore, et al., "An Extensive Message Format for Delivery Status Notifications," Network Working Group, Internet Draft, Sep. 1995.

"Information Technology—Text and office systems—Distributed-office-applications model —Part 1: General model," International Standard ISO/IEC 10031-1: 1-73, 1991 (E).

D. H. Crocker, "Standard for the Format of ARPA Interent Text Message," RFC 822, 1982.

J. Klensin, "Simple Mail Transfer Protocol," Internet Draft, draft-ietf-drums-02.txt, May 21, 1996.

N. Borenstein, et al., "MIME: Mechanisms for Specifying and Describing the Format of Internet Message Bodies," Network Working Group, RFC 1341, Jun. 1992.

N. Borenstein, "MIME (Multipurpose Internet Mail Extensions) Part One: Mechanism for Specifying and Describing the Format of Internet Message Bodies," Network Working Group, RFC 1521, Sep. 1993.

K. Moore, "MIME (Multipurpose Internet Mail Extensions) Part Two: Message Heacer Extensions for Non-ASCII Text," Network Working Group, RFC 1522, Sep. 1993.

N. Freed, et al., "Definition of the URL MIME External-Body Access-Type," Network Working Group, InternetDraft of RFC 2017 (Apr. 11, 1995) see also N. Freed et al.,"Definition of the URL MIME External-Body Access-Type," Network Working Group, RFC 2017, Oct. 1996.

C. Manros, "New Internet Mail Functionality for Delivery Status Notifications," Messaging Magazine, Jul./Aug. 1995.

K. Moore, "SMTP Service Extension for Delivery Status Notifications," Network Working Group, Internet-Draftof RFC 1891, Sep. 21, 1995.

"Internet Engineering Task Force, R. Braden (ed.),""Requirements for Internet Hosts—Application and Support,""Network Group, RFC 1123, Oct. 1989".

J. Myers, et al., "Post Office Protocol-Version 3," Network working Group, RFC 1725, Nov. 1994.

K. Sollins et al., "Functional Requirements for Uniform Resource Names," Network Working Group, RFC 1737Dec. 1994.

T. Berners-Lee, "Universal Resource Identifier in WWW, A Unifying Syntax for the Expression and Address ofObjects on the Network as used in the World-Wide Web," Network Working Group, RFC 1630, Jun. 1994.

T. Berners-Lee, et al., "Uniform Resurce Locators (URL),"Network Working Group, RFC 1738, Dec. 1994.

T. Berners-Lee, et al., "Hypertext Markup Language-2.0," Network Working Group, RFC 1866, Nov. 1995.

S. Bradner, "The Internet Standards Process—Revision 3," Network Working Group, RFC 2026, 1996.

J. K. Reynolds, et al., "The DARPA Experimental Multimedia Mail System," Computer: 82-89, 1985.

S. Baker, "Hypertext Browsing on the Internet," UNIX Review 21-27, 1994.

D.P. Dern, "Applying the Internet," BYTE Magazine, Feb. 1992.

K.M. Savetz, "Magazines Without Paper," BYTE Magazine, Sep. 1993.

S.J. Vaughan-Nichols, "The Web Means Business," BYTE Magazine, Nov. 1994.

A. Singleton, "The Virtual Storefront," BYTE Magazine, Jan. 1995.

J.R. Vacca, "Mosaic: Beyond Net Surfing," BYTE Magazine, Jan. 1995.

B. Smith, "Internet with Style," BYTE Magazine, Jan. 1995.

B. Smith, "Making the Internet Connection," BYTE Magazine, Jan. 1995.

B. Friesenhahn, "Build Your Own WWW Server," BYTE Magazine, Apr. 1995.

S.B. Jones, "Caught in the World Wide Web: MIT Moves Computer Documentation Online," Meet the ShadowFuture: 187-189, 1994.

S. Baker, "Mosaic-Surfing at Home and Abroad," Meet the Shadow Future: 159-163, 1994.

R. J. Vetter et al., Mosaic, HTML, and the World Wide Web, IEEE Computer, 27, 1994.

"University of Cambridge Statistical Laboratory, Using Mosaic for Xwindows," Internet Publication, Jul. 1994, downloaded from http://www.statslab.cam.ac.uk.

"New Fearutes in Mosaic 2.0" Internet Publicaation, downloaded from http://www.issi.com, Dec. 1994.

"World Wide Web Frequently Asked Questions,"from URL http://sunsite.unc.edu/boutell/faq/www._faq.html, Dec. 9, 1994.

"MHonArc Home Page updated Nov. 17, 1994 and MHonArc software manual published by Earl Hood<ehood@convex.com>Convex Computer Corporation, Richardson Texas".

C. Liu, et al., "Managing Internet Information Servicies," World Wide Web, Gopher, FTP, and more : 357-359,Dec.1994.

J. December, et al., "The World Wide Web; Everything You Need to Master the Web?" : 180-189-part I and 277-280 (part II), 1994.

T. Berners-Lee, et al., "Hypertext Markup Language (HTML); A Representation of Textual Information and Metainformation for Retrieval and Interchange," Internet Draft, IIIR Working Group, 1993.

K. Reichard, "Leveraging E-Mail", PC Magazine: 241, and 245, May 1995.

"Lan-Aces, Inc. Announces Expanded Capabilities to Office-Logic Clerk Application," PR Newswire, May-Jun. 1994.

500 Tips—Communications, Windows Magazine, pp. 1-7, WNDW 303, Issue: 412, Copyright 1993 CMP Publications, Inc., 2009 Factive, Inc.

1997 RightFax Administration Guide.

1997 RightFax E-mail Gateway Guide.

Larry Masinter, "Document Management, Digital Libraries and the Web", Jun. 9, 1995, http://larry.masinter.net/docwebilb.html, pp. 1-22.

John Taylor, VP Engineering, GammaLink, "Building FAX into Computer Telephony Applications", Computer Telephony Expo 95, Computer Fax 1995—Making Technology Work, GammaLink, A Dialogic Company, 233 pages.

"AT & T EasyLink Services and Visioneer offer easy integration of paper and electronic documents", 863 words, Nov. 28, 1994, Business Wire, BWR, English, Copyright 1994, Business Wire, pp. 1-2.

"Lotus Ships Notes: Document Imaging Release 2; Office Imaging Made Easy and Affordable", 1,189 words, Nov. 22, 1993, Business Wire, BWR, English, Copyright 1993, Business Wire, pp. 1-4.

"RightFAX Brings Award-Winning LAN Fax Software to Multi-Platform Environment With Web Client Module; Fax Server Software Leader Debuts New Module; Adds Remote Internet Connectivity to LAN Fax Server", Business Wire, Copyright 1996, Article dated: Oct. 11, 1996, pp. 1-2.

Pascal R. Chesnais, Matthew J. Mucklo, and Jonathan A. Sheena, "The Fishwrap Personalized News System", MIT Media Laboratory, 20 Ames Street, Cambridge, Massachusetts, USA, pp. CAP-J2032982-989.

Marc VanHeyningen, "New service: The Unified CS TR Index", Computer Science Dept., Indiana University, May 20, 1993, pp. 1-2.

David H. Crocker, "RFC822—Standard For The Format of ARPA Internet Text Messages", Dept. of Electrical Engineering, University of Deleware, Newark, DE 19711, Aug. 13, 1982, pp. 1-39.

James R. Davis, "A server for a distributed digital techical report library", Xerox Corporation, Design Research Institute, 502 Theory Center, Cornell University, Ithaca, NY 14853, davis@dri.cornell.edu, Jan. 15, 1994, pp. 1-8.

James R. Davis, "Creating a Networked Computer Science Technical Report Library", Design Research Institute, Xerox Corporation, 502 Rhodes Hall, Cornell University, Ithaca, NY 14853, davis@dri.cornell.edu, D-Lib Magazine, Sep. 1995, pp. 1-5.

Carl Lagoze and James R. Davis, "Dienst: An Architecture for Distributed Document Libraries", Communications of the ACM, Apr. 1995, vol. 38, No. 4, p. 47.

Carl Loze, Erin Shaw, James R. Davis, Dean B. Krafft, "Dienst: Implementation Reference Manual", May 5, 1995, Computer Science Department, Cornell University, Ithaca, NY 14853, lagoze@cs.cornell.edu, shaw@cs.cornell.edu, dean@cs.cirbekk edu, Xerox Corporation, Design Research Institute, Cornell University, Ithaca, NY 14853, davis@dri.cornell.edu., pp. 1-69.

James R. Davis and Carl Lagoze, "Dienst, A Protocol for a Distributed Digital Document Library", Xerox, Cornell, Jul. 1994, pp. 1-9.

Jim Davis and Carl Lagoze, "Drop-in" publishing with the world Wide Web, Xeriox, Inc. and Cornell University, Jun. 6, 2007, pp. 1-12.

Jeff Symoens, "Lotus' InterNotes Web Publisher speeds migration to the Web", Internet utility, Version 1.0, Lotus Development Corp., Cambridge, Mass, INFOWORLD Apr. 24, 1995.

"DEFINITY Communications System Generic 3 Feature Description", AT & T, 555-230-204, Issue 3, Mar. 1996. 200 pages. (Part 1 of 8).

"DEFINITY Communications System Generic 3 Feature Description", AT & T, 555-230-204, Issue 3, Mar. 1996. 200 pages. (Part 2 of 8).

"DEFINITY Communications System Generic 3 Feature Description", ATT& T, 555-230-204, Issue 3, Mar. 1996. 200 pages. (Part 3 of 8).

"DEFINITY Communications System Generic 3 Feature Description", AT & T, 555-230-204, Issue 3, Mar. 1996. 200 pages. (Part 4 of 8).

"DEFINITY Communications System Generic 3 Feature Description", AT & T, 555-230-204, Issue 3, Mar. 1996. 200 pages (Part 5 of 8).

"DEFINITY Communications System Generic 3 Feature Description", AT & T, 555-230-204, Issue 3, Mar. 1996. 200 pages (Part 6 of 8).

"DEFINITY Communications System Generic 3 Feature Description", AT & T, 555-230-204, Issue 3, Mar. 1996. 200 pages (Part 7 of 8).

"DEFINITY Communications System Generic 3 Feature Description", AT & T, 555-230-204, Issue 3, Mar. 1996. 184 pages (Part 8 of 8).

Asa Packer and Jay Scott, "The Perly Gateway version 0.1", Sep. 2, 1994, Subject: README, pp. 1-7.

James C. French, John C. Knight and Allison L. Powell, "Applying Hypertext Structures to Software Documentation", Department of Computer Science, University of Virginia, Charlottesville, VA 22903, U.S.A., Information Processing & Management, vol. 33, No. 2, 1997, pp. 216-231.

James C. French, John C. Knight and Allison L. Powell, "Hypertext Structures and Software Documentation", Technical Report CS-96-04, Department of Computer Science, University of Virginia, Feb. 1996, pp. 1-16.

Jim French, University of Virginia, Edward Fox, Virginia Polytechnic Institute and University, Kurt Maly, Old Dominion University,and Alan L. Selman, State University of New York at Buffalo"Wide Area Technical Report Service—technical reports online", Aug. 2, 1994, pp. 122-127.

Brian R. Gaines, "Supporting Collaboration through Multimedia Digital Document Archives", Knowledge Science Institute, University of Calgary, Version 1.0, Nov. 1994, pp. 1-53.

Ahmed Patel, et al., "A technique for multi-network access to multi-media messages" 20 Computer Communications 324-337, Jul. 1997.

Daniel J. Rosenbaum, "The E-Mail Route to Fax" 7 PC World, pp. 168-170, Jun. 1989.

Defendant Comodo Communications, Inc.'s Local Patent Rule 3-3 Invalidity Contentions in j2 Global Communications, Inc. v. Comodo Communications, Inc, Case No. 6:08-cv-275.

Hertzoff, Ira; AT&T Global Messaging, The AT&T EasyLink Services Sourcebook, (ch. 7, 10, 11. 12).

Intel NET SatisFAXtion Software Fax Administration Guide.

K. Moore, "Representation of Non-ASCII Text in Internet Message Headers", Internet RFC 1342, Sep. 1993.

Kaashoek, Dynamic Documents Mobile Wireless Access to the WWW, Sep. 15, 1994, MIT.

RightFax Installation & Administration Guide 1996.

Rightfax Introduces New Fax Server Designed for the Enterprise; Rightfax News Release (May 27, 1997).

RightFax User's Guide 1996.

Russell Kahan, "Fax over IP" Gale Grooup, Inc., 1997.

"Working with AT&T Easylink, An Effective Communication Solution for Business," PC Today 62, May 1995.

J. Davis, et al., "Drop-in Publishing With the World Wide Web," Computer Networks and IDSN Systems, 28, pp. 247-255, 1995.

K. Goldberg, "Beyond the Web: Manipulating the Real World," Computer Networks and ISDN Systems, 28, pp. 209-219, 1995.

A. N. Boston, et al., "Interactive species distribution reporting, mapping, and modelling using the World Wide Web," Computer Networks and ISDN Systems, 28, pp. 231-238, 1995.

T. W. Yan, et al., "From user access patterns to dynamic hypertext linking," Computer Networks and ISDN Systems, 28, pp. 1007-1014, 1996.

H. Pusch, "Design and implementation of a global reference mechanism for data objects," Computer Standards & Interfaces, 17, pp. 181-192, 1995.

B. Wiegel, "Secure External References in Multimedia Email Messages," 3rd ACM Conference on Computer and Communications Security, New Delhi, India, Mar. 14-16, 1996.

E. Levinson, "Exchanging SGML Documents Using Internet Mail and MIME," Computer Standards &Interfaces, 18, pp. 93-102, 1996.

E. Meyer, et al., "Borealis Image Server," Computer Networks and ISDN Systems, 28, pp. 1123-1137, 1996.

M. Rio, et al., "A framework for broadcasting and management of URIs," Computer Networks and ISDNSystems, 28, pp. 535-542, 1996.

Swartz, Barry K. and Stephen B. Weinstein, "Dual-Media Messaging Using Screen Telephones on the Telephone Network," IEEE International Conference on Communications ' 93, May 23-26, 1993, pp. 1183-1188, Technical Program, Conference Record, vol. 2/3.

Borenstein, Nathaniel S., "Internet Multimedia Mail with MIME: Emerging Standards for Interoperability," Upper Layer Protocols, Architectures and Applications, 1992, pp. 183-192. Elsevier Science Publishers B.V. (North Holland).

Supplementary European Search Report in European Patent Application No. EP 96 91 3855, search results mailed Nov. 22, 2001.

Patel, Sanjiv P., et al., "The Multimedia Fax-MIME Gateway," IEE Multimedia Journal, Winter 1994, at 64-70.

D. Nakamura, "AT&T Introduces Most Comprehensive Fax-to_Data Service" dated Feb. 22, 1996, downloaded from Internet at http://www.att.com/press/0296/960222.ela.html on May 16, 1997.

Biscom, "Biscom Introduces the E-fax Machine: the E-mail/Fac-simile Solution for the Rest of Us," FAXCOM, Sep. 19, 1996.

C3 Launches its Advanced Itmail Multi-medial Messaging System for Desk Top PC's Computer and Communications Company Ltd., Jun. 1993.

"Digital Note Fax2Net R5S 1-A Beginners Guide to Digital Mail Fax," Digital Mail Limited, Oct. 31, 1996.

"Frequently Asked Questions", Jfax Personal Telecom, downloaded from Internet at www.jfax.net/faq.htm on Oct. 31, 1996.

N. Ballard, "@ The Paperless Office", Jfax Personal Telecom, downloaded from the Internet at www.jfax.net/ballard1.htm on Oct. 31, 1996.

J. Lyle, "Internet Fax Software: Internet Fax Utility Offers Simplified Faxing to E-Mail Addresses", Lumina News, Sep. 3, 1996, downloaded from Internet at http://lumina2000.com/lumina/press93.html printed on Jun. 11, 1997.

"Delivering Unified Messaging Solutions on the Internet", Media Mail, Nov. 2, 1996, downloaded from Internet at www.web.archive.org/web/1996121905113/http://mediamail.com on Mar. 2, 2005.

"Metholody for Mail Delivery in a Multi-Media Environment," IBM Technical Disclosure Bulletin, Apr. 1993, pp. 507-508.

"ScanFX-Scanning Hardware for Internet E-Mail," Our Business Machines, Inc., OBM's Editorial Resource Chest, Aug. 1996, Irwindale, CA.

J. Kravitz, "SDML-Signed Document Markup Language," Financial Services Technology Consortium, W3C Note Jun. 19, 1998, downloaded from the Internet at www.23.org, on Jun. 19, 1998.

"Three Pronged Strategy for Octel, as it Integrates VMX and Moves from Core Market to New Territories," Computergram International, Aug. 1995, n.2719, ComputerWire, Inc.

D. Rush, "ANNOUNCE: Voice Mail, Email & Fax Integration Over the Web," Google Groups: biz.nextnewprod. Mar. 19, 1996, http://groups-beta.google.com/group/biznextnewprod/msg/db3c129fdo394667?dmode=source, Mar. 2, 2005.

D. Rush, "ANNOUNCE: Voice Mail, Email & Fax Integration Over the Web," Google Groups: biz.nextnewprod. Mar. 25, 1996, http://groups-beta.google.com/group/biznextnewprod/msg/b85b59d49e92318b?dmode=source, Mar. 2, 2005.

R. Schockey, "Fax->E-Mail Plus Voice Mail Also?" Google Groups, http://groups-beta.google.com/group/comp/dcom.telecom, Dec. 28, 1995.

R. Schockey, "Fax->E-Mail Plus Voice Mail Also?" Google Groups, http://groups-beta.google.com/group/comp/dcom.telecom/msg/7db6ab0035e113c2?dmode=source, Dec. 28, 1995.

R. Schockey, "Fax->E-Mail Plus Voice Continued" Google Groups, http://groups-beta.google.com/group/comp/dcom. telecom/msg/1a2c73a37bc90e6b?dmode=source, Dec. 28, 1995.

S. Sreenivasan "Cybertimes German Pop Singer Sets Sights on Virtual Office," Sep. 23, 1996, downloaded from The New York Times CyberTime website.

Fax Mailbox, PC Today, Sep. 1994.

Multimedia Fax-MIME Interworking, Patel, Henderson and Georganas, IEEE, 1994.

"IBM Software Allows Phone Messages to be Retrieved Via Internet World Wide Web,press release, Nov. 28, 1995 (announcing product release)".

MSN Hotmail Continues to Grow Faster than Any Media Company in History, pressrelease, Feb. 8, 1999 (referencing Jul. 4, 1996 launch of Hotmail, which permittedusers to access e-mail accounts through web browsers).

"Wide Area Networking Puts Remote Pop Offices On-Line," Managing Office Technology,Sep. 1994, pp. 49-50, 52, vol. 39, USA.

M. Pop, "Comparative Study of Electronic Mail Systems," May 30, 1994.

Supplementary European Search Report in European Patent Application No. EP 9895 0859, Jun. 3, 2005.

International Search Report in International Application No. PCT/US98/20732, Jan. 25, 1999.

International Search Report in International Application No. PCT/US96/05910, Jul. 18, 1996.

Critical Path Data Sheet—Crtitical Path Notification Server, 2 pages, Dec. 2002.

* cited by examiner



**FIG 1**

**FIG 2**



FIG 3



FIG 4A



**FIG 4B**



FIG 5

FIG 6

## Fax from (404)249-6801

Received on May 31, 1995 at 1:58 PM
Page 1 of 3

---

NetOffice, Inc.

From: Charles R. Bobo, II.
Pages: 3
Date: May 31, 1995

---



FIG 8



FIG 9

Next Page

Return to Fax Listing
This page was automatically generated by FaxWeb(tm) On May 31, 1995 at 2:05pm.
©1995 NetOffice, inc.

_NetOffice, inc._
PO Box 7115
Atlanta, GA 30357
info@netoffice.com

FIG 7



**FIG 10**



**FIG 11**



**FIG 12**

Case: 14-1611    Document: 366    Page: 271    Filed: 09/22/2016



**FIG 13**



**FIG 14**



FIG 15

| INDIVIDUAL APPLICATION PROGRAMS |
| COMMON GATEWAY INTERFACE (CGI) |
| HTTPD |
| INTERNET DEAMON (INETD) |
| OPERATING SYSTEM (OS) |
| TCP/IP |

FIG 16A

| PREFORMATTED HTML FILE |
| HTTPD |
| INETD |
| OS |
| TCP/IP |

FIG 16B

FIG. 17



320

321

USER SENDS REQUEST
FOR SEARCH

322

MSDS SENDS USER A
SEARCH QUERY FORM

323

USER ENTERS SEARCH
PARAMETERS IN
SEARCH QUERY FORM

324

MSDS PERFORMS
REQUESTED SEARCH
FOR FILES/MESSAGES

325

MSDS SENDS USER
RESULTS OF SEARCH

326

USER SELECTS DESIRED
FILES/MESSAGES

FIG. 18

SEARCH QUERY

RECIPIENT'S NAME:

DOCUMENT TYPE:

DATE:

TIME:

CALLING NO.:

FILE SIZE:

NO. PAGES:

DOCUMENT NO.:

OTHER FIELD:

SEARCH            RECENT FILES

STORED            HELP
SEARCH GROUP

FIG. 19

# SEARCH QUERY

RECIPIENT'S NAME: [                    ] [↓]

DOCUMENT TYPE: [FACSIMILE         ] [↓]

DATE: [                    ]

TIME: [                    ]

CALLING NO.: [(404) 249-6801    ]

FILE SIZE: [                    ]

NO. PAGES: [                    ]

DOCUMENT NO.: [                    ]

OTHER FIELD: [                    ] [↓]

SEARCH          RECENT FILES

STORED SEARCHES          HELP

# FIG. 20

# SEARCH
# RESULTS

1.   Document No. 11:  Facsimile from (404) 249-6801 to Jane Doe on May 31, 1995, 3 Pages

2.   Document No. 243:  Facsimile from (404) 249-6801 to Jane Doe on July 16, 1995, 21 Pages

3.   Document No. 1002:  Facsimile from (404) 249-6801 to Jane Doe on January 1, 1996, 10 Pages

SAVE SEARCH AS:    | CHARLES R. BOBO FACSIMILES |

HELP

# FIG. 21

# STORED
# SEARCHES

1.  CHARLES R. BOBO FACSIMILES

2.  CHARLES R. BOBO VOICE MESSAGES

3.  DATA TRANSFERS FROM 01-01-96 TO 6-01-96 TO
JANE DOE

HELP

# FIG. 22

US 7,895,313 B2

1

# SYSTEMS AND METHODS FOR STORING, DELIVERING, AND MANAGING MESSAGES

The present application is a continuation of U.S. application Ser. No. 10/963,586 filed Oct. 14, 2004, which is a continuation of U.S. application Ser. No. 10/436,798 filed May 12, 2003, now U.S. Pat. No. 6,857,074, which is a continuation of U.S. application Ser. No. 09/840,759 filed Apr. 23, 2001, now U.S. Pat. No. 6,564,321, which is a continuation of U.S. application Ser. No. 09/186,595 filed Nov. 5, 1998, now U.S. Pat. No. 6,350,066, which is a continuation of U.S. application Ser. No. 08/944,741 filed Oct. 6, 1997, now U.S. Pat. No. 5,870,549, which is a continuation-in-part of U.S. application Ser. No. 08/431,716 filed Apr. 28, 1995, now U.S. Pat. No. 5,675,507.

## FIELD OF THE INVENTION

This invention relates to system(s) and method(s) for storing and delivering messages and, more particularly, to system(s) and method(s) for storing messages and for delivery the messages through a network, such as the Internet, or a telephone line to an intended recipient. In another aspect, the invention relates to system(s) and method(s) for storing, delivering, and managing messages or other files, such as for archival purposes or for document tracking.

## BACKGROUND OF THE INVENTION

Even though the facsimile machine is heavily relied upon by businesses of all sizes and is quickly becoming a standard piece of office equipment many businesses or households cannot receive the benefits of the facsimile machine. Unfortunately, for a small business or for a private household, a facsimile machine is a rather expensive piece of equipment. In addition to the cost of purchasing the facsimile machine, the facsimile machine also requires toner, paper, maintenance, as well as possible repairs. These expenses may be large enough to prevent many of the small businesses and certainly many households from benefiting from the service that the facsimile machine can provide. For others who are constantly traveling and who do not have an office, it may be impractical to own a facsimile machine. In fact, the Atlanta Business Chronicle estimates that 30% of the small businesses do not have any facsimile machines. Therefore, many businesses and households are at a disadvantage since they do not have access to a facsimile machine.

Because a facsimile machine can be such an asset to a company and is heavily relied upon to quickly transmit and receive documents, a problem exists in that the machines are not always available to receive a facsimile message. At times, a facsimile machine may be busy receiving another message or the machine may be transmitting a message of its own. During these times, a person must periodically attempt to send the message until communication is established with the desired facsimile machine. This inability to connect with a facsimile machine can be frustrating, can consume quite a bit of the persons time, and prevent the person from performing more productive tasks. While some more advanced facsimile machines will retry to establish communication a number of times, a person will still have to check on the facsimile machine to ensure that the message was transmitted or to re-initiate the transmission of the message.

In addition to labor costs and a reduction in office efficiency, a facsimile machine may present costs to businesses that are not readily calculated. These costs include the loss of business or the loss of goodwill that occurs when the fac-

simile machine is not accessible by another facsimile machine. These costs can occur for various reasons, such as when the facsimile machine is out of paper, when the machine needs repairing, or when the facsimile machine is busy with another message. These costs occur more frequently with some of the smaller businesses, who are also less able to incur these expenses, since many of them have a single phone line for a telephone handset and the facsimile machine and thereby stand to lose both telephone calls and facsimile messages when the single line is busy. In fact, the Atlanta Business Chronicle estimated that fewer than 5% of the small businesses have 2 or more facsimile machines. Many of the larger companies can reduce these losses by having more than one facsimile machine and by having calls switched to another machine when one of the machines is busy. These losses, however, cannot be completely eliminated since the machines can still experience a demand which exceeds their capabilities.

A main benefit of the facsimile machine, namely the quick transfer of documents, does not necessarily mean that the documents will quickly be routed to the intended recipient. The facsimile machines may be unattended and a received facsimile message may not be noticed until a relatively long period of time has elapsed. Further, even for those machines which are under constant supervision, the routing procedures established in an office may delay the delivery of the documents. It is therefore a problem in many offices to quickly route the facsimile message to the intended recipient.

The nature of the facsimile message also renders it difficult for the intended recipient to receive a sensitive message without having the message exposed to others in the office who can intercept and read the message. If the intended recipient is unaware that the message is being sent, other people may see the message while it is being delivered or while the message remains next to the machine. When the intended recipient is given notice that a sensitive message is being transmitted, the intended recipient must wait near the facsimile machine until the message is received. It was therefore difficult to maintain the contents of a facsimile message confidential.

In an office with a large number of employee it may also be difficult to simply determine where the facsimile message should be routed. In light of this difficulty, some systems have been developed to automatically route facsimile messages to their intended recipient. One type of system, such as the one disclosed in U.S. Pat. No. 5,257,112 to Okada, can route an incoming call to a particular facsimile machine based upon codes entered with telephone push-buttons by the sender of the message. Another type of system, such as the one disclosed in U.S. Pat. No. 5,115,326 to Burgess et al. or in U.S. Pat. No. 5,247,591 to Baran, requires the sender to use a specially formatted cover page which is read by the system. This type of system, however, burdens the sender, who may very well be a client or customer, by requiring the sender to take special steps or additional steps to transmit a facsimile message. These systems are therefore not very effective or desirable.

Another type of routing system links a facsimile machine to a Local Area Network (LAN) in an office. For instance, in the systems disclosed in the patents to Baran and Burgess et al., after the system reads the cover sheet to determine the intended recipient of the facsimile message, the systems send an E-mail message to the recipient through the local network connecting the facsimile machine to the recipient's computer. Other office systems, such as those in U.S. Pat. No. 5,091,790 to Silverberg and U.S. Pat. No. 5,291,546 to Giler et al., are linked to the office's voice mail system and may leave a message with the intended recipient that a facsimile message

US 7,895,313 B2

3

has been received. Some systems which are even more advanced such as those in U.S. Pat. No. 5,317,628 to Misholi et al. and U.S. Pat. No. 5,333,266 to Boaz et al., are connected to an offices local network and provide integrated control of voice messages, E-mail messages, and facsimile messages.

The various systems for routing facsimile messages, and possibly messages of other types received in the office, are very sophisticated and expensive systems. While these office systems are desirable in that they can effectively route the messages at the office to their intended recipients, the systems are extremely expensive and only those companies with a great number of employees can offset the costs of the system with the benefits that the system will provide to their company. Thus, for most businesses, it still remains a problem to effectively and quickly route messages to the intended recipients. It also remains a problem for most businesses to route the messages in a manner which can preserve the confidential nature of the messages.

Even for the businesses that have a message routing system and especially for those that do not have any type of system, it is usually difficult for a person to retrieve facsimile messages while away from the office. Typically, a person away on business must call into the office and be informed by someone in the office as to the facsimile messages that have been received. Consequently, the person must call into the office during normal business hours while someone is in the office and is therefore limited in the time that the information in a facsimile message can be relayed.

If the person away on business wants to look at the facsimile message, someone at the office must resend the message to a facsimile machine accessible to that person since this accessible machine is often a facsimile machine at another business or at a hotel where the person is lodging, it is difficult for the person to receive the facsimile message without risking disclosure of its contents. Further, since someone at the person's office must remember to send the message and since someone at the accessible facsimile machine must route the message to the person away from the office, the person may not receive all of the facsimile messages or may have to wait to receive the messages.

The retrieval of facsimile messages, as well as voice mail messages, while away from the office is not without certain costs. For one, the person often must incur long distance telephone charges when the person calls the office to check on the messages and to have someone in the office send the messages to another facsimile. The person will then incur the expenses of transmitting the message to a fax bureau or hotel desk as well as the receiving location's own charges for use of their equipment. While these charges are certainly not substantial, the charges are nonetheless expenses incurred while the person is away from the office.

Overall, while the facsimile machine is an indispensable piece of equipment for many businesses, the facsimile machine presents a number of problems or costs. Many businesses or households are disadvantaged since they are unable to reap the benefits of the facsimile machine. For the businesses that do have facsimile machines, the businesses must incur the normal costs of operating the facsimile machine in addition to the costs that may be incurred when the facsimile machine or machines are unable to receive a message. Further, the facsimile messages may not be efficiently or reliably routed to the intended recipient and may have its contents revealed during the routing process. The costs and problems in routing a facsimile message are compounded when the intended recipient is away from the office.

Many of the problems associated with facsimile messages are not unique to just facsimile messages but are also associated with voice mail messages and data messages. With regard to voice messages, many businesses do not have voice mail systems and must write the message down. Thus, the person away from the office must call in during normal office hours to discover who has called. The information in these messages are usually limited to just the person who called, their number, and perhaps some indication as to the nature of the call. For those businesses that have voice mail, the person away from the office must call in and frequently incur long distance charges. Thus, there is a need for a system for storing and delivery voice messages which can be easily and inexpensively accessed at any time.

With regard to data messages, the transmission of the message often requires some coordination between the sender and the recipient. For instance, the recipient's computer must be turned on to receive the message, which usually occurs only when someone is present during normal office hours. Consequently, the recipient's computer is usually only able to receive a data message during normal office hours. Many households and also businesses may not have a dedicated data line and must switch the line between the phone, computer, and facsimile. In such a situation, the sender must call and inform the recipient to switch the line over to the computer and might have to wait until the sender can receive the message. The retransmission of the data message to another location, such as when someone is away from the office, only further complicates the delivery. It is therefore frequently difficult to transmit and receive data messages and is also difficult to later relay the messages to another location.

A standard business practice of many companies is to maintain records of all correspondence between itself and other entities. Traditionally, the correspondence that has been tracked and recorded includes letters or other such printed materials that is mailed to or from a company to the other entity. Although tracking correspondence of printed materials is relatively easy, non-traditional correspondence, such as facsimile messages, e-mail messages, voice messages, or data messages, are more difficult to track and record.

For example, facsimile messages may be difficult to track and record since the messages may be received on thermal papers which suffers from a disadvantage that the printing fades over time. Also, accurate tracking of facsimile messages is difficult since the facsimile messages may only be partially printed at the facsimile machine or the messages may be lost or only partially delivered to their intended recipients. Facsimile messages also present difficulties since they are often delivered within an organization through different channels than ordinary mail and thus easily fall outside the normal record keeping procedures of the company.

Voice mail messages are also difficult to track and record. Although voice messages can be saved, many voice mail servers automatically delete the messages after a certain period of time. To maintain a permanent record of a voice message, the voice message may be transcribed and a printed copy of the message may be kept in the records. This transcribed copy of the voice message, however, is less credible and thus less desirable than the original voice message since the transcribed copy may have altered material or may omit certain portions of the message.

In addition to facsimile and voice mail messages, data messages are also difficult to track and record. A download or upload of a file may only be evident by the existence of a is file itself. A file transfer procedure normally does not lend itself to any permanent record of what file was transferred the dialed telephone number, the telephone number of the computer receiving the file, the time, or the date of the transfer. It is

US 7,895,313 B2

5

therefore difficult to maintain accurate records of all data transfers between itself and another entity.

## SUMMARY OF THE INVENTION

It is an object of the invention to reliably and efficiently route messages to an intended recipient.

It is another object of the invention to route messages to the intended recipient while maintaining the contents of the message confidential.

It is another object of the invention to enable the intended recipient to access the messages easily and with minimal costs.

It is a further object of the invention to permit the simultaneous receipt of more than one message on behalf of the intended recipient.

It is a further object of the invention to enable the intended recipient of a message to access the message at any time and at virtually any location world-wide.

It is yet a further object of the invention to enable the intended recipient of a message to browse through the received messages.

It is yet a further object of the invention to quickly notify an intended recipient that a message has been received.

It is still another object of the invention to receive messages of various types.

It is still another object of the invention to deliver messages according to the preferences of the intended recipient.

It is still a further object of the invention to record and track correspondence, such as facsimile messages, voice mail messages, and data transfers.

Additional objects, advantages and novel features of the invention will be set forth in the description which follows, and will become apparent to those skilled in the art upon reading this description or practicing the invention. The objects and advantages of the invention may be realized and attained by the appended claims.

To achieve the foregoing and other objects, in accordance with the present invention, as embodied and broadly described herein, a system and method for storing and delivering messages involves receiving an incoming call and detecting an address signal associated with the incoming call, the address signal being associated with a user of the message storage and delivery system. A message accompanied with the address signal is then received and converted from a first file format to a second file format. The message is stored in the second file format within a storage area and is retrieved after a request has been received from the user. At least a portion of the message is then transmitted to the user over a network with the second file format being a mixed media page layout language.

In another aspect a network message storage and delivery system comprises a central processor for receiving an incoming call, for detecting an address signal on the incoming call, for detecting a message on the incoming call, and for placing the message in a storage area. The address signal on the incoming call is associated with a user of the network message storage and delivery system. A network server receives the message from the storage area, converts the message into a mixed media page layout language, and places the message in the storage area. When the network server receives a request from the user over the network, the network server transmits at least a portion of the message over the network to the user.

Preferably, the network storage and delivery system can receive facsimile messages, data messages, or voice messages and the network is the Internet. The messages are con-

6

verted into a standard generalized mark-up language and the user is notified that a message has arrived through E-mail or through a paging system. A listing of the facsimile messages may be sent to the user in one of several formats. These formats include a textual only listing or a listing along with a full or reduced size image of the first page of each message. A full or reduced size image of each page of a message in the listing may alternatively be presented to the user.

According to a further aspect, the invention relates to a system and method for managing files or messages and involves storing message signals in storage and receiving requests from a user for a search. The search preferably comprises a search query that is completed by a user and supplied to a hyper-text transfer protocol deamon (HTTP) in the system. The HTTPD transfers the request through a common gateway interface (CGI) to an application program which conducts the search. The results of the search are preferably returned through the HTTPD to the computer in the form of a listing of all messages or files satisfying the search parameters. The user may then select one or more of the listed messages or files and may save the search for later references.

## BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated in, and form a part of, the specification, illustrate an embodiment of the present invention and, together with the description, serve to explain the principles of the invention. In the drawings:

FIG. 1 is a block diagram illustrating the connections of a message storage and delivery system MSDS;

FIG. 2 is an overall flow chart of operations for transmitting a message to the MSDS of FIG. 1;

FIG. 3 is an overall flow chart of operations for receiving a message stored at the MSDS of FIG. 1;

FIGS. 4(A) and (B) are flowcharts of operations for generating HTML files according to user preferences;

FIG. 5 is a flowchart of operations for generating requested information;

FIG. 6 is a flowchart of operations for converting a facsimile message into HTML files;

FIG. 7 is an exemplary display of a first page of a facsimile message according to a fourth display option;

FIG. 8 is a flowchart of operations for converting a voice message into an HTML file;

FIG. 9 is a flowchart of operations for converting a data message into an HTML file;

FIG. 10 is a flowchart of operations for detecting a type of call received at the MSDS 10;

FIG. 11 is a flowchart of operations for receiving voice messages;

FIG. 12 is a flowchart of operations for interacting with an owner's call;

FIG. 13 is a more detailed block diagram of the MSDS 10;

FIG. 14 is a block diagram of the central processor in FIG. 13;

FIG. 15 is a block diagram of the Internet Server of FIG. 13;

FIGS. 16(A) and 16(B) depict possible software layers for the Internet Server of FIG. 13;

FIG. 17 is a diagram of a data entry for a message signal;

FIG. 18 is a flowchart of a process for sending a search query, for conducting a search, and for returning results of the search to a computer through the Internet;

FIG. 19 is an example of a search query form for defining a desired search;

FIG. 20 is an example of a completed search query;

7

FIG. **21** is an example of a set of search results returned to the computer in response to the search query of FIG. **20**; and

FIG. **22** is an example of a listing of stored searches.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Reference will now be made in detail to the preferred embodiments of the invention, examples of which are illustrated in the accompanying drawings.

With reference to FIG. **1**, a message storage and delivery system (MSDS) **10** is connected to a central office **20** of the telephone company through at least one direct inward dialing (DID) trunk **15**. With each call on the DID trunk **15**, an address signal indicating the telephone number being called is provided to the MSDS **10**. The DID truck **15** can carry a large number of telephone numbers or addresses. Preferably, the DID truck **15** comprises a number of DID trunks **15** connected in parallel between the central office **20** and the MSDS **10** so that the MSDS **10** can simultaneously receive more than one call and, moreover, can simultaneously receive more than one call for a single telephone number or address.

The central office **20** is connected to a number of third parties. For instance, the central office **20** may be connected to a facsimile machine **24**, a telephone set **26**, and to a computer **28** with each connection being made through a separate telephone line. While a single computer **28** is shown in the figure, the single computer **28** may actually represent a local area network which is connected through the central office **20** to the MSDS **10**. Although the facsimile machine **24**, telephone set **26**, and computer **28** have been shown on separate lines, it should be understood that one or more of these devices could share a single line.

The MSDS **10** is also connected to a network, preferably the Internet World Wide Web **30**. Although the Internet **30** has been shown as a single entity, it should be understood that the Internet **30** is actually a conglomeration of computer networks and is a constantly evolving and changing structure. The MSDS **10** therefore is not limited to the current structure or form of the Internet **30** but encompasses any future changes or additions to the Internet **30**. Further, the MSDS **10** is shown as being directly connected to the Internet **30**, such as through its own node or portal. The MSDS **10**, however, may be practiced with any suitable connection to the Internet **30**, such as through an intermediate Internet access provider.

With reference to FIG. **2** depicting an overall operation of the invention, a telephone call directed to a number serviced by the MSDS **10** is initiated at step **40** by a third party, for instance, through the facsimile machine **24**, telephone set **26**, or computer **28**. The incoming telephone call may therefore carry a facsimile message, a voice message, or a data message. At step **42**, the address signal associated with the initiated call is routed through the central office **20**, over the DID truck **15**, and to the MSDS **10**.

When the call reaches the MSDS **10**, the call is routed within the MSDS **10** in a manner that will be described in more detail below with reference to FIG. **13**. At step **46**, the MSDS **10** answers the telephone call and receives the address signal from the DID trunk **15**. Next, at step **48**, the call is established between the MSDS **10** and the third party and, at step **50**, the MSDS **10** receives the message transmitted over the telephone line. The message is stored at step **52**, a database within the MSDS to is updated at step **54**, and the intended recipient of the message is notified at step **56**. The intended recipient of the message uses the services provided

8

by the MSDS **10** and will hereinafter be referred to as a user. At step **58**, the message is converted into hyper-text mark-up language (HTML).

After the MSDS **10** receives a message for one of its users, the user can then communicate with the MSDS to at any time and at any location by connecting to the Internet World Wide Web **30** and retrieving the message stored within the MSDS **10**. With reference to FIG. **3**, at step **60** the user first connects to the Internet **30**, such as through a personal computer **32** which may be connected to the Internet **30** in any suitable manner, such as through its own portal or node or through some intermediate access provider. The personal computer **32** is not limited to a single computer but may instead comprise a network of computers, such as a local area network within an office.

Once connected with the Internet **30**, at step **62**, the user accesses with a hyper-text browser the Universal Resource Locator (URL) associated with his or her MSDS **10** mailbox. The computer **32** may use any suitable hypertext browser, such as Netscape, to access the mailbox. A Hypertext Transfer Protocol Deamon (HTTPD) within the MSDS **10** receives the URL request at step **64** and, at step **66**, requests user authentication. The user then supplies his or her ID and password at step **68** and, if found valid at step **70**, the MSDS **10** provides the computer **32** with access to the mailbox at step **72**. If the ID and password are invalid, as determined at step **70**, then the HTTPD sends the computer **32** an authentication failure message at step **74**.

After the user gains access to the mailbox at step **72**, the user can request information stored within the MSDS **10**. The MSDS **10** receives the request at step **76** and, at step **78**, determines whether the information exists. As is common practice, the MSDS **10** also determines the validity of the request at step **78**. The request from the user will include the mailbox number for the user, the message identifier, display preferences, and, if the message is a facsimile message, a page identifier. If for any reason the request is invalid, such as when a hacker is attempting to gain access to privileged information, the request for the information will be terminated.

If the requested information is available, then at step **80** the information is transmitted through the Internet **30** to the user's computer **32**. If, on the other hand, the information does not exist, then at step **82** the MSDS **10** will generate the requested information and then send the information to the user's computer through the Internet **30** at step **80**.

Prior to gaining access to the mailbox at step **72**, the user is preferably sent a greeting page or other such type of information which permits the user to team about the services provided by the MSDS **10**, open an account with the MSDS **10**, or gain access to an account. Once access is provided at step **72**, the user is provided with information indicating the total number of messages stored in his or her mailbox within the MSDS **10**. Preferably, the information sent by the MSDS **10** indicates the total number of messages for each type of message and also the total number of saved messages versus the total number of new messages.

The user is also preferably given the option at this step to change account information. The account information might include the E-mail address for the user, the manner in which messages are to be reviewed, the user's pager information, as well as other user preferences. The display options and other user preferences will be discussed in further detail below.

The general information HTML file which indicates the total number of different messages is provided with a number of anchors, which are also termed links or references. In general, an anchor permits a user on the computer **32** to

9

10

retrieve information located on another file. For instance, an anchor to a listing of facsimile messages is preferably provided on the display of the total number of messages. When the user selects the anchor for the facsimile list, the MSDS **10** pulls up and displays the file containing the list of facsimiles, such as a file "faxlist.html." The other types of messages, such as voice messages and data messages, would have similar anchors on the general information page directed to their respective HTML listing files.

When a new message is received at step **54** in FIG. **2**, the users mailbox is updated to display the total number and types of messages. The MSDS **10** might also update other files in addition to the total listing of messages. Additionally, at this time, the MSDS **10** sends an E-mail message to the user's computer **32** to inform the user of the newly arrived message. The MSDS **10** could also send notice to the user though a paging system so that the user receives almost instantaneous notice that a message is received.

The MSDS **10** also generates additional information according to the user's preferences. These preferences on how the MSDS **10** is configured for the user include options on how the messages are reviewed. With facsimile messages, for instance, the user can vary the amount or the type of information that will be supplied with the listing of the facsimile messages by selecting an appropriate option. Other options are also available so that the user can custom fit the MSDS **10** to the users own computer **32** or own personal preferences.

For instance, when a facsimile message is received, the MSDS **10**, at step **54**, will update the total listing of all messages to indicate the newly received message and may additionally generate the HTML files for the newly received facsimile message according to the user's preferences. When the user later requests information on the message at step **76**, the HTML information has already been generated and the MSDS **10** may directly send the requested information to the user at step **80**. If, on the other hand, the user desires to view the message according to one of the other options, the MSDS **10** will generate the HTML files at step **82** according to that other option at the time of the request.

A first option available to the user for viewing a facsimile message is a textual only listing of the messages. The information on the textual listing preferably includes the date and time that the message was received at the MSDS **10**, the telephone number from where the message was transmitted, the number of pages, the page size, and the size of the message in bytes. The messages, of course, could be listed with other types of information. When the user selects one of the facsimile messages on the list, a request is sent to the HTTPD within the MSDS **10** causing the message to be downloaded via the Internet **30** to the user's computer **32**. Once the message is received by the computer **32**, the message can be displayed, printed, or saved for further review.

The second through fifth options allow the user to preview an image of the facsimile message before having the message downloaded from the MSDS **10** through the Internet **30** and to the computer **32**. The second option permits the user to view the list of messages with a reduced size image of the cover page next to each entry on the list. When the user selects one of the messages on the list, the selected facsimile message is transmitted through the Internet **30** to the computer **32**. The user may also scroll through the listings if all of the message cannot be displayed at one time on the computer **32**.

The third option provides the user with a full size view of the cover page of each facsimile message. The user can quickly scroll through the cover pages of each message without downloading the entire message to the computer **32**. The full size view of the cover pages permit the user to clearly discern any comments that may be placed on the cover page, which may not be possible from just a reduced image of the cover page available through the second option.

The fourth option provides the user with a reduced size image of each page and permits the user to scroll through the entire message. The user can therefore read the entire facsimile message on screen before the message is downloaded onto the computer **32**. With this option, the user can go through the pages of the facsimile message and can also skip to the next message or previous message. Additionally, the user has the option of enlarging a page to a full size view of the page. When one of the messages is selected, as with the other options, the HTTPD within the MSDS **10** causes the facsimile message to be transmitted through the Internet **30** to the users computer **32**.

With a fifth option, a full size image of each page is transmitted to the user's computer **32**. The user can scroll through the pages of the facsimile message and easily read the contents of each page. If the user wants the message downloaded to the computer **32**, the user select the message and the HTTPD within the MSDS **10** transmits the message to the user's computer **32** through the Internet **30**.

As discussed above, after the database is updated at step **54**, the MSDS **10** will generate additional information based upon the option selected for displaying the facsimile messages. More specifically, as shown in FIG. **4**(A), if the first option has been selected, as determined at step **100**, then at step **102** the MSDS **10** will generate the textual listing of the facsimile messages with anchors or references to the respective facsimile files. The HTML files are then moved to an Internet Server at step **104**.

If the first option is not selected, the MSDS **10** next determines whether the second option has been selected at step **106**. With the second option, the facsimile messages are listed along with a reduced size image of the cover page. To generate this information, the cover page is extracted from the facsimile file at step **108** and a reduced size HTML image of the cover page is created at step **110**. At step **112**, a listing of the facsimile messages is generated with a thumbnail view of each cover page linked to its respective facsimile file. The generated HTML files are then sent to the Internet Server at step **104**.

When the third option is selected, as determined at step **114**, a full size image of the cover page is sent to the computer **32**. The full size image of the cover page is generated by first extracting the cover page from the facsimile file at step **116**. Next, the cover page is converted into a full size HTML image at step **118** and, at step **120**, the listing is generated with the embedded cover page linked to the facsimile file.

If, at step **122**, the fourth option is determined to be selected then a reduced size image of each page is provided to the user with the option of enlarging the page to view the contents of the page more clearly. With reference to FIG. **4**(B), the information necessary for the third option is produced by first extracting the first page of the facsimile message at step **124**. A reduced size HTML image is created at step **126** and then a full size HTML image is created at step **128**. At step **130**, the listing is generated with embedded thumbnail images of the pages with links to the full size images. If the page is not the last page, as determined at step **140**, then the next page is extracted at step **142** and steps **126** to **130** are repeated to generate the HTML files for the other pages of the facsimile message. After the last page has been converted into an HTML file according to the third option, the files are moved onto the Internet Server at step **104**.

US 7,895,313 B2

11

At step **144**, the MSDS **10** determines whether the fifth option has been selected. The fifth option provides the user with a full size image of each page of the facsimile message. While only five options have been discussed, the invention may be practiced with additional options. Consequently, with additional options and with the fourth option not being selected, the MSDS **10** would next determine whether one of the additional options have been selected. With the preferred embodiment of the invention having only five options, however, the MSDS **10** will assume that the fifth option has been selected if none of the first four options were found to be selected.

The information necessary to display the pages of the facsimile message according to the fifth option is generated by first extracting the first page of the facsimile message at step **146**. At step **148**, the full size HTML image of the page is created and, at step **150**, a listing is generated with an embedded image and links to previous and next pages. When the page is not the last page, as determined at step **152**, the MSDS **10** extracts the next page and generates the HTML file for that page. After all pages have been converted into HTML files according to the fourth option, the files are sent to the Internet Server at step **104**.

While FIGS. **4**(A) and (B) describe the operations of the MSDS **10** at the time a message is received, FIG. **5** depicts an overall flowchart of operations for the MSDS **10** when the user requests a page of information in a display format other than the user's preferred option of displaying the message. FIG. **5** is therefore a more detailed explanation of how the MSDS **10** generates the necessary information at step **82** of FIG. **3**.

In general, as shown in FIG. **5**, the MSDS to first determines the type of image that is needed at step **82a**. For example, at this step, the MSDS **10** will determine whether images are unnecessary, whether an image of just the cover page is necessary, whether an image is needed for every page, and whether the image needs to be a full size, a reduced size, or both full and reduced sized images. At step **82b**, the MSDS **10** determines whether the image has already been created. If the image has not been created, then at step **82c** the MSDS **10** will extract the page from the base facsimile file and, at step **82d**, generate the required HTML image. As discussed above, the required image may be for just the cover page, for all the pages, and may be a full size and/or a reduced size image of the page. At step **82e**, the image is embedded with links or anchors to other HTML files. These links or anchors might be references to the next and previous pages and also to the next and previous facsimile messages. Finally, the HTML file having the embedded image and links is sent to the user at step **80** in FIG. **3**.

The process for converting a facsimile message into HTML files according to the fifth option will be described with reference to FIG. **6**. This process will occur at step **54** when the message is received and when the fifth option is the users preferred option of displaying the messages. It should be understood that a similar type of process will also occur when the user requests a page of information according to the fifth option when the user is retrieving a facsimile message and the fifth option is not the user's preferred option. The conversion processes according to the other options will become apparent to those skilled in the art and will therefore not be discussed in further detail.

With reference to FIG. **6**, when the facsimile message is received, the message is in a Tagged Image File Format/ Facsimile (TIFF/F) and each page of the facsimile message is split into a separate file. Each page of the facsimile message is then converted from the TIFF/F format into a Portable Pixel

12

Map (PPM) format. The PPM files are next converted into separate Graphic Interchange Format (GIF) files and then into separate HTML files. Thus, each page of the facsimile message is converted into a separate HTML file. The TIFF/F files may be converted into PPM with an available software package entitled "LIBTIFF" and the PPM files may be converted into GIF files with an available software package found in "Portable Pixel Map Tools."

The invention is not limited to this exact conversion process or to the particular software packages used in the conversion process. For instance, the TIFF/F files may be converted into another portable file format, through any other type of intermediate format, or may be converted directly into the GIF format. Further, instead of GIF, the facsimile messages may be converted into JPEG, BMP, PCX, PIF, PNG, or any other suitable type of file format.

The files may be identified with any suitable filename. In the preferred embodiment, the files for each user are stored in a separate directory assigned to just that one user because an entire directory for a given user generally can be protected easier than the individual files. The memory, however, may be organized in other ways with the files for a single user being stored in different directories. The first part of the filename is a number preferably sequentially determined according to the order in which messages arrive for that user. The preferred naming convention for ending the filenames is depicted in FIG. **6**. Each page of the facsimile message is saved as a separate file with an extension defined by the format of the file. Thus, the files will end with an extension of ".TIFF," ".PPM," ".GIF," or ".HTML" according to the format of the particular file. In the example shown, the separate pages have filenames which end with the respective page number, for instance, the first page ends with a "1." The files, however, are preferably terminated with a letter or multiples letters to indicate the order of the pages. For instance, page 1 might have an ending of "aa," page 2 might have an ending of "ab," etc. The invention, however, is not limited to the disclosed naming convention but encompasses other conventions that will be apparent to those skilled in the art.

As shown in FIG. **6**, in addition to the GIF files representing the pages of the facsimile message, the HTML files include a number of anchors or references. In the example shown, the first HTML file has an anchor a for the "Next Page." Anchor a is defined as a=<A HREF="2.html"> Next Page <a> and will therefore reference the second HTML file when a user selects the "Next Page." The second HTML file has an anchor b for the "Previous Page." and an anchor c for the "Next Page" and the third HTML file has an anchor d for the "Previous Page." With these particular HTML files, the user can scroll through each page of the facsimile message and view a full size image of the page.

Each HTML file preferably contains anchors in addition to those relating to "Next Page" and "Previous Page," For instance, each HTML file may contain an anchor to the next facsimile message, an anchor to the previous facsimile message, and an anchor to return to the facsimile list. The HTML files preferably contain anchors relating to "Save" and "Delete." When the "Save" anchor is selected, the user would be able to save the message under a more descriptive name for the message. The "Delete" anchor is preferably followed by a inquiry as to whether the user is certain that he or she wants to delete the message. Other anchors, such as an anchor to the general listing, will be apparent to those skilled in the art and may also be provided.

FIG. **7** provides an example of a display according to the fifth option for the first page of the facsimile message shown in FIG. **6**. The headings of the display provide information on

US 7,895,313 B2

13

the telephone number from where the message was sent, the date and time the message was received at the MSDS 10, and an indication of the page of the message being displayed. The main portion of the display is the full site image of the page. At the bottom of the display, an anchor or link is provided to the "Next Page" and another anchor is provided to the "Return to Fax Listing." Additional information may also be provided on the display, such as a link to a company operating the MSDS 10.

An example of the "1.html" file for generating the display shown in FIG. 7 is shown below in Table 1.

TABLE 1

```
<HTML>
<HEAD>
<TITLE>Fax Received on May 31, 1995 at 1:58 PM from (404) 249 6801;
Page 1 of 3</TITLE>
</HEAD>
<BODY>
<H1>Fax from (404) 249-6801</H1>
<H2>Received on May 31, 1995 at 1:58 PM</H2>
<H2>Page 1 of 3</H2>
<IMG SRC="1.gif">
<P>
<A HREF="2.html">Next Page</a>
<HR>
<A HREF="faxlist.html">Return to Fax Listing</A>
<P>
This page was automatically generated by FaxWeb(tm) on May 31,
1995 at 2:05 PM.
<P>
&copy; 1995 NetOffice, Inc.
<HR>
<Address>
<A HREF="http://www.netoffice.com/">NetOffice, Inc.</A><BR>
PO Box 7115<BR>
Atlanta, GA 30357<BR>
<A HREF="mailto:info@netoffice.com">info@netoffice.com</A>
</Address>
</BODY>
</HTML>
```

As is apparent from the listing in Table 1, the image file "1.gif" for the first page is embedded into the HTML file "1.html." Also apparent from the listing is that the anchor for "Next Page" directs the MSDS 10 to the second page of the facsimile message having the filename "2.html" and the anchor for "Return to Fax Listing" directs the MSDS 10 to the filename "faxlist.html" containing the list of facsimile messages.

A process for converting a voice message into an HTML file is illustrated in FIG. 8. The voice message is originally stored in a VOX format or an AD/PCM format and is retrieved at step 170. The voice message is then converted either into an AU format or WAV format in accordance with the user's preference, which is stored in memory. Preferably, the message is preferably in the AD/PCM format originally and is converted in WAV, but the voice files may alternatively be stored and converted in file formats other than the ones disclosed, such as RealAudio (RA).

At step 174, the listing of all of the voice messages is then updated to include a listing of the newly received voice message and an anchor to the voice message. For instance, the original voice message may be stored with filename "1.vox" and is converted into WAV and stored with a filename "1.wav." The HTML file "voicelist.html" which contains a list of all voice messages would then have an anchor to the filename "1.wav" along with identifying information for the voice message, such as when the message was received.

The listing of the voice messages may have additional anchors or references. For instance, each voice message may

14

have an anchor directing the MSDS 10 to a file which contains a short sampling of the message. Thus, when the user selects this anchor, the user could receive the first 5 seconds of the message or some other predefined number of seconds. As with the listing of facsimile messages, the listing of the voice messages also preferably has anchors to "Save" and "Delete."

FIG. 9 illustrates a process for converting a data message into HTML. At step 180, the data file is retrieved from a database and at step 182 the HTML file containing the list of data messages is updated to include a listing of the newly received message along with identifying information. For instance, the HTML file for the listing "datalist.html" would be updated to include an anchor to a data file "file.1" and would have information such as the time and date that the file was transmitted, the size of the data file, as well as additional identifying information.

Because the MSDS 10 can receive messages of various types, such as a facsimile message, voice message or data messages the MSDS 10 must be able to determine the type of message that is being sent over the DID truck 15. With reference to FIG. 10, when an incoming call is received, the MSDS 10 goes off hook at step 200 and stars to generate a ringing sound. If, at step 202, a facsimile calling tone is detected, the ringing sound is stopped at step 204 and the message is received as a facsimile message at step 206. Similarly, when a data modem calling tone is detected at step 208, the ringing sound is stopped at step 210 and the message is identified as a data message at step 212.

If the MSDS 10 detects a DTMF digit at step 214, the ringing sound is stopped at step 216 and the MSDS 10 then determines which digit was pressed. When the digit is a "1," as determined at step 218, the message is identified as a facsimile message. The MSDS 10 will thereafter receive and store the facsimile message in the manner described above with reference to FIG. 2. If the digit is identified as a "0" at step 220, the call is identified as an owner's call and will be processed in a manner that will be described below with reference to FIG. 12. As will be apparent, other digits may cause the MSDS 10 to take additional steps. If any other DTMF digit is pressed, at step 224 the MSDS 10 activates a voice call system, which will be described in more detail below with reference to FIG. 11.

With step 226, the MSDS 10 will enter a loop continuously checking for a facsimile calling tone, a data modem calling tone, or for a DTMF digit. If after n rings none of these tones or digits has been detected, the ringing sound is stopped at step 228 and the voice call system is activated at step 224.

With reference to FIG. 1, when a fax calling tone or modem calling tone is not detected, the voice call system begins at step 230 by playing a voice greeting. If the greeting was not interrupted by a DTMF digit as determined at step 232, then the caller is prompted for the voice message at step 234 and, at step 236, the voice message is recorded and stored in memory. At step 238, the caller is prompted with a number of options, such as listening to the message, saving the message, or re-recording the message. Since the selection of these options with DTMF digits will be apparent to those skilled in the art the details of this subroutine or subroutines will not be described in further detail. When the caller wishes to re-record the message, as determined at step 240, the caller is again prompted for a message at step 234. If the caller does not wish to re-record the message, the call is terminated at step 242.

If the voice greeting is interrupted by a DTMF digit, as determined at step 232, then the MSDS 10 ascertains which digit has been pressed. At step 244, if the digit is a "0," the MSDS 10 detects that the call is an owner's call. When the

US 7,895,313 B2

15

digit is a "1," the MSDS 10 is informed at step 206 that the call carries a facsimile message. As discussed above with reference to FIG. 10, other DTMF digits may cause the MSDS 10 to take additional steps. If an invalid digit is pressed, by default at step 248 the routine returns to step 234 of prompting the caller for a message.

It should be understood that the invention is not limited to the specific interactive voice response system described with reference to FIG. 11. As discussed above, the invention may be responsive to DTMF digits other than just a "0" and a "1." Further variations or alterations will be apparent to those skilled in the art.

With reference to FIG. 12, when the call is considered an owner's call, the caller is first prompted for the password at step 250. The password is received at step 252 and, if found correct at step 254, a set of announcements are played to the owner. These announcements would preferably inform the owner of the number of new messages that have been received, the number of saved messages, the number of facsimile message, the number of data messages, and the number of voice messages. Other announcements, of course, could also be made at this time.

At step 258, the owner then receives a recording of the owner's menu with the appropriate DTMF digit for each option. For instance, the DTMF digit "1" may be associated with playing a message, the DTMF digit "2" may be associated with an options menu, and the DTMF digit "*" may be associated with returning to a previous menu or terminating the call if no previous menu exists.

A DTMF digit is detected at step 260 and the appropriate action is taken based upon the digit received. Thus, if the digit is determined to be a "1" at step 264, the owner can play a message at step 266. At step 266, the owner is preferably greeted with a menu giving the owner the options of playing or downloading new messages, saved messages, facsimile messages, data messages, or voice messages. As should be apparent to those skilled in the art, the owner may receive one or more menus at step 266 and the owner may enter one or more DTMF digits in order to play or download a particular message.

If, instead, the digit is determined to be a "2" at step 268, then the owner receives an options menu at step 270. With the options menu, the owner can enter or change certain parameters of the MSDS 10. For instance, the owner cm change his or her password, the owner can change the manner in which facsimile messages are displayed on the computer 32, the owner can change the image file format from GIF to another format the owner can select the file formats for the voice messages, as well as other options.

If the "*" DTMF digit is received, as determined at step 272, then the owner is returned to a previous menu. The "*" digit is also used to terminate the call when the owner has returned to the initial menu. The "*" digit is therefore universally recognized by the MSDS 10 throughout the various menus as a command for returning to a previous menu.

If the owner enters a DTMF digit that is not being used by the MSDS 10, the owner receives an indication at step 276 that the key is invalid and the owner is then again provided with the owner's menu at step 258. When the owner does not enter a DTMF digit while the owner's menu is being played, as determined at step 260 the menu will be replayed n times. Once the menu has been replayed n times, as determined at step 262, then the call will be terminated at step 278.

If the password is incorrect, as determined at step 254, then the MSDS 10 checks whether the user has made more than "n" attempts at step 280. If "n" attempts have not been made, then a password incorrect message will be displayed to the

16

user at step 282 and the user will once again be prompted for the password at step 250. When the user has made "n" attempts to enter the correct password, the MSDS 10 will play a failure message to the user at step 284 and then terminate the call at step 286. The specific number "n" may be three so that the call is terminated after three failed attempts.

The owner's menu may be responsive to an additional number of DTMF digits and may be structured in other ways. For instance, separate DTMF digits may direct the owner to the respective types of messages, such as a facsimile message, data message, or voice message. Also, separate DTMF digits may direct the owner to a recording of new messages or to a recording of saved messages. Other variations will be apparent to those skilled in the art.

A more detailed diagram of the MSDS 10 is shown in FIG. 13. As shown in the figure, a plurality of DID trucks 15 are received by an input/output device 17 and are then sent to a central processor 3. The number of DID trucks 15 may be changed to any suitable number that would be necessary to accommodate the anticipated number of telephone calls that may be made to the MSDS 10. The input/output device 17 routes a call on one of the DID trucks 15 to an open port of the central processor 3 and is preferably a DID Interface Box manufactured by Exacom.

The central processor 3 receives the calls on the DID trucks 15 and stores the messages in storage 11 in accordance with software 7. Preferably, a separate directory in storage 11 is established for each user having an account on the MSDS 10 so that all of the messages for a single user will be stored in the same directory. It should be understood that the number of processors within the central processor 3 is dependent upon the number of DID truck 15. With a greater number of DID trucks 15 capable of handling a larger number of telephone calls, the central processor 3 may actually comprise a number of computers. The input/output device 17 would then function to route incoming calls to an available computer within the central processor 3.

A more detailed diagram of the central processor 3 is shown in FIG. 14. The central processor 3 comprises a telephone line interface 21 for each DID trunk 15. The telephone interface 21 provides the ringing sounds and other communication interfacing with the telephone lines. The signals from the telephone interface 21 are routed to a pulse/tone decoder 23 and to a digital signal processor (DSP) 25. The pulse/tone decoder 23 detects the address signal off of an incoming call and sends the address signal onto a bus 29 to a microprocessor 27. The DSP performs the necessary signal processing on the incoming calls and routes the processed signals to the microprocessor 27.

The microprocessor 27 will then read the address signal from the pulse/tone decoder 23 and store the message from the DSP 25 in an appropriate directory in storage 11. As discussed above, the central processor 3 may comprise a number of computers or, more precisely, a number of microprocessors 27 with each microprocessor 27 handling the calls from a certain number, such as four, DID trucks 15. The microprocessor 27 may comprise any suitable microprocessor, but is preferably at least a 486 PC.

In addition to handling incoming calls and storing the messages in storage 11, the central processor 3 also coordinates the interactive voice response system of the MSDS 10. The software 7 would incorporate the flowcharts of operations for receiving a message shown in FIG. 3, for detecting the type of message on an incoming call shown in FIG. 10, for receiving voice messages shown in FIG. 11, and for receiving an owner's call shown in FIG. 12. Based upon the above-referenced flowcharts and the respective descriptions, the

US 7,895,313 B2

17                                                                      18

production of the software 7 is within the capability of one of ordinary skill in the art and will not be described in any further detail.

The Internet Server 5 is connected to the central processor 3, such as through a local area network, and also has access to the storage 11. The Internet Server 5 performs a number of functions according to software 9. For instance, the Internet Server 5 retrieves the data files stored in storage 11 by the central computer 3 and converts the files into the appropriate HTML files. The converted HTML files are then stored in storage 11 and may be downloaded to the computer 32 through the Internet 30. The Internet Server 5 also handles the requests from the computer 32, which might require the retrieval of files from the storage 11 and possibly the generation of additional HTML files.

The software 9 for the Internet Server 5 would therefore incorporate the flowchart of operations for generating HTML files according to user preferences shown in FIG. 4, for generating requested information from a user shown in FIG. 5, for converting facsimile messages into HTML shown in FIG. 6, for converting voice messages into HTML shown in FIG. 8, and for converting data messages into HTML shown in FIG. 9. Based upon the above-referenced flowcharts and their respective descriptions, the production of the software 9 is within the capability of one of ordinary skill in the art and need not be described in any further detail.

Nonetheless, a more detailed block diagram of the Internet Server 5 is shown in FIG. 15. The Internet Server 5 runs on a suitable operating system (OS) 39, which is preferably Windows NT. The Internet Server 5 has a number of application programs 31, such as the ones depicted in the flowcharts discussed above, for communicating with the central processor 3 and for accessing data from storage 11 and also from memory 33.

The memory 33, inter alia would contain the data indicating the preferences of each user. Thus, for example, when a facsimile message in the TIFF/F format is retrieved by the Internet Server 5, the Internet Server 5 would ascertain from the data in memory 33 the preferred option of displaying the facsimile message and would generate the appropriate HTML files.

All interfacing with the Internet 30 is handled by the HTTPD 37, which, in the preferred embodiment, is "Enterprise Server" from NetScape Communications Corp. Any requests from users, such as a request for a file, would be handled by the HTTPD 37, transferred through the CGI 35, and then received by the application programs 31. The application programs 31 would then take appropriate actions according to the request, such as transferring the requested file through the CGI 35 to the HTTPD 37 and then through the Internet 30 to the users computer 32.

The Internet Server 5 may be connected to a paging system 13. Upon the arrival of a new message, in addition to sending an E-mail message to the user's mailbox, the Internet Server 13 may also activate the paging system 13 so that a pager 15 would be activated. In this manner, the user could receive almost instantaneous notification that a message has arrived.

The paging system 13 is preferably one that transmits alphanumeric characters so that a message may be relayed to the user's pager 15. The Internet Server 5 therefore comprises a signal processor 41 for generating signals recognized by the paging system 13 and a telephone interface 43. The signal processor 4 preferably receives information from the application programs 31 and generates a paging message in a paging file format, such as XIO/TAP. The telephone interface

43 would include a modem, an automatic dialer, and other suitable components for communicating with the paging system 13.

The information from the application programs 31 may simply notify the user of a message or may provide more detailed information. For instance, with a facsimile message, the information from the application programs 31 may comprise CSI information identifying the sender's telephone number. The user would therefore receive a message on the pager 15 informing the user that a facsimile message was received from a specified telephone number. The amount and type of information that may be sent to the user on the pager 15 may vary according to the capabilities of the paging system 13 and may provide a greater or lesser amount of information than the examples provided.

The Internet Server 5 is not limited to the structure shown FIG. 15 but may comprise additional components. For instance, the HTTPD 37 would be linked to the Internet 30 through some type of interface, such as a modem or router. The Internet Server 5 may be connected to the Internet 30 through typical phone lines, ISDN lines, a T1 circuit, a T3 circuit, or in other ways with other technologies as will be apparent to those skilled in the art.

Furthermore, the Internet Server 5 need not be connected to the Internet 30 but may be connected to other types of networks. For instance, the Internet Server 5, or more generally the network Server 5, could be connected to a large private network, such as one established for a large corporation. The network Server 5 would operate in the same manner by converting messages into HTML files, receiving requests for information from users on the network, and by transmitting the information to the users.

Also, at least one interface circuit would be located between the Internet Server 5 and the central processor 3 in order to provide communication capabilities between the Internet Server 5 and the central processor 3. This network interface may be provided within both the Internet Server 5 and the central processor 3 or within only one of the Internet Server 5 or central processor 3.

Examples of the Internet Server 5 software layers are shown in FIGS. 16(A) and 16(B), with FIG. 16(A) representing the Internet Server 5 in an asynchronous mode of communication and FIG. 16(B) representing the Internet 5 in a synchronous mode of communication. As shown in the figures, the software 9 for the Internet Server 5 may additional comprise an Internet Deamon for running the HTTPD 37. The software 9 for the Internet Server 5 would also include TCP/IP or other transport layers. Moreover, while the authentication is provided through the HTTPD 37, the authentication of the user's password and ID may be supplemented or replaced with other ways of authentication.

The term synchronous has been used to refer to a mode of operation for the MSDS 10 in which the all possible HTML files for a message are generated at the time the message is received. The HTML files may be generated by the central processor 3 or by the application programs 31. When a request for information is then later received by the HTTPD 37, the information has already been generated and the HTTPD 37 only needs to retrieve the information from storage 11 and transmit the information to the user's computer 32. With a synchronous mode of operation, the CGI 35 would be unnecessary.

The MSDS 10 preferably operates according to an asynchronous mode of operation. In an asynchronous mode of operation, information requested by the user may not be available and may have to be generated after the request. The asynchronous mode of operation is preferred since fewer files

19 20

are generated, thereby reducing the required amount of storage **11**. Because the information requested by a user may not be available, some anchors cannot specify the filename, such as "2.html," but will instead contain a command for the file. For instance, an anchor may be defined as <AHREF="/fax-web/users/2496801/viewpage.cgi?FAX_NUM= 1&PAGE=1&VIEW_MODE=FULL"> for causing the CGI **35** to run a viewpage program so that page 1 of facsimile message **1** will be displayed in a full size image. The CGI **35** will generate the requested information when the information has not been generated, otherwise the CGI **35** will retrieve the information and relay the information to the HTTPD **37** for transmission to the user.

With the invention, the MSDS **10** can reliably receive voice, facsimile, and data messages for a plurality of users and can receive more than one message for a user at a single time. The messages are stored by the MSDS **10** and can be retrieved at the user's convenience at any time by connecting to the Internet **30**. The Internet World Wide Web **30** is a constantly expanding network that permits the user to retrieve the messages at virtually any location in the world. Since the user only needs to incur a local charge for connecting to the Internet **30**, the user can retrieve or review messages at a relatively low cost.

Even for the user's at the office or at home, the MSDS **10** provides a great number of benefits. The user would not need a facsimile machine, voice mail system, or a machine dedicated for receiving data messages. The user also need not worry about losing part of the message or violating the confidential nature of the messages. The user, of course, can still have a facsimile machine and dedicated computer for data messages. The MSDS **10**, however, will permit the user to use the telephone company's "call forwarding" feature so that messages may be transferred to the MSDS **10** at the user's convenience, such as when the user is away from the office.

The software **7** and software **9** are not limited to the exact forms of the flowcharts shown but may be varied to suit the particular hardware embodied by the invention. The software may comprise additional processes not shown or may combine one or more of the processes shown into a single process. Further the software **7** and **9** may be executed by a single computer, such as a Silicon Graphics Workstation or may be executed by a larger number of computers.

The facsimile messages preferably undergo signal processing so that the images of the facsimile messages are converted from a two tone black or white image into an image with a varying gray scale. As is known in the art a gray scale image of a facsimile message provides a better image than simply a black or white image of the message. The signal processing may comprise any suitable standard contrast curve method of processing, such as anti-aliasing or a smoothing filter. The signal processing may occur concurrently with the conversion from TIFF/F to GIF and is preferably performed for both full and reduced size images of the facsimile messages.

Furthermore, the user may be provided with a greater or fewer number of options in displaying or retrieving messages. The options are not limited to the exact forms provided but may permit the user to review or retrieve the messages in other formats. The options may also permit a user to join two or messages into a single message, to delete portions of a message, or to otherwise the contents of the messages. Also, the various menus provided to the user over the telephone may have a greater number of options and the MSDS **10** may accept responses that involve more than just a single DTMF digit.

The specific DTMF digits disclosed in the various menus are only examples and, as will be apparent to those skilled in the a other digits may be used in their place. For instance, a "9" may be used in the place of a "*" in order to exit the menu or to return to a previous menu. Also, the DTMF digits may be changed in accordance with the users personal convention. If the user had a previous voice mail system, the user could customize the commands to correspond with the commands used in the previous system in order to provide a smooth transition to the MSDS **10**.

The MSDS **10** may restrict a user to only certain types of messages. For instance, a user may want the MSDS **10** to store only facsimile messages in order to reduce costs of using the MSDS **10**. In such a situation, the MSDS **10** would perform an additional step of checking that the type of message received for a user is a type of message that the MSDS **10** is authorized to receive on the user's behalf. When the message is an unauthorized type of message, the MSDS **10** may ignore the message entirely or the MSDS **10** may inform the user that someone attempted to send a message to the MSDS **10**.

Moreover, the MSDS **10** has been described as having the central processor **3** for handling incoming calls and the Internet Server **10** for interfacing with the Internet **30**. The invention may be practiced in various ways other than with two separate processors. For instance, the central processor **3** and the Internet Server **5** may comprise a single computer or workstation for handling the incoming calls and for interfacing with the Internet **30**. The MSDS **10** may convert the messages into files prior to storing the messages. Also, the central processor **3** may communicate with the paging system **13** instead of the Internet Server **5**. Additionally, as discussed above, the central processor **3** may comprise a number of microprocessors **27** for handling a large number of DID trucks.

The invention has been described as converting the messages into HTML and transmitting the HTML files over the Internet **30** to the computer **32**. The HTML format, however, is only the currently preferred format for exchanging information on the Internet **30** and is actually only one type of a Standard Generalized Mark-Up Language. The invention is therefore not limited to the HTML format but may be practiced with any type of mixed media page layout language that can be used to exchange information on the Internet **30**.

SGML is not limited to any specific standard but encompasses numerous dialects and variations in languages. One example of an SGML dialect is virtual reality mark-up language (VRML) which is used to deliver three dimensional images trough the Internet. As another example, the computer **32** for accessing the MSDS **10** through the Internet **30** may comprise a handheld device. A handheld device is generally characterized by a small display size, limited input capabilities, limited bandwidth, and limited resources, such as limited amount of memory, processing power, or permanent storage. In view of these limited capabilities, a handheld device markup language (HDML) has been proposed to provide easy access to the Internet **30** for handheld devices. The SGML information transmitted by the MSDS **10** to the computer **32** may therefore comprise HDML information suitable for a handheld device or may comprise VRML.

As another example, Extensible Mark-Up Language (XML) is an abbreviated version of SGML, which makes it easier to define document types and makes it easier for programmers to write programs to handle them. XML omits some more complex and some less-used parts of the standard SGML in return for the benefits of being easier to write applications for, easier to understand, and more suited to delivery and inter-operability over the Web. Because XML is nonetheless a dialect of SGML, the MSDS **10** therefore encompasses the translation of facsimile, voice, and data

US 7,895,313 B2

21

messages into XML, including all of its dialects and variations, and the delivery of these messages to computers **32** through the Internet **30**.

As a further example, the MSDS **10** encompasses the use of "dynamic HTML." "Dynamic HTML" is a term that has been used to describe the combination of HTML, style sheets, and scripts that allows documents to be animated. The Document Object Model (DOM) is a platform-neutral and language neutral interface allowing dynamic access and updating of content, structure, and style of documents. The MSDS **10** may therefore include the use of the DOM and dynamic HTML to deliver dynamic content to the computer **32** through the Internet **30**.

The MSDS **10** is also not limited to any particular version or standard of HTTP and thus not to any particular hyper-text transfer protocol deamon **37**. In general, HTTP is a data access protocol run over TCP and is the basis of the World Wide Web. HTTP began as a generic request-response protocol, designed to accommodate a variety of applications ranging from document exchange and management to searching and forms processing. Through the development of HTTP, the request for extensions and new features to HTTP has exploded; such extensions range from caching, distributed authoring and content negotiation to various remote procedure call mechanisms. By not having a modularized architecture, the price of new features has been an overly complex and incomprehensible protocol. For instance, a Protocol Extension Protocol (PEP) is an extension mechanism for HTTP designed to address the tension between private agreement and public specification and to accommodate extension of HTTP clients and servers by software components. Multiplexing Protocol (MUX) is another extension that introduces asynchronous messaging support at a layer below HTTP. As a result of these drawbacks of HTTP, a new version of HTTP, namely HTTP-NG, has been proposed and its purpose is to provide a new architecture for the HTTP protocol based on a simple, extensible distributed object-oriented model. HTTP-NG, for instance, provides support for commercial transactions including enhanced security and support for on-line payments. Another version of HTTP, namely S-HTTP, provides secure messaging. The MSDS **10** and the HTTPD **37** may incorporate these versions or other versions of HTTP.

In addition to different versions of HTTP, the HTTPD **37** of the MSDS **10** may operate with other implementations of HTTP. For instance, the W3C's has an implementation of HTTP called "Jigsaw." Jigsaw is an HTTP server entirely written in Java and provides benefits in terms of portability, extensibility, and efficiency. The MSDS **10** may employ Jigsaw or other implementations of HTTP.

With regard to the transmission of messages to the user's computer **32**, the MSDS **10** permits the user to sample the voice message or to preview the facsimile message without requiring the MSDS **10** to transmit the entire message to the computer **32**. This sampling ability is a significant benefit since the transmission of the entire message would frequently tie up the computer **32** for a rather long period of time. Thus, with the preview or sample feature, the user can determine whether the user needs the message transmitted to the computer **32**.

If the user does decide that the entire message needs to be transmitted, as stated above, the user's computer **32** might be receiving the message for a relatively long period of time. After the entire message has been received, the user then has the options of viewing, listening, retrieving, or saving the message. As an alternative, the user's computer may instead indicate the contents of the message to the user as the message is being received.

22

For instance, with a voice message, the user's computer **32** could send the message to an audio speaker as the message is being received. In this manner, the message would be played in real time and the user would not need to wait until the entire message is received before listening to the message. In order to play the messages in real time, the messages are preferably in the RealAudio (RA) format, which the user can select as the preferred file format for voice messages.

In operation, the MSDS **10** would transmit an HTML file containing an RA file. If the user selects the RA file with the browser on the computer **32**, the browser wilt activate a program for use with RA flies. The operations and functioning of this program will be apparent to those skilled in the art and will be available as a separate software package or will be incorporated within a browser program. The RA program will request the RA data file containing the message from the MSDS **10** and, as the RA file is being received at the computer **32**, this program will play the message in real time.

The MSDS **10** and the users computer **32** could also be arranged so that each page or even line of a facsimile message could be displayed as the computer **32** receives the facsimile message. Further, although the transmission of a data message is relatively fast in comparison to a voice or facsimile message, the computer **32** could also be programmed to permit access to the data message as the message is being received.

The invention has been described as storing and transmitting voice messages. It should be understood that the voice message would probably be the most often type of audio message stored at the MSDS **10**. The invention, however, may be used with any type of audio message and is in no way limited to just voice messages.

According to another aspect of the invention, the MSDS **10** may be used as a file repository serving as an archive for a particular user or group of users. As described above, the MSDS **10** may maintain a list of all messages for a particular user which is displayed to the user when the user access his or her mailbox. The MSDS **10** may store all messages, whether they are voice, facsimile, or data, for a user in the database indefinitely. The MSDS **10** may therefore be relied upon by a user to establish the authenticity of a message and the existence or absence of a particular message. Through the MSDS **10**, a user can therefore maintain an accurate record of all received email messages, facsimile messages, and data transfers.

In addition to serving as a file depository, the MSDS **10** may also function as a document management tool. As described above with reference to FIG. **2**, when the MSDS **10** receives a message, the MSDS **10** updates a database with information on the message. This information includes the type of message, whether it is a facsimile message, voice message, or data message, the time and date at which the message was received, the size of the file, such as in bytes, the telephone number of the caller leaving the message, as well as other information, such as the number of pages of a facsimile message. Because the telephone number called is unique for each user, the information also includes the intended recipient of the message.

An example of a data entry **300** in storage **11** for a message is shown in FIG. **17**. The data entry **300** represents the entry for just a single message with each message having a separate data entry **300**. Preferably, the data entries **300** are stored in a relational database and may be searched through a structured query language (SQL).

As shown in FIG. **17**, the data field **300** for a message may comprise numerous data fields for describing the message. One of these data fields may comprise a field **301** for indicat-

US 7,895,313 B2

23

ing the name of the person receiving the message. As will be appreciated by those skilled in the art the person may be identified in numerous ways, such as by a portion of the person's name or by a unique number. Another field **302** in the data entry **300** indicates the type of the document, such as whether the document is a facsimile message, voice message, or data transfer, and fields **303** and **304** respectively indicate the date and time that the message was received by the MSDS **10**. The telephone number of the caller is indicated in field **305** while the size of the message, which may be measured in bytes, is indicated in field **306** and the number of pages of the message is indicated in field **307**. A document number for uniquely identifying the message is indicated in field **308**. As discussed above, the files or messages received for a particular user may be numbered sequentially in the order that they are received by the MSDS **10**. The files and messages, however, may be numbered or identified in other ways, such as by a combination of numbers with an identifier for the date when the message was received. Also, the documents number or identifier may be unique for each file or message directed to a user or, alternatively, may be unique for each file or message directed to a plurality of users, which is advantageous when the MSDS **10** tracks documents for an entire company or other group of users.

In addition to fields **301** to **308**, the data entry **300** for a message or file may have other fields **309** for describing or documenting the message or file. The other fields **309**, for instance, may be used to identify the type of storage that a message should receive. The messages or files may have different lengths of time that the message is stored before being automatically deleted. The type of storage, such as whether the full text of the message is stored, may also be indicated by field **309**. Another example of a trait that may be contained within the other field **309** is security. At times, a user may desire and may be granted access to another person's mailbox, such when the MSDS **10** tracks documents for an entire company. By designating a message or file as secure in field **309**, a user may restrict or deny access to that message or file by other users. The other fields **309** may also be used by a user to customize the MSDS **10** according to his or her own desires. For instance, if the user is a company, the company may want to classify messages according to the division at which the message is directed, such as one code for marketing, one for sales, one for engineering, and one for legal.

As another example of a use of one of the other fields **309**, a user can input notes in the other field **309**. When a user initially receives a data entry **300**, the entry **300**, for instance, may include data in all fields **301** to **308** except field **309**, which has been left blank. The user can then input his or her notes in the other field. An initial data entry **300** may include the field **305** for the caller's telephone number which contains the digits for the calling number. The user, however, may not readily recognize the caller from just reading the telephone number listed in field **305**. To more clearly indicate the caller, the user may input notes in field **309** to identify the caller's name. Alternatively, the notes in field **309** may reflect part or all of the contents of the message. The user may receive a large document or message and may input a brief description of the document or message in the field **309**. As another example, the recipient of the message may read the message or document and discover that the caller is requesting some service or go from the recipient, such as a request for certain documents or delivery of a certain quantity of goods. The recipient may read the document or message and place somes notes in the field **309** to indicate the type of follow-up service or action that needs to be taken. An assistant to the recipient can then view the notes in field **309** and take appropriate steps

24

to ensure that the requested service or goods are delivered. If the data entry is security protected, one of the other fields **309**, as discussed above, may grant the assistant limited access to just the field **309** or may grant more expansive access whereby the assistant can view fields **301** to **309** as well as the actual document or message. The fields **309** may serve various other purposes, as will be apparent is to those skilled in the art.

FIG. **18** illustrates a process **320** for using the MSDS **10** for document management purposes. With reference to FIG. **18**, a user sends a search request to the MSDS **10** for a particular document or set of documents at step **321**. The user may issue this request with the computer **32** by clicking on a link, such as "Search Documents," which may be presented to the user by the MSDS **10** after the user has been granted accesses to his or her mailbox at step **72** shown in FIG. **3**. The MSDS **10** may present the user with the option to search the document archives at other times, such as when the user first attempts to access the mailbox at step **62**, or when the URL received by the HTTPD **37** from computer **32** points toward the document archives.

In response to this request the HTTPD **37** sends the user a search query form at step **322** to allow the user to define a desired search. An example of a search query form is shown in FIG. **19**. The search query form may include an entry for each of the data fields **301** to **309** in the data entry **300**. For instance, the user may input one or more names for a recipient and have the MSDS **10** search for all messages or files directed to just those recipients. The user may also indicate the type of document, such as whether it is a facsimile, voice message or data file. The search query form also has entries for the date or time, which preferably accept ranges of times and dates, and an entry for the telephone number of the caller to the MSDS **10**. The search query form may also include an entry for the size of the file or for the number of pages, which is relevant if the message is a facsimile message. The search query form may also include an entry for the document number, which may accept a range of document numbers, and also an entry for another field.

At step **323**, the user enters the search parameters in the search query form with computer **32** and returns the information to the MSDS **10** through the Internet **30**. The user may define the search about any one data field or may define the search about a combination of two or more data fields. For instance, as reflected in the completed search query form shown in FIG. **20**, a user may define a search by designating the document type as a facsimile and the calling number as (404) 249-6801. Once the user has finished defining the search, the user then selects the "SEARCH" link shown at the bottom of the screen whereby the user's computer **32** would send the completed search query form through the Internet **30** to the HTTPD **37** of the MSDS **10**.

At step **324**, the HTTPD **37** receives the completed search query form and, through CGI **35**, invokes one or more of the application programs **31** for performing the desired search for any files or messages falling within the parameters of the search. The results of the search are passed from the application programs **31** through the CGI **35** to the HTTPD **37** and, at step **325**, are returned to the user through the Internet **30**. Preferably, the MSDS **10** returns the search results in the form of a listing of all files or messages contained within the search parameters, although the MSDS **10** may return the results in other ways.

An example of the search results of the query shown in FIG. **20** is shown in FIG. **21**. As discussed above, the parameters of the search were all facsimile messages from telephone number (404) 249-6081. With reference to FIG. **21**,

US 7,895,313 B2

25      26

this query resulted in three messages being discovered. The first document has a document number 11 and is described as being a facsimile from the designated telephone number to Jane Doe on May 31, 1995, and consists of three pages. This first-listed document is an example of the facsimile shown in FIG. 7. The other two documents respectively correspond to document numbers 243 and 1,002 and are also from the designated telephone number.

At step **326**, the user selects the desired file or message from the listing of messages and files. For instance, by clicking on the first listed document, namely document number 11, the computer **32** sends a request to the MSDS **10** for a viewing of that document and, in response, the MSDS **10** provides a viewing of the document according to the user defined preferences. As described above, the user may receive a reduced size image of the first page, a full size image of the first page, reduced size images of all pages, or full size images of all pages of the facsimile message. Thus, if the user selected the fourth display option as the user defined preference, the MSDS **10** would return an image of the first page of the facsimile, such as the one depicted in FIG. 7.

At step **326**, the user may also have the MSDS **10** save the search result. For instance, as shown in FIG. **21**, the user may input the name of "CHARLES R. BOBO FACSIMILES" as the name for the search. By clicking on the "SAVE SEARCH AS" link, the name of the search is provided from the computer **32** to the MSDS **10**. At the MSDS **10**, the HTTPD **37** transfers the information from the computer **32** to the CGI **35** and the CGI **35** invokes an application program **31** to store the results of the search in storage **11** under the designated name. The invoked application program **31** preferably does not store the contents of all messages but rather stores a listing of the search results in the storage **11**.

The results of a search may be stored in storage **11** as either a closed search or an open search. If the MSDS **10** saves the results of a search as an open search, then the files or messages in that named search may be updated with recent files or messages falling within the particular search parameters for the search. On the other hand, a closed search is one in which the files or messages in the named search are limited to those existing at the time of the search. For example, if the MSDS **10** saved the search results shown in FIG. **21** as a closed search, then any retrieval of the "CHARLES R. BOBO FACSIMILES" would result in only the three listed documents. If, on the other hand, the search named as the "CHARLES R. BOBO FACSIMILES," was saved by the MSDS **10** as an open search, then the MSDS **10** would reactivate the search query shown in FIG. **20** in response to a request by the computer **32** for that search in order to obtain all facsimile messages from that particular telephone number, including those received after the initial saving of the search results.

With reference to FIG. **19**, rather than defining a new search, the user may click on the "STORED SEARCHES" link in order to receive the results of a previously performed search. For example, by clicking on this link, the MSDS **10** may return a listing of searches stored for that particular user, such as the searches shown in FIG. **22**. As shown in this figure, the "CHARLES R. BOBO FACSIMILES" is included within the list of stored searches. If the user then selected the "CHARLES R. BOBO FACSIMILES" search, the user may then be presented with the listing of facsimiles shown in FIG. **21**, possibly including recent additions to the search group.

With reference to FIG. **19**, the MSDS **10** may also provide a user with a link to "RECENT FILES" at step **322**. By selecting this link, the MSDS **10** may return a listing of all facsimile, voice, and data messages received with a particular period of time, such as the last month. By placing the

"RECENT FILES" link on the search query form rather than in the listing of "STORED SEARCHES," the user can quickly turn to the most recent files and messages. The search query form may contain other such easy-access links, such as a link to the last search performed by the MSDS **10** on behalf of the user.

The messages or files received by the MSDS **10** need not arrive from a third party. In other words, the MSDS **10** may be used as a file repository or as a file manager for documents generated by the user itself. The user may call the designated telephone number for receiving messages and transmit voice messages, data messages, or facsimile messages and have the MSDS **10** document the receipt and content of these messages. A user may easily use a facsimile machine as a scanner for entering documents into the storage **11** of the MSDS **10**.

The MSDS **10** may have applications in addition to those discussed-above with regard to serving as a message deliverer, file repository, and file manager. For instance, the MSDS **10** may perform some additional processing on the incoming calls prior to forwarding them to the user. For voice messages, this processing may involve transcribing the message and then returning the transcribed messages to the user. The MSDS **10** may therefore be viewed as offering secretarial assistance which may be invaluable to small companies or individuals who cannot afford a secretary or even to larger businesses who may need some over-flow assistance. The transcription may be provided by individuals located in any part of the world or may be performed automatically by a speech-to-text recognition software, such as VoiceType from IBM.

Another type of processing that the MSDS **10** may provide is translation services. The incoming call, whether it is a voice, facsimile, or data message, can be converted into SGML and then forwarded first to a translator. Given the reach of the Internet the translator may be located virtually anywhere in the world and can return the translated document via the Internet to the MSDS **10**. The MSDS **10** can notify the user that the translation has been completed through email, voice mail, pager, facsimile, or in other ways. The user would then connect to the Internet and retrieve the translated document. The translation services of the MSDS **10** may also provide transcription of die message, such as with speech-to-text recognition software.

The foregoing description of the preferred embodiments of the invention have been presented only for the purposes of illustration and description. It is not intended to be exhaustive or to limit the invention to the precise form disclosed. Many modifications and variations are possible in light of the above teaching.

The embodiments were chosen and described in order to explain the principles of the invention and their practical application so as to enable others skilled in the art to utilize the invention and various embodiments and with various modifications as are suited to the particular use contemplated. It is intended that the scope of the invention only be limited by the claims appended hereto.

What is claimed is:

1. A method for receiving and storing a message addressed to an intended recipient and for delivering the message to a client computer that has a graphical user interface, comprising:

    receiving the message;

    storing the message in a restricted-access message storage area associated with the intended recipient;

    receiving, at a hyper-text transfer protocol daemon, a first request from the client computer, and forwarding the

US 7,895,313 B2

27

first request to a network server, wherein the first request is a request to access the restricted-access message storage area;

receiving, at the hyper-text transfer protocol daemon, a second request from the client computer, and forwarding the second request to the network server, wherein the second request is a request for the message;

forwarding at least a part of the message from the network server to the hyper-text transfer protocol daemon; and

transmitting at least part of the message from the hyper-text transfer protocol daemon to the client computer; wherein the transmitting comprises transmitting a mark-up language file to an application program executing on the client computer, and wherein the application program generates a mailbox user interface in response to the mark-up language file, the mailbox user interface comprising a link to the message in the restricted-access message storage area.

**2**. The method as set forth in claim **1**, wherein the message is a member of the group consisting of a voice mail message received via an interface to a public switched telephone network, a facsimile message received via an interface to the public switched telephone network, and a data message.

**3**. The method as set forth in claim **1**, wherein the client computer comprises the intended recipient's computer.

**4**. A method for receiving and storing a message addressed to an intended recipient and for delivering the message to a client computer that has a graphical user interface, comprising:

receiving the message;

storing the message in a restricted-access message storage area associated with the intended recipient;

creating a markup language file that, when processed in the client computer, causes an interactive user interface to be displayed on the graphical user interface, wherein the markup language file provides a mailbox user interface including a selectable indication of the presence of the message, the selectable indication comprising a link to the message in the restricted-access message storage area;

receiving, from the client computer, via a communications network, at a network server, a first request, wherein the first request is a request to access the restricted-access message storage area;

authenticating the first request, and, in response to a successful authentication, transmitting to the client computer the markup language file;

receiving, from the client computer, via the communications network, at the network server, a second request, wherein the second request is coupled from the client computer in response to a user selection of the selectable indication in the mailbox user interface; and

in response to the second request, forwarding, from the network server, via the communications network, to the client computer, at least portion of the message.

**5**. The method as set forth in claim **4**, wherein the client computer comprises the intended recipient's computer.

**6**. A method for receiving and storing a message addressed to an intended recipient and for delivering the message to a client computer that runs a web browser program, comprising:

receiving the message;

storing the message in a restricted-access message storage area associated with the intended recipient;

creating an HTML file that, when processed in the client computer, causes a user interactive web page to be displayed by the web browser program in a graphical user

28

interface, wherein the HTML file causes the user interface to provide a link to at least a portion of the message;

receiving, from the client computer, via an Internet, at a network server, a first request, wherein the first request is a request to access the restricted-access message storage area;

authenticating the first request, and, in response to a successful authentication, transmitting to the client computer the HTML file;

receiving, from the client computer, via the Internet, at the network server, a second request, wherein the second request is coupled from the client computer in response to a user selection of the link; and

in response to the second request, forwarding, from the network server, via the computer network, to the client computer, at least portion of the message.

**7**. The method as set forth in claim **6**, wherein the client computer comprises the intended recipient's computer.

**8**. A method for receiving and storing a message directed to an intended recipient and for relaying the message to a client computer that runs a web browser program, comprising:

receiving the message;

storing the message in a restricted-access message storage area associated with the intended recipient;

creating a markup language file that, when processed in the client computer, causes a user interactive web page to be displayed by the web browser program in a graphical user interface, wherein the markup language file causes the user interface to provide a link to at least a portion of the message;

receiving, from the client computer, via a communications network, at a network server, a first request, wherein the first request is a request to access the restricted-access message storage area;

authenticating the first request, and, in response to a successful authentication, transmitting to the client computer the markup language file;

receiving, from the client computer, via the communications network, at the network server, a second request, wherein the second request is coupled from the client computer in response to a user selection of the link; and

in response to the second request, forwarding, from the network server, via the communications network, to the client computer, at least portion of the message.

**9**. The method as set forth in claim **8**, wherein the client computer comprises the intended recipient's computer.

**10**. A method for storing and delivering a message addressed to an intended recipient to the intended recipient's computer, comprising:

storing the message in a restricted access storage area of a storage medium associated with a network server; and

establishing an application layer session between a browser program executing on the intended recipient's computer and an application layer program executing on the network server, via an HTTPD, over the Internet, and, during the application layer session:

transmitting a mark-up language file from the network server to the intended recipient's computer, wherein the browser program produces a mailbox user interface in response to the mark-up language file, the mailbox user interface comprising a link to the message in the restricted access storage area thereby enabling the intended recipient to request delivery of the message;

transmitting the message, over the Internet, from the restricted access storage area to the intended recipient's computer, in response to a request for delivery of the message made by the intended recipient.

**11**. A method for storing and delivering a message addressed to an intended recipient to the intended recipient's user device, comprising:

storing the message in a restricted access storage area associated with a network server;

the network server receiving a request for access to the restricted access storage area from a browser program executing on the user device, over a network, via an HTTPD;

responsive to the request for access, the network server granting or denying the requested access; and

responsive to a grant of access, the network server transmitting a mark-up language file to the user device, over the network, via the HTTPD;

wherein the browser program produces a mailbox user interface in response to the mark-up language file, the mailbox user interface providing a hyper-text link which can be activated by the intended recipient to download the message from the remote storage and delivery system to the intended recipient's device, over the network.

**12**. A method for accessing a message addressed to a user and stored on a network server using a hyper-text transfer protocol, comprising:

sending an access request from a hyper-text browser executing on a client computer to the network server via the packet switched data network in accordance with the hyper-text transfer protocol, wherein the access request contains an application layer address associated with the network server on the network and is indicative of a request by a user of the client computer to gain access to a user-specific message storage area accessible by the network server;

in response to a determination made by the network server to grant the access request, receiving from the network server at the hyper-text browser a mark-up language file, via the network, using the hyper-text transfer protocol;

using information contained in the markup language file, the hyper-text browser generating a mailbox user interface through which a link to the message stored in the user-specific message Storage area can be selected by the user;

sending, via the network, in accordance with the hyper-text:

transfer protocol, an indication that the user has selected the link;

receiving the message at the client computer, via the network, in accordance with the hyper-text transfer protocol; and

transmitting information related to the message to the user via the hyper-text browser, wherein the message is addressed to the user.

**13**. The method as set forth in claim **12**, wherein the computer comprises a personal computer comprising a display device and a user input device.

**14**. The method as set forth in claim **12**, wherein the application layer address comprises a URL.

**15**. The method as set forth in claim **12**, wherein the network comprises the Internet.

**16**. The method as set forth in claim **12**, wherein the network comprises a private network.

**17**. The method as set forth in claim **12**, wherein the user-specific message storage area comprises a user-specific message mailbox within a messaging database comprising a plurality of message mailboxes for a plurality of users.

**18**. The method as set forth in claim **12**, wherein the message comprises an HTML file.

**19**. The method as set forth in claim **12**, wherein the mark-up language file comprises an HTML file.

**20**. The method as set forth in claim **12**, wherein the network server executes a hyper-text transfer protocol daemon (HTTPD) to execute the hyper-text transfer protocol interactions between the network server and the hyper-text browser.

**21**. The method as set forth in claim **20**, wherein the network server comprises an HTTP server and the user's computer comprises an HTTP client.

**22**. The method as set forth in claim **21**, wherein the network comprises the Internet.

**23**. The method as set forth in claim **12**, wherein the message comprises a mark-up language file that conforms with a dialect of a standardized generalized mark-up language (SGML).

**24**. The method as set forth in claim **12**, wherein the message comprises a standardized generalized mark-up language (SGML) file.

**25**. The method as set forth in claim **12**, wherein the message is received in a first file format other than a mark-up language file format, and, further comprising converting a file format of the received message from the first file format to the mark-up language file format.

**26**. The method as set forth in claim **12**, wherein the message comprises a voice mail message.

**27**. The method as set forth in claim **12**, wherein the message comprises a facsimile message.

**28**. The method as set forth in claim **12**, wherein the message comprises a data message.

**29**. The method as set forth in claim **12**, wherein the making a determination is performed in response to an authentication information received from the hyper-text browser via the network, in accordance with the hyper-text transfer protocol.

**30**. The method as set forth in claim **29**, wherein the authentication information includes a user-specific password.

**31**. The method as set forth in claim **29**, wherein the authentication information includes a user name.

**32**. The method as set forth in claim **12**, wherein the hyper-text browser comprises a web browser.

**33**. The method as set forth in claim **32**, wherein the packet switched data network comprises the Internet.

**34**. The method as set forth in claim **32**, wherein the computer comprises a personal computer that includes a keyboard and a display.

**35**. The method as set forth in claim **12**, wherein the mailbox user interface provides additional links to other messages stored in the user-specific message storage area.

**36**. The method as set forth in claim **35**, wherein the mailbox user interface further provides an indication of the total number of messages stored in the user-specific message storage area.

**37**. The method as set forth in claim **36**, wherein the mailbox user interface further provides an indication of the total number of new messages stored in the user-specific message storage area, and an indication of the total number of saved messages stored in the user-specific message storage area.

**38**. The method as set forth in claim **12**, wherein the message is a confidential message intended to be viewed by only the user.

US 7,895,313 B2

31

**39**. The method as set forth in claim **12**, wherein the mailbox user interface enables the user to browse through all messages stored in the user-specific message storage area.

**40**. The method as set forth in claim **12**, further comprising sending a notification to the user to notify the user that the message has been received.

32

**41**. The method as set forth in claim **40**, wherein the notification comprises an e-mail message.

**42**. The method as set forth in claim **40**, wherein the notification comprises a wireless notification.

* * * * *

US007934148B2

(12) **United States Patent**

Bobo, II

(10) **Patent No.:** **US 7,934,148 B2**

(45) **Date of Patent:** **Apr. 26, 2011**

(54) **SYSTEMS AND METHOD FOR STORING, DELIVERING, AND MANAGING MESSAGES**

(75) Inventor: **Charles R. Bobo, II**, Atlanta, GA (US)

(73) Assignee: **Advanced Messaging Technologies, Inc.**, Los Angeles, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1090 days.

(21) Appl. No.: **11/609,003**

(22) Filed: **Dec. 11, 2006**

(65) **Prior Publication Data**

US 2007/0083614 A1      Apr. 12, 2007

**Related U.S. Application Data**

(63) Continuation of application No. 10/963,586, filed on Oct. 14, 2004, which is a continuation of application No. 10/436,798, filed on May 12, 2003, now Pat. No. 6,857,074, which is a continuation of application No. 09/840,759, filed on Apr. 23, 2001, now Pat. No. 6,564,321, which is a continuation of application No. 09/186,595, filed on Nov. 5, 1998, now Pat. No. 6,350,066, which is a continuation of application No. 08/944,741, filed on Oct. 6, 1997, now Pat. No. 5,870,549, which is a continuation-in-part of application No. 08/431,716, filed on Apr. 28, 1995, now Pat. No. 5,675,507.

(51) **Int. Cl.**
| | | |
|---|---|---|
| *G06F 17/00* | (2006.01) | |
| *H04M 1/658* | (2006.01) | |
| *H04N 1/00* | (2006.01) | |

(52) **U.S. Cl.** ..... **715/208**; 358/402; 358/403; 379/88.14; 379/88.15; 715/760

(58) **Field of Classification Search** .................. 715/273, 715/760, 208; 358/402, 403; 379/88.14, 379/88.15

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,106,060 A    8/1978  Chapman, Jr.

(Continued)

FOREIGN PATENT DOCUMENTS

AU            755321      12/2002

(Continued)

OTHER PUBLICATIONS

Kaashoek, M. Frans et al. "Dynamic Documents: Extensibility and Adaptability in the WWW", Sep. 15, 2004 Massachusetts Institute of Technology.*

(Continued)

*Primary Examiner* — Adam M Queler
*Assistant Examiner* — Tyler J Schallhorn
(74) *Attorney, Agent, or Firm* — Kenyon & Kenyon LLP

(57) **ABSTRACT**

Systems and methods are provided for storing a mark-up language file and delivering the file from a network server to a user's computer via a packet switched data network using a hyper-text transfer protocol (HTTP). The mark-up language file is stored in a storage area accessible by the network server, wherein the file contains information personal to the user. A notification is transmitted to the user's computer, wherein the notification serves to notify the user of the availability of the file. In response to a user request made in response to the notification, the mark-up language file is transmitted from the network server to the user's computer, via the packet switched data network, using the HTTP.

**178 Claims, 18 Drawing Sheets**



**US 7,934,148 B2**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,130,885 | A | 12/1978 | Dennis |
| 4,289,930 | A | 9/1981 | Connolly et al. |
| 4,405,829 | A | 9/1983 | Rivest et al. |
| 4,532,588 | A | 7/1985 | Foster |
| 4,571,699 | A | 2/1986 | Herzog |
| 4,713,780 | A | 12/1987 | Schultz et al. |
| 4,754,428 | A | 6/1988 | Schultz et al. |
| 4,816,653 | A | 3/1989 | Anderl et al. |
| 4,837,798 | A | 6/1989 | Cohen et al. |
| 4,853,961 | A | 8/1989 | Pastor |
| 4,918,722 | A | 4/1990 | Duehren et al. |
| 4,941,170 | A | 7/1990 | Herbst |
| 5,008,814 | A | 4/1991 | Mathur |
| 5,018,191 | A | 5/1991 | Catron et al. |
| 5,029,199 | A | 7/1991 | Jones et al. |
| 5,033,079 | A | 7/1991 | Catron et al. |
| 5,047,918 | A | 9/1991 | Schwartz et al. |
| 5,054,096 | A | 10/1991 | Beizer |
| 5,065,427 | A | 11/1991 | Godbole |
| 5,068,797 | A | 11/1991 | Sansone et al. |
| 5,068,888 | A | 11/1991 | Scherk et al. |
| 5,091,790 | A | 2/1992 | Silverberg |
| 5,105,184 | A | 4/1992 | Pirani et al. |
| 5,113,430 | A | 5/1992 | Richardson, Jr. et al. |
| 5,113,496 | A | 5/1992 | McCalley et al. |
| 5,115,326 | A | * 5/1992 | Burgess et al. ............... 358/440 |
| 5,127,003 | A | 6/1992 | Doll, Jr. et al. |
| 5,129,080 | A | 7/1992 | Smith |
| 5,167,011 | A | 11/1992 | Priest |
| 5,175,762 | A | 12/1992 | Kochis et al. |
| 5,193,110 | A | 3/1993 | Jones et al. |
| 5,195,085 | A | 3/1993 | Bertsch et al. |
| 5,210,824 | A | 5/1993 | Putz et al. |
| 5,224,156 | A | 6/1993 | Fuller et al. |
| 5,227,893 | A | 7/1993 | Ett |
| 5,241,594 | A | 8/1993 | Kung |
| 5,247,591 | A | 9/1993 | Baran |
| 5,247,661 | A | 9/1993 | Hager et al. |
| 5,255,312 | A | 10/1993 | Koshiishi |
| 5,257,112 | A | 10/1993 | Okada |
| 5,267,047 | A | 11/1993 | Argenta et al. |
| 5,267,301 | A | 11/1993 | Nishii |
| 5,274,635 | A | 12/1993 | Rahman et al. |
| 5,276,869 | A | 1/1994 | Forrest et al. |
| 5,283,887 | A | 2/1994 | Zachery |
| 5,289,371 | A | 2/1994 | Abel et al. |
| 5,289,472 | A | 2/1994 | Cho |
| 5,291,302 | A | 3/1994 | Gordon et al. |
| 5,291,546 | A | 3/1994 | Giler et al. |
| 5,293,250 | A | 3/1994 | Okumura et al. |
| 5,296,934 | A | 3/1994 | Ohtsuki |
| 5,297,208 | A | 3/1994 | Schlafly et al. |
| 5,299,255 | A | 3/1994 | Iwaki et al. |
| 5,301,226 | A | 4/1994 | Olson et al. |
| 5,307,456 | A | 4/1994 | MacKay |
| 5,313,572 | A | * 5/1994 | Yamamoto et al. ........... 358/403 |
| 5,317,628 | A | 5/1994 | Misholi et al. |
| 5,333,266 | A | 7/1994 | Boaz |
| 5,339,156 | A | 8/1994 | Ishii |
| 5,349,636 | A | 9/1994 | Irribarren |
| 5,351,276 | A | 9/1994 | Doll, Jr. et al. |
| 5,355,472 | A | 10/1994 | Lewis |
| 5,367,621 | A | 11/1994 | Cohen et al. |
| 5,371,885 | A | 12/1994 | Letwin |
| 5,379,374 | A | 1/1995 | Ishizaki et al. |
| 5,384,830 | A | * 1/1995 | Ide ......................... 379/88.24 |
| 5,384,835 | A | 1/1995 | Wheeler et al. |
| 5,394,460 | A | 2/1995 | Olson et al. |
| 5,394,522 | A | 2/1995 | Sanchez-Frank et al. |
| 5,404,231 | A | 4/1995 | Bloomfield |
| 5,406,557 | A | * 4/1995 | Baudoin ...................... 370/407 |
| 5,418,908 | A | 5/1995 | Keller et al. |
| 5,424,724 | A | 6/1995 | Williams et al. |
| 5,432,841 | A | 7/1995 | Rimer |
| 5,438,433 | A | 8/1995 | Reifman et al. |
| 5,448,626 | A | 9/1995 | Kajiya |
| 5,452,289 | A | 9/1995 | Sharma et al. |
| 5,459,584 | A | 10/1995 | Gordon et al. |
| 5,471,617 | A | 11/1995 | Farrand et al. |
| 5,475,738 | A | 12/1995 | Penzias |
| 5,479,408 | A | * 12/1995 | Will ............................ 370/313 |
| 5,479,411 | A | 12/1995 | Klein |
| 5,479,491 | A | 12/1995 | Herrero Garcia et al. |
| 5,483,466 | A | 1/1996 | Kawahara et al. |
| 5,483,524 | A | 1/1996 | Lev et al. |
| 5,483,580 | A | 1/1996 | Brandman et al. |
| 5,487,100 | A | 1/1996 | Kane |
| 5,488,651 | A | 1/1996 | Giler |
| 5,495,610 | A | 2/1996 | Shing et al. |
| 5,497,373 | A | 3/1996 | Hullen et al. |
| 5,502,637 | A | 3/1996 | Beaulieu et al. |
| 5,509,123 | A | 4/1996 | Dobbins et al. |
| 5,513,126 | A | 4/1996 | Harkins et al. |
| 5,513,323 | A | 4/1996 | Williams et al. |
| 5,517,556 | A | 5/1996 | Pounds |
| 5,524,137 | A | 6/1996 | Rhee |
| 5,526,353 | A | 6/1996 | Henley et al. |
| 5,530,740 | A | * 6/1996 | Irribarren et al. .......... 379/88.17 |
| 5,530,852 | A | 6/1996 | Meske, Jr. et al. |
| 5,534,913 | A | 7/1996 | Majeti et al. |
| 5,537,415 | A | 7/1996 | Miller et al. |
| 5,544,320 | A | 8/1996 | Konrad |
| 5,546,388 | A | 8/1996 | Lin |
| 5,548,789 | A | 8/1996 | Nakanura |
| 5,552,901 | A | 9/1996 | Kikuchi |
| 5,555,100 | A | 9/1996 | Bloomfield et al. |
| 5,557,659 | A | * 9/1996 | Hyde-Thomson ........ 379/88.13 |
| 5,559,611 | A | * 9/1996 | Bloomfield et al. .......... 358/407 |
| 5,559,721 | A | 9/1996 | Ishii |
| 5,561,703 | A | 10/1996 | Arledge et al. |
| 5,568,536 | A | 10/1996 | Tiller et al. |
| 5,568,540 | A | * 10/1996 | Greco et al. ............... 379/88.25 |
| 5,572,643 | A | 11/1996 | Judson |
| 5,579,472 | A | 11/1996 | Keyworth, II et al. |
| 5,590,178 | A | 12/1996 | Murakami et al. |
| 5,604,737 | A | 2/1997 | Iwami et al. |
| 5,604,788 | A | 2/1997 | Tett |
| 5,608,446 | A | 3/1997 | Carr et al. |
| 5,608,786 | A | 3/1997 | Gordon |
| 5,608,874 | A | 3/1997 | Ogawa et al. |
| 5,619,648 | A | 4/1997 | Canale et al. |
| 5,621,727 | A | 4/1997 | Vaudreuil |
| 5,625,675 | A | 4/1997 | Katsumaru et al. |
| 5,630,060 | A | 5/1997 | Tang et al. |
| 5,630,061 | A | 5/1997 | Richter et al. |
| 5,633,916 | A | 5/1997 | Goldhagen et al. |
| 5,634,005 | A | 5/1997 | Matsuo |
| 5,647,002 | A | 7/1997 | Brunson |
| 5,654,886 | A | 8/1997 | Zereski et al. |
| 5,654,957 | A | 8/1997 | Koyama |
| 5,657,461 | A | * 8/1997 | Harkins et al. ................. 715/733 |
| 5,664,102 | A | 9/1997 | Faynberg |
| 5,673,316 | A | 9/1997 | Auerbach et al. |
| 5,675,507 | A | 10/1997 | Bobo, II |
| 5,677,955 | A | 10/1997 | Doggett et al. |
| 5,687,220 | A | 11/1997 | Finnigan |
| 5,689,550 | A | 11/1997 | Garson et al. |
| 5,692,039 | A | 11/1997 | Brankley et al. |
| 5,694,458 | A | 12/1997 | Okada et al. |
| 5,694,546 | A | 12/1997 | Reisman |
| 5,710,883 | A | 1/1998 | Hong et al. |
| 5,712,901 | A | 1/1998 | Meermans |
| 5,712,903 | A | 1/1998 | Bartholomew et al. |
| 5,712,907 | A | 1/1998 | Wegner et al. |
| 5,715,314 | A | 2/1998 | Payne et al. |
| 5,715,444 | A | 2/1998 | Danish et al. |
| 5,715,453 | A | 2/1998 | Stewart |
| 5,717,742 | A | 2/1998 | Hyde-Thomson |
| 5,724,406 | A | 3/1998 | Juster |
| 5,724,410 | A | 3/1998 | Parvulescu et al. |
| 5,724,424 | A | 3/1998 | Gifford |
| 5,724,425 | A | 3/1998 | Chang et al. |
| 5,724,514 | A | 3/1998 | Arias |
| 5,724,567 | A | 3/1998 | Rose et al. |
| 5,727,156 | A | 3/1998 | Herr-Hoyman et al. |
| 5,732,219 | A | 3/1998 | Blumer et al. |
| 5,737,395 | A | 4/1998 | Irribarren |

**US 7,934,148 B2**

Page 3

| | | | | | |
|---|---|---|---|---|---|
| 5,737,396 A | | 4/1998 | Garcia | | |
| 5,737,533 A | | 4/1998 | de Hond | | |
| 5,740,231 A | | 4/1998 | Cohn et al. | | |
| 5,742,596 A | | 4/1998 | Baratz et al. | | |
| 5,742,668 A | | 4/1998 | Pepe et al. | | |
| 5,742,905 A | * | 4/1998 | Pepe et al. ........ | 455/461 | |
| 5,751,791 A | | 5/1998 | Chen et al. | | |
| 5,751,814 A | | 5/1998 | Kafri | | |
| 5,751,956 A | | 5/1998 | Kirsch | | |
| 5,754,939 A | * | 5/1998 | Herz et al. ........ | 455/3.04 | |
| 5,758,088 A | | 5/1998 | Bezaire et al. | | |
| 5,761,201 A | | 6/1998 | Vaudreuil | | |
| 5,761,396 A | | 6/1998 | Austin et al. | | |
| 5,761,662 A | | 6/1998 | Dasan | | |
| 5,765,033 A | | 6/1998 | Miloslavsky | | |
| 5,768,528 A | | 6/1998 | Stumm | | |
| 5,771,354 A | | 6/1998 | Crawford | | |
| 5,774,668 A | | 6/1998 | Choquier et al. | | |
| 5,781,614 A | | 7/1998 | Brunson | | |
| 5,781,901 A | | 7/1998 | Kuzma | | |
| 5,787,175 A | | 7/1998 | Carter | | |
| 5,790,790 A | | 8/1998 | Smith et al. | | |
| 5,790,793 A | | 8/1998 | Higley | | |
| 5,793,972 A | | 8/1998 | Shane | | |
| 5,801,702 A | | 9/1998 | Dolan et al. | | |
| 5,805,298 A | | 9/1998 | Ho et al. | | |
| 5,812,278 A | | 9/1998 | Toyoda et al. | | |
| 5,812,639 A | | 9/1998 | Bartholomew et al. | | |
| 5,812,786 A | | 9/1998 | Seazholtz et al. | | |
| 5,819,092 A | | 10/1998 | Ferguson | | |
| 5,819,295 A | | 10/1998 | Nakagawa et al. | | |
| 5,825,865 A | | 10/1998 | Oberlander et al. | | |
| 5,838,906 A | | 11/1998 | Doyle et al. | | |
| 5,845,303 A | | 12/1998 | Templeman | | |
| 5,848,413 A | | 12/1998 | Wolff | | |
| 5,854,893 A | | 12/1998 | Ludwig et al. | | |
| 5,855,015 A | | 12/1998 | Shoham | | |
| 5,859,967 A | | 1/1999 | Kaufeld et al. | | |
| 5,870,454 A | | 2/1999 | Dahlen | | |
| 5,870,549 A | | 2/1999 | Bobo, II | | |
| 5,870,552 A | | 2/1999 | Dozier et al. | | |
| 5,872,845 A | | 2/1999 | Feder | | |
| 5,872,926 A | | 2/1999 | Levac et al. | | |
| 5,881,233 A | | 3/1999 | Toyoda et al. | | |
| 5,892,591 A | | 4/1999 | Anglin, Jr. et al. | | |
| 5,892,909 A | | 4/1999 | Grasso | | |
| 5,893,908 A | | 4/1999 | Cullen et al. | | |
| 5,903,723 A | | 5/1999 | Beck et al. | | |
| 5,907,598 A | | 5/1999 | Mandalia et al. | | |
| 5,911,776 A | | 6/1999 | Guck | | |
| 5,917,615 A | | 6/1999 | Reifman et al. | | |
| 5,930,493 A | | 7/1999 | Ottessen et al. | | |
| 5,933,412 A | | 8/1999 | Choudhury et al. | | |
| 5,933,490 A | | 8/1999 | White et al. | | |
| 5,937,041 A | | 8/1999 | Cardillo, IV et al. | | |
| 5,937,161 A | | 8/1999 | Mulligan | | |
| 5,937,162 A | | 8/1999 | Funk | | |
| 5,940,476 A | | 8/1999 | Morganstein et al. | | |
| 5,940,598 A | | 8/1999 | Strauss et al. | | |
| 5,944,786 A | | 8/1999 | Quinn | | |
| 5,945,989 A | | 8/1999 | Freishtat et al. | | |
| 5,946,386 A | | 8/1999 | Rogers et al. | | |
| 5,958,016 A | | 9/1999 | Chang et al. | | |
| 5,960,085 A | | 9/1999 | de la Huerga | | |
| 5,961,582 A | | 10/1999 | Gaines | | |
| 5,963,618 A | | 10/1999 | Porter | | |
| 5,963,892 A | | 10/1999 | Tanaka et al. | | |
| 5,970,490 A | | 10/1999 | Morgenstern | | |
| 5,978,813 A | | 11/1999 | Foltz et al. | | |
| 5,987,504 A | | 11/1999 | Toga | | |
| 5,987,508 A | | 11/1999 | Agraharam et al. | | |
| 5,991,292 A | | 11/1999 | Focsaneanu et al. | | |
| 5,996,006 A | | 11/1999 | Speicher | | |
| 5,999,525 A | | 12/1999 | Krishnaswamy et al. | | |
| 5,999,594 A | | 12/1999 | Mizoguchi et al. | | |
| 5,999,965 A | | 12/1999 | Kelly | | |
| 6,009,173 A | | 12/1999 | Sumner | | |
| 6,009,469 A | | 12/1999 | Mattaway et al. | | |
| 6,014,668 A | | 1/2000 | Tabata et al. | | |
| 6,020,980 A | | 2/2000 | Freeman | | |
| 6,023,345 A | | 2/2000 | Bloomfield | | |
| 6,023,700 A | | 2/2000 | Owens et al. | | |
| 6,025,931 A | | 2/2000 | Bloomfield | | |
| 6,028,609 A | | 2/2000 | Murphy | | |
| 6,032,192 A | | 2/2000 | Wegner et al. | | |
| 6,035,332 A | | 3/2000 | Ingrassia, Jr. et al. | | |
| 6,052,367 A | | 4/2000 | Bowater et al. | | |
| 6,052,442 A | | 4/2000 | Cooper et al. | | |
| 6,055,530 A | | 4/2000 | Sato | | |
| 6,061,448 A | | 5/2000 | Smith et al. | | |
| 6,064,653 A | | 5/2000 | Farris | | |
| 6,064,722 A | | 5/2000 | Cohn et al. | | |
| 6,069,890 A | | 5/2000 | White et al. | | |
| 6,072,862 A | | 6/2000 | Srinivasan | | |
| 6,073,165 A | | 6/2000 | Narasimhan et al. | | |
| 6,084,892 A | | 7/2000 | Benash et al. | | |
| 6,084,952 A | | 7/2000 | Beerman, Jr. et al. | | |
| 6,085,101 A | | 7/2000 | Jain et al. | | |
| 6,097,797 A | | 8/2000 | Oseto | | |
| 6,108,329 A | | 8/2000 | Oyama et al. | | |
| 6,157,706 A | | 12/2000 | Rachelson | | |
| 6,167,253 A | | 12/2000 | Farris et al. | | |
| 6,181,781 B1 | | 1/2001 | Porter et al. | | |
| 6,185,603 B1 | | 2/2001 | Henderson et al. | | |
| 6,192,407 B1 | | 2/2001 | Smith et al. | | |
| 6,208,638 B1 | | 3/2001 | Rieley et al. | | |
| 6,211,972 B1 | | 4/2001 | Okutomi et al. | | |
| 6,212,550 B1 | | 4/2001 | Segur | | |
| 6,215,858 B1 | | 4/2001 | Bartholomew et al. | | |
| 6,216,173 B1 | | 4/2001 | Jones et al. | | |
| 6,229,844 B1 | | 5/2001 | Kong | | |
| 6,233,318 B1 | | 5/2001 | Picard et al. | | |
| 6,240,445 B1 | | 5/2001 | Kumar et al. | | |
| 6,240,454 B1 | | 5/2001 | Nepustil | | |
| 6,246,983 B1 | | 6/2001 | Zou et al. | | |
| 6,256,115 B1 | | 7/2001 | Adler et al. | | |
| 6,259,533 B1 | | 7/2001 | Toyoda et al. | | |
| 6,263,064 B1 | | 7/2001 | O'Neal et al. | | |
| 6,266,160 B1 | | 7/2001 | Saito et al. | | |
| 6,278,532 B1 | | 8/2001 | Heimendinger et al. | | |
| 6,282,270 B1 | | 8/2001 | Porter | | |
| 6,285,777 B2 | | 9/2001 | Kanevsky et al. | | |
| 6,288,799 B1 | | 9/2001 | Sekiguchi | | |
| 6,295,350 B1 | | 9/2001 | Schreyer et al. | | |
| 6,295,552 B1 | | 9/2001 | Shibata | | |
| 6,301,245 B1 | | 10/2001 | Luzeski et al. | | |
| 6,301,339 B1 | | 10/2001 | Staples et al. | | |
| 6,304,636 B1 | | 10/2001 | Goldberg et al. | | |
| 6,314,425 B1 | | 11/2001 | Serbinis et al. | | |
| 6,330,070 B1 | | 12/2001 | Toyoda et al. | | |
| 6,330,079 B1 | | 12/2001 | Dugan et al. | | |
| 6,330,323 B1 | | 12/2001 | Gottlieb et al. | | |
| 6,334,142 B1 | | 12/2001 | Newton et al. | | |
| 6,339,591 B1 | | 1/2002 | Migimatsu | | |
| 6,339,780 B1 | * | 1/2002 | Shell et al. ........ | 715/207 | |
| 6,341,160 B2 | | 1/2002 | Tverskoy et al. | | |
| 6,350,066 B1 | | 2/2002 | Bobo, II | | |
| 6,356,356 B1 | | 3/2002 | Miller, Jr. et al. | | |
| 6,359,881 B1 | | 3/2002 | Gerszberg et al. | | |
| 6,360,256 B1 | | 3/2002 | Lim | | |
| 6,404,513 B1 | | 6/2002 | Denker | | |
| 6,411,696 B1 | | 6/2002 | Iverson et al. | | |
| 6,417,930 B2 | | 7/2002 | Mori | | |
| 6,430,272 B1 | | 8/2002 | Maruyama et al. | | |
| 6,486,895 B1 | * | 11/2002 | Robertson et al. ........ | 715/776 | |
| 6,498,835 B1 | | 12/2002 | Skladman et al. | | |
| 6,510,438 B2 | | 1/2003 | Hasegawa | | |
| 6,564,321 B2 | | 5/2003 | Bobo, II | | |
| 6,597,688 B2 | | 7/2003 | Narasimhan et al. | | |
| 6,643,034 B1 | | 11/2003 | Gordon | | |
| 6,690,480 B2 | | 2/2004 | Maeda | | |
| 6,742,022 B1 | | 5/2004 | King et al. | | |
| 6,775,264 B1 | | 8/2004 | Kurganov | | |
| 6,795,108 B2 | | 9/2004 | Jarboe et al. | | |
| 6,825,955 B1 | | 11/2004 | Shibata | | |
| 6,948,070 B1 | | 9/2005 | Ginter et al. | | |
| 2001/0014910 A1 | | 8/2001 | Bobo, II | | |

US 7,934,148 B2

Page 4

| 2003/0208688 | A1 | 11/2003 | Bobo, II |
| 2005/0050349 | A1 | 3/2005 | Bobo, II |
| 2008/0229182 | A1 | 9/2008 | Hendricks et al. |

FOREIGN PATENT DOCUMENTS

| DE | 4309072 | A1 | 9/1994 |
| EP | 0615368 | A2 | 9/1994 |
| EP | 0760503 | A1 | 5/1997 |
| EP | 0835021 | A1 | 4/1998 |
| EP | 0554456 | A1 | 8/1998 |
| GB | 2024561 | A | 1/1980 |
| GB | 2157117 | A | 10/1985 |
| JP | 2237338 | A | 9/1990 |
| JP | 04018844 | A | 1/1992 |
| JP | 04111557 | A | 4/1992 |
| JP | 04150351 | A | 5/1992 |
| JP | 04256273 | A | 9/1992 |
| JP | 4265040 | A | 9/1992 |
| JP | 04290033 | A | 10/1992 |
| JP | 04291858 | A | 10/1992 |
| JP | 05233488 | A | 9/1993 |
| JP | 05235997 | A | 9/1993 |
| JP | 05244292 | A | 9/1993 |
| JP | 05284326 | A | 10/1993 |
| JP | 05316309 | A | 11/1993 |
| JP | 06069956 | A | 3/1994 |
| JP | 06164645 | A | 6/1994 |
| JP | 06217069 | A | 8/1994 |
| JP | 07023057 | A | 1/1995 |
| JP | 07038689 | A | 2/1995 |
| JP | 07058845 | A | 3/1995 |
| JP | 07212393 | A | 8/1995 |
| JP | 07250094 | A | 9/1995 |
| JP | 07288543 | A | 10/1995 |
| JP | 07288668 | A | 1/1996 |
| JP | 08009092 | A | 1/1996 |
| JP | 08111692 | A | 4/1996 |
| JP | 08130601 | A | 5/1996 |
| JP | 08237294 | A | 9/1996 |
| JP | 08237297 | A | 9/1996 |
| JP | 08256235 | A | 10/1996 |
| JP | 08286991 | A | 11/1996 |
| JP | 08336053 | A | 12/1996 |
| JP | 09023273 | A | 1/1997 |
| JP | 07170288 | A | 2/1997 |
| JP | 09046369 | A | 2/1997 |
| JP | 09102798 | A | 4/1997 |
| JP | 09135266 | A | 5/1997 |
| JP | 09163064 | A | 6/1997 |
| JP | 09200251 | A | 7/1997 |
| JP | 09-223004 | A | 8/1997 |
| JP | 09214559 | A | 8/1997 |
| JP | 09214560 | A | 8/1997 |
| WO | 94/06230 | | 3/1994 |
| WO | 95/01040 | | 1/1995 |
| WO | 95/06386 | | 3/1995 |
| WO | 95/20288 | | 7/1995 |
| WO | 9531060 | A1 | 11/1995 |
| WO | 9627160 | A1 | 9/1996 |
| WO | 9627967 | A1 | 9/1996 |
| WO | 9629663 | A1 | 9/1996 |
| WO | 9629664 | A1 | 9/1996 |
| WO | 9634341 | A1 | 10/1996 |
| WO | 9638987 | A1 | 12/1996 |
| WO | 9641463 | A1 | 12/1996 |
| WO | 97/09682 | | 3/1997 |
| WO | 9710668 | A | 3/1997 |
| WO | 9718635 | A2 | 5/1997 |
| WO | 9723082 | A1 | 6/1997 |
| WO | 9723988 | A1 | 7/1997 |
| WO | 9817041 | A2 | 4/1998 |
| WO | 9823058 | A2 | 5/1998 |

OTHER PUBLICATIONS

Liu, Cricket et al. "Managing Internet Information Services", Dec. 1994 O'Reilly and Associates.*

Kaashoek, M. Frans "Dynamic Documents: Wireless Access to the WWW" 1994, IEEE.*

McFetridge, Craig "The Server Side Includes Tutorial" Feb. 19, 1995.*

Lotus Fax Server Gives cc:Mail, Notes Users better fax gateway services, Jan. 30, 1995, v. 17, n. 5, 1995 WLNR 5462216, InfoWord Media Group, Inc. (2 pgs).

Lotus Notes for Dummies, IDG Books Worldwide, Inc., 1994, p. 295, (3 pgs).

M. Horton, Standard for Interchange of USENET Messages, RFC 850 (Jun. 1983) (19 pgs).

M. Kauffman, Computer Based Fax Processing The Kauffman Group, Cherry Hill, N.J. First edition 1994, pp. 19-20, 61, 75, 77-79 (ISBN 0-936648-62-7) (10 pgs).

Mail2HTML.c, Convert Mail/News Files to HTML (Prototype), Jan. 21, 1993, Rev. 0.3 (17 pgs).

Marc Andreessen, NCSA Mosaic for X 2.0 available, www.talk newsgroup message, Nov. 10, 1993 (8 pgs).

Mark Miller, Defusing TCPIP-based internet problems in layers, Network World, Oct. 17, 1994 (6 pgs).

MHonArc: Index Page Customization, v1.0.0, http://ftp.sunet.se/pub/text-processing/sgml/DTD2HTML/ file MHonArc 1.0.0.tar.gz. (5 pgs).

Michael L. Nelson, et al., Electronic Document Distribution Design of the Anonymous FTP Langley Technical Report Server, NASA Technical Memorandum 4567, Mar. 1994, National Aeronautics and Space Administration, Langley Research Center, Hampton, Virginia (20 pgs).

Michael L. Nelson, et al., The Widest Practicable Dissemination: The NASA Technical Report Server, Computers in Aerospace 10 (Mar. 28-30, 1995, San Antonio, TX), 1995, American Institute of Aueronautics and Astronautics, Inc. (14 pgs).

Michael L. Nelson, et al., The World Wide Web and Technology Transfer at NASA Langley Research Center, Proceedings of the Second International World Wide Web Conference: Mosaic and the Web (Oct. 19-21, 1994, Chicago, IL, pp. 701-710), NASA Langley Research Center (12 pgs).

Michael L. Nelson, et al., World Wide Web Implementation of the Langley Technical Report Server, Sep. 5, 1994, NASA Technical Memorandum 109162, National Aeronautics and Space Administration, Langley Research Center, Hampton, Virginia (31 pgs).

NCSA http—Unified Directory Structure (1 pg).

NCSA httpd—Compatibility (1 pg).

NCSA httpd—Document Root Directive.html (1 pg).

NCSA httpd—Security (1 pg).

NetScan Kofax: The Easy Way to Share a Scanner, 1996, KOFAX, http://www.netscan.kofax.com. (10 pgs).

On the Road: The Telephone User Interface, Computer Telephony Expo in Dallas, TX, Mar. 7, 1995, Applied Voice Technology, Inc. (4 pgs).

Pacific Bell Information Services, 1994 Annual Report, p. 6 (1994) (10 pgs).

Putting Paper Documents In The World-wide Web, Myka, 1994 Article (10 pgs).

QNet Business Plan, Apr. 1987 (104 pgs).

R. Thomas, Hands-On Wizard's Grabbag Getting a Bang Out of Unix, UnixWorld's Open Computing, vol. 11, No. 1 (Jan. 1, 1994) (5 pgs).

Reg Quinton, Sendmail—Care and Feeding, Mar. 24, 1992, pp. 1-44, Computing and Communications Services, The University of Westerr, Ontario, Canada (23 pgs).

RightFAX Web Client. (RightFAX's RightFAX Web Client) (Product Announcement) Software Magazine, Apr. 1, 1997 (1 pg).

Ronald J. Vetter, et al., Mosaic and the World-Wide Web, pp. 49-57, Computer Practives, Oct. 1994 (9 pgs).

S. Broadhead, Getting Your Fax Straight: Getting Ahead of the Game with Fax Server Technology Network Computing, Feb. 1997 (Abstract) (2 pgs).

S. Leffler, FlexFAX—A Network-based Facsimile Service, Silicon Graphics, Inc., Nov. 27, 1990 (9 pgs).

S.C. Hui, et al, A Distributed Fax Messaging System, Proc. of IEEE Singapore Intl. Conf. on Networks/Intl Conf on Information Engineering 1995, pp. 393-397, IEEE Cat. No. 95TH8061 (6 pgs).

S.D. Reilly, et al., Increasing the Computational Potential of the World Wide Web, Feb. 9, 1996, pp. 1-28, Dept. of Computer Science School of Engineering and Applied Science University of Virginia, Charlottesville, VA (30 pgs).

Stephen Laudermilk, Trio Set to Roll Out Fax Gear for LANs, PC Week, Aug. 17, 1992, pp. 39, 47.

Steve Putz, Design and Implementation of the System 33 Document Service, ISTL-NLTT-93-07-01, 1993, Xerox Corporation (116 pgs).

Steve Putz, Interactive Information Services Using World-Wide Web Hypertext, First International Conference on World-Wide Web, (May 25-27, 1994), Apr. 20, 1994, pp. 1-10, ISTL-QCA-1994-03-01, Xerox Corporation (10 pgs).

Steve Putz, System 33 Gateway Code, Gateway Software, http://www.w3.org/Gateways/System33/gateway (14 pgs).

Stuart Melnitsky, Fax Server Face Off, Network World, Apr. 15, 1996, pp. 43-45.

T. Kasper, Untangling the Web—The role of text retrieval in a hypertext environment (6 pgs).

The Geometry Forum News Gateway—A Newsreader for the World Wide Web, Forum Outposts: The Geometry Forum Newsletter (Dec. 30, 1994) (2 pgs).

V. Kumar, et al., A SHARed Web to Support Design Teams, Enterprise Integration Technologies Corp., 1994 IEEE, 0-8186-5705-7/94, pp. 178-182.

Wayne Rash, The Fax of the Matter, Information Week, May 20, 1996 (4 pgs).

XDOC Data Format, Technical Specification, Mar. 1995, pp. 1:1-2:10, vol. 3.0, The Document Company Xerox (15 pgs).

Yahoo, Inc., NetScan Kofax, Yahoo! Internet Life, Jan. 1997, p. 73, vol. 3, No. 1, <http://www.yil.com/>.

Yvonee L. Lee, Vendors to Showcase Integrated Telephony Solutions, InfoWorld, Mar. 4, 1996, p. 18(1), vol. 18, No. 10, Gale Group (1 pg).

European Search Report in European Patent Application No. EP 09165919, Sep. 1, 2009 (59 pgs).

Notice of Reason for Rejection, Dispatch Date: Jan. 17, 2008, Patent Application No. JP 2000-515377 (5 pgs).

Invalidity Contentions of Defendant Packetel, Inc. in *j2 Global Communications, Inc.* v. *Packetel, Inc.*, Case No. 09cv3240 DDP (AJWx) (20 pgs).

Invalidity Contentions of Defendant Protus IP Solutions, Inc. in *j2 Global Communications, Inc.v. Protus IP Solutions, Inc.*, Case No. 05cv5610 DDP (AJWx) (109 pgs).

Invalidity Contentions of Defendant Venali, Inc. in *j2 Global Communications, Inc.* v. *Venali, Inc.*, Case No. 04v1172 DDP (AJWx) (52 pgs).

Defendant Captaris, Inc.'s Invalidity Contentions in *j2 Global Communications, Inc.* v. *Captaris, Inc.*, Case No. 09cv4150 DDP (AJWx) (217 pgs) (2 Parts).

Defendant Easylink Service International Corporation's Invalidity Contentions as to '638 in *j2 Global Communications Inc.* v. *Easylink Service International Corporation*, Case No. 09cv4189 DDP (AJWx) (17 pgs).

Defendant Easylink Service International Corporation's Invalidity Contentions as to '688 & '132 in *j2 Global Communications, Inc.* v. *Easylink Service International Copration*, Case No. 09cv4189 DDP (AJWx) (92 pgs).

Defendant EasyLink's Opening Claim Construction Brief in *j2 Global Communications* v *Easylink Services Intl. Corp.*, 09cv4189 (55 pgs).

Defendant Venali's Opening Claim Construction Brief in *j2 Global Communications, Inc.* v *Venali, Inc.*, cv 04-1172 DDP AJWx.pdf (filed Jun. 11, 2010) (42 pgs).

Plaintiff j2 Global Communications, Inc.'s Opening Markman Brief filed on Jun. 11, 2010, *j2 Global Comm., Inc.* v. *Venali, Inc.*, Case No. 04-1172 DDP (AJWx) (DI 160) (65 pgs).

Consolidated Opening Claim Construction Brief of Defendants Captaris, Inc., Packetel, Inc. and Protus IP Solutions filed in *j2 Global Communications, Inc.* v *Protus*, et al., filed Jun. 11, 2010, *j2 Global Communications* v *Protus* 05cv5610 (61 pgs).

Reply Claim Construction Brief of Defendants Captaris, Inc., Packetel, Inc. and Protus IP Solutions filed Jul. 1, 2010 *j2 Global Comm* v *Protus* 05cv5610 (52 pgs).

Defendant Venali's Reply Claim Construction Brief, filed Jul. 1, 2010 *j2 Global* v *Venali* 04cv1172 (43 pgs).

Plaintiffs Reply Markman Brief filed on Jul. 1, 2010, *j2 Global Comm., Inc.* v. *Protus IP Solutions, Inc.*, Case No. 05-5610 DDP (AJWx) (67 pgs).

Easylink's Reply to Plaintiff's Claim Construction Brief filed Jul. 1, 2010 09cv4189 (46 pgs).

*j2 Global Communications, Inc.* v *Callwave, Inc.* CV04-7068 DDP AJWx Callwave Inc.'s Responses to Plaintiff's First Set of Interrogatories Dec. 22, 2004 (12 pgs).

*j2 Global Communications, Inc.* v *Venali, Inc.*, cv 04-1172 DDP AJWx, Defendant Venali, Inc.'s Objections and Responses to Plaintiff j2 Global Communications, Inc.'s First Set of Interrogatories (Nos. 1-7) (19 pgs).

Notice of Dismissal filed on Sep. 22, 2005, *j2 Global Comm., Inc.* v. *Mijanda, Inc.*, Case No. 05-5300 DDP (AJWx) (DI 15) (1 pg).

Declaration of Professor Walter Scacchi Regarding Defendant CallWave, Inc.'s Opening Claim Construction Brief in *j2 Global Communications, Inc.* v. *Call Wave, Inc.*, CV 04-7068 VBKx (20 pgs).

Defendant Protus' Answer and Counterclaim in *j2 Global Comm.* v *Protus* 05cv5610 filed Nov. 12, 2005 (12 pgs).

Administrators Guide Lotus Notes Release 3, Lotus Development Co., 1993, p. 5-54 (1 pg).

Alta Vista Search, SHAREWARE.COM: Search results, Dec. 5, 1996 (2 pgs).

Andrew Eberle, The Path Taken: Inbound Routing, Network World, May 2, 1994, p. 101.

(Author Unknown) Call and Voice Processing PC Board Roundup (Buyers Guide), in Teleconnect Library, Inc., Dec. 1995, v13, n12, pp. 1-6.

B. Kantor, et al., Network News Transfer Protocol, A Proposed Standard for the Stream-Based Transmission of News, RFC 977, Feb. 1986 (29 pgs).

B. Mathers, et al., Lotus Notes Internet Cookbook, last modified Apr. 21, 1995, (25 pgs).

C. Hunt, TCP IP Network Administration, Jan. 1994(268 pgs).

Carlos A. Varela, et al., Providing Data on the Web: From Examples to Programs, Second International WWW Conference, Oct. 17-21, 1994, pp. 1-12, http://fiaker.ncsa.uiuc.edu:8080/WWW94-2/paper.html.

Chane Fullmer, et al., A TCP/IP Network Facsimile System Built from Publicly Available Software, in Association for Computing Machinery (ACM), 1992, ref. No. 089791-472-4/92/0002/525, pp. 525-529.

comp.mail.mime meta-FAQ: Help for MIME problems, downloaded from the Internet at www.cis.ohio-state.edu/text/faq/usenet/mail/mimefaq/part1/faq.html. Aug. 8, 1997 (8 pgs).

Dale Doughtery, et al., The Mosaic Handbook for Microsoft Windows, Oct. 1994, O'Reilly & Associates (239 pgs).

Duval & Main, Exploring the Internet with Mosaic, Library Software Review, vol. 13, No. 4, Winter 1994, Sage Periodicals Press, pp. 269-279.

ED Liebowitz, The Dialogic VAR Parade: Open Voice Processing for Art Dealers, the Blind, the Dallas Cowboys and the RBOCs, in Teleconnect, Apr. 1993, v11, n4, p. 40(3) (2 pgs).

e-mail-fax-120.hqx, E-Mail Fax Search Results, Shareware.com, Nov. 24, 1996, <http://www.search.shareware.com/code/...mail+fax+&category=All- Categories> (2 pgs).

F. Sung and M. Johnson, Faxing Docs in HP MPower, Apr. 1994 Hewlett-Packard Journal, pp. 53-61.

Facsimile and Voice System Links Offices, Electronics, Jan. 18, 1979 (379-100), S9054 0063, pp. 69-70.

FaxMail Networks for Windows v5.13: Fax over a network, ZD NET Software Library, Nov. 14, 1996, http://search2.zdnet.com/cgi-bin/texis/swlib/hotfiles/search.html. (3 pgs).

FaxSav, faxMAILER—How FaxMailer Works, (1996) (2 pgs).

FaxSav, The FaxSav Technology Edge: A White Paper, (1997) (5 pgs).

French, Fox, Maly & Selman, Wide Area Technical Report Service—Technical Reports Online, Communications on the ACM, Apr. 1995, ACM 002-0782/95/0400 pp. 124-127.

US 7,934,148 B2

Graphics, Visualization and Usability Center GSQL-ORACLE Backend, Date Unknown (2 pgs).

GSQL in detail, Dec. 1993 (4 pgs).

Halama, James R., et al., An Interactive Electronic Bulletin Board Implementation for Mosaic and HTTP Server, EBBSMos.htm, Date Unknown (4 pgs).

Helen Plotkin, The Forum Newsreader Plans, Apr. 5, 1994, http://mathforum.org/kb/plaintext.jspa?messageID=1072645 (2 pgs).

Hong, J., et al.; Personal Electronic Notebook with Sharing, Center for Design Research, Stanford University, 1080-1383/95, 1995 IEEE, pp. 88-94.

J. Kent, Browsing Electronic Mail: Experiences interfacing a Mail System to a DBMS. Proceedings of the Fourteenth International Conference on Very Large Data Base. Los Angeles, CA. pp. 112-123, 1988.

Jay C. Weber, The Webmaster's Starter Kit, WWW Fall '94 paper, Enterprise Integration Technologies Corporation (4 pgs).

Jennifer Myers, Announcing Version 0.11 of 'readcomics', a Common Gateway Interface World Wide Web Gateway to clari.feature.dilbert, January 17, 1994, v. 0.11, Article 9857, comp.lang.perl. (6 pgs).

Jennifer Myers, readcomics, Jan.y 18, 1994, v. 0.12 (4 pgs).

JFAX Personal Telecom, Free Downloads JFAX Communicator Software!, Dec. 4, 1996 <http://www.jfax.net/software.htm/> (2 pgs).

JFAX Personal Telecom, Get All Your Voice-Mail and Faxes in your E-Mail, Dec. 4, 1996, <http://www.jfax.net/> (4 pgs).

JFAX Personal Telecom, What the Media Says About JFAX Personal Telecom, Oct. 31, 1996, <http://www.fax.net/> (2 pgs).

K. Tomaru, Electronic Mail Systems, Japan Annual Review in Electronics, Computers & Telecommunications, 1983, vol. 9, Telecommunication Technology, pp. 283-290.

Kevin Bachus, Touring Lotus Notes: The New World of Group ware, Windows Magazine, Mar. 1, 1994 Issue 503, CMP Publications, Inc., Factiva, Inc. (7 pgs).

Kevin Brown, et al., Mastering Lotus Notes, Sybex, Inc., 1995, p. 939.

L. Orozco-Barbosa, et al., Design and Performance Evaluation of Intelligent Multimedia Services, rec'd Jun. 28, 1996, pp. 219-232, v. 20 (1997), Computer Communications.

Request for Ex Parte Reexamination Transmittal Form Control No. 90007539.

Request for Reexamination Control No. 90007539 Detailed Statement in Support of Request for Reexamination of United States Patent No. 6,350,066.

European Patent Office—Letter of the opponent dated Sep. 30, 2010 in Application No. 98950859.3-2413 / 1034651.

Schreiser, Ulf et al., "Alert: An Architecture for Transforming a Passive DBMS into an Active DBMS", Proceedings of the 17th International Conference on Very Large Data Bases, Sep. 1991, pp. 468-478, Barcelona, Spain.

Bowman, Judith S. et al., "The Practical SQL Handbook: Using Structure Query Language, Third Edition", pp. 44, 310-312, Addison-Wesley Developers Press, Reading, MA.

Goldberg, David et al., Using Collaborative Filtering to Weave an Information Tapestry, Communications of the ACM Archive, Dec. 1992, pp. 61-70, vol. 35, No. 12, ACM (The Association for Computing Machinery), New York, NY.

Terry, Douglas et al., "Continuous Queries over Append-Only Databases". Proceedings of the 1992 ACM SIGMOC International Conference on Management of Data, pp. 321-330, 1992.

j2 Global Communications, Inc. v Venali, Inc., cv 04-1172 DDP AJWx, Defendant Venali, Inc.'s Objections and Responses to Plaintiff j2 Global Communications, Inc.'s First Set of Interrogatories (Nos. 1-7) (19 pgs).

j2 Global Communications, Inc. v Venali, Inc., cv 04-1172 DDP AJWx, litigation cover page (1 pg).

Kennie Jones, NASA Langley Research Center, Tops On-Line—Automating the Construction and Maintenance of HTML Pages, 1994 (7 pgs).

"Invalidity Contentions of Defendant Protus IP Solutions, Inc." in j2 Global Communications, Inc. v. Protus IP Solutions, Inc.,Case No. 6:08-cv-211-LED-JDL.

"Defendant Captaris, Inc.'s, Local Patent Rule 3-3 Invalidity Contentions" in j2 Global Communications, Inc. v. Captaris, Inc., Case No. 6:08-cv-262 (LED).

"Defendant Easylink Service International Corporation's Invalidity Contentions under P.R. 3-3 " in j2 Global Communications, Inc. v. Easylink Service International Copration, Case No. 6:08-cv-263.

Deixler, Lyle; Fax Forges Ahead; Teleconnect; v. 14 n 11, p. 25(12).

Fax Solutions; Lan Times, v.13 n 21, p. 123(5).

Guide to Intelligent Least Cost Routing, Right Fax, Inc.

Guide to Internet Faxing, Right Fax, Inc.

Hertzoff, Ira; AT&T Global Messaging , The AT&T EasyLink Services Sourcebook; Ch. 6, p. 107-47.

Mendel, Brett; Net Faxing Awaits Its Day; Lan Times, Dec. 9, 1996, v13 n 27 p. 25(2).

Beware the Fax Beast, Network World Reprint; vol. 12, # 48.

Rightfax Introduces New Fax Server Designed for the Enterprise; Rightfax News Release.

Rightfax Poised for Internet Faxing; Rightfax News Release.

Rightfax Ships Internet Connectivity Module for Lan Fax Software; Rightfax News Release.

Guo Zhen Sheng, et al.,"Internet-Based Mail Fax Gateway Technology", 1997 IEEE International Conference on Intelligent Processing Systems, Oct. 28-31, Beijing, China 97TH8335 vol. 2 of 2 pp. 1607-161.

Savetz, Kevin; Faxing From the Internet; Tricks of the Internet Gurus, CH. 6. pp. 165-174.

RightFAX E-mail Gateway Guide, 1996.

Castelle FaxPress Internet Faxing White Paper, Dec. 9, 1997.

Castelle FaxPress End User Features, Dec. 9, 1997.

Castelle FaxPress The Integrated Network Fax Server, Dec. 9, 1997.

Castelle FaxPress Network Diagram, Dec. 16, 1997.

Castelle FaxPress Lotus cc-Mail Gateway, Dec. 9, 1997.

Castelle FaxPress Lotus Notes Gateway, Dec. 9, 1997.

Castelle FaxPress Exchange Direct, Dec. 9, 1997.

Castelle Infopress Press Release: New Castelle System Merges Web, Fax, E-Mail and Phone for Universal Document Access/Delivery, Oct. 28, 1996.

FAXSAV, Rebiller/Reseller Manual, 1997.

FAXSAV Launches Serverlink 1997.

Simeonov, P.L., A Distributed Intelligent Network Approach to Bridge Switching . . . , Computer Comms. & Networks, 1997.

Hoffmann, P., Integrating Telephony and Internet, IEEE Conference on Protocols for Multimedia Systems . . . 1997.

Tanenbum, A.S., Computer Networks, 3rd Edition, 1996.

Boran.com, It Security Cookbook-Firewalls.

Cormen, T.H., Introduction to Algorithms, 8th Printing, 1992.

Patterson, D.A., Computer Organization & Design: The Hardware/Software Interface, 2nd, 1998.

Malamud, C, RFC 1528 Priciples of Operation for the TPC.INT Subdomain: Remote Printing-Technical Procedures, Oct. 1993 ("Malamud 1").

Malamud, C, RFC 1530 Priciples of Operation for the TPC.INT Subdomain: Remote Printing-Technical Procedures, Oct. 1993 ("Malamud 2").

Rose, M.T., The Internet Message: Closing the Book with Electronic Mail, 1993.

Toyoda, K., RFC 2305 A Simple Mode of Facsimile Using Internet Mail, Mar. 1998.

Berners-Lee, T., Hypertext Transfer Protocols—HTTP/1.0 Network Working Group Internet Draft, Dec. 1994.

Luotonen, A., CERN httpd Reference Manual: A Guide to A World-Wide Web Hyper Text Daemon, May 1994.

December, J., The World Wide Web Unleashed, 1994.

Microsoft Corporation, Microsoft Internet Information Server Technical Articles Web Services Frequently Asked Questions, 1997.

RightFax Installation & Administration Guide, Version 3.5 1994.

RightFax Installation & Administration Guide, Version 3.51 1994.

RightFax Installation & Administration Guide, Version 3.0 1993.

RightFax User's Guide, V. 3.5 1994.

RightFax E-mail Gateway Guide 1996.

RightFax Web Client Installation and Administration Guide, Version 1.1 1997.

An Introduction to Database Systems vol. II, Chapters 7 & 8.

The DCA/Intel Communicating Applications Specification. InstantCom/ESL.

Delrina WinFax Pro 4.0 User's Guide.

Delrina WinFax Pro 4.1 Set-Up Guide.

Delrina WinFax Pro 4.1 for Networks User's Guide.

FaxBack InForms Reference Guide.

CallXpress3 Unified Messaging To Be Fully Compatible with Windows 95 and Microsoft Mail Server.

Applied Voice Technology Announces New Version of its Award-Winning Voice and Call Processing System CallXpress3.

Applied Voice Technology Announces CallXpress3 Release 4.0.

Low Cost Messaging the LAN Fax Way (McCusker).

Surprise! Fax Servers Smarten Up (Levine).

Pursuing One Peripheral (Blankenhorn).

What's Ahead for PC/Fax (Cook).

Meet the Intranet.

Now Your PC Can "Read" Your Fax (Stevens).

Intel NET SatisFaxtion Software User's Guide.

Intel FAXability Plus Software for Windows User's Guide.

Intel Net SatisFaxtion Software Installation Guide for Net Ware networks.

FaxPress Supervisor's Guide.

Commerce Path Messaging Connector.

VVinFax Pro's User Guide v. 3.0.

RightFax E-mail Gateway Guide 3.51.

Commerce Path Net Link User Guide.

WinFax Pro for Networks 4.1 Marketing Brochure.

"Defendant Comodo Communications, Inc.'s Local Patent Rule 3-3 Invalidity Contentions" in *j2 Global Communications, Inc.* v. *Comodo Communications, Inc.*, Case No. 6:08-cv-275.

Coresoft Technologies, CenterPoint Fax Server Administration Guide, 1997-1998.

Russell Kahan, "Fax over IP" Gale Group, Inc., 1997.

Shung-Foo Yu et al., "A multimedia gateway for phone/fax and MIME mail" 20 Computer Communications, pp. 615-627, Aug. 1997.

Ahmed Patel, et al., "A technique for multi-network access to multimedia messages" 20 Computer Communications 324-337, Jul. 1997.

Daniel J. Rosenbaum, "The E-Mail Route to Fax" 7 PC World, pp. 168-170, Jun. 1989.

Hertzoff, Ira; AT&T Global Messaging , The AT&T EasyLink Services Sourcebook; Ch. 7, p. 149-176.

Hertzoff, Ira; AT&T Global Messaging , The AT&T EasyLink Services Sourcebook; Ch. 10, p. 219-249.

Hertzoff, Ira; AT&T Global Messaging , The AT&T EasyLink Services Sourcebook; Ch. 11, p. 251-283.

Hertzoff, Ira; AT&T Global Messaging , The AT&T EasyLink Services Sourcebook; Ch. 12, p. 285-319.

RightFax Installation & Administration Guide, 1996.

RightFax E-mail Gateway Guide, 1994, v. 3.51.

RightFax Users Guide, 1996.

J. Duffy, "IBM's SAA Gets Voice: Company to Expland Enterprise Networking Horizons," Computer Systems News, p. 1, May 14, 1990.

E Spire, "Fax->E-mail" Google Groups, http://groups-beta.google.com/group/comp/acom.telecom, Dec. 20, 1995.

Plaintiff's Opposition Claim Construction Brief in *j2 Global Communications, Inc.* v. *Venali, Inc.*, cv 04-1172 DDP AJWx.

Brief in Opposition to Plaintiff j2's Opening Claim Construction Brief in *j2 Global Communications, Inc.* v. *Venali, Inc.*, cv 04-1172 DDP AJWx.

Plaintiff's Opening Claim Construction Brief in *j2 Global Communications, Inc.* v. *Venali, Inc.*, cv 04-1172 DDP AJWx.

Opening Claim Construction Brief in *j2 Global Communications, Inc.* v. *Venali, Inc.*, cv 04-1172 DDP AJWx.

Docket Report from cv 04-1172 DDP AJWx.

Critical Path Data Sheet—Critical Path Messaging Server, 2 pages, Dec. 2002r.

Critical Path Data Sheet—Critical Path Internet File Server, 2 pages, Dec. 2002r.

Critical Path Data Sheet—Critical Path Presentation Server, 2 pages, Dec. 2002r.

Critical Path Data Sheet—Critical Path SMS Access Server, 2 pages, 2002r.

Critical Path Data Sheet—Critical Path Calendar Server, 2 pages, Dec. 2002r.

Critical Path Data Sheet—Critical Path Personal Address Book Server, 2 pages, Dec. 2002r.

CPT™ Meta-Directory Server, 4 pages, Jun. 2002r.

Critical Path Meta-Directory Server, 1 page, May 8, 2003http://www.cp.net/solutions/metaDirectoryServer.html.

Tumbleweed Communications, 3 pages, May 8, 2003http://www.tumbleweed.com/en/products/ime_overview.html.

Tumbleweed Communications, 1 page, May 8, 2003http:/www/tumbleweed.com/en/products/ime_product_architecture. html.

Tumbleweed Communications, 1 page, May 8, 2003http://www.tumbleweed.com/en/products/ime_for automated_deliveries.html.

Tumbleweed Communications, 3 pages, May 8, 2003 _http://www.tumbleweed.com/dy/print/.

Tumbleweed Communications, 1 page, May 8, 2003http://www.tumbleweed.com/en/products/ime_portal_integration.html.

Tumbleweed Communications, 1 page, May 8, 2003http://www.tumbleweed.com/en/products/ime_message_tracking.html.

Tumbleweed Communications, 2 pages, May 8, 2003http://www.tumbleweed.com/dy/print/.

Nakagawa, et al., Development of a Network Model for the Total Health Care Management of Multi-Vendor Environment, in Multimedia Communications, 1994, Multimedia '94, 5th IEEE COMSOC Int'l Workshop, pp. 5/2/1-5/2/4 (workshop occurred May 16-19, 1994).

Larry M. Edwards, E-Mail: Industry is Posting Impressive Gains, in San Diego Business Journal, pp. 1 and 17-18 (Mar. 7, 1994).

Author unknown, Lotus Executive Details Notes' Work Flow Strategy; Pinches Notes as a platform for Third-Party Products, in Network World, p. 27 (Sep. 6, 1993).

Paul Kinnucan, What's New in the Fax World, in Systems Integration, vol. 23, No. 2 at 50 (Feb. 1990).

Author unknown, Delrina WinFax Pro 4.0 Focuses on Ease of Use, Newsbytes, Post-Newsweek Business Information, Inc., (Mar. 15, 1994).

David Morgenstern, DynaWeb Server Holds SGML Books: Web Server Queries, Converts to HTML, in MacWeek, vol. 8, No. 28 at 12 (Jul. 11, 1994).

Gorul Nickerson, WorldWideWeb: hypertext from CERN, Computers in Libraries, vol. 12, No. 11, p. 75 (1992).

Mario J. Silva and Randy H. Katz, The case for Design Using the World Wide Web, in 32nd ACM/IEEE Design Automation Conference (1995).

Barry Fenn and Hermann Maurer, Harmony on an Expanding Net, ACM Interactions, pp. 27-38 (Oct. 1994).

"JFax Personal Telecom—Plug a Phone Into Your E-Mail," downloaded from the Internet at www.jfax.com on Oct. 31, 1996.

J. Peck, et al., "MII & xmh, Email for USOIS & Programers," O'Reilly & Associates, Inc., Sebastopol, Ca, 1995.

"ScanFX-Scanning Hardware for Internet E-Mail", Aug. 1990.

"Defendant CallWave's Supplemental Disclosures Pursuant FRCP 26(A)(1)" in *j2 Global Communications, Inc.* v. *CallWave, Inc.*, CV04-7068 DDP AJWx.

MIME (Multipurpose Internet Mail Extension) Part One: "Mechanisms for Specifying and Describing the Format of Internet Message Bodies", Internet RFC 1341 and 1521, Sep. 1993.

MIME (Multipurpose Internet Mail Extension) Part Two: "Message Header Extensions got Non-ASCII Text", Internet RFC 1342, Sep. 1993.

Patel, Henderson and Georganas, The Multimedia Fax-MIME Gateway, IEEE Multimedia, 1994.

"Hypertext Markup Language (HTML), A Representation of Textual Information and Meta Information for Retrieval and Interchange," Draft version, Jun. 1993.

"Lotus Turns up the Heat on Microsoft Exchange Rival," Network Week, Jan. 27, 1995.

"Novell Inc. to Demonstrate Alex, a Universal In-box That Will Accept and Store Email, Voice mail and Faxes," Computer Reseller News, Feb. 6, 1995.

Public-Key Cryptography Standards (PKCS), Revised Nov. 1, 1993, downloaded from the Internet at www.ftp.rsa.com, on Oct. 1, 1998.
*j2 Global Communications, Inc. v. Venali, Inc.* CV04-1172 DDP AJWx Venali, Inc.'s Answer to First Amended Complaint for Patent Infringement and Counterclaim for Declaration of Noninfringement and Invalidity Nov. 1, 2004.
*j2 Global Communications, Inc v. CallWave, Inc.*, CV04-7068 DDP AJWx Callwave Inc.'s Second Set of Supplemental Responses to Plaintiff's First Set of Interrogatories Mar. 30, 2005.
M. Sirbu, "RFC1049—Content-type header field for Internet messages", [Online], Mar. 1988, XP-002542400 retrieved from the Internet: URL: http://www.faqs.org/rfcs/rfc1049.html>, [retrieved on Aug. 21, 2009].
Luca Manunza, "SOFT>WebMail, a www interface to e-mail" [Online], Mar. 10, 1995, XP-002542401 retrieved from the Internet: URL: http://scout.wisc.edu/Projects/PastProjects/NH/95-03-/95-3-20/0010.html>, [retrieved on Aug. 20, 2009].
Luca Manunza, SOFT>WebMail, a www interface to e-mail—1st public release [Online], Mar. 30, 1995, XP-002542402 retrieved from the Internet: URL: http://scout.wisc.edu/Projects/PastProjects/NH/95-03/95-03-30/0009.html>, [retrieved on Aug. 20, 2009].
Craig McFetridge, "Server Side Includes" [Online], Feb. 19, 1995, XP-002542447 retrieved from the Internet: URL: http://http-server.carleton.ca/~dmcfet/html/ssi.html>, [retrieved on Aug. 21, 2009].
Daniel W. Conolly, "Towards closure on HTML" [Online], Apr. 7, 1994, XP-002542403 retrieved from the Internet: URL: http://www.w3.org/MarkUp/html-spec/html-direction.html>, [retrieved on Aug. 20, 2009].
Jason Levitt, "A Push-Button Solution" [Online], Apr. 3, 1995, XP-002542404 retrieved from the Internet: URL: http://www.informationweek.com/521/21oljl.htm:jsessionid=LN00SMQTD0F01QE1GHPSKH4ATMY32JVN>, [retrieved on Aug. 21, 2009].
"Plaintiff's Opening Markman Brief" in *j2 Global Communications, Inc. v. CallWave, Inc.*, CA 04-7068 DDP AJWx.
"Plaintiff's Opposition Markman Brief" in *j2 Global Communications, Inc. v. CallWave, Inc.*, CA 04-7068 DDP AJWx.
"Defendant CallWave, Inc.'s Opening Claim Construction Brief" in *j2 Global Communications, Inc. v. CallWave, Inc.*, CA 04-7068 DDP AJWx.
"Defendant CallWave, Inc.'s Opposition to Plaintiff j2's Opening Markman Brief" in *j2 Global Communications, Inc. v. CallWave, Inc.*, CA 04-7068 DDP AJWx.
"Defendant CallWave's Supplemental Disclosures Pursuant FRCP 26(A)(1)" in *j2 Global Communications, Inc. v. CallWave, Inc.*, CA 04-7068 DDP AJWx.
Delrina Advertisement, 1994.
"Working with . . . Fax Mailbox" PCToday by Jim Cope (Sep. 1994, vol. 8, Issue 9).
Voice/Fax Combos by Stuart Warren, Computer Telephony, Sep./Oct. 1994, p. 88.
B.S. Kaliski Jr., "An Overview of the PKCS Standards," RSA Laboratories Technical Note, RSA Security, Inc., Public-Key Cryptography Standards (PKCS), Revised Nov. 1, 1993.
"Keys and Certificates" downloaded from the Internet at www.elock.com.
"Cryptography Systems," downloaded from the internet at www.elock.com.
How does the S/MIME encryption and digital signature process work? downloaded from the Internet at www.worldtalk.com, on Jul. 25, 1999.
PKCS #7: Cryptographic Message Syntax Standard, RSA Laboratories Technical Note, Version 1.5, RSA Security, Inc. Public-Key Cryptography Standards (PKCS), Revised Nov. 1, 1993, downloaded from the Internet at www.ftp.rsa.com, on Oct. 1, 1998.
C. Ellison, et al., "Default Protecting Secret Keys with Personal Entropy," Mar. 3, 1999.
Chaffing and Winnowing: Confidentiality without Encryption, downloaded from the Internet at www.theory.lcs.mit.edu, on Jul. 13, 1999.
"S/MIME Or OpenPGP? How Will You Secure Your E-mail?""downloaded from the Internet at www.worldtalk.com".
"S/MIME Frequently Asked Questions," downloaded from the Internet at www.rsa.com, on Jul. 23, 1999.

"S/MIME Frequently Asked Questions," downloaded from the Internet at www.rsa.com, on Nov. 16, 1999.
"SDML-Signed Document Markup Language," W3C Note Jun. 19, 1998, downloaded from the Internet at www.23.org, on Oct. 28, 1998.
C. R. Baudoin, "The Sematech Electronic Mail System,""Proceedings of the Digital Equipment Computer Users Society, pp. 221-231, US.A., Spring 1989".
N. Borenstein, et al., "A Multi-media Message System for Andrew," USENIX Winter Conference, Dallas, TX, pp. 37-42, Feb. 9-12, 1988.
J. Donahue, et al., "Walnut: Storing Electronic Mail in a Database," XEROX PARK, CSI.-85-9, Nov. 1985.
K. Hofrichter, et al., "The BERKOM Multimedia-Mail Teleservice," Proceedings of the Fourth Workshop on Future Trends of Distributed Computing Systems, Lisbon, Portugal, pp. 23-30, Sep. 22-24, 1993.
J. K. Reichard, "Leveraging E-Mail," PC Magazine: 241, 244 and 245 (May 1995), et al., "Browsing Electronic Mail: Experiences Interfacing a Mail System to a DBMS," Proceedings of the Fourteenth International Conference on Very Large Data Bases, Los Angeles, CA, pp. 112-123, 1988.
E. Moeller, et al., "The BERKOM multimedia-mail teleservice," Computer Communications, vol. 18:2, pp. 89-102, Feb. 1995.
J. Pan, "Internet Security & Firewall Issues for NIIIP Virtual Enterprise," NIIIP OMB Meeting, Boca Raton, FL, Jan. 23-25, 1996.
A. Poggio, et al., "CCWS: A Computer-Based, Multimedia Information System," Multimedia Communications, pp. 92-103, Oct. 1985.
A. Reinhardt, "Smarter E-Mail Is Coming," BYTE Magazine, pp. 90-108, Mar. 1993.
J. Rosenberg, et al., "An Overview of the Andrew Message System," Computer Communications Review, vol. 17:5, pp. 99-108, Apr. 1988.
S. Sakata, et al., "A Distributed Interoffice Mail System," Multimedia Communications, pp. 106-116, Oct. 1985.
S. J. Vaughan-Nichols, "Internet Publishing Tools Proliferate," BYTE Magazine, Mar. 1995.
"Microsoft Messaging Application Pro Interface (MAPI)," downloaded from the Internet at www.microsoft.com/win32dev/apiext/mapiwp.html.
Novell Announces *Softsolutions* 4.1, PR Newswire, New Orleans, LA, May 9, 1995.
"How Posta Works", downloaded from the Internet at www.tumbleweed.com/posta/posta_overview.html.
"Overview of the Trans-Virtual Enterprise Server," Product Overview.
V. Gay, et al, "Conception of a Multimedia Electronic Mail Based on Standards,""Proceedings of the Fourth Workshop on Future Trends of Distributed Computing Systems, Sep. 22-24, 1993".
J. Postel, et al. "An Experimental Multimedia Mail System,""ACM Transactions on Office Information Systems, vol. 6, No. 1, Jan. 1988".
"Web Mail", Information Week, pp. 120, Dec. 16, 1996.
"Ipswitch Delivers the First Internet-Ready Messaging Server for Windows NT That Allows Access to E-mailvia the Web", PR Newswire, pp. 1209NEM007, Dec. 9, 1996.
"Hotmail Introduces Hotmail WebCourier Direct Content Delivery Service", Business Wire, pp. 02030123, Mar. 1997.
J. B. Postel, RFC0821, Simple Mail Transfer Protocol, HTTP://rfc-koeln.de/html, 80 pages, Aug. 1982.
M. Sherman, et al., "Allocation of User-Interface Resources in the Andrew Toolkit,""International Conference on Multimedia Information stems, pp. 261-272, 1991".
M. Sherman, et al., "Building Hypertext on a Multimedia Toolkit: An Overview of Andrew Toolkit Hypermedia Facilities," Proceedings of the First European Conference on Hypertext, pp. 13-24, France, Nov. 1990.
V. S.,Wheatman, "Sorting Through the Secure Messaging Maze,""Messaging Magazine, downloaded from theInternet at www.ema.org/html/pubs/mmv4n2/msgmaze.htm, Mar.-Apr. 1998".
The Andrew Messages System, downloaded from the Internet at www.cs.cmu.edu/afs/cs.cmu.edu/project/atk-ftp/web/ams.html.
"Facts on File re: Andrew," downloaded from the Internet at www.cs.cmu.edu:80/afs/cs.cmu.edu/project/atk-ftp/web/faxonfile.html.
Welcome to the Andrew Consortium, www.cs.cmu.edu:80/afs/cs.cmu.edu/project/atk-ftp/web/andrew-home.html.

"The Andrew Publication Archive," ftp.andrew.cmu.edu/pub/AUIS/PAPERS/REDME.

"Bibliography of Publications on the Andrew User Interface System," ftp.andrew.cmu.edu/pub/AUIS/PAPERS/BIBLIOGRAPHY on May 13, 2002.

J. Peek, et al., "MH & xmh, Email for Users & Programmers,""0' Reilly & Associates, Inc., Sebastopol, CA, 1995".

B. Costales, et al., "sendmail," 0' Reilly & Associates, Inc., Sebastopol, CA, 1993.

K. S. Morris, "A Technical Overview of MIME," Web Developer's Journal Archives, Mar. 1995.

"comp.mail.mime FAQ (frequently asked questions list)," downloaded from the Internet at www.cis.ohio-state.edu/text/faq/usenet/mail/mime-faq/part/faq.html Jun. 11, 1997.

"Composing and Sending MIME Message," downloaded from the Internet at www.gieldasgarage.com/mh/cosemine.htm.

"Reading MIME Messages," downloaded from the Internet at www.gieldasgarage.com/mh/cosemine.htm.

"comp.mail.mime frequently asked questions list (FAQ) (1/3)," downloaded from the Internet at www.tu-chemnitz.del-fri/mime/FAQ-1.htmk, Sep. 4, 1994.

M. Grand, "MIME Overview," downloaded from the Internet at www.mindspring.com/-mgrand/mime.html, revised Oct. 26, 1993.

D. W. Connolly, "A Formalism for Internet Communication References,""downloaded from the Internet atwww.w3.org/people//Connolly/drafts/formalism.txt".

G. Vaudreuil, "The Multipart/Report Content Type for the Reporting of Mail System Administrative Messages,""Network Working Group, Internet Draft, Sep. 1995".

G. Vaudreuil, "Enhanced Mail System Status Codes," Network Working Group, Internet Draft, Jun. 1995.

K. Moore, et al., "An Extensible Message Format for Delivery Status Notifications,""Network Working Group,Internet Draft, Sep. 1995".

"Information Technology—Text and office systems—Distributed-office-applications model-Part 1: General model,""International Standard ISO / IEC 10031-1:1-73, 1991 (E)".

"Information Technology—Text and Office Systems—Distributed Office Applications Model: Part 2;Distinguished-object-reference and Associated Procedures,""International Standard ISO/IEC 10031-2:1-13, 1991".

D. H. Crocker, "Standard for the Format of ARPA Interent Text Message," RFC 822, 1982.

J. Klensin, "Simple Mail Transfer Protocol," Internet Draft, draft-ietf-drums-02.txt, May 21, 1996.

N. Borenstein et al., "MIME: Mechanisms for Specifying and Describing the Format of Internet Message Bodies," Network Working Group, RFC 1341, Jun. 1992.

N. Borenstein, "MIME (Multipurpose Internet Mail Extensions) Part One: Mechanism for Specifying and Describing the Format of Internet Message Bodies," Network Working Group, RFC 1521, Sep. 1993.

K. Moore, "MIME (Multipurpose Internet Mail Extensions) Part Two: Message Header Extensions for Non-ASCII Text," Network Working Group, RFC 1522, Sep. 1993.

N. Freed, et al., "Definition of the URL MIME External-Body Access-Type,""Network Working Group, InternetDraft of RFC 2017 (Apr. 11, 1995) see also N. Freed et al.,""Definition of the URL MIME External-Body Access-Type,""Network Working Group, RFC 2017, Oct. 1996".

C. Manros, "New Internet Mail Functionality for Delivery Status Notifications,""Messaging Magazine,Jul./Aug. 1995".

K. Moore, "SMTP Service Extension for Delivery Status Notifications,""Network Working Group, Internet-Draftof RFC 1891, Sep. 21, 1995".

"Internet Engineering Task Force, R. Braden (ed.),""Requirements for Internet Hosts—Application and Support,""Network Working Group, RFC 1123, Oct. 1989".

J. Myers, et al., "Post Office Protocol-Version 3," Network Working Group, RFC 1725, Nov. 1994.

K. Sollins et al., "Functional Requirements for Uniform Resource Names,""Network Working Group, RFC 1737Dec. 1994".

T. Berners-Lee, "Universal Resource Identifier in WWW, A Unifying Syntax for the Expression and Address ofObjects on the Network as used in the World-Wide Web,""Network Working Group, RFC 1630, Jun. 1994".

T. Berners-Lee, et al., "Uniform Resource Locators (URL)," Network Working Group, RFC 1738, Dec. 1994.

T. Berners-Lee, et al., "Hypertext Markup Language-2.0," Network Working Group, RFC 1866, Nov. 1995.

S. Bradner, "The Internet Standards Process—Revision 3," Network Working Group, RFC 2026, 1996.

J. K. Reynolds, et al., "The DARPA Experimental Multimedia Mail System," Computer: 82-89, 1985.

S. Baker, "Hypertext Browsing on the Internet," UNIX Review : 21-27, 1994.

D.P. Dern, "Applying the Internet," BYTE Magazine, Feb. 1992.

K.M. Savetz, "Magazines Without Paper," BYTE Magazine, Sep. 1993.

S.J. Vaughan-Nichols, "The Web Means Business," BYTE Magazine, Nov. 1994.

A. Singleton, "The Virtual Storefront," BYTE Magazine, Jan. 1995.

J.R. Vacca, "Mosaic: Beyond Net Surfing," BYTE Magazine, Jan. 1995.

B. Smith, "Internet with Style," BYTE Magazine, Jan. 1995.

B. Smith, "Making the Internet Connection," BYTE Magazine, Jan. 1995.

B. Friesenhahn, "Build Your Own WWW Server," BYTE Magazine, Apr. 1995.

S.B. Jones, "Caught in the World Wide Web: MIT Moves Computer Documentation Online,""Meet the ShadowFuture: 187-189, 1994".

S. Baker, "Mosaic-Surfing at Home and Abroad," Meet the Shadow Future: 159-163, 1994.

R. J. Vetter et al., Mosaic, HTML, and the World Wide Web, IEEE Computer, 27, 1994.

"University of Cambridge Statistical Laboratory,""Using Mosaic for Xwindows,""Internet Publication, Jul. 1994, downloaded from http://www.statslab.cam.ac.uk".

"New Features in Mosaic 2.0," Internet Publication, downloaded from http://www.issi.com, Dec. 1994.

"World Wide Web Frequently Asked Questions," from URL http://sunsite.unc.edu/boutell/faq/www__faq.html, Dec. 9, 1994.

"MHonArc Home Page updated Nov. 17, 1994 and MHonArc software manual published by Earl Hood<chood@convex.com> Convex Computer Corporation, Richardson Texas".

C. Liu, et al., "Managing Internet Information Services,""World Wide Web, Gopher, FTP, and more : 357-359,Dec. 1994".

J. December, et al., "The World Wide Web, Everything You Need to Master the Web!"": 180-189-part I and 277-280 (part II), 1994".

T. Berners-Lee, et al., "Hypertext Markup Language (HTML); A Representation of Textual Information and Metainformation for Retrieval and Interchange,""Internet Draft, IIIR Working Group, 1993".

K. Reichard, "Leveraging E-Mail", PC Magazine: 241, 244 and 245, May 1995.

"Lan-Aces, Inc. Announces Expanded Capabilities to Office-Logic Clerk Application," PR Newswire, May-Jun. 1994.

"Working with AT&T Easylink, An Effective Communioafion Solution for Business," PC Today 62, May 1995.

J. Davis, et al., "Drop-in Publishing With the World Wide Web," Computer Networks and ISDN Systems, 28, pp, 247-255, 1995.

K. Goldberg, "Beyond the Web: Manipulating the Real World," Computer Networks and ISDN Systems, 28, pp. 209-219, 1995.

A. N. Boston, et al., "Interactive species distribution reporting, mapping, and modelling ustng the World Wide Web" Computer Networks and ISDN Systems, 28, pp. 231-238, 1995.

T. W. Yan, et al., "From user access patterns to dynamic hypertext linking," Computer Networks and ISDN Systems, 28, pp, 1007-1014, 1996.

H. Pusch, "Design and implementation of a global reference mechanism for data objects," Computer Standards & Interfaces, 17, pp. 181-192, 1995.

B. Wiegel, "Secure External References in Multimedia Email Messages," 3rd ACM Conference on Computer and Communications Security, New Delhi, Mar. 14-16, 1996.

E. Levinson, "Exchanging SGML Documents Using Internet Mail and MIME,""Computer Standards &Interfaces, 18, pp. 93-102, 1996".

E. Meyer, et al., "Borealis Image Server," Computer Networks and SDN Systems, 28, pp. 1123-1137, 1996.

M. Rio, et al., "A framework for broadcasting and management of URIs,""Computer Networks and ISDNSystems, 28, pp. 535-542, 1996."

Swartz, Barry K. and Stephen B. Weinstein, "Dual-Media Messaging Using Screen Telephones on the Telephone Network," IEEE International Conference on Communications '93, May 23-26, 1993, pp. 1183-1188, Technical Program; Conference Record, vol. 2/3.

Borenstein, Nathaniel S., "Internet Multimedia Mail with MIME: Emerging Standards for Interoperability," Upper Layer Protocols; Architectures and Applications, 1992, pp, 183-192. Elsevier Science Publishers B.V, (North Holland).

Supplementary European Search Report in European Patent Apphcation No. EP 96 91 3855, search results mailed Nov. 22, 2001.

Patel, Sanjiv P., et al., "The Multimedia Fax-MIME Gateway,"IEE MULTIMEDIA JOURNAL, Winter 1994, at 64-70.

D. Nakamura, "AT&T ntroduces Most Comprehensive Fax-to_Data Service" dated Feb. 22, 1996, downloaded from Internet at http://www.att.com/press/0296/960222.ela.html on May 16, 1997.

Biscom, "Biscom Introduces the E-fax Machine: the E-mail/Fac-simile Solution 'for the Rest of Us,'" FAXCOM, Sep. 19, 1996.

C3 Launches its Advanced Itmail Multi-medial Messaging System for Desk Top PC's Computer and Communications Company Ltd., Jun. 1993.

"Digital Nate Fax2Net R5S 1-A Beginners Guide to Digital Mail Fax," Digital Mail Limited, Oct, 31, 1996.

"Frequenty Asked Questions", Jfax Personal Telecom, downloaded from Internet at www.jfax.net/faq.htm on Oct. 31, 1996.

N. Ballard, "@ The Paperless Office", Jfax Personal Telecom, downloaded from the Internet at www.jfax.net/ballard1.htm on Oct. 31, 1996.

J. Lyle, "Internet Fax Software: Internet Fax Utility Offers Simplified Faxing to E-Mail Addresses", Lumina News, Sep. 3, 1996, downloaded from the Internet at http://lumina2000.com/lumina/press93.html printed on Jun. 11, 1997.

"Delivering Unified Messaging Solutions on the Internet", Media Mail, Nov. 2, 1996, downloaded from Internet at www.web.archive.org/web/1996121905113/http://mediamail.com on Mar. 2, 2005.

"Metholohy for Mail Delivery in a Multi-Media Environment," IBM Technical Disclosure Bulletin, Apr. 1993, pp. 507-508.

"ScanFX-Scanning Hardware for Internet E-Mail," Our Business Machines, Inc., OBM's Editorial Resource Chest, Aug. 1996, Irwindale, CA.

J. Kravitz, "SDML-Signed Document Markup Language," Financial Services Technology Consortium, W3C Note Jun. 19, 1998, downloaded from the Internet at www.23.org, on Jun. 19, 1998.

"Three Pronged Strategy for Octel, as it Integrates VMX and Moves from Core Market to New Territories," Computergram International, Aug. 1995, n.2719, ComputerWire, Inc.

D. Rush, "ANNOUNCE: Voice Mail, Email & Fax Integration Over the Web," Google Groups: biz.nextnewprod. Mar. 19, 1996, http://groups-beta.google.com/group/biznextnewprod/msg/db3c129fdo394667?dmode+source, Mar. 2, 2005.

D. Rush, "ANNOUNCE: Voice Mail, Email & Fax Integration Over the Web," Google Groups: biz.nextnewprod. Mar. 25, 1996, http://groups-beta.google.com/group/biznextnewprod/msg/b85b59d49e92318b?dmode+source, Mar. 2, 2005.

R. Schookey, "Fax->E-Mall Plus Voice Mail Also?" Google Groups, http://groups-beta.google.com/group/comp/dcom.telecom. Dec. 28, 1995.

R. Schockey, "Fax->E-Mail Plus Voice Mail Also?" Google Groups, http://groups-beta.google.com/group/comp/dcom.telecom/msg/7db6ab0035e113c2?dmode=source. Dec 28, 1995.

R. Schockey, "Fax->E-Mail Plus Voice Continued" Google Groups, hftp://groups-beta.google.com/group/comp/dcom.telecom/msg/1a2c73a37bc90e6b?dmode=source, Dec. 28, 1995.

S. Sreenivasan "Cybertimes German Pop Singer Sets Sights on Virtual Office," Sep. 23, 1996, downloaded from The New York Times CyberTime website.

Fax Mailbox, PC Today, Sep. 1994.

Multimedia Fax-MIME Interworking, Patel, Henderson and Georganas, IEEE, 1994.

"IBM Software Allows Phone Messages to be Retrieved Via Internet World Wide Web,press release, Nov. 23, 1995 (announcing product release)".

MSN Hotmail Continues to Grow Faster than Any Media Company in History, pressrelease, Feb. 8, 1999 (referencing Jul. 4, 1996 launch of Hotmail, which permitteedusers to access e-mail accounts through web browsers).

"Wide Area Networking Puts Remote Offices On-Line," Managing Office Technology,Sep. 1994, pp. 49-50, 52, vol. 39, USA.

M. Pop, "Comparative Study of Eectonc Mail Systems," May 30, 1994.

H. Chan et al., "Integrated Telephone/Fax/Paging/Email Services over ATM/MAN-based Personal Communication Networks," Department of Electrical and ComputerEngineering, The University of British Columbia. Vancouver. B. C., Canada.

Supplementary European Search Report in European Patent Apphcation No. EP 9895 0859, Jun. 3, 2005.

International Search Report in International Application No. PCT/US98/20732, Jan. 25, 1999.

International Search Report in International Application No. PCT/US96/05910, Jul. 18, 1996.

Critical Path Data Sheet—Critical Path Notification Server, 2 pages, Dec. 2002r.

500 Tips—Communications, Windows Magazine, pp. 1-7, WNDW 303, Issue: 412, Copyright 1993 CMP Publications, Inc., 2009 Factive, Inc.

1997 RightFax Administration Guide.

1997 RightFAX E-mail Gateway Guide.

Larry Masinter, "Document Management, Digital Libraries and the Web", Jun. 9, 1995, http://larry.masinter.net/docwebilb.html, pp. 1-22.

John Taylor, VP Engineering, GammaLink, "Building FAX into Computer Telephony Applications", Computer Telephony Expo 95, Computer Fax 1995—Making Technology Work, GammaLink, A Dialogic Company, 233 pages.

"AT & T EasyLink Services and Visioneer offer easy integration of paper and electronic documents", 863 words, Nov. 28, 1994, Business Wire, BWR, English, Copyright 1994, Business Wire, pp. 1-2.

"Lotus Ships Notes: Document Imaging Release 2; Office Imaging Made Easy and Affordable", 1,189 words, Nov. 22, 1993, Business Wire, BWR, English, Copyright 1993, Business Wire, pp. 1-4.

"RightFAX Brings Award-Winning LAN FAX Software to Multi-Platform Environments With Web Client Module; Fax Server Software Leader Debuts New Module; Adds Remote Internet Connectivity to LAN Fax Server", Business Wire, Copyright 1996, Article dated: Oct. 11, 1996, pp. 1-2.

Pascal R. Chesnais, Matthew J. Mucklo, and Jonathan A. Sheena, "The Fishwrap Personalized News System", MIT Media Laboratory, 20 Ames Street, Cambridge, Massachusetts, USA, pp. CAP-J2032982-989.

Marc VanHeyningen, "New service: The Unified CS TR Index", Computer Science Dept., Indiana University, May 20, 1993, pp. 1-2.

David H. Crocker, "RFC822—Standard For The Format of ARPA Internet Text Messages", Dept. of Electrical Engineering, University of Delaware, Newark, DE 19711, Aug. 13, 1982, pp. 1-39.

James R. Davis, "A server for a distributed digital technical report library", Xerox Corporation, Design Research Institute, 502 Theory Center, Cornell University, Ithaca, NY 14853, davis@dri.cornell.edu, Jan. 15, 1994, pp. 1-8.

James R. Davis, "Creating a Networked Computer Science Technical Report Library", Design Research Institute, Xerox Corporation, 502, Rhodes Hall, Cornell University, Ithaca, NY 14853, davis@dri.cornell.edu, D-Lib Magazine, Sep. 1995, pp. 1-5.

Carl Lagoze and James R. Davis, "Dienst: An Architecture for Distributed Document Libraries", Communications of the ACM, Apr. 1995, vol. 38, No. 4, p. 47.

Carl Loze, Erin Shaw, James R. Davis, Dean B. Krafft, "Dienst: Implementation Reference Manual", May 5, 1995, Computer Science Department, Cornell University, Ithaca, NY 14853, lagoze@cs. cornell.edu, shaw@cs.cornell.edu, dean@cs.cornell.edu, Xerox Corporation, Design Research Institute, Cornell University, Ithaca, NY 14853, davis@dri.cornell.edu., pp. 1-69.

James R. Davis and Carl Lagoze, "Dienst, A Protocol for a Distributed Digital Document Library", Xerox, Cornell, Jul. 1994, pp. 1-14.

Jim Davis and Carl Lagoze, ""Drop-in" publishing with the world Wide Web", Xeriox, Inc. and Cornell University, Jun. 6, 2007, pp. 1-12.

Jeff Symoens, "Lotus' InterNotes Web Publisher speeds migration to the Web", Internet utility, Version 1.0, Lotus Development Corp., Cambridge, Mass, INFOWORLD Apr. 24, 1995.

"DEFINITY Communications System Generic 3 Feature Description", AT & T, 555-230-204, Issue 3, Mar. 1996. 200 pages (Part 1 of 8).

"DEFINITY Communications System Generic 3 Feature Description", AT & T, 555-230-204, Issue 3, Mar. 1996. 200 pages (Part 2 of 8).

"DEFINITY Communications System Generic 3 Feature Description", AT & T, 555-230-204, Issue 3, Mar. 1996. 200 pages (Part 3 of 8).

"DEFINITY Communications System Generic 3 Feature Description", AT & T, 555-230-204, Issue 3, Mar. 1996. 200 pages (Part 4 of 8).

"DEFINITY Communications System Generic 3 Feature Description", AT & T, 555-230-204, Issue 3, Mar. 1996. 200 pages (Part 5 of 8).

"DEFINITY Communications System Generic 3 Feature Description", AT & T, 555-230-204, Issue 3, Mar. 1996. 200 pages (Part 6 of 8).

"DEFINITY Communications System Generic 3 Feature Description", AT & T, 555-230-204, Issue 3, Mar. 1996. 200 pages (Part 7 of 8).

"DEFINITY Communications System Generic 3 Feature Description", AT & T, 555-230-204, Issue 3, Mar. 1996. 184 pages (Part 8 of 8).

Asa Packer and Jay Scott, "The Perly Gateway version 0.1", Sep. 2, 1994, Subject: README, pp. 1-7.

James C. French, John C. Knight and Allison L. Powell, "Applying Hypertext Structures To Software Documentation", Department of Computer Science, University of Virginia, Charlottesville, VA 22903, U.S.A., Information Processing & Management, vol. 33, No. 2, 1997, pp. 216-231.

James C. French, John C. Knight and Allison L. Powell, "Hypertext Structures And Software Documentation", Technical Report CS-96-04, Department of Computer Science, University of Virginia, Feb. 1996, pp. 1-16.

Jim French, University of Virginia, Edward Fox, Virginia Polytechnic Institute and University, Kurt Maly, Old Dominion University,and Alan L. Selman, State University of New York at Buffalo"Wide Area Technical Report Service—technical reports online", Aug. 2, 1994, pp. 122-127.

Brian R. Gaines, "Supporting Collaboration through Multimedia Digital Document Archives", Knowledge Science Institute, University of Calgary, Version 1.0, Nov. 1994, pp. 1-53.

Defendant Comodo Communications, Inc.'s Local Patent Rule 3-3 Invalidity Contentions in *j2 Global Communications, Inc.* v. *Comodo Communications, Inc.*, Case No. 6:08-cv-275.

Hertzoff, Ira; AT&T Global Messaging, The At&T EasyLink Services Sourcebook, (ch. 7, 10, 11. 12).

Intel NET SatisFAXtion Software Fax Administration Guide.

K. Moore, "Representation of Non-ASCII Text in Internet Message Headers", Internet RFC 1342, Sep. 1993.

Kaashoek, Dynamic Documents Mobile Wireless Access to the WWW, Sep. 15, 1994, MIT.

RightFax Installation & Administration Guide 1996.

RightFax Introduces New Fax Server Designed for the Enterprise; Rightfax News Release (May 27, 1997).

RightFax User's Guide 1996.

* cited by examiner



**FIG 1**

**FIG 2**



FIG 3



**FIG 4A**



**FIG 4B**



FIG 5

FIG 6

# Fax from (404)249-6801

Received on May 31, 1995 at 1:58 PM
Page 1 of 3

---

NetOffice, Inc.

From: Charles R. Bobo, II.
Pages: 3
Date: May 31, 1995

---



**FIG 8**



**FIG 9**

Next Page

Return to Fax Listing
This page was automatically generated by FaxWeb(tm) On May 31, 1995 at 2:05pm.
©1995 NetOffice, inc.

---

NetOffice, inc.
PO Box 7115
Atlanta, GA 30357
info@netoffice.com

**FIG 7**



**FIG 10**



**FIG 11**



**FIG 12**



**FIG 13**



**FIG 14**



FIG 15

FIG 16A

FIG 16B

FIG. 17



FIG. 18

# SEARCH QUERY

RECIPIENT'S NAME: ⬜⬜⬜⬜ ↓

DOCUMENT TYPE: ⬜⬜⬜⬜ ↓

DATE: ⬜⬜⬜⬜

TIME: ⬜⬜⬜⬜

CALLING NO.: ⬜⬜⬜⬜

FILE SIZE: ⬜⬜⬜⬜

NO. PAGES: ⬜⬜⬜⬜

DOCUMENT NO.: ⬜⬜⬜⬜

OTHER FIELD: ⬜⬜⬜⬜ ↓

SEARCH        RECENT FILES

STORED        HELP
SEARCH GROUP

## FIG. 19

# SEARCH QUERY

RECIPIENT'S NAME: ⬇

DOCUMENT TYPE: FACSIMILE ⬇

DATE:

TIME:

CALLING NO.: (404) 249-6801

FILE SIZE:

NO. PAGES:

DOCUMENT NO.:

OTHER FIELD: ⬇

SEARCH        RECENT FILES

STORED SEARCHES        HELP

# FIG. 20

# SEARCH RESULTS

1.   Document No. 11: Facsimile from (404) 249-6801 to Jane Doe on May 31, 1995, 3 Pages

2.   Document No. 243: Facsimile from (404) 249-6801 to Jane Doe on July 16, 1995, 21 Pages

3.   Document No. 1002: Facsimile from (404) 249-6801 to Jane Doe on January 1, 1996, 10 Pages

SAVE SEARCH AS:   | CHARLES R. BOBO FACSIMILES |

HELP

FIG. 21

# STORED SEARCHES

1. CHARLES R. BOBO FACSIMILES

2. CHARLES R. BOBO VOICE MESSAGES

3. DATA TRANSFERS FROM 01-01-96 TO 6-01-96 TO JANE DOE

HELP

# FIG. 22

US 7,934,148 B2

## SYSTEMS AND METHOD FOR STORING, DELIVERING, AND MANAGING MESSAGES

The present application is a continuation of U.S. application Ser. No. 10/963,586 filed Oct. 14, 2004, which is a continuation of U.S. application Ser. No. 10/436,798 filed May 12, 2003, now U.S. Pat. No. 6,857,074, which is a continuation of U.S. application Ser. No. 09/840,759 filed Apr. 23, 2001, now U.S. Pat. No. 6,564,321, which is a continuation of U.S. application Ser. No. 09/186,595 filed Nov. 5, 1998, now U.S. Pat. No. 6,350,066, which is a continuation of U.S. application Ser. No. 08/944,741 filed Oct. 6, 1997, now U.S. Pat. No. 5,870,549, which is a continuation-in-part of U.S. application Ser. No. 08/431,716 filed Apr. 28, 1995, now U.S. Pat. No. 5,675,507.

### FIELD OF THE INVENTION

This invention relates to system(s) and method(s) for storing and delivering messages and, more particularly, to system(s) and method(s) for storing messages and for delivery the messages through a network, such as the Internet, or a telephone line to an intended recipient. In another aspect, the invention relates to system(s) and method(s) for storing, delivering, and managing messages or other files, such as for archival purposes or for document tracking.

### BACKGROUND OF THE INVENTION

Even though the facsimile machine is heavily relied upon by businesses of all sizes and is quickly becoming a standard piece of office equipment many businesses or households cannot receive the benefits of the facsimile machine. Unfortunately, for a small business or for a private household, a facsimile machine is a rather expensive piece of equipment. In addition to the cost of purchasing the facsimile machine, the facsimile machine also requires toner, paper, maintenance, as well as possible repairs. These expenses may be large enough to prevent many of the small businesses and certainly many households from benefiting from the service that the facsimile machine can provide for others who are constantly traveling and who do not have an office, it may be impractical to own a facsimile machine. In fact, the Atlanta Business Chronicle estimates that 30% of the small businesses do not have any facsimile machines. Therefore, many businesses and households are at a disadvantage since they do not have access to a facsimile machine.

Because a facsimile machine can be such an asset to a company and is heavily relied upon to quickly transmit and receive documents, a problem exists in that the machines are not always available to receive a facsimile message. At times, a facsimile machine may be busy receiving another message or the machine may be transmitting a message of its own. During these times, a person must periodically attempt to send the message until communication is established with the desired facsimile machine. This inability to connect with a facsimile machine can be frustrating, can consume quite a bit of the persons time, and prevent the person from performing more productive tasks. While some more advanced facsimile machines will retry to establish communication a number of times, a person will still have to check on the facsimile machine to ensure that the message was transmitted or to re-initiate the transmission of the message.

In addition to labor costs and a reduction in office efficiency, a facsimile machine may present costs to businesses that are not readily calculated. These costs include the loss of business or the loss of goodwill that occurs when the fac-

simile machine is not accessible by another facsimile machine. These costs can occur for various reasons, such as when the facsimile machine is out of paper, when the machine needs repairing, or when the facsimile machine is busy with another message. These costs occur more frequently with some of the smaller businesses, who are also less able to incur these expenses, since many of them have a single phone line for a telephone handset and the facsimile machine and thereby stand to lose both telephone calls and facsimile messages when the single line is busy. In fact, the Atlanta Business Chronicle estimated that fewer than 5% of the small businesses have 2 or more facsimile machines. Many of the larger companies can reduce these losses by having more than one facsimile machine and by having calls switched to another machine when one of the machines is busy. These losses, however, cannot be completely eliminated since the machines can still experience a demand which exceeds their capabilities.

A main benefit of the facsimile machine, namely the quick transfer of documents, does not necessarily mean that the documents will quickly be routed to the intended recipient. The facsimile machines may be unattended and a received facsimile message may not be noticed until a relatively long period of time has elapsed. Further, even for those machines which are under constant supervision, the routing procedures established in an office may delay the delivery of the documents. It is therefore a problem in many offices to quickly route the facsimile message to the intended recipient.

The nature of the facsimile message also renders it difficult for the intended recipient to receive a sensitive message without having the message exposed to others in the office who can intercept and read the message. If the intended recipient is unaware that the message is being sent, other people may see the message while it is being delivered or while the message remains next to the machine. When the intended recipient is given notice that a sensitive message is being transmitted, the intended recipient must wait near the facsimile machine until the message is received. It was therefore difficult to maintain the contents of a facsimile message confidential.

In an office with a large number of employee it may also be difficult to simply determine where the facsimile message should be routed. In light of this difficulty, some systems have been developed to automatically route facsimile messages to their intended recipient. One type of system, such as the one disclosed in U.S. Pat. No. 5,257,112 to Okada, can route an incoming call to a particular facsimile machine based upon codes entered with telephone push-buttons by the sender of the message. Another type of system, such as the one disclosed in U.S. Pat. No. 5,115,326 to Burgess et al. or in U.S. Pat. No. 5,247,591 to Baran, requires the sender to use a specially formatted cover page which is read by the system, this type of system, however, burdens the sender, who may very well be a client or customer, by requiring the sender to take special steps or additional steps to transmit a facsimile message. These systems are therefore not very effective or desirable.

Another type of routing system links a facsimile machine to a Local Area Network (LAN) in an office. For instance, in the systems disclosed in the patents to Baran and Burgess et al., after the system reads the cover sheet to determine the intended recipient of the facsimile message, the systems send an E-mail message to the recipient through the local network connecting the facsimile machine to the recipient's computer. Other office systems, such as those in U.S. Pat. No. 5,091,790 to Silverberg and U.S. Pat. No. 5,291,546 to Giler et al., are linked to the office's voice mail system and may leave a message with the intended recipient that a facsimile message

US 7,934,148 B2

3

4

has been received. Some systems which am even more advanced such as those in U.S. Pat. No. 5,317,628 to Misholi et al. and U.S. Pat. No. 5,333,266 to Boaz et al., are connected to an offices local network and provide integrated control of voice messages, E-mail messages, and facsimile messages.

The various systems for routing facsimile messages, and possibly messages of other types received in the office, are very sophisticated and expensive systems. While these office systems are desirable in that they can effectively route the messages at the office to their intended recipients, the systems arc extremely expensive and only those companies with a great number of employees can offset the costs of the system with the benefits that the system will provide to their company. Thus, for most businesses, it still remains a problem to effectively and quickly route messages to the intended recipients. It also remains a problem for most businesses to route the messages in a manner which can preserve the confidential nature of the messages.

Even for the businesses that have a message routing system and especially for those that do not have any type of system, it is usually difficult for a person to retrieve facsimile messages while away from the office. Typically, a person away on business must call into the office and be informed by someone in the office as to the facsimile messages that have been received. Consequently, the person must call into the office during normal business hours while someone is in the office and is therefore limited in the time that the information in a facsimile message can be relayed.

If the person away on business wants to look at the facsimile message, someone at the office must resend the message to a facsimile machine accessible to that person. Since this accessible machine is often a facsimile machine at another business or at a hotel where the person is lodging, it is difficult for the person to receive the facsimile message without risking disclosure of its contents. Further, since someone at the person's office must remember to send the message and since someone at the accessible facsimile machine must route the message to the person away from the office, the person may not receive all of the facsimile messages or may have to wait to receive the messages.

The retrieval of facsimile messages, as well as voice mail messages, while away from the office is not without certain costs. For one, the person often must incur long distance telephone charges when the person calls the office to check on the messages and to have someone in the office send the messages to another facsimile. The person will then incur the expenses of transmitting the message to a fax bureau or hotel desk as well as the receiving location's own charges for use of their equipment. While these charges are certainly not substantial, the charges are nonetheless expenses incurred while the person is away from the office.

Overall, while the facsimile machine is an indispensable piece of equipment for many businesses, the facsimile machine presents a number of problems or costs. Many businesses or households are disadvantaged since they are unable to reap the benefits of the facsimile machine. For the businesses that do have facsimile machines, the businesses must incur the normal costs of operating the facsimile machine in addition to the costs that may be incurred when the facsimile machine or machines are unable to receive a message. Further, the facsimile messages may not be efficiently or reliably routed to the intended recipient and may have its contents revealed during the routing process. The costs and problems in routing a facsimile message are compounded when the intended recipient is away from the office.

Many of the problems associated with facsimile messages are not unique to just facsimile messages but are also associ-

ated with voice mail messages and data messages. With regard to voice messages, many businesses do not have voice mail systems and must write the message down. Thus, the person away from the office must call in during normal office hours to discover who has called. The information in these messages are usually limited to just the person who called, their number, and perhaps some indication as to the nature of the call. For those businesses that have voice mail, the person away from the office must call in and frequently incur long distance charges. Thus, there is a need for a system for storing and delivery voice messages which can be easily and inexpensively accessed at any time.

With regard to data messages, the transmission of the message often requires some coordination between the sender and the recipient. For instance, the recipients computer must be turned on to receive the message, which usually occurs only when someone is present during normal office hours. Consequently, the recipients computer is usually only able to receive a data message during normal office hours. Many households and also businesses may not have a dedicated data line and must switch the line between the phone, computer, and facsimile. In such a situation, the sender must call and inform the recipient to switch the line over to the computer and might have to wait until the sender can receive the message. The retransmission of the data message to another location, such as when someone is away from the office, only further complicates the delivery. It is therefore frequently difficult to transmit and receive data messages and is also difficult to later relay the messages to another location.

A standard business practice of many companies is to maintain records of all correspondence between itself and other entities. Traditionally, the correspondence that has been tracked and recorded includes letters or other such printed materials that is mailed to or from a company to the other entity. Although tracking correspondence of printed materials is relatively easy, non-traditional correspondence, such as facsimile messages, e-mail messages, voice messages, or data messages, are more difficult to track and record.

For example, facsimile messages may be difficult to track and record since the messages may be received on thermal papers which suffers from a disadvantage that the printing fades over time. Also, accurate tracking of facsimile messages is difficult since the facsimile messages may only be partially printed at the facsimile machine or the messages may be lost or only partially delivered to their intended recipients. Facsimile messages also present difficulties since they are often delivered within an organization through different channels than ordinary mail and thus easily fall outside the normal record keeping procedures of the company.

Voice mail messages are also difficult to track and record. Although voice messages can be saved, many voice mail servers automatically delete the messages after a certain period of time. To maintain a permanent record of a voice message, the voice message may be transcribed and a printed copy of the message may be kept in the records. This transcribed copy of the voice message, however, is less credible and thus less desirable than the original voice message since the transcribed copy may have altered material or may omit certain portions of the message.

In addition to facsimile and voice mail messages, data messages are also difficult to track and record. A download or upload of a file may only be evident by the existence of a file itself. A file transfer procedure normally does not lend itself to any permanent record of what file was transferred the dialed telephone number, the telephone number of the computer receiving the file, the time, or the date of the transfer. It is

US 7,934,148 B2

5

therefore difficult to maintain accurate records of alt data transfers between itself and another entity.

## SUMMARY OF THE INVENTION

It is an object of the invention to reliably and efficiently route messages to an intended recipient.

It is another object of the invention to route messages to the intended recipient while maintaining the contents of the message confidential.

It is another object of the invention to enable the intended recipient to access the messages easily and with minimal cost.

It is a further object of the invention to permit the simultaneous receipt of more than one message on behalf of the intended recipient.

It is a further object of the invention to enable the intended recipient of a message to access the message at any time and at virtually any location world-wide.

It is yet a further object of the invention to enable the intended recipient of a message to browse through the received messages.

It is yet a further object of the invention to quickly notify an intended recipient that a message has been received.

It is still another object of the invention to receive messages of various types.

It is still another object of the invention to deliver messages according to the preferences of die intended recipient.

It is still a further object of the invention to record and track correspondence, such as facsimile messages, voice mail messages, and data transfers.

Additional objects, advantages and novel features of the invention will be set forth in the description which follows, and will become apparent to those skilled in the art upon reading this description or practicing the invention. The objects and advantages of the invention may be realized and attained by the appended claims.

To achieve the foregoing and other objects, in accordance with the present invention, as embodied and broadly described herein, a system and method for storing and delivering messages involves receiving an incoming call and detecting an address signal associated with the incoming call, the address signal being associated with a user of the message storage and delivery system. A message accompanied with the address signal is then received and converted from a first file format to a second file format. The message is stored in the second file format within a storage area and is retrieved after a request has been received from the user. At least a portion of the message is then transmitted to the user over a network with the second file format being a mixed media page layout language.

In another aspect, a network message storage and delivery system comprises a central processor for receiving an incoming call, for detecting an address signal on the incoming call, for detecting a message on the incoming call, and for placing the message in a storage area. The address signal on the incoming call is associated with a user of the network message storage and delivery system. A network server receives the message from the storage area, converts the message into a mixed media page layout language, and places the message in the storage area. When the network server receives a request from the user over the network, the network server transmits at least a portion of the message over the network to the user.

Preferably, the network storage and delivery system can receive facsimile messages, data messages, or voice messages and the network is the Internet. The messages are converted into a standard generalized mark-up language and the

6

user is notified that a message has arrived through E-mail or through a paging system. A listing of the facsimile messages may be sent to the user in one of several formats. These formats include a textual only listing or a listing along with a full or reduced size image of the first page of each message. A full or reduced size image of each page of a message in the listing may alternatively be presented to the user.

According to a further aspect, the invention relates to a system and method for managing files or messages and involves storing message signals in storage and receiving requests from a user for a search. The search preferably comprises a search query that is completed by a user and supplied to a hyper-text transfer protocol daemon (HTTPD) in the system. The HTTPD transfers the request through a common gateway interface (CGI) to an application program which conducts the search. The results of the search are preferably returned through the HTTPD to the computer in the form of a listing of all messages or files satisfying the search parameters. The user may then select one or more of the listed messages or files and may save the search for later references.

## BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated in, and form a part of, the specification, illustrate an embodiment of the present invention and, together with the description, serve to explain the principles of the invention. In the drawings:

FIG. 1 is a block diagram illustrating the connections of a message storage and delivery system MSDS;

FIG. 2 is an overall flow chart of operations for transmitting a message to the MSDS of FIG. 1;

FIG. 3 is an overall flow chart of operations for receiving a message stored at the MSDS of FIG. 1;

FIGS. 4(A) and (B) are flowcharts of operations for generating HTML files according to user preferences;

FIG. 5 is a flowchart of operations for generating requested information;

FIG. 6 is a flowchart of operations for converting a facsimile message into HTML files;

FIG. 7 is an exemplary display of a first page of a facsimile message according to a fourth display option;

FIG. 8 is a flowchart of operations for converting a voice message into an HTML file;

FIG. 9 is a flowchart of operations for converting a data message into an HTML file;

FIG. 10 is a flowchart of operations for detecting a type of call received at the MSDS 10;

FIG. 11 is a flowchart of operations for receiving voice messages;

FIG. 12 is a flowchart of operations for interacting with an owner's call;

FIG. 13 is a more detailed block diagram of the MSDS 10 ;

FIG. 14 is a block diagram of the central processor in FIG. 13;

FIG. 15 is a block diagram of the Internet Server of FIG. 13;

FIGS. 16(A) and 16(B) depict possible software layers for the Internet Server of FIG. 13;

FIG. 17 is a diagram of a data entry for a message signal;

FIG. 18 is a flowchart of a process for sending a search query, for conducting a search, and for returning results of the search to a computer through the Internet;

FIG. 19 is an example of a search query form for defining a desired search;

FIG. 20 is an example of a completed search query;

US 7,934,148 B2

7

8

FIG. **21** is an example of a set of search results returned to the computer in response to the search query of FIG. **20**; and

FIG. **22** is an example of a listing of stored searches.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Reference will now be made in detail to the preferred embodiments of the invention, examples of which are illustrated in the accompanying drawings.

With reference to FIG. **1**, a message storage and delivery system (MSDS) **10** is connected to a central office **20** of the telephone company through at least one direct inward dialing (DID) trunk **15**. With each call on the DID trunk **15**, an address signal indicating the telephone number being called is provided to the MSDS **10**. The DID trunk **15** can carry a large number of telephone numbers or addresses. Preferably, the DID trunk **15** comprises a number of DID trunks **15** connected in parallel between the central office **20** and the MSDS **10** so that the MSDS **10** can simultaneously receive more than one call and, moreover, can simultaneously receive more than one call for a single telephone number or address.

The central office **20** is connected to a number of third parties. For instance, the central office **20** may be connected to a facsimile machine **24**, a telephone set **26**, and to a computer **28** with each connection being made through a separate telephone line. While a single computer **28** is shown in the figure, the single computer **28** may actually represent a local area network which is connected through the central office **20** to the MSDS **10**. Although the facsimile machine **24**, telephone set **26**, and computer **28** have been shown on separate lines, it should be understood that one or more of these devices could share a single line.

The MSDS **10** is also connected to a network, preferably the Internet World Wide Web **30**. Although the Internet **30** has been shown as a single entity, it should be understood that the Internet **30** is actually a conglomeration of computer networks and is a constantly evolving and changing structure. The MSDS **10** therefore is not limited to the current structure or form of the Internet **30** but encompasses any future changes or additions to the Internet **30**. Further, the MSDS **10** is shown as being directly connected to the Internet **30**, such as through its own node or portal. The MSDS **10**, however, may be practiced with any suitable connection to the Internet **30**, such as through an intermediate Internet access provider.

With reference to FIG. **2** depicting an overall operation of the invention, a telephone call directed to a number serviced by the MSDS **10** is initiated at step **40** by a third party, for instance, through the facsimile machine **24**, telephone set **26**, or computer **28**. The incoming telephone call may therefore carry a facsimile message, a voice message, or a data message. At step **42**, the address signal associated with the initiated call is routed through the central office **20**, over the DID trunk **15**, and to the MSDS **10**.

When the call reaches the MSDS **10**, the call is routed (see, e.g., step **44**) within the MSDS **10** in a manner that will be described in more detail below with reference to FIG. **13**. At step **46**, the MSDS **10** answers the telephone call and receives the address signal from the DID trunk **15**. Next, at step **48**, the call is established between the MSDS **10** and the third party and, at step **50**, the MSDS **10** receives the message transmitted over the telephone line. The message is stored at step **52**, a database within the MSDS **10** is updated at step **54**, and the intended recipient of the message is notified at step **56**. The intended recipient of the message uses the services provided

by the MSDS **10** and will hereinafter be referred to as a user. At step **58**, the message is converted into hyper-text mark-up language (HTML).

After the MSDS **10** receives a message for one of its users, the user can then communicate with the MSDS **10** at any time and at any location by connecting to the Internet World Wide Web **30** and retrieving the message stored within the MSDS **10**. With reference to FIG. **3**, at step **60** the user first connects to the Internet **30**, such as through a personal computer **32** which may be connected to the Internet **30** in any suitable manner, such as through its own portal or node or through some intermediate access provider. The personal computer **32** is not limited to a single computer but may instead comprise a network of computers, such as a local area network in an office.

Once connected with the Internet **30**, at step **62**, the user accesses with a hyper-text browser the Universal Resource Locator (URL) associated with his or her MSDS **10** mailbox. The computer **32** may use any suitable hypertext browser, such as Netscape, to access the mailbox. A Hypertext Transfer Protocol Daemon (HTTPD) within the MSDS **10** receives the URL request at step **64** and, at step **66**, requests user authentication. The user then supplies his or her ID and password at step **68** and, if found valid at step **70**, the MSDS **10** provides the computer **32** with access to the mailbox at step **72**. If the ID and password are invalid, as determined at step **70**, then the HTTPD sends the computer **32** an authentication failure message at step **74**.

After the user gains access to the mailbox at step **72**, the user can request information stored within the MSDS **10**. The MSDS **10** receives the request at step **76** and, at step **78**, determines whether the information exists. As is common practice, the MSDS **10** also determines the validity of the request at step **78**. The request from the user will include the mailbox number for the user, the message identifier, display preferences, and, if the message is a facsimile message, a page identifier. If for any reason the request is invalid, such as when a hacker is attempting to gain access to privileged information, the request for the information will be terminated.

If the requested information is available, then at step **80** the information is transmitted through the Internet **30** to the user's computer **32**. If, on the other hand, the information does not exist, then at step **82** the MSDS **10** will generate the requested information and then send the information to the user's computer through the Internet **30** at step **80**.

Prior to gaining access to the mailbox at step **72**, the user is preferably sent a greeting page or other such type of information which permits the user to team about the services provided by the MSDS **10**, open an account with the MSDS **10**, or gain access to an account. Once access is provided at step **72**, the user is provided with information indicating the total number of messages stored in his or her mailbox within the MSDS **10**. Preferably, the information sent by the MSDS **10** indicates the total number of messages for each type of message and also the total number of saved messages versus the total number of new messages.

The user is also preferably given the option at this step to change account information. The account information might include the E-mail address for the user, the manner in which messages are to be reviewed, the user's pager information, as well as other user preferences. The display options and other user preferences wilt be discussed in further detail below.

The general information HTML file which indicates the total number of different messages is provided with a number of anchors, which are also termed links or references. In general, an anchor permits a user on the computer **32** to

US 7,934,148 B2

9

10

retrieve information located on another file. For instance, an anchor to a listing of facsimile messages is preferably provided on the display of the total number of messages. When the user selects the anchor for the facsimile list, the MSDS **10** pulls up and displays the file containing the list of facsimiles, such as a file "faxlist.html" The other types of messages, such as voice messages and data messages, would have similar anchors on the general information page directed to their respective HTML listing files.

When a new message is received at step **54** in FIG. **2**, the users mailbox is updated to display the total number and types of messages. The MSDS **10** might also update other files in addition to the total listing of messages. Additionally, at this time, the MSDS **10** sends an E-mail message to the user's computer **32** to inform the user of the newly arrived message. The MSDS **10** could also send notice to the user though a paging system so that the user receives almost instantaneous notice that a message is received.

The MSDS **10** also generates additional information according to the user's preferences. These preferences on how the MSDS **10** is configured for the user include options on how the messages are reviewed. With facsimile messages, for instance, the user can vary the amount or the type of information that will be supplied with the listing of the facsimile messages by selecting an appropriate option. Other options are also available so that the user can custom fit the MSDS **10** to the users own computer **32** or own personal preferences.

For instance, when a facsimile message is received, the MSDS **10**, at step **54**, will update the total listing of all messages to indicate the newly received message and may additionally generate the HTML files for the newly received facsimile message according to the users preferences. When the user later requests information on the message at step **76**, the HTML information has already been generated and the MSDS **10** may directly send the requested information to the user at step **80**. If, on the other hand, the user desires to view the message according to one of the other options, the MSDS **10** will generate the HTML files at step **82** according to that other option at the time of the request.

A first option available to the user for viewing a facsimile message is a textual only listing of the messages. The information on the textual listing preferably includes the date and time that the message was received at the MSDS **10**, the telephone number from where the message was transmitted, the number of pages, the page size, and the size of the message in bytes. The messages, of course, could be listed with other yes of information. When the user selects one of the facsimile messages on the list, a request is sent to the HTTPD within the MSDS **10** causing the message to be downloaded via the Internet **30** to the user's computer **32**. Once the message is received by the computer **32**, the message can be displayed, printed, or saved for further review.

The second through fifth options allow the user to preview an image of the facsimile message before having the message downloaded from the MSDS **10** through the Internet **30** and to the computer **32**. The second option permits the user to view the list of messages with a reduced size image of the cover page next to each entry on the list. When the user selects one of the messages on the list, the selected facsimile message is transmitted through the Internet **30** to the computer **32**. The user may also scroll through the listings if all of the message cannot be displayed at one time on the computer **32**.

The third option provides the user with a full size view of the cover page of each facsimile message The user can quickly scroll through the cover pages of each message without downloading the entire message to the computer **32**. The full size view of the cover pages permit the user to clearly discern any comments that may be placed on the cover page, which may not be possible from just a reduced image of the cover page available through the second option.

The fourth option provides the user with a reduced size image of each page and permits the user to scroll through the entire message. The user can therefore read the entire facsimile message on screen before the message is downloaded onto the computer **32**. With this option, the user can go through the pages of the facsimile message and can also skip to the next message or previous message. Additionally, the user has the option of enlarging a page to a full size view of the page. Then one of the messages is selected, as with the other options, the HTTPD within the MSDS **10** causes the facsimile message to be transmitted through the Internet **30** to the user's computer **32**.

With a fifth option, a lull size image of each page is transmitted to the users computer **32**. The user can scroll through the pages of the facsimile message and easily read the contents of each page. If the user wants the message downloaded to the computer **32**, the user select the message and the HTTPD within the MSDS **10** transmits the message to the users computer **32** through the Internet **30**.

As discussed above, after the database is updated at step **54**, the MSDS **10** will generate additional information based upon the option selected for displaying the facsimile messages. More specifically, as shown in FIG. **4**(A), if the first option has been selected, as determined at step **100**, then at step **102** the MSDS **10** will generate the textual listing of the facsimile messages with anchors or references to the respective facsimile files. The HTML files are then moved to an Internet Server at step **104**.

If the first option is not selected, the MSDS **10** next determines whether the second option has been selected at step **106**. With the second option, the facsimile messages are listed along with a reduced size image of the cover page. To generate this information, the cover page is extracted from the facsimile file at step **108** and a reduced size HTML image of the cover page is created at step **110**. At step **112**, a listing of the facsimile messages is generated with a thumbnail view of each cover page linked to its respective facsimile file. The generated HTML files are then sent to the Internet Server at step **104**.

When the third option is selected, as determined at step **114**, a full size image of the cover page is sent to the computer **32**. The full size image of the cover page is generated by first extracting the cover page from the facsimile file at step **116**. Next, the cover page is converted into a full size HTML image at step **118** and, at step **120**, the listing is generated with the embedded cover page linked to the facsimile file.

If, at step **122**, the fourth option is determined to be selected then a reduced size image of each page is provided to the user with the option of enlarging the page to view the contents of the page more clearly. With reference to FIG. **4**(B), the information necessary for the third option is produced by first extracting the first page of the facsimile message at step **124**. A reduced size HTNE image is created at step **126** and then a full size HTML image is created at step **128**. At step **130**, the listing is generated with embedded thumbnail images of the pages with links to the full size images. If the page is not the last page, as determined at step **140**, then the next page is extracted at step **142** and steps **126** to **130** are repeated to generate the HTML files for the other pages of the facsimile message. After the last page has been converted into an HTML file according to the third option, the files are moved onto the Internet Server at step **104**.

US 7,934,148 B2

11

At step **144**, the MSDS **10** determines whether the fifth option has been selected. The fifth option provides the user with a full size image of each page of the facsimile message. While only five options have been discussed, the invention may be practiced with additional options. Consequently, with additional options and with the fourth option not being selected, the MSDS **10** would next determine whether one of the additional options have been selected. With the preferred embodiment of the invention having only five options, however, the MSDS **10** will assume that the fifth option has been selected if none of the first four options were found to be selected.

The information necessary to display the pages of the facsimile message according to the fifth option is generated by first extracting the fit page of the facsimile message at step **146**. At step **148**, a full size HTML image of the page is created and, at step **150**, a listing is generated with an embedded image and links to previous and next pages. When the page is not the last page, as determined at step **152**, the MSDS **10** extracts the next page and generates the HTML file for that page. After all pages have been converted into HTML files according to the fourth option, the files are sent to the Internet Server at step **104**.

While FIGS. **4**(A) and (B) describe the operations of the MSDS **10** at the time a message is received, FIG. **5** depicts an overall flowchart of operations for the MSDS **10** when the user requests a page of information in a display format other than the user's preferred option of displaying the message. FIG. **5** is therefore a more detailed explanation of how the MSDS **10** generates the necessary information at step **82** of FIG. **3**.

In general, as shown in FIG. **5**, the MSDS to first determines the type of image that is needed at step **82**$a$. For example, at this step, the MSDS **10** will determine whether images are unnecessary, whether an image of just the cover page is necessary, whether an image is needed for every page, and whether the image needs to be a full size reduced size, or both full and reduced sized images. At step **82**$b$, die MSDS **10** determines whether the image has already been created. If the image has not been created, then at step **82**$c$ the MSDS **10** will extract the page from the base facsimile file and, at step **82**$d$, generate the required HTML image. As discussed above, the required image may be for just the cover page, for all the pages, and may be a full size and/or a reduced size image of the page. At step **82**$e$, the image is embedded with links or anchors to other HTML files. The links or anchors might be references to the next and previous pages and also to the next and previous facsimile messages. Finally, the HTML file having the embedded image and links is sent to the user at step **80** in FIG. **3**.

The process for converting a facsimile message into HTML files according to the fifth option will be described with reference to FIG. **6**. This process will occur at step **54** when the message is received and when the fifth option is the users preferred option of displaying the messages. It should be understood that a similar type of process will also occur when the user requests a page of information according to the fifth option when the user is retrieving a facsimile message and the fifth option is not the users preferred option The conversion processes according to the other options will become apparent to those skilled in the art and will therefore not be discussed in further detail.

With reference to FIG. **6**, when the facsimile message is received, the message is in a Tagged Image File Format/ Facsimile (TIFF/F) and each page of the facsimile message is split into a separate file. Each page of the facsimile message is then converted from the TIFF/F format into a Portable Pixel

12

Map (PPM) format. The PPM files are next converted into separate Graphic Interchange Format (GIF) files and then into separate HTML files. Thus, each page of the facsimile message is converted into a separate HTML file The TIFF/F files may be converted into PPM with an available software package entitled "LIBTIFF" and the PPM files may be converted into GIF files with an available software package found in "Portable Pixel Map Tools."

The invention is not limited to this exact conversion process or to the particular software packages used in the conversion process. For instance, the TIFF/F files may be converted into another portable file format, through any other type of intermediate format, or may be converted directly into the GIF format. Further, instead of GIF, the facsimile messages may be converted into JPEG, BMP, PCX, PIF, PNG, or any other suitable type of file format.

The files may be identified with any suitable filename. In the preferred embodiment, the files for each user are stored in a separate directory assigned to just that one user because an entire directory for a given user generally can be protected easier than the individual files. The memory, however, may be organized in other ways with the files for a single user being stored in different directories. The first part of the filename is a number preferably sequentially determined according to the order in which messages arrive for that user. The preferred naming convention for ending the filenames is depicted in FIG. **6**. Each page of the facsimile message is saved as a separate file with an extension defined by the format of the file. Thus, the files will end with an extension of ".TIFF," ".PPM," ".GIF," or ".HTML." according to the format of the particular file. In the example shown, the separate pages have filenames which end with the respective page number, for instance, the first page ends with a "1." The files, however, are preferably terminated with a letter or multiples letters to indicate the order of the pages. For instance, page might have an ending of "aa," page 2 might have an ending of "ab," etc. The invention, however, is not limited to the disclosed naming convention but encompasses other conventions that will be apparent to those skilled in the art.

As shown in FIG. **6**, in addition to the GIF files representing the pages of the facsimile message, the HTML files include a number of anchors or references. In the example shown, the first HTML file has an anchor a for the "Next Page." Anchor a is defined as a=<A REF="2.html">Next Page <a> and will therefore reference the second HTML file when a user selects the "Next Page." The second HTML file has an anchor b for the "Previous Page" and an anchor c for the "Next Page" and the third HTML file has an anchor d for the "Previous Page." With these particular HTML files, the user can scroll through each page of the facsimile message and view a full size image of the page.

Each HTML file preferably contains anchors in addition to those relating to "Next Page" and "Previous Page." For instance, each HTML file may contain an anchor to the next facsimile message, an anchor to the previous facsimile message, and an anchor to return to the facsimile list. The HTML files preferably contain anchors relating to "Save" and "Delete." When the "Save" anchor is selected, the user would be able to save the message under a more descriptive name for the message. The "Delete" anchor is preferably followed by a inquiry as to whether the user is certain that he or she wants to delete the message. Other anchors, such as an anchor to the general listing, will be apparent to those skilled in the art and may also be provided.

FIG. **7** provides an example of a display according to the fifth option for the first page of the facsimile message shown in FIG. **6**. The headings of the display provide information on

US 7,934,148 B2

13

the telephone number from where the message was sent, the date and time the message was received at the MSDS **10**, and an indication of the page of the message being displayed. The main portion of the display is the full site image of the page. At the bottom of the display, an anchor or link is provided to the "Next Page" and another anchor is provided to the "Return to Fax Listing." Additional information may also be provided on the display, such as a link to a company operating the MSDS **10**.

An example of the "1.html" file for generating the display shown in FIG. **7** is shown below in Table 1.

TABLE 1

```
<HTML>
<HEAD>
<TITLE>Fax Received on May 31, 1995 at 1:58 PM from (404) 249 6801;
Page 1 of 3</TITLE>
</HEAD>
<BODY>
<H1>Fax from (404) 249-6801</H1>
<H2>Received on May 31, 1995 at 1:58 PM</H2>
<H2>Page 1 of 3</H2>
<IMG SRC="1.gif">
<P>
<A HREF="2.html">Next Page</a>
<HR>
<A HREF="faxlist.html">Return to Fax Listing</A>
<P>
This page was automatically generated by FaxWeb(tm) on May 31, 1995
at 2:05 PM.
<P>
&copy; 1995 NetOffice, Inc.
<HR>
<Address>
<A HREF="http://www.netoffice.com/">NetOffice, Inc.</A><BR>
PO Box 7115<BR>
Atlanta, GA 30357<BR>
<A HREF="mailto:info@netoffice.com">info@netoffice.com</A>
</Address>
</BODY>
</HTML>
```

As is apparent from the listing in Table 1, the image file "1.gif" for the first page is embedded into the ITML file "1.html." Also apparent from the listing is that the anchor for "Next Page" directs the MSDS **10** to the second page of the facsimile message having the filename "2.html" and the anchor for "Return to Fax Listing" directs the MSDS **10** to the filename "faxlist.html" containing the list of facsimile messages.

A process for converting a voice message into an HTML file is illustrated in FIG. **8**. The voice message is originally stored in a VOX format or an AD/PCM format and is retrieved at step **170**. The voice message is then converted either into an AU format or WAV format in accordance with the user's preference, which is stored in memory. Preferably, the message is in the AD/PCM format originally and is converted in WAV (e.g., as indicated at step **172**), but the voice files may alternatively be stored and converted in file formats other than the ones disclosed, such as REALAUDIO® (RA) audio format.

At step **174**, the listing of all of the voice messages is then updated to include a listing of the newly received voice message and an anchor to the voice message. For instance, the original voice message may be stored with filename "1.vox" and is converted into WAV and stored with a filename "1.wav." The file "voicelist.html" which contains a list of all voice messages would then have an anchor to the filename "1.wav" along with identifying information for the voice message, such as when the message was received.

14

The listing of the voice messages may have additional anchors or references. For instance, each voice message may have an anchor directing the MSDS **10** to a file which contains a short sampling of the message. Thus, when the user selects this anchor, the user could receive the first 5 seconds of the message or some other predefined number of seconds. As with the listing of facsimile messages, the listing of the voice messages also preferably has anchors to "Save" and "Delete."

FIG. **9** illustrates a process for converting a data message into HTML. At step **180**, the data file is retrieved from a database and at step **182** the HTML file containing the list of data messages is updated to include a listing of the newly received message along with identifying information. For instance, the HTML file for the listing "datalist.html" would be updated to include an anchor to a data file "file1.1" and would have information such as the time and date that the data was transmitted, the size of the data file, as well as additional identifying information.

Because the MSDS **10** can receive messages of various types, such as a facsimile message, voice message or data messages the MSDS **10** must be able to determine the type of message that is being sent over the DID trunk **15**. With reference to FIG. **10**, when an incoming call is received, the MSDS **10** goes off hook at step **200** and starts to generate a ringing sound. If, at step **202**, a facsimile calling tone is detected, then the ringing sound is stopped at step **204** and the message is received as a facsimile message at step **206**. Similarly, when a data modem calling tone is detected at step **208**, the ringing sound is stopped at step **210** and the message is identified as a data message at step **212**.

If the MSDS **10** detects a DTMF digit at step **214**, the ringing sound is stopped at step **216** and the MSDS **10** then determines which digit was pressed. When the digit is a "1," as determined at step **218**, the message is identified as a facsimile message. The MSDS **10** will thereafter receive and store the facsimile message in the manner described above with reference to FIG. **2**. If the digit is identified as a "0" at step **220**, the call is identified as an owner's call and will be processed in a manner that will be described below with reference to FIG. **12**. As will be apparent, other digits may cause the MSDS **10** to take additional steps. If any other DTMF digit is pressed, at step **224** the MSDS **10** activates a voice call system, which will be described in more detail below with reference to FIG. **11**.

With step **226**, the MSDS **10** will enter a loop continuously checking for a facsimile calling tone, a data modem calling tone, or for a DTMF digit. If after n rings none of these tones or digits has been detected, the ringing sound is stopped at step **228** and the voice call system is activated at step **224**.

With reference to FIG. **11**, when a fax calling tone or modem calling tone is not detected, the voice call system begins at step **230** by playing a voice greeting. If the greeting was not interrupted by a DTMF digit as determined at step **232**, then the caller is prompted for the voice message at step **234** and, at step **236**, the voice message is recorded and stored in memory. At step **238**, the caller is prompted with a number of options, such as listening to the message, saving the message, or re-recording the message. Since the selection of these options with DTMF digits will be apparent to those skilled in the art the details of this subroutine or subroutines will not be described in further detail. When the caller wishes to re-record the message, as determined at step **240**, the caller is again prompted for a message at step **234**. If the caller does not wish to re-record the message, the call is terminated at step is **242**.

If the voice greeting is interrupted by a DTMF digit, as determined at step **232**, then the MSDS **10** ascertains which

US 7,934,148 B2

15 16

digit has been pressed. At step **244**, if the digit is a "0," the MSDS **10** detects that the call is an owner's call. When the digit is a "1," the MSDS **10** is informed at step **206** that the call carries a facsimile message. As discussed above with reference to FIG. **10**, other DTMF digits may cause the MSDS **10** to take additional steps. If an invalid digit is pressed, by default at step **248** the routine returns to step **234** of prompting the caller for a message.

It should be understood that the invention is not limited to the specific interactive voice response system described with reference to FIG. **11**. As discussed above, the invention may be responsive to DTMF digits other than just a "0" and a "1." Further variations or alterations will be apparent to those skilled in the art.

With reference to FIG. **12**, when the call is considered an owner's call, the caller is first prompted for the password at step **250**. The password is received at step **252** and, if found correct at step **254**, a set of announcements are played to the owner. These announcements would preferably inform the owner of the number of new messages that have been received, the number of saved messages, the number of facsimile message, the number of data messages, and the number of voice messages. Other announcements, of course, could also be made at this time.

At step **258**, the owner then receives a recording of the owner's menu with the appropriate DTMF digit for each option. For instance, the **137** digit "1" may be associated with playing a message, the DTMF digit "2" may be associated with an options menu, and the DTMF digit "*" may be associated with returning to a previous menu or terminating the call if no previous menu exists.

A DTMF digit is detected at step **260** and the appropriate action is taken based upon the digit received. Thus, if the digit is determined to be a "1" at step **264**, the owner can play a message at step **266**. At step **266**, the owner is preferably greeted with a menu giving the owner the options of playing or downloading new messages, saved messages, facsimile messages, data messages, or voice messages. As should be apparent to those skilled in the art, the owner may receive one or more menus at step **266** and the owner may enter one or more DTMF digits in order to play or download a particular message.

If, instead, the digit is determined to be a "2" at step **268**, then the owner receives an options menu at step **270**. With the options menu, the owner can enter or change certain parameters of the MSDS **10**. For instance, the owner can change his or her password, the owner can change the manner in which facsimile messages are displayed on the computer **32**, the owner can change the image file format from GIF to another format the owner can select the file formats for the voice messages, as well as other options.

If the "*" DTMF digit is received, as determined at step **272**, then the owner is returned to a previous menu (see, e.g., step **274**). The "*" digit is also used to terminate the call when the owner has returned to the initial menu. The "*" digit is therefore universally recognized by the MSDS **10** throughout the various menus as a command for returning to a previous menu.

If the owner enters a DTMF digit that is not being used by the MSDS **10**, the owner receives an indication at step **276** that the key is invalid and the owner is then again provided with the owner's menu at step **258**. When the owner does not enter a DTMF digit while the owner's menu is being played, as determined at step **260**, the menu will be replayed n times. Once the menu has been replayed n times, as determined at step **262**, then the call will be terminated at step **278**.

If the password is incorrect, as determined at step **254**, then the MSDS **10** checks whether the user has made more than "n" attempts at step **280**. If "n" attempts have not been made, then a password incorrect message will be displayed to the user at step **282** and the user will once again be prompted for the password at step **250**. When the user has made "n" attempts to enter the correct password, the MSDS **10** will play a failure message to the user at step **284** and then terminate the call at step **286**. The specific number "n" may be three so that the call is terminated after three failed attempts.

The owner's menu may be responsive to an additional number of DTMF digits and may be structured in other ways. For instance, separate DTMF digits may direct the owner to the respective types of messages, such as a facsimile message, data message, or voice message. Also, separate DTMF digits may direct the owner to a recording of new messages or to a recording of saved messages. Other variations will be apparent to those skilled in the art.

A more detailed diagram of the MSDS **10** is shown in FIG. **13**. As shown in the figure, a plurality of DID trunks **15** are received by an input/output device **17** and are then sent to a central processor **3**. The number of DID trunks **15** may be changed to any suitable number that would be necessary to accommodate the anticipated number of telephone calls that may be made to the MSDS **10**. The input/output device **17** routes a call on one of the DID trunks **15** to an open port of the central processor **3** and is preferably a DID Interface Box manufactured by Exacom.

The central processor **3** receives the calls on the DID trunks **15** and stores the messages in storage **11** in accordance with software **7**. Preferably, a separate directory in storage **11** is established for each user having an account on the MSDS **10** so that all of the messages for a single user will be stored in the same directory. It should be understood that the number of processors within the central processor **3** is dependent upon the number of DID trunks **15**. With a greater number of DID trunks capable of handling a larger number of telephone calls, the central processor **3** may actually comprise a number of computers. The input/output device **17** would then function to route incoming calls to an available computer within the central processor **3**.

A more detailed diagram of the central processor **3** is shown in FIG. **14**. The central processor **3** comprises a telephone line interface **21** for each DID trunk **15**. The telephone interface **21** provides the ringing sounds and other communication interfacing with the telephone tines. The signals from the telephone interface **21** are routed to a pulse/tone decoder **23** and to a digital signal processor (DSP) **25**. The pulse/tone decoder **23** detects the address signal off of an incoming call and sends the address signal onto a bus **29** to a microprocessor **27**. The DSP performs the necessary signal processing on the incoming calls and routes the processed signals to the microprocessor **27**.

The microprocessor **27** will then read the address signal from the pulse/tone decoder **23** and store the message from the DSP **25** in an appropriate directory in storage **11**. As discussed above, the central processor **3** may comprise a number of computers or, more precisely, a number of microprocessors **27** with each microprocessor **27** handling the calls from a certain number, such as four, DID trunks **15**. The microprocessor **27** may comprise any suitable microprocessor, but is preferably at least a 486 PC.

In addition to handling incoming calls and storing the messages in storage **11**, the central processor **3** also coordinates the interactive voice response system of the MSDS **10**. The software **7** would incorporate the flowcharts of operations for receiving a message shown in FIG. **3**, for detecting

US 7,934,148 B2

17

the type of message on an incoming call shown in FIG. 10, for receiving voice messages shown in FIG. 11, and for receiving an owner's call shown in FIG. 12. Based upon the above-referenced flowcharts and the respective descriptions, the production of the software 7 is within the capability of one of ordinary skill in the art and will not be described in any further detail.

The Internet Server 5 is connected to the central processor 3, such as through a local area network, and also has access to the storage 11. The Internet Server 5 performs a number of functions according to software 9. For instance, the Internet Server 5 retrieves the data files stored in storage 11 by the central computer 3 and converts the files into the appropriate HTML files. The converted HTML files are then stored in storage 11 and may be downloaded to the computer 32 through the Internet 30. The Internet Server 5 also handles the requests from the computer 32, which might require the retrieval of files from the storage 11 and possibly the generation of additional HTML files.

The software 9 for the Internet Server 5 would therefore incorporate the flowchart of operations for generating HTML files according to user preferences shown in FIG. 4, for generating requested information from a user shown in FIG. 5, for converting facsimile messages into shown in FIG. 6, for converting voice messages into HTML shown in FIG. 8, and for converting data messages into HTML shown in FIG. 9. Based upon the above-referenced flowcharts and their respective descriptions, the production of the software 9 is within the capability of one of ordinary skill in the art and need not be described in any further detail.

Nonetheless, a more detailed block diagram of the Internet Server 5 is shown in FIG. 15. The Internet Server 5 runs on a suitable operating system (OS) 39, which is preferably WIN-DOWS® NT operating system. The Internet Server 5 has a number of application programs 31, such as the ones depicted in the flowcharts discussed above, for communicating with the central processor 3 and for accessing data from storage 11 and also from memory 33.

The memory 33, inter alia, would contain the data indicating the preferences of each user. Thus, for example, when a facsimile message in the TIFF/F format is retrieved by the Internet Server 5, the Internet Server 5 would ascertain from the data in memory 33 the preferred option of displaying the facsimile message and would generate the appropriate HTML files.

All interfacing with the Internet 30 is handled by the HTTPD 37, which, in the preferred embodiment, is "Enterprise Server" from NetScape Communications Corp. Any requests from users, such as a request for a file, would be handled by the HTTPD 37, transferred through the CGI 35, and then received by the application programs 31. The application programs 31 would then take appropriate actions according to the request, such as transferring the requested file through the CGI 35 to the HTTPD 37 and then through the Internet 30 to the users computer 32.

The Internet Server 5 may be connected to a paging system 13. Upon the arrival of a new message, in addition to sending an E-mail message to the user's mailbox, the Internet Server 13 may also activate the paging system 13 so that a pager 15 would be activated. In this manner, the user could receive almost instantaneous notification that a message has arrived.

The paging system 13 is preferably one that transmits alphanumeric characters so that a message may be relayed to the user's pager 15. The Internet Server 5 therefore comprises a signal processor 41 for generating signals recognized by the paging system 13 and a telephone interface 43. The signal processor 4 preferably receives information from the appli-

18

cation programs 31 and generates a paging message in a paging file format, such as XIO/TAP. The telephone interface 43 would include a modem, an automatic dialer, and other suitable components for communicating with the paging system 13.

The information from the application programs 31 may simply notify the user of a message or may provide more detailed information. For instance, with a facsimile message, the information from the application programs 31 may comprise CSI information identifying the sender's telephone number. The user would therefore receive a message on the pager 15 informing the user that a facsimile message was received from a specified telephone number. The amount and type of information that may be sent to the user on the pager 15 may vary according to the capabilities of the paging system 13 and may provide a greater or lesser amount of information than the examples provided.

The Internet Server 5 is not limited to the structure shown FIG. 15 but may comprise additional components. For instance, the HTTPD 37 would be linked to the Internet 30 through some type of interface, such as a modem or route. The Internet Server 5 may be connected to the Internet 30 through typical phone lines, ISDN lines, a T1 circuit, a T3 circuit, or in other ways with other technologies as will be apparent to those skilled in the art.

Furthermore, the Internet Server 5 need not be connected to the Internet 30 but may be connected to other types of networks. For instance, the Internet Server 5, or more generally the network Server 5, could be connected to a large private network, such as one established for a large corporation. The network Server 5 would operate in the same manner by converting messages into HTML files, receiving requests for information from users on the network, and by transmitting the information to the users.

Also, at least one interface circuit would be located between the Internet Server 5 and the central processor 3 in order to provide communication capabilities between the Internet Server 5 and the central processor 3. This network interface may be provided within both the Internet Server 5 and the central processor 3 or within only one of the Internet Server 5 or central processor 3.

Examples of the Internet Server 5 software layers are shown in FIGS. 16(A) and 16(B), with FIG. 16(A) representing the Internet Server 5 in an asynchronous mode of communication and FIG. 16(B) representing the Internet 5 in a synchronous mode of communication. As shown in the figures, the software 9 for the Internet Server 5 may additional comprise an Internet Daemon for running the HTTPD 37. The software 9 for the Internet Server 5 would also include TCP/IP or other transport layers. Moreover, while the authentication is provided through the HTTPD 37, the authentication of the user's password and ID may be supplemented or replaced with other ways of authentication.

The term synchronous has been used to refer to a mode of operation for the MSDS 10 in which the all possible HTML files for a message are generated at the time the message is received. The HTML files may be generated by the central processor 3 or by the application programs 31. When a request for information is then later received by the HTTPD 37, the information has already been generated and the HTTPD 37 only needs to retrieve the information from storage 11 and transmit the information to the user's computer 32. With a synchronous mode of operation, the CGI 35 would be unnecessary.

The MSDS 10 preferably operates according to an asynchronous mode of operation. In an asynchronous mode of operation, information requested by the user may not be

US 7,934,148 B2

19 20

available and may have to be generated after the request. The asynchronous mode of operation is preferred since fewer files are generated, thereby reducing the required amount of storage **11**. Because the information requested by a user may not be available, some anchors cannot specify the filename, such as "2.html," but will instead contain a command for the file. For instance, an anchor may be defined as <AHREF="/fax-web/users/2496801/ viewpage.cgi?FAX_NUM=1&PAGE=1&VIEW_MODE=FULL"> for causing the CGI **35** to run a viewpage progam so that page 1 of facsimile message **1** will be displayed in a full size image. The CGI **35** will generate the requested information when the information has not been generated, otherwise the CGI **35** will retrieve the information and relay the information to the HTTPD **37** for transmission to the user.

With the invention, the MSDS **10** can reliably receive voice, facsimile, and data messages for a plurality of users and can receive more than one message for a user at a single time. The messages are stored by the MSDS **10** and can be retrieved at the user's convenience at any time by connecting to the Internet **30**. The Internet World Wide Web **30** is a constantly expanding network that permits the user to retrieve the messages at virtually any location in the world. Since the user only needs to incur a local charge for connecting to the Internet **30**, the user can retrieve or review messages at a relatively low cost.

Even for the user's at the office or at home, the MSDS **10** provides a great number of benefits. The user would not need a facsimile machine, voice mail system, or a machine dedicated for receiving data messages. The user also need not worry about losing part of the message or violating the confidential nature of the messages. The user, of course, can still have a facsimile machine and dedicated computer for data messages. The MSDS **10**, however, will permit the user to use the telephone company's "call forwarding" feature so that messages may be transferred to the MSDS **10** at the user's convenience, such as when the user is away from the office.

The software **7** and software **9** are not limited to the exact forms of the flowcharts shown but may be varied to suit the particular hardware embodied by the invention. The software may comprise additional processes not shown or may combine one or more of the processes shown into a single process. Further the software **7** and **9** may be executed by a single computer, such as a Silicon Graphics Workstation or may be executed by a larger number of computers.

The facsimile messages preferably undergo signal processing so that the images of the facsimile messages are converted from a two tone black or white image into an image with a varying gray scale. As is known in the art a gray scale image of a facsimile message provides a better image than simply a black or white image of the message. The signal is processing may comprise any suitable standard contrast curve method of processing, such as anti-aliasing or a smoothing filter. The signal processing may occur concurrently with the conversion from TIFF/F to GIF and is preferably performed for both full and reduced size images of the facsimile messages.

Furthermore, the user may be provided with a greater or fewer number of options in displaying or retrieving messages. The options are not limited to the exact forms provided but may permit the user to review or retrieve the messages in other formats. The options may also permit a user to join two or more messages into a single message, to delete portions of a message, or to otherwise the contents of the messages. Also, the various menus provided to the user over the telephone may have a greater number of options and the MSDS **10** may accept responses that involve more than just a single DTMF digit.

The specific DTMF digits disclosed in the various menus are only examples and, as will be apparent to those skilled in the art, other digits may be used in their place. For instance, a "9" may be used in the place of a "*" in order to exit the menu or to return to a previous menu. Also, the DTMF digits may be changed in accordance with the users personal convention. If the user had a previous voice mail system, the user could customize the commands to correspond with the commands used in the previous system in order to provide a smooth transition to die MSDS **10**.

The MSDS **10** may restrict a user to only certain types of messages For instance, a user may want the MSDS **10** to store only facsimile messages in order to reduce costs of using the MSDS **10**. In such a situation, the MSDS **10** may perform an additional step of checking that the type of message received for a user is a type of message that the MSDS **10** is authorized to receive on the user's behalf. When the message is an unauthorized type of message, the MSDS **10** may ignore the message entirely or the MSDS **10** may inform the user that someone attempted to send a message to the MSDS **10**.

Moreover, the MSDS to has been described as having the central processor **3** for handling incoming calls and the Internet Server **10** for interfacing with the Internet **30**. The invention may be practiced in various ways other than with two separate processors. For instance, the central processor **3** and the Internet Server **5** may comprise a single computer or workstation for handling the incoming calls and for interfacing with the Internet **30**. The MSDS **10** may convert the messages into files prior to storing the messages. Also, the central processor **3** may communicate with the paging system **13** instead of the Internet Server **5**. Additionally, as discussed above, the central processor **3** may comprise a number of microprocessors **27** for handling a large number of DID trunks.

The invention has been described as converting the messages into HTML and transmitting the HTML files over the Internet **30** to the computer **32** The HTML format, however, is only the currently preferred format for exchanging information on the Internet **30** and is actually only one type of a Standard Generalized Mark-Up Language. The invention is therefore not limited to the HTML format but may be practiced with any type of mixed media page layout language that can be used to exchange information on the Internet **30**.

SGML is not limited to any specific standard but encompasses numerous dialects and variations in languages. One example of an SGML dialect is virtual reality mark-up language (VRML) which is used to deliver three dimensional images through the Internet. As another example, the computer **32** for accessing the MSDS **10** through the Internet **30** may comprise a handheld device. A handheld device is generally characterized by a small display size, limited input capabilities, limited bandwidth, and limited resources, such as limited amount of memory, processing power, or permanent storage, in view of these limited capabilities, a handheld device markup language (HDML) has been proposed to provide easy access to the Internet **30** for handheld devices. The SGML information transmitted by the MSDS **10** to the computer **32** may therefore comprise HDML information suitable for a handheld device or may comprise VRML.

As another example, Extensible Mark-Up Language (XML) is an abbreviated version of SGML, which makes it easier to define document types and makes it easier for programmers to write programs to handle them. XML omits some more complex and some less-used parts of the standard SGML in return for the benefits of being easier to write applications for, easier to understand, and more suited to delivery and inter-operability over the Web. Because XML is

US 7,934,148 B2

21

nonetheless a dialect of SGML, the MSDS **10** therefore encompasses the translation of facsimile, voice, and data messages into XML, including all of its dialects and variations, and the delivery of these messages to computers **32** through the Internet **30**.

As a further example, the MSDS **10** encompasses the use of "dynamic HTML." "Dynamic HTML" is a term that has been used to describe the combination of HTML, style sheets, and scripts that allows documents to be animated. The Document Object Model (DOM) is a platform-neutral and language neutral interface allowing dynamic access and updating of content, structure, and style of documents. The MSDS **10** may therefore include the use of the DOM and dynamic HTML to deliver dynamic content to the computer **32** through the Internet **30**.

The MSDS **10** is also not limited to any particular version or standard of HTTP and thus not to any particular hyper-text transfer protocol deamon **37**. In general, HTTP is a data access protocol run over TCP and is the basis of the World Wide Web. HTTP began as a generic request-response protocol, designed to accommodate a variety of applications ranging from document exchange and management to searching and forms processing. Through the development of HTTP, the request for extensions and new features to HTTP has exploded; such extensions range from caching, distributed authoring and content negotiation to various remote procedure call mechanisms. By not having a modularized architecture, the price of new features has been an overly complex and incomprehensible protocol. For instance, a Protocol Extension Protocol (PEP) is an extension mechanism for HTTP designed to address the tension between private agreement and public specification and to accommodate extension of HTTP clients and servers by software components. Multiplexing Protocol (MUX) is another extension that introduces asynchronous messaging support at a layer below HTTP. As a result of these drawbacks of HTTP, a new version of HTTP, namely HTTP-NG has been proposed and its purpose is to provide a new architecture for the HTTP protocol based on a simple, extensible distributed object-oriented model. HTTP-NG, for instance, provides support for commercial transactions including enhanced security and support for on-line payments. Another version of HTTP, namely S-HTTP, provides secure messaging. The MSDS **10** and the HTTPD **37** may incorporate these versions or other versions of HTTP.

In addition to different versions of HTTP, the HTTPD **37** of the MSDS **10** may operate with other implementations of HTTP. For instance, the W3C's has an implementation of HTTP called "jigsaw." Jigsaw is an HTTP server entirely written in JAVA® programming language and provides benefits in terms of portability, extensibility, and efficiency. The MSDS **10** may employ Jigsaw or other implementations of HTTP.

With regard to the transmission of messages to the user's computer **32**, the MSDS **10** permits the user to sample the voice message or to preview the facsimile message without requiring the MSDS **10** to transmit the entire message to the computer **32**. This sampling ability is a significant benefit since the transmission of the entire message would frequently tie up the computer **32** for a rather long period of time. Thus, with the preview or sample feature, the user can determine whether the user needs the message transmitted to the computer **32**.

If the user does decide that the entire message needs to be transmitted, as stated above, the user's computer **32** might be receiving the message for a relatively long period of time. After the entire message has been received, the user then has the options of viewing, listening, retrieving, or saving the

22

message. As an alternative, the user's computer may instead indicate the contents of the message to the user as the message is being received.

For instance, with a voice message, the user's computer **32** could send the message to an audio speaker as the message is being received. In this manner, the message would be played in real time and the user would not need to wait until the entire message is received before listening to the message. In order to play the messages in real time, the messages are preferably in the REALAUDIO® (RA) audio format, which the user can select as e preferred file format for voice messages.

In operation, the MSDS **10** would transmit an HTML file containing an RA file. If the user selects the RA file with the browser on the computer **32**, the browser will activate a program for use with RA files. The operations and functioning of this program will be apparent to those skilled in the art and will be available as a separate software package or will be incorporated within a browser program. The RA program will request the RA data file containing the message from the MSDS **10** and, as the RA file is being received at the computer **32**, this program will play the message in real time.

The MSDS **10** and the users computer **32** could also be arranged so that each page or even line of a facsimile message could be displayed as the computer **32** receives the facsimile message. Further, although the transmission of a data message is relatively fast in comparison to a voice or facsimile message, the computer **32** could also be programmed to permit access to the data message as the message is being received.

The invention has been described as storing and transmitting voice messages. It should be understood that the voice message would probably be the most often type of audio message stored at the MSDS **10**. The invention, however, may be used with any type of audio message and is in no way limited to just voice messages.

According to another aspect of the invention, the MSDS **10** may be used as a file repository serving as an archive for a particular user or group of users. As described above, the MSDS **10** may maintain a list of all messages for a particular user which is displayed to the user when the user access his or her mailbox. The MSDS **10** may store all messages, whether they are voice, facsimile, or data, for a user in the database indefinitely. The MSDS **10** may therefore be relied upon by a user to establish the authenticity of a message and the existence or absence of a particular message. Through the MSDS **10**, a user can therefore maintain an accurate record of all received email messages, facsimile messages, and data transfers.

In addition to serving as a file depository, the MSDS **10** may also function as a document management tool. As described above with reference to FIG. **2**, when the MSDS **10** receives a message, the MSDS **10** updates a database with information on the message. This information includes the type of message, whether it is a facsimile message, voice message, or data message, the time and date at which the message was received, the size of the file, such as in bytes, the telephone number of the caller leaving the message, as well as other information, such as the number of pages of a facsimile message. Because the telephone number called is unique for each user, the information also includes the intended recipient of the message.

An example of a data entry **300** in storage **11** for a message is shown in FIG. **17**. The data entry **300** represents the entry for just a single message with each message having a separate data entry **300**. Preferably, the data entries **300** are stored in a relational database and may be searched through a structured query language (SQL).

US 7,934,148 B2

23

As shown in FIG. 17, the data field 300 for a message may comprise numerous data fields for describing the message. One of these data fields may comprise a field 301 for indicating the name of the person receiving the message. As will be appreciated by those skilled in the art, the person may be identified in numerous ways, such as by a portion of the person's name or by a unique number. Another field 302 in the data entry 300 indicates the type of the document, such as whether the document is a facsimile message, voice message, or data transfer, and fields 303 and 304 respectively indicate the date and time that the message was received by the MSDS 10. The telephone number of the caller is indicated in field 305 while the size of the message, which may be measured in bytes, is indicated in field 306 and the number of pages of the message is indicated in field 307. A document number for uniquely identifying the message is indicated in field 308. As discussed above, the files or messages received for a particular user may be numbered sequentially in the order that they are received by the MSDS 10. The files and messages, however, may be numbered or identified in other ways, such as by a combination of numbers with an identifier for the date when the message was received. Also, the documents number or identifier may be unique for each file or message directed to a user or, alternatively, may be unique for each file or message directed to a plurality of users, which is advantageous when the MSDS 10 tracks documents for an entire company or other group of users.

In addition to fields 301 to 308, the data entry 300 for a message or file may have other fields 309 for describing or documenting the message or file. The other fields 309, for instance, may be used to identify the type of storage that a message should receive. The messages or files may have different lengths of time that the message is stored before being automatically deleted. The type of storage, such as whether the full text of the message is stored, may also be indicated by field 309. Another example of a trait that may be contained within the other field 309 is security. At times, a user may desire and may be granted access to another person's mailbox, such when the MSDS 10 trucks documents for an entire company. By designating a message or file as secure in field 309, a user may restrict or deny access to that message or file by other users. The other fields 309 may also be used by a user to customize the MSDS 10 according to his or her own desires. For instance, if the user is a company, the company may want to classify messages according to the division at which the message is directed, such as one code for marketing, one for sales, one for engineering, and one for legal.

As another example of a use of one of the other fields 309, a user can input notes in the other field 309. When a user initially receives a data entry 300, the entry 300, for instance, may include data in all fields 301 to 308 except field 309, which has been left blank. The user can then input his or her notes in the other field. An initial data entry 300 may include the field 305 for the caller's telephone number which contains the digits for the calling number. The user, however, may not readily recognize the caller from just reading the telephone number listed in field 305. To more clearly indicate the caller, the user may input notes in field 309 to identify the caller's name. Alternatively, the notes in field 309 may reflect part or all of the contents of the message. The user may receive a large document or message and may input a brief description of the document or message in the field 309. As another example, the recipient of the message may read the message or document and discover that the caller is requesting some service or goods from the recipient, such as a request for certain documents or delivery of a certain quantity of goods. The recipient may read the document or message and place

24

some notes in the field 309 to indicate the type of follow-up service or action that needs to be taken. An assistant to the recipient can then view the notes in field 309 and take appropriate steps to ensure that tee requested service or goods are delivered. If the data entry is security protected, one of the other fields 309, as discussed above, may grant the assistant limited access to just the field 309 or may grant more expansive access whereby the assistant can view fields 301 to 309 as well as the actual document or message. The fields 309 may serve various other purposes, as will be apparent to those skilled in the art.

FIG. 18 illustrates a process 320 for using the MSDS 10 for document management purposes. With reference to FIG. 18, a user sends a search request to the MSDS 10 for a particular document or set of documents at step 321. The user may issue this request with the computer 32 by clicking on a link, such as a link to "Search Documents," which may be presented to the user by the MSDS 10 after the user has been granted accesses to his or her mailbox at step 72 shown in FIG. 3. The MSDS 10 may present the user with the option to access the document archives at other times, such as when the user first attempts to access the mailbox at step 62, or when the URL received by the HTTPD 37 from computer 32 points toward the document archives.

In response to this request the HTTPD 37 sends the user a search query form at step 322 to allow the user to define a desired search. An example of a search query form is shown in FIG. 19. The search query form may include an entry for each of the data fields 301 to 309 in the data entry 300. For instance, the user may input one or more names for a recipient and have the MSDS to search for all messages or files directed to just those recipients. The user may also indicate the type of document, such as whether it is a facsimile, voice message or data file. The search query form also has entries for the date or time, which preferably accept ranges of times and dates, and an entry for the telephone number of the caller to the MSDS 10. The search query form may also include an entry for the size of the file or for the number of pages, which is relevant if the message is a facsimile message. The search query form may also include an entry for the document number, which may accept a range of document numbers, and also an entry for another field.

At step 323, the user enters the search parameters in the search query form with computer 32 and returns the information to the MSDS 10 through the Internet 30. The user may define the search about any one data field or may define the search about a combination of two or more data fields. For instance, as reflected in the completed search query form shown in FIG. 20, a user may define a search by designating the document type as a facsimile and the calling number as (404)249-6801. Once the user has finished defining the search, the user then selects the "SEARCH" link shown at the bottom of the screen whereby the user's computer 32 would send the completed search query form through the Internet 30 to the HTTPD 37 of the MSDS 10.

At step 324, the HTTPD 37 receives the completed search query form and, through CGI 35, invokes one or more of the application programs 31 for performing the desired search for any files or messages falling within the parameters of the search. The results of the search are passed from the application programs 31 through the CGI 35 to the HTTPD 37 and, at step 325, are returned to the user through the Internet 37. Preferably, the MSDS 10 returns the search results. In the form of a listing of all files or messages contained within the search parameters, although the MSDS 10 may return the results in other ways.

An example of the search results of the query shown in FIG. **20** is shown in FIG. **21**. As discussed above, the parameters of the search were all facsimile messages from telephone number (404)249-6081. With reference to FIG. **21**, this query resulted in three messages being discovered. The first document has a document number **11** and is described as being a facsimile from the designated telephone number to Jane Doe on May 31, 1995, and consists of three pages. This first-listed document is an example of the facsimile shown in FIG. **9**. The other two documents respectively correspond to document numbers **243** and **1,002** and are also from the designated telephone number.

At step **326**, the user selects the desired file or message from the listing of messages and files. For instance, by clicking on the first listed document, namely document number **11**, the computer **32** sends a request to the MSDS **10** for a viewing of that document and, in response, the MSDS **10** provides a viewing of the document according to the user defined preferences. As described above, the user may receive a reduced size image of the first page, a full size image of the first page, reduced size images of all pages, or full size images of all pages of the facsimile message. Thus, if the user selected the fourth display option as the user defined preference, the MSDS **10** would return an image of the first page of the facsimile, such as the one depicted in FIG. **7**.

At step **326**, the user may also have the MSDS **10** save the search result. For instance, as shown in FIG. **21**, the user may input the name of "CHARLES R. BOBO FACSMILES" as the name for the search. By clicking on the "SAVE SEARCH AS" link, the name of the search is provided from the computer **32** to the MSDS **10**. At the MSDS **10**, the HTTPD **37** transfers the information from the computer **32** to the CGI **35** and the CGI **35** invokes an application program **31** to store the results of the search in storage **11** under the designated name. The invoked application program **31** preferably does not store the contents of all messages but rather stores a listing of the search results in the storage **11**.

The results of a search may be stored in storage **11** as either a closed search or an open search. If the MSDS **10** saves the results of a search as an open search, then the files or messages in that named search may be updated with recent files or messages falling within the particular search parameters for the search. On the other hand, a closed search is one in which the files or messages in the named search are limited to those existing at the time of the search. For example, if the MSDS **10** saved the search results shown in FIG. **21** as a closed search, then any retrieval of the "CHARLES R. BOBO FACSIMILES" would result in only the three listed documents. If, on the other hand, the search named as the "CHARLES R. BOBO FACSIMILES," was saved by the MSDS **10** as an open search, then the MSDS **10** would reactivate the search query shown in FIG. **20** in response to a request by the computer **32** for that search in order to obtain all facsimile messages from that particular telephone number, including those received after the initial saving of the search results.

With reference to FIG. **19**, rather than defining a new search, the user may click on the "STORED SEARCHES" link in order to receive the results of a previously performed search. For example, by clicking on this link, the MSDS **10** may return a listing of searches stored for that particular user, such as the searches shown in FIG. **22**. As shown in this figure, the "CHARLS R. BOBO FACSIMILES" is included within the list of stored searches. If the user then selected the "CHARLES R. BOBO FACSIMILES" search, the user may then be presented with the listing of facsimiles shown in FIG. **21**, possibly including recent additions to the search group.

With reference to FIG. **19**, the MSDS **10** may also provide a user with a link to "RECENT FILES" at step **322**. By selecting this link, the MSDS **10** may return a listing of all facsimile, voice, and data messages received with a particular period of time, such as the last month. By placing the "RECENT FILES" link on the search query form rather than in the listing of "STORED SEARCHES," the user can quickly turn to the most recent files and messages. The search query form may contain other such easy-access links, such as a link to the last search performed by the MSDS **10** on behalf of the user.

The messages or files received by the MSDS **10** need not arrive from a third party. In other words, the MSDS **10** may be used as a file repository or as a file manager for documents generated by the user itself. The user may call the designated telephone number for receiving messages and transmit voice messages, data messages, or facsimile messages and have the MSDS **10** document the receipt and content of these messages. A user may easily use a facsimile machine as a scanner for entering documents into the storage **11** of the MSDS **10**.

The MSDS **10** may have applications in addition to those discussed-above with regard to serving as a message deliverer, file repository, and file manager. For instance, the MSDS **10** may perform some additional processing on the incoming calls prior to forwarding them to the user. For voice messages, this processing may involve transcribing the message and then returning the transcribed messages to the user. The MSDS **10** may therefore be viewed as offering secretarial assistance which may be invaluable to small companies or individuals who cannot afford a secretary or even to larger businesses who may need some over-flow assistance. The transcription may be provided by individuals located in any part of the world or may be performed automatically by a speech-to-text recognition software, such as VoiceType from IBM.

Another type of processing that the MSDS **10** may provide is translation services. The incoming call, whether it is a voice, facsimile, or data message, can be converted into SGML and then forwarded first to a translator. Given the reach of the Internet the translator may be located virtually anywhere in the world and can return the translated document via the Internet to the MSDS **10**. The MSDS **10** can notify the user that the translation has been completed through email, voice mail, pager, facsimile, or in other ways. The user would then connect to the Internet and retrieve the translated document. The translation services of the MSDS **10** may also provide transcription of the message, such as with speech-to-text recognition software.

The foregoing description of the preferred embodiments of the invention have been presented only for the purposes of illustration and description. It is not intended to be exhaustive or to limit the invention to the precise form disclosed. Many modifications and variations are possible in light of the above teaching.

The embodiments were chosen and described in order to explain the principles of the invention and their practical application so as to enable others skilled in the art to utilize the invention and various embodiments and with various modifications as are suited to the particular use contemplated. It is intended that the scope of the invention only be limited by the claims appended hereto.

What is claimed is:

**1**. A method for storing a mark-up language file and delivering the mark-up language file and delivering the mark-up language file from a network server to a user's computer via a packet switched data network using a hyper-text transfer protocol (HTTP), comprising:

generating the mark-up language file to include a sequence of mark-up language instructions that cause an application program executing on the user's computer to generate a user interface that provides a link to a message stored in a user-specific message storage area accessible by the network server, and that further provides information personal to the user;

storing the mark-up language file in a storage area accessible by the network server;

transmitting a notification to the user's computer, wherein the notifications serves to notify the user of the availability of the mark-up language file; and

in response to a user request made in response to the notification, transmitting the mark-up language file from the network server to the user's computer, via the packet switched data network, using the hyper-text transfer protocol.

**2**. The method as set forth in claim **1**, wherein the mark-up language file is customized according to one or more user-selected preferences received by the network server from the user's computer.

**3**. The method as set forth in claim **1**, wherein the information personal to the user contained in the mark-up language file comprises information pertaining to one or more messages directed to the user as an intended recipient.

**4**. The method as set forth in claim **3**, wherein the one or more messages comprise voice mail messages.

**5**. The method as set forth in claim **3**, wherein the one or more messages comprise facsimile messages.

**6**. The method as set forth in claim **3**, wherein the one or more messages comprise data messages.

**7**. The method as set forth in claim **1**, wherein the notification comprises an e-mail message.

**8**. The method as set forth in claim **7**, wherein the e-mail message contains information regarding the content of the mark-up language file.

**9**. The method as set forth in claim **1**, wherein the notification contains information regarding the content of the mark-up language file.

**10**. The method as set forth in claim **1**, wherein the notification contains information that enables the user to gain access to the mark-up language file.

**11**. The method as set forth in claim **1**, wherein the packet switched data network comprises the Internet.

**12**. The method as set forth in claim **1**, wherein the mark-up language file comprises an HTML file.

**13**. The method as set forth in claim **1**, wherein the mark-up language file comprises an HTML file personalized according to one or more user-selected preferences received by the network server from the user's computer.

**14**. The method as set forth in claim **1**, wherein the packet switched data network comprises a private network.

**15**. The method as set forth in claim **1**, wherein the user's computer comprises a personal computer that includes a display and a keyboard.

**16**. The method as set forth in claim **1**, wherein the user's computer comprises a handheld device.

**17**. The method as set forth in claim **1**, wherein the application program comprises a hyper-text browser which displays at least part of the content of the mark-up language file in accordance with the sequence of mark-up language instructions.

**18**. The method as set forth in claim **1**, wherein a location of the mark-up language file in the storage area is identified by a URL.

**19**. The method as set forth in claim **18**, wherein the application program enables the user to download the mark-up language file using the URL.

**20**. The method as set forth in claim **19**, wherein the application program comprises a browser.

**21**. The method as set forth in claim **19**, wherein the application program comprises a hyper-text browser.

**22**. The method as set forth in claim **18**, wherein the application program comprises a hyper-text browser.

**23**. The method as set forth in claim **1**, wherein the mark-up language file conforms with a dialect of a standardized generalized mark-up language (SGML).

**24**. The method as set forth in claim **1**, wherein the mark-up language file comprises a standardized generalized mark-up language (SGML) file.

**25**. The method as set forth in claim **1**, wherein the network server executes an HTTP daemon (HTTPD) which performs the transmitting.

**26**. The method as set forth in claim **1**, wherein the network server executes an HTTP daemon (HTTPD) which handles HTTP interactions between the network server and the user's computer.

**27**. The method as set forth in claim **1**, wherein:

the network server executes an HTTP daemon (HTTPD);

the application program is a browser; and

wherein the HTTPD performs the transmitting by transmitting the mark-up language file to the browser, using the HTTP.

**28**. The method as set forth in claim **27**, wherein the browser comprises a hyper-text browser.

**29**. The method as set forth in claim **1**, wherein the network server executes an additional application program and an HTTP daemon (HTTPD), and wherein the HTTPD performs the transmitting and processing of user access requests.

**30**. The method as set forth in claim **29**, wherein the application program executing on the user's computer is a hyper-text browser, and the HTTPD performs the transmitting by transmitting the mark-up language file to the hyper-text browser, using the HTTP.

**31**. The method as set forth in claim **30**, wherein the HTTPD establishes an HTTP application layer session between the additional application program executing on the network server and the hyper-text browser executing on the user's computer.

**32**. The method as set forth in claim **1**, wherein the network server comprises an HTTP server and the user's computer comprises an HTTP client.

**33**. The method as set forth in claim **1**, wherein the notification comprises a wireless notification.

**34**. The method as set forth in claim **1**, wherein the mark-up language file includes new information that has only become available subsequent to a prior notification.

**35**. The method as set forth in claim **1**, wherein the mark-up language file includes a reduced size image that the user can select to produce a full-size image.

**36**. The method as set forth in claim **1**, wherein the mark-up language file includes both graphical and textual information.

**37**. The method as set forth in claim **1**, wherein the user interface is customized according to one or more user-selected preferences according to commands contained in the mark-up language file.

**38**. The method as set forth in claim **1**, further comprising varying the amount of information contained in the mark-up language file according to one or more user-selected preferences received by the network server from the user's computer.

US 7,934,148 B2

29

**39.** The method as set forth in claim **1**, wherein the user-specific message storage area comprises a user-specific message mailbox within a messaging system comprising a plurality of message mailboxes for a respective plurality of users.

**40.** The method as set forth in claim **1**, wherein the message comprises an HTML message.

**41.** The method as set forth in claim **40**, wherein the HTML message comprises a data message encoded in HTML.

**42.** The method as set forth in claim **40**, wherein the HTML message comprises a voice mail message encoded in HTML.

**43.** The method as set forth in claim **40**, wherein the HTML message comprises a fax mail message encoded in HTML.

**44.** The method as set forth in claim **1**, wherein the user-specific message storage area comprises a user-specific message mailbox within a searchable messaging database comprising a plurality of message mailboxes for a respective plurality of users.

**45.** The method as set forth in claim **1**, wherein the message is received by the network server in a first file format other than a mark-up language file format, and further comprising converting the first file format to the mark-up language file format.

**46.** The method as set forth in claim **1**, wherein:

the user request comprises an access request received from the user's computer by the network server, via the packet switched data network, using the hyper-text transfer protocol,

the access request is indicative of a request by the user to gain access to the user-specific message storage area,

the network server making a determination to grant or deny the access request, and

in response to a determination to grant the access request, the network server transmitting the mark-up language file to the user's computer, via the packet switched data network, using the hyper-text transfer protocol.

**47.** The method as set forth in claim **46**, wherein the application program executing on the user's computer comprises a hyper-text browser.

**48.** The method as set forth in claim **47**, wherein the hyper-text browser generates the access request.

**49.** The method as set forth in claim **46**, wherein the access request includes authentication information that enables the network server to authenticate the user as being authorized to access the user-specific message storage area.

**50.** The method as set forth in claim **49**, wherein the authentication information is entered into the user's computer and transmitted to the network server.

**51.** The method as set forth in claim **49**, wherein the authentication information includes a user-specific name.

**52.** The method as set forth in claim **49**, wherein the authentication information includes a user-specific password.

**53.** The method as set forth in claim **49**, wherein the authentication information includes a user-specific name and a user-specific password.

**54.** The method as set forth in claim **53**, wherein the application program executing on the user's computer comprises a hyper-text browser that generates the access request, including the authentication information.

**55.** The method as set forth in claim **54**, wherein the hyper-text browser comprises a web browser.

**56.** The method as set forth in claim **54**, wherein the packet switched data network comprises the Internet.

**57.** The method as set forth in claim **1**, wherein the user interface provides additional links to other messages stored in the user-specific storage area.

30

**58.** The method as set forth in claim **57**, wherein the message and the additional messages are each addressed to the user.

**59.** The method as set forth in claim **58**, wherein the user interface further provides an indication of a total number of new messages stored in the user-specific storage area.

**60.** The method as set forth in claim **59**, wherein the user interface enables the user to browse through a plurality of messages stored in the user-specific storage area, including the message and the additional messages.

**61.** The method as set forth in claim **60**, wherein the packet switched data network comprises the Internet.

**62.** The method as set forth in claim **60**, wherein the user interface provides icons or text designations to allow the user to browse through messages stored in the user-specific message storage area in sequence.

**63.** The method as set forth in claim **62**, wherein the sequence of browsing can be to prior or subsequent messages relative to a currently displayed or highlighted message.

**64.** The method as set forth in claim **58**, wherein the user interface further provides an indication of a total number of messages stored in the user-specific storage area.

**65.** The method as set forth in claim **57**, wherein the user interface enables access to one or more search fields.

**66.** The method as set forth in claim **65**, wherein:

the user interface enables the user to enter data into the one or more search fields;

the user interface enables the user to issue a search request to search the messages stored in the user-specific message storage area based on data entered by the user into the one or more search fields, and

the search request is subsequently received by the network server from the user's computer.

**67.** The method as set forth in claim **66**, wherein:

in response to the search request, the network server returns a dynamically generated mark-up language file to the user's computer,

the content of the dynamically generated mark-up language file is based at least in part on results of the search request, and

the dynamically generated mark-up language file is enabled to be displayed to the user on the user's computer via the application program after it is received from the network server in an updated instance of the user interface.

**68.** The method as set forth in claim **67**, wherein the updated instance of the user interface also provides links to one or more messages stored in the user-specific message storage area accessible by the network server, and the links to the one or more messages are generated as a result of the search request.

**69.** The method as set forth in claim **68**, wherein the user is enabled to additionally select, at the time of the search request submission, to save the search request for future resubmission to the network server.

**70.** The method as set forth in claim **69**, wherein:

the user is enabled to assign a custom name to the saved search,

the custom name is enabled to be subsequently displayed to the user during an update of the user interface, and

the custom name is enabled to be selected to initiate a resubmission of the search request to the network server.

**71.** The method as set forth in claim **70**, wherein the resubmission of a saved search request is enabled to be manually requested by the user via the user interface or a subsequently updated instance of the user interface.

US 7,934,148 B2

31

**72**. The method as set forth in claim **68**, wherein the user may additionally select, upon viewing the results of the search request, to save the search request for future resubmission to the network server.

**73**. The method as set forth in claim **72**, wherein:

the user is enabled to assign a custom name to the saved search,

the custom name is enabled to be subsequently displayed to the user during an update of the user interface, and

the custom name is enabled to be selected to initiate a resubmission of the search request to the network server.

a subsequently updated instance of the user interface.

**74**. The method as set forth in claim **73**, wherein the resubmission of a saved search request is enabled to be manually requested by the user via the user interface or

**75**. The method as set forth in claim **57**, wherein the user is enabled to request a message from the network server by selecting the link for that message.

**76**. The method as set forth in claim **75**, wherein contents of the message requested by the user are embodied in a mark-up language.

**77**. The method as set forth in claim **76**, wherein the contents of the message requested by the user are dynamically generated by the network server upon the receipt by the network server of the request for the message.

**78**. The method as set forth in claim **75**, further comprising generating at least a portion of a content of the message as a result of a translation performed subsequent to the receipt by the network server of data intended for the user.

**79**. The method as set forth in claim **78**, wherein the translation is performed on the network server.

**80**. The method as set forth in claim **78**, wherein the translation is performed on a server remote to the network server.

**81**. The method as set forth in claim **78**, wherein at least a portion of the data received at the network server that is intended for the user is in the form of audio information and the translation is a voice-to-text transcription.

**82**. The method as set forth in claim **78**, wherein at least a portion of the data received at the network server that is intended for the user is in the form of facsimile information and the translation is a facsimile-to text-conversion.

**83**. The method as set forth in claim **78**, wherein at least a portion of the data received at the network server that is intended for the user is in the form of text information in one linguistic form and the translation comprises translating the original linguistic form to another linguistic form.

**84**. The method as set forth in claim **57**, wherein the user interface enables one or more additional message control functions.

**85**. The method as set forth in claim **84**, wherein a particular one of the one or more message control functions allows a user to save one or more messages stored in the user-specific message storage area.

**86**. The method as set forth in claim **85**, wherein a particular one of the one or more message control functions allows a user to delete one or more messages stored in the user-specific message storage area.

**87**. The method as set forth in claim **57**, wherein messages stored in the user-specific message storage area may be stored there indefinitely.

**88**. The method as set forth in claim **1**, wherein the message is addressed to the user.

**89**. The method as set forth in claim **1**, wherein the message is a confidential message addressed to the user and intended to be viewed by only the user.

32

**90**. A method for storing and delivering a mark-up language file from a network server to a user's client device via a packet switched data network using an Internet protocol, comprising:

generating the mark-up language file to include a sequence of mark-up language instructions that cause an application program executing on the user's client device to generate a user interface that provides a link to a message stored in a user-specific message storage area accessible by the network server, and that further provides information personal to the user;

storing the mark-up language file in a storage area accessible by the network server;

transmitting a notification to the user's client device, the notification serving to notify the user of the availability of the mark-up language file; and

in response to a request received from the user's client device via the packet switched data network, transmitting the mark-up language file from the network server to the user's client device, via the packet switched data network, using the Internet protocol;

wherein the request is generated in the user's client device in response to a user action performed after the notification is received at the user's client device.

**91**. The method as set forth in claim **90**, wherein the mark-up language file is customized according to one or more user-selected preferences received by the network server from the user's client device.

**92**. The method as set forth in claim **90**, wherein the user-specific information contained in the mark-up language file comprises information pertaining to one or more messages directed to the user as an intended recipient.

**93**. The method as set forth in claim **92**, wherein the one or more messages comprise voice mail messages.

**94**. The method as set forth in claim **92**, wherein the one or more messages comprise facsimile messages.

**95**. The method as set forth in claim **92**, wherein the one or more messages comprise data messages.

**96**. The method as set forth in claim **90**, wherein the notification comprises an e-mail message.

**97**. The method as set forth in claim **96**, wherein the e-mail message contains information regarding the content of the mark-up language file.

**98**. The method as set forth in claim **90**, wherein the notification contains information regarding the content of the mark-up language file.

**99**. The method as set forth in claim **90**, wherein the notification contains information that enables the user to gain access to the mark-up language file.

**100**. The method as set forth in claim **90**, wherein the packet switched data network comprises the Internet.

**101**. The method as set forth in claim **90**, wherein the mark-up language file comprises an HTML file.

**102**. The method as set forth in claim **90**, wherein the mark-up language file comprises a web page personalized according to one or more user-selected preferences received by the network server from the user's client device.

**103**. The method as set forth in claim **90**, wherein the packet switched data network comprises a private network.

**104**. The method as set forth in claim **90**, wherein the user's client device comprises a personal computer that includes a display and a keyboard.

**105**. The method as set forth in claim **90**, wherein the user's client device comprises a handheld device.

**106**. The method as set forth in claim **90**, wherein the application program comprises a hyper-text browser which

US 7,934,148 B2

33

34

displays at least part of the content of the mark-up language file in accordance with the sequence of mark-up language instructions.

**107.** The method as set forth in claim **90**, wherein a location of the mark-up language file in the storage area is identified by a URL.

**108.** The method as set forth in claim **107**, wherein the application program enables the user to download the mark-up language file using the URL.

**109.** The method as set forth in claim **108**, wherein the application program comprises a browser.

**110.** The method as set forth in claim **108**, wherein the application program comprises a hyper-text browser.

**111.** The method as set forth in claim **108**, wherein the application program comprises a web browser.

**112.** The method as set forth in claim **90**, wherein the mark-up language file conforms with a dialect of a standardized generalized mark-up language (SGML).

**113.** The method as set forth in claim **90**, wherein the mark-up language file comprises a standardized generalized mark-up language (SGML) file.

**114.** The method as set forth in claim **90**, wherein the network server executes an HTTP daemon (HTTPD) which performs the transmitting.

**115.** The method as set forth in claim **90**, wherein the Internet protocol comprises a hyper-text transfer protocol (HTTP), and wherein the network server executes an HTTP daemon (HTTPD) which handles HTTP interactions between the network server and the user's client device.

**116.** The method as set forth in claim **90**, wherein:

the Internet protocol comprises a hyper-text transfer protocol (HTTP);

the network server executes an HTTP daemon (HTTPD);

the application program is a browser; and

wherein the HTTPD performs the transmitting by transmitting the mark-up language file to the browser, using the HTTP.

**117.** The method as set forth in claim **116**, wherein the browser comprises a hyper-text browser.

**118.** The method as set forth in claim **90**, wherein the network server executes an additional application program and an HTTP daemon (HTTPD), and wherein the HTTPD performs the transmitting and processing of user access requests.

**119.** The method as set forth in claim **118**, wherein the Internet protocol comprises a hyper-text transfer protocol (HTTP), the application program executing on the user's client device is a hyper-text browser, and the HTTPD performs the transmitting by transmitting the mark-up language file to the hyper-text browser, using the HTTP.

**120.** The method as set forth in claim **119**, wherein the HTTPD establishes an HTTP application layer session between the additional application program executing on the network server and the hyper-text browser executing on the user's client device.

**121.** The method as set forth in claim **90**, wherein the network server comprises an HTTP server and the user's client device comprises an HTTP client.

**122.** The method as set forth in claim **90**, wherein the notification comprises a wireless notification.

**123.** The method as set forth in claim **90**, wherein the mark-up language file includes new information that has only become available subsequent to a prior notification.

**124.** The method as set forth in claim **90**, wherein the mark-up language file includes a reduced size image that the user can select to produce a full-size image.

**125.** The method as set forth in claim **90**, wherein the mark-up language file includes both graphical and textual information.

**126.** The method as set forth in claim **90**, wherein the user interface is customized according to one or more user-selected preferences.

**127.** The method as set forth in claim **90**, further comprising varying the amount of information contained in the mark-up language file according to one or more user-selected preferences received by the network server from the user's client device.

**128.** The method as set forth in claim **90**, wherein the user-specific message storage area comprises a user-specific message mailbox within a messaging system comprising a plurality of message mailboxes for a respective plurality of users.

**129.** The method as set forth in claim **90**, wherein the message comprises an HTML message.

**130.** The method as set forth in claim **129**, wherein the HTML message comprises a data message encoded in HTML.

**131.** The method as set forth in claim **129**, wherein the HTML message comprises a voice mail message encoded in HTML.

**132.** The method as set forth in claim **129**, wherein the HTML message comprises a fax mail message encoded in HTML.

**133.** The method as set forth in claim **90**, wherein the user-specific message storage area comprises a user-specific message mailbox within a searchable messaging database comprising a plurality of message mailboxes for a respective plurality of users.

**134.** The method as set forth in claim **90**, wherein the message is received by the network server in a first file format other than a mark-up language file format, and further comprising converting the first file format to the mark-up language file format.

**135.** The method as set forth in claim **90**, wherein:

the user request comprises an access request received from the user's client device by the network server, via the packet switched data network, using the Internet protocol,

the access request is indicative of a request by the user to gain access to the user-specific message storage area,

the network server making a determination to grant or deny the access request, and

in response to a determination to grant the access request, the network server transmitting the mark-up language file to the user's client device, via the packet switched data network, using the Internet protocol.

**136.** The method as set forth in claim **135**, wherein the application program executing on the user's client device comprises a hyper-text browser.

**137.** The method as set forth in claim **136**, wherein the hyper-text browser generates the access request.

**138.** The method as set forth in claim **135**, wherein the access request includes authentication information that enables the network server to authenticate the user as being authorized to access the user-specific message storage area.

**139.** The method as set forth in claim **138**, wherein the authentication information is entered into the user's client device and transmitted to the network server.

**140.** The method as set forth in claim **138**, wherein the authentication information includes a user-specific name.

**141.** The method as set forth in claim **138**, wherein the authentication information includes a user-specific password.

US 7,934,148 B2

35

**142**. The method as set forth in claim **138**, wherein the authentication information includes a user-specific name and a user-specific password.

**143**. The method as set forth in claim **142**, wherein the application program executing on the user's client device comprises a hyper-text browser that generates the access request, including the authentication information.

**144**. The method as set forth in claim **143**, wherein the hyper-text browser comprises a web browser.

**145**. The method as set forth in claim **143**, wherein the packet switched data network comprises the Internet.

**146**. The method as set forth in claim **90**, wherein the user interface provides additional links to other messages stored in the user-specific storage area.

**147**. The method as set forth in claim **146**, wherein the message and the additional messages are each addressed to the user.

**148**. The method as set forth in claim **147**, wherein the user interface further provides an indication of a total number of new messages stored in the user-specific storage area.

**149**. The method as set forth in claim **147**, wherein the user interface further provides an indication of a total number of messages stored in the user-specific storage area.

**150**. The method as set forth in claim **147**, wherein the user interface enables the user to browse through a plurality of messages stored in the user-specific storage area, including the message and the additional messages.

**151**. The method as set forth in claim **150**, wherein the user interface provides icons or text designations to allow the user to browse through messages stored in the user-specific message storage area in sequence.

**152**. The method as set forth in claim **151**, wherein the sequence of browsing can be to prior or subsequent messages relative to a currently displayed or highlighted message.

**153**. The method as set forth in claim **147**, wherein the packet switched data network comprises the Internet.

**154**. The method as set forth in claim **146**, wherein the user interface enables access to one or more search fields.

**155**. The method as set forth in claim **154**, wherein:

the user interface enables the user to enter data into the one or more search fields;

the user interface enables the user to issue a search request to search the messages stored in the user-specific message storage area based on data entered by the user into the one or more search fields, and

the search request is subsequently received by the network server from the user's client device.

**156**. The method as set forth in claim **155**, wherein:

in response to the search request, the network server returns a dynamically generated mark-up language file to the user's client device,

the content of the dynamically generated mark-up language file is based at least in part on results of the search request, and

the dynamically generated mark-up language file is enabled to be displayed to the user on the user's client device via the application program after it is received from the network server in an updated instance of the user interface.

**157**. The method as set forth in claim **156**, wherein the updated instance of the user interface also provides links to one or more messages stored in the user-specific message storage area accessible by the network server, and the links to the one or more messages are generated as a result of the search request.

**158**. The method as set forth in claim **157**, wherein the user is enabled to additionally select, at the time of the search

36

request submission, to save the search request for future resubmission to the network server.

**159**. The method as set forth in claim **158**, wherein:

the user is enabled to assign a custom name to the saved search,

the custom name is enabled to be subsequently displayed to the user during an update of the user interface, and

the custom name is enabled to be selected to initiate a resubmission of the search request to the network server.

**160**. The method as set forth in claim **159**, wherein the resubmission of a saved search request is enabled to be manually requested by the user via the user interface or a subsequently updated instance of the user interface.

**161**. The method as set forth in claim **157**, wherein the user may additionally select, upon viewing the results of the search request, to save the search request for future resubmission to the network server.

**162**. The method as set forth in claim **161**, wherein:

the user is enabled to assign a custom name to the saved search,

the custom name is enabled to be subsequently displayed to the user during an update of the user interface, and

the custom name is enabled to be selected to initiate a resubmission of the search request to the network server.

**163**. The method as set forth in claim **162**, wherein the resubmission of a saved search request is enabled to be manually requested by the user via the user interface or a subsequently updated instance of the user interface.

**164**. The method as set forth in claim **146**, wherein the user is enabled to request a message from the network server by selecting the link for that message.

**165**. The method as set forth in claim **164**, wherein contents of the message requested by the user are embodied in a mark-up language.

**166**. The method as set forth in claim **165**, wherein the contents of the message requested by the user are dynamically generated by the network server upon the receipt by the network server of the request for the message.

**167**. The method as set forth in claim **164**, further comprising generating at least a portion of a content of the message as a result of a translation performed subsequent to the receipt by the network server of data intended for the user.

**168**. The method as set forth in claim **167**, wherein the translation is performed on the network server.

**169**. The method as set forth in claim **167**, wherein the translation is performed on a server remote to the network server.

**170**. The method as set forth in claim **167**, wherein at least a portion of the data received at the network server that is intended for the user is in the form of audio information and the translation is a voice-to-text transcription.

**171**. The method as set forth in claim **167**, wherein at least a portion of the data received at the network server that is intended for the user is in the form of facsimile information and the translation is a facsimile-to text-conversion.

**172**. The method as set forth in claim **167**, wherein at least a portion of the data received at the network server that is intended for the user is in the form of text information in one linguistic form and the translation comprises translating the original linguistic form to another linguistic form.

**173**. The method as set forth in claim **146**, wherein the user interface enables one or more additional message control functions.

**174**. The method as set forth in claim **173**, wherein a particular one of the one or more message control functions allows a user to save one or more messages stored in the user-specific message storage area.

Appx0502

US 7,934,148 B2

37

**175**. The method as set forth in claim **174**, wherein a particular one of the one or more message control functions allows a user to delete one or more messages stored in the user-specific message storage area.

**176**. The method as set forth in claim **146**, wherein messages stored in the user-specific storage area may be stored there indefinitely.

38

**177**. The method as set forth in claim **90**, wherein the message is addressed to the user.

**178**. The method as set forth in claim **90**, wherein the message is a confidential message addressed to the user and intended to be viewed by only the user.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

| | | |
|---|---|---|
| PATENT NO. | : 7,934,148 B2 | Page 1 of 1 |
| APPLICATION NO. | : 11/609003 | |
| DATED | : April 26, 2011 | |
| INVENTOR(S) | : Charles R. Bobo, II | |

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Col. 26, lines 63-64, after "language file" (first instance in claim), delete "and delivering the mark-up language file".

Signed and Sealed this
Fourteenth Day of June, 2011

David J. Kappos
*Director of the United States Patent and Trademark Office*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on September 22, 2016, two copies of the foregoing were served by Federal Express overnight delivery upon counsel for all Appellants.

The undersigned hereby further certifies that on September 22, 2016, the original and eleven copies of the foregoing were served via hand delivery to the Clerk of the Court, U.S. Court of Appeals – Federal Circuit at the below address:

> United States Court of Appeals for the Federal Circuit
> Clerk of Court
> 717 Madison Place, N.W.
> Washington D.C. 20439

Dated: September 22, 2016                /s/ Timothy E. Grochocinski
                                                        Timothy E. Grochocinski

                                                        Counsel for Plaintiffs-Appellants
                                                        Unified Messaging Solutions LLC
                                                        and Advanced Messaging
                                                        Technologies, Inc.

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS</u>

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

The brief contains 13,171 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

The brief has been prepared in proportionally spaced typeface using MS Word – Office 365 in Times New Roman 14 Point Font.

Dated: September 22, 2016          /s/ Timothy E. Grochocinski
                                                      Timothy E. Grochocinski

                                                      Counsel for Plaintiffs-Appellants
                                                      Unified Messaging Solutions LLC
                                                      and Advanced Messaging
                                                      Technologies, Inc.